ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

FILED
APR 8 2008
U.S. COURT OF FEDERAL CLAIMS

THE CNA CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 08-249 C

(Judge _______)

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The CNA Corporation ("CNAC") by and through its undersigned counsel, files this complaint for declaratory and injunctive relief and alleges as follows:

**NATURE OF THE CASE**

1. Plaintiff CNAC brings this pre-award procurement protest action to challenge the arbitrary and capricious decision of Defendant, the United States, acting by and through the National Institutes of Health ("NIH"), a part of the United States Department of Health and Human Services ("HHS"), to prospectively disqualify CNAC from award of a contract under Request for Proposals No. NIH –NICHD-NCS-08-21E ( "2008 RFP"), for the National Children's Study ("NCS") based on the erroneous and arbitrary conclusion that CNAC's proposed Principal Investigator ("PI") – Dr. Sarah L. Friedman – is permanently barred from acting as PI for a NCS Study Center by the post-employment restrictions of 18 U.S.C. § 207.

2. In its previous case, *CNA Corporation v. United States*, No. 07-858C (Horn, J.), CNAC protested NIH's failure to award CNAC a contract under Request for Proposals No. NIH-

NICHD-NCS-07-11 ( "2007 RFP") for the Montgomery County, Maryland Study Center location ("Montgomery County Contract"), which NIH would have awarded to CNAC but for its arbitrary and capricious ethics evaluation of Dr. Friedman. As a result of that protest, *inter alia*, NIH was required by this Court's January 3, 2008 Order to conduct a proper ethics evaluation of Dr. Friedman.

3. On March 19, 2008, CNAC received NIH's required ethics decision, which concluded that Dr. Friedman was permanently barred from acting as a PI for a NCS Study Center as a result of the post-employment restrictions of 18 U.S.C. § 207 implicated by Dr. Friedman's prior government employment. *See* NIH's Letter of March 19, 2008 ("Disqualification Letter") (a copy of which is attached to the Motion for Preliminary Injunction filed herewith) at 1. The Disqualification Letter, signed by the Contracting Officer for the NCS, also indicated that, while a final determination regarding Dr. Friedman's eligibility under 18 U.S.C. § 207 for the 2008 RFP had not been made, "the 2008 RFP does not materially differ from the 2007 RFP with respect to Dr. Friedman's eligibility" and "I would anticipate the same determination with respect to Dr. Friedman under the 2008 RFP." Disqualification Letter at 1. The 2008 RFP was also issued on March 19, 2008 – the same date that CNAC received NIH's Disqualification Letter.

4. NIH based its original decision not to award CNAC the Montgomery County Contract under the 2007 RFP on a flawed analysis of the post-employment restrictions of 18 U.S.C. § 207 that was arbitrary, capricious, and contrary to law. Despite the opportunity, over a period of several months, to correct its flawed analysis, the ethics evaluation of Dr. Friedman provided by NIH on March 19, 2008, fails to rectify its prior arbitrary and capricious evaluation as required by this Court's January 3, 2008 Order. The ethics evaluation is nothing more than a

further *post hoc* justification for failing to award CNAC the Montgomery County Contract under the 2007 RFP. Had NIH properly evaluated CNAC's proposal pursuant to applicable statutes and regulations, CNAC would have received award of the Montgomery County Contract under the 2007 RFP.

5. CNAC intends to submit a proposal in response to the 2008 RFP for the Montgomery County Contract, but NIH's Disqualification Letter and the accompanying ethics opinion have severely impeded CNAC's ability to propose Dr. Friedman as CNAC's PI in response to the 2008 RFP. NIH's affirmation of its prior arbitrary and capricious ethics decision and its conclusion that Dr. Friedman is permanently barred by 18 U.S.C. § 207, which conclusion was several months in the making, has prejudiced CNAC and effectively precluded CNAC from consideration for award of the Montgomery County Contract under the 2008 RFP. As a result of the delay from January 3 to March 19, 2008 in issuance of NIH's ethics opinion, CNAC has lost several of its original team members, who have joined CNAC's competitors or formed their own teams. Even more damaging is the loss of Dr. Friedman as the proposed PI for CNAC. As a result of these arbitrary and capricious actions, CNAC has been effectively precluded from competing for award for the Montgomery County Contract.

6. In this pre-award bid protest action, CNAC seeks this Court's review of the merits of NIH's Disqualification Letter (including the accompanying ethics opinion) and a determination by the Court that the Disqualification Letter (including the accompanying ethics decision) is arbitrary and capricious. CNAC further seeks a preliminary injunction precluding further procurement action on the Montgomery County portion of the 2008 RFP pending this Court's review of the merits of NIH's Disqualification Letter (and accompanying ethics opinion). Upon review of the record, and in its decision on the merits of this action, the Court

should find that NIH's Disqualification Letter (and accompanying ethics opinion) are arbitrary, capricious, and violative of this Court's January 3, 2008 Order, and in these unique circumstances this Court should exercise its equitable powers and direct NIH to award the Montgomery County Contract to CNAC.

## JURISDICTION AND STANDING

7. This Court has jurisdiction over this pre-award bid protest pursuant to 28 U.S.C. § 1491(b).

8. CNAC submitted a proposal in response to the 2007 RFP and CNAC intends to submit a proposal in response to the 2008 RFP and, therefore, is an "interested party" because CNAC is a prospective offeror with a direct economic interest in NIH's award or failure to award the Montgomery County Contract. However, CNAC's ability to compete for the Montgomery County Contract under the 2008 RFP has been severely prejudiced by NIH's delay in issuing its Disqualification Letter and the erroneous decision in its ethics opinion to permanently disqualify Dr. Friedman from acting as PI for the Montgomery County Contract.

## PARTIES

9. Plaintiff CNAC is a non-profit research and analysis organization based in Alexandria, Virginia. CNAC's purpose is to provide independent research and analysis to public sector organizations, such as NIH.

10. Defendant is the United States, acting by and through NIH, a part of HHS. NIH is the primary federal agency responsible for conducting and supporting biomedical and behavioral research, and the procuring agency in this protest.

## FACTUAL BACKGROUND

**The National Children's Study**

11. In the Children's Health Act of 2000, 106 Pub. L. No. 310, § 1004, 114 Stat. 1101, 1130-31 (2000), Congress authorized and directed a consortium of federal agencies, led by the National Institute of Child Health and Human Development ("NICHD"), an NIH Institute, in partnership with other federal agencies, to conduct the National Children's Study.

12. The National Children's Study is a long-term, large-scale longitudinal study designed to enroll and follow a nationally representative sample of approximately 100,000 children born in the United States, to assess the effects of various environmental influences (including physical, chemical, biological, and psychosocial) on children's health and development. *Id.*

13. NIH has organized the collection of data for the NCS through 105 Study Center locations throughout the United States, including both metropolitan and rural areas. NIH selected the Montgomery County, Maryland location as one of these Study locations.

**The 2007 RFP and Award Determination**

14. CNAC submitted an offer in response to the 2007 RFP, which expected to award approximately 20 contracts for up to 30 additional locations for the National Children's Study. CNAC submitted an offer for the Montgomery County location and teamed with seven research institutions in the Baltimore-Washington Area, which would provide data collection services for 1000 live births over a four-year period for Montgomery County, Maryland. CNAC proposed the Montgomery County Location as a "Study Center" (a pre-requisite for award of additional

Study locations – CNAC also bid on an additional "OPTION" location of Baltimore County, Maryland).

15. Pursuant to the 2007 RFP, NIH required offerors to propose a Principal Investigator to oversee the operation of the Study Center: "Each contract that is awarded as a result of this solicitation will be awarded to a Prime Contractor (i.e., a single institute, organization, or other entity). There must be a single named Principal Investigator (PI) employed by the Prime Contractor responsible for oversight of the entire project." 2007 RFP, Amendment 2 at 2 (emphasis in original).

16. CNAC proposed Dr. Sarah L. Friedman as its Principal Investigator for the Montgomery County Contract. Dr. Friedman joined CNAC on April 3, 2006, to serve as director of the Appalachian Regional Education Laboratory. Prior to her employment with CNAC, Dr. Friedman worked in various capacities for the federal government including as a research scientist at the National Institute of Mental Health, as a science administrator at the National Institute of Education, and as a science administrator and research scientist at the NICHD.

17. From October 2005 through February 15, 2006, while working with NICHD, Dr. Friedman had a part-time role as a team leader to assist in the development of the infant neurodevelopmental protocol and social environmental measures for the National Children's Study. Dr. Friedman's role was essentially limited to providing technical advice for two of the many assessment measures used for the technical portion of the National Children's Study. Her team met approximately 20 times between October 26, 2005 and February 15, 2006 to assist in developing the neurodevelopmental protocol. This team provided its recommendations via a 34-page power point presentation to the National Children's Study Director and to the Study's Steering Committee; the team had no authority to implement its recommendations and the Study

Director and the Study's Steering Committee had no obligation to accept the recommendation. Some of the team's recommendations were accepted as part of the Study; some were not.

18. During her participation as a team leader for this protocol, Dr. Friedman had no official affiliation with the National Children's Study. Moreover, she had no authority regarding any of the other protocols to be used as part of the Study. Dr. Friedman was also not involved in any procurement or contracting issues related to NCS. Her work was limited to technical advice concerning one protocol and related social environmental measures, and this work was itself limited to an assessment of the procedures for recovering the type of data to be solicited, assembled, and analyzed for purposes of completing one discrete temporal segment (birth to 18 months) of the NCS. Dr. Friedman was but one of a large number of contributors to the NCS. As described by NIH at page 4 of its ethics opinion: "The Program Office within the NICHD, the chartered federal advisory committee, 22 working groups comprised of over 200 scientists, and more than 2500 people interested in the design, conduct, and results of the NCS provided input during the planning phase" of the NCS. Dr. Friedman was simply one "of over 200 scientists, and more than 2500 people" that "provided input" to the development of the many protocols for the National Children's Study. Given the large number and professional diversity of those contributing to the development of NCS, neither Dr. Friedman nor CNAC understood Dr. Friedman's contribution to NCS to be "substantial" within the meaning of 18 U.S.C. § 207.

19. CNAC's understanding of Dr. Friedman's limited role was confirmed by NIH's complete silence on this issue during the 2007 procurement. At no point prior to the Notice of Award on October 5, 2007, was Dr. Friedman's previous employment with the federal government raised as a potential issue or conflict by NIH. Indeed, during August and September

2007, NIH conducted price and technical discussions with CNAC, and led CNAC to believe it had been "down-selected" for award for the Montgomery County Contract.

20. By letter dated October 5, 2007, CNAC received notice that its proposal for the Montgomery County Contract was not selected for award in connection with the 2007 RFP. The only reason given for the rejection of CNAC's proposal was that, as a consequence of the Government's post-employment restrictions under 18 U.S.C. § 207, "the proposed Principal Investigator (PI) would not be able to fulfill the duties of a PI as contemplated by the terms and conditions of the Request for Proposals (RFP). As set forth in the terms of the RFP, the Principal Investigator is required to have substantial interactions with Government personnel during the performance of the contract." Shortly thereafter, CNAC received a debriefing that confirmed it had been recommended for award for the Montgomery County Contract, but did not receive award based on NIH's flawed ethics decision concerning Dr. Friedman – CNAC's PI.

21. Prior to filing its first bid protest, CNAC's counsel attempted to work with NIH to reverse the agency's decision and probe the basis for finding a conflict under 18 U.S.C. § 207 and noted that NIH should consider 5 C.F.R. § 2637.201, among other regulations interpreting the statute. By letter dated November 26, 2007, NIH (acting through HHS's Office of General Counsel) reiterated its conclusion that 18 U.S.C. § 207 prevented Dr. Friedman from acting as CNAC's PI and, thereby, disqualified CNAC from receiving award of the Montgomery County Contract.

**First Court of Federal Claims Protest**

22. On December 5, 2007, CNAC submitted a Court of Federal Claims protest challenging NIH's failure to award it the Montgomery County Center.

23. CNAC sought preliminary injunctive relief, requesting that NIH not make an award for the Montgomery County Contract until after the Court had an opportunity to rule on CNAC's protest. During the December 6, 2007 initial status conference, NIH agreed not to make any award for the Montgomery County Contract until the Court had an opportunity to rule on CNAC's protest. The Court memorialized this statement in its December 7, 2007 Order: "Defendant has advised the court that no award for the Montgomery County, Maryland Study location will be made on the present or any future solicitation until after the court has rendered its opinion on this bid protest."

24. During the December 6, 2007 initial status conference (and memorialized in the December 7, 2007 Order), the Court set forth a briefing schedule and dates for NIH to serve the administrative record. On December 18, 2007, NIH filed the administrative record with the Court and served CNAC.

25. On December 27, 2007, NIH moved to stay the case and requested that the Court remand the case back to the agency for development of a sufficient record and rationale for its decision to exclude Dr. Friedman from acting as PI for CNAC.

26. On January 2, 2008, CNAC submitted its response to NIH's motion, opposing the stay and remand and arguing that the Court could provide injunctive relief assuring that NIH awarded the Montgomery County Contract to CNAC.

27. On January 2, 2008, the Court held an oral argument by conference call to consider NIH's motion. Based on the hearing, the Court concluded that it would enter judgment in favor of CNAC, but stopped short of enjoining NIH from awarding the contract for the Montgomery County location to any contractor other than CNAC.

28. On January 3, 2008, the Court memorialized its conclusion rendered during the January 2, 2008 oral argument. The Court noted that NIH had essentially conceded it failed to "provide an adequate explanation for excluding Dr. Friedman on the basis of 18 U.S.C. § 207(a)." January 3, 2008 Order at 1 (internal quotations and citations omitted). The Court quoted NIH's concession that it failed to consider 5 C.F.R. § 2637 and that the record of its ethics decision was "unquestionably sparse." *Id.* at 2 (internal quotations and citations omitted).

29. Based on these concessions (and others), the Court stated,

> [T]he weight of the admissions by defendant as to the inadequacy of the decision making process, the filed administrative record compiled by the defendant and the absence in the filed record of sufficient indication or documentation to support proper administrative review, directs the court to a finding that the agency, NIH, acted arbitrarily and capriciously when it found Dr. Friedman ineligible to participate as the Principal Investigator in a contract award to the plaintiff. The agency conducted an inadequate review of the important ethics issues presented and failed to properly document even the minimal review steps it undertook.

*Id.* at 2-3. The Court granted CNAC partial injunctive relief by vacating the original ethics decision and ordering NIH to "pursue a reconsideration of the ethics decision and, at a minimum, shall consider the issues raised by the applicable statutory and regulatory sections, including subsections of 18 U.S.C. § 207 (2000) and 5 C.F.R. § 2637 (Jan. 1, 2007), not previously and properly considered." *Id.* at 3.

30. In its January 3, 2008 Order, the Court also noted that "statements made by government officials, and acknowledged by defendant's counsel and agency personnel in the hearings before the court" acknowledged "that plaintiff CNA Corporation had been recommended for an award for the Montgomery County study contract, pending only the issue of the eligibility of Dr. Friedman as plaintiff's Principal Investigator, given her previous employment at NIH." *Id.* at 3.

31. The Court's order also admonished NIH: "The court further anticipates that Dr. Friedman, and plaintiff, will not be penalized as a result of bringing this successful, post-award

bid protest to the court, especially given the agency's former, high appraisal on the substance of plaintiff's proposal." *Id.*[1]

32. On February 29, 2008, the Government filed a notice of appeal from this Court's January 3, 2008 Order and resultant January 7, 2008 judgment. By Order dated April 3, 2008, the U.S. Court of Appeals for the Federal Circuit has dismissed this appeal based on the Government's April 1, 2008 consent motion to dismiss the appeal.

**Issuance of the 2008 RFP**

33. On January 8, 2008, NIH issued a pre-solicitation notice for the 2008 RFP, in which NIH expressed the expectation to invite offers for, *inter alia*, the Montgomery County Contract.

34. Periodically throughout January, February, and March 2008, the undersigned counsel for CNAC communicated with counsel for HHS/NIH concerning the status of NIH's ethics review and the 2008 RFP release date. CNAC's counsel explained that it was vital for CNAC to receive NIH's ethics decision concerning Dr. Friedman prior to issuance of the 2008 RFP, since a "cloud" had been placed over Dr. Friedman and her ability to participate as CNAC's PI. CNAC's counsel also explained that NIH's failure to resolve Dr. Friedman's situation was causing CNAC to lose team members and was making it very difficult for CNAC to prepare for or respond to the 2008 RFP.

---

[1] The Court's January 3, 2008 Order also awarded CNAC its bid preparation and proposal costs. The application for those costs was submitted on April 4, 2008. To the extent the Court directs award of the Montgomery County Contract to CNAC, CNAC will withdraw its application for bid preparation and proposal costs.

35. On March 19, 2008, NIH issued the 2008 RFP, which includes the Montgomery County Contract as part of the solicitation. Proposals responding to the 2008 RFP are to be submitted on May 2, 2008. *See* 2008 RFP at 1.

**NIH's Ethics Evaluation of Dr. Friedman**

36. On March 19, 2008 – just a few hours prior to issuance of the 2008 RFP – NIH provided CNAC with its evaluation of the eligibility of Dr. Friedman to serve as PI for a NCS Study Center in a letter from Elizabeth Osinski, NIH's Contracting Officer for this procurement. This letter again reiterated NIH's decision to disqualify CNAC from award under the 2007 RFP based on Dr. Friedman's prior Government employment. *See* Disqualification Letter at 1. The Disqualification Letter specifically adopts the opinion of the Office of the General Counsel, Ethics Division, ( "Ethics Opinion") (a copy of which is attached to the Motion for Preliminary Injunction filed herewith) which concludes that Dr. Friedman is permanently barred from serving as PI for a NCS Study Center by the post-employment restrictions of 18 U.S.C. § 207.

37. The Ethics Opinion provided by NIH bases its conclusion that Dr. Friedman is barred by 18 U.S.C. § 207 on the grounds that the NCS, taken as a whole, constitutes a particular matter involving specific parties. Ethics Opinion at 10. The Ethics Opinion further states that, "even if we had considered the contracts awarded as a result of the fiscal year 2007 procurement . . . as separate matters, we believe that the permanent ban on representational communications or appearances would still apply. . . . " *Id.* The Ethics Opinion also states, with only a limited factual discussion, that Dr. Friedman participated personally and substantially in the development of the NCS. Ethics Opinion at 13. Finally, the Ethics Opinion concludes that Dr. Friedman is barred because she "would have been required to appear before or communicate with Government officials with the intent to influence on behalf of CNA." Ethics Opinion at 13.

## CLAIMS FOR RELIEF

## COUNT I

**(Injunctive Relief to Prohibit NIH From Proceeding With Procurement Action on the Montgomery County Contract Pending This Court's Review of the Merits of this Complaint)**

38. CNAC incorporates by reference all the preceding paragraphs.

39. The Ethics Opinion provided by NIH bases its conclusion that Dr. Friedman is permanently barred from serving as a PI for the NCS on a flawed analysis of the post-employment provisions of 18 U.S.C. § 207 and applicable regulations. In particular, 18 U.S.C. § 207 permanently restricts former Government employees from

> [K]nowingly mak[ing], *with the intent to influence*, any communication to or appearance before any officer or employee of any department, agency, court, or court-martial of the United States or the District of Columbia, on behalf of any other person (except the United States or the District of Columbia) in connection with a particular matter -
> (A) in which the United States or the District of Columbia is a party or has a direct and substantial interest,
> (B) in which the person participated *personally and substantially* as such officer or employee, and
> (C) which involved a specific *party or specific parties at the time of such participation*, shall be punished as provided in section 216 of this title [18 USCS § 216].

(emphasis added).

40. The Ethics Opinion provided by NIH fails to provide an adequate explanation for its conclusion that the NCS is the same "particular matter involving specific parties" in which Dr. Friedman participated during her Government employment. *See* Ethics Opinion at 7-12. The Ethics Opinion contends that the entirety of NCS – which will extend over a period of decades and involve hundreds of contracts – must be viewed as the same "particular matter involving specific parties" and that it should therefore not be broken down into any component parts. Ethics Opinion at 10. NIH's conclusion that NCS in its entirety constitutes a particular

matter is arbitrary and operates as a lifetime ban on all former employees who worked on even the most isolated components of the development of the NCS technical protocols from serving in any representational capacity with respect to any aspect of the NCS. The scope of the Ethics Opinion is extraordinary; it also contravenes the underlying purpose of 18 U.S.C. § 207, and serves no public policy interest of the U.S. Government.

41. In its characterization of the entirety of the NCS as a "particular matter involving specific parties," the NIH Ethics Opinion ignores the proper interpretation and application of Section 207, as informed by 5 C.F.R. § 2637.201(c), which states, in relevant part, as follows:

> "Particular matter involving a specific party or parties"... Such a matter typically involves a specific proceeding affecting the legal rights of the parties or an isolatable transaction or related set of transactions between identifiable parties. Rulemaking, legislation, the formulation of general policy, standards or objectives, or other action of general application is not such a matter. Therefore, a former Government employee may represent another person in connection with a particular matter involving a specific party even if rules or policies which he or she had a role in establishing are involved in the proceeding.

42. At the time of Dr. Friedman's employment with NICHD, the NCS had not sufficiently evolved to constitute a "particular matter." During the period Dr. Friedman provided advice (2005-2006), the NCS was still in its developmental stage. Various protocols essential to the NCS were still being developed at that time, including the protocols for infant neurodevelopment and social environment data collection with which Dr. Friedman was involved. Furthermore, Dr. Friedman had no role in the formulation or preparation of any procurement documents (such as RFPs) or in the contracting or acquisition process for the NCS; her limited role was related to recommendations regarding technical protocol development and design.

43. 5 C.F.R. § 2637.201(c)(1) further illustrates that NCS did not constitute a "particular matter" from which Dr. Friedman should now be barred:

> Example 4: An employee of the Office of Management and Budget participates substantially on the merits of a decision to reduce the funding level of a program, which has the effect of reducing the amount of money which certain cities receive to conduct youth work programs. *After leaving the Government she may represent any of the cities in securing funds for its youth program, since her participation was in connection with a program, not a particular matter involving specific parties.*

(emphasis added).

44. Despite its statement that the NCS should not be broken down into parts, the Ethics Opinion contradicts this assertion by breaking down the NCS into 4 stages: "the NCS can be viewed as a program having several more or less distinct phases: (1) feasibility; (2) concept clearance; (3) study design/planning; and (4) implementation/contracting." Ethics Opinion at 9. This statement is an acknowledgment by NIH that the NCS is a complicated, multi-faceted, large-scale, longitudinal study. According to the Ethics Opinion, the "implementation/contracting" phase began precisely on November 16, 2004, when the RFP for the 2005 procurement for the "Vanguard Centers" was issued. *Id.* at 10. However, this critical determination is directly contradicted by information on NIH's own website for NCS (http://www.nationalchildrensstudy.gov). That website indicates that the "implementation phase" of NCS did not even commence until Fiscal Year 2007 – well after Dr. Friedman left Government service. *See* NCS Website – Funding & Legislation, *available at* http://www.nationalchildrensstudy.gov/about/funding/index.cfm. Moreover, NIH was still working on development of the NCS protocols in 2005-2006, during Dr. Friedman's participation, a key fact which undercuts the Ethics Opinion assertion that "implementation/contracting" began in November 2004. Although NIH accurately observes that it should not unnecessarily break a contract down into its component parts, the same logic precludes NIH from drawing highly arbitrary – and in this case, unsupported – distinctions about when the contracting process actually began.

45. At the time of Dr. Friedman's involvement with NCS, there was no "specific party" connected to the Study, an important predicate to the imposition of a lifetime ban on her participation as PI at CNAC. As detailed above, Dr. Friedman's team worked in an advisory capacity, and provided input on the creation of technical assessments. Her input was not in relation to a "specific party" but was more akin to general policy making, conduct which 18 U.S.C. § 207 does not reach.

46. NIH further contends that, because Dr. Friedman's "work on the protocol(s) to be incorporated in that contract occurred after expressions of interest were made in 2005 by potential bidders who were eligible to serve in the Study Locations in the State of Maryland covered by the 2007 procurement," the Montgomery County Contract had sufficiently evolved to constitute a "particular matter involving specific parties." Ethics Opinion at 12. This interpretation of the statute is patently unreasonable. Notably, the 2005 RFP for the Vanguard Centers did not even solicit proposals for the Montgomery County Study Location. Dr. Friedman had no "personal and substantial" involvement in the 2005 RFP, since it was issued on November 16, 2004 -- before she had any involvement in NCS.

47. Moreover, NIH's interpretation elevates the importance of purely serendipitous events while limiting the legitimate post-Government employment activities of a well-qualified research scientist. Characterization of the NCS in the manner now espoused by NIH suggests that Dr. Friedman would not be prohibited from working on the NCS if she simply had taken post-government employment with an employer in a state outside of the "respective census regions" where there had been no "early interest" expressed in 2005 by entities eligible to serve as Study Center locations. A definition of NCS which creates such an arbitrary determination of when the contract for the Montgomery County Study location became a "particular matter

involving specific parties" is irrational, capricious, contrary to applicable law, and serves no legitimate public policy interest of the U.S. Government.

48. To be permanently barred by 18 U.S.C. § 207(a), a former Government employee must also have "participated personally and substantially" in the particular matter. As detailed above, Dr. Friedman's work on the NCS was in an advisory role, working with a team of other individuals and building on information provided by many other scientists who were commissioned by NIH to identify appropriate neurodevelopmental and social environment assessments. This advisory role does not constitute "personal and substantial" involvement in the entire NCS, as NIH has concluded. Her team was tasked with studying the many measures recommended by others (with the option of suggesting additional measures) and selecting from among those measures to assess a very narrow period (birth to 18 months) in a Study designed to follow its participants until adulthood.

49. Despite NIH's contention that Dr. Friedman's limited role constituted personal and substantial involvement, the Ethics Opinion provided by NIH provides scant detail of what work Dr. Friedman undertook that constitutes personal and substantial participation in the entire NCS as required by 18 U.S.C. § 207. Further, the NCS website purports to recognize the individuals who have contributed time and expertise to the development of the NCS. *See* Persons Who Have Contributed Time and Expertise to the Development of the Study, (March 13, 2008), *available at* http://www.nationalchildrensstudy.gov/about/study_contributors/. Dr. Friedman's name is curiously absent from the list. Dr. Friedman's contributions to the Study, which NIH now alleges were sufficiently personal and substantial so as to permanently bar her under 18 U.S.C. § 207, apparently were not so substantial as to justify her recognition on NCS's list of contributors. *Id.* This is yet another example where NIH's published information on NCS

differs markedly from the conclusions and characterizations adopted by NIH in its Ethics Opinion.

50. The Ethics Opinion also contends that communications that would result from the award of the Montgomery County Contract to CNAC would implicate § 207 because Dr. Friedman will potentially violate § 207(a) in connection with those communications.

51. The NIH Ethics Opinion, however, inexplicably continues to ignore the exceptions for the communication of technical and scientific information in the applicable regulations. Those regulations clearly anticipate that a former Government employee who worked on the development of technical protocols may in the future assume a role in the private sector implementing such protocols. The proposed new rule for 5 C.F.R. § 2641.201(e)(2) states that:

> Certain communications to and appearances before employees of the United States are not made with the intent to influence... including, but not limited to, communications and appearances made solely for the purpose of...(iv) Signing an assurance that one will be responsible as principal investigator for the direction and conduct of research under a Federal grant (see example 4 to paragraph (d) of this section).

*See* 68 Fed. Reg. 7844, 7873 (Feb. 18, 2003). To date, the Office of Government Ethics has not finalized its revision to the conflict-of-interest regulations. However, the prior regulations are not to the contrary. *See* 5 C.F.R. § 2637.201(c)(2) ("In connection with technical work, participation in projects generally involving one or more scientific or engineering concepts, in feasibility studies, or in proposed programs prior to the formulation of a contract will not restrict former Government employees with respect to a contract or specific programs entered into at a later date.").

52. Under 5 C.F.R. § 2637 (which this Court directed NIH to review in preparing its Ethics Opinion), the Office of Government Ethics provides an example involving a former

employee at NIH that later acts as a PI (albeit in the context of the one-year restriction under 18 U.S.C. § 207(c)):

> A former Senior Employee of the National Institute of Health (NIH), employed by a non-exempt research institute, prepares an application to NIH for a research contract. The application is submitted to NIH by the institute and lists the Senior Employee as principal investigator. The Senior Employee does not violate 18 U.S.C. 207(c) by preparing the application or by being listed as principal investigator, since these are not representational activities. He may also sign an assurance to NIH, as part of the application, that he will be responsible for the scientific and technical direction and conduct of the project if an award is made. He may also communicate with NIH to provide scientific or technical information on the application, including presentation to NIH personnel at the research site, so long as he does not argue for approval or funding of the application.

*See* 5 C.F.R. § 2637.204(g), Example 1, *superseded in part by* 5 C.F.R. § 2641.

53. The new proposed regulations include an almost identical example within the context of the lifetime ban under 18 U.S.C. § 207(a):

> A former employee of the National Institutes of Health (NIH) prepares an application for an NIH research grant on behalf of her university employer. The application is signed and submitted by another university officer, but it lists the former employee as the principal investigator who will be responsible for the substantive work under the grant. He has not made a communication. He also may sign an assurance to the agency that he will be personally responsible for the direction and conduct of the research under the grant, pursuant to § 2641.201(e)(2)(iv). Moreover, he may personally communicate scientific or technological information to NIH concerning the application, provided that he does so under circumstances indicating no intent to influence the Government pursuant to § 2641.201(e)(2) or he makes the communication in accordance with the exception for scientific or technological information.

*See* 68 Fed. Reg. at 7873 (proposed new rule 5 C.F.R. § 2641.201(d)).

54. For the reasons set forth above, NIH's Ethics Opinion concerning Dr. Friedman is arbitrary and capricious. CNAC has suffered injury and will continue to suffer injury because of NIH's failure to fairly evaluate Dr. Friedman and to correctly analyze and apply the post-government employment restrictions that govern her. CNAC has no adequate remedy at law for this injury. Accordingly, CNAC respectfully requests that the Court issue a preliminary injunction prohibiting NIH from proceeding with any procurement action on the Montgomery County Contract while the Court reviews the merits of this action.

## COUNT II

### (Injunctive Relief Directing NIH To Award The Montgomery County Contract To CNAC)

55. CNAC incorporates by reference all the preceding paragraphs.

56. This Court previously concluded that NIH acted arbitrarily and capriciously when the agency last analyzed whether Dr. Friedman should be disqualified as PI. The Court directed NIH to undertake that evaluation and consider the proper statutory and regulatory provisions. Moreover, the Court emphasized that NIH should not "penalize" CNAC for its successful bid protest. To date, NIH has failed to conduct a proper ethics evaluation of Dr. Friedman and its failure to do so has severely penalized CNAC and continues to penalize CNAC by impeding its ability to compete for award under the 2008 RFP.

57. As NIH has admitted and the Court acknowledged in the Court's January 3, 2008 Order during CNAC's previous protest, NIH would have awarded the Montgomery County Contract to CNAC absent NIH's arbitrary and capricious ethics evaluation of Dr. Friedman. To date, NIH has not remedied that arbitrary and capricious evaluation. As a result of the actions taken by NIH, this court should direct that NIH award the Montgomery County Contract to CNAC.

58. In the previous protest, NIH suggested that it lacked any additional funding as the basis to deny CNAC's request to enjoin NIH from awarding the Montgomery County Contract to any offeror other than CNAC. However, NIH's decision to include the Montgomery County location in the 2008 RFP establishes that NIH now has sufficient funding for the work to be performed for the Montgomery County Contract.

59. Permanent declaratory and injunctive relief in connection with the issuance of a merits decision by this Court is in the public interest because it will increase the likelihood that

the Government will get the benefit of Dr. Friedman's substantial expertise, and enforce this Court's prior judgment and order. Additionally, directing NIH to make award to CNAC will save NIH from the administrative effort and expense associated with evaluating CNAC's proposal for the Montgomery County Contract or any other potential offeror's proposal for the Montgomery County Contract through the 2008 Solicitation. CNAC will be irreparably injured by the denial of this relief, because it will otherwise have effectively lost the opportunity to compete for and perform this contract. In particular, NIH's delay in issuing a decision on the status of Dr. Friedman and the ultimate arbitrary and capricious Ethics Opinion purportedly prohibiting Dr. Friedman from working as PI, drove CNAC's teammates to other teams for the 2008 RFP. As a result of NIH's actions, CNAC has been irreparably harmed and placed on an unequal footing to re-compete for the Montgomery County Contract. NIH's delay and ultimate ruling has had the effect of severely penalizing CNAC under the 2008 RFP.

60. Injunctive relief also is in the public interest because NIH already had designated CNAC for contract award and NIH would have awarded CNAC the Montgomery County Contract, absent its arbitrary and capricious ethics decision. The balance of the harms favors CNAC, because CNAC and Dr. Friedman have been deprived of the opportunity to serve the public by contributing to the National Children's Study; CNAC has also been denied the opportunity to enhance its own reputation in the field as the awardee of the Montgomery County Contract. NIH will suffer no harm, as an award to CNAC comports with NIH's prior determination that CNAC was fully capable of performing at the Montgomery County Contract.

61. CNAC has suffered injury and will continue to suffer injury because of NIH's failure to fairly evaluate Dr. Friedman. CNAC has no adequate remedy at law for this injury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CNAC prays that this Court grant the following relief:

1. A preliminary injunction enjoining NIH from taking any procurement action regarding the Montgomery County location until after this Court reviews and rules upon the merits of the NIH ethics decision regarding Dr. Friedman;

2. A declaratory judgment that Dr. Sarah Friedman is not barred from working as a Principal Investigator for CNAC on any contracts awarded to CNAC arising out of the National Children's Study;

3. A permanent injunction directing NIH to award the Montgomery County Contract to CNAC;

4. Award CNAC its costs of pursuing this case, including reasonable attorneys' fees and expenses; and

5. Such other relief as the Court deems just and proper.

Dated: April 8, 2008

Respectfully submitted,

Alex Tomaszczuk by [signature]
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)
Counsel for The CNA Corporation

*Of Counsel:*

Daniel S. Herzfeld
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859

Caroline L. Plant
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406