ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

FILED
APR 8 2008
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CNA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No: 08-249 C<br><br>Judge: ________ |

**MOTION FOR A PRELIMINARY INJUNCTION AND**
**<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF</u>**


Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel for The CNA Corporation

*Of Counsel:*
Daniel S. Herzfeld
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7612
(703) 770-7901 (fax)

Caroline L. Plant
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406

# TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 2

II. QUESTION PRESENTED .......... 3

III. JURISDICTION AND STANDING .......... 3

IV. STATEMENT OF THE CASE .......... 4

V. STANDARD FOR INJUNCTIVE RELIEF .......... 4

VI. ARGUMENT .......... 5

A. CNAC Will Prevail On The Merits Of This Action .......... 5

1. NIH's Determination That Dr. Friedman is Permanently Barred By The Post-Employment Restrictions of 18 U.S.C. § 207 is Arbitrary, Capricious, and Without a Rational or Reasonable Basis .......... 6

a. Dr. Friedman's Involvement in the Neurodevelopmental and Social Environment Assessments During Her Tenure as a Government Employee Does Not Qualify as Involvement on a Particular Matter Involving Specific Parties, as Required For Disqualification Under 18 U.S.C. § 207 .......... 6

b. Dr. Friedman Did Not Participate Personally and Substantially on the NCS During Her Tenure as a Government Employee, as Required For Disqualification Under 18 U.S.C. § 207. .......... 14

c. Communications by Dr. Friedman as PI for The Montgomery County Contract Do Not Implicate the Ban On Representational Activity Prohibited By 18 U.S.C. § 207 .......... 15

d. NIH's Permanent Disqualification of Dr. Friedman Serves No Legitimate Public Policy Interest of the U.S. Government and Is Contrary To The Legislative Intent of 18 U.S.C. § 207 .......... 17

B. CNAC Will Suffer Irreparable Harm Without Injunctive Relief .......... 18

C. The Harm to CNAC Outweighs Any Harm to Defendants .......... 19

D. The Public Interest Will Be Served By Granting Preliminary Injunctive Relief .. 20

VII. CONCLUSION .......... 21

# TABLE OF AUTHORITIES

Page

**Cases**


*Aeroplate Corp. v. United States*,
67 Fed. Cl. 1 (2005) .......... 4
*Alfa Laval Separation, Inc. v. United States*,
175 F.3d 1365 (Fed. Cir. 1999) .......... 5
*Am. Fed. of Gov't Employees, AFL-CIO v. United States*,
258 F.3d 1294 (Fed. Cir. 2001) .......... 4
*CACI, Inc. v. United States*,
719 F.2d 1567 (Fed. Cir. 1983) .......... 8
*Dairy Maid Dairy, Inc. v. United States*,
837 F. Supp. 1370 (E.D. Va. 1993) .......... 19, 20
*Data Gen. Corp. v. Johnson*,
78 F.3d 1556 (Fed. Cir. 1996) .......... 5
*Day & Zimmerman Servs.*,
38 Fed. Cl. at 610 .......... 20
*FMC Corp. v. United States*,
3 F.3d 424 (Fed. Cir. 1993) .......... 5
*Hybritech Inc. v. Abbott Labs.*,
849 F.2d 1446 (Fed. Cir. 1988) .......... 5
*Mark Dunning Indus. v. United States*,
60 Fed. Cl. 687 (2004) .......... 5
*Mark Dunning Indus., Inc. v. Perry*,
890 F. Supp. 1504 (M.D. La. 1995) .......... 20
*Overstreet Elec. Co. v. United States*,
47 Fed. Cl. 728 (2000) .......... 19, 20
*Scanwell Labs v. Schaffer*,
424 F.2d 859 (D.C. Cir. 1970) .......... 20
*Seattle Sec. Servs., Inc. v. United States*,
45 Fed. Cl. 560 (2000) .......... 19
*Space Age Engineering, Inc. v. United States*,
4 Cl. Ct. 739, 741 (1984) .......... 18
*United Int'l Investigative Servs., Inc. v. United States*,
41 Fed. Cl. 312 (1998) .......... 19
*United States Ass'n of Importers of Textiles & Apparel v. United States*,
413 F.3d 1344 (Fed. Cir. 2005) .......... 4
*United States v. Clark*,
333 F. Supp. 2d 789 (D. Wis. 2004) .......... 17
*United States v. Medico Industries, Inc.*,
784 F.2d 840 (7th Cir. 1986) .......... 12, 17

**Statutes and Codes**

18 U.S.C. § 207 .......... passim
18 U.S.C. § 207(a) .......... passim
18 U.S.C. § 207(a)(1)(A)-(C) .......... 7
18 U.S.C. § 207(c) .......... 16
18 USCS § 216 .......... 7
28 U.S.C. § 1491(b) .......... 3
5 C.F.R. § 2637 .......... 16
5 C.F.R. § 2637.201 .......... 7, 16
5 C.F.R. § 2637.201(c) .......... 7
5 C.F.R. § 2637.201(c)(2) .......... 12
5 C.F.R. § 2637.201(c)(4) .......... 7, 10
5 C.F.R. § 2637.201(d) .......... 14
5 C.F.R. § 2637.204(g) .......... 16
5 C.F.R. § 2641.201(d) .......... 16
5 C.F.R. § 2641.201(e)(2) .......... 15, 16
5 C.F.R. § 2641.201(e)(2)(iv) .......... 16

**Rules and Regulations**

68 Fed. Reg. 7844 (Feb. 18, 2003) .......... 15
RCFC 65(a) .......... 1

**Other Authorities**

B. Manning, *Federal Conflict of Interest Law*, 179-180 (1964) .......... 17
Bayless Manning, *Federal Conflict of Interest Law* 204 (1964) .......... 10
S. Rep. No. 170, 95th Cong., 1st Sess. 31-33 (1977) .......... 17

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| THE CNA CORPORATION, | ) | |
| Plaintiff, | ) | No: __________ |
| v. | ) | |
| THE UNITED STATES, | ) | Judge: ________ |
| Defendant. | ) | |

**MOTION FOR A PRELIMINARY INJUNCTION AND**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Pursuant to RCFC 65(a), Plaintiff, the CNA Corporation ("CNAC"), respectfully requests that this Court issue a Preliminary Injunction enjoining Defendant, United States, acting through the National Institutes of Health ("NIH"), a part of the Department of Health and Human Services ("HHS"), and its officers, agents, and employees, from taking action in furtherance of the procurement for the Montgomery County, Maryland center ("Montgomery County Contract") of the National Children's Study ("NCS" or "Study") under Request for Proposals No. NIH-NICHD-NCS-08-21E (hereinafter "2008 RFP"), pending a final determination on the merits of this action by this Court. Absent such injunctive relief, CNAC will suffer substantial and irreparable harm.

## I. INTRODUCTION

Plaintiff CNAC brings this pre-award protest to challenge NIH's failure to rectify its previous arbitrary and capricious decision to disqualify Dr. Sarah L. Friedman, as required by this Court's January 3, 2008 Order in *CNA Corporation v. United States*, No. 07-858C (Horn, J.). In its prior case No. 07-858, CNAC protested NIH's failure to award CNAC the Montgomery County Contract of the NCS under Request for Proposals No. NIH-NICHD-NCS-07-11 ("2007 RFP"), which NIH would have awarded to CNAC but for its arbitrary and capricious ethics evaluation of Dr. Friedman.

As the result of that prior protest, NIH was required by this Court's January 3, 2008 Order to conduct a proper ethics evaluation of Dr. Friedman. On March 19, 2008, CNAC received NIH's required ethics decision. Unfortunately, NIH has again concluded, without providing a sufficient factual or legal basis, that Dr. Friedman was permanently barred from acting as a PI for a NCS Study Center as a result of the post-employment restrictions of 18 U.S.C. § 207 because of her prior government employment. *See* NIH's Letter of March 19, 2008 ("Disqualification Letter") (attached hereto as Exhibit A) at 1. The Disqualification Letter, signed by the Contracting Officer for the NCS, further indicates that, while a final determination regarding the disqualification of Dr. Friedman from award under the 2008 RFP has not been made, "the 2008 RFP does not materially differ from the 2007 RFP with respect to Dr. Friedman's eligibility" and "I would anticipate the same determination with respect to Dr. Friedman under the 2008 RFP." Disqualification Letter at 1. The 2008 RFP was also issued on March 19, 2008 – the same date that CNAC received NIH's Disqualification Letter.

The decision by NIH to affirm its prior decision to disqualify CNAC from award under the 2007 RFP, and to indicate that the evaluation of Dr. Friedman would remain unchanged under the 2008 RFP, effectively prohibits CNAC from fair consideration for award of the Montgomery County Contract even if it submits a meritorious proposal in response to the 2008 RFP. CNAC seeks this Court's review of the merits of NIH's Disqualification Letter and a determination by the Court that the Disqualification Letter is arbitrary, capricious, and otherwise

contrary to applicable law and regulation. Among other deficiencies, NIH's decision (1) contradicts information on its own website concerning the relevant phases of the NCS, (2) is contrary to existing and proposed regulations promulgated by the U.S. Office of Government Ethics, and (3) undermines the public policy considerations embodied in 18 U.S.C. § 207 (to say nothing of the devastating effect of the Disqualification Letter on Dr. Friedman).

For these reasons, CNAC seeks a preliminary injunction precluding further procurement action on the Montgomery County portion of the 2008 RFP pending this Court's review of the merits of NIH's Disqualification Letter. Absent such injunctive relief, CNAC will suffer substantial and irreparable harm, because it will again be denied the opportunity to receive award of, or to compete for, the Montgomery County Contract. CNAC requests that this preliminary injunction remain in effect until this Court decides the merits of CNAC's Complaint, filed herewith. Finally, if the Court concludes upon review of the record that NIH's Disqualification Letter is arbitrary, capricious, and violative of this Court's January 3, 2008 Order, CNAC respectfully submits that – given these unique circumstances – this Court should exercise its equitable powers and direct NIH to award the Montgomery County Contract to CNAC.

## II. QUESTION PRESENTED

Is CNAC entitled to a preliminary injunction based on NIH's failure to comply with applicable statutes and regulations in its decision to disqualify Dr. Friedman under 18 U.S.C. § 207, thereby effectively disqualifying CNAC from award of the Montgomery County Contract?

## III. JURISDICTION AND STANDING

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(b), which expressly provides this Court with jurisdiction "to render judgment on an action by an interested party objecting to. . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." CNAC is an "interested party," as it intends to submit a proposal for the Montgomery County Contract in response to the 2008 RFP. As a prospective offeror, CNAC has a direct economic interest in NIH's award of the

Montgomery County Contract under the 2008 RFP. *See Am. Fed. of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (defining "interested party" as "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract").

## IV. STATEMENT OF THE CASE

As set forth more fully in CNAC's accompanying Complaint for Declaratory and Injunctive Relief, which is incorporated herein by reference, the instant action arises from CNAC's prior successful protest challenging NIH's failure to award it the Montgomery County Contract, which would have been awarded to CNAC had NIH originally conducted an appropriate analysis of the statutes and regulations governing the post-employment restrictions applicable to former government employees like Dr. Friedman. *See CNA Corporation v. United States*, No. 07-858C (Horn, J.). On March 19, 2008, NIH issued both its Disqualification Letter of Dr. Friedman, and the 2008 RFP that seeks proposals for the Montgomery County Contract. While CNAC intends to submit a proposal in response to the 2008 RFP for the Montgomery County Contract, its ability to do that has been irreparably injured. As a result of the delay from January 3 to March 19 in issuance of NIH's Ethics Opinion, CNAC has lost several of its original team members, who have joined CNAC's competitors or formed their own teams. Even more damaging is the loss of Dr. Friedman as the proposed PI for CNAC. In short, NIH's conduct has prejudiced and effectively precluded CNAC from consideration for award of the Montgomery County Contract under the 2008 RFP.

## V. STANDARD FOR INJUNCTIVE RELIEF

In considering CNAC's motion for preliminary injunctive relief, this Court must weigh the following four factors: (i) CNAC's likelihood of success on the merits; (ii) the immediate and irreparable injury to CNAC; (iii) the public interest; and (iv) the balance of the hardship on all the parties. *See United States Ass'n of Importers of Textiles & Apparel v. United States*, 413 F.3d 1344, 1347-48 (Fed. Cir. 2005); *Aeroplate Corp. v. United States*, 67 Fed. Cl. 1, 2 (2005). No single factor is determinative, and "the weakness of the showing regarding one factor may be

overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see also Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988) ("These factors, taken individually, are not dispositive; rather, the . . . court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested.")

Applying these factors to the circumstances of this case, CNAC is entitled to injunctive relief.

## VI. ARGUMENT

### A. CNAC Will Prevail On The Merits Of This Action

To prevail on the merits of this bid protest action, CNAC must show "a significant, prejudicial error in the procurement process." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999). As the court stressed in *Mark Dunning*, "to succeed in a bid protest action, [a] protestor must prove by a preponderance of the evidence the arbitrary and capricious nature of the Government's actions or the violation of an applicable procurement regulation." *Mark Dunning Indus. v. United States*, 60 Fed. Cl. 687, 689 (2004) (internal quotations omitted). The *Dunning* Court continued, "[u]nder this standard, a frustrated bidder must establish that (1) the Government officials involved in the procurement process were without a rational and reasonable basis for their decision, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations. Further, the protester must also show that it was prejudiced by the error in the procurement process." *Id.* (internal citations and quotations omitted). To establish prejudice, a protestor must show "that there was a 'substantial chance' it would have received the contract award but for the alleged error." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). Had NIH properly evaluated CNAC's proposal pursuant to applicable statutes and regulations, CNAC would have received award of the Montgomery County Contract under the 2007 RFP. Here, NIH's disqualification of Dr. Friedman (and by extension, CNAC) lacked a rational basis and prejudicially violated statute and regulation.

1. **<u>NIH's Determination That Dr. Friedman is Permanently Barred By The Post-Employment Restrictions of 18 U.S.C. § 207 is Arbitrary, Capricious, and Without a Rational or Reasonable Basis.</u>**

On March 19, 2008 – just a few hours prior to issuance of the 2008 RFP – NIH provided CNAC with its Disqualification Letter, which again reiterated NIH's decision to disqualify CNAC from award under the 2007 RFP based on Dr. Friedman's prior Government employment. *See* Disqualification Letter at 1. The Disqualification Letter specifically adopts the opinion of the Office of the General Counsel, Ethics Division (hereinafter referred to as "Ethics Opinion") (attached hereto as Exhibit B), which concludes that Dr. Friedman is permanently barred from serving as PI for a NCS Study Center by the post-employment restrictions of 18 U.S.C. § 207.

The Ethics Opinion provided by NIH bases its conclusion that Dr. Friedman is barred by 18 U.S.C. § 207 on the grounds that the NCS, taken as a whole, constitutes a particular matter involving specific parties. Ethics Opinion at 10. The Ethics Opinion further states that, "[m]oreover, even if we had considered the contracts awarded as a result of the fiscal year 2007 procurement . . . as separate matters, we believe that the permanent ban on representational communications or appearances would still apply. . . ." *Id.* The Ethics Opinion also states, with only a limited factual discussion, that Dr. Friedman participated personally and substantially in the development of the NCS. Ethics Opinion at 13. Finally, the Ethics Opinion concludes that Dr. Friedman is barred because she "would have been required to appear before or communicate with Government officials with the intent to influence on behalf of CNA." Ethics Opinion at 13. Each of these NIH arguments is flawed, as detailed below.

a. **Dr. Friedman's Involvement in the Neurodevelopmental and Social Environment Assessments During Her Tenure as a Government Employee Does Not Qualify as Involvement on a Particular Matter Involving Specific Parties, as Required For Disqualification Under 18 U.S.C. § 207.**

NIH erred in concluding that the post employment provision of 18 U.S.C. § 207 barred Dr. Friedman from serving as a PI for CNAC. In particular, 18 U.S.C. § 207(a) permanently restricts former Government employees from participating after their Government service terminates in connection with a *particular matter*:

> (A) in which the United States or the District of Columbia is a party or has a direct and substantial interest,
>
> (B) in which the person participated personally and substantially as such officer or employee, and
>
> (C) which involved a specific party or specific parties at the time of such participation, shall be punished as provided in section 216 of this title [18 U.S.C.].

18 U.S.C. § 207(a)(1)(A)-(C). The particular matter must involve specific parties "both at the time that the Government employee acts in an official capacity and at the time in question after Government service." 5 C.F.R. § 2637.201(c)(4). Furthermore, it must be the same particular matter involving specific parties at both times, although "the same particular matter may continue in another form or in part." *Id.*

In its characterization of the entirety of the NCS as a "particular matter involving specific parties," the NIH Ethics Opinion ignores the proper interpretation and application of Section 207, as informed by 5 C.F.R. § 2637.201(c), which states, in relevant part, as follows:

> "Particular matter involving a specific party or parties". . . Such a matter typically involves a specific proceeding affecting the legal rights of the parties or an isolatable transaction or related set of transactions between identifiable parties. *Rulemaking, legislation, the formulation of general policy, standards or objectives, or other action of general application is not such a matter.* Therefore, a former Government employee may represent another person in connection with a particular matter involving a specific party even if rules or policies which he or she had a role in establishing are involved in the proceeding.

(emphasis added). One of the examples contained in 5 C.F.R. § 2637.201(c)(1) further illustrates that NCS did not constitute a "particular matter" from which Dr. Friedman should now be barred:

> Example 4: An employee of the Office of Management and Budget participates substantially on the merits of a decision to reduce the funding level of a program, which has the effect of reducing the amount of money which certain cities receive to conduct youth work programs. *After leaving the Government she may represent any of the cities in securing funds for its youth program, since her participation was in connection with a program, not a particular matter involving specific parties.*

*Id.* § 2637.201(c)(1) (emphasis added).

Notwithstanding its length, the Ethics Opinion provided by NIH fails to provide an adequate explanation for its conclusion that the NCS is the same "particular matter involving

specific parties" in which Dr. Friedman participated during her Government employment. *See* Ethics Opinion at 7-12. The Ethics Opinion contends that the entirety of NCS – which will extend over a period of decades and potentially involve up to fifty contracts – must be viewed as one enormous "particular matter involving specific parties" and that it should therefore not be broken down into any component parts. Ethics Opinion at 10.[1] In reaching this conclusion, NIH's Ethics Opinion relies heavily upon the determination that NCS has four phases, and that the last phase – "implementation/contracting" – began on November 16, 2004 when the RFP for the 2005 Vanguard Centers requirement was issued. There are several major flaws in this analysis.

First, notwithstanding NIH's position, "it is frequently the case that successive contracts are viewed as being different particular matters from each other." *See* OGE Advisory Opinion 02 x 5 (July 31, 2002) (the *Yucca Mountain* opinion) at 9, *available at* http://www.usoge.gov/pages/advisory_opinions/advop_files/2002/02x5.html; *see also CACI, Inc. v. United States*, 719 F.2d 1567, 1575-76 (Fed. Cir. 1983) (holding that a contract for data processing was not the same "contract" as earlier data processing agreements because the specifications evolved enough to make the course of performance significantly different). The U.S. Office of Government Ethics ("OGE") has advised that a case by case analysis is required to determine at which stage a particular matter has sufficiently progressed to involve specific parties. OGE DAEOgram DO-06-029 at 4-5 (October 4, 2006), *available at* http://www.usoge.gov/pages/daeograms/dgr_files/2006/do06029.html.

Second, unlike the Ethics Opinion that describes the NCS as consisting of four phases, the NCS website, http://www.nationalchildrensstudy.gov, characterizes the NCS as involving only two distinct phases: (1) the "planning phase" of the Study and (2) the "implementation"

---

[1] NIH's conclusion that NCS in its entirety constitutes a particular matter operates as a lifetime ban on all former employees who worked on even the most isolated components of the development of its technical protocol from serving in any representational capacity with respect to any aspect of the NCS. This is an overly broad interpretation of the statute, and contravenes the provisions of the implementing regulations cited above.

phase of the Study. *See* NCS Website – Funding & Legislation, *available at* http://www.nationalchildrensstudy.gov/about/funding/index.cfm (attached hereto as Exhibit C). According to the NCS website, the "planning phase" of NCS extended from Fiscal Year 2000 through Fiscal Year 2006. *Id.* The same website indicates that the "implementation phase of the study" commenced in Fiscal Year 2007. *Id.* NIH cannot have it both ways – either the Ethics Opinion is wrong or the website (notably not prepared in anticipation of litigation) is wrong as to when implementation of or contracting for NCS began. The website explanation that implementation of NCS did not begin until 2007 is further supported in appropriations data set forth on the website. It indicates that the funding received during the "planning phase" of NCS reached its peak in Fiscal Year 2006, at a total of $12.1 million. *Id.* In comparison, the funding for the "implementation phase" of the Study jumps significantly to $69 million for fiscal year 2007 and $110.9 million for Fiscal Year 2008. *Id.*

CNAC submits that NIH's published appropriations data for NCS is a compelling indicator of the distinct "phases" of development of the NCS. Such data indicates that Dr. Friedman participated in the development of protocols during the "planning" phase of NCS, at a time when the NCS had not sufficiently evolved so as to constitute a "particular matter involving specific parties." The NCS website, combined with the funding data provided, establishes that the implementation and contracting phase of NCS did not begin until Fiscal Year 2007. Since Dr. Friedman left NIH's employ in the spring of 2006, *a fortiori* she was not involved in the implementation or contracting phase of NCS. The Ethics Opinion finding to the contrary is plainly and demonstrably wrong.

Third, in its Ethics Opinion, NIH relies upon the *Yucca Mountain* opinion, in which the OGE was asked to evaluate whether federal employees who had participated in the conduct or management of feasibility and other preliminary studies and evaluations of the proposed Yucca Mountain nuclear waste disposal facility would be precluded by the post-employment restrictions from appearing before or communicating with government officials on behalf of non-governmental parties interested in the subsequent NRC facility licensing proceedings. Ethics

Opinion at 9. *Yucca Mountain* states that in determining whether two particular matters are viewed as the same for purposes of section 207(a), it is appropriate to consider "the extent to which the matters involve the same basic facts, related issues, the same or related parties, time elapsed, the same confidential information, and the continuing existence of an important Federal interest." *Yucca Mountain* at 6 (quoting 5 C.F.R. § 2637.201(c)(4)). OGE has stated that when the term "particular matter involving specific parties" is used, "it reflects 'a deliberate effort to impose a more limited ban and to narrow the circumstances in which the ban is to operate.'" OGE DAEOgram DO-06-029 at 3 (quoting Bayless Manning, *Federal Conflict of Interest Law* 204 (1964)). In this instance, NIH has seemingly defined "particular matter involving specific parties" to cast the widest net possible, in contravention of OGE's guidance that the term "particular matter involving specific parties" should be construed narrowly.

Fourth, NIH erroneously contends that, because Dr. Friedman's work on the protocol(s) to be incorporated in the Montgomery County Contract occurred after expressions of interest were made in 2005 by potential bidders who were eligible to serve in the Study Locations in the State of Maryland covered by the 2007 procurement, "the Montgomery County Contract had sufficiently evolved to constitute a 'particular matter involving specific parties.'" Ethics Opinion at 12. However, at the time NIH awarded contracts for the first Vanguard Centers in 2005, it had not secured funding for future sites, as explained by NICHD's Director: "The Study has adequate funding to launch the Vanguard Centers. The federal agencies leading it hope to award additional Study Centers to work in a total of 105 sites, subject to the availability of future funding . . . . The timing of a new competitive process also depends on future funding." *See* Remarks of Duane Alexander, M.D. Director, National Institute of Child Health and Human Development (September 29, 2005); *available at* http://www.nichd.nih.gov/news/releases/duane_alexander.cfm ("Remarks of Duane Alexander"). Notably, the 2005 RFP for the Vanguard Centers did not even solicit proposals for the Montgomery County Study Location. Further, while the protocols for the various Study Centers had yet to be finalized or fully developed at the time the Vanguard Centers RFP was released,

NIH nonetheless alleges the Montgomery County Contract constituted a "particular matter involving specific parties" as of that precise date (November 16, 2004). However, the Vanguard Centers RFP clearly distinguishes that RFP from future RFPs for other Study Centers:

> Although the intent is to combine data collected through Vanguard Centers with data collected through Study Centers that are added later, several possibilities exist. If, through experience at the Vanguard Centers, it is learned that critical aspects of the protocol are infeasible, leading to major revisions in procedures, it may not be scientifically valid to combine initial data collected at Vanguard Centers with data collected in the full Study. Further, the addition of the full complement of Study Centers is dependent on receipt of full funding for the NCS.

National Children's Study Plan, RFP NICHD-2004-07 ("Vanguard RFP"), Attachment 1, p. 46, *available at* http://www.nationalchildrensstudy.gov/research/study_plan/vanguard_attachments.cfm . In general, new particular matters have been found where there are fundamental changes or differences between related matters. OGE Advisory Opinion 99 x 14(2) (July 7, 1999) at 2, *available at* http://www.usoge.gov/pages/advisory_opinions/advop_files/1999/99x14_2.html (citing *United States v. Medico Industries, Inc.*, 784 F.2d 840 (7th Cir. 1986)). Here, the 2005 RFP for the Vanguard Centers (issued on November 16, 2004) differs markedly from the 2007 or 2008 RFPs.[2]

NIH's contention that, simply because certain eligible parties had expressed interest in future NCS Study Center sites that *may* have been approved for funding in the future and that

---

[2] For several different reasons, the Vanguard RFP appears to be a distinct "particular matter involving specific parties." The Vanguard RFP tasks the Vanguard Locations "to finalize the Study Protocol, including finalizing the Sampling Plan for their particular Study Location and methods of data collection." Vanguard RFP, Section C at 9. The work of the Vanguard Centers was carried out by "specific parties" who were chosen through a competitive bid process. *See, supra,* Remarks of Duane Alexander. The role of the Vanguard Centers is also broader than that of the Study Centers. *See* National Children's Study Questions and Answers (October 2007), *available at* http://www.nationalchildrensstudy.gov/get_involved/learn_more/qa.cfm. Their mission is not only to enroll and collect data from Study participants but also to "test the study's different components for incorporation into the full Study." *Id.*; *see also* Vanguard RFP. Section C, at 9. The previously selected Vanguard Centers interested in performing work at a Study Center were also required to submit proposals in response to the 2007 RFP, which further indicates that these were distinct matters. *See* National Children's Study Pre-Proposal Conference (March 7, 2007) at 12.

*may* have instituted the protocols developed to that point, the Montgomery County Contract had sufficiently evolved to constitute "a particular matter involving specific parties" is patently unreasonable; it elevates the importance of purely serendipitous events while limiting the legitimate post-government employment activities of a well-qualified research scientist. Characterization of the NCS in this manner suggests that Dr. Friedman would not be prohibited from working on the NCS if she simply had taken post-government employment with an employer in a state outside of the "respective census regions" where there had been no "early interest" expressed in 2005 by entities eligible to serve as Study Center locations. A definition of NCS which creates such an arbitrary determination of when the contract for the Montgomery County Study location became a "particular matter involving specific parties" is irrational, capricious, and contrary to applicable law.

Finally, in its Ethics Opinion, NIH has ignored the persuasive legal authority suggesting that technical design work, including the use and development of scientific or engineering concepts, frequently does <u>not</u> operate to ban a former Government employee from employment in the private sector involving the implementation of that technical design because at the early stage of development a "specific party" has not been identified.

> [W]e take it that an official who drafts specifications for a weapon may represent people who later submit bids to make the weapon; specifications (or regulations) do not have "specific parties." A scientist who analyzes a new chemical could do further work on that chemical for a private employer; there would be no overlap of parties.

*Medico Industries*, 784 F.2d at 843. Example 2 at 5 C.F.R. § 2637.201(c)(2), discussed in OGE Advisory Opinion 99 x 16 (September 10, 1999), likewise illustrates that technical design can appropriately be considered a distinct matter from the ultimate matter involving specific parties.

> [W]ork on the technical design of a new satellite communications system was separate from the subsequent contracting process to construct that system. The issue in [Example 2 at 5 C.F.R. § 2637.201(c)(2)] was when the satellite contract became a particular matter and ultimately a matter involving specific parties. Since the technical design did not relate to the contracting process, it was considered to be separate; furthermore, it did not apparently involve specific parties at that stage. Therefore, the former employee could represent a company in its contract proposals, even though he had worked on the technical design for the system.

OGE Advisory Opinion 99 x 16 (September 10, 1999) at 4, *available at* http://www.usoge.gov/pages/advisory_opinions/advop_files/1999/99x16.html. Even in the *Yucca Mountain* opinion, the entirety of the Yucca Mountain project is not arbitrarily lumped by OGE into one matter, "[t]here may be certain Yucca Mountain matters, apart from the site characterization process, that are sufficiently distinct from the licensing proceedings that they constitute different particular matters." *Yucca Mountain* at 7, n.6.[3]

In summary, at the time of Dr. Friedman's employment with NICHD, the NCS had simply not sufficiently evolved to constitute a "particular matter involving specific parties." During the period Dr. Friedman provided advice, the NCS was still in its developmental stage, as evidenced by Dr. Friedman's role as an advisor in the development of protocol for infant neurodevelopment and social environment data collection. Furthermore, Dr. Friedman had no role in the formulation or preparation of any procurement documents (such as solicitations) or in the contracting or acquisition process for the NCS; her role was limited to recommendations

---

[3] Additionally, the role of post-Government employees that implicates section 207(a) in *Yucca Mountain* is significantly different from the role Dr. Friedman has sought to undertake following her Government service, which is a factor this Court should consider in determining whether Dr. Friedman's role in the creation of a technical protocol is the same "particular matter involving specific parties" as the role she seeks now as PI for an NCS Study Center. Specifically, the *Yucca Mountain* opinion only bans prior Government employees from acting in a representational capacity for private parties in *adjudicatory* proceedings related to the Yucca Mountain licensing before the Nuclear Regulatory Commission. *Yucca Mountain* at 1. "Indeed, license application hearings in particular, may be viewed as quintessential 'party matters,' having as they do a quasi-judicial character involving formal parties who have formal procedural rights and obligations." *Yucca Mountain* at 6. The license application proceedings in *Yucca Mountain* that presented the conflict of interest at issue were formal administrative adjudicatory proceedings, and therefore starkly different from the role that Dr. Friedman would undertake as PI in a longitudinal data collection study. Furthermore, the *Yucca Mountain* opinion is only applicable to former employees who were involved "either personally or substantially, or as supervisors with official responsibility." *Yucca Mountain* at 4. As discussed below, NIH has not shown that the advisory role of Dr. Friedman on the neurodevelopmental and social environment assessments in the development of the NCS constituted "personal and substantial" involvement; indeed, the weight of the evidence is to the contrary.

regarding the technical protocol development and design. NIH's failure to consider these salient facts was arbitrary and capricious.

**b. Dr. Friedman Did Not Participate Personally and Substantially on the NCS During Her Tenure as a Government Employee, as Required For Disqualification Under 18 U.S.C. § 207.**

To be permanently barred by 18 U.S.C. § 207(a), a former Government employee must also have "participated personally and substantially" in the particular matter. The phrase "personally and substantially" is defined in 5 C.F.R. § 2637.201(d), as follows:

> The restrictions of section 207(a) apply only to those matters in which a former Government employee had "personal and substantial participation," exercised "through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise." To participate "personally" means directly, and includes the participation of a subordinate when actually directed by the former Government employee in the matter. "Substantially," means that the employee's involvement must be of significance to the matter, or form a basis for a reasonable appearance of such significance. It requires more than official responsibility, knowledge, perfunctory involvement, or involvement on an administrative or peripheral issue. A finding of substantiality should be based not only on the effort devoted to a matter, but on the importance of the effort. While a series of peripheral involvements may be insubstantial, the single act of approving or participation in a critical step may be substantial.

As detailed more thoroughly in the Complaint filed herewith, Dr. Friedman's work on the NCS was in an advisory role, working with a team of other individuals. Her team was tasked with recommending measures (from a list of potential measures identified by others) for two of many technical protocols for a very narrow period (birth to 18 months) to be utilized in a Study designed to follow its participants until adulthood. These key facts are not even considered in the Ethics Opinion. While Dr. Friedman's work on the NCS protocols may have been helpful to the ultimate success of the NCS, she made no decisions with respect to the NCS and had no involvement in the portion of the NCS concerned with development in infants older than 18 months.

Further, the NCS website purports to recognize the individuals who have contributed time and expertise to the development of the NCS. *See* NCS Website – Persons Who Have

Contributed Time and Expertise to the Development of the Study, (March 13, 2008), *available at* http://www.nationalchildrensstudy.gov/about/study_contributors/. Dr. Friedman's name is curiously absent from the list. Dr. Friedman's contributions to the Study, which NIH now alleges were sufficiently personal and substantial so as to permanently bar her under 18 U.S.C. § 207, apparently were not so substantial as to justify her recognition on NCS's list of contributors. *Id.* This is yet another example where the published information on NCS's website differs markedly from the conclusions and characterizations adopted by NIH in its Ethics Opinion. Thus, the advisory role of Dr. Friedman on the neurodevelopmental and social environment assessments does not constitute "personal and substantial" involvement in the entire NCS, as NIH has concluded.

**c. Communications by Dr. Friedman as PI for The Montgomery County Contract Do Not Implicate the Ban On Representational Activity Prohibited By 18 U.S.C. § 207.**

The NIH Ethics Opinion inexplicably continues to ignore the exceptions for the communication of technical and scientific information in the applicable regulations. The Ethics Opinion also contends that communications that would result from the award of the Montgomery County Contract to CNAC would implicate section 207 because Dr. Friedman will potentially violate § 207(a) in connection with those communications. However, the regulations clearly anticipate that a former Government employee who worked on the development of technical protocols may in the future assume a role in the private sector implementing these protocols. The proposed new rule for 5 C.F.R. § 2641.201(e)(2) states that:

> Certain communications to and appearances before employees of the United States are not made with the intent to influence. . . including, but not limited to, communications and appearances made solely for the purpose of. . . (iv) Signing an assurance that one will be responsible as principal investigator for the direction and conduct of research under a Federal grant (see example 4 to paragraph (d) of this section).

*See* 68 Fed. Reg. 7844, 7873 (Feb. 18, 2003). To date, the Office of Government Ethics has not finalized its revision to the conflict-of-interest regulations. However, the prior regulations are

not to the contrary. *See* 5 C.F.R. § 2637.201(c)(2) ("In connection with technical work, participation in projects generally involving one or more scientific or engineering concepts, in feasibility studies, or in proposed programs prior to the formulation of a contract will not restrict former Government employees with respect to a contract or specific programs entered into at a later date.").

Under 5 C.F.R. § 2637 (which this Court directed NIH to review in preparing its Ethics Opinion), the Office of Government Ethics provides an example involving a former employee at NIH that later acts as a Principal Investigator (albeit in the context of the one-year restriction under 18 U.S.C. § 207(c)):

> A former Senior Employee of the National Institute of Health (NIH), employed by a non-exempt research institute, prepares an application to NIH for a research contract. The application is submitted to NIH by the institute and lists the Senior Employee as principal investigator. The Senior Employee does not violate 18 U.S.C. 207(c) by preparing the application or by being listed as principal investigator, since these are not representational activities. He may also sign an assurance to NIH, as part of the application, that he will be responsible for the scientific and technical direction and conduct of the project if an award is made. He may also communicate with NIH to provide scientific or technical information on the application, including presentation to NIH personnel at the research site, so long as he does not argue for approval or funding of the application.

*See* 5 C.F.R. § 2637.204(g) , Example 1, *superseded in part by* 5 C.F.R. 2641. The proposed regulations include an almost identical example within the context of the lifetime ban under 18 U.S.C. § 207(a):

> A former employee of the National Institutes of Health (NIH) prepares an application for an NIH research grant on behalf of her [sic] university employer. The application is signed and submitted by another university officer, but it lists the former employee as the principal investigator who will be responsible for the substantive work under the grant. He has not made a communication. He also may sign an assurance to the agency that he will be personally responsible for the direction and conduct of the research under the grant, pursuant to § 2641.201(e)(2)(iv). Moreover, he may personally communicate scientific or technological information to NIH concerning the application, provided that he does so under circumstances indicating no intent to influence the Government pursuant to § 2641.201(e)(2) or he makes the communication in accordance with the exception for scientific or technological information.

*See* 68 Fed. Reg. at 7873 (proposed new rule 5 C.F.R. § 2641.201(d)(3), Example 4). This example demonstrates that 18 U.S.C. § 207(a) is not intended to prohibit the types of scientific

communications that would occur between Dr. Friedman as CNAC's PI and the NIH officials involved in NCS.

**d. NIH's Permanent Disqualification of Dr. Friedman Serves No Legitimate Public Policy Interest of the U.S. Government and Is Contrary To The Legislative Intent of 18 U.S.C. § 207.**

NIH's arbitrary conclusion that Dr. Friedman is barred by the post-employment restrictions of 18 U.S.C. § 207 fails to uphold the legislative intent of the statute. "The purpose of the post employment provisions is to avoid the 'revolving door' syndrome inherent in which are the potentialities for the use of inside information and for continuing personal influence." OGE Advisory Opinion 81 x 35 (December 16, 1981) (citing B. Manning, *Federal Conflict of Interest Law*, 179-180 (1964); S. Rep. No. 170, 95th Cong., 1st Sess. 31-33 (1977)). "Many employees of the government are experts in particular fields. A broad construction of 'particular matter' might make it very difficult for these people, their human capital heavily invested in a single subject, to leave the government for a private employer that deals extensively with the government." *Medico Industries*, 784 F.2d at 843.

Thus, the intent of § 207(a) is not to prohibit all former Government employees who contributed to the development of a study or technical issue during their tenure as a Government employee from communicating with the Government after leaving Government service. In enacting § 207(a), Congress's purpose was not to protect the public from an individual attempting to use his or her expertise, but rather to preclude the use of trading upon the specific knowledge obtained during public service. *United States v. Clark*, 333 F. Supp. 2d 789, 793 (D. Wis. 2004). Among other things, the statute seeks to prevent such knowledge from being used against the Government itself. *Id.*

Here, there is no danger that Dr. Friedman has acquired information that she can "use against the Government." The NCS is essentially a broad-based Study designed to facilitate the collection of data. Dr. Friedman was involved in the development of a discrete, limited technical protocol during the formulation of this Study. The full protocol is itself a data collection methodology which, having been adopted, cannot be "used against" NIH or any other entity. Dr.

Friedman now seeks to involve herself in the implementation of the Study as a whole as PI. Dr. Friedman's proposed role as CNAC's PI does not violate 18 U.S.C. § 207.

**B. CNAC Will Suffer Irreparable Harm Without Injunctive Relief**

CNAC also meets the second prong of the test for preliminary injunctive relief – irreparable harm to the plaintiff. NIH's prior arbitrary and capricious decision to disqualify Dr. Friedman, its failure to rectify that decision, and its decision to solicit new proposals for the Montgomery County Contract under the 2008 RFP, constitutes irreparable injury that justifies granting the injunctive relief.

CNAC was irreparably harmed when NIH previously denied it award of the Montgomery County Contract based on a flawed decision to disqualify Dr. Friedman as Principal Investigator for the Montgomery County Location. After a successful protest by CNAC, this Court gave NIH the opportunity to rectify its decision by conducting a proper ethics evaluation of Dr. Friedman. Despite the opportunity over a period of several months to correct its flawed analysis, NIH's ethics evaluation of Dr. Friedman provided to CNAC on March 19, 2008, fails to rectify its prior arbitrary and capricious evaluation as required by this Court's January 3, 2008 Order.

As a result of NIH's arbitrary and capricious disqualification of Dr. Friedman, CNAC now stands to suffer further irreparable harm, as NIH has issued the 2008 RFP which seeks proposals for the Montgomery County Contract. It is an implied condition of every request for proposals issued by the Government that each responsive proposal submitted will be fairly and honestly considered. *Space Age Engineering, Inc. v. United States*, 4 Cl. Ct. 739, 741 (1984); *see also L-3 Communications Integrated Sys., LP v. United States*, 79 Fed. Cl. 453, 461-62 (2007) ("The statute does not limit the legal theories on which such an 'objection' to a contract award might be based. Whether conduct be characterized as an arbitrary and capricious agency action or a breach of the implied duty to consider proposals fairly, such conduct is actionable in a bid protest."). While CNAC intends to submit a proposal in response to the 2008 RFP for the Montgomery County Contract, NIH's affirmation of its prior arbitrary and capricious ethics decision and its conclusion that Dr. Friedman is permanently barred by 18 U.S.C. § 207 has

prejudiced and effectively precluded CNAC from fair consideration for award of the Montgomery County Contract under the 2008 RFP.

CNAC will be irreparably injured by the denial of this injunctive relief, because it will otherwise have effectively lost the opportunity to compete for and perform this contract for a second time. This Court regularly holds that "this type of loss, deriving from a lost opportunity to compete in a fair competitive bidding process for a contract, has been found sufficient to prove irreparable harm." *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000); *see also United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) ("The opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000) ("a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm"). Likewise, the "denial of the right to have a bid fairly and lawfully considered constitutes irreparable harm." *Overstreet Elec. Co.*, 47 Fed. Cl. at 744, n.25; *Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. 1370, 1381 (E.D. Va. 1993).

NIH's prior violation of procurement statutes and regulations, and its continued refusal to comply with this Court's January 3, 2008 Order prevents CNAC from being properly considered for the Montgomery County Contract, and from having its offer fairly and lawfully evaluated. Such a failure constitutes irreparable harm under the second prong for injunctive relief.

**C. The Harm to CNAC Outweighs Any Harm to Defendants**

As discussed above, NIH's conduct continues to harm CNAC. This Court has previously determined that NIH acted arbitrarily and capriciously in regards to Dr. Friedman and CNAC's proposal for the Montgomery County Contract. Furthermore, CNAC and Dr. Friedman have already been deprived of the opportunity to serve the public by contributing to the NCS, and CNAC has been denied the opportunity to enhance its own reputation in the field as the awardee of the Montgomery County Contract.

NIH will not suffer any harm if it is enjoined from further procurement activity in support of the Montgomery County Contract. First, it cannot appropriately evaluate CNAC's proposal in

response to the 2008 RFP without first properly evaluating Dr. Friedman as CNAC's proposed PI (an undertaking which NIH has now twice failed to perform). Second, Montgomery County is only one of many NCS Study Centers encompassed by the 2008 RFP. NIH suffers no harm by delaying procurement action on the Montgomery County Contract given that its efforts to procure services at various other sites can continue unabated. Finally, NIH's arbitrary and capricious evaluation regarding Dr. Friedman's status has placed CNAC and its NCS teammates in an untenable position. CNAC's competitors for the Montgomery Country Contract under the 2007 RFP, which received awards for locations other than Montgomery County, can now bid Montgomery County with the benefit of the economies of scale that come with having multiple sites, giving them an unfair price advantage over CNAC. Additionally, these competitors can leverage their experience to date on NCS, received as a result of their award under the 2007 RFP, experience which CNAC was unjustly denied. If CNAC's teammates wish to participate in NCS, they must now consider entreaties from CNAC's competitors or form teams of their own.

For all of these reasons, the balance of the harms favors CNAC and the injunctive relief sought herein should issue.

### D. The Public Interest Will Be Served By Granting Preliminary Injunctive Relief

In evaluating this final factor, this Court has stated, "[i]t is beyond peradventure that the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Overstreet Elec. Co.*, 47 Fed. Cl. at 744; *see also Dairy Maid Dairy*, 837 F. Supp. at 1382 (citing *Scanwell Labs v. Schaffer*, 424 F.2d 859, 866-67 (D.C. Cir. 1970)); *see also Day & Zimmerman Servs. v. United States*, 38 Fed. Cl. 591, 610 (1997) (finding protection of the integrity of the procurement system to be in the public interest). It is equally true that "a public interest is manifest in ensuring that the Government closely adhere to the requirements of the procurement regulations." *Overstreet Elec. Co.*, 47 Fed. Cl. at 744; *cf Mark Dunning Indus., Inc. v. Perry*, 890 F. Supp. 1504, 1518 (M.D. La. 1995) (holding that the public interest in maintaining the integrity of the procurement



US_SW_600577230v1 (2)

process and ensuring fair and open competition outweighed the public interest in avoiding disruption of the procurement process).

In this case, the integrity of the procurement process demands that NIH conduct the competition in a manner that is consistent with federal statutes and regulations. Because NIH has failed to do so, the public interest would be clearly served by the correction of this failure, especially because there is essentially no adverse impact on the Government compared against the substantial irreparable harm to CNAC (and Dr. Friedman) absent the requested injunctive relief. Further, granting the proposed injunctive relief in this instance will allow the Government to benefit from Dr. Friedman's substantial expertise, and enforce this Court's prior judgment and order.

## VII. <u>CONCLUSION</u>

For the reasons stated above, CNAC seeks this Court's review of the merits of NIH's Disqualification Letter and a determination by the Court that the Disqualification Letter is arbitrary and capricious. CNAC further seeks a preliminary injunction precluding further procurement action on the Montgomery County portion of the 2008 RFP pending this Court's review of the merits of NIH's Disqualification Letter. Finally, in the event that this Court concludes – as it should – that NIH's Disqualification Letter is arbitrary, capricious, and violative of this Court's January 3, 2008 Order, in these unique circumstances this Court should exercise its equitable powers and direct NIH to award the Montgomery County contract to CNAC.

Dated: April 8, 2008

Respectfully submitted,

Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)
Counsel for The CNA Corporation

*Of Counsel:*

Daniel S. Herzfeld
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859

Caroline L. Plant
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406

**DEPARTMENT OF HEALTH & HUMAN SERVICES** Public Health Service

Phone: (301) 496-4611
Fax: (301) 402-3676
http://www.nichd.nih.gov

National Institutes of Health (NIH)
National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK)
Office of Acquisitions, NICHD Branch
6100 Executive Blvd., Room 7A07, MSC 7510
Bethesda, MD 20892-7510

March 19, 2008

Stephen Broyhill, Vice-President, Business Development
Keith Thornburg, Manager of Contracts
The CNA Corporation
4825 Mark Center Drive
Alexandria, VA. 22311

Dear Mr. Broyhill and Mr. Thornburg:

In accordance with Judge Horn's order dated January 3, 2008, and in fulfillment of my responsibility under Federal Acquisition Regulation (FAR) 1.602-2 to safeguard the interests of the United States in its contractual relationships, I affirm my decision to exclude the CNA Corporation (CNAC) from consideration for the 2007 award of a contract under RFP-NIH-NICHD-NCS-07-11, National Children's Study Centers (2007 RFP). Consistent with the instruction at FAR 1.602-2(c), I have requested and considered the advice of specialists in law in order to safeguard those interests. Specifically, I adopt the attached opinion of the Office of the General Counsel, Ethics Division, regarding the prospective violation of 18 U.S.C. § 207(a) as a result of CNAC's proposal of Dr. Sarah Friedman as its principal investigator under a National Children's Study Center contract. I affirm my decision to act under FAR 1.602-2 by excluding CNAC from consideration under the 2007 RFP in order to prevent an eventual violation of § 207(a) and the tainting of the contract and procurement thereby.

With respect to the forthcoming solicitation Reference-Number-NIH-NICHD-NCS-08-21 (2008 RFP), I advise you that the 2008 RFP does not materially differ from the 2007 RFP with respect to Dr. Friedman's eligibility under 18 U.S.C. § 207(a)(1) to serve as principal investigator. Accordingly, I would anticipate the same determination with respect to Dr. Friedman under the 2008 RFP as under the 2007 RFP. However, given that the 2008 RFP has not been issued, and given that CNA has not yet submitted a proposal, I have not made a determination as to whether or not to CNAC would be ineligible for award pursuant to the 2008 RFP. Thus, CNAC is not excluded from submitting a proposal in response to the 2008 RFP. Should CNAC submit a proposal in response to the 2008 RFP identifying Dr. Friedman as its proposed principal investigator, I would consider any information or argument that CNAC submitted with its proposal bearing upon Dr. Friedman's eligibility.

The legal opinion I have adopted is attached[1]. I have decided to provide this specific document to CNAC to fully explain the Government's analysis. I have waived attorney-client privilege with respect to the attached comment only and for no other purpose. In addition, I have not waived attorney-client privilege with respect to consultations and exchanges with counsel on this matter.

Sincerely,

Elizabeth Osinski

Elizabeth Osinski
Contracting Officer, NICHD Contracts Management Branch
Office of Acquisitions, NIDDK, NIH
Executive Building, Room 7A-07
6100 Executive Blvd., MSC 7510
Bethesda, Maryland 20892-7510
Phone: 301-435-6947
FAX: 301-402-3676
E-mail: eo43m@nih.gov

Enclosure

cc: Alex D. Tomaszczuk

1 I have noted a minor factual error on page four of the opinion. The last sentence on page four which reads "In addition, contracts for the collection of data in seven of the 105 Study Locations were awarded in fiscal year 2005," should instead reference "calendar year 2005," since one such contract was awarded on November 1, 2005. My attorneys have advised me that this minor factual error has no impact on the legal analysis and conclusion.

DEPARTMENT OF HEALTH & HUMAN SERVICES

Office of the Secretary

Office of the General Counsel
Washington, D.C. 20201

March 18, 2008

MEMORANDUM

TO: Elizabeth J. Osinski
Contracting Officer
NIDDK Office of Acquisitions,
NICHD Branch
National Institutes of Health

FROM: Edgar M. Swindell
Associate General Counsel for Ethics
Designated Agency Ethics Official

SUBJECT: Eligibility of Sarah Friedman, Ph.D., to Serve as a Principal Investigator for a Study Center Selected to Collect Data for the National Children's Study

In response to the order of Judge Marian Blank Horn in *The CNA Corporation v. United States*, No. 07-858C (Fed. Cl. Jan. 3, 2008), we are documenting the legal analysis that informed our advice to you in connection with your determination that Sarah Friedman, Ph.D., was ineligible to serve as a Principal Investigator (PI) for a Study Center selected under the 2007 procurement to collect data for the National Children's Study (NCS).

As you know, former federal employees are subject to the criminal post-employment statute, 18 U.S.C. § 207. With the exception of a provision not relevant to this case,[1] former employees who are not "senior employees"[2] for purposes of the statute are subject only to the so-called

---

[1] Under 18 U.S.C. § 207(b), former employees who participated in ongoing trade or treaty negotiations on behalf of the United States within the year preceding their departure cannot, for one year, represent, aid, or advise anyone based on information exempt from disclosure to which the employees had access.

[2] "Senior employees" are subject to paragraphs (a)(1), (a)(2), (b), and additional restrictions known as the one-year "cooling-off period" and the one-year "foreign entity representation and advice prohibition," 18 U.S.C. §§ 207(c) and (f), respectively. "Senior employees" include Presidential appointees paid at Levels II through V of the Executive Schedule, uniformed service officers at pay grades O-7 or above, and members of the Senior Executive Service and employees in other pay systems with an annual rate of basic pay (excluding locality-based adjustments) set at an amount equal to or greater than 86.5% of the rate of basic pay for Level II of the Executive Schedule. For 2008, Level II is $172,200, which yields a senior status threshold of $148,953. In 2006, when Dr. Friedman left government employment,

"permanent ban" and the "two-year bar," 18 U.S.C. §§ 207(a)(1) and (a)(2), respectively.[3] At issue in the 2007 procurement was the permanent ban. Under this provision, former employees are prohibited from appearing before or communicating with government officials on behalf of any other person or organization (except the United States)[4] with the intent to influence in relation to any specific party matter in which the employee personally and substantially participated at any time during federal employment.

---

Level II was $165,200 and the senior status figure was $142,898. Dr. Friedman's salary was calculated according to the GS 15 pay schedule. The highest base pay that year for a Grade 15, Step 10, was $118,957. Accordingly, no employee paid under the General Schedule was a "senior employee."

[3] The remaining parts of 18 U.S.C. § 207 were inapplicable to this case. Paragraph (d) imposes a two-year "cooling-off period" for the Vice President, Cabinet officers paid at Level I, and certain high level employees of the Executive Office of the President. These "very senior employees" are precluded from making post-employment representational contact to employees of their former agency, as well as to any Presidential appointee in the entire Executive Branch and any employee paid at Levels I through V of the Executive Schedule. Paragraph (e) prescribes the post-employment restrictions for Members of Congress and Legislative Branch employees. Paragraphs (g), (h), and (i) address, respectively, special rules for detailees, the designation of separate components for purposes of the one-year "cooling-off period," and definitions. Paragraphs (j) and (k) deal with exceptions and a waiver procedure that are not applicable in this case, *see* discussion *infra* at pages 13-16, and paragraph (l) applies to detailees assigned to an agency from private sector organizations.

[4] In addition to the parenthetical exception in section 207(a)(1) that permits representational activities that are conducted on behalf of the United States, section 207(j)(1), discussed *infra* at footnote 19 on page 14, provides an explicit exception for acts done in carrying out official duties on behalf of the United States. However, neither the parenthetical exception in paragraph (a)(1) nor the exception in paragraph (j)(1) permit representational appearances or communications by former employees who work for government contractors or grantees. In discussing its proposed regulation, *see* discussion *infra* footnote 11 at page 8, to implement both the parenthetical and section 207(j)(1), the Office of Government Ethics (OGE) notes that such an expansive reading of the statute has been consistently rejected. 68 Fed. Reg. 7861 (February 18, 2003). According to OGE, a former employee does not act on behalf of the United States by virtue of performing work funded by the Government or engaging in the appearance or communication on behalf of a third party in response to a contact initiated by the Government, or because the Government will derive some benefit from the activity, or because the former employee or the person or organization on whose behalf he or she is acting may share the same objective as the Government. *Id.*; *see also* OGE Memorandum to Designated Agency Ethics Officials, General Counsels, and Inspectors General (February 17, 2000), available under "DAEOgrams" on the OGE web site, http://frwebgate.access.gpo.gov/cgi-bin/leaving.cgi?from=leavingFR.html&log=linklog&to=http://www.usoge.gov.

In September 2007, after NICHD ethics officials consulted with the Senior Ethics Counsel on my staff assigned to advise the National Institutes of Health (NIH), you determined that the permanent ban prohibited Dr. Friedman from serving as a Study Center PI. As a result, although the proposal submitted by The CNA Corporation (CNA) to operate as Study Center for Baltimore County and Montgomery County, MD, was included in the competitive range, CNA did not receive an award. Thereafter, CNA filed the above-referenced bid protest action disputing the government's analysis regarding the application of the criminal statute in Dr. Friedman's case on three grounds: (1) that the NCS is not a specific party matter to which the restriction applies in Dr. Friedman's case; (2) that Dr. Friedman was not personally and substantially involved in the NCS matter; or (3) that, alternatively, Dr. Friedman is exempt from the application of the restriction because of the nature of her work on the NCS while she was a federal employee. On January 3, 2008, the Court of Federal Claims issued an order finding that the record submitted in the case lacked a clearly articulated basis for concluding that section 207 would bar Dr. Friedman's participation as the Study Center PI if CNA were selected. The court directed NIH to reconsider the ethics decision and to articulate the statutory and regulatory grounds for its determination.

<u>Background concerning the National Children's Study</u>

Based upon our review of documentation related to the development of the NCS—including pre-solicitation and pre-award correspondence and documentation contained in the contracting files related to the fiscal year 2005 and 2007 procurements; acquisition plans; requests for proposals (RFPs); comments on RFPs; materials from pre-proposal conferences; competitive range and source selection determinations; information that currently exists regarding the planned fiscal year 2008 procurement; other information publicly available on the NCS web site; and the Complaint for Declaratory, Preliminary and Permanent Injunctive Relief and Motion for Preliminary Injunction filed by CNA in the United States Court of Federal Claims—and multiple consultations with you and members of the program staff, the following describes our understanding of the NCS:[5]

The Children's Health Act of 2000, 42 U.S.C. § 201, authorized and directed, in part, a consortium of federal agencies, led by the National Institute of Child Health and Human Development (NICHD) in partnership with the Centers for Disease Control and Prevention (CDC), the Environmental Protection Agency (EPA), and the National Institute of Environmental Health Sciences (NIEHS), to plan and conduct a large longitudinal study of the effect of

---

[5] It may also be worth noting that our understanding of the NCS is further informed by the significant interactions that Senior NIH Ethics Counsel Gretchen H.Weaver, the principal author of this opinion, has had with program officials since the autumn of 2001 in connection with the analysis and consideration of potential conflict of interest issues for the members of the National Children's Study Advisory Committee.

environmental exposures on child health and development.[6] After considering the feasibility of conducting a longitudinal cohort study of environmental effects on mothers and children, concept clearance was granted for the NCS, as a whole, in March 2004. The NCS will involve a nationally representative sample of approximately 100,000 children from before birth, whenever possible, to age 21. For purposes of the NCS, the environment is defined broadly to include biological, chemical, physical, behavioral, social, cultural, geographical, and educational factors. The goal of the NCS is to provide information that will lead to improvements in the health and development of children.

The Interagency Coordinating Committee comprised of federal employees from the NICHD and the other lead agencies was established in 2000 to guide the planning and implementation of the NCS. The Program Office within the NICHD, the chartered federal advisory committee, 22 working groups comprised of over 200 scientists, and more than 2500 people interested in the design, conduct, and results of the NCS provided input during the planning phase.

Based upon the advice of experts in study design and sampling and the recommendations of the National Children's Study Advisory Committee, the Government decided that the NCS would be conducted using a national probability sample of all births in the United States. In 2004, the first stage of sampling was completed with the selection of 105 geographic locations (the Study Locations), corresponding to counties or, in sparsely populated areas, contiguous counties, in the United States from which the NCS participants would be drawn.

In fiscal year 2005, the contract for the NCS-Coordinating Center was awarded. The NCS-Coordinating Center is responsible for providing scientific support to the NCS Project Officer(s) in the development and implementation of the NCS, coordinating the day-to-day activities of the Study Centers (i.e. the entities that will collect the data in the Study Locations), the Central Laboratories, and the Central Repository, supporting the Information Management System for the NCS, handling the data processing and supporting the statistical analysis and reporting of NCS results. In addition, contracts for the collection of data in seven of the 105 Study Locations were awarded in fiscal year 2005.

In 2007, 22 contracts were awarded for the collection of data in 40 Study Locations. It is anticipated that contracts for the collection of data in the remaining Study Locations may be awarded following a fiscal year 2008 solicitation and, as needed, future solicitations. Notably, concept clearance was waived in relation to the fiscal year 2007 procurement as a result of the project concept clearance that was granted in March 2004. Contracting decisions are made subject to the availability of funds, the quality of proposals received, and other factors at the time

[6] By Act of Congress (Public Law 110-154), the NICHD was recently renamed the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development.

of each solicitation.[7] Subject to OMB approval, the first wave of data collection is scheduled to begin in 2008.[8]

Although the Study Center contracts are described as contracts for the collection of data, the study design, or Research Plan, and RFPs instruct that the Study Centers will work collaboratively with the Project Officer(s), the NCS-Coordinating Center, and other participating Study Centers to determine and finalize the protocol(s), schedules and methods they will employ. In order to take advantage of scientific advancements that will occur during the 20+ years of the study, and to ensure that the study can adapt to accommodate new hypotheses and measurement tools, the PIs for each of the Study Centers serve on the Steering Committee for the NCS, along with NICHD program officials, officials from the NCS-Coordinating Center, and the Interagency Coordinating Committee. All data collections will be conducted in accordance with standardized protocols. The schedule of data collections, measurements and tools to be employed during the pre-conception through 18 months of age phase of the NCS was substantially completed in 2007, subject to peer review and approval from the Office of Management and Budget under the Paperwork Reduction Act. In particular, decisions regarding the measures and tools that would be used to assess neuro and psychosocial development were made in 2006. In addition, the Study Centers will collaborate in relation to the data analysis and publication of NCS findings and conclusions.

As mentioned above, the study design for the NCS employs a multistage probability sample of births in the United States. This national probability design was determined to be the best design in light of the following goals:

(1) Collection of high quality, objective data to minimize measurement biases;
(2) Avoidance of selection biases and other biases that could lead to invalid references concerning exposure and outcome relations;
(3) Ability to capture the diversity of the population of the United States such that both the range and diversity of exposures and outcomes are represented; and
(4) Ability to generalize the results of the NCS to the population of the United States.

In keeping with principles of research validity, a statistically representative sample must be maintained to the greatest extent possible throughout data collection. Conclusions drawn from an unrepresentative sample could not be extrapolated and supported. As a result, in each successive procurement, the contracts awarded must provide for data collection from previously identified study locations such that the entire sample that will exist until the next procurement is, to the greatest extent possible, statistically representative of the population of the United States.

---

[7] For the fiscal years 2000-2008, respectively, the following funding (in approximate millions) has been available for the NCS: $1.0; $3.2; $6.1; $10.6; $10.6; $11.0; $12.1; $69.0; and $110.9.

[8] Due to logistic and cost considerations, data collection cannot begin simultaneously in all 105 locations.

Dr. Friedman's Role

As noted above, the NCS is a long-term longitudinal study of children from birth to adulthood to assess the affects of various environmental influences on child health and development. The goal of the NCS is to better understand the role of biological, chemical, physical, social and behavioral influences on children. Pursuant to the Research Plan, the impact of a wide range of environmental influences will be examined, including air pollutants; drinking water contaminants; dietary nutrients, supplements, and contaminants; infectious and allergic agents; and social and behavioral characteristics. Participating children will be followed to evaluate the impact of the various measures in a wide range of health and developmental outcomes. Pursuant to their contracts, each of the Study Centers will conduct the study according to the prescribed protocol(s). Each Study Center will collect information and data on the same schedules and using the same tools and measures. Data analysis will occur in relation to each developmental phase and longitudinally. Hence, the analysis of data in the context of later developmental phases will necessarily be dependent on data collected in early phases. In other words, the effect of an environmental influence early in life will be measured or evaluated at various points in the lives of the participating children, and must be evaluated in the context of all other influences.

Dr. Friedman is an expert in the field of early childhood development who was employed at the NICHD for more than 15 years.[9] Based upon her experience and expertise, she was selected in 2005 by the Project Officer(s) to lead the NCS protocol development team tasked with evaluating available tools designed to measure cognitive, neurobehavioral, educational, psychological, motor, sensory, and social development early in life for use in the NCS. The relative quality of her team's work product (i.e., the recommendations) that she presented to the Steering Committee— a group comprised of the already identified Study Center PIs and NICHD and other government officials— was dependent upon the careful and deliberate consideration of the literature and other information available to them, and the exercise of sound scientific analysis of the relevant issues. This was not merely a ministerial task.[10] Dr. Friedman and her team were tasked and trusted to evaluate the state of the science and to make recommendations based on their sound analysis. Their work and discussions generated over 100 e-mail exchanges discussing the relative merits of various tools and approaches. Based upon our consultations with program officials, it seems clear that the importance of scientific analysis during the development of protocols for a study of the magnitude of the NCS cannot be overstated. The decisions made regarding what to measure and how to do it can and will affect the ultimate validity and reliability of the data and analyses and whether, ultimately, the statutory mandate is satisfied.

---

[9] Dr. Friedman was promoted to the GS-15 level effective in January 1998.

[10] It is noted that should Dr. Friedman serve as a Study Center PI, she will become a member of the Steering Committee she advised as part of her government duties.

Minutes from the NCS Neurodevelopmental Protocol Team indicate there were 20 meetings in 76 business days, between October 26, 2005, and February 15, 2006. The minutes reflect that the six-member team, joined in December by four Study Center PIs following the fiscal year 2005 contract awards, carefully considered, scrutinized, and debated the relative merits and utility of at least 60 different measurement tools during this period, contacting inventors and authors wherever necessary, based on the following criteria:

(1) Soundness of psychometric properties including internal consistency, test-retest reliability, concurrent/construct and predictive validity;
(2) Logistical feasibility (time, burden) within a large-scale multi-site study involving testing in the home;
(3) Relative ease of administration and scoring;
(4) Sensitivity to both individual variations in normal samples and clinically-relevant groups;
(5) Lack of bias against low-income, minority, or cultural groups; and
(6) Existence of comparable measures in the same domains for data collection at later ages.

A number of recommendations emerged from the meetings. For example, the minutes for the November 15, 2005, meeting indicate that the team recommended that:

(1) The NNNS measure of neurobehavioral organization be administered at age one month;
(2) The Bayley III (full version) be administered at twelve and eighteen months of age to assess language, cognitive, and motor function;
(3) A short-form Bayley III not be administered; and
(4) At age six months, the Ruff focused attention, Rose visual recognition memory, and the Rose representational competence measures would be administered.

By the time Dr. Friedman presented the work of her team to the Steering Committee on January 12, 2006, she presented a recommended schedule for the use of eleven selected measurement scales and tools to collect data relevant to ten developmental outcomes to be employed at various points during the first eighteen months of life, and indicated that measures addressing three additional outcomes were still being discussed.

Program staff has indicated that barring significant difficulty or problem discovered during the initial accrual phase, the recommendations made by Dr. Friedman and her team will be continued in the subsequent accrual phases.

<u>Dr. Friedman Participated in a Particular Matter Involving Specific Parties</u>

As noted in CNA's court filings, the permanent ban applies only in relation to certain government matters. Specifically, it applies in relation to "particular matters involving specific

parties." Among government matters, "particular matters" are those that involve consideration, determination, decision, or other action that is focused on the interests of specific persons, or a discrete and identifiable class of persons, and "particular matters involving specific parties" are the subset of particular matters that include applications, contracts, grants, and other proceedings that affect or determine the legal rights of the parties, or a related set of transactions between identified parties. *See* 5 C.F.R. § 2640.103(a)(1), 5 C.F.R. § 2640.102(l)-(m), 5 C.F.R. § 2635.402(b)(3), and 5 C.F.R. § 2637.201(c)(1).[11] These "particular matters involving specific parties" are distinguished from the other subset of "particular matters" that involve the formulation of policy, rules, and legislation that is focused on the interests of a broader group or identifiable class of entities and in relation to which the post-employment restrictions in 18 U.S.C. §§ 207(a)(1) and (a)(2) do not apply.[12] *Id.*

Guidance from the Office of Government Ethics (OGE) reflects that in order for the permanent ban in 18 U.S.C. § 207(a)(1) to attach, the "particular matter involving specific parties" must have involved specific parties both at the time of the former employee's involvement and at the time of the employee's post-employment contact, and the matter involved in the post-employment time frame must be the same "particular matter involving specific parties" in which the former employee officially participated during federal service.[13] *See* OGE Advisory Opinion 02 x 5 (July 31, 2002) (the *Yucca Mountain* opinion).

---

[11] As a result of the 1989 amendment of 18 U.S.C. § 207, the regulations published at 5 C.F.R. Part 2637 are binding only as to employees terminating federal service prior to January 1, 1991. In the present case, these regulations are properly cited, per the official notation to Part 2637, only as guidance in relation to terms and provisions that were not substantively revised. In 2003, the Office of Government Ethics published, with the concurrence of the Department of Justice as required by section 201(c) of Executive Order 12674, a proposed rule to revise and update the regulations implementing section 207. 68 Fed. Reg. 7844 (February 18, 2003). Although the draft final rule remains under consideration with the Office of Management and Budget, the proposed rule expresses the intent to discontinue the publication of 5 C.F.R. Part 2637. *See* 68 Fed. Reg. at 7844.

[12] This subset of "particular matters" is denominated "particular matters of general applicability." *See* 5 C.F.R. § 2640.102(m) and 5 C.F.R. § 2637.201(c)(1).

[13] OGE is a separate agency of the Executive Branch charged with overseeing and providing advice and guidance in relation to the administration of the ethics program within each Department and agency of the Executive Branch. Since 1980, OGE has had shared responsibility for providing interpretive guidance regarding the application of 18 U.S.C. § 207 with the Department of Justice, Office of Legal Counsel, although neither has authority to determine whether a particular individual's conduct violated the statute. *See* OGE Advisory Opinion 82 x 13 (August 31, 1982), at footnote 1, and OGE Advisory Opinion 05 x 06 (September 19, 2005), at page 1.

In the *Yucca Mountain* case, OGE was asked to evaluate whether federal employees who had participated in the conduct or management of feasibility and other preliminary studies and evaluations of the proposed Yucca Mountain nuclear waste disposal facility conducted pursuant to contract by the Department of Energy would be precluded by the post-employment restrictions from appearing before or communicating with government officials on behalf of non-governmental parties interested in the subsequent NRC facility licensing proceedings. After examining the relationship between the early studies and the licensing proceedings, as well as the nature of the licensing proceedings themselves, OGE concluded that the licensing proceedings were "a continuation of the same particular matter that involved the earlier site characterization process, as well as other efforts that were in anticipation of a potential license application." *Id.* There was one "particular matter involving specific parties" for purposes of the post-employment restriction, and the matter became one once persons "expressed an interest in participating in the matter or where circumstances indicate that persons have an obvious and distinct stake in participating in the matter." *Id.* OGE recognizes, however, that when the government pursues "a multi-year, multi-phase, multi-contract procurement program, it is not always easy to determine what parts of the process may constitute a particular matter or matters involving specific parties and exactly when they do so." OGE Advisory Opinion 05 x 6 (September 19, 2005) (the *Analysis Development Demonstration* opinion).

Based on our understanding of the NCS, the NCS can be viewed as a program having several, more or less distinct, phases: (1) feasibility; (2) concept clearance; (3) study design/planning; and (4) implementation/contracting. Under this construct, as noted above, the concept clearance phase concluded upon approval in March 2004. The study design and planning phase, during which it was determined that the NCS would be accomplished through the collaborative effort of NICHD program and other government officials and contractors selected on the basis of technical merit and geographic location, concluded not later than November 16, 2004, when the RFP for the fiscal year 2005 procurement was issued, a date by which it seems clear that the ongoing implementation/contracting phase began.[14] Considering this date to be the start of the implementation phase of the NCS is also consistent with the NCS E-Update dated November 16, 2004, which describes the NCS as entering the implementation phase with the release of a Study Plan, the list of Study Locations, and the issuance of the fiscal year 2005 RFP. According to information contained in CNA's court filings, Dr. Friedman was employed within the National Institutes of Health (NIH) at the NICHD until March 2006, and was tasked, from October 2005 until February 16, 2006, to lead a team of scientists developing recommendations regarding the neurodevelopmental and social environment assessments in the NCS study for the period between birth and eighteen months of age. *See* CNA's Memorandum at p. 4. Documentation provided in connection with this review reflects that her work as the team leader of the workgroup continued through at least March 19, 2006. In any event, it is clear that Dr. Friedman's participation occurred after the implementation/contracting phase began.

---

[14] As noted herein, NICHD expects to issue an RFP in fiscal year 2008 soliciting proposals for Study Centers representing remaining Study Locations. Subject to OMB approval, the first wave of data collection is also scheduled to begin this year.

Interpretive guidance from OGE reflects the general rule that in government contracting matters, parties are first identified "when the Government first receives an expression of interest from a prospective contractor." OGE DAEOgram DO-06-029 (October 4, 2006). *See also* OGE Advisory Opinion 91 x 33 (August 29, 1991) (citing earlier opinion in which OGE stated, "the question of when a particular matter involves a specific party is not to be determined mechanically by dates of contract documents, but more realistically by the degree of interest expressed and contacts made with...parties as contractual requirements evolve."), and OGE Advisory Opinion 05 x 06 (and citations therein). When parties to a particular matter are identified, the matter, by definition becomes a particular matter involving specific parties. Proposals submitted in response to the fiscal year 2005 RFP were due on or before February 16, 2005. Based on our reading of the *Yucca Mountain* opinion, the NCS was, as of that date, considered a particular matter involving specific parties in which Dr. Friedman subsequently participated.[15]

As previously noted, the Children's Health Act of 2000 called for one study; there was one concept approval for the entire project. The Research Plan and RFPs all indicate that the Study Centers will work collaboratively with each other, as members of the NCS Steering Committee, and with NICHD program and other officials to refine the further design and planning necessary to conduct a nationwide longitudinal study of this magnitude and duration, and that all data collection will occur according to standardized protocols. These facts, coupled with the need to maintain a statistically representative sample at all times, reflect the inter-relatedness of all of the Study Center contracts. The NCS was not considered analogous to government programs under which numerous awards having little direct relation to each other are made.

The Office of Government Ethics has advised that matters sharing a common nucleus of operative facts and related issues are not to be broken down into component parts. *See* 5 C.F.R. § 2637.201(c)(4); OGE Advisory Opinion 99 x 16 (September 10, 1999). Moreover, even if we had considered the contracts awarded as a result of the fiscal year 2007 procurement, in relation to which CNA proposed Dr. Friedman as a PI, as separate matters, we believed that the permanent ban on representational communications or appearances would still apply, based on the facts described below.

As we have noted, OGE has advised that in government contracting matters, the matter becomes a particular matter involving specific parties "when the Government first receives an expression

[15] That CNA may not have been an identified party at the time of Dr. Friedman's participation in the NCS was not considered relevant. Noting that "[i]f the statute had intended to prohibit only a former employee's representations of a party which was involved at the time of his or her official participation in the matter, a simple change in the language could have made that clear," OGE has concluded that section 207(a) applies even where the party the former employee would appear or communicate on behalf of was not an identified or proposed party at the time of the employee's participation in the relevant matter. OGE Advisory Opinion 84 x 15 (November 19, 1984).

of interest from a prospective contractor." OGE DAEOgram DO-06-29. In the *Analysis Development and Demonstration* opinion, OGE explained that the Government may even receive expressions of interest from prospective bidders in advance of a published solicitation or request. *See* OGE Advisory Opinion 05 x 6, at pages 6-7. Further, it is well-settled that the permanent post-employment ban can apply where the employee's participation was during an arguably preliminary or informal stage of a contract. *Id.* (citing 2 Op. O.L.C. 313, 315 (1978)).

The RFP issued in fiscal year 2005 solicited proposals for eight Study Locations: Orange County, CA; Orange County, FL; Lincoln, Pipestone, and Yellow Medicine Counties, MN; Duplin County, NC; New York City (Queens), NY; Montgomery County, PA; Salt Lake County, UT; and Waukesha County, WI. As previously noted, the RFP was issued on November 16, 2004, and proposals were due on or before February 16, 2005. The RFP indicated that Study Centers covering other Study Locations would be identified through subsequent solicitations. The list of other Study Locations was, as noted above, also released on November 16, 2004. Among the papers provided in connection with our review of the 2007 determination regarding Dr. Friedman's eligibility to serve as a Study Center PI, are a number of communications received by program and contracting staff regarding the NCS. From these, we have identified thirteen inquiries received in calendar year 2005 (i.e., prior to or during the time of Dr. Friedman's service as team leader) from universities, medical facilities and practices, and county health administrations, each of which requested information on eligibility requirements and/or the steps necessary to become a Study Center. Three of these expressions of interest came from entities within the census region that includes the State of Maryland.[16] Because the RFP issued in fiscal year 2007 solicited proposals for Study Centers covering all remaining Study Locations, the communications made in 2005 by entities eligible to serve as Study Centers for the Maryland locations can be considered early expressions of interest regarding the publicized future procurement(s). Consequently, even if each contract awarded under the NCS were viewed as a separate matter from the NCS itself, the contracts awarded in 2007 would have become particular matters involving specific parties in 2005, prior to or during Dr. Friedman's service as the neuro and psychosocial development team leader. Given this, and the fact that each of the contractors is required by the study design to collect the same data using the same tools, including the tools evaluated and recommended for purposes of the NCS by Dr. Friedman and her team, we believe that Dr. Friedman participated in the Montgomery County, MD, contract that otherwise would have been awarded in 2007 because her work on the protocol(s) to be incorporated in that contract occurred after expressions of interest were made in 2005 by

[16] Information provided in 2005 by the contracting office to those seeking information indicates that in relation to future procurements, successful bidders would be located within the same census region as the Study Location(s) for which they would serve as Study Center. Hence, any of these three could apply to serve as a Study Center for any Study Location in the relevant census region, including Baltimore County or Montgomery County, MD, or otherwise be a partner organization involved in a successful proposal for these counties.

potential bidders who were eligible to serve in the Study Locations in the State of Maryland covered by the 2007 procurement.[17]

In its court filings, CNA asserted that language contained within a regulatory definition of "particular matter involving specific parties" and certain examples following the text provide an "exemption" from section 207(a)(1). CNA asserted that Dr. Friedman participated "'in a proposed program prior to the formulation of a contract.'" *See* Memorandum, p.10. The language quoted by CNA is followed by two examples to illustrate its meaning. According to OGE, the first example reflects that an employee who participates in feasibility or "other technical work *before* parties are identified" to a particular matter may not be subject to the permanent ban. OGE Advisory opinion 05 x 6, p. 5 (emphasis in original). The second reflects that an employee involved in a project before initial proposals or indications of interest are received does not participate in a "particular party matter involving specific parties." *Id.* at p. 6. Although we did not have occasion to address this argument specifically when our advice was rendered initially, as noted herein, the facts demonstrate that even if the NCS were viewed as a program composed of multiple contracts to be issued, Dr. Friedman participated at a time when parties had expressed interest in contract(s) that eventually would be awarded within the respective census regions in which they operated.

<u>Dr. Friedman Participated Personally and Substantially</u>

As noted above, the permanent post-employment ban applies in relation to certain particular matters involving specific parties. Specifically, it applies only in relation to those particular matters involving specific parties in which the former employee participated "personally and substantially" during federal employment. 18 U.S.C. § 207(a)(1)(c). An employee participates personally if she is directly involved or supervises the direct involvement of a subordinate. *See* 5 C.F.R. § 2640.103(a)(2), 5 C.F.R. § 2635.402(b)(4), and 5 C.F.R. § 2637.201(d)(1). Former employees who participated in a matter through the exercise of discretion, the making of recommendations, or the provision of advice are deemed to have personally participated. Where that participation was of significance to the matter, the former employee is deemed to have participated substantially, and "[p]articipation may be substantial even though it is not determinative of the outcome of a particular matter." 5 C.F.R. § 2640.103(a)(2); *see also* 5 C.F.R. § 2637.201(d)(1) (reflecting that personal and substantial participation can occur

---

[17] Our review of a draft fiscal year 2008 RFP indicates that it is substantially similar to the 2007 RFP in that it solicits proposals for Study Centers covering remaining Study Locations, and informs the contractors that they will collect the same data using the same tools as the others, including those that Dr. Friedman's team evaluated for purposes of the NCS. Accordingly, while it would be premature for us to opine definitively in light of OMB's current consideration of the draft OGE final rule implementing section 207, given the same facts and absent significant changes in OGE's interpretation, we would expect to reach the same conclusions regarding Dr. Friedman's participation in a particular matter involving specific parties in relation to the fiscal year 2008 procurement.

through the making of recommendations or the rendering of advice). Accordingly, we would have rejected the bare assertion presented in CNA's court filings that because Dr. Friedman participated by providing recommendation or advice she could not have participated personally and substantially. The fact that the Steering Committee adopted some, but not all, of her recommendations is similarly not determinative of the substantiality of her participation as, again, there is no requirement that the employee's involvement be determinative of outcome.

Based upon our understanding of the relationship to and effect data collected in the early years of the NCS will have on findings made in later years, and conversations with program officials regarding the significance of the protocol development efforts to the integrity, validity, and perceived quality of the NCS, our opinion was predicated on the conclusion that Dr. Friedman's participation as described herein was both personal and substantial.

Dr. Friedman Would Have Been Required to Appear Before or Communicate with Government Officials with the Intent to Influence on behalf of CNA

As a practical matter, even where the permanent post-employment restriction applies based on a former employee's personal and substantial participation in a particular matter involving specific parties, its only effect is to prohibit the former employee from making, with the intent to influence, any appearance before or communication with government officials on behalf of a third party in relation to the relevant particular matter. 18 U.S.C. § 207(a)(1). It is well-settled that routine requests and exchanges of factual information are not prohibited communications or appearances because they do not reflect the requisite intent to influence. *See* 5 C.F.R. § 2637.201(b)(5). OGE has described the communications and appearances that trigger the statute as those "made for the purpose of seeking a discretionary Government ruling, benefit, approval, or other action in connection with a matter which the former employee knows involves an appreciable element of dispute concerning the particular Government action to be taken." OGE Advisory Opinion 04 x 11 (July 29, 2004), at pages 3-4.

For purposes of this review, Dr. Peter Scheidt, Director of the NCS, was consulted regarding this statutory element. Based on his experiences to date involving the Study Center PIs as members of the Steering Committee, he indicated that he and other program officials meet with Study Center PIs from time to time to discuss matters that are controversial, sensitive, and/or that have financial implications for the Study Centers. He further indicated that he strongly believes that this will continue, and that program officials must be able to fully interact will all PIs in order to fully and effectively implement the NCS in accordance with the statutory mandate. Although a factual determination of a violation cannot be made prior to an appearance or communication by Dr. Friedman acting as the PI for CNA, Dr. Scheidt's description of interactions he has already had with Study Center PIs is entirely consistent with our understanding and what a reasonable person would expect in such a large and complex collaboration in which all participating Study Centers are required to participate in planning and design, as well as data collection and analysis over a period of more than 20 years.

Dr. FriedmanWould Be Required to Make Communications As a Study Center PI on behalf of CNA That Do Not Qualify under the Scientific or Technological Information Exception

An exception to the permanent post-employment ban allows former employees to make communications to an agency "solely" for the purpose of furnishing scientific or technical information.[18] 18 U.S.C. § 207(j)(5). Although this exception was not raised by CNA, we evaluated potential exceptions when our initial opinion was given. For a scientific or technical communication to qualify under the exception, it must have been made (1) "under procedures" acceptable to the agency to which the communication is directed, or (2) the head of such agency must have made, in consultation with the Director of OGE, a certification published in the *Federal Register* that the former employee has outstanding qualifications in a particular discipline, is acting with respect to a particular matter which requires such qualifications, and that the national interest would be served by the participation of the former employee. OGE has opined that if an agency has not established such procedures, "to qualify under the exception, the second statutory mechanism would have to be followed." OGE Op. 96 X 21 (November 5, 1996). HHS has no such procedures, and the Secretary of the Department of Health and Human Services has not undertaken the requisite steps to publish a certification regarding Dr. Friedman and her participation in the NCS.

Dr. Friedman is not Eligible for a Presidential Waiver.

In the absence of applicable exceptions, we considered whether the section 207(k) waiver provision would apply. In recognition of the special relationship between the government and government-owned, contractor-operated entities, the post-employment statute gives the President of the United States limited authority to waive post-employment restrictions for up to twenty-five

---

[18] We determined that the additional statutory exceptions, subparagraphs (j)(1)-(j)(4), (j)(6), and (j)(7), are inapplicable. Subparagraph (j)(1) establishes an exception for activities a former employee may undertake as part of official duties at a federal agency, on behalf of the District of Columbia, or as an elected official at the state or local level. Similarly, subparagraphs (j)(2), (j)(3), and (j)(7) create exceptions for activities undertaken by a former employee on behalf of state and local government institutions, including universities, hospitals and medical research institutions, international organizations, and political parties and campaigns, respectively. Subparagraph (j)(4) reflects that a former employee may make uncompensated statements based on his or her own special knowledge, and subparagraph (j)(6) creates an exception permitting a former employee to provide testimony under oath or penalty of perjury in certain circumstances. Subparagraphs (j)(2), (j)(4), and (j)(7), by their terms, only apply to alleviate the restrictions of sections 207(c), (d), and (e). Since the restriction at issue in the 2007 procurement was section 207(a)(1), these exceptions did not apply. Moreover, because CNA is a private entity and not a governmental body or an international organization, the exceptions provided as subsections (j)(1) and (j)(3) did not apply. Finally, because the activities to be undertaken by a Study Center PI do not involve the provision of testimony, the exception at subparagraph (j)(6) was inapplicable as well.

Executive Branch employees. 18 U.S.C. § 207(k). These waivers may be granted to civilian employees, other than those employed in the Executive Office of the President. In order to grant one, the President must certify in writing that the waiver serves the public interest and that the services of the subject employee are "critically needed for the benefit of the Federal Government." 18 U.S.C. § 207(k)(1). Significantly, these waivers can only be granted:

> (1) To employees who were employed by a Government-owned, contractor-operated entity immediately prior to federal service in connection with the employee's re-employment at that entity following federal service; or
>
> (2) In the case of a federal employee who was employed at the Lawrence Livermore National Laboratory, Los Alamos National Laboratory, or Sandia National Laboratory immediately prior to federal service, in connection with the employee's re-employment at any such national laboratory following federal service.

18 U.S.C. § 207(k)(1)(B). Because CNA is not a Government-owned, contractor-operated entity, a waiver could not be granted to Dr. Friedman under this provision.

## Conclusion

Based upon our review and consideration of numerous documents and other papers related to the NCS, multiple consultations with you and other program officials, and research and analysis of the legal issues surrounding the eligibility of Dr. Sarah Friedman to serve as a Study Center PI for the NCS in light of the criminal post-employment statute, 18 U.S.C. § 207, we rendered the opinion that a violation of the statute would occur if she were to assume that role and make the communications and appearances expected of that position. If you have any questions, please contact Gretchen H. Weaver, Senior NIH Ethics Counsel, on my staff at (301) 402-2577.



about the Study

THE NATIONAL CHILDREN'S STUDY

about the Study | Study centers | the research | how to get involved | adjunct studies | events | news | contact us

mission/purpose | funding and legislation | Study locations | organization | Study sponsors | Study supporters | Study contributors | search GO

## Funding and Legislation

Congress authorized the planning and implementation of the National Children's Study with the Children's Health Act of 2000. The following table shows the Interagency and Congressional funding levels for the Study.

**Interagency and Congressional Funding for the National Children's Study (Dollars in Millions)**

| Funding received during the planning phase of the Study | | | | | | | Funding received during the implementation phase of the Study | |
|---|---|---|---|---|---|---|---|---|
| FY 2000 | FY 2001 | FY 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 |
| 1.0 | 3.2 | 6.1 | 10.6 | 10.6 | 11.0 | 12.1 | 69.0 | 110.9 |

Contributing Agencies are NICHD/NIH/HHS, NIEHS/NIH/HHS, CDC/HHS, and EPA

## Children's Health Act of 2000

Section 1004 of the Children's Health Act focuses on the National Children's Study. An excerpt from the Act follows:

> *(a) PURPOSE.—It is the purpose of this section to authorize the National Institute of Child Health and Human Development* to conduct a national longitudinal study of environmental influences (including physical, chemical, biological, and psychosocial) on children's health and development.*
> *(b) IN GENERAL.—The Director of the National Institute of Child Health and Human Development* shall establish a consortium of representatives from appropriate Federal agencies (including the Centers for Disease Control and Prevention, the Environmental Protection Agency) to—*
> *(1) plan, develop, and implement a prospective cohort study, from birth to adulthood, to evaluate the effects of both chronic and intermittent exposures on child health and human development; and*
> *(2) investigate basic mechanisms of developmental disorders and environmental factors, both risk and protective, that influence health and developmental processes.*
> *(c) REQUIREMENT.—The study under subsection (b) shall—*
> *(1) incorporate behavioral, emotional, educational, and contextual consequences to enable a complete assessment of the physical, chemical, biological, and psychosocial environmental influences on children's well-being;*
> *(2) gather data on environmental influences and outcomes on diverse populations of children, which may include the consideration of prenatal exposures; and*
> *(3) consider health disparities among children, which may include the consideration of prenatal exposures.*

*Congress passed Public Law 110-154 on December 21, 2007, renaming the Institute as the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development.

For a full copy of the legislation, see Children's Health Act of 2000 (Public Law 106-310 Sec. 1004).

## Congressional History

This study is led by a consortium of federal agency partners including: the National Institutes of Health (NIH), the Centers for Disease Control and Prevention (CDC), the Department of Education (ED), and the U.S. Environmental Protection Agency (EPA).

The National Children's Study is designed to examine the effects of environmental influences on the health

and development of more than 100,000 children across the United States, following them from before birth until age 21. The goal of the Study is to improve the health and well-being of children. Researchers will analyze how these elements interact with each other and what helpful and/or harmful effects they might have on children's health. By studying children through their different phases of growth and development, researchers will be better able to understand the role of these factors on health and disease. Findings from the Study will be made available as soon as possible as the research progresses. The Study can also allow scientists to find the differences that exist between groups of people, in terms of their health, health care access, disease occurrence, and other issues, so that these differences or disparities can be addressed.

Congress appropriated funds for Fiscal Years 2007 and 2008 to continue the first phase of implementation of the National Children's Study. With these funds, the seven Vanguard Centers will begin recruitment of families into the Study; in addition, contracts for 22 additional Study Centers were awarded at the end of Fiscal Year 2007 to conduct the Study in 40 additional locations or counties. An additional wave of Study Centers and Locations will be awarded in 2008. The President's Budget Request for Fiscal Year 2009 does not request further funding for the National Children's Study.

Page updated - 03/18/08

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing Motion for a Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof was served by U.S. Mail (first class, postage pre-paid) and e-mail on April 8, 2008, upon:

Matthew Solomson, Esq.
Trial Attorney, Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530



US_SW_600577230v1 (2)