**1IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Electronically Filed on April 17, 2008)**
**BID PROTEST**

| | | |
|---|---|---|
| THE CNA CORPORATION, | ) | |
| Plaintiff, | ) | No: 08-249C |
| | ) | (Judge Horn) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**THE CNA CORPORATION'S BRIEF IN SUPPORT**
**OF DECLARATORY AND INJUNCTIVE RELIEF**

*Of Counsel:*
Daniel S. Herzfeld
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7612
(703) 770-7901 (fax)

Caroline L. Plant
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406

Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel for The CNA Corporation

# TABLE OF CONTENTS


I. STATEMENT OF THE CASE ... 1

II. QUESTION PRESENTED ... 3

III. STATEMENT OF FACTS ... 3

A. The 2007 RFP and Award Determination ... 4

B. Dr. Friedman's Prior Government Employment at NICHD ... 6

C. First Court of Federal Claims Protest ... 8

D. Issuance of the 2008 RFP ... 10

E. NIH's Ethics Evaluation of Dr. Friedman ... 10

IV. JURISDICTION AND STANDING ... 11

A. CNAC is an Interested Party and Has Standing To Bring This Action ... 11

B. This Dispute Is Ripe For Adjudication ... 15

V. ARGUMENT ... 17

A. NIH's Ethics Evaluation of Dr. Friedman Should Be Set Aside As Arbitrary, Capricious and Without a Rational or Reasonable Basis ... 17

1. Dr. Friedman's Involvement in the Neurodevelopmental and Social Environment Assessments During Her Tenure as a Government Employee Does Not Qualify as Involvement on a Particular Matter Involving Specific Parties, as Required For Disqualification Under 18 U.S.C. § 207 ... 19

2. Dr. Friedman Did Not Participate Personally and Substantially on the NCS During Her Tenure as a Government Employee, as Required For Disqualification Under 18 U.S.C. § 207. ... 27

3. Communications by Dr. Friedman as PI for The Montgomery County Contract Do Not Implicate the Ban On Representational Activity Prohibited By 18 U.S.C. § 207. ... 28

4. NIH's Permanent Disqualification of Dr. Friedman Serves No Legitimate Public Policy Interest of the U.S. Government and Is Contrary To The Legislative Intent of 18 U.S.C. § 207. ... 30

B. This Court Should Issue a Permanent Injunction Prohibiting NIH from Awarding the Montgomery County Contract to Any Offeror Other Than CNAC, or, Alternatively, Directing NIH to Award the Montgomery County Contract to CNAC ... 31

VI. CONCLUSION ... 38




US_SW_600580511v1

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967)....................................................................................... 15
*Abel Converting, Inc. v. United States*,
679 F. Supp. 1133 (D.D.C. 1988) ..................................................................... 34
*Aerolease Long Beach v. United States*,
31 Fed. Cl. 342 (Ct. Cl. 1994)........................................................................... 17
*AFGE, Local 1482 v. United States*,
258 F.3d 1294 (Fed. Cir. 2001)......................................................................... 12
*Alfa Laval Separation, Inc. v. United States*,
175 F.3d 1365 (Fed. Cir. 1999)................................................................... 13, 35
*Alfa Laval Separation, Inc. v. United States*,
47 Fed. Cl. 305 (2000) ...................................................................................... 35
*Allentown Mack Sales & Serv., Inc. v. National Labor Relations Bd.*,
522 U.S. 359 (1998)........................................................................................... 18
*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 n. 12 (1987).................................................................................. 32
*Bean Dredging Corp. v. United States*,
22 Cl. Ct. 519 (1991) ................................................................................. 35, 36
*Bennett v. Spear*,
520 U.S. 154 (1997)........................................................................................... 16
*Blue & Gold Fleet, L.P. v. United States*,
492 F. 3d 1308 (Fed. Cir. 2007)........................................................................ 17
*Blue Cross & Blue Shield of Maryland, Inc. v. United States*,
718 F. Supp. 80 (D.D.C. 1989).......................................................................... 35
*CACI, Inc. v. United States*,
719 F.2d 1567 (Fed. Cir. 1983)......................................................................... 21
*Cedars-Sinai Medical Ctr. v. Watkins*,
11 F.3d 1573 (Fed. Cir. 1993)........................................................................... 15
*Choctaw Mfg. Co. v. United States*,
761 F.2d 609 (11th Cir. 1985) ........................................................................... 36
*CNA Corporation v. United States*,
No. 07-858C (Horn, J.) ........................................................................................ 2
*CW Gov't Travel, Inc. v. United States*,
61 Fed. Cl. 559 (2004) ...................................................................................... 17
*Dairy Maid Dairy, Inc. v. United States*,
837 F. Supp. 1370 (E.D. Va. 1993) .................................................................. 35
*Delta Data Systems Corp. v. Webster*,
744 F.2d 197 (D.C. Cir. 1984)..................................................................... 35, 36
*Essex Electro Engineers, Inc. v. United States*,
3 Cl. Ct. 277 (1983) .......................................................................................... 36
*Impresa Construction Geom. Domenicao Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001).................................................................. 14, 18



US_SW_600580511v1

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002)........................................................................................ 18
*Info. Tech. & Applications Corp. v. United States*,
316 F.3d 1312 (Fed. Cir. 2003)................................................................................. 12, 13
*KSD, Inc. v. United States*,
72 Fed. Cl. 236 (2006)..................................................................................................... 18
*Logicon, Inc. v. United States*,
22 Cl. Ct. 776 (1991)....................................................................................................... 17
*M. Steinthal & Co. v. Seamans*,
455 F.2d 1289 (D.C. Cir. 1970)........................................................................................ 37
*Mack Trucks v. United States*,
6 Cl. Ct. 68 (1984)........................................................................................................... 36
*Magnavox Elec. Sys. Co. v. United States*,
26 Cl. Ct. 1373 (1992)..................................................................................................... 35
*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................................................... 18
*MVM, Inc. v. United States*,
46 Fed. Cl. 137 (1999)..................................................................................................... 33
*Myers Investigative & Sec. Servs. v. United States*,
275 F.3d 1366 (Fed. Cir. 2002)........................................................................................ 13
*Nat'l Maritime Union of Am., AFL-CIO v. Commander Military Sealift Command*,
824 F.2d 1228 (D.C. Cir. 1987)........................................................................................ 35
*NSK Ltd. v. United States*,
510 F.3d 1375 (Fed. Cir. 2007)........................................................................................ 16
*Overstreet Elec. Co., Inc. v. United States*,
47 Fed. Cl. 728 (2000)..................................................................................................... 35
*Parcel 49C Ltd. Partnership v. United States*,
31 F.3d 1147 (Fed. Cir. 1994).......................................................................................... 37
*PCI/RCI v. United States*,
36 Fed. Cl. 761 (1996).............................................................................................. 36, 37
*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004)........................................................................................ 32
*Ramcor Servs. Group, Inc. v. United States*
185 F.3d 1286 (Fed. Cir. 1999)........................................................................................ 11
*Red River Serv. Corp. v. United States*,
60 Fed. Cl. 532 (2004).............................................................................................. 13, 15
*Rex Serv. Corp. v. United States*,
448 F.3d 1305 (2006)........................................................................................................ 14
*Scott v. United States*,
78 Fed. Cl. 151 (2007)..................................................................................................... 13
*Seattle Security Servs., Inc. v. United States*,
45 Fed. Cl. 560 (2000).............................................................................................. 33, 34
*Software Testing Solutions, Inc. v. United States*,
58 Fed. Cl. 533 (2003)..................................................................................................... 17
*Statistica, Inc. v. Christopher*,
102 F.3d 1577 (Fed. Cir. 1996)........................................................................................ 13

*Superior Oil Co.v. Udall,*
409 F.2d 1115 (D.C.Cir. 1969) ........ 36
*Transatlantic Lines LLC v. United States,*
68 Fed. Cl. 48 (2005) ........ 17
*TRW Environment Safety Systems, Inc. v. United States,*
18 Cl. Ct. 33 (1989) ........ 36
*United Int'l Investigative Servs. v. United States,*
41 Fed. Cl. 312 (1998) ........ 35
*United Power Corp. v. United States Def. Mapping Agency,*
736 F. Supp. 354 (D.D.C. 1990) ........ 35
*United States v. Clark,*
333 F. Supp. 2d 789 (D. Wis. 2004) ........ 31
*United States v. Medico Industries, Inc.,*
784 F.2d 840 (7th Cir. 1986) ........ 25, 26, 31
*Vanguard Sec. Inc. v. United States,*
20 Cl. Ct. 90 (1990) ........ 37
*Wit Assocs, Inc. v. United States,*
62 Fed. Cl. 657 (2004) ........ 17

**Statutes and Codes**

Administrative Dispute Resolution Act 1996,
Pub. L. No. 104-320, 110 Stat. 3870 (1996) ........ 11, 18
Children's Health Act of 2000,
Pub. L. No. 106-310, 114 Stat. 1101 (2000) ........ 3
5 U.S.C. § 706 ........ 18
18 U.S.C. § 207 ........ passim
18 U.S.C. § 216 ........ 19
28 U.S.C. § 1491 ........ 11, 12, 38, 39

**Rules and Regulations**

4 C.F.R. § 21.2 ........ 17
5 C.F.R. § 2637.201 ........ passim
5 C.F.R. § 2637.204 ........ 30
5 C.F.R. § 2641 ........ 30
68 Fed. Reg. 7844 (Feb. 18, 2003)
(proposed new rule for 5 C.F.R. § 2641.201) ........ 29, 30

**Other Authorities**

OGE Advisory Opinion 99 x 14(2) (July 7, 1999), *available at*
http://www.usoge.gov/pages/advisory_opinions/advop_files/1999/99x14_2.html ........ 25
OGE Advisory Opinion 99 x 16 (September 10, 1999), *available at*
http://www.usoge.gov/pages/advisory_opinions/advop_files/1999/99x16.html ........ 26
OGE Advisory Opinion 02 x 05 (July 31, 2002)("*Yucca Mountain*"), *available at*
http://www.usoge.gov/pages/advisory_opinions/advop_files/2002/02x5.html ........ 21, 23, 27
DAEOgram DO-06-029 (October 4, 2006),
available at http://www.usoge.gov/pages/daeograms/dgr_files/2006/do06029.html ........ 21, 23

Bayless Manning, *Federal Conflict of Interest Law*, 179-180 (1964) .................................... 23, 31
Remarks of Duane Alexander, M.D.
Director, National Institute of Child Health and Human Development (September 29, 2005); available at http://www.nichd.nih.gov/news/releases/duane_alexander.cfm ..................... 24, 25
S. Rep. No. 170, 95th Cong., 1st Sess. (1977) .................................................................. 31

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Electronically Filed on April 17, 2008)**
**BID PROTEST**

| | | |
|---|---|---|
| THE CNA CORPORATION, | ) | |
| Plaintiff, | ) | No: 08-249C |
| | ) | (Judge Horn) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**THE CNA CORPORATION'S BRIEF IN SUPPORT**
**<u>OF DECLARATORY AND INJUNCTIVE RELIEF</u>**

Pursuant to this Court's April 9 and 10, 2008 scheduling orders, Plaintiff The CNA Corporation ("CNAC") submits this brief in support of declaratory and injunctive relief.

## I. <u>STATEMENT OF THE CASE</u>

On April 8, 2008, Plaintiff CNAC filed this pre-award procurement protest action to challenge the arbitrary and capricious decision of Defendant, the United States (the "Government"), acting by and through the National Institutes of Health ("NIH"), a part of the United States Department of Health and Human Services ("HHS"), to prospectively disqualify CNAC from award of a contract under Request for Proposals No. NIH-NICHD-NCS-08-21E ("2008 RFP"), for the Montgomery County, Maryland Study Center location ("Montgomery County Contract") of the National Children's Study ("NCS" or "Study"). The March 19, 2008 determination of NIH's Contracting Officer to disqualify CNAC ("Disqualification Letter") is based on the erroneous and arbitrary conclusion that CNAC's proposed Principal Investigator ("PI") – Dr. Sarah L. Friedman – is permanently barred from acting as PI for a NCS Study



US_SW_600580511v1

Center by the post-employment restrictions of 18 U.S.C. § 207. That conclusion is set forth in the opinion of NIH's Office of the General Counsel, Ethics Division ("Ethics Opinion"), which the Contracting Officer explicitly adopts. This case involves the propriety and legality of those coordinated decisions. CNAC respectfully submits that NIH's ethics evaluation of Dr. Friedman is arbitrary, capricious, and contrary to law; furthermore, it is prejudicial and it effectively precludes CNAC (and Dr. Friedman) *permanently* from award of the Montgomery County Contract.

In its previous case, *CNA Corporation v. United States*, No. 07-858C (Horn, J.), CNAC successfully protested NIH's failure to award CNAC the Montgomery County Contract under Request for Proposals No. NIH-NICHD-NCS-07-11 ("2007 RFP"), which NIH would have awarded to CNAC but for its arbitrary and capricious ethics evaluation of Dr. Friedman. On March 19, 2008 – the very same day that NIH issued its Disqualification Letter and Ethics Opinion – NIH also issued the 2008 RFP. The 2008 RFP contains essentially the same requirement for the Montgomery County Contract as did the 2007 RFP. Unfortunately, NIH's delay in issuing its Disqualification Letter and Ethics Opinion – combined with the substance of NIH's decision to permanently bar Dr. Friedman from serving as CNAC's PI – have irreparably harmed CNAC's ability to compete for award under the 2008 RFP.

In this action, CNAC seeks (1) a determination by the Court that NIH's ethics evaluation of Dr. Friedman should be set aside as arbitrary, capricious, and contrary to law; and (2) a permanent injunction prohibiting NIH from awarding the Montgomery County Contract to any offeror other than CNAC or, alternatively, an order directing NIH to award the Montgomery

County Contract to CNAC. As discussed below, absent such relief, CNAC will continue to suffer substantial and irreparable harm.[1]

## II. QUESTION PRESENTED

Is CNAC entitled to declaratory and injunctive relief based on NIH's failure to comply with applicable statutes and regulations in its decision to disqualify Dr. Friedman under 18 U.S.C. § 207, thereby effectively permanently disqualifying CNAC from award of the Montgomery County Contract?

## III. STATEMENT OF FACTS

This case arises out of the competition for award of the Montgomery County Contract of the NCS. Through the Children's Health Act of 2000, Pub. L. No. 106-310, § 1004, 114 Stat. 1101, 1130-31 (2000), Congress authorized and directed a consortium of federal agencies, led by the National Institute of Child Health and Human Development ("NICHD"), an NIH Institute, in partnership with other federal agencies, to conduct the NCS. The NCS is a long-term, large-scale longitudinal study designed to enroll and follow a nationally representative sample of approximately 100,000 children born in the United States, to assess the effects of various environmental influences (including physical, chemical, biological, and psychosocial) on children's health and development. *Id.* NIH has organized the collection of data for the NCS through 105 Study Center locations throughout the United States, including both metropolitan and rural areas. Study Centers are those entities or institutions chosen by NIH to establish

---

[1] CNAC focuses on permanent relief in this brief based on the Court's statements at the April 9, 2008 status conference that it intended to issue a ruling at or immediately after the April 22, 2008 oral argument, which would appear to obviate the need for any preliminary injunctive relief. To the extent the Court is not merging the permanent and preliminary injunctive relief as part of one merits briefing, CNAC reinstates its motion for preliminary injunctive relief to enjoin NIH from taking any action in furtherance of the procurement for the Montgomery County Contract, pending this Court's final determination on the merits of this action.

contacts in the community, recruit research participants, perform data collection, and conduct reporting and analysis. *See* 2007 RFP, Attachment 3, Appendix ("App.") at 40-47. NIH anticipates that 30-50 Study Centers will carry out the work of the 105 Study locations. NIH selected the Montgomery County, Maryland location as one of these Study Centers.

Data collection for the Study locations was designed to be implemented in different phases. In 2005 NIH conducted a procurement for the original first seven locations ("Vanguard Centers"), which were awarded and selected pursuant to a competitive process.

**A. The 2007 RFP and Award Determination**

On March 1, 2007, NIH issued the 2007 RFP, which included a solicitation for proposals for the Montgomery County Contract. *See* 2007 RFP, Attachment 4, App. at 48. In response to the 2007 RFP, CNAC submitted an offer for the Montgomery County Contract and teamed with seven research institutions in the Baltimore-Washington Area, which would provide data collection services for 1000 live births over a four-year period for Montgomery County, Maryland.

Pursuant to the 2007 RFP, NIH required offerors to propose a Principal Investigator to oversee the operation of the Study Center: "Each contract that is awarded as a result of this solicitation will be awarded to a Prime Contractor (i.e., a single institute, organization, or other entity). There must be a single named Principal Investigator (PI) employed by the Prime Contractor responsible for oversight of the entire project." 2007 RFP, Amendment 2, App. at 49. (emphasis in original). CNAC proposed Dr. Sarah L. Friedman as its PI for the Montgomery County Contract.

By letter dated October 5, 2007, CNAC received notice that its proposal for the Montgomery County Contract was not selected for award in connection with the 2007 RFP. The only reason given for the rejection of CNAC's proposal was that, as a consequence of the

Government's post-employment restrictions under 18 U.S.C. § 207, "the proposed Principal Investigator (PI) would not be able to fulfill the duties of a PI as contemplated by the terms and conditions of the Request for Proposals (RFP). As set forth in the terms of the RFP, the Principal Investigator is required to have substantial interactions with Government personnel during the performance of the contract." Notice of Award, App. at 22.

After CNAC was notified that it failed to receive an award, CNAC timely requested and received a debriefing, at which it received a Technical Evaluation Report ("TER") for its proposal for the Montgomery County Contract. For this proposal, CNAC received an overall technical score of 81. TER, App. at 26. This technical score was equivalent to, or greater than, the technical score of other institutions that received contract awards pursuant to the Solicitation. At the debriefing, CNAC was advised that the NCS Study Director, Dr. Peter Scheidt, had recommended CNAC for award of the Montgomery County Contract.

The TER also highlighted Dr. Friedman, CNAC's proposed PI, as one of the proposal's greatest strengths. *Id.* "The strengths of the proposal include the experience of the Principal Investigator . . . . " *Id.* CNAC's proposed PI "has extensive prior experience in directing several national longitudinal and multi-sites studies, such as NICHD study of Early Child Care and Youth Development that enrolled and followed up the development of 1400 children from birth up to 15 years of age." TER, App. at 29. Dr. Friedman is "an extremely experienced investigator in the assessment of several longitudinal NICHD funded studies." TER, App. at 32.

Prior to filing its first bid protest, CNAC's counsel attempted to work with NIH to reverse the agency's decision and probe the basis for finding a conflict under 18 U.S.C. § 207 and noted that NIH should consider 5 C.F.R. § 2637.201, among other regulations interpreting the statute. By letter dated November 26, 2007, NIH (acting through HHS's Office of General



US_SW_600580511v1

Counsel) reiterated its conclusion that 18 U.S.C. § 207 prevented Dr. Friedman from acting as CNAC's PI and, thereby, disqualified CNAC from receiving award of the Montgomery County Contract. *See* November 26, 2007 Letter, App. at 24-25. No awards were made to any offeror under the 2007 RFP for the Montgomery County Contract.

**B. <u>Dr. Friedman's Prior Government Employment at NICHD</u>**

Prior to her employment with CNAC, Dr. Friedman worked in various capacities for the federal government including as a research scientist at the National Institute of Mental Health, as a science administrator at the National Institute of Education, and as a science administrator and research scientist at the NICHD. During her employment with NICHD, Dr. Friedman received two Merit awards for her leadership role in a large long-term longitudinal study known as the NICHD Study of Early Child Care and Youth Development. This work was separate and distinct from any of her work on the NCS. Dr. Friedman joined CNAC on April 3, 2006, to serve as director of the Appalachian Regional Education Laboratory.

From October 2005 through February 15, 2006, while working with NICHD, Dr. Friedman had a part-time role as a team leader to assist in the development of the infant neurodevelopmental protocol and social environmental measures for the NCS. Dr. Friedman's role was limited to providing technical advice for two of the many assessment measures used for the technical portion of the National Children's Study. Her team met approximately 20 times between October 26, 2005 and February 15, 2006 to assist in developing the neurodevelopmental protocol. This team provided its recommendations via a power point presentation to the NCS Director and to the Study's Steering Committee. Dr. Friedman's team worked in an advisory capacity, with no authority to implement its recommendations; the Study Director and the Study's Steering Committee had no obligation to accept the recommendations. Some of the team's recommendations were accepted as part of the Study; some were not.

During her participation as a team leader for this protocol, Dr. Friedman had no official affiliation with the NCS. Moreover, she had no authority regarding any of the other nineteen (19) protocols to be used as part of the Study. Dr. Friedman was also not involved in any procurement or contracting issues related to NCS. Her work was limited to technical advice concerning one protocol and related social environmental measures, and this work was itself limited to an assessment of the procedures for recovering the type of data to be solicited, assembled, and analyzed for purposes of completing one discrete temporal segment (birth to 18 months) of the NCS.

Further, Dr. Friedman was but one of a large number of contributors to the NCS. As described by NIH at page 4 of its Ethics Opinion: "The Program Office within the NICHD, the chartered federal advisory committee, 22 working groups comprised of over 200 scientists, and more than 2500 people interested in the design, conduct, and results of the NCS provided input during the planning phase" of the NCS. *See* Ethics Opinion, App. at 6. Dr. Friedman was simply one "of over 200 scientists, and more than 2500 people" that "provided input" to the development of the many protocols for the NCS. Given the large number and professional diversity of those contributing to the development of NCS, neither Dr. Friedman nor CNAC understood Dr. Friedman's contribution to NCS to be "substantial" within the meaning of 18 U.S.C. § 207.

CNAC's understanding of Dr. Friedman's limited role was confirmed by NIH's complete silence on this issue during the 2007 procurement. At no point prior to the Notice of Award on October 5, 2007, was Dr. Friedman's previous employment with the federal government raised as a potential issue or conflict by NIH. In fact, as discussed above, the experience of Dr. Friedman was actually highlighted by NIH as a positive factor in its evaluation of CNAC's

technical proposal for the Montgomery County Contract under the 2007 RFP. Indeed, during August and September 2007, NIH conducted detailed price and technical discussions with CNAC, and led CNAC to believe it had been "down-selected" for award for the Montgomery County Contract.

**C. First Court of Federal Claims Protest**

On December 5, 2007, CNAC submitted a Court of Federal Claims protest challenging NIH's failure to award it the Montgomery County Contract. In response to CNAC's motion for a preliminary injunction, the Government agreed not to award or re-solicit the requirement for the Montgomery County Contract. *See* December 7, 2007 Order at 1 ("Defendant has advised the court that no award for the Montgomery County, Maryland Study location will be made on the present or any future solicitation until after the court has rendered its opinion on this bid protest.").

After producing the administrative record, the Government moved to stay the case pending a remand to NIH to provide a justification for its ethics determination; CNAC opposed that motion. On January 2, 2008, the Court held an oral argument by conference call to consider NIH's motion. Based on the hearing, the Court concluded that it would enter judgment in favor of CNAC, but stopped short of enjoining NIH from awarding the contract for the Montgomery County location to any contractor other than CNAC.

On January 3, 2008, the Court memorialized its conclusion rendered during the January 2, 2008 oral argument. The Court noted that NIH had essentially conceded it failed to "provide an adequate explanation for excluding Dr. Friedman on the basis of 18 U.S.C. § 207(a)." January 3, 2008 Order at 1 (internal quotations and citations omitted). The Court quoted NIH's concession that it failed to consider 5 C.F.R. § 2637 and that the record of its ethics decision was "unquestionably sparse." *Id.* at 2 (internal quotations and citations omitted).

Based on these concessions (and others), the Court stated,

> [T]he weight of the admissions by defendant as to the inadequacy of the decision making process, the filed administrative record compiled by the defendant and the absence in the filed record of sufficient indication or documentation to support proper administrative review, directs the court to a finding that the agency, NIH, acted arbitrarily and capriciously when it found Dr. Friedman ineligible to participate as the Principal Investigator in a contract award to the plaintiff. The agency conducted an inadequate review of the important ethics issues presented and failed to properly document even the minimal review steps it undertook.

*Id.* at 2-3. The Court granted CNAC partial injunctive relief by vacating the original ethics decision and ordering NIH to "pursue a reconsideration of the ethics decision and, at a minimum, shall consider the issues raised by the applicable statutory and regulatory sections, including subsections of 18 U.S.C. § 207 (2000) and 5 C.F.R. § 2637 (Jan. 1, 2007), not previously and properly considered." *Id.* at 3. In its January 3, 2008 Order, the Court also noted that "statements made by government officials, and acknowledged by defendant's counsel and agency personnel in the hearings before the court" acknowledged "that plaintiff CNA Corporation had been recommended for an award for the Montgomery County study contract, pending only the issue of the eligibility of Dr. Friedman as plaintiff's Principal Investigator, given her previous employment at NIH." *Id.* at 3. The Court's order also admonished NIH: "The court further anticipates that Dr. Friedman, and plaintiff, will not be penalized as a result of bringing this successful, post-award bid protest to the court, especially given the agency's former, high appraisal on the substance of plaintiff's proposal." *Id.*[2] On February 29, 2008, the Government filed a notice of appeal from this Court's January 3, 2008 Order and resultant January 7, 2008 judgment. By Order dated April 3, 2008, the U.S. Court of Appeals for the

[2] The Court's January 3, 2008 Order also awarded CNAC its bid preparation and proposal costs. The application for those costs was submitted on April 4, 2008. To the extent the Court directs award of the Montgomery County Contract to CNAC, CNAC will withdraw its application for bid preparation and proposal costs.

Federal Circuit dismissed the appeal based on the Government's April 1, 2008 consent motion to dismiss.

**D. Issuance of the 2008 RFP**

Periodically throughout January, February, and March 2008, the undersigned counsel for CNAC communicated with counsel for HHS and NIH concerning the status of NIH's ethics review and the 2008 RFP release date. CNAC's counsel explained that it was vital for CNAC to receive NIH's ethics decision concerning Dr. Friedman prior to issuance of the 2008 RFP, since a "cloud" had been placed over Dr. Friedman and her ability to participate as CNAC's PI. CNAC's counsel also explained that NIH's failure to resolve Dr. Friedman's situation was causing CNAC to lose team members and was making it very difficult for CNAC to prepare for or respond to the 2008 RFP. On March 19, 2008, NIH issued the 2008 RFP, which includes the Montgomery County Contract as part of the solicitation. Proposals responding to the 2008 RFP are to be submitted on May 2, 2008. *See* 2008 RFP, App. at 51.

**E. NIH's Ethics Evaluation of Dr. Friedman**

On March 19, 2008 – just a few hours prior to issuance of the 2008 RFP – NIH's contracting officer for the 2007 and 2008 RFPs – Ms. Elizabeth Osinski – provided CNAC with NIH's evaluation of the eligibility of Dr. Friedman to serve as PI for a NCS Study Center. *See* Disqualification Letter, App. at 1. This letter reaffirmed NIH's prior decision that Dr. Friedman was permanently barred from acting as a PI for a NCS Study Center as a result of the post-employment restrictions of 18 U.S.C. § 207 because of her prior government employment. *Id.* The Disqualification Letter specifically adopts the accompanying Ethics Opinion of the Office of the General Counsel, Ethics Division, which concludes that Dr. Friedman is permanently barred from serving as PI for a NCS Study Center by the post-employment restrictions of 18 U.S.C. § 207. The Disqualification Letter, signed by the Contracting Officer for the NCS, further

indicates that, while a final determination regarding the disqualification of Dr. Friedman under the 2008 RFP has not been made, "the 2008 RFP does not materially differ from the 2007 RFP with respect to Dr. Friedman's eligibility" and "I would anticipate the same determination with respect to Dr. Friedman under the 2008 RFP." Disqualification Letter, App. at 1.

## IV. JURISDICTION AND STANDING

### A. CNAC is an Interested Party and Has Standing To Bring This Action

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act 1996, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874-75 (1996), this Court has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or *any alleged violation of statute or regulation in connection with a procurement or a proposed procurement*.

28 U.S.C. § 1491(b)(1) (emphasis added). Thus, the jurisdictional issues are (1) whether this case is "in connection with" a procurement or proposed procurement and (2) whether CNAC is an "interested party." *Id.*; *see also Ramcor Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope. As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction."). Section 1491(b)(2) vests this court with the authority to afford "any relief that [it] considers proper, including declaratory and injunctive relief…." 28 U.S.C. § 1491(b)(2).

The procurement at issue in this action is the contract for the NCS Study Center for the Montgomery County Study location. Originally the Montgomery County Contract was solicited by NIH under the 2007 RFP. Having failed to make award of the Montgomery County Contract under that solicitation, NIH has re-solicited the same requirement under the 2008 RFP. This satisfies the first prong of the jurisdictional prerequisite of 1491(b)(1), that the action involve

violation of a statute or regulation in connection with "a procurement or a proposed procurement." *Id.*

In order to satisfy the jurisdictional prerequisites of the Tucker Act, CNAC must also show that it is an "interested party." *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). In order to meet this standing requirement, a plaintiff must show that it is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Info. Tech. & Applications Corp.*, 316 F.3d at 1319 (citing *AFGE, Local 1482 v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). Another two-part test has been used to determine "interested party" status: (1) the protestor must show a connection to the procurement; and (2) the protestor must have an economic interest in the procurement. *See AFGE, Local 1482*, 258 F. 3d at 1302.

CNAC's relationship to the procurement at issue is clear. As an actual offeror under the 2007 RFP, CNAC would have been awarded the Montgomery County Contract under the 2007 RFP but for NIH's arbitrary and capricious conduct in connection with that procurement, which this court ordered NIH to rectify. As a result of NIH's failure to award the Montgomery County Contract under the 2007 RFP, NIH has re-solicited proposals for that contract under the 2008 RFP. At the status conference call held in this matter on April 9, 2008 counsel for the Government conceded that the requirements for the Montgomery County Contract in the 2008 RFP are essentially identical to those in the 2007 RFP. CNAC now intends to submit a proposal for the Montgomery County Contract in response to the 2008 RFP, and therefore qualifies as a "prospective offeror."

Having established its connection to the procurement, CNAC finally must show that it has a direct economic interest in the procurement it is challenging. *Id.* For its "direct economic



US_SW_600580511v1

interest" to be affected, a protestor must show that it was prejudiced. *Info. Tech. & Applications Corp.*, 316 F.3d at 1319; *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing.").

Generally, at least in a post-award protest context, a plaintiff must establish prejudice by showing that "there was a substantial chance it would have received the contract award." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)). In this case, this Court has already determined that CNAC would have been awarded the Montgomery County Contract but for NIH's erroneous ethics determination regarding Dr. Friedman. Thus, CNAC has established prejudice with respect to the Montgomery County Contract, and it therefore meets both prongs of the test employed by the Federal Circuit to determine "interested party" status.

Furthermore, as this Court noted in *Red River*, and as briefly discussed at the April 9, 2008 status conference, application of the "substantial chance" standard in the pre-award context is problematic. *Red River Serv. Corp. v. United States*, 60 Fed. Cl. 532, 538-539 (2004). Accordingly, in *Red River* this Court held that a plaintiff instituting a pre-award bid protest was not required to establish that there was a "substantial chance" it would receive award of the contract under the challenged procurement. *Id.*

> Although the United States Court of Appeals for the Federal Circuit has not explicitly addressed the standard of review for a plaintiff's standing in a pre-award context, the United States Court of Federal Claims is persuaded that a plaintiff would not be required to establish that, but for the alleged error, there was a substantial chance it would have received the contract award. . . . For these reasons, the court declines to require the plaintiff in this case to satisfy the "substantial chance" standing test pre-award, but rather will rely on the "interested party" test until the United States Court of Appeals for the Federal Circuit directs otherwise.

*Id. See also Scott v. United States*, 78 Fed. Cl. 151, 154 (2007) (holding that, even in the pre-award context, plaintiff has the burden to establish prejudice by showing that it "had a

'substantial chance' of receiving the contract" and dismissing protest because, among other reasons, plaintiff did not submit a proposal in response to the solicitation) (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (2006)).

In this instance, CNAC satisfies the requirements of the standing doctrine under any test which this Court may apply. First, CNAC already successfully protested NIH's failure to award it the Montgomery County Contract. In so doing, CNAC demonstrated that, absent NIH's arbitrary and capricious conduct, CNAC would have received award of the Montgomery County Contract. *See* January 3, 2008 Order at 3 ("[P]laintiff CNA Corporation had been recommended for an award for the Montgomery County study contract, pending only the issue of the eligibility of Dr. Friedman as plaintiff's Principal Investigator, given her previous employment at NIH."). This alone satisfies the "substantial chance" standard.

Second, as a result of CNAC's prior protest, NIH was required to undertake an ethics evaluation of Dr. Friedman. Despite the opportunity to correct its prior flawed analysis, NIH reaffirmed its disqualification of Dr. Friedman and indicated that it anticipated the same disqualification under the 2008 RFP. Although CNAC intends to submit a proposal in response to the 2008 RFP, NIH has indicated that its ethics evaluation of Dr. Friedman under the 2008 RFP would likely remain unchanged. Therefore, NIH's arbitrary and capricious conduct again stands as an obstacle to CNAC's award of the Montgomery County Contract. It is uncontested that, under the 2007 RFP, but for the ethics disqualification of Dr. Friedman CNAC would have received award of the Montgomery County contract. If NIH were ever to evaluate Dr. Friedman's proposed role as PI fairly, and in accord with the underlying statute and OGE regulations, CNAC would have a "substantial chance" of award of the Montgomery County Contract. *See Impresa Construzioni Geom. Domenicao Garufi v. United States*, 238 F.3d 1324,

1334 (Fed. Cir. 2001) (appellant satisfied "substantial chance" standard where if appellant's bid protest were allowed because of an arbitrary and capricious responsibility determination by the contracting officer, the government would be obligated to rebid the contract, and appellant could compete for the contract once again). *See also Red River Serv. Corp.*, 60 Fed. Cl. at 538-539 (holding that plaintiff had established it was an "interested party" where plaintiff intended to submit a proposal in response to the solicitation and had a direct economic interest in being awarded the contract, based on the dollar amount at issue, and where a new contract for these services would not be solicited for another seven years).

For all of the foregoing reasons CNAC has established that it is an interested party and has standing to assert this bid protest.

**B. <u>This Dispute Is Ripe For Adjudication</u>**

The basic rationale of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-149 (1967). Thus, the court is required to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Id.* Both prongs must be satisfied before a court may apply its adjudicative powers to the merits of an action. *See Cedars-Sinai Medical Ctr. v. Watkins*, 11 F.3d 1573, 1581 (Fed. Cir. 1993).

"Accordingly, in order to be a final decision, and therefore ripe for judicial review, (1) there must be an agency action that marks 'the consummation of the agency's decisionmaking process,' *i.e.*, it must not be merely tentative or interlocutory, and (2) 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'"

*NSK Ltd. v. United States*, 510 F.3d 1375, 1385 (Fed. Cir. 2007) (quoting *Bennett v. Spear*, 520 U.S. 154, 177 (1997)).

As discussed above, the instant action is directly related to CNAC's prior successful protest in which this Court ordered NIH to undertake a proper ethics evaluation of Dr. Friedman. On March 19, 2008 NIH issued that ethics determination and reaffirmed its prior disqualification of Dr. Friedman from serving as PI for the Montgomery County Contract. On the same day, NIH issued the 2008 RFP which solicits proposals for the Montgomery County Contract. Although the Disqualification Letter issued by NIH states that it will consider relevant arguments that Dr. Friedman is not barred under the 2008 RFP, the Ethics Opinion adopted by the Disqualification Letter definitively states that Dr. Friedman is permanently barred from acting as PI for an NCS Study Center. *See* Disqualification Letter, App. at 1; Ethics Opinion, App. at 17. The Disqualification Letter is not "tentative or interlocutory" and it has definite "legal consequences." Therefore the ethics evaluation of Dr. Friedman provided by NIH is a final decision regarding the eligibility of Dr. Friedman which is ripe for judicial review.

At this stage of the proceedings, NIH's ethics evaluation and resulting disqualification of Dr. Friedman is not abstract; it has been finalized in the Disqualification Letter and the Ethics Opinion provided by NIH. Thus, an evaluation of the merits of that determination is not premature. Furthermore, if this Court were to find that this action is not yet ripe for judicial review, CNAC will suffer substantial hardship, in that it will be effectively precluded from award of the Montgomery County Contract.

Finally, the Federal Circuit's recent decision in *Blue & Gold Fleet, L.P. v. United States*, 492 F. 3d 1308, 1313 (Fed. Cir. 2007), recognizes a "waiver rule" which requires that a party object to solicitation terms during the bidding process and not sit idly by and wait until the time

for responses to an RFP have passed: "[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Id.*[3] As applied to this case, *Blue & Gold Fleet* suggests that CNAC cannot wait beyond May 2 – the closing date for receipt of proposals – to raise the issue of Dr. Friedman's disqualification. In short, CNAC's action is ripe and appropriately positioned for judicial review.

## V. ARGUMENT

### A. NIH's Ethics Evaluation of Dr. Friedman Should Be Set Aside As Arbitrary, Capricious and Without a Rational or Reasonable Basis

The Administrative Dispute Resolution Act incorporates by reference § 706 of the Administrative Procedure Act, which in turn provides that

---

[3] Contrary to the Government's suggestion at the April 9, 2008 initial status conference, the rule in *Blue & Gold* applies with equal force to any unambiguously obvious errors in a solicitation. *See Blue & Gold Fleet*, 492 F.3d at 1313 (noting that the waiver rule "requires that a party object to solicitation terms during the bidding process"). Furthermore, several decisions in this Court have recognized and applied the doctrines of laches and equitable estoppel to deny injunctive relief in the bid protest context. *Id.* (citing *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 52, 57 (2005) (considering "delay in procurement process" in assessing balance of hardships factor; *Wit Assocs, Inc. v. United States*, 62 Fed. Cl. 657, 662 n.5 (2004) ("[I]n some cases, serious delay in raising a claim may impact the equities in determining whether an injunction should issue or lead to the imposition of laches."); *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 568-69 (2004) (considering delay as part of laches analysis); *Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 535-36 (2003) (stating that delay may be "considered in the multi-factored analysis of whether injunctive relief is warranted" or in "the application of equitable doctrines such as laches")). Analogously, while 1491(b) contains no specific time limit for protest filings, this Court and the Federal Circuit in *Blue & Gold Fleet* have favorably considered the timeliness regulations of the GAO for bid protests: "Protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals." *See Aerolease Long Beach v. United States*, 31 Fed. Cl. 342, 358 (Ct. Cl. 1994) (quoting 4 C.F.R. § 21.2(a)(1) (1992); *Logicon, Inc. v. United States*, 22 Cl. Ct. 776, 789 (1991) (finding favor with the timeliness regulations of the GAO for bid protests)).

> The reviewing court shall - . . . (2) hold unlawful and set aside agency action, findings and conclusions found to be - . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (D) without observance of procedure required by law[.]

5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706); *see also Impresa Construzioni*, 238 F. 3d at 1332 (holding that a bid award may be set aside if either "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure"). The United States Supreme Court has characterized arbitrary or capricious agency action as follows:

> The agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *KSD, Inc. v. United States*, 72 Fed. Cl. 236, 251 (2006)). The Administrative Procedure Act, which governs the proceedings of administrative agencies and related judicial review, establishes a scheme of "reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52. Not only must an agency's decree result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational. *Allentown Mack Sales & Serv., Inc. v. National Labor Relations Bd.*, 522 U.S. 359 (1998); *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).

The Ethics Opinion provided by NIH bases its conclusion that Dr. Friedman is barred by 18 U.S.C. § 207 on the grounds that the NCS, taken as a whole, constitutes a particular matter involving specific parties. Ethics Opinion, App. at 12. The Ethics Opinion further states that, "even if we had considered the contracts awarded as a result of the fiscal year 2007 procurement . . . as separate matters, we believe that the permanent ban on representational communications or appearances would still apply. . . . " *Id.* The Ethics Opinion also states, with only a limited

factual discussion, that Dr. Friedman participated personally and substantially in the development of the NCS. Ethics Opinion, App. at 15. Finally, the Ethics Opinion concludes that Dr. Friedman is barred because, as a PI, she "would have been required to appear before or communicate with Government officials with the intent to influence on behalf of CNA." *Id.*

As detailed below, each of these arguments in support of NIH's ethics evaluation of Dr. Friedman is flawed, and therefore should be set aside.

**1. Dr. Friedman's Involvement in the Neurodevelopmental and Social Environment Assessments During Her Tenure as a Government Employee Does Not Qualify as Involvement on a Particular Matter Involving Specific Parties, as Required For Disqualification Under 18 U.S.C. § 207.**

NIH erred in concluding that the post employment provision of 18 U.S.C. § 207 barred Dr. Friedman from serving as a PI for CNAC. In particular, 18 U.S.C. § 207(a) permanently restricts former Government employees from participating after their Government service terminates in connection with a *particular matter*:

> (A) in which the United States or the District of Columbia is a party or has a direct and substantial interest,
>
> (B) in which the person participated personally and substantially as such officer or employee, and
>
> (C) which involved a specific party or specific parties at the time of such participation, shall be punished as provided in section 216 of this title [18 U.S.C.].

18 U.S.C. § 207(a)(1)(A)-(C). The particular matter must involve specific parties "both at the time that the Government employee acts in an official capacity and at the time in question after Government service." 5 C.F.R. § 2637.201(c)(4). Furthermore, it must be the same particular matter involving specific parties at both times, although "the same particular matter may continue in another form or in part." *Id.*

In its characterization of the entirety of the NCS as a "particular matter involving specific parties," the NIH Ethics Opinion ignores the proper interpretation and application of Section 207, as informed by 5 C.F.R. § 2637.201(c), which states, in relevant part, as follows:

> "Particular matter involving a specific party or parties". . . Such a matter typically involves a specific proceeding affecting the legal rights of the parties or an isolatable transaction or related set of transactions between identifiable parties. *Rulemaking, legislation, the formulation of general policy, standards or objectives, or other action of general application is not such a matter*. Therefore, a former Government employee may represent another person in connection with a particular matter involving a specific party even if rules or policies which he or she had a role in establishing are involved in the proceeding.

(emphasis added). One of the examples contained in 5 C.F.R. § 2637.201(c)(1) further illustrates that NCS did not constitute a "particular matter" from which Dr. Friedman should now be barred:

> Example 4: An employee of the Office of Management and Budget participates substantially on the merits of a decision to reduce the funding level of a program, which has the effect of reducing the amount of money which certain cities receive to conduct youth work programs. *After leaving the Government she may represent any of the cities in securing funds for its youth program, since her participation was in connection with a program, not a particular matter involving specific parties.*

*Id.* § 2637.201(c)(1) (emphasis added).

Notwithstanding its length, the Ethics Opinion provided by NIH fails to provide an adequate explanation for its conclusion that the NCS is the same "particular matter involving specific parties" in which Dr. Friedman participated during her Government employment. *See* Ethics Opinion, App. at 9-14. The Ethics Opinion contends that the entirety of NCS – which will extend over a period of decades and potentially involve up to fifty separate contracts – must be viewed as one enormous "particular matter involving specific parties" and that it should therefore not be broken down into any component parts. *Id.* at 13.[4] In reaching this conclusion,

[4] NIH's conclusion that NCS in its entirety constitutes a particular matter operates as a lifetime ban on all former employees who worked on even the most isolated components of the development of its technical protocols from serving in any representational capacity with respect

NIH's Ethics Opinion relies heavily upon the determination that NCS has four phases, and that the last phase – "implementation/contracting" – began on November 16, 2004 when the RFP for the 2005 Vanguard Centers requirement was issued. There are several major defects in this analysis.

First, notwithstanding NIH's position, "it is frequently the case that successive contracts are viewed as being different particular matters from each other." *See* OGE Advisory Opinion 02 x 5 (July 31, 2002) (the *Yucca Mountain* opinion) at 9, *available at* http://www.usoge.gov/pages/advisory_opinions/advop_files/2002/02x5.html; *see also CACI, Inc. v. United States*, 719 F.2d 1567, 1575-76 (Fed. Cir. 1983) (holding that a contract for data processing was not the same "contract" as earlier data processing agreements because the specifications evolved enough to make the course of performance significantly different). The U.S. Office of Government Ethics ("OGE") has advised that a case by case analysis is required to determine at which stage a particular matter has sufficiently progressed to involve specific parties. OGE DAEOgram DO-06-029 at 4-5 (October 4, 2006), *available at* http://www.usoge.gov/pages/daeograms/dgr_files/2006/do06029.html.

Second, unlike the Ethics Opinion that describes the NCS as consisting of four phases, the NCS website, http://www.nationalchildrensstudy.gov, characterizes the NCS as involving only two distinct phases: (1) the "planning phase" of the Study and (2) the "implementation" phase of the Study. *See* NCS Website – Funding & Legislation, *available at* http://www.nationalchildrensstudy.gov/about/funding/index.cfm, App. at 18. According to the

---

to any aspect of the NCS. This is an overly broad interpretation of the statute, and contravenes the provisions of the implementing regulations cited above. If this construction of 18 U.S.C. § 207 and the implementing regulations were applied broadly, the Government would be deprived of access to the highly skilled private sector workforce upon which the Government now relies heavily to maintain the continuity and integrity of Government operations.

NCS website, the "planning phase" of NCS extended from Fiscal Year 2000 through Fiscal Year 2006. *Id.* The same website indicates that the "implementation phase of the study" commenced in Fiscal Year 2007. *Id.* NIH cannot have it both ways – either the Ethics Opinion is wrong or the website (notably not prepared in anticipation of litigation) is wrong as to when implementation of or contracting for NCS began. The website explanation that implementation of NCS did not begin until 2007 is further supported in appropriations data set forth on the website. It indicates that the funding received during the "planning phase" of NCS reached its peak in Fiscal Year 2006, at a total of $12.1 million. *Id.* In comparison, the funding for the "implementation phase" of the Study jumps significantly to $69 million for fiscal year 2007 and $110.9 million for Fiscal Year 2008. *Id.*

CNAC submits that NIH's published appropriations data for NCS is a compelling indicator of the distinct "phases" of development of the NCS. Such data indicates that Dr. Friedman participated in the development of protocols during the "planning" phase of NCS, at a time when the NCS had not sufficiently evolved so as to constitute a "particular matter involving specific parties." The NCS website, combined with the funding data provided, establishes that the implementation and contracting phase of NCS did not begin until Fiscal Year 2007. Since Dr. Friedman left NIH's employ in the spring of 2006, *a fortiori* she was not involved in the implementation or contracting phase of NCS. The Ethics Opinion finding to the contrary is plainly and demonstrably wrong.

Third, in its Ethics Opinion, NIH relies upon the *Yucca Mountain* opinion, in which the OGE was asked to evaluate whether federal employees who had participated in the conduct or management of feasibility and other preliminary studies and evaluations of the proposed Yucca Mountain nuclear waste disposal facility would be precluded by the post-employment

restrictions from appearing before or communicating with government officials on behalf of non-governmental parties interested in the subsequent NRC facility licensing proceedings. Ethics Opinion, App. at 11. *Yucca Mountain* states that in determining whether two particular matters are viewed as the same for purposes of section 207(a), it is appropriate to consider "the extent to which the matters involve the same basic facts, related issues, the same or related parties, time elapsed, the same confidential information, and the continuing existence of an important Federal interest." *Yucca Mountain* at 6 (quoting 5 C.F.R. § 2637.201(c)(4). OGE has stated that when the term "particular matter involving specific parties" is used, "it reflects 'a deliberate effort to impose a more limited ban and to narrow the circumstances in which the ban is to operate.'" OGE DAEOgram DO-06-029 at 3 (quoting Bayless Manning, *Federal Conflict of Interest Law* 204 (1964)). In this instance, NIH has seemingly defined "particular matter involving specific parties" to cast the widest net possible, in contravention of OGE's guidance that the term "particular matter involving specific parties" should be construed narrowly.

Fourth, NIH erroneously contends that, because Dr. Friedman's work on the protocol(s) to be incorporated in the Montgomery County Contract occurred after expressions of interest were made in 2005 by potential bidders who were eligible to serve in the Study Locations in the State of Maryland covered by the 2007 procurement, "the Montgomery County Contract had sufficiently evolved to constitute a 'particular matter involving specific parties.'" Ethics Opinion, App. at 14. However, at the time NIH awarded contracts for the first Vanguard Centers in 2005, it had not secured funding for future sites, as explained by NICHD's Director: "The Study has adequate funding to launch the Vanguard Centers. The federal agencies leading it hope to award additional Study Centers to work in a total of 105 sites, subject to the availability of future funding . . . . The timing of a new competitive process also depends on future funding."

*See* Remarks of Duane Alexander, M.D. Director, National Institute of Child Health and Human Development (September 29, 2005); *available at* http://www.nichd.nih.gov/news/releases/duane_alexander.cfm ("Remarks of Duane Alexander"). Notably, the 2005 RFP for the Vanguard Centers did not even solicit proposals for the Montgomery County Study Location. Further, while the protocols for the various Study Centers had yet to be finalized or fully developed at the time the Vanguard Centers RFP was released, NIH nonetheless alleges the Montgomery County Contract constituted a "particular matter involving specific parties" as of that precise date (November 16, 2004). However, the Vanguard Centers RFP clearly distinguishes that RFP from future RFPs for other Study Centers:

> Although the intent is to combine data collected through Vanguard Centers with data collected through Study Centers that are added later, several possibilities exist. If, through experience at the Vanguard Centers, it is learned that critical aspects of the protocol are infeasible, leading to major revisions in procedures, it may not be scientifically valid to combine initial data collected at Vanguard Centers with data collected in the full Study. Further, the addition of the full complement of Study Centers is dependent on receipt of full funding for the NCS.

National Children's Study Plan, RFP NICHD-2004-07 ("Vanguard RFP"), *available at* http://www.nationalchildrensstudy.gov/research/study_plan/vanguard_attachments.cfm, App. at 38 . In general, new particular matters have been found where there are fundamental changes or differences between related matters. OGE Advisory Opinion 99 x 14(2) (July 7, 1999) at 2, *available at* http://www.usoge.gov/pages/advisory_opinions/advop_files/1999/99x14_2.html (citing *United States v. Medico Industries, Inc.*, 784 F.2d 840 (7th Cir. 1986)). Here, the 2005 RFP for the Vanguard Centers (issued on November 16, 2004) differs markedly from the 2007 or 2008 RFPs.[5]

[5] For several different reasons, the Vanguard RFP appears to be a distinct "particular matter involving specific parties." The Vanguard RFP tasks the Vanguard Locations "to finalize the Study Protocol, including finalizing the Sampling Plan for their particular Study Location and methods of data collection." Vanguard RFP, App. at 39. The work of the Vanguard Centers was

NIH's contention that, simply because certain eligible parties had expressed interest in future NCS Study Center sites that *may* have been approved for funding in the future and that *may* have instituted the protocols developed to that point, the Montgomery County Contract had sufficiently evolved to constitute "a particular matter involving specific parties" is patently unreasonable; it elevates the importance of purely serendipitous events while limiting the legitimate post-government employment activities of a well-qualified research scientist. Characterization of the NCS in this manner suggests that Dr. Friedman would not be prohibited from working on the NCS if she simply had taken post-government employment with an employer in a state outside of the "respective census regions" where there had been no "early interest" expressed in 2005 by entities eligible to serve as Study Center locations. A definition of NCS which creates such an arbitrary determination of when the contract for the Montgomery County Study location became a "particular matter involving specific parties" is irrational, capricious, and contrary to applicable law.

Finally, in its Ethics Opinion, NIH has ignored – again – the persuasive legal authority suggesting that technical design work, including the use and development of scientific or engineering concepts, frequently does <u>not</u> operate to ban a former Government employee from employment in the private sector involving the implementation of that technical design because at the early stage of development a "specific party" has not been identified.

---

carried out by "specific parties" who were chosen through a competitive bid process. *See, supra,* Remarks of Duane Alexander. The role of the Vanguard Centers is also broader than that of the Study Centers. *See* National Children's Study Questions and Answers (October 2007), *available at* http://www.nationalchildrensstudy.gov/get_involved/learn_more/qa.cfm. Their mission is not only to enroll and collect data from Study participants but also to "test the study's different components for incorporation into the full Study." *Id.*; *see also* Vanguard RFP, App. at 39. The previously selected Vanguard Centers interested in performing work at a Study Center were also required to submit proposals in response to the 2007 RFP, which further indicates that these were distinct matters. *See* National Children's Study Pre-Proposal Conference (March 7, 2007), App. at 37.

> [W]e take it that an official who drafts specifications for a weapon may represent people who later submit bids to make the weapon; specifications (or regulations) do not have "specific parties." A scientist who analyzes a new chemical could do further work on that chemical for a private employer; there would be no overlap of parties.

*Medico Industries*, 784 F.2d at 843. Example 2 at 5 C.F.R. § 2637.201(c)(2), discussed in OGE Advisory Opinion 99 x 16 (September 10, 1999), likewise illustrates that technical design can appropriately be considered a distinct matter from the ultimate matter involving specific parties.

> [W]ork on the technical design of a new satellite communications system was separate from the subsequent contracting process to construct that system. The issue in [Example 2 at 5 C.F.R. § 2637.201 (c)(2)] was when the satellite contract became a particular matter and ultimately a matter involving specific parties. *Since the technical design did not relate to the contracting process, it was considered to be separate; furthermore, it did not apparently involve specific parties at that stage.* Therefore, the former employee could represent a company in its contract proposals, even though he had worked on the technical design for the system.

OGE Advisory Opinion 99 x 16 (September 10, 1999) at 4, *available at* http://www.usoge.gov/pages/advisory_opinions/advop_files/1999/99x16.html (emphasis added). Even in the *Yucca Mountain* opinion, the entirety of the Yucca Mountain project is not arbitrarily lumped by OGE into one matter, "[t]here may be certain Yucca Mountain matters, apart from the site characterization process, that are sufficiently distinct from the licensing proceedings that they constitute different particular matters." *Yucca Mountain* at 7, n.6.[6]

---

[6] Additionally, the role of post-Government employees that implicates section 207(a) in *Yucca Mountain* is significantly different from the role Dr. Friedman has sought to undertake following her Government service, which is a factor this Court should consider in determining whether Dr. Friedman's role in the creation of a technical protocol is the same "particular matter involving specific parties" as the role she seeks now as PI for an NCS Study Center. Specifically, the *Yucca Mountain* opinion only bans prior Government employees from acting in a representational capacity for private parties in *adjudicatory* proceedings related to the Yucca Mountain licensing before the Nuclear Regulatory Commission. *Yucca Mountain* at 1. "Indeed, license application hearings in particular, may be viewed as quintessential 'party matters,' having as they do a quasi-judicial character involving formal parties who have formal procedural rights and obligations." *Yucca Mountain* at 6. The license application proceedings in *Yucca Mountain* that presented the conflict of interest at issue were formal administrative adjudicatory proceedings, and therefore starkly different from the role that Dr. Friedman would undertake as

In summary, at the time of Dr. Friedman's employment with NICHD, the NCS had simply not sufficiently evolved to constitute a "particular matter involving specific parties." During the period Dr. Friedman provided advice, the NCS was still in its developmental stage, as evidenced by Dr. Friedman's role as an advisor in the development of protocol for infant neurodevelopment and social environment data collection. Furthermore, Dr. Friedman had no role in the formulation or preparation of any procurement documents (such as solicitations) or in the contracting or acquisition process for the NCS; her role was limited to recommendations regarding the technical protocol development and design. NIH's failure to consider these salient facts was arbitrary and capricious.

**2. Dr. Friedman Did Not Participate Personally and Substantially on the NCS During Her Tenure as a Government Employee, as Required For Disqualification Under 18 U.S.C. § 207.**

To be permanently barred by 18 U.S.C. § 207(a), a former Government employee must also have "participated personally and substantially" in the particular matter. The phrase "personally and substantially" is defined in 5 C.F.R. § 2637.201(d), as follows:

> The restrictions of section 207(a) apply only to those matters in which a former Government employee had "personal and substantial participation," exercised "through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise." To participate "personally" means directly, and includes the participation of a subordinate when actually directed by the former Government employee in the matter. "Substantially," means that the employee's involvement must be of significance to the matter, or form a basis for a reasonable appearance of such significance. It requires more than official responsibility, knowledge, perfunctory involvement, or involvement on an administrative or peripheral issue. A finding of substantiality should be based not only on the effort devoted to a matter, but on the importance of the effort. While a series of peripheral involvements may be insubstantial, the single act of approving or participation in a critical step may be substantial.

---

PI in a longitudinal data collection study. Furthermore, the *Yucca Mountain* opinion is only applicable to former employees who were involved "either personally or substantially, or as supervisors with official responsibility." *Yucca Mountain* at 4. As discussed below, NIH has not shown that the advisory role of Dr. Friedman on the neurodevelopmental and social environment assessments in the development of the NCS constituted "personal and substantial" involvement; indeed, the weight of the evidence is to the contrary.

As detailed above, Dr. Friedman's work on the NCS was in an advisory role, working with a team of other individuals. Her team was tasked with recommending measures (from a list of potential measures identified by others) for two of the more than twenty technical protocols for a very narrow period (birth to 18 months) to be utilized in a Study designed to follow its participants until adulthood. These key facts are not even considered in the Ethics Opinion. While Dr. Friedman's work on the NCS protocols may have been helpful to the ultimate success of the NCS, she made no decisions with respect to the NCS and had no involvement in the portion of the NCS concerned with development in infants older than 18 months.

Further, the NCS website purports to recognize the individuals who have contributed time and expertise to the development of the NCS. *See* NCS Website – Persons Who Have Contributed Time and Expertise to the Development of the Study, (March 13, 2008), *available at* http://www.nationalchildrensstudy.gov/about/study_contributors/. Dr. Friedman's name is curiously absent from the list. Dr. Friedman's contributions to the Study, which NIH now alleges were sufficiently personal and substantial so as to permanently bar her under 18 U.S.C. § 207, apparently were not so substantial as to justify her recognition on NCS's list of contributors. *Id.* This is yet another example where the published information on NCS's website differs markedly from the conclusions and characterizations adopted by NIH in its Ethics Opinion. Thus, the advisory role of Dr. Friedman on the neurodevelopmental and social environment assessments does not constitute "personal and substantial" involvement in the entire NCS, as NIH has concluded.

**3. Communications by Dr. Friedman as PI for The Montgomery County Contract Do Not Implicate the Ban On Representational Activity Prohibited By 18 U.S.C. § 207.**

The NIH Ethics Opinion inexplicably continues to ignore the exceptions for the communication of technical and scientific information in the applicable regulations. The Ethics

Opinion also contends that communications that would result from the award of the Montgomery County Contract to CNAC would implicate section 207 because Dr. Friedman will potentially violate § 207 (a) in connection with those communications. However, both the existing and proposed OGE regulations clearly anticipate that a former Government employee who worked on the development of technical protocols may in the future assume a role in the private sector implementing these protocols. The proposed new rule for 5 C.F.R. § 2641.201(e)(2) states that:

> Certain communications to and appearances before employees of the United States are not made with the intent to influence. . . including, but not limited to, communications and appearances made solely for the purpose of. . . (iv) Signing an assurance that one will be responsible as principal investigator for the direction and conduct of research under a Federal grant (see example 4 to paragraph (d) of this section).

*See* 68 Fed. Reg. 7844, 7873 (Feb. 18, 2003). To date, the Office of Government Ethics has not finalized its revision to the conflict-of-interest regulations. However, the prior regulations are not to the contrary. *See* 5 C.F.R. § 2637.201(c)(2) ("In connection with technical work, participation in projects generally involving one or more scientific or engineering concepts, in feasibility studies, or in proposed programs prior to the formulation of a contract will not restrict former Government employees with respect to a contract or specific programs entered into at a later date.").

Under 5 C.F.R. § 2637 (which this Court directed NIH to review in preparing its Ethics Opinion), the Office of Government Ethics provides an example involving a former employee at NIH that later acts as a Principal Investigator (albeit in the context of the one-year restriction under 18 U.S.C. § 207(c)):

> A former Senior Employee of the National Institute of Health (NIH), employed by a non-exempt research institute, prepares an application to NIH for a research contract. The application is submitted to NIH by the institute and lists the Senior Employee as principal investigator. The Senior Employee does not violate 18 U.S.C. 207 (c) by preparing the application or by being listed as principal investigator, since these are not representational activities. He may also sign an assurance to NIH, as part of the application, that he will be responsible for the

> scientific and technical direction and conduct of the project if an award is made. He may also communicate with NIH to provide scientific or technical information on the application, including presentation to NIH personnel at the research site, so long as he does not argue for approval or funding of the application.

*See* 5 C.F.R. § 2637.204(g), Example 1, *superseded in part by* 5 C.F.R. § 2641. The proposed regulations include an almost identical example within the context of the lifetime ban under 18 U.S.C. § 207 (a):

> A former employee of the National Institutes of Health (NIH) prepares an application for an NIH research grant on behalf of her [sic] university employer. The application is signed and submitted by another university officer, but it lists the former employee as the principal investigator who will be responsible for the substantive work under the grant. He has not made a communication. He also may sign an assurance to the agency that he will be personally responsible for the direction and conduct of the research under the grant, pursuant to § 2641.201(e)(2)(iv). Moreover, he may personally communicate scientific or technological information to NIH concerning the application, provided that he does so under circumstances indicating no intent to influence the Government pursuant to § 2641.201(e)(2) or he makes the communication in accordance with the exception for scientific or technological information.

*See* 68 Fed. Reg. at 7873 (proposed new rule 5 C.F.R. § 2641.201(d)(3), Example 4). This example demonstrates that 18 U.S.C. § 207 (a) is not intended to prohibit the types of scientific communications that would occur between Dr. Friedman as CNAC's PI and the NIH officials involved in NCS.

**4. NIH's Permanent Disqualification of Dr. Friedman Serves No Legitimate Public Policy Interest of the U.S. Government and Is Contrary To The Legislative Intent of 18 U.S.C. § 207.**

NIH's arbitrary conclusion that Dr. Friedman is barred by the post-employment restrictions of 18 U.S.C. § 207 fails to uphold the legislative intent of the statute. "The purpose of the post employment provisions is to avoid the 'revolving door' syndrome inherent in which are the potentialities for the use of inside information and for continuing personal influence." OGE Advisory Opinion 81 x 35 (December 16, 1981) (citing Bayless Manning, *Federal Conflict of Interest Law*, 179-180 (1964); S. Rep. No. 170, 95th Cong., 1st Sess. 31-33 (1977)). "Many employees of the government are experts in particular fields. A broad construction of 'particular

matter' might make it very difficult for these people, their human capital heavily invested in a single subject, to leave the government for a private employer that deals extensively with the government." *Medico Industries*, 784 F.2d at 843.

Thus, the intent of § 207 (a) is not to prohibit all former Government employees who contributed to the development of a study or technical issue during their tenure as a Government employee from communicating with the Government after leaving Government service. In enacting § 207 (a), Congress's purpose was not to protect the public from an individual attempting to use his or her expertise, but rather to preclude the use of trading upon the specific knowledge obtained during public service. *United States v. Clark*, 333 F. Supp. 2d 789, 793 (D. Wis. 2004). Among other things, the statute seeks to prevent such knowledge from being used against the Government itself. *Id.*

Here, there is no danger that Dr. Friedman has acquired information that she can "use against the Government" or use to gain an unfair competitive advantage for CNAC. The NCS is essentially a broad-based Study designed to facilitate the collection of data. Dr. Friedman was involved in the development of a discrete, limited technical protocol during the formulation of this Study. The full protocol is itself a data collection methodology which, having been adopted, cannot be "used against" NIH or any other entity. Dr. Friedman now seeks to involve herself in the implementation of the Study as a whole as PI. Dr. Friedman's proposed role as CNAC's PI does not violate 18 U.S.C. § 207, therefore NIH's ethics evaluation should be set aside as arbitrary, capricious, and contrary to law.

**B. <u>This Court Should Issue a Permanent Injunction Prohibiting NIH from Awarding the Montgomery County Contract to Any Offeror Other Than CNAC, or, Alternatively, Directing NIH to Award the Montgomery County Contract to CNAC</u>**

CNAC seeks a permanent injunction directing NIH to award CNAC the Montgomery County Contract, or, in the alternative, prohibiting NIH from awarding the Montgomery County



US_SW_600580511v1

Contract to any offeror other than CNAC.[7] In determining whether to grant permanent injunctive relief this Court must consider the same four factors as described in CNAC's April 8, 2008 motion for preliminary injunction, with the exception that the plaintiff must show actual success on the merits rather than likelihood of success. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12 (1987); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) ("In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.")

For the reasons discussed above, this Court should issue a declaratory judgment and injunction stating that Dr. Friedman is not permanently barred from serving as a PI for the NCS. In its prior protest CNAC established that, but for NIH's arbitrary and capricious conduct, CNAC would have received award of the Montgomery County Contract. In lieu of directing award to CNAC at that juncture, this Court ordered NIH to undertake a proper ethics evaluation of Dr. Friedman. Despite now having had *two* opportunities to review and address the issue, NIH has again failed to properly apply the law in regards to Dr. Friedman. As a result, this Court should conclusively determine that Dr. Friedman is not barred by the post-employment provisions of section 207. After making such a determination, this Court should grant CNAC its requested permanent injunctive relief, because (1) absent such relief CNAC has no adequate

---

[7] As the Court has indicated it will rule, at least preliminarily, on the merits of this action at the hearing scheduled for April 22, 2008, CNAC does not herein repeat the various grounds which support the entry of a preliminary injunction. To the extent a preliminary injunction is needed during or after the hearing on April 22, CNAC reserves the right to reinstate its motion for a preliminary injunction as originally filed on April 8, 2008.

remedy and will continue to suffer specific irreparable injury, (2) the harm to CNAC outweighs the harm to NIH and any third parties, and (3) granting the injunctive relief serves the public interest. *See MVM, Inc. v. United States*, 46 Fed. Cl. 137, 142 (1999).

CNAC has been irreparably harmed by NIH's continued arbitrary and capricious conduct. NIH's original arbitrary determination that Dr. Friedman was disqualified from serving as PI for an NCS Study Center was the sole reason CNAC was not awarded the Montgomery County Contract. CNAC has now suffered further irreparable injury because NIH's recent arbitrary and capricious ethics evaluation of Dr. Friedman *again* deprives CNAC of the ability to fairly compete for or to receive award of the Montgomery County Contract. Even if this Court vacates the determination by NIH that Dr. Friedman is barred by section 207, this remedy will be insufficient to repair the irreparable injury suffered by CNAC. Additionally, even if given the opportunity to re-compete for the Montgomery County Contract, CNAC will be unable to compete for that contract on a level playing field, as a result of NIH's continued arbitrary and capricious conduct. When assessing irreparable injury, the relevant inquiry is whether plaintiff has an adequate remedy in the absence of an injunction. *Seattle Security Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000) (internal quotations and citations omitted). Here, absent the injunctive relief CNAC seeks herein, CNAC has no adequate remedy.

As a result of the prior non-award to CNAC of the Montgomery County Contract, and NIH's continued arbitrary and capricious conduct, CNAC has been placed in an untenable position. Because of the delay in NIH's issuance of the ethics opinion disqualifying Dr. Friedman from serving as the PI on CNAC's team, some of CNAC's original teams members have joined other competing teams or formed their own teams to compete for the Montgomery County Contract. Thus, CNAC's ability to compete for the Montgomery County Contract under

the 2008 RFP has been harmed; CNAC has been placed in the difficult position of having to identify and replace lost talent, on an extremely tight schedule. To make matters even worse, CNAC's competitors for the Montgomery Country Contract under the 2007 RFP, which received awards for locations other than Montgomery County, can now bid for the Montgomery County Contract with the benefit of the economies of scale that come with having multiple sites, giving them an unfair price advantage over CNAC. Additionally, these competitors can leverage their experience to date on NCS, received as a result of their award under the 2007 RFP, experience which CNAC was unjustly denied. Thus, NIH's actions have permanently prohibited CNAC from fair consideration for award of the Montgomery County Contract; this constitutes irreparable harm.

Countless cases have held that the "denial of the right to have [a] bid fairly and lawfully considered constitutes an irreparable injury . . . as does the loss of a major contract." *Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. 1370, 1381 (E.D. Va. 1993) (citing *Abel Converting, Inc. v. United States,* 679 F. Supp. 1133, 1142 (D.D.C. 1988); *United Power Corp. v. United States Def. Mapping Agency*, 736 F. Supp. 354, 357-58 (D.D.C. 1990); *Nat'l Maritime Union of Am., AFL-CIO v. Commander Military Sealift Command*, 824 F.2d 1228, 1237 (D.C. Cir. 1987)); *accord Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 744 (2000) (citing *United Int'l Investigative Servs. v. United States*, 41 Fed. Cl. 312, 323 (1998); *Magnavox Elec. Sys. Co. v. United States*, 26 Cl. Ct. 1373, 1379 (1992); *Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 524 (1991) (bidder would be irreparably harmed because it could only recover bid preparation costs, not lost profits, through an action at law) (internal quotations and citations omitted)). The lost opportunity to compete on a level playing field for a contract has been found sufficient to constitute irreparable harm. *Seattle Security Servs., Inc.,* 45 Fed. Cl. at 571 (internal

citations omitted). Accordingly, CNAC has adequately demonstrated that it will continue to suffer irreparable harm if injunctive relief is not provided.

Where it is clear that, but for the unlawful conduct of the contracting officer, the contract would have gone to the unsuccessful bidder, a reviewing court has the authority to award the contract to that bidder. *Blue Cross & Blue Shield of Maryland, Inc. v. United States*, 718 F. Supp. 80, 89 (D.D.C. 1989) (citing *Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984)). And, this Court has exercised that authority. *See Alfa Laval Separation, Inc. v. United States*, 47 Fed. Cl. 305, 315 (2000) (concluding that agency is "enjoined permanently from making further orders under the subject solicitation and contract to any entity other than" protestor), *on remand from*, 175 F.3d 1365 (Fed. Cir. 1999); *PCI/RCI v. United States*, 36 Fed. Cl. 761, 776 (1996) (granting permanent injunction enjoining award of contract to any party other than plaintiff); *Bean Dredging Corp. v. United States*, 19 Cl. Ct. 561, 583-84 (1990) (same); *TRW Environment Safety Systems, Inc. v. United States*, 18 Cl. Ct. 33, 74-75 (1989) (same); *Mack Trucks v. United States*, 6 Cl. Ct. 68, 72-73 (1984) (same); *Essex Electro Engineers, Inc. v. United States*, 3 Cl. Ct. 277, 288 (1983) (same). Additionally, before Congress made this Court the sole court for hearing bid protests, the regional circuits also provided the same relief in appropriate circumstances. *See, e.g., Superior Oil Co.v. Udall*, 409 F.2d 1115, 1120-22 (D.C.Cir. 1969) (canceling government contract and awarding to plaintiff where but for violation of law in contracting, plaintiff would have received contract); *Choctaw Mfg. Co. v. United States*, 761 F.2d 609, 621 (11th Cir. 1985) (directing award of contract to appellant where absent violation of applicable procurement regulations, appellant would have received award).

The equitable factors the court should consider in determining the propriety of such relief include:

> whether the contract has already been awarded to another party and, if so, is being performed; the extent an order awarding the contract to the unsuccessful bidder is necessary to vindicate the interest of the public, and competing bidders, in the agency's adherence to the law; and the cost to the government, and hence to the taxpayers, of substituting an unsuccessful bidder for the successful bidder whose price may have been considerably lower.

*Choctaw Mfg. Co.*,761 F.2d at 619 (citations omitted). "Putting the disappointed bidder in the economic position it would have occupied but for the error is normally the best approach to this result." *Delta Data Systems Corp.*, 744 F. 2d at 206-07. As discussed above, the only way CNAC can be put in the same position as it would have been but for NIH's arbitrary and capricious conduct, is to prohibit NIH from awarding the Montgomery County Contract to any offeror other than CNAC.

The balance of hardships in this action clearly favors CNAC, as NIH would suffer no injury if this Court issues the permanent injunctive relief. NIH has indicated that it eventually intends to award the Montgomery County Contract of the NCS (as evidenced by its repeated solicitation for that contract). Prohibiting NIH from awarding the Montgomery County Contract to any other offeror under these circumstances is not a hardship to NIH; rather, it saves NIH time and resources spent evaluating alternative proposals. Furthermore, had NIH properly evaluated Dr. Friedman in the first instance, CNAC would have been awarded the contract. To the extent the Government even argues the point, it strains credulity to suggest that making award of the Montgomery County Contract to the prior offeror selected for award works any hardship on NIH. While NIH maintains the discretion to make no award for the Montgomery County Contract under the 2008 RFP, a permanent injunction prohibiting NIH from awarding the contract to any other offeror accomplishes the goal of restoring CNAC's award of the contract, while allowing NIH to retain the discretion it possesses to make no award of the Montgomery County Contract under the 2008 RFP. 2008 RFP, App. at 52.

Finally, the public has an interest in "minimizing the costs of federal procurements." Prohibiting NIH from awarding the Montgomery County Contract to any other offeror satisfies this public interest. *See Vanguard Sec. Inc. v. United States*, 20 Cl. Ct. 90, 113 (1990). Moreover, the public has a strong interest in preserving the integrity of the procurement process. *See Parcel 49C Ltd. Partnership v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994); *see also PCI/RCI*, 36 Fed. Cl. at 776 (the public interest in protecting the integrity of the procurement system from irrational conduct is served by granting a permanent injunction); *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1305-06 (D.C. Cir. 1970) (noting that "[t]he courts are properly concerned that the procurement activities of the Government be carried out in accordance with the applicable statutes and agency regulations and that these governmental functions not be permitted to deteriorate into actions reflecting personal predelictions [sic] of administrative officials, whether ascribable to whim, misplaced zeal, or impermissible influence"). The issuance of a permanent injunction in this case would protect these interests. Finally, as discussed above, the disqualification of Dr. Friedman on the basis of the post-employment provisions of section 207 does not further the legislative intent of the statute, but rather denies the public the opportunity to benefit from Dr. Friedman's substantial expertise in this area. Thus, the Court should grant CNAC's requested permanent injunction.

CNAC is cognizant that permanent injunctive relief of this nature is not routinely granted by this Court. Generally, ordering that a party be allowed to re-compete for a contract repairs the injury sustained by the successful protestor. However, in this instance, due to NIH's prior arbitrary and capricious conduct, CNAC's ability to compete on a level playing field for an award under the 2008 RFP has been irreparably injured. NIH was previously granted the opportunity to rectify its arbitrary and capricious conduct, and it failed to do so. If prior conduct

is any indication, granting NIH a third opportunity to act in a non-arbitrary manner will not rectify the situation and may result in these parties coming before this Court yet again. Thus, granting CNAC's requested permanent injunctive relief, although not routine, is fully warranted given the unique circumstances of this action.

Finally, there can be no doubt that under the Tucker Act this Court has the authority either to direct NIH to award to CNAC or, alternatively, to preclude NIH from awarding the Montgomery County Contract to any offeror other than CNAC. In pertinent part, the Tucker Act states

> (2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

28 U.S.C. § 1491(b)(2) (emphasis added). In exercising its equitable powers in bid protest litigation, this Court has the clear statutory authority to award CNAC "any relief" it deems appropriate. As discussed above, CNAC's only adequate remedy is permanent injunctive relief. Thus, the Court should exercise its sound discretion and authority here by directing NIH to award the Montgomery County Contract to CNAC, or by precluding NIH from awarding the Montgomery County Contract to any offeror other than CNAC.

## VI. CONCLUSION

For the reasons stated above, CNAC seeks this Court's review of the merits of NIH's Disqualification Letter and a determination by the Court that the Disqualification Letter should be set aside as arbitrary, capricious, and contrary to law. In the event that this Court concludes – as it should – that NIH's Disqualification Letter is arbitrary, capricious, and violative of this Court's January 3, 2008 Order, in these unique circumstances this Court should exercise its equitable powers and direct NIH to award the Montgomery County Contract to CNAC, or

permanently enjoin NIH from awarding the Montgomery County Contract to any offeror other than CNAC.

Dated: April 17, 2008

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Daniel S. Herzfeld

Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel for The CNA Corporation

*Of Counsel:*
Daniel S. Herzfeld
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859

Caroline L. Plant
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406