**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Electronically Filed on April 17, 2008)**
**BID PROTEST**

| | | |
|---|---|---|
| THE CNA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No: 08-249C<br>(Judge Horn) |

**APPENDIX IN SUPPORT OF THE CNA CORPORATION'S**
**BRIEF IN SUPPORT OF DECLARATORY AND INJUNCTIVE RELIEF**


Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel for The CNA Corporation

*Of Counsel:*
Daniel S. Herzfeld
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7612
(703) 770-7901 (fax)

Caroline L. Plant
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406


Date: April 17, 2008

# INDEX TO APPENDIX


| TAB | | PAGE |
|---|---|---|
| A. | Disqualification Letter | 1 |
| B. | Ethics Opinion | 3 |
| C. | NCS Website – Funding & Legislation | 18 |
| D. | Notice of Award | 20 |
| E. | November 26, 2007 Letter | 23 |
| F. | Technical Evaluation Report | 26 |
| G. | NCS Pre-Proposal Conference (March 7, 2007) | 37 |
| H. | Vanguard RFP (Excerpts) | 38 |
| I. | 2007 RFP (Excerpts) | 40 |
| J. | 2008 RFP (Excerpts) | 51 |

# TAB A

**DEPARTMENT OF HEALTH & HUMAN SERVICES** Public Health Service

Phone: (301) 496-4611
Fax: (301) 402-3676
http://www.nichd.nih.gov

National Institutes of Health (NIH)
National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK)
Office of Acquisitions, NICHD Branch
6100 Executive Blvd., Room 7A07, MSC 7510
Bethesda, MD 20892-7510

March 19, 2008

Stephen Broyhill, Vice-President, Business Development
Keith Thornburg, Manager of Contracts
The CNA Corporation
4825 Mark Center Drive
Alexandria, VA. 22311

Dear Mr. Broyhill and Mr. Thornburg:

In accordance with Judge Horn's order dated January 3, 2008, and in fulfillment of my responsibility under Federal Acquisition Regulation (FAR) 1.602-2 to safeguard the interests of the United States in its contractual relationships, I affirm my decision to exclude the CNA Corporation (CNAC) from consideration for the 2007 award of a contract under RFP-NIH-NICHD-NCS-07-11, National Children's Study Centers (2007 RFP). Consistent with the instruction at FAR 1.602-2(c), I have requested and considered the advice of specialists in law in order to safeguard those interests. Specifically, I adopt the attached opinion of the Office of the General Counsel, Ethics Division, regarding the prospective violation of 18 U.S.C. § 207(a) as a result of CNAC's proposal of Dr. Sarah Friedman as its principal investigator under a National Children's Study Center contract. I affirm my decision to act under FAR 1.602-2 by excluding CNAC from consideration under the 2007 RFP in order to prevent an eventual violation of § 207(a) and the tainting of the contract and procurement thereby.

With respect to the forthcoming solicitation Reference-Number-NIH-NICHD-NCS-08-21 (2008 RFP), I advise you that the 2008 RFP does not materially differ from the 2007 RFP with respect to Dr. Friedman's eligibility under 18 U.S.C. § 207(a)(1) to serve as principal investigator. Accordingly, I would anticipate the same determination with respect to Dr. Friedman under the 2008 RFP as under the 2007 RFP. However, given that the 2008 RFP has not been issued, and given that CNA has not yet submitted a proposal, I have not made a determination as to whether or not to CNAC would be ineligible for award pursuant to the 2008 RFP. Thus, CNAC is not excluded from submitting a proposal in response to the 2008 RFP. Should CNAC submit a proposal in response to the 2008 RFP identifying Dr. Friedman as its proposed principal investigator, I would consider any information or argument that CNAC submitted with its proposal bearing upon Dr. Friedman's eligibility.

The legal opinion I have adopted is attached[1]. I have decided to provide this specific document to CNAC to fully explain the Government's analysis. I have waived attorney-client privilege with respect to the attached comment only and for no other purpose. In addition, I have not waived attorney-client privilege with respect to consultations and exchanges with counsel on this matter.

Sincerely,

Elizabeth Osinski

Elizabeth Osinski
Contracting Officer, NICHD Contracts Management Branch
Office of Acquisitions, NIDDK, NIH
Executive Building, Room 7A-07
6100 Executive Blvd., MSC 7510
Bethesda, Maryland 20892-7510
Phone: 301-435-6947
FAX: 301-402-3676
E-mail: eo43m@nih.gov

Enclosure

cc: Alex D. Tomaszczuk

1 I have noted a minor factual error on page four of the opinion. The last sentence on page four which reads "In addition, contracts for the collection of data in seven of the 105 Study Locations were awarded in fiscal year 2005," should instead reference "calendar year 2005," since one such contract was awarded on November 1, 2005. My attorneys have advised me that this minor factual error has no impact on the legal analysis and conclusion.

# TAB B

DEPARTMENT OF HEALTH & HUMAN SERVICES

Office of the Secretary

Office of the General Counsel
Washington, D.C. 20201

March 18, 2008

MEMORANDUM

TO: Elizabeth J. Osinski
Contracting Officer
NIDDK Office of Acquisitions,
NICHD Branch
National Institutes of Health

FROM: Edgar M. Swindell
Associate General Counsel for Ethics
Designated Agency Ethics Official

SUBJECT: Eligibility of Sarah Friedman, Ph.D., to Serve as a Principal Investigator for a Study Center Selected to Collect Data for the National Children's Study

In response to the order of Judge Marian Blank Horn in *The CNA Corporation v. United States*, No. 07-858C (Fed. Cl. Jan. 3, 2008), we are documenting the legal analysis that informed our advice to you in connection with your determination that Sarah Friedman, Ph.D., was ineligible to serve as a Principal Investigator (PI) for a Study Center selected under the 2007 procurement to collect data for the National Children's Study (NCS).

As you know, former federal employees are subject to the criminal post-employment statute, 18 U.S.C. § 207. With the exception of a provision not relevant to this case,[1] former employees who are not "senior employees"[2] for purposes of the statute are subject only to the so-called

[1] Under 18 U.S.C. § 207(b), former employees who participated in ongoing trade or treaty negotiations on behalf of the United States within the year preceding their departure cannot, for one year, represent, aid, or advise anyone based on information exempt from disclosure to which the employees had access.

[2] "Senior employees" are subject to paragraphs (a)(1), (a)(2), (b), and additional restrictions known as the one-year "cooling-off period" and the one-year "foreign entity representation and advice prohibition," 18 U.S.C. §§ 207(c) and (f), respectively. "Senior employees" include Presidential appointees paid at Levels II through V of the Executive Schedule, uniformed service officers at pay grades O-7 or above, and members of the Senior Executive Service and employees in other pay systems with an annual rate of basic pay (excluding locality-based adjustments) set at an amount equal to or greater than 86.5% of the rate of basic pay for Level II of the Executive Schedule. For 2008, Level II is $172,200, which yields a senior status threshold of $148,953. In 2006, when Dr. Friedman left government employment,

"permanent ban" and the "two-year bar," 18 U.S.C. §§ 207(a)(1) and (a)(2), respectively.[3] At issue in the 2007 procurement was the permanent ban. Under this provision, former employees are prohibited from appearing before or communicating with government officials on behalf of any other person or organization (except the United States)[4] with the intent to influence in relation to any specific party matter in which the employee personally and substantially participated at any time during federal employment.

---

Level II was $165,200 and the senior status figure was $142,898. Dr. Friedman's salary was calculated according to the GS 15 pay schedule. The highest base pay that year for a Grade 15, Step 10, was $118,957. Accordingly, no employee paid under the General Schedule was a "senior employee."

[3] The remaining parts of 18 U.S.C. § 207 were inapplicable to this case. Paragraph (d) imposes a two-year "cooling-off period" for the Vice President, Cabinet officers paid at Level I, and certain high level employees of the Executive Office of the President. These "very senior employees" are precluded from making post-employment representational contact to employees of their former agency, as well as to any Presidential appointee in the entire Executive Branch and any employee paid at Levels I through V of the Executive Schedule. Paragraph (e) prescribes the post-employment restrictions for Members of Congress and Legislative Branch employees. Paragraphs (g), (h), and (i) address, respectively, special rules for detailees, the designation of separate components for purposes of the one-year "cooling-off period," and definitions. Paragraphs (j) and (k) deal with exceptions and a waiver procedure that are not applicable in this case, *see* discussion *infra* at pages 13-16, and paragraph (l) applies to detailees assigned to an agency from private sector organizations.

[4] In addition to the parenthetical exception in section 207(a)(1) that permits representational activities that are conducted on behalf of the United States, section 207(j)(1), discussed *infra* at footnote 19 on page 14, provides an explicit exception for acts done in carrying out official duties on behalf of the United States. However, neither the parenthetical exception in paragraph (a)(1) nor the exception in paragraph (j)(1) permit representational appearances or communications by former employees who work for government contractors or grantees. In discussing its proposed regulation, *see* discussion *infra* footnote 11 at page 8, to implement both the parenthetical and section 207(j)(1), the Office of Government Ethics (OGE) notes that such an expansive reading of the statute has been consistently rejected. 68 Fed. Reg. 7861 (February 18, 2003). According to OGE, a former employee does not act on behalf of the United States by virtue of performing work funded by the Government or engaging in the appearance or communication on behalf of a third party in response to a contact initiated by the Government, or because the Government will derive some benefit from the activity, or because the former employee or the person or organization on whose behalf he or she is acting may share the same objective as the Government. *Id.*; *see also* OGE Memorandum to Designated Agency Ethics Officials, General Counsels, and Inspectors General (February 17, 2000), available under "DAEOgrams" on the OGE web site, http://frwebgate.access.gpo.gov/cgi-bin/leaving.cgi?from=leavingFR.html&log=linklog&to=http://www.usoge.gov.

In September 2007, after NICHD ethics officials consulted with the Senior Ethics Counsel on my staff assigned to advise the National Institutes of Health (NIH), you determined that the permanent ban prohibited Dr. Friedman from serving as a Study Center PI. As a result, although the proposal submitted by The CNA Corporation (CNA) to operate as Study Center for Baltimore County and Montgomery County, MD, was included in the competitive range, CNA did not receive an award. Thereafter, CNA filed the above-referenced bid protest action disputing the government's analysis regarding the application of the criminal statute in Dr. Friedman's case on three grounds: (1) that the NCS is not a specific party matter to which the restriction applies in Dr. Friedman's case; (2) that Dr. Friedman was not personally and substantially involved in the NCS matter; or (3) that, alternatively, Dr. Friedman is exempt from the application of the restriction because of the nature of her work on the NCS while she was a federal employee. On January 3, 2008, the Court of Federal Claims issued an order finding that the record submitted in the case lacked a clearly articulated basis for concluding that section 207 would bar Dr. Friedman's participation as the Study Center PI if CNA were selected. The court directed NIH to reconsider the ethics decision and to articulate the statutory and regulatory grounds for its determination.

## Background concerning the National Children's Study

Based upon our review of documentation related to the development of the NCS—including pre-solicitation and pre-award correspondence and documentation contained in the contracting files related to the fiscal year 2005 and 2007 procurements; acquisition plans; requests for proposals (RFPs); comments on RFPs; materials from pre-proposal conferences; competitive range and source selection determinations; information that currently exists regarding the planned fiscal year 2008 procurement; other information publicly available on the NCS web site; and the Complaint for Declaratory, Preliminary and Permanent Injunctive Relief and Motion for Preliminary Injunction filed by CNA in the United States Court of Federal Claims—and multiple consultations with you and members of the program staff, the following describes our understanding of the NCS:[5]

The Children's Health Act of 2000, 42 U.S.C. § 201, authorized and directed, in part, a consortium of federal agencies, led by the National Institute of Child Health and Human Development (NICHD) in partnership with the Centers for Disease Control and Prevention (CDC), the Environmental Protection Agency (EPA), and the National Institute of Environmental Health Sciences (NIEHS), to plan and conduct a large longitudinal study of the effect of

---

[5] It may also be worth noting that our understanding of the NCS is further informed by the significant interactions that Senior NIH Ethics Counsel Gretchen H.Weaver, the principal author of this opinion, has had with program officials since the autumn of 2001 in connection with the analysis and consideration of potential conflict of interest issues for the members of the National Children's Study Advisory Committee.

environmental exposures on child health and development.[6] After considering the feasibility of conducting a longitudinal cohort study of environmental effects on mothers and children, concept clearance was granted for the NCS, as a whole, in March 2004. The NCS will involve a nationally representative sample of approximately 100,000 children from before birth, whenever possible, to age 21. For purposes of the NCS, the environment is defined broadly to include biological, chemical, physical, behavioral, social, cultural, geographical, and educational factors. The goal of the NCS is to provide information that will lead to improvements in the health and development of children.

The Interagency Coordinating Committee comprised of federal employees from the NICHD and the other lead agencies was established in 2000 to guide the planning and implementation of the NCS. The Program Office within the NICHD, the chartered federal advisory committee, 22 working groups comprised of over 200 scientists, and more than 2500 people interested in the design, conduct, and results of the NCS provided input during the planning phase.

Based upon the advice of experts in study design and sampling and the recommendations of the National Children's Study Advisory Committee, the Government decided that the NCS would be conducted using a national probability sample of all births in the United States. In 2004, the first stage of sampling was completed with the selection of 105 geographic locations (the Study Locations), corresponding to counties or, in sparsely populated areas, contiguous counties, in the United States from which the NCS participants would be drawn.

In fiscal year 2005, the contract for the NCS-Coordinating Center was awarded. The NCS-Coordinating Center is responsible for providing scientific support to the NCS Project Officer(s) in the development and implementation of the NCS, coordinating the day-to-day activities of the Study Centers (i.e. the entities that will collect the data in the Study Locations), the Central Laboratories, and the Central Repository, supporting the Information Management System for the NCS, handling the data processing and supporting the statistical analysis and reporting of NCS results. In addition, contracts for the collection of data in seven of the 105 Study Locations were awarded in fiscal year 2005.

In 2007, 22 contracts were awarded for the collection of data in 40 Study Locations. It is anticipated that contracts for the collection of data in the remaining Study Locations may be awarded following a fiscal year 2008 solicitation and, as needed, future solicitations. Notably, concept clearance was waived in relation to the fiscal year 2007 procurement as a result of the project concept clearance that was granted in March 2004. Contracting decisions are made subject to the availability of funds, the quality of proposals received, and other factors at the time

---

[6] By Act of Congress (Public Law 110-154), the NICHD was recently renamed the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development.

of each solicitation.[7] Subject to OMB approval, the first wave of data collection is scheduled to begin in 2008.[8]

Although the Study Center contracts are described as contracts for the collection of data, the study design, or Research Plan, and RFPs instruct that the Study Centers will work collaboratively with the Project Officer(s), the NCS-Coordinating Center, and other participating Study Centers to determine and finalize the protocol(s), schedules and methods they will employ. In order to take advantage of scientific advancements that will occur during the 20+ years of the study, and to ensure that the study can adapt to accommodate new hypotheses and measurement tools, the PIs for each of the Study Centers serve on the Steering Committee for the NCS, along with NICHD program officials, officials from the NCS-Coordinating Center, and the Interagency Coordinating Committee. All data collections will be conducted in accordance with standardized protocols. The schedule of data collections, measurements and tools to be employed during the pre-conception through 18 months of age phase of the NCS was substantially completed in 2007, subject to peer review and approval from the Office of Management and Budget under the Paperwork Reduction Act. In particular, decisions regarding the measures and tools that would be used to assess neuro and psychosocial development were made in 2006. In addition, the Study Centers will collaborate in relation to the data analysis and publication of NCS findings and conclusions.

As mentioned above, the study design for the NCS employs a multistage probability sample of births in the United States. This national probability design was determined to be the best design in light of the following goals:

(1) Collection of high quality, objective data to minimize measurement biases;
(2) Avoidance of selection biases and other biases that could lead to invalid references concerning exposure and outcome relations;
(3) Ability to capture the diversity of the population of the United States such that both the range and diversity of exposures and outcomes are represented; and
(4) Ability to generalize the results of the NCS to the population of the United States.

In keeping with principles of research validity, a statistically representative sample must be maintained to the greatest extent possible throughout data collection. Conclusions drawn from an unrepresentative sample could not be extrapolated and supported. As a result, in each successive procurement, the contracts awarded must provide for data collection from previously identified study locations such that the entire sample that will exist until the next procurement is, to the greatest extent possible, statistically representative of the population of the United States.

---

[7] For the fiscal years 2000-2008, respectively, the following funding (in approximate millions) has been available for the NCS: $1.0; $3.2; $6.1; $10.6; $10.6; $11.0; $12.1; $69.0; and $110.9.

[8] Due to logistic and cost considerations, data collection cannot begin simultaneously in all 105 locations.

Dr. Friedman's Role

As noted above, the NCS is a long-term longitudinal study of children from birth to adulthood to assess the affects of various environmental influences on child health and development. The goal of the NCS is to better understand the role of biological, chemical, physical, social and behavioral influences on children. Pursuant to the Research Plan, the impact of a wide range of environmental influences will be examined, including air pollutants; drinking water contaminants; dietary nutrients, supplements, and contaminants; infectious and allergic agents; and social and behavioral characteristics. Participating children will be followed to evaluate the impact of the various measures in a wide range of health and developmental outcomes. Pursuant to their contracts, each of the Study Centers will conduct the study according to the prescribed protocol(s). Each Study Center will collect information and data on the same schedules and using the same tools and measures. Data analysis will occur in relation to each developmental phase and longitudinally. Hence, the analysis of data in the context of later developmental phases will necessarily be dependent on data collected in early phases. In other words, the effect of an environmental influence early in life will be measured or evaluated at various points in the lives of the participating children, and must be evaluated in the context of all other influences.

Dr. Friedman is an expert in the field of early childhood development who was employed at the NICHD for more than 15 years.[9] Based upon her experience and expertise, she was selected in 2005 by the Project Officer(s) to lead the NCS protocol development team tasked with evaluating available tools designed to measure cognitive, neurobehavioral, educational, psychological, motor, sensory, and social development early in life for use in the NCS. The relative quality of her team's work product (i.e., the recommendations) that she presented to the Steering Committee— a group comprised of the already identified Study Center PIs and NICHD and other government officials— was dependent upon the careful and deliberate consideration of the literature and other information available to them, and the exercise of sound scientific analysis of the relevant issues. This was not merely a ministerial task.[10] Dr. Friedman and her team were tasked and trusted to evaluate the state of the science and to make recommendations based on their sound analysis. Their work and discussions generated over 100 e-mail exchanges discussing the relative merits of various tools and approaches. Based upon our consultations with program officials, it seems clear that the importance of scientific analysis during the development of protocols for a study of the magnitude of the NCS cannot be overstated. The decisions made regarding what to measure and how to do it can and will affect the ultimate validity and reliability of the data and analyses and whether, ultimately, the statutory mandate is satisfied.

---

[9] Dr. Friedman was promoted to the GS-15 level effective in January 1998.

[10] It is noted that should Dr. Friedman serve as a Study Center PI, she will become a member of the Steering Committee she advised as part of her government duties.

Minutes from the NCS Neurodevelopmental Protocol Team indicate there were 20 meetings in 76 business days, between October 26, 2005, and February 15, 2006. The minutes reflect that the six-member team, joined in December by four Study Center PIs following the fiscal year 2005 contract awards, carefully considered, scrutinized, and debated the relative merits and utility of at least 60 different measurement tools during this period, contacting inventors and authors wherever necessary, based on the following criteria:

(1) Soundness of psychometric properties including internal consistency, test-retest reliability, concurrent/construct and predictive validity;
(2) Logistical feasibility (time, burden) within a large-scale multi-site study involving testing in the home;
(3) Relative ease of administration and scoring;
(4) Sensitivity to both individual variations in normal samples and clinically-relevant groups;
(5) Lack of bias against low-income, minority, or cultural groups; and
(6) Existence of comparable measures in the same domains for data collection at later ages.

A number of recommendations emerged from the meetings. For example, the minutes for the November 15, 2005, meeting indicate that the team recommended that:

(1) The NNNS measure of neurobehavioral organization be administered at age one month;
(2) The Bayley III (full version) be administered at twelve and eighteen months of age to assess language, cognitive, and motor function;
(3) A short-form Bayley III not be administered; and
(4) At age six months, the Ruff focused attention, Rose visual recognition memory, and the Rose representational competence measures would be administered.

By the time Dr. Friedman presented the work of her team to the Steering Committee on January 12, 2006, she presented a recommended schedule for the use of eleven selected measurement scales and tools to collect data relevant to ten developmental outcomes to be employed at various points during the first eighteen months of life, and indicated that measures addressing three additional outcomes were still being discussed.

Program staff has indicated that barring significant difficulty or problem discovered during the initial accrual phase, the recommendations made by Dr. Friedman and her team will be continued in the subsequent accrual phases.

<u>Dr. Friedman Participated in a Particular Matter Involving Specific Parties</u>

As noted in CNA's court filings, the permanent ban applies only in relation to certain government matters. Specifically, it applies in relation to "particular matters involving specific

parties." Among government matters, "particular matters" are those that involve consideration, determination, decision, or other action that is focused on the interests of specific persons, or a discrete and identifiable class of persons, and "particular matters involving specific parties" are the subset of particular matters that include applications, contracts, grants, and other proceedings that affect or determine the legal rights of the parties, or a related set of transactions between identified parties. *See* 5 C.F.R. § 2640.103(a)(1), 5 C.F.R. § 2640.102(l)-(m), 5 C.F.R. § 2635.402(b)(3), and 5 C.F.R. § 2637.201(c)(1).[11] These "particular matters involving specific parties" are distinguished from the other subset of "particular matters" that involve the formulation of policy, rules, and legislation that is focused on the interests of a broader group or identifiable class of entities and in relation to which the post-employment restrictions in 18 U.S.C. §§ 207(a)(1) and (a)(2) do not apply.[12] *Id.*

Guidance from the Office of Government Ethics (OGE) reflects that in order for the permanent ban in 18 U.S.C. § 207(a)(1) to attach, the "particular matter involving specific parties" must have involved specific parties both at the time of the former employee's involvement and at the time of the employee's post-employment contact, and the matter involved in the post-employment time frame must be the same "particular matter involving specific parties" in which the former employee officially participated during federal service.[13] *See* OGE Advisory Opinion 02 x 5 (July 31, 2002) (the *Yucca Mountain* opinion).

---

[11] As a result of the 1989 amendment of 18 U.S.C. § 207, the regulations published at 5 C.F.R. Part 2637 are binding only as to employees terminating federal service prior to January 1, 1991. In the present case, these regulations are properly cited, per the official notation to Part 2637, only as guidance in relation to terms and provisions that were not substantively revised. In 2003, the Office of Government Ethics published, with the concurrence of the Department of Justice as required by section 201(c) of Executive Order 12674, a proposed rule to revise and update the regulations implementing section 207. 68 Fed. Reg. 7844 (February 18, 2003). Although the draft final rule remains under consideration with the Office of Management and Budget, the proposed rule expresses the intent to discontinue the publication of 5 C.F.R. Part 2637. *See* 68 Fed. Reg. at 7844.

[12] This subset of "particular matters" is denominated "particular matters of general applicability." *See* 5 C.F.R. § 2640.102(m) and 5 C.F.R. § 2637.201(c)(1).

[13] OGE is a separate agency of the Executive Branch charged with overseeing and providing advice and guidance in relation to the administration of the ethics program within each Department and agency of the Executive Branch. Since 1980, OGE has had shared responsibility for providing interpretive guidance regarding the application of 18 U.S.C. § 207 with the Department of Justice, Office of Legal Counsel, although neither has authority to determine whether a particular individual's conduct violated the statute. *See* OGE Advisory Opinion 82 x 13 (August 31, 1982), at footnote 1, and OGE Advisory Opinion 05 x 06 (September 19, 2005), at page 1.

In the *Yucca Mountain* case, OGE was asked to evaluate whether federal employees who had participated in the conduct or management of feasibility and other preliminary studies and evaluations of the proposed Yucca Mountain nuclear waste disposal facility conducted pursuant to contract by the Department of Energy would be precluded by the post-employment restrictions from appearing before or communicating with government officials on behalf of non-governmental parties interested in the subsequent NRC facility licensing proceedings. After examining the relationship between the early studies and the licensing proceedings, as well as the nature of the licensing proceedings themselves, OGE concluded that the licensing proceedings were "a continuation of the same particular matter that involved the earlier site characterization process, as well as other efforts that were in anticipation of a potential license application." *Id.* There was one "particular matter involving specific parties" for purposes of the post-employment restriction, and the matter became one once persons "expressed an interest in participating in the matter or where circumstances indicate that persons have an obvious and distinct stake in participating in the matter." *Id.* OGE recognizes, however, that when the government pursues "a multi-year, multi-phase, multi-contract procurement program, it is not always easy to determine what parts of the process may constitute a particular matter or matters involving specific parties and exactly when they do so." OGE Advisory Opinion 05 x 6 (September 19, 2005) (the *Analysis Development Demonstration* opinion).

Based on our understanding of the NCS, the NCS can be viewed as a program having several, more or less distinct, phases: (1) feasibility; (2) concept clearance; (3) study design/planning; and (4) implementation/contracting. Under this construct, as noted above, the concept clearance phase concluded upon approval in March 2004. The study design and planning phase, during which it was determined that the NCS would be accomplished through the collaborative effort of NICHD program and other government officials and contractors selected on the basis of technical merit and geographic location, concluded not later than November 16, 2004, when the RFP for the fiscal year 2005 procurement was issued, a date by which it seems clear that the ongoing implementation/contracting phase began.[14] Considering this date to be the start of the implementation phase of the NCS is also consistent with the NCS E-Update dated November 16, 2004, which describes the NCS as entering the implementation phase with the release of a Study Plan, the list of Study Locations, and the issuance of the fiscal year 2005 RFP. According to information contained in CNA's court filings, Dr. Friedman was employed within the National Institutes of Health (NIH) at the NICHD until March 2006, and was tasked, from October 2005 until February 16, 2006, to lead a team of scientists developing recommendations regarding the neurodevelopmental and social environment assessments in the NCS study for the period between birth and eighteen months of age. *See* CNA's Memorandum at p. 4. Documentation provided in connection with this review reflects that her work as the team leader of the workgroup continued through at least March 19, 2006. In any event, it is clear that Dr. Friedman's participation occurred after the implementation/contracting phase began.

---

[14] As noted herein, NICHD expects to issue an RFP in fiscal year 2008 soliciting proposals for Study Centers representing remaining Study Locations. Subject to OMB approval, the first wave of data collection is also scheduled to begin this year.

Interpretive guidance from OGE reflects the general rule that in government contracting matters, parties are first identified "when the Government first receives an expression of interest from a prospective contractor." OGE DAEOgram DO-06-029 (October 4, 2006). *See also* OGE Advisory Opinion 91 x 33 (August 29, 1991) (citing earlier opinion in which OGE stated, "the question of when a particular matter involves a specific party is not to be determined mechanically by dates of contract documents, but more realistically by the degree of interest expressed and contacts made with...parties as contractual requirements evolve."), and OGE Advisory Opinion 05 x 06 (and citations therein). When parties to a particular matter are identified, the matter, by definition becomes a particular matter involving specific parties. Proposals submitted in response to the fiscal year 2005 RFP were due on or before February 16, 2005. Based on our reading of the *Yucca Mountain* opinion, the NCS was, as of that date, considered a particular matter involving specific parties in which Dr. Friedman subsequently participated.[15]

As previously noted, the Children's Health Act of 2000 called for one study; there was one concept approval for the entire project. The Research Plan and RFPs all indicate that the Study Centers will work collaboratively with each other, as members of the NCS Steering Committee, and with NICHD program and other officials to refine the further design and planning necessary to conduct a nationwide longitudinal study of this magnitude and duration, and that all data collection will occur according to standardized protocols. These facts, coupled with the need to maintain a statistically representative sample at all times, reflect the inter-relatedness of all of the Study Center contracts. The NCS was not considered analogous to government programs under which numerous awards having little direct relation to each other are made.

The Office of Government Ethics has advised that matters sharing a common nucleus of operative facts and related issues are not to be broken down into component parts. *See* 5 C.F.R. § 2637.201(c)(4); OGE Advisory Opinion 99 x 16 (September 10, 1999). Moreover, even if we had considered the contracts awarded as a result of the fiscal year 2007 procurement, in relation to which CNA proposed Dr. Friedman as a PI, as separate matters, we believed that the permanent ban on representational communications or appearances would still apply, based on the facts described below.

As we have noted, OGE has advised that in government contracting matters, the matter becomes a particular matter involving specific parties "when the Government first receives an expression

---

[15] That CNA may not have been an identified party at the time of Dr. Friedman's participation in the NCS was not considered relevant. Noting that "[i]f the statute had intended to prohibit only a former employee's representations of a party which was involved at the time of his or her official participation in the matter, a simple change in the language could have made that clear," OGE has concluded that section 207(a) applies even where the party the former employee would appear or communicate on behalf of was not an identified or proposed party at the time of the employee's participation in the relevant matter. OGE Advisory Opinion 84 x 15 (November 19, 1984).

of interest from a prospective contractor." OGE DAEOgram DO-06-29. In the *Analysis Development and Demonstration* opinion, OGE explained that the Government may even receive expressions of interest from prospective bidders in advance of a published solicitation or request. *See* OGE Advisory Opinion 05 x 6, at pages 6-7. Further, it is well-settled that the permanent post-employment ban can apply where the employee's participation was during an arguably preliminary or informal stage of a contract. *Id.* (citing 2 Op. O.L.C. 313, 315 (1978)).

The RFP issued in fiscal year 2005 solicited proposals for eight Study Locations: Orange County, CA; Orange County, FL; Lincoln, Pipestone, and Yellow Medicine Counties, MN; Duplin County, NC; New York City (Queens), NY; Montgomery County, PA; Salt Lake County, UT; and Waukesha County, WI. As previously noted, the RFP was issued on November 16, 2004, and proposals were due on or before February 16, 2005. The RFP indicated that Study Centers covering other Study Locations would be identified through subsequent solicitations. The list of other Study Locations was, as noted above, also released on November 16, 2004. Among the papers provided in connection with our review of the 2007 determination regarding Dr. Friedman's eligibility to serve as a Study Center PI, are a number of communications received by program and contracting staff regarding the NCS. From these, we have identified thirteen inquiries received in calendar year 2005 (i.e., prior to or during the time of Dr. Friedman's service as team leader) from universities, medical facilities and practices, and county health administrations, each of which requested information on eligibility requirements and/or the steps necessary to become a Study Center. Three of these expressions of interest came from entities within the census region that includes the State of Maryland.[16] Because the RFP issued in fiscal year 2007 solicited proposals for Study Centers covering all remaining Study Locations, the communications made in 2005 by entities eligible to serve as Study Centers for the Maryland locations can be considered early expressions of interest regarding the publicized future procurement(s). Consequently, even if each contract awarded under the NCS were viewed as a separate matter from the NCS itself, the contracts awarded in 2007 would have become particular matters involving specific parties in 2005, prior to or during Dr. Friedman's service as the neuro and psychosocial development team leader. Given this, and the fact that each of the contractors is required by the study design to collect the same data using the same tools, including the tools evaluated and recommended for purposes of the NCS by Dr. Friedman and her team, we believe that Dr. Friedman participated in the Montgomery County, MD, contract that otherwise would have been awarded in 2007 because her work on the protocol(s) to be incorporated in that contract occurred after expressions of interest were made in 2005 by

---

[16] Information provided in 2005 by the contracting office to those seeking information indicates that in relation to future procurements, successful bidders would be located within the same census region as the Study Location(s) for which they would serve as Study Center. Hence, any of these three could apply to serve as a Study Center for any Study Location in the relevant census region, including Baltimore County or Montgomery County, MD, or otherwise be a partner organization involved in a successful proposal for these counties.

potential bidders who were eligible to serve in the Study Locations in the State of Maryland covered by the 2007 procurement.[17]

In its court filings, CNA asserted that language contained within a regulatory definition of "particular matter involving specific parties" and certain examples following the text provide an "exemption" from section 207(a)(1). CNA asserted that Dr. Friedman participated "'in a proposed program prior to the formulation of a contract.'" *See* Memorandum, p.10. The language quoted by CNA is followed by two examples to illustrate its meaning. According to OGE, the first example reflects that an employee who participates in feasibility or "other technical work *before* parties are identified" to a particular matter may not be subject to the permanent ban. OGE Advisory opinion 05 x 6, p. 5 (emphasis in original). The second reflects that an employee involved in a project before initial proposals or indications of interest are received does not participate in a "particular party matter involving specific parties." *Id.* at p. 6. Although we did not have occasion to address this argument specifically when our advice was rendered initially, as noted herein, the facts demonstrate that even if the NCS were viewed as a program composed of multiple contracts to be issued, Dr. Friedman participated at a time when parties had expressed interest in contract(s) that eventually would be awarded within the respective census regions in which they operated.

<u>Dr. Friedman Participated Personally and Substantially</u>

As noted above, the permanent post-employment ban applies in relation to certain particular matters involving specific parties. Specifically, it applies only in relation to those particular matters involving specific parties in which the former employee participated "personally and substantially" during federal employment. 18 U.S.C. § 207(a)(1)(c). An employee participates personally if she is directly involved or supervises the direct involvement of a subordinate. *See* 5 C.F.R. § 2640.103(a)(2), 5 C.F.R. § 2635.402(b)(4), and 5 C.F.R. § 2637.201(d)(1). Former employees who participated in a matter through the exercise of discretion, the making of recommendations, or the provision of advice are deemed to have personally participated. Where that participation was of significance to the matter, the former employee is deemed to have participated substantially, and "[p]articipation may be substantial even though it is not determinative of the outcome of a particular matter." 5 C.F.R. § 2640.103(a)(2); *see also* 5 C.F.R. § 2637.201(d)(1) (reflecting that personal and substantial participation can occur

---

[17] Our review of a draft fiscal year 2008 RFP indicates that it is substantially similar to the 2007 RFP in that it solicits proposals for Study Centers covering remaining Study Locations, and informs the contractors that they will collect the same data using the same tools as the others, including those that Dr. Friedman's team evaluated for purposes of the NCS. Accordingly, while it would be premature for us to opine definitively in light of OMB's current consideration of the draft OGE final rule implementing section 207, given the same facts and absent significant changes in OGE's interpretation, we would expect to reach the same conclusions regarding Dr. Friedman's participation in a particular matter involving specific parties in relation to the fiscal year 2008 procurement.

through the making of recommendations or the rendering of advice). Accordingly, we would have rejected the bare assertion presented in CNA's court filings that because Dr. Friedman participated by providing recommendation or advice she could not have participated personally and substantially. The fact that the Steering Committee adopted some, but not all, of her recommendations is similarly not determinative of the substantiality of her participation as, again, there is no requirement that the employee's involvement be determinative of outcome.

Based upon our understanding of the relationship to and effect data collected in the early years of the NCS will have on findings made in later years, and conversations with program officials regarding the significance of the protocol development efforts to the integrity, validity, and perceived quality of the NCS, our opinion was predicated on the conclusion that Dr. Friedman's participation as described herein was both personal and substantial.

<u>Dr. Friedman Would Have Been Required to Appear Before or Communicate with Government Officials with the Intent to Influence on behalf of CNA</u>

As a practical matter, even where the permanent post-employment restriction applies based on a former employee's personal and substantial participation in a particular matter involving specific parties, its only effect is to prohibit the former employee from making, with the intent to influence, any appearance before or communication with government officials on behalf of a third party in relation to the relevant particular matter. 18 U.S.C. § 207(a)(1). It is well-settled that routine requests and exchanges of factual information are not prohibited communications or appearances because they do not reflect the requisite intent to influence. *See* 5 C.F.R. § 2637.201(b)(5). OGE has described the communications and appearances that trigger the statute as those "made for the purpose of seeking a discretionary Government ruling, benefit, approval, or other action in connection with a matter which the former employee knows involves an appreciable element of dispute concerning the particular Government action to be taken." OGE Advisory Opinion 04 x 11 (July 29, 2004), at pages 3-4.

For purposes of this review, Dr. Peter Scheidt, Director of the NCS, was consulted regarding this statutory element. Based on his experiences to date involving the Study Center PIs as members of the Steering Committee, he indicated that he and other program officials meet with Study Center PIs from time to time to discuss matters that are controversial, sensitive, and/or that have financial implications for the Study Centers. He further indicated that he strongly believes that this will continue, and that program officials must be able to fully interact will all PIs in order to fully and effectively implement the NCS in accordance with the statutory mandate. Although a factual determination of a violation cannot be made prior to an appearance or communication by Dr. Friedman acting as the PI for CNA, Dr. Scheidt's description of interactions he has already had with Study Center PIs is entirely consistent with our understanding and what a reasonable person would expect in such a large and complex collaboration in which all participating Study Centers are required to participate in planning and design, as well as data collection and analysis over a period of more than 20 years.

Dr. Friedman Would Be Required to Make Communications As a Study Center PI on behalf of CNA That Do Not Qualify under the Scientific or Technological Information Exception

An exception to the permanent post-employment ban allows former employees to make communications to an agency "solely" for the purpose of furnishing scientific or technical information.[18] 18 U.S.C. § 207(j)(5). Although this exception was not raised by CNA, we evaluated potential exceptions when our initial opinion was given. For a scientific or technical communication to qualify under the exception, it must have been made (1) "under procedures" acceptable to the agency to which the communication is directed, or (2) the head of such agency must have made, in consultation with the Director of OGE, a certification published in the *Federal Register* that the former employee has outstanding qualifications in a particular discipline, is acting with respect to a particular matter which requires such qualifications, and that the national interest would be served by the participation of the former employee. OGE has opined that if an agency has not established such procedures, "to qualify under the exception, the second statutory mechanism would have to be followed." OGE Op. 96 X 21 (November 5, 1996). HHS has no such procedures, and the Secretary of the Department of Health and Human Services has not undertaken the requisite steps to publish a certification regarding Dr. Friedman and her participation in the NCS.

Dr. Friedman is not Eligible for a Presidential Waiver.

In the absence of applicable exceptions, we considered whether the section 207(k) waiver provision would apply. In recognition of the special relationship between the government and government-owned, contractor-operated entities, the post-employment statute gives the President of the United States limited authority to waive post-employment restrictions for up to twenty-five

---

[18] We determined that the additional statutory exceptions, subparagraphs (j)(1)-(j)(4), (j)(6), and (j)(7), are inapplicable. Subparagraph (j)(1) establishes an exception for activities a former employee may undertake as part of official duties at a federal agency, on behalf of the District of Columbia, or as an elected official at the state or local level. Similarly, subparagraphs (j)(2), (j)(3), and (j)(7) create exceptions for activities undertaken by a former employee on behalf of state and local government institutions, including universities, hospitals and medical research institutions, international organizations, and political parties and campaigns, respectively. Subparagraph (j)(4) reflects that a former employee may make uncompensated statements based on his or her own special knowledge, and subparagraph (j)(6) creates an exception permitting a former employee to provide testimony under oath or penalty of perjury in certain circumstances. Subparagraphs (j)(2), (j)(4), and (j)(7), by their terms, only apply to alleviate the restrictions of sections 207(c), (d), and (e). Since the restriction at issue in the 2007 procurement was section 207(a)(1), these exceptions did not apply. Moreover, because CNA is a private entity and not a governmental body or an international organization, the exceptions provided as subsections (j)(1) and (j)(3) did not apply. Finally, because the activities to be undertaken by a Study Center PI do not involve the provision of testimony, the exception at subparagraph (j)(6) was inapplicable as well.

Executive Branch employees. 18 U.S.C. § 207(k). These waivers may be granted to civilian employees, other than those employed in the Executive Office of the President. In order to grant one, the President must certify in writing that the waiver serves the public interest and that the services of the subject employee are "critically needed for the benefit of the Federal Government." 18 U.S.C. § 207(k)(1). Significantly, these waivers can only be granted:

> (1) To employees who were employed by a Government-owned, contractor-operated entity immediately prior to federal service in connection with the employee's re-employment at that entity following federal service; or
>
> (2) In the case of a federal employee who was employed at the Lawrence Livermore National Laboratory, Los Alamos National Laboratory, or Sandia National Laboratory immediately prior to federal service, in connection with the employee's re-employment at any such national laboratory following federal service.

18 U.S.C. § 207(k)(1)(B). Because CNA is not a Government-owned, contractor-operated entity, a waiver could not be granted to Dr. Friedman under this provision.

<u>Conclusion</u>

Based upon our review and consideration of numerous documents and other papers related to the NCS, multiple consultations with you and other program officials, and research and analysis of the legal issues surrounding the eligibility of Dr. Sarah Friedman to serve as a Study Center PI for the NCS in light of the criminal post-employment statute, 18 U.S.C. § 207, we rendered the opinion that a violation of the statute would occur if she were to assume that role and make the communications and appearances expected of that position. If you have any questions, please contact Gretchen H. Weaver, Senior NIH Ethics Counsel, on my staff at (301) 402-2577.

# TAB C



about the Study

THE NATIONAL CHILDI

about the Study | Study centers | the research | how to get involved | adjunct studies | events | news | contact us |

mission/purpose  funding and legislation  Study locations  organization  Study sponsors  Study supporters  Study contributors  search

## Funding and Legislation

Congress authorized the planning and implementation of the National Children's Study with the Children's Health Act of 2000. The following table shows the Interagency and Congressional funding levels for the Study.

**Interagency and Congressional Funding for the National Children's Study (Dollars in Millions)**

| Funding received during the planning phase of the Study | | | | | | | Funding received during the implementation phase of the Study | |
|---|---|---|---|---|---|---|---|---|
| **FY 2000** | **FY 2001** | **FY 2002** | **FY 2003** | **FY 2004** | **FY 2005** | **FY 2006** | **FY 2007** | **FY 2008** |
| 1.0 | 3.2 | 6.1 | 10.6 | 10.6 | 11.0 | 12.1 | 69.0 | 110.9 |

Contributing Agencies are NICHD/NIH/HHS, NIEHS/NIH/HHS, CDC/HHS, and EPA

## Children's Health Act of 2000

Section 1004 of the Children's Health Act focuses on the National Children's Study. An excerpt from the Act follows:

> *(a) PURPOSE.—It is the purpose of this section to authorize the National Institute of Child Health and Human Development* to conduct a national longitudinal study of environmental influences (including physical, chemical, biological, and psychosocial) on children's health and development.*
> *(b) IN GENERAL.—The Director of the National Institute of Child Health and Human Development* shall establish a consortium of representatives from appropriate Federal agencies (including the Centers for Disease Control and Prevention, the Environmental Protection Agency) to—*
> *(1) plan, develop, and implement a prospective cohort study, from birth to adulthood, to evaluate the effects of both chronic and intermittent exposures on child health and human development; and*
> *(2) investigate basic mechanisms of developmental disorders and environmental factors, both risk and protective, that influence health and developmental processes.*
> *(c) REQUIREMENT.—The study under subsection (b) shall—*
> *(1) incorporate behavioral, emotional, educational, and contextual consequences to enable a complete assessment of the physical, chemical, biological, and psychosocial environmental influences on children's well-being;*
> *(2) gather data on environmental influences and outcomes on diverse populations of children, which may include the consideration of prenatal exposures; and*
> *(3) consider health disparities among children, which may include the consideration of prenatal exposures.*

*Congress passed Public Law 110-154 on December 21, 2007, renaming the Institute as the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development.

For a full copy of the legislation, see Children's Health Act of 2000 (Public Law 106-310 Sec. 1004).

## Congressional History

This study is led by a consortium of federal agency partners including: the National Institutes of Health (NIH), the Centers for Disease Control and Prevention (CDC), the Department of Education (ED), and the U.S. Environmental Protection Agency (EPA).

The National Children's Study is designed to examine the effects of environmental influences on the health and development of more than 100,000 children across the United States, following them from before birth until age 21. The goal of the Study is to improve the health and well-being of children. Researchers will analyze how these elements interact with each other and what helpful and/or harmful effects they might have on children's health. By studying children through their different phases of growth and development, researchers will be better able to understand the role of these factors on health and disease. Findings from the Study will be made available as soon as possible as the research progresses. The Study can also allow scientists to find the differences that exist between groups of people, in terms of their health, health care access, disease occurrence, and other issues, so that these differences or disparities can be addressed.

Congress appropriated funds for Fiscal Years 2007 and 2008 to continue the first phase of implementation of the National Children's Study. With these funds, the seven Vanguard Centers will begin recruitment of families into the Study; in addition, contracts for 22 additional Study Centers were awarded at the end of Fiscal Year 2007 to conduct the Study in 40 additional locations or counties. An additional wave of Study Centers and Locations will be awarded in 2008. The President's Budget Request for Fiscal Year 2009 does not request further funding for the National Children's Study.

Page updated - 04/09/08

# TAB D

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Phone: (301) 435-6947
Fax: (301) 402-3676
Email: eo43m@nih.gov

National Institutes of Health (NIH)
National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK)
Office of Acquisitions, NICHD Branch
6100 Executive Blvd., Room 7A07, MSC 7510
BETHESDA MD 20892-7510
Overnight Delivery Zip code (FedEx): 20852

October 05, 2007

Mr. Keith Thornburg
CNA Corporation
4825 Mark Center Drive
Alexandria VA 22311

Subject: Request for Proposals (RFP) No. NIH-NICHD-NCS-07-11 East entitled "National Children's Study"

Dear Mr. Thornburg:

This letter is to notify you that your proposal, submitted in response to the above subject RFP, was not selected for contract award.

The following information is provided pursuant to Federal Acquisition Regulation (FAR) 15.503 (b). Eighteen (18) proposals were received on or before the due date. Twelve (12) awards with an effective date of September 28, 2007 have been made under this RFP to the following institutions:

1. University of Pittsburgh
   139 University Place
   350 Thackeray Hall
   PITTSBURGH PA 15260

   Contract No.: HHSN267200700029C
   Contract Amount: Base -- Westmorland County, PA $11,797,478; Option location – Marion County, WV $12,945,406

2. Brown University
   Office of Sponsored Projects
   Box 1929
   164 Angell Street
   PROVIDENCE RI 02912

   Contract No.: HHSN267200700032C
   Contract Amount: Base – Providence, RI $14,111,816

3. The University of North Carolina at Chapel Hill
   123 West Franklin Street, University Square
   CHAPEL HILL NC 27516-2524

   Contract No.: HHSN267200700049C
   Contract Amount: Base – Durham, NC $4,588,968; Option locations – Rockingham County, NC $10,870,917; Durham County, NC $10,992,967; Burke County, NC $11,100,026; Buncombe County, NC $11,124,130

4. Johns Hopkins University
Bloomberg School of Public Health
615 North Wolfe Street
BALTIMORE MD 21025

Contract No.: HHSN267200700048C
Contract Amount: Base – Baltimore County, MD $12,808,223

5. Yale University
Grant and Contract Administration
P.O. Box 20847
NEW HAVEN CT 06520-8047

Contract No.: HHSN267200700028C
Contract Amount: Base – New Haven, CT $15,053,669

6. The Children's Hospital of Philadelphia
Joseph Stokes, Jr. Research Institute
Abramson Pediatric Research Center
3615 Civic Center Boulevard
PHILADELPHIA PA 19104

Contract No.: HHSN267200700020C
Contract Amount: Base – Philadelphia, PA $17,932,932; Option locations – New Castle, DE $12,684,513; Schuylkill, PA $13,490,645

7. University of Massachusetts Medical School
55 Lake Avenue North
WORCESTER MA 01655

Contract No.: HHSN267200700024C
Contract Amount: Base – Worcester, MA $16,245,311

8. Mount Sinai School of Medicine
One Gustave L. Levy Place
NEW YORK NY 10029

Contract No.: HHSN267200700047C
Contract Amount: Base – New York City, NY $18,851,068; Option locations – Nassau County, NY $16,093,827; Passaic County, NY $15,147,150; Middlesex County, NY $14,815,941; Brooklyn, NY $16,981,892

9. Michigan State University
Contract and Grant Administration
301 Administration Building
EAST LANSING MI 48824

Contract No.: HHSN267200700034C
Contract Amount: Base – Wayne County, MI $18,581,901

Request for Proposals (RFP) No. NIH-NICHD-NCS-07-11 East entitled "National Children's Study"

10. Emory University
1784 N. Decatur Rd. Suite 530
ATLANTA GA 30322

Contract No.: HHSN267200700007C
Contract Amount: Base – DeKalb County, GA $13,373,534; Option location– Fayette County, GA $12,126,816

11. Northwestern University
633 Clark Street
EVANSTON IL 60208-1110

Contract No.: HHSN267200700027C
Contract Amount: Base – Cook County, IL $16,776,174; Option location – Cook County, IL $15,242,096

12. University of Mississippi Medical Center
2500 North State Street
JACKSON MS 39216

Contract No.: HHSN267200700030C
Contract Amount: Base – Hinds, MS -- $12,840,315

In accordance with FAR 15.503 (b)(v), the primary reason CNA did not receive an award, is that as a consequence of the Government post employment restrictions, 18 U.S.C. 207, the proposed Principal Investigator (PI) would not be able to fulfill the duties of a PI as contemplated by the terms and conditions of the Request for Proposals (RFP). As set forth in the terms of the RFP, the Principal Investigator is required to have substantial interactions with Government personnel during the performance of the contract.

The National Institute of Child Health and Human Development sincerely appreciates your interest in our program as evidenced by the submission of your proposal; and we look forward to your continued interest in our acquisitions.

Sincerely,

Elizabeth J. Osinski

Elizabeth J. Osinski
Contracting Officer
NICHD Branch, OA, NIDDK

cc: Proposed Principal Investigator: Sarah Friedman, M.D.

# TAB E

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**OFFICE OF THE GENERAL COUNSEL**
**General Law Division**
**Room 4760**
**330 Independence Avenue, S.W.**
**Washington, DC 20201**

# FACSIMILE TRANSMISSION SHEET

DATE: November 26, 2007

TO: Alex D. Tomaszczuk, Esq.
Pilsbury Winthrop Shaw Pittman LLP
1650 Tysons Boulevard
14th Floor
McLean, VA 22102-4859
**Fax: 703.770.7901**

FROM: Daniel Barry
Phone: (202) 619-0153
Fax: (202) 619-2922

PAGE(S): 3 (including cover)

RE: CNA

DEPARTMENT OF HEALTH & HUMAN SERVICES

Office of the General Counsel
General Law Division

330 Independence Avenue, S.W.
Rm. 4760 Wilbur J. Cohen Federal Building
Washington, DC 20201

November 26, 2007

Alex D. Tomaszczuk, Esq.
Pilsbury Winthrop Shaw Pittman LLP
1650 Tysons Boulevard
14th Floor
McLean, VA 22102-4859
Fax: 703.770.7901

RE: CNA Proposal on NIH-NICHD-NCS-07-11-EAST

Dear Mr. Tomaszczuk :

This is in response to CNA's request for our office's response to certain questions you posed during our October meeting regarding the National Institute of Health's decision to not award a contract to CNA in response to Request for Proposal NIH-NICHD-NCS-07-11-EAST based on the proposed Principal Investigator's inability to both fulfill her responsibilities under the contract and comply with the post-employment restrictions found at 18 U.S.C. 207.

During our meeting, you posed three specific questions for which you asked the Agency's response, specifically, (1) how did HHS define "matter" in applying Section 207 to the present situation, (2) how did HHS believe the "specific party" prong of the statute was met, and (3) why HHS did not recognize the exception for technical matters provided for at 5 C.F.R. 2637.204 to operate and remove application of the post employment restriction in this case.

The relevant provision of Section 207 prohibits former employees from communicating with or appearing before government officials on behalf of a third party in relation to "particular matters involving specific parties" in which the former employee participated during federal service. The term "particular matter" is defined by the statute to include "any investigation, application, request for a ruling or determination, rulemaking, contract, controversy, claim, charge, accusation, arrest, or judicial or other proceeding." 18 U.S.C. 207(i)(3). The Agency considers the Study to be a "particular matter involving specific parties." This term has been defined by the Office of Government Ethics and the Department of Justice to include specific proceedings affecting the legal rights of parties, or a related set of transactions between identified parties. Accordingly, the Agency believes it would be inappropriate to attempt to segregate the Study into separate and distinct matters based on protocols. The Principal Investigator's work on the protocol(s) was both personal and of significance to the related set of transactions. The fact that CNA might not have been aware of the development of the RFP at this time, or that the proposed

Principal Investigator had no contact whatsoever with CNA during the drafting of the RFP, is not relevant for this analysis.

Finally, CNA indicated it believed the exception for "technical matters" provided at 5 C.F.R. 2637.201 precluded application of the post-employment restriction in this case. First, we would not agree that the proposed principal investigator's work on the protocol was merely a technical matter in the meaning of that regulation. In fact, the entire reason for drafting the protocol was for the express purpose of inclusion in the RFP an eventual contract at issue; the protocol had no other use except to be incorporated in the statement of work. In any event, however, 5 C.F.R. 2637.201 does not apply to this situation, as its application is limited to individuals who terminated Government service before January 1, 1991:

> NOTE: Part 2637 provides guidance concerning the prior version of 18 U.S.C. 207 (1988) as it continues to apply to individuals who terminated Government service (or a "Senior" Government position) before January 1, 1991. However, since no former "Senior Employee" who terminated service before that date could any longer be subject to the one-year restriction of section 207(c) of 18 U.S.C. as it existed prior to its amendment by the Ethics Reform Act of 1989, the listing of separate statutory agencies that previously appeared in § 2637.214 has been deleted.

5 C.F.R. 2367.214 (emphasis added.) Thus, this provision is not in effect in so far as the current situation is concerned, and the agency is not bound by the exception for "technical matters" provided therein.

It is my hope that this information is helpful to you and your client. Furthermore, my client has indicated that may conduct procurements in the future for the National Children's Study, and would encourage your client to submit proposals on such procurements, assuming that it can do so with a principal investigator whose prior employment would not implicate the post employment restrictions at 18 U.S.C. 207. Once again, I enjoyed meeting you and Ms. Goodman and appreciate your in person visit to our offices to discuss this matter

Sincerely,

Daniel Barry
Deputy Associate General Counsel

cc: Elizabeth Osinski
Gretchen Weaver, Esq.

# TAB F

SPECIAL EMPHASIS PANEL CONTRACT REVIEW
TECHNICAL EVALUATION REPORT
Privileged Communication

Type: New----------X-----Renewal-----
R & D--------X-----Support------
Competed----X-----Sole Source--

**Base Proposal:** **Montgomery County, MD**

RFP No.: RFP-NIH-NICHD-NCS-2007-11

ORGANIZATION: CNA Corporation

CITY, STATE: Alexandria, VA

PRINCIPAL INVESTIGATOR: Sarah Friedman Degrees: Ph.D.

PROJECT TITLE: National Children's Study

PROGRAM AREA: National Children's Study – The East Coast Review

MEETING DATES: June 10-12, 2007

TECHNICAL SCORE: 81

RECOMMENDATION: Acceptable

<u>RESUME:</u> This proposal was submitted in response to RFP-NICHD-NCS-2007-11 entitled, "National Children's Study." The investigators proposed to contribute locally a cohort of 1000 live births over a four-year period from Montgomery County (the "Base") in Maryland. The strengths of the proposal include the experience of the Principal Investigator and a well written proposal. The proposal has several weaknesses. The institutional capabilities/qualifications of the CNA Corporation are not clearly demonstrated. It is not clear if the CNA Corporation has past track record in housing such large-scale studies and prior successful research with longitudinal birth cohort studies that begin prior to or early in pregnancy. The person who is specializing in fetal ultrasound in the team is not identified. The investigators provide a long listing of community leaders, community-based organizations (churches, social organizations) and, medical, maternal health care, community services, and societies and foundations in the target population. But their previous engagement with these local communities in the target population is unclear; the letters of support from these community leaders are not presented. The CNA's organizational capabilities and experience in hosting such large and complex studies are not clearly presented. In spite of these weaknesses, the reviewers found this proposal acceptable and recommended it for further consideration.

(2)

**1- Description of the Proposal**

This proposal is submitted in response to an RFP-NIH-NICHD-07-11-E issued by NICHD to award contracts to organizations having the ability to serve as Study Centers for the National Children's Study (NCS) a planned cohort study examining the effects of environmental influences on the health and development of approximately 100,000 children. The proposed Baltimore Washington Study Center (BWC) at the CNA Corporation proposes to contribute locally a cohort of 1000 live births over a four-year period from Montgomery County (the "Base") in Maryland. The BWC allocate the investigators from 10 research institutions in the Baltimore Washington Area, mainly including the CNA Corporation, the Children's National Medical Center, Insight Policy Research, Medical Research Institute, the Gorge Washington University, the Georgetown University, the University of Maryland Baltimore County, and the University of Maryland School of Medicine. The BWC will enroll women to ensure an average of 250 live births per year for next 4 years in Montgomery County, including a group of women who are in their first trimester and a group of women who at high probability of becoming pregnant. The PI and the team members have extensive experience in the design and implementation of the national-wide studies, similar to the NCS, on early child and development. The proposal provides detailed description of efforts for achieving NCS goals that relate to sampling strategies, community engagement and participation, engagement and collaboration with hospitals and clinics, protocol development and methods, recruitment, enrollment and retention, problem identification and solutions, data collection, protection of human subjects and quality assurance. The management plan of the proposed study is clearly presented and appears to be efficient.

__**CRITIQUE 1:**__

**2- Technical Evaluation**

**A. Criterion #1: Understanding Project Requirements**

__**Strengths:**__
The offeror demonstrates a clear understanding of the complexity and unique context of NCS. The proposed BWC will: 1) bring together expertise to all NCS protocol; 2) engage communities in the target populations; 3) meet NCS goals for recruitment and retention of study subjects with minimum attrition and missing data. The offeror provides a clear description of social, demographic characteristics of the target population in Montgomery Country, and present with detailed multi-stage cluster sampling strategies designed for the NCS. The offeror provide detailed plan to engage the community using the approaches guided by community based participatory research principles, involving creating a Community Advisory Board, as well as using informant interviews of community organization leaders and focus groups approaches with pregnant women in promoting the study and in assessing the community needs.

Deleted: 1

(3)

The offeror clearly provides detailed information on recruitment and enrollment of 1,000 live births through 1) household sampling –screening 9000 households; 2) prenatal care providers; 3) collaborating hospitals/clinics; 4) community organizations. The plan of enrolling 65% of pregnant women in their 1st trimester and 25% women prior to conception is clearly evident and achievable.

The offeror has obtained the letters of agreement/support from several key partners/collaborators (e.g., hospital/clinics) for their roles and responsibilities for relevant clinical sites, and provides the plans for scheduling visits, tracking participants, collecting data in a variety of settings including clinical, home and community as well as required specimen and sample collections, by using the state-of- the-art instruments such as CATI and other unique software.

The offeror demonstrates a clear understanding of multiple challenges/problems of NCS including how to handle multiple visits (preconception, prenatal, delivery, postnatal visits, and how to coordinate the hospitals/clinics for notifying the upcoming delivery of a woman for collecting clinical and bio-specimens, and offers several solutions to address these challenges (p. 15). The offeror also proposes strategies to address language barriers affecting target population recruitment and retention, data collection and obtaining informed consent; and strategies for screening visits, prenatal visits and ultrasounds, birth visits, neonatal examinations, as well as specimen and sample collection are clearly discussed.

**Weaknesses:**

The offeror doesn't provide more detailed information about potential environmental challenge/risk to pregnant women and children and their health conditions and other health problems of the target population.

The offeror provides a long listing of community leaders, community-based organizations (churches, social organizations) and, medical, maternal health care, community services, and societies and foundations in the target population (p.5). But their previous engagement with these local communities in the target population is unclear, the letters of support from these community leaders are not presented.

Although the offeror provides a description of the plan for clinical data and biological specimens collection at the collaborating hospitals and clinics, details on such as who and where to do the fetal ultrasounds, and how to collect and who will collect placental tissues and cord blood at the time of delivery, and how and where to assess infant development and who will do the assessment are not clearly presented.

**Questions for Clarification:**

None

(4)

**B. Criterion #2: Organizational Qualifications and Experience**

**Strengths:**
The offeror describes that the CNA Corporation (CNAC) is a 65-year old non-profit organization, specializing in providing highly quality research, evaluation, and technical assistance to government organizations at the federal, state, and local level, and to other non-profit organizations and foundations. The PI, Dr. Sarah Friedman is the chief staff at the Institute for Public Research of the CNA Corporation. The PI used to be a senior scientist at NICHD and had extensive experience in conducting studies, similar to the NCS, of following up children longitudinally and developed the neurodevelopment protocol. The other collaborating organizations have prior evidence of successful research experience in the large-scale epidemiological studies in pregnant women and their infants.

**Weaknesses:**
The institutional capabilities/qualifications of the CNA Corporation are not clearly demonstrated. It is not clear if the CNA Corporation has past track record in housing such large-scale studies and prior successful research with longitudinal birth cohort studies that begin prior to or early in pregnancy..

**Questions for Clarification:**
None

**C. Criterion #3: Personnel Qualifications and Experience**

**Strengths:**
The offeror appears to allocate excellent professional staff to accomplish the proposed project. In particular, The PI, Dr. Sarah Friedman, the Director of the Appalachian Regional Educational Laboratory at the CNA Corporation, was former NICHD Scientific Project Coordinator between 1989 and 2006. She has extensive prior experience in directing several national, longitudinal and multi-sites studies, such as NICHD study of Early Child Care and Youth Development that enrolled and followed up the development of 1400 children from birth up to 15 years of age. She also made contributions to the development of the protocol for assessing infant neurodevelopment for the NCS before she left NICHD for the current position. Other key collaborators include: Dr. Ayman El-Mohandes, professor and Chair of the Department of Prevention and Community Health, and Pediatrics and Obstetrics in George Washington University School of Medicine, who has been involving community-based programs for more than 15 years; Dr. Menachem Miodovnik, the director in OB/GYN of the Medstar Research Institute and Washington Hospital Center, who will bring his area of expertise in maternal and fetal medicine for the proposed study;

(5)

Dr. Craig T. Ramey, professor of Health Studies and Psychiatry and Director of Georgetown University Center on Health and education, who will bring expertise on assessment of development; Dr. Kathy Katz, associate of Pediatrics, Georgetown University, who has extensive experience in conducting studies in infant mortality and child development; and Dr. Ivan Walks, chief Health Officer and Department of Health Director for the District of Columbia, who will be able to help to promote the proposed study in Montgomery County, and Ellen Boyle, who have been research coordinator for several studies similar to the NCS. Additional key personnel are identified with expertise and experience in coordinating, managing and conducting all aspects of data collection, as well as expertise in large tissue and blood sampling. Appropriate resumes are included.

**Weaknesses:**
The person who is specializing in fetal ultrasound in the team is not clearly evident.

**Questions for Clarification:**
None

**D. Criterion #4: Facilities**

**Strengths:**
The CNAC will be the main base for the study, which is close (about 28 miles) to Montgomery and Baltimore (Option) Counties, as well as to the NCS Headquarter at NICHD. The offeror clearly presents the facilities and equipments that will be available for the study, including office space, computing system, libraries, the state-of-the-art meeting and conferences, and IT networking system. Internet capabilities and IT security mechanisms are detailed for the main offices and satellite offices. The space at Georgetown University Hospital will be available for the biological specimens and other equipments such as ultrasound equipment and facilities available for sample receipt and processing, short – and long-term storages at the collaborating centers

**Weaknesses:**
The offeror heavily relies on the use of facilities/equipments from the collaborating institutions, such as space for pregnancy visits, ultrasound equipments, laboratories equipped necessarily equipments for biologic sampling processing and temporary storage, and such facilities/equipments are not specified in the letters of support from the collaborators.

**Questions for Clarification:**
None

(6)

**3. Summary Recommendation:**

Overall, this is a well written proposal and all criteria for proposed Montgomery County being as the NCS site are responded well. The team members, in particular the PI, have extensive experience in conducting community-based, multi-sites, longitudinal studies in pregnant women and follow-up of children. Minor concern is that the offeror's organizational capabilities and experience in hosting such large and complex studies are not clearly presented.

**CRITIQUE 2:**

This Base application from the CNA Corporation proposes a plan to accomplish the goals of the NCS in establishing a Study Center responsible for the enrollment of 1,000 women from Montgomery County, MD into the NCS. The target population is defined as pre-pregnant women, women in their first trimester of pregnancy, and women after delivery. Data will be collected concerning the pregnancy, the children born to the recruited mothers, and the physical and social environments in which the women and their children live. Biomedical, physical, demographic, sociological, and neurodevelopmental data will be longitudinally collected.

**2- Technical Evaluation**

**A. Criterion #1: Understanding of the Study Location and Plan for Engagement of relevant communities**

**Strengths:**

The strengths of this proposal lie in the well conceptualized, logical identification of components, collaborations, structure and function of the Study Center and the linkage of the Study Center to its partner communities. Each major component is well described and identified exactly how it will contribute to the success of the goal and objectives of the NCS. The investigators demonstrate a very clear understanding of the complexity and context of the NCS the purpose of the research and how both the Base and Option Site align with the goals and objectives of the CHS. Data collection activities and potential problems are identified and solution provided to address each. The realities of real world situations are vividly expressed and problems that may impede reaching objectives defined and provided with relevant solutions. The investigators provide a deep understanding of the community and neighborhoods where participants will be enrolled. Local community leaders are involved and community advisory boards defined. Investigators have engaged and collaborated with the various birth hospitals in the community and identified relevant clinical sites within the Study locations.

(7)

The PI of the Base Proposal is Dr. Sarah Friedman, an extremely experienced investigator in the assessment of several longitudinal NICHD funded studies. Dr. Friedman led the NCS group that developed the neurodevelopment protocol and worked with members of the NICHD/NCS staff, the staff of the NCS Data Center and individuals from the Vanguard Centers.

The management structure is well defined and includes seven teams at each county location, consisting of operations and Data Collection, reporting directly to the PI and Center Coordinator, James Teufel and managing coordination of study protocols at the center and county levels. These include, sampling and secondary data, community outreach and engagement, neighborhood and household field activities, clinic and birth visits and home visits and specimens processing and storage. Dr. Ann Peterson is responsible for the sampling and secondary data and served with the US Bureau of the Census, directing and implementing several large-scale and complex national surveys including the National Health Interview Survey and the National Epidemiologic Survey on Alcohol and Related Conditions.

The investigators have defined well their approach to the multi-stage cluster sampling design being applied to the NCS. They propose to divide the county into equally sized segments, divide the segments into 10 to 15 geographical and demographical strata and then select one sample segment per stratum for inclusion in the study. Innovative approaches to data collection include the use of specialized mapping software using special mapping of data to assess parameters of race/ethnicity, household income and educational levels, neighborhood vulnerability indicators such as proportion of substandard housing and crime rates, as well as environmental characteristics such as age of housing, pesticide exposure, and estimated levels of hazardous air pollutants. Community engagement is enhanced by implementing community based participatory research principle key informant interviews, meeting with community based organizations including neighborhood organizations, churches, social organizations and stakeholder groups. This approach is very well conceptualized in the proposal and demonstrates solid understanding of the need to develop and secure long-term commitments to enhance and maintain partnership collaborations.

**Weaknesses:**
More detailed information is needed to identify social indicators such as neighborhood vulnerability (crime levels and substandard housing).

**B. Criterion #2: Organizational Capacity**

The top ten hospitals delivering babies of women living in Montgomery County account for over 90% of births in the county, with Holy Cross Hospital accounting for 44% of the total.

(8)

Letters of support have been obtained from hospitals accounting for more than 80% of the total births and endorsements are expected from the other hospitals. Recruitment and enrollment procedures are well defined and target groups adequately identified to provide a total of 250 live births per annum. Procedures have been identified to recruit and follow up women in their second or third trimester of pregnancy at the time of the initial screening. George Washington University School of Public Health (GWUSPH) will assist the BWC in the household enumeration process. To reach the required 250 births, BWC will screen at least 9,000 households in Montgomery County. GWUSPH has a great deal of expertise and knowledge in the local community, language and cultural sensitivity skills.

BWC will also coordinate enrollment and recruitment activities with prenatal care providers, birthing centers and delivery hospitals, and community organizations serving the target population in able to assure that all eligible women in the county are identified. In order to confirm a representative sample is enrolled, BWC will assess the impact of non-response bias by comparing results between responders and non-responders.

All other data collection activities, such as the management of data collected, participant tracking, scheduling of visits using a information management system, telephone interviews collection of biospecimens, and the periodic collection of community level physical, social and environmental data are well documented and supported by strong scientific methodologies.

**Weaknesses:**
It is important to assure that all hospitals have provided supporting letters to actively be involved in the study.

**C. Criterion #3: Plan for Implementation**

**Strengths:**
The study team has identified a very comprehensive approach to the implementation of their well-conceptualized protocol involving a strong community based participatory research approach. The investigative team demonstrates a thorough understanding of potential operational and logistical challenges unique to the Study location. The investigative team is well qualified and has very relevant experience in the design and implementation of longitudinal surveys. The participating institutions have worked together and have presented a very strong approach to the conduct of this longitudinal investigation. Of particular strength are the strategies being used to maximize retention and follow up of all enrolled and eligible participants, including enrollment procedures, recruitment via other mechanisms, tracking, in-person data collection in addition to telephone contacts, antenatal clinical visits, very extensive delivery visit follow ups, home visits, biological and environmental sample processing, excellent plans for addressing language through trained interpreters.

(9)

**CRITIQUE 3:**

This proposal is submitted in response to an RFP issued by NICHD to award contracts to organizations having the ability to serve as Study Centers for the National Children's Study, a planned cohort study examining the effects of environmental influences on the health and development of approximately 100,000 children. The CNA Corporation has submitted a proposal for a Study Center located in Montgomery County, Maryland (primary location) with an option location in Baltimore County Maryland. CNA Corporation led by Dr Sarah Friedman (PI) has assembled a consortium that includes The University of Maryland (College Park & Baltimore County), MedStar Health, Georgetown University, George Washington University, and the Children's National Medical Center.

The consortium plans to enroll 385 births per year of the 13,500 births that occur annually in the county.

**Technical Evaluation**
**A. Criterion #1: Understanding Project Requirements**

Strengths:
The following strengths are identified: BWC has staff with experience in the assessment of LEP community needs through a Social Security Administration evaluation.
All scheduling will be coordinated from and centralized at the Study Center. Schedulers will be paired with families for duration of study. There will be bilingual staff among the schedulers though does not state for which languages.
Field research pair (nurse practitioner and research assistant) will be assigned to a family from pre-conception to post birth.
Have agreements with 6 out of the top 10 hospitals with highest share of births in County.
It includes socio-demographically and ethnically diverse County.
Storage of bio specimens will be responsibility of a physician at a central location
Use of geo-coding will enable to evaluate more than just percentage of births represented by area. It will also allow BWC to assess representation of births by other socio-demographic factors.
Use of geographic mapping technology to assist with demarcation and characterization of the sampling blocks is considered strength.
Using Community Based Participatory Research principles as part of plan to engage the local community is another strength.
Will also be collecting data on out-of home childcare through linkage with another study of the same counties participating in NCS.
Will track moves within and across segments to ensure environmental samples are collected.

(10)

**Weaknesses:**
"Although not every concern can be addressed by the study, it will be useful in recruiting participants to know what particular issues in the community that the study can address, for example, a high incidence of childhood asthma in an urban area" (p. 5). What impact will this recruitment strategy have on overall representativeness of the sample? Could it not introduce bias into the sample? Not much is said about how data collection from LEP populations will be handled or how they will handle issue of low literacy especially in case of self-administered forms. Participants will notify BWC when they go into labor. It is not clear whether there will be a hospital initiated notification system (p.13)

**Questions for Clarification:**
"Listening sessions" used for dissemination of findings? Seems contradictory.
How confounded is SES with Ethnicity in this sample of the population?
There will be easy access to ultrasound facility for participant since records will be collected from each of the pre-natal care providers. But raises question about the quality of the ultrasounds. Is this pretty standard?
To what extent is the NCS targeting women who give birth outside of hospitals?
What will be done to diminish threats to integrity of the self-collected specimens?
What will be done to handle problems that might arise in relation to collection of environmental samples (e.g., access to locations of private businesses)?
Why is probability of pregnancy grouping criteria different by site?
Will you work with media outlets that target ethnic and linguistic minority populations in the County?

**B. Criterion #2: Organizational Qualifications and Experience**

**Strengths:**
The following strengths are identified: PI Sarah Friedman led the Study of Early Child Care and Youth Development
Partner Georgetown University at least three longitudinal projects tracking infants from birth. Project HOPE, GROUP STREP,
Project Hope recruited 100 pregnant minority women at primary care sites throughout the DC area

**Weaknesses:**
None

**Questions for Clarification:**
None

**C. Criterion #3: Personnel Qualifications and Experience**

(11)

**Strengths:**
The offeror appears to allocate excellent professional staff to accomplish the proposed project.

**Weaknesses:**
Most of the key personnel are budgeted for 5% or less. Is this typical?

**Questions for Clarification:**
Is 40% time by the PI sufficient for a project of this size?

**D. Criterion #4: Facilities**

**Strengths:**
Adequate

**Weaknesses:**
None

**Questions for Clarification:**
Study headquarters at CNAC. Does this hinder coordination with the hospitals?

**HUMAN SUBJECT EVALUATION:**

| | |
|---|---|
| Protection from Research Risk: | Acceptable |
| Data and Safety Monitoring: | Acceptable |
| Inclusion of Women and Minority: | Acceptable |

# TAB G

in a county that is not included in the list of Study locations. And the answer to that is no. The first criterion specifies that the proposal has to address data collections in one of the pre-specified counties or locations.

Will proposals for collection of data in one of the seven Vanguard locations be considered? The answer is no. We already have contractors for that work. And we did get a question asking whether existing Vanguard Centers can submit a proposal. And the answer to that is yes; they can submit a proposal for one of the 98 locations in the same way that others would submit one.

There is more to the first mandatory qualification criteria so I just wanted to continue with that. In addition to submitting a proposal for one of the 98 pre-specified areas, the Study location must be either in the same state as the Study Center—I think that is pretty clear and self-explanatory—or in a state that is contiguous with the state of the proposing Center. Again, we did not receive any questions on that so I think that was clear.

The next one is the third criteria that could qualify and offer to become a Study Center, is that they be in a state that is not contiguous, but separated from the border of the proposing Study Center by no more than 100 miles. So, I wanted to give just one example. So, somebody in Kansas could propose for a site in a location in Texas because this little piece of land of Oklahoma is less than 100 miles. There are other examples that could be cited and if there are specific questions on that you should submit them after the conference in writing to the contract office and we can clarify whether or not your Center would meet that criterion.

Participants will be identified through a screening of households in selected neighborhoods and again I would refer you to attachment 4, which is an overview of the Study design. In general, the goal is to enroll a sufficient number of women such that there are 1000

# TAB H

## II. INTRODUCTION

### A. Overview

The National Children's Study is a longitudinal cohort study that aims to examine the effects of environmental influences on the health and development of approximately 100,000 children. Environment is broadly defined to include biological, chemical, physical, social, psychological and behavioral influences on children's health and development. Priority outcomes include obesity, diabetes and physical development; psychological development; injuries; asthma; pregnancy-related outcomes; and mental health. Children will be followed from before birth until their 21st birthday. The goal of the study is to acquire information that will ultimately lead to improvement in the health and well being of children.

In the initial phase of this study, data will be collected in three to eight geographic areas in the United States, referred to as Vanguard Locations. Data collection in each Vanguard Location will be conducted by a single Study Center, referred to as a Vanguard Center. Vanguard Centers will be expected to follow a common Study protocol and will have primary responsibility for many aspects of the Study including, but not limited to, establishing community relationships and collection of data from Study participants and their environments. Additionally, the Vanguard Centers will pilot new Study procedures prior to incorporation of these procedures into the Study protocol. It is expected that additional contracts will be awarded to the remaining 30-50 Study Centers when full funding for this effort becomes available.

Importantly, a separate solicitation is being released for a single, competitively awarded NCS Coordinating Center (NCS-CC). The NCS-CC will perform the logistical and technical support to handle all of the data collected as part of the NCS and will assist the NICHD, as needed in coordinating efforts of the Study Centers. Additionally, the NCS-CC will provide training for all aspects of data collection and will be responsible for all data collections that do not require in-person contact with participants or their environment, e.g. conduct of telephone interviews, collection of self administered questionnaire or diary data, and collection of data from regional environmental monitoring systems.

### B. Background

#### B.1 Description of Document

The purpose of this document is to describe the current study plan for the Vanguard Centers of the NCS. The Vanguard Centers will serve as the initial study centers for the NCS. It is anticipated that there will be 3-8 Vanguard Centers, depending on the availability of funds and the quality of proposals received. The intent of this document is to outline the Study Plan that will be utilized not only at the Vanguard Centers, but eventually also in the full complement of 30-50 Study Centers.

This document provides a broad outline of the Study including background and study rationale, the sampling scheme, schedule of visits, type and scope of data collections, and an overview of ethical issues. A more detailed Study protocol and operational manuals will be developed with the input of investigators from the Vanguard Centers and the NCS-CC.

Although the intent is to combine data collected through Vanguard Centers with data collected through Study Centers that are added later, several possibilities exist. If, through experience at the Vanguard Centers, it is learned that critical aspects of the protocol are infeasible, leading to major revisions in procedures, it may not be scientifically valid to combine initial data collected at Vanguard Centers with data collected in the full Study. Further, the addition of the full complement of Study Centers is dependent on receipt of full funding for the NCS.

#### B.2 Definitions

Steering Committee - The Steering Committee for the NCS will be the committee responsible for making recommendations to the NICHD Project Officer (PO) regarding Study design and data collections. The Project Officer must approve all recommendations, plans, or modifications prior to implementation. Initially, the Steering Committee will include the PO and other members of the NCS Program Office, as well as members from the NCS- CC, the NCS

**[NOTE TO OFFEROR: As noted in the mandatory evaluation criteria for this solicitation (see Section M of RFP), offerors <u>must</u> be located in the same census region as the Vanguard Location for which they are proposing.]**

As outlined in detail below, each Vanguard Center will be expected to enroll and follow sufficient women to ensure 250 live births per year over a five-year recruitment period. Live births in the NCS must be statistically representative of all live births in the targeted Vanguard Site(s). Information and specimens will be gathered from mothers, fathers, children, and possibly others. Environmental samples will be obtained from the home, as well as other sites (e.g. daycare centers, schools, and the workplace). It is expected that children enrolled in this Study will be followed until their 21st birthday; however, this initial solicitation details activities only during the first few years of their lives (during the five year contract period of performance). Additionally, although it is expected that data gathered from families enrolled through the Vanguard Centers will be included as part of the larger cohort, the Vanguard Centers will also serve as the pilot sites for the continuing, full Study. As experience is gained, it is expected that there may be modifications to initial Study procedures as children age throughout the conduct of the Study.

Implementation and conduct of the Study across the Vanguard Centers will be coordinated through a separate coordinating center and specimens will be processed by a Central Laboratory(ies) and stored in a Central Repository(ies). A separate solicitation was released for the NCS Coordinating Center (NCS-CC) and can be found at: http://www.eps.gov/spg/HHS/NIH/NICHD/RFP%2DNICHD%2D2004%2D12/listing.html. In the subject solicitation, which is specifically for the Vanguard Centers, activities are divided into two phases: Phase I Start-up (Initial 15 months), Phase II Enrollment, Implementation, Ongoing Analysis and Reporting (15 months -Year 5).

Further it is anticipated that there will be opportunities for adjunct studies to address research questions related to specific issues of interest within a given community, as indicated below.

## II. Scope

The Contractor will: (1) recruit, retain, and follow Study participants; (2) collect data including, at a minimum, interview data, observations and examinations, biospecimens, and environmental samples at specified timepoints; (3) submit samples and data for processing to the designated centers, e.g., the NCS-Coordinating Center (NCS-CC), laboratory/repository, NCS Information Management Systems (IMS), etc; (4) participate in multiple levels of training activities; (5) insure the protection of human subjects; and,(6) participate in the evaluation of protocols, systems and procedures and implement revisions, as necessary.

## III. Technical Requirements

Independently, and not as an agent of the Government, the Contractor will furnish all the necessary services, qualified personnel, material, equipment, and facilities not otherwise provided by the Government, that are necessary to conduct the work as set forth below under the terms of this contract. All definitions are included at the end of this Statement of Work. Specifically, the Contractor will:

### (A) Phase I – Start Up (Months 1-15)

1) During the Start Up phase, Vanguard Centers will work collaboratively with the NICHD, the NCS-CC, and other participating Vanguard Centers to finalize the Study Protocol, including finalizing the Sampling Plan for their particular Study Location and methods of data collection. All Plans that are developed, must be reviewed and approved by the Project Officer prior to implementation. (See the attached Draft Study Plan)

   a) With respect to the Sampling Plan, Vanguard Centers will provide information to the NCS-CC regarding local communities within the Vanguard Locations, as detailed in the attached Draft Study Plan. This information will be used to characterize communities for defining segments and selection of Vanguard Sites in the second stage of

# TAB I

## Attachment 3 – STATEMENT OF WORK

### I. Background

The National Institute of Child Health and Human Development (NICHD) serves as the lead agency for the National Children's Study (NCS or Study), a longitudinal cohort study that will examine the effects of environmental influences on the health and development of approximately 100,000 children. Environment is broadly defined to include biological, physical, chemical, and social/cultural influences on children's health and development. Priority outcomes include obesity, diabetes, and physical development; injuries; asthma; pregnancy-related outcomes; child development and mental health. Children will be followed from before birth until the age of 21 years. The goal of the Study is to provide information that will ultimately lead to improvements in the health, development, and well being of children. Additional background about the Study is available on the Study's Website (www.nationalchildrensstudy.gov ).

Upon the advice of a panel of National Experts in study design and sampling and the National Children's Study Federal Advisory Committee (NCSAC) a national probability sample of all U.S. births was chosen as the design that best fulfills the goals of the Study. In 2004, the first stage of sampling was completed with the selection of 105 Locations across the United States. These locations correspond to counties or, in sparsely populated areas, groups of contiguous counties and will be the places from which participants will be enrolled. (Further detail is provided in the attached Overview of Study Design and Methods.) It is anticipated that data collection in these 105 geographic areas will be conducted by 30-50 Study Centers, under 30-50 separate contracts, depending on funds, quality of proposals received, and other factors at the time of solicitations. In the full NCS, each Study Center will be expected to oversee data collection in approximately 1-3 Study Locations. Contracts were awarded for collection of data at the first seven "Vanguard Locations" in 2005. Offerors responding to this solicitation must demonstrate the ability to conduct the Study in one or more of the 98 remaining Study Locations. (See study locations at http://www.nationalchildrensstudy.gov/about/locations/ as well as Attachment). It is expected that approximately 15 to 20 contracts will be awarded as a result of this solicitation for the collection of data in up to 30 Locations. It is anticipated that Future solicitations will be released for additional Study Centers, depending on the availability of funds.

Below is a description of the technical requirements of this contract. Offerors may submit proposals to collect data in one Location (referred to as the Primary Location) or in the Primary Location and additional Locations (options). The technical requirement described below applies to both Primary and Additional Locations. **(See Additional Technical Proposal Instructions – Attachment # 6).**

### II. Technical Requirements

Independently and not as an agent of the Government, the Contractor shall furnish all the necessary services, qualified personnel, materials, equipment [see Attachment 7 – Additional Business Proposal Instructions for specific guidance on purchase of equipment] and facilities, not otherwise provided by the Government (directly or through the NCS-CC) under the terms of this Contract to perform the work set forth below.

**[See Attachment 13 - Definitions for a list of terms used in the following statement]**

**A. Phase I – Start Up (21 Months)**

1) **Protocol Development:** Study Centers will work collaboratively with the NCS Project Officer(s), the NCS-CC, and other participating Study Centers to finalize those aspects of the Study Protocol and Procedural Manual that require modification to meet local needs. Study Centers will also make other preparations for fielding the study as described below and will collaborate on development of the common protocol for future data collections that have not yet been specified. All Plans that are developed must be reviewed and approved by the Project Officer(s) prior to implementation.

2) **Sampling**: Study Centers will work with the NCS-CC in defining boundaries for segments within their respective locations. Once defined, the NCS-CC will do the actual selection of segments. The Study Centers will be responsible for activities such as: (a) identifying important geographic or regional characteristics such as health regions that should be considered by the NCS-CC in the definition of strata or segment boundaries; (b) providing the NCS-CC historical counts of all births to mothers residing in the Study Location (inclusive of births to county residents for whom the place of delivery is outside of the county) by census block. Within two months of award, the Study Centers will provide total birth counts by census block for the most recent five years available. The format will be electronic (e.g. an Excel file or other format subject to approval by the PO(s); (c) providing indicators of major changes in block-level births that are occurring or expected to occur. The typical indicator of change is a count of new housing units or lots along with the expected number of dwelling units in the lot; and, (d) reviewing Segment boundaries and boundaries for geographic units which will be prepared by the NCS-CC and sent to the Study Centers for review. When indicated, Study Centers will suggest alternative segment boundaries to ensure the segments are of the appropriate size in terms of numbers of births and that the boundaries are consistent with important neighborhood characteristics. Details on how these activities will be utilized in sampling segments and households are given in the attached Overview of Study Design and Methods document.

3) **Plan for evaluation of coverage of Sample**: Study Centers shall develop a plan for the collection of birth and fetal death certificate data or other means of capturing basic data on all births and fetal deaths within Study Sites, including, at a minimum, the residence of the mother at the time of delivery; the date of birth, gender, race, ethnicity, and outcome (live birth, fetal death, infant death) of the newborn. This information will be used to gauge the success of recruitment with respect to coverage of the targeted population in the Study Site(s).

4) **Plan for community participation and engagement**: Each Study Center shall develop and begin implementation of a plan to support recruitment and retention efforts for the Study. The specific activities will be planned in collaboration with the NCS-CC and NCS-PO and may include, but are not limited to, meetings with community groups and leaders and local media releases.

5) **Establishment of Community Advisory Board**: Each Center shall establish a Community Advisory Board which shall meet on a regular basis with Study Center staff. **(See Additional Technical Proposal Instructions – Attachment # 6).**

6) **Engagement of Communities and Conduct of Community Needs Assessments**. Each Center shall conduct community assessments including but not limited to suggestions from the community for implementation of the study Protocol and considerations to enhance recruitment, retention and overall participation in the Study. The methods of community assessment will be developed with

input and coordination from the NCS-CC and agreed upon by the Study Center and the Project Officer. The methods could include, but are not limited to, focus groups, town meetings, or surveys.

7) **Engagement of Hospitals:** Each Study Center shall gain the cooperation of hospitals that serve as the primary delivery sites for the target population as well as other clinical sites that will be involved in the Study (e.g. prenatal care providers involved with recruitment of participants) or serve as sites of data collection. Note that these hospitals and clinical sites may be located outside of the Study Location.

8) **Plan for specimen and sample collection:** Where appropriate, Study Centers shall develop a plan for the collection of specimens or data that rely on persons other than Study staff. Examples might include collection of placental tissue or cord blood at community hospitals or birthing centers or collection of information or environmental specimens from daycare centers, schools, pediatrician offices, urgent care centers, local hospitals, etc. Study Centers shall also prepare a plan for temporary storage of samples at relevant locations (e.g. birthing hospitals).

9) **Plan for fetal ultrasounds**: Each Study Location will need to have capability to conduct fetal ultrasounds, to be performed by an American College of Radiology certified ultrasound technician. These may either be at a Study Location such as a clinic or arranged by contract with local venders.

10) **Methods development:** Study Centers shall work collaboratively with the Program Staff, the NCS-CC, and other participating Study Centers in the development of the Study Protocol, data forms, Study procedures, the NCS Manual of Operating Procedures (MOP), and other documents, as needed.

**11) IRB and other reviews and approvals**: Study Centers shall obtain required Institution specific approvals [e.g., Institutional Review Board (IRB) approval] and assist the NCS-CC with preparation of materials for other project-wide approvals, as needed.

12) **Training**: Training of personnel associated with the NCS is a shared responsibility of the NCS-CC and the Study Center Staff. The NCS-CC will guide and conduct the initial trainings and will develop and implement a train-the-trainer program. In this program, staff from the Study Centers Staff must participate in training sessions provided by the NCS-CC to become trainers of additional staff at the Study Center. Trainers from the Study Centers will have responsibility for providing on-going in-person training to existing or new staff at their respective Center. This will be supplemented by web-based or other remote trainings by the NCS-CC. Study Center staff will also provide training to Study participants in relevant areas of self-collected data/specimens, including, but not limited to, completion of daily diaries and other self-reported data, use of data collection instruments or procedures (pregnancy tests) and use/reporting of self-collected environmental samples/readings.

13) **Staffing**: Study Centers shall hire research staff with appropriate qualifications to address all aspects of the NCS. This includes, but is not limited to, a Principal Investigator, Study Coordinator/ Operational Manager (or named staff with comparable responsibilities), field staff, field supervisors, and other staff with appropriate training to accomplish interviews; collection of biologic and environmental specimens; collection of household samples; conduct of physical examinations; and child developmental assessments (e.g. developmental, physical, cognitive, and behavioral assessments), etc. **(See Estimate of Effort by Annual Contract Year - Attachment # 8).**

14) **Materials**: Study Centers shall provide necessary space, equipment and supplies to enroll Study subjects, perform Study tests and examinations; and, to collect and appropriately process and store data, biospecimens and environmental samples prior to shipping, as needed, to the NCS-CC, central repository(ies), and laboratory(ies). **(See Additional Business Proposal Instructions – Attachment # 7).**

**15) Meetings with the Project Officers(s), Coordinating Center and Participation on the Steering Committee**:

a. The Study Center key personnel will meet via phone conference with the Project Officer(s) and staff from the NCS-CC at regular intervals to be scheduled after contract award to review progress and anticipated or existing problems.

b. Each Study Center will be represented on the Study's Steering Committee, collaborating with investigators from the NICHD, the NCS-CC, the Interagency Coordinating Committee (ICC), and PIs from other Study Centers. It is anticipated that there will be face to face Steering committee meetings every four months during the start-up phase. The first meeting is anticipated within a month of contract.

**16) Pilot studies**: As necessary Study Centers shall conduct pilot tests of sampling approaches, data collection instruments and methods, and data handling procedures, in anticipation of implementation of the full Study Protocol. The need for a pilot study can be identified by the Program Office or a Study Center; however, pilot studies identified by Study Center's require Project Officer approval prior to implementation.

17) **Information management system (IMS):** In cooperation with the NCS-CC and possibly separate Information Technology contractors, Study Centers shall participate in testing of the Information Management System as a System user.

18) **Reporting Requirements and Deliverables :** Report progress according to technical reporting requirements and submit deliverables according to schedule of deliverables (See Attachment 5)

19) **Confidentiality:** Study Centers shall ensure privacy of Study participants and confidentiality of all data.

20) **HIPAA:** Study Centers shall comply with all IRB, OMB, and Health Insurance Portability and Accountability Act (HIPAA) requirements.

**B. Phase II –Enrollment/ Implementation/Reporting** (39 Months)

1) **Community Engagement:** During the enrollment period, each Study Center will continue to conduct activities to increase awareness of the Study among residents in the targeted community, according to the plan developed in Phase I of the Study.

2) **Recruitment and Enrollment**: Each Study Center will enroll sufficient women to ensure an average of 250 live births per year over the four -year recruitment period in each primary sampling unit (PSU). Study Sites (roughly equivalent to neighborhoods, within the Primary Sampling Units), will be the areas from which study subjects are recruited. **(See Overview of Study Design and Methods -- Attachment # 4).**

a. Primary recruitment: The primary method for identification and recruitment of Study

participants is through screening of households in the target community. Under this approach, the NCS-CC will provide the Study Center with a preliminary list of households within the selected Study Sites. The NCS-CC will also send advance mailings to households in the targeted areas describing the Study and the upcoming screening activities. Following these activities, interviewers from the Study Centers will visit the selected neighborhoods. As the interviewer initially moves through the segment, they will make corrections to the preliminary listing. In addition they will attempt to enumerate all people in the household and to complete a brief screening questionnaire to identify potentially eligible participants. Procedures for the listing, enumeration and screening will be specified in the Study Protocol and further detailed in the operational manual, including algorithm for timing and number of attempts for screenings. Additionally, as outlined in the Overview of the Study Design, it is expected that in addition to the initial household screening, there will be a more limited re-screening of targeted households approximately midway through the recruitment period to "refresh" the sample. The minimal targeted overall response rate (combination of successful screening and initial enrollment of eligible women) is 65%. It is estimated that, on average, approximately 9,000 households will need to be screened per location to meet the Study's Recruitment goals.

b. Recruitment and enrollment through other methodologies: In addition to enrollment through the household screening approach, a number of supplementary approaches will be utilized to ensure that the final sample is representative of births in the target Study Site.

i. Prenatal Care Providers: Each Study Center will enroll otherwise eligible Study participants through prenatal care providers and delivery hospitals that serve the target population, providing a mechanism for women who are missed through household sampling to be represented in the Study. This might include non-responders to the initial screening who later present for prenatal care or, women who have moved to the segment after screening occurred there.

ii. Community Enrollment: Each Study Center will provide a mechanism for women in the targeted geographic area to volunteer to be a participant in the Study if they live in the sampled segments, meet other eligibility criteria and contact Study staff during the period of enrollment.

3) **Tracking and Follow-up:** At the time of enrollment, information needed to track Study participants will be gathered by the staff from the Study Centers and transmitted to the NCS-CC for inclusion in a secure portion of the NCS IMS. Tracking information will be stored separate from Study Data. Staff from Study Centers will be responsible for the conduct of all in-person visits, including those related to tracking Study subjects. This may include visits to the home of participants, relatives of participants and other named contacts, or other neighborhood/community resources. The NCS-CC will perform computerized searches, directory assistance, post office change of address and other searches related to tracking of Study participants. If a Study participant leaves the Study Location of one Study Center, the NCS-CC will facilitate either their enrollment at the Study Center that is closest to their new residence or assume the responsibility of data collection for that participant, and continue tracking that participant.

4) **Data Collection** – Once enrolled in the Study, mothers, fathers, and children will be followed according to the schedule outlined in the attached Overview of Study Design and Methods. Data Collections are detailed in the Overview of Study Design and Methods (Attachment 4) and include, but are not limited to interview data, observations and examinations, collection of biospecimens, and collection of environmental samples. Specific responsibilities of the Study

Centers with respect to data collection include:

a. Scheduling Home and Clinic Visits:

The schedule of data collections for participants at the Study Centers is determined by the NCS protocol, and for any given participant a schedule of visits is maintained in the IMS. The IMS will provide each Study Center with a listing of upcoming visits that need to be scheduled. It will be the responsibility of the Study Center to schedule their field staff time for all Study-related visits that require face-to-face contact, e.g. visits in the home, daycare, school, or clinical setting and ensuring that all scheduled visits are entered in the IMS. Schedulers from the Study Center also will be responsible for scheduling those telephone interviews that will be conducted by staff from the Study Center (see 4.b.ii below).

b. Data collection:

i. In-person Data Collections: All Study-related data collections that take place in the home, in the community, or in a clinical or specific Study setting will be the responsibility of staff from the Study Centers. This includes, but is not limited to, face-to-face interviews; observations, tests, and examinations; collection of biospecimens; and collection of environmental samples.

ii. Telephone interviews: Telephone interviews will be a joint responsibility of the Study Centers and the NCS-CC. The responsibility for telephone interviews will be negotiated independently for each Center. **(See Additional Technical Proposal Instructions – Attachment # 6).** A specific schedule of phone interviews is provided in the attached Overview of Study Design and Methods. Those Centers conducting phone interviews must have 1) a dedicated area for the conduct of phone calls within the study center to both ensure confidentiality and minimal distractions 2) sufficient staffing to complete the requisite number of phone interviews, staff must have Assurance of Confidentiality training and must be available both during normal working hours and evening and weekend hours 3) separate telephone lines must be available to accommodate incoming as well as out-going calls 4) Auto-dialers, cell phones, or voice-over internet protocol (voice-over IP) services may not be used for telephone interviewing 5) As a quality control measure, study centers must provide capabilities for supervisor monitoring of 10% of each telephone interviewer's work.

iii. Self administered forms: Several of the data collections require completion of a self administered form. Most of the forms will be left with participants at the preceding in-person contact. Those that need to be mailed to participants will be mailed directly from the NCS-CC. All forms will include return mailing materials with the return mailing address of the Study Center. Study Centers will be required to optically scan self administered forms for electronic submission to the NCS-CC. Study Centers will be responsible for resolving issues that require call-backs to study participants (e.g. internal inconsistencies, etc.).

iv. Self collected biospecimens: Study Centers will not be responsible for receiving or processing of self collected biospecimens or environmental samples that are mailed by the participant. The mailing materials provided with these specimen collection kits will be addressed to the appropriate processing center (i.e. central repository or laboratory).

v. Collection of data from local records or local databases: Collection of data from existing records that are maintained in the community or from state or local health departments will be the responsibility of the Study Centers. This may include, but is not limited to, collection of data from birth certificates and delivery records, other medical and dental records, daycare centers and school records.

vi. Collection of Community level physical, social and environmental data. Following a protocol provided by the NCS-CC, staff from Study Centers will periodically collect community level measures. This may include, but is not limited to, collection of environmental samples (e.g. air and water), community food samples e.g. from grocery stores, collections related to social factors (e.g. social cohesion) or observations of physical factors (e.g. local traffic patterns).

5) **Submission of Study data and specimens:** It is anticipated that the Study will utilize a web-based information management system (IMS) maintained by the NCS-CC for collection, tracking and submission of data. The IMS will track and report all required data collections. The Study Centers will be responsible for submitting all collected data, the output of electronically scanned data forms and specimens collected and /or processed according to specifications outlined in the Overview of Study Design and Methods (Attachment 4) and later specified in greater detail in the Study Protocol and the MOP. This includes, but is not limited to, submission of data to the NCS-CC and mailing of specimens to a central repository(ies) and laboratory(ies) and other specified processing centers.

6) **Quality Control:** Ensure compliance with ongoing quality control procedures described in the Overview of Study Design and Methods and to be specified more in detail in the NCS MOP.

7) **Training:** Training of personnel associated with the NCS is a shared responsibility of the NCS-CC and the Study Center Staff. The NCS-CC will guide and conduct the initial trainings and will develop and implement a train-the-trainer program. In this program, staff from the Study Centers Staff must participate in training sessions provided by the NCS-CC to become trainers of additional staff at the Study Center. Trainers from the Study Centers will have responsibility for providing on-going in-person training to existing or new staff at their respective Center. This will be supplemented by web-based or other remote trainings by the NCS-CC. Study Center staff will also provide training to Study participants in relevant areas of self-collected data/specimens, including, but not limited to, completion of daily diaries and other self-reported data, use of data collection instruments or procedures (pregnancy tests) and use/reporting of self-collected environmental samples/readings.

8) **Meetings with the Project Officers(s), Coordinating Center and Participation on the Steering Committee**:

a) The Study Center key personnel will meet via phone conference with the Project Officer(s) and staff from the NCS-CC at regular intervals to be scheduled after contract award to review progress and anticipated or existing problems.
b) Each Study Center will be represented on the Study's Steering Committee, collaborating with investigators from the NICHD, the NCS-CC, the Interagency Coordinating Committee (ICC), and PIs from other Study Centers. It is anticipated that there will be two face to face Steering committee meetings per year during the implementation phase.

9) **Pilot Studies:** Study Centers will conduct ongoing pilot tests of data collection instruments and methods, as needed, before implementation of new collection or reporting efforts in the full Study. The need for a pilot study can be identified by the Program Office or a Study Center. Pilot

studies identified by Study Center's require Project Officer approval prior to implementation.

10) **Human Subjects:** Study Centers will comply with all human subjects provisions of the Study Protocol and all Federally required provisions, including, but not limited to, obtaining required annual IRB approval(s) at the local site(s) and provision of their summary/approval in a timely fashion for NIH-IRB approvals.

11) **Reviews and approvals**: Study Centers will comply with all IRB, OMB and HIPAA requirements.

12) **Reporting and Analysis** Study Centers will:

a) Ensure that all data are processed using the Study's Quality Control procedures and forwarded to the NCS-CC, through the IMS or any other designated format, in a timely manner.

b) Ensure that all biological and environmental specimens have been forwarded to the NCS-CC, repository(ies) or appropriate laboratories, or processing centers as specified in the NCS-MOP.

c) Prepare and submit required reports to the Project Officer as specified in the Reporting Requirements of this contract.

d) Participate as investigators in analyses, presentations, and publications that utilize data collected in the NCS.

13) **Reporting Requirements and Deliverables :** Report progress according to technical reporting requirements and submit deliverables according to schedule of deliverables (**See Reporting Requirements and Deliverables -- Attachment # 5).**

# Attachment 9 – Study Map and List of Locations

THE NATIONAL ... STUDY

## Vanguard Locations (7 total)

**Orange County, CA**
**Lincoln, Pipestone, and Yellow Medicine Counties, MN and Brookings County, SD**
**Duplin County, NC**
**New York City (Queens), NY**
**Montgomery County, PA**
**Salt Lake County, UT**
**Waukesha County, WI**

## Study Locations (98 total)

Colbert County, AL
Benton County, AR
Apache County, AZ
Maricopa County, AZ
Pinal County, AZ
Humboldt County, CA
Kern County, CA
Los Angeles County, CA
Sacramento County, CA
San Bernardino County, CA
San Diego County, CA
San Mateo County, CA
Ventura County, CA
Denver, CO
Douglas County, CO
Litchfield County, CT
New Haven County, CT
New Castle County, DE
Baker County, FL
Hillsborough County, FL
Miami-Dade County, FL
Orange County, FL
Baldwin County, GA
DeKalb County, GA
Fayette County, GA
Honolulu County, HI
Polk County, IA
Bear Lake County, ID and Lincoln and Uinta Counties, WY
Cook County, IL
DuPage County, IL
Johnson, Union, and Williamson Counties, IL
Macoupin County, IL
Will County, IL
Marion County, IN
Saline County, KS
Jefferson County, KY
Jessamine County, KY
Beauregard and Vernon Parishes, LA
New Orleans, LA
Bristol County, MA
Worcester County, MA
Baltimore County, MD
Montgomery County, MD
Cumberland County, ME
Genesee County, MI
Grand Traverse County, MI
Lenawee County, MI
Macomb County, MI
Wayne County, MI
Becker, Clearwater, and Mahnomen Counties, MN
Ramsey County, MN
Stearns County, MN
Jefferson County, MO
St. Louis, MO
Coahoma County, MS
Hinds County, MS
Buncombe County, NC
Burke County, NC
Cumberland County, NC
Durham County, NC
Gaston County, NC
Rockingham County, NC
Stark County, ND
Burlington County, NJ
Middlesex County, NJ
Passaic County, NJ
Warren County, NJ
Valencia County, NM
Monroe County, NY
Nassau County, NY
New York City (Brooklyn), NY
New York City (Manhattan), NY
Cuyahoga County, OH
Lorain County, OH
Cleveland County, OK
Comanche County, OK
Marion County, OR
Philadelphia County, PA
Schuylkill County, PA
Westmoreland County, PA
Providence County, RI
Spartanburg County, SC
Bradley County, TN
Cumberland and Morgan Counties, TN
Davidson County, TN
Bexar County, TX
Childress, Collingsworth, Donley, and Hall Counties, TX
Dallas County, TX
Harris County, TX
Hidalgo County, TX
Lamar County, TX
Stephens and Young Counties, TX
Travis County, TX
Cache County, UT
Grant County, WA
King County, WA
Thurston County, WA
Marion County, WV

February 2007

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

| 1. CONTRACT ID CODE | PAGE | OF PAGES |
|---|---|---|
| | 1 | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|
| 002 | March 12, 2007 | | |

**6. ISSUED BY** CODE

Office of Acquisitions, NIDDK
NICHD Contracts Management Branch
National Institutes of Health
Executive Building, Suite 7A07
6100 EXECUTIVE BLVD, MSC 7510
BETHESDA, MD 20892-7510

**7. ADMINISTERED BY *(If other than Item 5)*** CODE

**8. NAME AND ADDRESS OF CONTRACTOR *(No., street, city, county, State and ZIP Code)***

TITLE: National Children's Study Centers

TO ALL POTENTIAL OFFERORS

CODE | FACILITY CODE

(✓) ✓ **9A. AMENDMENT OF SOLICITATION NO.** RFP-NIH-NICHD-NCS-07-11

**9B. DATED *(SEE ITEM 11)*** March 1, 2007

**10A. MODIFICATION OF CONTRACT/ORDER NO.**

**10B. DATED *(SEE ITEM 13)***

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

[✓] The above numbered solicitation is amended as set forth in item 14. The hour and date specified for receipt of Offers _ is extended, ✓ is not extended. Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning one (1) copy of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

**12. ACCOUNTING AND APPROPRIATION DATA *(if required)***

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| (✓) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER (Specify type of modification and authority) |

**E. IMPORTANT:** Contractor __ is not, __ is required to sign this document and return ____ copies to the issuing office.

**14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible**

Purpose: 1. to revise the Attachment 7, Additional Business Proposal Instructions; 2. to revise the NICHD Contracts Management Branch Pre-Proposal conference presentation, Page 11, and 3. to provide further clarifications for the RFP based on inquiries received at the National Children's Study Centers Pre-Proposal conference, dated March 7, 2007:

See continuation pages for Amendment

Except as provided herein, all terms and conditions of the document referenced in item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER<br>Elizabeth Osinski, Contracting Officer<br>Team Leader, NICHD Contracts Management Branch | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR<br>BY ____<br>*(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY /S/<br>*(Signature of Contracting Officer)* | 16C. DATE SIGNED |

NSN 7540-01-152-8070
PREVIOUS EDITION NOT USABLE

30-105

**STANDARD FORM 30 (REV 10-83)**
Prescribed by GSA
FAR (48 CFR) 53.214(a)

| RFP-NIH-NICHD-NCS-07-11<br>AMENDMENT No.: 002 | CONTINUATION PAGE | Page 2 of 2 |
|---|---|---|

As a result of this amendment:

1. The RFP Attachment 7, Additional Business Proposal Instructions, Option Location tables, page 1, is revised to read as follows:

Option Location X – Assume option exercised at contract inception, on/about 9/27/2007. Only submit one option budget proposal for Location X.

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Location Budget | 9/27/2007 | | | | | |

Option Location Y – Assume option exercised at contract inception, on/about 9/27/2007. Only submit one option budget proposal for Location Y.

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Location Budget | 9/27/2007 | | | | | |

The offerors must not submit four (4) budgets with different start periods with the initial proposals. The offerors may be requested to submit Option Location budget proposals with different start periods during negotiations.

Any area in the RFP related to the Option Location budget proposals are revised as set forth above.

2. The NICHD Contracts Management Branch Pre-Proposal conference presentation, page 11, second paragraph is revised to read as follows:

Propose Option Location budget proposals to start at contract inception, on/about 9/27/2007. (At this time it has not been determined when options will be exercised).

3. Further clarifications for the RFP based on inquiries received at the National Children's Study Centers Pre-Proposal conference:

**Principal Investigator**
Each contract that is awarded as a result of this solicitation will be awarded to a Prime Contractor (i.e. a single institute, organization or other entity). There must be a single named Principal Investigator (PI) employed by the Prime Contractor responsible for oversight of the entire project. Unlike a Grant, the Multiple PI Model has not been implemented for contracts and therefore cannot be proposed on this project. Offerors may have Co-PIs at either the base location, optional locations and/or with subcontractors.

**Proposals from Existing Vanguard Centers**
Contractors that have existing contracts for collection of data in a Vanguard Location may respond to this solicitation. The requirements are the same as for offerors who do not have an existing contract. The offeror must address the Base Requirement which includes the Study Center and a Primary Study Location. While the Study Center could be the same as the Study Center overseeing data collections in the Vanguard Location, the Primary Study Location and any Secondary (option) Locations must be selected from the remaining 98 Locations as described in the RFP.

**Organization of Technical Proposals**
As noted on page 41 of the RFP "the technical proposal should reflect a clear understanding of the nature of the work being undertaken. The technical proposal must include information on how the project is to be organized, staffed, and managed…." While it is suggested that offerors follow the guidance for organization of technical proposals provided on pages 41-43, there is no prescribed format for organization of proposals.

# TAB J

# SOLICITATION

## SECTION A - SOLICITATION/CONTRACT FORM

| 1. Purchase Authority: Public Law 92-218 as amended | | | |
|---|---|---|---|
| 2. **Request for Proposal (RFP) Number:** EASTRFPNIH-NICHD-NCS-08-21E | 3. **Issue Date:** March 19, 2008 | 4. **Just in Time:** [X]No [ ]Yes See Part IV Section L | 5. **Set Aside:** [X]No [ ]Yes See Part IV Section L |
| 6. Title : NICHD National Children's Study (NCS) Study Centers | | | |
| 7. ISSUED BY: Office of Acquisitions, NIDDK NICHD Contracts Management Branch National Institutes of Health Executive Building, Suite 7A07 6100 EXECUTIVE BLVD MSC 7510 BETHESDA MD 20892-7510 | | 8. SUBMIT OFFERS TO: See Part III, Section J, "Packaging and Delivery of the Proposal," ATTACHMENT 1 of this Solicitation. | |
| 9. Proposals for furnishing the supplies and/or services in THE SCHEDULE will be received at the place specified in, and in the number of copies specified in Attachment 1, "Packaging and Delivery of the Proposal," **until 4:00PM local time on May 2, 2008**. Offers will be valid for 120 days unless a different period is specified by the offeror on the Attachment entitled, "Proposal Summary and Data Record, NIH 2043. | | | |
| 10. THIS SOLICITATION REQUIRES DELIVERY OF PROPOSALS TO TWO DIFFERENT LOCATIONS. THE OFFICIAL POINT OF RECEIPT FOR THE PURPOSE OF DETERMINING TIMELY DELIVERY IS THE ADDRESS PROVIDED FOR THE OFFICE OF ACQUISITIONS AS STATED IN ATTACHMENT 1, "PACKAGING AND DELIVERY OF THE PROPOSAL." IF YOUR PROPOSAL IS NOT RECEIVED BY THE CONTRACTING OFFICER OR HIS DESIGNEE AT THE PLACE AND TIME SPECIFIED FOR THE OFFICE OF ACQUISITIONS, THEN IT WILL BE CONSIDERED LATE AND HANDLED IN ACCORDANCE WITH HHSAR CLAUSE 352.215-70, ENTITLED, "LATE PROPOSALS, AND REVISIONS" LOCATED IN SECTION L.1. k. OF THIS SOLICITATION. | | | |
| 11. Offeror must be registered in the Central Contractor Registry (CCR) prior to award of a contract. http://www.ccr.gov | | | |
| 12. FOR INFORMATION CALL: Fred Ettehadieh, Contracting Officer PHONE: 301-435-6961 e-MAIL: fe19w@nih.gov COLLECT CALLS WILL NOT BE ACCEPTED. | | | |
| Secondary Point of Contact: Elizabeth Osinski, Contracting Officer, Team Leader e-Mail: e043m@nih.gov Phone: 301-435-6947 | | • **PRE-PROPOSAL WEBCAST TELECONFERENCE: April 2, 2008. See details in Section J, Attachment 15.** • **CUT-OFF DATE FOR ALL QUESTIONS ON THIS RFP: April 11, 2008** • **PAGE LIMITS ON THE TECHNICAL PROPOSAL: See details in Section J, Attachment 7, Additional Technical Proposal Instructions.** | |

*(f) Contract award.*

*(1) The Government intends to award a contract or contracts resulting from this solicitation to the responsible offeror(s) whose proposal(s) represents the best value after evaluation in accordance with the factors and subfactors in the solicitation.*

*(2) The Government may reject any or all proposals if such action is in the Government's interest.*

*(3) The Government may waive informalities and minor irregularities in proposals received.*

*(4) The Government intends to evaluate proposals and award a contract without discussions with offerors (except clarifications as described in FAR 15.306(a)). Therefore, the offeror's initial proposal should contain the offeror's best terms from a cost or price and technical standpoint. The Government reserves the right to conduct discussions if the Contracting Officer later determines them to be necessary. If the Contracting Officer determines that the number of proposals that would otherwise be in the competitive range exceeds the number at which an efficient competition can be conducted, the Contracting Officer may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals.*

*(5) The Government reserves the right to make an award on any item for a quantity less than the quantity offered, at the unit cost or prices offered, unless the offeror specifies otherwise in the proposal.*

*(6) The Government reserves the right to make multiple awards if, after considering the additional administrative costs, it is in the Government's best interest to do so.*

*(7) Exchanges with offerors after receipt of a proposal do not constitute a rejection or counteroffer by the Government.*

*(8) The Government may determine that a proposal is unacceptable if the prices proposed are materially unbalanced between line items or subline items. Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly overstated or understated as indicated by the application of cost or price analysis techniques. A proposal may be rejected if the Contracting Officer determines that the lack of balance poses an unacceptable risk to the Government.*

*(9) If a cost realism analysis is performed, cost realism may be considered by the source selection authority in evaluating performance or schedule risk.*

*(10) A written award or acceptance of proposal mailed or otherwise furnished to the successful offeror within the time specified in the proposal shall result in a binding contract without further action by either party.*

*(11) If a post-award debriefing is given to requesting offerors, the Government shall disclose the following information, if applicable:*

*(i) The agency's evaluation of the significant weak or deficient factors in the debriefed offeror's offer.*

*(ii) The overall evaluated cost or price and technical rating of the successful and debriefed offeror and past performance information on the debriefed offeror.*

*(iii) The overall ranking of all offerors, when any ranking was developed by the agency during source selection;*

*(iv) A summary of the rationale for award.*