No. 08-249C
(Judge Horn)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE CNA CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**DEFENDANT'S MOTION TO DISMISS AND, IN THE ALTERNATIVE, FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

DEBORAH A. BYNUM
Assistant Director

MATTHEW H. SOLOMSON
Trial Attorney, Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street, N.W.
Washington, DC 20530
Tele: (202) 305-3274
Fax: (202) 514-8624

Attorneys for Defendant

Of Counsel:

Daniel Barry
Deputy Associate General Counsel
Procurement, Fiscal and Information Law
Office of the General Counsel
Department of Health and Human Services
330 Independence Avenue, S.W.
Washington, DC 20201

Gretchen H. Weaver
Senior NIH Ethics Counsel
Office of the General Counsel, Ethics Div.
Department of Health and Human Services

Dated: April 17, 2008

# TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . iii

DEFENDANT'S BRIEF . . . . . . . . . . 1

QUESTIONS PRESENTED . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . 4

- I. The National Children's Study . . . . . . . . . . 4
- II. The Role of the Study Center Principal Investigator . . . . . . . . . . 6
- III. Dr. Friedman's Role in the Development of the NCS . . . . . . . . . . 7
- IV. The Procurements . . . . . . . . . . 10

SUMMARY OF THE ARGUMENT . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . 13

- I. This Court Should Dismiss CNAC's "Bid Protest" Because There Is No Agency Action To Challenge Under 28 U.S.C. § 1491(b)(1) . . . . . . . . . . 13
  - A. CNAC Does Not Assert A Cause Of Action Under 28 U.S.C. § 1491(b)(1) And Is Not An Interested Party Under That Statute . . . . . . . . . . 14
  - B. In Any Event, Because The Agency Has Not Excluded CNAC From Submitting A Proposal In Response To The 2008 RFP, There Is No Dispute Ripe For This Court's Review . . . . . . . . . . 17
- II. Assuming CNAC May Challenge The Contracting Officer's Now Moot March 19, 2008 Determination, The United States Is Entitled To Judgment Upon The Administrative Record Because CNAC's Exclusion From The 2007 RFP Was Reasonable . . . . . . . . . . 25
  - A. The Government Has Broad Discretion To Exclude An Offeror From A Procurement Pursuant To FAR 1.602-2 . . . . . . . . . . 25

B. CNAC Cannot Prevail Where, As Here, It Merely Disagrees With The Agency's Decision . . . . . 29

C. The Agency's Determinations And Findings In Its Ethics Memorandum Were Reasonable . . . . . 31

1. The Agency Reasonably Found That The NCS, With Respect To The 2007 RFP, Constituted a Particular Matter Involving Specific Parties . . . . . 31

2. The Agency Reasonably Concluded That Dr. Friedman Participated Personally And Substantially In The Relevant Matter . . . . . 37

3. The Agency Reasonably Found That Dr. Friedman's Performance As A Principal Investigator On An NCS Contract Likely Would Involve Communications Prohibited By 18 U.S.C. § 207(a)(1) . . . . . 38

4. The Agency Reasonably Concluded That The Scientific or Technological Information Exceptions Are Inapplicable . . . . . 38

III. This Court Has No Power To Award The Injunctive Or Declaratory Relief CNAC Seeks . . . . . 39

CONCLUSION . . . . . 41

## TABLE OF AUTHORITIES

### CASES

Abbott Labs. v. Gardner,
387 U.S. 136 (1967) . . . . . . . . . . 18

Air California v. United States Transportation,
654 F.2d 616 (9th Cir. 1981) . . . . . . . . . . 22

Am Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) . . . . . . . . . . 23

American Land Title Association v. Clarke,
743 F. Supp. 491 (W.D. Tex. 1989) . . . . . . . . . . 21, 22

Arrowhead Metals, Ltd. v. United States,
8 Cl. Ct. 703 (1985) . . . . . . . . . . 40

Asia Pacific Airlines v. United States,
68 Fed. Cl. 8 (2005) . . . . . . . . . . 15

Bannum, Inc. v. United States,
56 Fed. Cl. 453 (2003) . . . . . . . . . . 18

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005) . . . . . . . . . . 25

Bay-Houston Towing Co., Inc. v. United States,
58 Fed. Cl. 462 (2003) . . . . . . . . . . 23

Beekwilder v. United States,
55 Fed. Cl. 54 (2002) . . . . . . . . . . 18, 22

Bennett v. Spear,
520 U.S. 154 (1997) . . . . . . . . . . 18

Burroughs Corp. v. United States,
617 F.2d 590 (Ct. Cl. 1980) . . . . . . . . . . 30

CACI, Inc.-Federal v. United States,
719 F.2d 1567 . . . . . . . . . . 27, 40

CNA Corp. v. United States
(Fed. Cl. No. 07-858C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

CW Government Travel, Inc. v. United States,
46 Fed. Cl. 554 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Charter FSB v. Office of Thrift Supervision,
976 F.2d 203 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Colorado Dept. of Human Services v. United States,
74 Fed.Cl. 339 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Computer Technology Assoc., Inc.,
2001 WL 1513195 (Comp. Gen. Nov. 7, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Contract Custom Drapery Service, Inc. v. United States,
6 Cl. Ct. 811, 820 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Crandon v. United States,
494 U.S. 152 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

DSD Labs., Inc. V. United States,
46 Fed. Cl. 467 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

Data Gen. Corp. v. Johnson,
78 F.3d 1556 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

E.W. Bliss Co. v. United States,
77 F.3d 445 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Erinys Iraq Ltd. v. United States,
78 Fed. Cl. 518 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Fed. Power Comm'n v. Fl. Power & Light Co.,
404 U.S. 453 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Federal Trade Comm'n v. Standard Oil Co.,
449 U.S. 232 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Galen Med. Assocs. v. United States,
369 F.3d 1324 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Greenbrier v. United States,
193 F.3d 1348 (Fed. Cir. 1999) . . . . . . . . . . 23

Innovative Resources v. United States,
63 Fed. Cl. 287 (2004) . . . . . . . . . . 40

Lion Raisins, Inc. v. United States,
51 Fed. Cl. 238 (2001) . . . . . . . . . . 25

ManTech Telecommunications and Information Sys. Corp. v. United States,
49 Fed. Cl. 57 (2001) . . . . . . . . . . 40

Martinez v. United States,
333 F.3d 1295 (Fed. Cir.2003) . . . . . . . . . . 14

NKF Engineering, Inc. v. United States,
805 F.2d 372 (Fed. Cir. 1986) . . . . . . . . . . 27, 28

NSK Ltd. v. United States,
510 F.3d 1375 (Fed. Cir. 2007) . . . . . . . . . . 18, 19

Naddaf Int'l Trading Co.,
1990 WL 278571 (Comp. Gen. Oct. 19, 1990) . . . . . . . . . . 28

Nat'l Air Traffic Controllers Ass'n v. United States,
160 F.3d 714 (Fed. Cir. 1998) . . . . . . . . . . 14

OGE Informal Advisory Letter 05 x 6,
2005 WL 4169815 (Sept. 19, 2005) . . . . . . . . . . 35

OGE Informal Advisory Letter 06 x 8,
2006 WL 4512828 (Aug. 23, 2006) . . . . . . . . . . 35

OGE Informal Advisory Letter 99 x 12,
1999 WL 33305905 (April 29, 1999) . . . . . . . . . . 26

OGE Informal Advisory Letter 99 x 16,
1999 WL 33305910 (Sept. 10, 1999) . . . . . . . . . . 35

OGE Letter 93 x 32,
1993 WL 721252 (Nov. 9, 1993) . . . . . . . . . . 26, 34

PGBA v. United States,
389 F.3d 1219 (Fed. Cir. 2004) .......................................... 14, 41

Parcel 49C Ltd. Partnership v. United States,
31 F.3d 1147 (Fed. Cir. 1994) .......................................... 40

Pax Christi Memorial Gardens, Inc. v. United States,
52 Fed. Cl. 318 (2002) .......................................... 23

Red River Serv. Corp. v. United States,
60 Fed. Cl. 532 (2004) .......................................... 15, 16, 17

Renegotiation Board v. Bannercraft Clothing Co.,
415 U.S. 1, 24 (1974) .......................................... 21

Robishaw Engineering, Inc. v. United States,
891 F. Supp. 1134 (E.D. Va. 1995) .......................................... 22

Scanwell Lab., Inc. v. Shaffer,
424 F.2d 859 (D.C. Cir. 1970) .......................................... 40

Scott v. United States,
78 Fed. Cl. 151 (2007) .......................................... 17

Suitum v. Tahoe Regional Planning Agency,
520 U.S. 725 (1997) .......................................... 18

Tchakarski v. United States,
69 Fed. Cl. 218 (2005) .......................................... 14

Tech Systems, Inc. v. United States,
50 Fed. Cl. 216 (2001) .......................................... 25

Texas v. United States,
523 U.S. 296 (1998) .......................................... 18

United States v. Clark,
333 F. Supp. 2d 789 (E.D. Wis. 2004) .......................................... 37

Vessels v. Sec'y of Dep't of Health & Human Serv.,
65 Fed. Cl. 563 (2005) .......................................... 15

Washington State Dep't of Serv. for the Blind v. United States,
58 Fed. Cl. 781 (2003) . . . . . . . . . . 15, 16

**STATUTES AND REGULATIONS**

5 C.F.R. 2637.101(a) . . . . . . . . . . 26

5 C.F.R. § 2637.201(c)(1) . . . . . . . . . . 31, 37

5 C.F.R. § 2640.103(a)(1) . . . . . . . . . . 31, 37

5 C.F.R. § 2640.102(l)-(m) . . . . . . . . . . 31, 37

5 C.F.R.§ 2635.402(b)(3) . . . . . . . . . . 31, 37

48 C.F.R. 1.602-2 . . . . . . . . . . 26, 30

72 Fed. Reg. 41339 (July 27, 2007) . . . . . . . . . . 7

72 Fed. Reg. 65049 (Nov. 9, 2007) . . . . . . . . . . 7, 8, 9, 10

18 U.S.C. 207 . . . . . . . . . . passim

28 U.S.C. 1491(b)(1) . . . . . . . . . . passim

28 U.S.C. 1491(b)(2) . . . . . . . . . . 14

28 U.S.C. §§ 2201-2202 . . . . . . . . . . 14

42 U.S.C. § 201 . . . . . . . . . . 4, 5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE CNA CORPORATION, | ) | |
| | ) | No. 08-249C |
| Plaintiff, | ) | |
| | ) | (Judge Horn) |
| v. | ) | |
| | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS AND, IN THE ALTERNATIVE, FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Defendant, the United States, respectfully requests this Court to dismiss plaintiff's complaint, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), for lack of subject matter jurisdiction. In the alternative, pursuant to RCFC 52.1, we respectfully request this Court to grant judgment upon the administrative record to the United States. In support of our motion, we rely upon plaintiff's complaint (including the exhibits attached thereto), our brief, and the attached exhibits.

**DEFENDANT'S BRIEF**

QUESTIONS PRESENTED

1. Whether plaintiff's pre-award bid protest should be dismissed for lack of subject matter jurisdiction because: (a) plaintiff does not state a cause of action under 28 U.S.C. § 1491(b)(1); or (b) plaintiff is not an interested party under that statute; or (c) there is no final agency action that is ripe for this Court's consideration.

2. Whether a contracting officer has broad authority and discretion under FAR 1.602-2 to exclude an offeror from a procurement based upon a possible future violation of a criminal Government ethics statute that is committed to the sound discretion of an agency to enforce.

3. Whether the contracting officer in this case may rely upon the reasonable recommendation and advice of counsel contained in a March 18, 2008 memorandum from the Designated Agency Ethics Official for the Department of Health and Human Services ("HHS") to preclude plaintiff from using a particular principal investigator in response to a National Institutes of Health ("NIH") request for proposals ("RFP").

4. Whether this Court lacks the power to direct the government to award a contract to plaintiff.

5. Whether this Court lacks the power to issue a declaratory judgment that Dr. Sarah Friedman is not barred from working as a principal investigator for plaintiff on any National Children's Study contract.

STATEMENT OF THE CASE

Pursuant to both this Court's January 3, 2008 order and its January 7, 2008 judgment in CNA Corp. v. United States (Fed. Cl. No. 07-858C), NIH reconsidered its ethics decision with respect to Dr. Sarah Friedman's eligibility to serve as a principal investigator for a study center to collect data for the National Children's Study ("NCS"). In particular, on March 18, 2008, Mr. Edgar M. Swindell – the Associate General Counsel for Ethics and the Designated Agency Ethics Official ("DAEO") for HHS – provided the contracting officer with a memorandum of opinion, explaining that Dr. Friedman was ineligible to serve as a principal investigator for a

study center contract awarded under the 2007 request for proposals ("2007 RFP") that was the subject of plaintiff The CNA Corp.'s ("CNAC") first bid protest. See Exhibit 1 (March 18, 2008 Ethics Memorandum from Mr. Swindell to Ms. E. Osinksi, Contracting Officer) (hereinafter "Ethics Memorandum") (A2-16).[1]

The contracting officer, in turn, affirmed her "decision to act under FAR 1.602-2 by excluding CNAC from consideration under the 2007 RFP." See Exhibit 29 (March 19, 2008 Letter from Contracting Officer to CNAC) (A2293-94). The contracting officer, however, explained that she did "not make a determination as to whether or not CNAC would be ineligible for award pursuant to the 2008 RFP" and that "CNAC is not excluded from submitting a proposal in response to the 2008 RFP." Id. Also, on March 19, 2008, NIH issued Request for Proposals No. NIH-NICHD-NCS-08-21E (the "2008 RFP"), soliciting proposals for additional NCS study centers, including one for Montgomery County, Maryland. Pl. Compl. at ¶¶ 1, 35 (noting that "[p]roposals responding to the 2008 RFP are to be submitted on May 2, 2008").

On April 8, 2008, CNAC filed the above-captioned case, purporting to challenge the March 18, 2008 Ethics Memorandum and the contracting officer's aforementioned March 19, 2008 letter. CNAC's complaint in this case, however, should be dismissed because: (1) the complaint fails to state a bid protest claim within this Court's jurisdiction under 28 U.S.C. § 1491(b)(1); (2) CNAC is not an "interested party" under that statute; and (3) CNAC fails to challenge final agency action, and thus does not present a ripe dispute for judicial review.

[1] The exhibits contained in the appendix to this brief have been consecutively paginated. "A_" refers to a specific appendix page number.

Moreover, even if CNAC's complaint states a claim within this Court's jurisdiction, a contracting officer's decision pursuant to FAR 1.602-2 is entitled to great deference. Accordingly, in this case, the United States is entitled to judgment upon the administrative record because the contracting officer's reliance on the Ethics Memorandum, and her related decision to exclude CNAC from the 2007 procurement, was rational and should not be second-guessed by this Court.

## STATEMENT OF FACTS

### I. The National Children's Study

The Children's Health Act of 2000, 42 U.S.C. § 201, authorized and directed a consortium of Federal agencies – led by the National Institute of Child Health and Human Development ("NICHD") in partnership with the Centers for Disease Control and Prevention ("CDC"), the Environmental Protection Agency ("EPA"), and the National Institute of Environmental Health Sciences ("NIEHS") – to plan and conduct a large, longitudinal study of the effect of various environmental factors on child health and development.[2] See Exhibit 2 (NCS Funding and Legislation Home Page) (A19). Following a feasibility assessment, concept clearance was granted for the NCS, as a whole, in March 2004. See Exhibit 3 (March 18, 2004 Concept Clearance) (A21); Exhibit 4 (January 3, 2007 Memorandum Re: Waiver of Concept Clearance for NCS Study Centers) (A63). Ultimately, the NCS will involve a nationally representative sample of approximately 100,000 children. See Exhibit 5 (Growing Up Healthy: An Overview of the National Children's Study) (A119, A167); Exhibit 6 (National Children's

[2] By Act of Congress (Public Law 110-154), the NICHD was recently renamed the Eunice Kennedy Shriver National Institute of Child Health and Human Development.

Study Research Plan ("Research Plan") (A246).

For purposes of the NCS, environmental factors are defined broadly to include biological, chemical, physical, behavioral, social, cultural, geographical, and educational factors. See Exhibit 7 (www.nationalchildrensstudy.gov web page) (A471). The goal of the NCS is to provide information leading to improvements in the health and development of children. Id.

The Interagency Coordinating Committee was established in 2000 to guide the planning and implementation of the NCS, and is comprised of Federal employees from the NICHD and the other lead agencies. See Exhibit 8 (National Children's Study E-Update, January 2008) (A473). The NICHD program office, working with a chartered Federal advisory committee, 22 working groups comprised of over 200 scientists, and more than 2500 people interested in the design, conduct, and results of the NCS, provided input during the planning phase. See Exhibit 9 (November 29, 2005 Presentation of NCS Director) (A487); Exhibit 10 (December 1, 2004 Briefing for Pre-proposal Conference) (A531).

Based upon the advice of experts in study design and sampling, and the recommendations of the NCS Advisory Committee, the Government decided that the NCS would be conducted using a national probability sample of all births in the United States to ensure that children across the nation are fairly represented in the study. See Exhibit 11 (2007 RFP, Statement of Work, Attachment 3) (A666); Exhibit 12 (National Children's Study E-Update, November 2004) (A715); Exhibit 13 (National Children's Study E-Update, July 2004) (A721).

In 2004, the first stage of sampling was completed with the selection of 105 geographic locations (the "Study Locations"), corresponding to counties or, in sparsely populated areas, contiguous counties, in the United States, from which the NCS participants would be drawn. See

Exhibit 11 (A666); Exhibit 6 (A247-249). This national multistage probability sample of births in the United States was determined to be the best design in light of the following goals: (1) the collection of high quality, objective data to minimize measurement biases; (2) avoidance of selection biases and other biases that could lead to invalid references concerning exposure and outcome relations; (3) ability to capture the diversity of the population of the United States such that both the range and diversity of exposures and outcomes are represented; and (4) ability to generalize the results of the NCS to the population of the United States. Id.

## II. The Role of the Study Center Principal Investigator

Although the NCS study center contracts are described as contracts for the collection of data, the study design (or Research Plan) and the various NCS RFPs expressly provide that study centers will work collaboratively with the NCS Project Officer(s), the NCS-Coordinating Center, and other participating study centers to determine and finalize protocols, schedules, and methods the study centers will employ, and will collaborate in relation to the data analysis and publication of NCS findings and conclusions. See Exhibit 11 (A667); Exhibit 6 (A242-43). Specifically, the key personnel of each study center – defined to include the principal investigator and the study coordinator or operational manager – are required to meet with the Project Officer(s) and staff of the NCS Coordinating Center at regular intervals, and each study center is represented on the NCS Steering Committee. See Exhibit 11 (A594, A666-69)

In order to take advantage of scientific advancements that will occur during the NCS – the duration of which is expected to exceed 20 years – and to ensure that the study can adapt to accommodate new hypotheses and measurement tools, the principal investigators for each of the study centers also serve on the NCS Steering Committee, along with officials from the NICHD

program office, the NCS-Coordinating Center, and the Interagency Coordinating Committee. See id.; Exhibit 6 (A242-43). Thus, in the course of the NCS study center contracts, program officials have discussed, and will continue to discuss, scientific matters that are controversial, sensitive, and/or that have financial implications for the study centers and their key personnel. See Exhibit 14 (Declaration of Dr. Peter C. Scheidt, M.D., M.P.H., Director, NCS), at ¶ 2. Moreover, program officials and the key personnel of the study centers must be able to freely interact and collaborate on matters involving design, planning, management, and budget over a period of more than 20 years in order to fully and effectively implement the large and complex NCS in accordance with the NCS statutory mandate. Id.

III. Dr. Friedman's Role in the Development of the NCS

The schedule of data collections, measurements, and research tools to be employed during the pre-conception through two years-of-age phase of the NCS was substantially completed in 2007, subject to peer review and approval from the Office of Management and Budget under the Paperwork Reduction Act. See Exhibit 15 (Proposed NCS 2007 Research Plan, 72 Fed. Reg. 41339 (July 27, 2007)) (A728); Exhibit 16 (Notice of Proposed Collection, 72 Fed. Reg. 65049 (Nov. 9, 2007)) (A731). In particular, decisions regarding the measurements and tools that would be used to assess neuro- and psychosocial development were made in 2006. See Exhibit 17 (Agenda, Minutes, & Presentation, Federal Advisory Committee Meeting, May 31, 2006) (A748-750; A778-82).

Dr. Friedman is an expert in the field of early childhood development and was employed at the NICHD for more than 15 years. See Exhibit 18 (May 8, 2006 CNAC Press Release) (A784); Exhibit 19 (CNAC description of REL Appalachia Staff and Organization) (A786-87).

In 2005, the NCS Project Officer(s) selected Dr. Friedman, based upon her experience and expertise, to lead the NCS protocol development team tasked with evaluating available research tools designed to measure cognitive, neurobehavioral, educational, psychological, motor, sensory, and social development for use in the NCS. See Exhibit 14; Exhibit 20 (Minutes of NCS Neurodevelopmental Team Meetings (various dates from Oct. 26, 2005 - Feb. 15, 2006)) (A791). The relative quality of Dr. Friedman's development team's work product in the form of recommendations that she presented to the NCS Steering Committee – a group comprised of the already identified study center principal investigators, and NICHD and other government officials – depended upon the careful and deliberate consideration of scientific literature and other available information, in addition to the exercise of sound judgment and the analysis of relevant scientific issues. Id. Dr. Friedman and her team were tasked and trusted to evaluate the state of the science and to make recommendations based upon their sound analysis and judgment. Id. Their work and discussions generated over 100 e-mail exchanges discussing the relative merits of various tools and approaches. See Exhibit 21 (various e-mail exchanges plus attachments) (e.g., A877-78 (describing neurodevelopmental team accomplishments); A928; A1173-75; A1205)

The importance of scientific analysis during the development of protocols for a study of the magnitude of the NCS cannot be overstated. See Exhibit 14. Decisions made regarding how and what to measure can and will affect not only the ultimate validity and reliability of the data collected and analyzed, but also, accordingly, whether the NCS statutory mandate is satisfied. Id. NCS data analysis will occur in relation to each developmental phase of childhood and longitudinally. Id. Hence, the analysis of data in the context of later developmental phases will

necessarily be dependent upon data collected in early phases. Id.

Between October 26, 2005 and February 15, 2006, the team held 20 meetings in just 76 business days. See Exhibit 20. As of the December 12, 2005 meeting, the six-member team was joined by four principal investigators from contractor study centers following the FY2005 NCS contract awards. This group carefully considered, scrutinized, and debated the relative merits and utility of at least 60 different measurement tools during this period. Id. The group contacted inventors and authors wherever necessary, based upon the following criteria: (1) soundness of psychometric properties including internal consistency, test-retest reliability, concurrent/construct and predictive validity; (2) logistical feasibility (time, burden) within a large-scale multi-site study involving testing in the home; (3) relative ease of administration and scoring; (4) sensitivity to both individual variations in normal samples and clinically-relevant groups; (5) lack of bias against low-income, minority, or cultural groups; and (6) existence of comparable measures in the same domains for data collection at later ages. See Exhibit 22 (January 12, 2006 Presentation of Neurodevelopmental Team to NCS Steering Committee) (A2090).

A number of recommendations emerged from these meetings. Indeed, by the time Dr. Friedman presented the work of her team to the Steering Committee on January 12, 2006, she presented a recommended schedule for the use of eleven selected measurement scales and tools to collect data relevant to ten developmental outcomes (to be employed at various points during the first 18 months of life), and indicated that measures addressing three additional outcomes were still being discussed. See Exhibit 22 (A2088-2104).

IV. The Procurements

On November 16, 2004, the implementation phase of the NCS began with the publication of the RFP for the fiscal year 2005 procurement, and the release of the Study Plan and the list of Study Locations. See Exhibit 23 (2004 RFP) (A2106); Exhibit 12 (A715-16). The 2004 RFP solicited proposals for eight Study Locations: Orange County, CA; Orange County, FL; Lincoln, Pipestone, and Yellow Medicine Counties, MN; Duplin County, NC; New York City (Queens), NY; Montgomery County, PA; Salt Lake County, UT; and Waukesha County, WI. See Exhibit 23 (A2245-46). The RFP indicated that study centers covering other Study Locations would be identified through subsequent solicitations. Id. (A2152). Contracts for the collection of data in seven of the 105 Study Locations were awarded as a result of the fiscal year 2005 procurement. See Exhibit 25 (National Children's Study E-Update, September 2005) (A2260). Proposals in response to that RFP were due on or before February 16, 2005. See Exhibit 23 (A2106).

According to CNAC, Dr. Friedman was employed at NIH's NICHD until March 2006, and was tasked, from October 2005 until February 16, 2006, to lead a team of scientists developing recommendations regarding the neurodevelopmental and social environment assessments in the NCS study for the period between birth and eighteen months of age. See Pl. Compl. at ¶ 16-17. Agency e-mail records reflect that her work as the team leader of the workgroup continued through at least March 19, 2006. See Exhibit 24 (March 19, 2006 e-mail from Dr. Friedman to Dr. Scheidt) (A2255).

There were thirteen inquiries in calendar year 2005 from universities, medical facilities and practices, and county health administrators requesting information on eligibility requirements and/or the steps necessary to become a study center for Study Locations other than

the eight included in the fiscal year 2005 RFP. See Exhibit 26 (various expressions of interest) (A2264-2285). These expressions of interest came either before or during Dr. Friedman's work to develop the nuerodevelopmental protocol. Indeed, three of these expressions of interest came from entities within the census region that includes the State of Maryland.[3] Id.; see also Exhibit 10 (A525).

On March 1, 2007, the agency issued the 2007 RFP. See Exhibit 11 (A587). The 2007 RFP solicited proposals for study centers covering all remaining Study Locations. Id. (Section J, Attachment 3, Statement of Work, at 1). Pursuant to that RFP, contracts were awarded for 22 new study centers for the collection of data in 26 additional locales. See Exhibit 28 (National Children's Study E-Update, October 2007) (A2290). CNA submitted a proposal, in response to the 2007 RFP, to serve as the study center for Montgomery County, Maryland. See Pl. Compl. at ¶¶ 14-16. Although the proposal submitted by CNA was included in the competitive range, CNA did not receive an award because the agency determined, in September 2007, that Dr. Friedman could not serve as a study center principal investigator due to the role she played in the development of the NCS, and in light of the role she would be required to undertake as a study center principal investigator. See Exhibit 30 (Notification of Award) (A2296-98). On December 5, 2007, CNAC filed its first bid protest challenging NIH's failure to award CNAC a

---

[3] Information provided in 2005 by the contracting office to those seeking information indicates that, in relation to future procurements, successful offerors would be located within the same census region as the Study Location(s) for which they would serve as study center. Hence, any of these three entities that expressed interest could have submitted proposals to serve as a study center for any Study Location in the relevant census region – including, e.g., Baltimore County or Montgomery County, Maryland – or otherwise be a partner organization involved in a successful proposal for those counties. See Exhibit 27 (January 3, 2005 e-mail from Contracting Officer Virginia DeSeau to Drs. Salafia and Adair) (A2287-88).

study center contract for Montgomery County, Maryland pursuant to the 2007 RFP.

On January 3, 2008, the Court issued an order vacating the agency's decision to exclude CNAC from the 2007 study center procurement. The Court ordered, however, only partial injunctive relief and did not enjoin the agency from proceeding with any of its awards pursuant to the 2007 RFP. See Pl. Compl. at ¶ 27. Rather, the Court ordered only that the "agency shall pursue a reconsideration of the ethics decision" challenged in CNAC's bid protest. See January 7, 2008 Judgement; Pl. Compl. at ¶ 29.

On March 18, 2008, the agency completed its reconsideration of its previous ethics decision that was rendered only with respect to CNAC's proposal submitted pursuant to the 2007 RFP. See Exhibit 1 (A2). On March 19, 2008, the contracting officer notified CNAC that she was affirming the agency's original decision – again, only with respect to the 2007 RFP – to exclude CNAC based on its proposal to employ Dr. Friedman as its study center's principal investigator. See Exhibit 29 (A2293-94).

On March 19, 2008, NIH issued the 2008 RFP, soliciting proposals for additional NCS study centers, including one for Montgomery County, Maryland. Pl. Compl at ¶¶ 1, 35 (noting that "[p]roposals responding to the 2008 RFP are to be submitted on May 2, 2008"). On April 8, 2008, CNAC filed its complaint in the above-captioned case, purporting to challenge both the contracting officer's aforementioned March 19, 2008 reconsideration decision, and the agency's accompanying March 18, 2008 Ethics Memorandum.

## SUMMARY OF THE ARGUMENT

In order for CNAC to demonstrate that this Court possesses jurisdiction to entertain CNAC's bid protest, CNAC must identify an agency action reviewable by this Court under 28 U.S.C. § 1491(b)(1). In this case, the only possibly relevant agency action is the agency's decision to exclude CNAC from a procurement pursuant to FAR 1.602-2. However, while the agency excluded CNAC from an award under the 2007 RFP, the agency has not excluded CNAC from award under any pending RFP. For that reason alone, this case should be dismissed.

Moreover, CNAC has failed to demonstrate either that it is an "interested party" under 28 U.S.C. § 1491(b)(1) or that its bid protest is ripe for judicial review. CNAC's case must be dismissed upon these grounds as well.

In the alternative, this Court should enter judgment upon the administrative record in favor of the United States because FAR 1.602-2 provides government agencies with wide latitude in excluding offerors based upon possible, future violations of criminal, Government ethics statutes, and because CNAC cannot demonstrate that any such decision was irrational.

## ARGUMENT

### I. This Court Should Dismiss CNAC's "Bid Protest" Because There Is No Agency Action To Challenge Under 28 U.S.C. § 1491(b)(1)

Pursuant to RCFC 12(b)(1), this Court should dismiss CNAC's complaint because it fails to challenge any agency action pursuant to 28 U.S.C. § 1491(b)(1). Moreover, CNAC has not alleged facts, let alone demonstrated, that it is an "interested party" under that statute. At best, CNAC's complaint constitutes a challenge to non-final agency action, and, thus, in any event, is not ripe for judicial review and should be dismissed.

A. CNAC Does Not Assert A Cause Of Action Under 28 U.S.C. § 1491(b)(1) And Is Not An Interested Party Under That Statute

We begin by noting that this Court "does not have jurisdiction under the Declaratory Judgment Act." Tchakarski v. United States, 69 Fed. Cl. 218, 221 (2005) (discussing 28 U.S.C. §§ 2201-2202, and citing Nat'l Air Traffic Controllers Ass'n v. United States, 160 F.3d 714, 717 (Fed. Cir. 1998), for the proposition that "Congress did not intend for the Declaratory Judgment Act to extend the jurisdiction of the United States Court of Federal Claims"). Moreover, "[t]he Federal Circuit . . . has held that the CFC 'lacks APA jurisdiction.'" Colorado Dept. of Human Services v. United States, 74 Fed.Cl. 339, 347 (2006) (quoting Martinez v. United States, 333 F.3d 1295, 1313 (Fed. Cir.2003) (en banc)). Thus, although 28 U.S.C. § 1491(b)(2) "gives the Court of Federal Claims discretion in fashioning relief," PGBA v. United States, 389 F.3d 1219, 1225 (Fed. Cir. 2004), including the power to issue declaratory and injunctive relief, this Court only possesses jurisdiction over the types of bid protest actions enumerated in 28 U.S.C. § 1491(b)(1).[4]

Accordingly, for this Court to have jurisdiction, CNAC's "action" must "object[]" to: (1) "a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award"; or (2) "the award of a contract"; or (3) "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." See 28 U.S.C. § 1491(b)(1). In this case, CNAC objects neither to "a solicitation" nor "to a proposed award." Id. Nor, for that matter, does CNAC object to an "award of a contract." Id. CNAC thus must

[4] 28 U.S.C. § 1491(b)(2) permits the Court of Federal Claims to issue declaratory or injunctive relief only "in such an action" identified in § 1491(b)(1). See 28 U.S.C. § 1491(b)(2) ("To afford relief in such an action, the courts may award any relief that the court considers proper . . .")

argue that it is objecting to an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Id.

CNAC, however, does not do so. Instead, CNAC "seeks this Court's review of the merits of NIH's [March 19, 2008] Disqualification Letter (including the accompanying ethics opinion) and a determination by the Court that the Disqualification Letter (including the accompanying ethics opinion) is arbitrary and capricious." Pl. Compl. at ¶ 5; see also id. at ¶ 56 ("NIH has failed to conduct a proper ethics evaluation of Dr. Friedman and its failure to do so has severely penalized CNAC . . . by impeding its ability to compete for award under the 2008 RFP"). Nowhere in its complaint, however, does CNAC identify "an alleged violation of statute or regulation." CNAC cannot seek a review of the merits of NIH's letter or ethics decision in a vacuum under the mistaken assumption that this Court has broad authority under the APA to review agency action generally. Yet, that is precisely what CNAC attempts to do here. See Pl. Mot. for P.I. at 21.

In support of its position, CNAC relies upon Red River Serv. Corp. v. United States, 60 Fed. Cl. 532 (2004). See April 9, 2008 Hearing Tr. at 9:15-22; 10:1-4. However, Red River is inapposite and provides no support for CNAC's assertion that this Court has jurisdiction over CNAC's complaint here. In Red River, this Court held only that a plaintiff, to demonstrate that it is an "interested party," should not be required to establish prejudice in the same manner as ordinarily required in a post-award context. 60 Fed. Cl. at 538-39.[5] However, the plaintiff in

[5] The decision of one judge of the Court of Federal Claims is not binding upon another judge. See Vessels v. Sec'y of Dep't of Health & Human Serv., 65 Fed. Cl. 563, 569 (2005). Furthermore, other judges have applied the "substantial chance" test in the pre-award context. See, e.g., Asia Pacific Airlines v. United States, 68 Fed. Cl. 8 (2005); Washington State Dep't of Serv. for the Blind v. United States, 58 Fed. Cl. 781 (2003).

that case objected to a provision in "a solicitation by a Federal agency" as being contrary to law, something CNAC has not done here. See id. at 537-38 (emphasis omitted) (holding that court has jurisdiction over a "Contracting Officer's NAICS Code selection"); id. at 545 ("CO's selection of NAICS Code . . . did not comply with 48 C.F.R. § 19.102(b)(1)").

The reason given for not applying the usual "substantial chance" test in Red River was that, at the pre-award stage, plaintiff would not know the qualifications of the other bidders, and would therefore not know if his offer would be in the "zone of active consideration." Red River, 60 Fed. Cl. at 539. The court also stated that the "substantial chance" test should not apply because a rule requiring comparable industry experience or prior Government contracting experience would preclude a new entrant from being able to assert a protest. Id. As to the first point, perhaps CNAC would not know the qualifications of other bidders, but CNAC would know of its own qualifications and could compare those qualifications to the requirements of the solicitation to determine whether it has a substantial chance of being awarded the contract.

As to the second point, prior experience may be a factor in determining standing, but it is not the only factor. For example, the court may also look at plaintiff's available resources to determine if he would have a substantial chance of being awarded the contract. Accordingly, the "substantial chance" test does not preclude new entrants from asserting protests. Therefore, the Court should apply the "substantial chance" test to determine CNAC's standing as an "interested party" to bring this protest. Indeed, with respect to CNAC's available resources, CNAC concedes that it "has lost several of its original team members, who have joined CNAC's competitors or formed their own teams." Pl. Compl. at ¶ 5; see also Pl. Mot. for P.I. at 4. Thus, it remains unclear whether CNAC is in a position to submit a proposal for the pending RFP.

Finally, in Scott v. United States, 78 Fed. Cl. 151, 154 (2007), this Court rejected the standing analysis first articulated in Red River. In particular, this Court in Scott held that "the Federal Circuit has not articulated any difference in standing for protests initiated pre-award versus post-award" and thus "[t]he governing precedent thus requires plaintiff to establish that he is an interested party by demonstrating that he is an actual or prospective bidder with a direct economic interest in the procurement." 78 Fed. Cl. at 154 ("To prove direct economic interest, the burden is plaintiff's to establish that he was prejudiced by showing that he "had a 'substantial chance' of receiving the contract."). In any event, plaintiff's motion for a preliminary injunction acknowledges that the applicable standard in this case is the one articulated in Scott. See Pl. Mot. for P.I. at 5 (quoting Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).

CNAC's action does not fall within any category of 28 U.S.C. § 1491. It does not object to terms of the 2008 RFP. It does not object to an award or a proposed award of a contract pursuant to the 2008 RFP. And, it does not identify any alleged violation of statute or regulation. Accordingly, CNAC has failed to allege any cause of action under 28 U.S.C. § 1491(b)(1), and to demonstrate that it is an "interested party" as defined by that statute. Accordingly, this Court should dismiss CNAC's complaint.

B. In Any Event, Because The Agency Has Not Excluded CNAC From Submitting A Proposal In Response To The 2008 RFP, There Is No Dispute Ripe For This Court's Review

CNAC has not submitted a proposal in response to the NCS 2008 RFP, despite having been invited to do so. In that regard, and as explained in more detail below, no final agency decision has been made with respect to CNAC's eligibility to receive a contract award pursuant to that RFP, should CNAC submit a proposal with Dr. Friedman as the company's principal

investigator. Here, because there has been no agency action that precludes CNAC from submitting a proposal pursuant to the 2008 RFP, and because it remains unclear whether CNAC is in a position to submit a proposal, with or without Dr. Friedman, CNAC's claim is not ripe for review. Therefore, this Court lacks subject matter jurisdiction to adjudicate the dispute. Beekwilder v. United States, 55 Fed. Cl. 54, 60 (2002) (citing, amongst other cases, Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, 735 (1997), and explaining that "[a] plaintiff's failure to present a ripe dispute is a defect that goes to the heart of the court's jurisdiction to hear the claim"). "It is the plaintiff's burden, as the party seeking relief under the power of the court, to establish the court's jurisdiction." Id.

Ripeness considerations apply to bid protest actions. See Bannum, Inc. v. United States, 56 Fed. Cl. 453, 462 (2003) ("A claim is not ripe 'if it is premised upon contingent future events that may occur as anticipated, or indeed may not occur at all.' Texas v. United States, 523 U.S. 296, 300 (1998). If a claim is not ripe, the court does not have jurisdiction to hear the case, and it must be dismissed without prejudice."). "Generally, an agency decision is not ripe for judicial review until the allegedly offending agency has adopted a final decision." NSK Ltd. v. United States, 510 F.3d 1375, 1384-85 (Fed. Cir. 2007) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)). "[I]n order to be a final decision, and therefore ripe for judicial review, (1) there must be an agency action that marks 'the consummation of the agency's decisionmaking process,' i.e., it must not be merely tentative or interlocutory, and (2) ' the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" NSK, 510 F.3d at 1385 (quoting Bennett v. Spear, 520 U.S. 154, 177 (1997)).

The March 18, 2008 Ethics Memorandum and the March 19, 2008 letter from the contracting officer – the putative agency "action" about which CNAC complains – are both moot, as those documents related solely to the 2007 RFP, and do not constitute a final agency decision with respect to the 2008 RFP. Indeed, as the contracting officer clearly communicated to CNAC, the agency has made no final determination with respect to Dr. Friedman's eligibility to participate as a principal investigator on a contract awarded pursuant to the 2008 RFP. Although the contracting officer did indicate that she anticipated making a similar determination with respect to Dr. Friedman's eligibility, the contracting officer explained to CNAC: (1) that the agency has "not made a determination as to whether or not … CNAC would be ineligible for award pursuant to the 2008 RFP"; and (2) that "CNAC is not excluded from submitting a proposal in response to the 2008 RFP." See Exhibit 29 (A2293-94). Thus, the contracting officer agreed that the agency "would consider any information or argument that CNAC submitted with its proposal bearing on Dr. Friedman's eligibility." Id.

Despite both the agency's express statement that no determination has been made with respect to the 2008 RFP, and its willingness to consider "information and argument" with respect to Dr. Friedman's eligibility, CNAC incorrectly has concluded that the agency has issued a final decision with respect to the 2008 RFP. Indeed, the contracting officer's statements are consistent with the negotiation process contemplated in the FAR:

> Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract. When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.

FAR 15.306(d) (emphasis added). In addition, the FAR explains that "[a]t a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3).

The purpose of the contracting officer's March 19, 2008 letter to CNAC was to communicate the agency's reconsideration of its ethics decision regarding the 2007 RFP. CNAC's misperceptions aside, the contracting officer did not make any determination with respect to the 2008 RFP, and, indeed, invited CNAC to submit a proposal with additional factual information and legal argument for the agency to consider. The March 19, 2008 letter, at most, was aimed, not at disqualifying CNAC or its preferred principal investigator from the procurement, but rather at directing CNAC to the FAR negotiation process, which is the appropriate process by which the agency and CNAC should address any ethics issue. Thus, rather than making a judgment on the potential ethics issue at this time, the agency communicated its concerns to CNAC at the early stage of the pending procurement, so that CNAC would have an opportunity to address any ethics issue in its initial proposal.

The contracting officer's letter in this case is thus virtually identical to the administrative complaint at issue in Federal Trade Comm'n v. Standard Oil Co., 449 U.S. 232 (1980). In that case, the Supreme Court held an FTC administrative complaint did not constitute final agency action that was subject to judicial review. Id. Although the Supreme Court began by noting that it previously had permitted a challenge to certain regulations issued by the Commissioner of Food and Drugs as constituting final agency action, see 449 U.S. at 239 (discussing Abbott Labs. v. Gardner, 387 U.S. 136 (1967)), the Supreme Court did so because those "regulations were

'definitive' statements of the Commission's position" and because "[t]hey had 'the status of law' and 'immediate compliance with their terms was expected.'" 449 U.S. at 239 (387 U.S. at 151-53). In Standard Oil Co., however, the Court held that an FTC administrative complaint did not represent "a definitive statement of position." 449 U.S. at 241. In so holding, the Court commented that, "[t]o be sure, the issuance of the complaint is definitive on the question whether the Commission avers reason to believe that the respondent to the complaint is violating the [Federal Trade Commission] Act." Id. However, because Standard Oil was permitted to challenge the complaint and its charges "proves that the averment of reason to believe is not 'definitive' in a comparable manner to the regulations in Abbot Laboratories." Id.

Moreover, although the plaintiff in Standard Oil argued that it would be "irreparably harmed unless the issuance of the complaint is judicially reviewed immediately" in that "the expense and disruption of defending itself in protracted adjudicatory proceedings constitutes irreparable harm[,]" id. at 244, the Court rejected that contention outright, holding that "'[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.'" Id. (quoting Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 24 (1974)).

Likewise, in American Land Title Association v. Clarke, 743 F. Supp. 491 (W.D. Tex. 1989), plaintiffs sued the Comptroller of the Currency and the Office of the Comptroller of the Currency (OCC), challenging two interpretive letters issued by agency. 743 F. Supp. at 492. In particular, plaintiffs sought a declaratory judgment that the interpretive letters in question were "null and avoid because they were issued in excess of statutory authority and without observance of procedure required by law, and otherwise are arbitrary and capricious." Id. In holding that plaintiffs' suit was not ripe, the district court explained the interpretive letters "more closely

resemble the FTC's threshold complaint than the FDA's immediately enforceable regulations" and that "[t]he Letters do not represent a definitive statement of the OCC's position as they were written by subordinate officials in response to hypothetical questions, and do not have the status of law as they do not 'impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process.'" 743 F. Supp. at 494 (quoting Air California v. United States Transportation, 654 F.2d 616, 621 (9th Cir. 1981)); see also 743 F. Supp. at 495 (noting "OCC has stated its willingness to reconsider the matters addressed in Letter No. 368").

Finally, in Robishaw Engineering, Inc. v. United States, 891 F. Supp. 1134, 1151 (E.D. Va. 1995), the district court held there was no final agency action where the Army "explicitly solicited reaction and submission of further information from Robishaw." The district court also held plaintiff's claim was unripe. 891 F. Supp. at 1152. The plaintiff contended "that the Army's claim to have a royalty-free patent license is preventing it from negotiating and selling a patent license to the Army, and is creating a 'cloud' that diminishes the patents' market value." Id. The district court rejected that argument, noting that such "harms do not affect Robishaw's day-to-day business" and that "[t]he Army's claim to a non-exclusive license does not impose any affirmative duty or burden of compliance on Robishaw." Id.

Nor will CNA be able to demonstrate that submitting a proposal and additional information would be futile. "Clear evidence of futility of exhausting potential administrative relief is part of the plaintiff's burden." Beekwilder v. United States, 55 Fed. Cl. 54, 61 (2002). For example, in a takings case, plaintiffs argued that an Army Corps' letter "effectively denie[d] their application [to dredge and fill certain wetlands] or clearly demonstrates the futility of completing the process at this time." Pax Christi Memorial Gardens, Inc. v. United States, 52

Fed. Cl. 318, 325 (2002). This Court rejected plaintiffs' argument, noting that there was "nothing in [that] letter to suggest that the Corps has made up its mind not to give fair consideration to all issues." Id. Indeed, the Court rejected plaintiffs' claim of futility because they failed to "present[] any evidence to show that the Corps' request for information in July 1997 was simply pro forma." Id. at 326.

In that regard, the Court concluded that it "must presume that the government will act in good faith." Id. (quoting Am Pro Protective Agency, Inc. v. United States, 281 F.3d 1234 (Fed. Cir. 2002), for the proposition that "there is a 'high evidentiary burden of proof needed to overcome the presumption that government officials act properly and in good faith'"). In so holding, this Court distinguished other takings cases in which "the permitting authority ha[d] no authority to issue any permit for the proposed use." Id. In contrast, the agency in Pax Christi had "the discretion to allow plaintiffs to use a portion of the" land as plaintiffs sought. Accordingly, this Court concluded that "the plaintiff's contention that the Corps effectively denied the permit in July 1997, or that completing the process would be futile, must be rejected." Id. (dismissing plaintiffs' claims as "not ripe").

Similarly, in Bay-Houston Towing Co., Inc. v. United States, 58 Fed. Cl. 462 (2003), the plaintiff also argued that its permanent takings claim was ripe because pursuing further permitting requests with the agency would be futile. 58 Fed. Cl. at 465. In particular, plaintiff argued that agency comments "strongly suggest that the Corps would not permit any further mining" in the manner sought by plaintiff. Id. This Court disagreed, noting that "[w]e are not, however, able or obligated to read defendant's mind." Id.; see also Greenbrier v. United States, 193 F.3d 1348, 1359 (Fed. Cir. 1999) ("The failure to follow all applicable administrative

procedures can only be excused in the limited circumstance in which the administrative entity has no discretion regarding the regulations' applicability and its only option is enforcement.").

In this case, the agency's predictive comment to CNAC – i.e., that the agency would look to its ethics decision regarding the 2007 RFP with respect to future such determinations – is unremarkable. Indeed, the only unique aspect of that statement is that CNAC now has more information in its possession than any of its potential competitors regarding the possible status of a particular investigator. We note, in that regard, that CNAC has not submitted any additional documentation or information to the agency for its consideration. Finally, the contracting officer cannot rely on the March 18, 2008 Ethics Memorandum because, by its very terms, with respect to the 2008 RFP, the memorandum explains that it would be "premature for [the Office of General Counsel (OGC)] to opine definitively [on the 2008 RFP] in light of OMB's current consideration of the draft OGE final rule implementing section 207." Exhibit 1 (A13).

In sum, because CNAC has not submitted a proposal in response to the 2008 RFP, has not sought to provide the agency with any additional information with respect to Dr. Friedman, has failed to challenge any final agency action, and cannot demonstrate that pursuing further discussions and negotiations with the agency would be futile, CNAC's bid protest claims are not ripe, and should be dismissed for lack of jurisdiction. Where, as here,"several contingencies separate [plaintiff] from a threat of final agency action in this case," CNA's claim in this case cannot be ripe. Charter FSB v. Office of Thrift Supervision, 976 F.2d 203, 209 (4th Cir. 1992) (citing 10A Wright & Miller, Federal Practice and Procedure § 2757, at 586-87 (3d ed. 1983)).

II. Assuming CNAC May Challenge The Contracting Officer's Now Moot March 19, 2008 Determination, The United States Is Entitled To Judgment Upon The Administrative Record Because CNAC's Exclusion From The 2007 RFP Was Reasonable

Pursuant to RCFC 52.1, this Court reviews an agency decision to determine whether it is supported by the already-existing administrative record. The standards applicable to a motion for judgment upon the administrative record differ from those applied in the context of a Rule 56 motion for summary judgment. Bannum, Inc. v. United States, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005); Lion Raisins, Inc. v. United States, 51 Fed. Cl. 238, 246-47 (2001); Tech Systems, Inc. v. United States, 50 Fed. Cl. 216, 222 (2001) (explaining basis for summary judgment based upon the administrative record). Unlike a Rule 56 motion, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record. . . ." Bannum, 404 F.3d at 1356. "Thus, the central inquiry on a motion for summary judgment – whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment – has no bearing on the review of the administrative record. . . ." Tech Systems, 50 Fed. Cl. at 22; accord Bannum, 404 F.3d at 1356 (holding that RCFC [52.1] requires a different standard of review without the burden-shifting and presumptions required pursuant to RCFC 56).

A. The Government Has Broad Discretion To Exclude An Offeror From A Procurement Pursuant To FAR 1.602-2

As explained in more detail below, Government agencies are tasked with the primary responsibility of, and are authorized to act with wide discretion in, administratively enforcing 18 U.S.C. § 207. Agencies do so, however, pursuant to FAR 1.602-2, which provides that "[c]ontracting officers are responsible for . . . safeguarding the interests of the United States in its contractual relationships" and, in that regard, "should be allowed wide latitude to exercise business judgment." 48 C.F.R. 1.602-2 (emphasis added). On the other hand, 18 U.S.C. § 207 is

a criminal statute that imposes a number of different restrictions upon the activities of former Government employees. See 18 U.S.C. § 207. In particular, 18 U.S.C. § 207(a)(1), the provision at issue in this case, proscribes former Government employees from representing others in connection with a "particular matter," involving a "specific party or parties," in which the former employee "participated personally and substantially."

While "[c]riminal enforcement of the provisions of 18 U.S.C. 207 remains the exclusive responsibility of the Attorney General[,]" 5 C.F.R. § 2637.101(a), "[d]epartments and agencies have primary responsibility for the administrative enforcement of the post employment restrictions found in the [Ethics in Government] Act." Id. at § 2637.101(c)(6). Accordingly, the Office of Government Ethics ("OGE") has explained that "regulations implementing 18 U.S.C. § 207 assign agencies the primary responsibility for providing advice to former employees regarding post-employment restrictions, because that advice is fact specific and the agency is in the best position to ascertain the facts." OGE Letter 93 x 32, 1993 WL 721252 (Nov. 9, 1993). "In particular, since an agency ethics official will undoubtedly be more familiar with agency programs and operations, OGE 'generally defers to the cognizant agency ethics official when the issue is whether two particular matters are the same for the purposes of the permanent bar.'" OGE Informal Advisory Letter 99 x 12, 1999 WL 33305905, *3 (April 29, 1999) (quoting OGE Informal Advisory Letter 93 x 17). In that regard, we note that "§ 207 is a prophylactic statute that is 'intended to prevent even the appearance of wrongdoing and that may apply to conduct that has caused no actual injury to the United States.'" 20 U.S. Op. OLC 326, 1996 WL 33101187 (Sept. 12, 1996) (quoting Crandon v. United States, 494 U.S. 152, 164 (1990)).

The United States Court of Appeals for the Federal Circuit has confirmed that agencies

are entitled to substantial and broad deference when disqualifying a contractor, pursuant to FAR 1.602-2, based upon potential conflicts of interest of its employee prohibited by the Ethics in Government Act (including, e.g., 18 U.S.C. § 207). See NKF Engineering, Inc. v. United States, 805 F.2d 372 (Fed. Cir. 1986). In NKF, the Federal Circuit held that "[t]he CO was sensitive, as common sense compels him to be, to the integrity of the bidding process" and that such "sensitivity is by no means irrational." In so holding, the Federal Circuit concurred with the Claims Court that the contracting officer was permitted to exclude an offeror from award in light of "'the contracting officer's responsibility of safeguarding the interests of the United States in its contractual relationships.'" 805 F.2d at 377 (quoting NKF Engineering, Inc. v. United States, 9 Cl. Ct. 585, 592 (1986), and 48 C.F.R. § 1.602-2) (internal quotes omitted).

Moreover, the Federal Circuit agreed with the Claims Court's assessment of "'the latitude the courts have historically shown with respect to he contracting officer's basic authority to enter into, administer, or terminate contracts . . . and the overriding importance of the Government's need to insure full and fair competition in the conduct of its procurements.'" 805 F.2d at 377 (quoting 9 Cl. Ct. at 592). Indeed, even absent a probable future violation of a criminal ethics statute (i.e., should an offeror receive a contract award), "when a CO perceives a strong appearance of impropriety in a situation not precisely covered by the Act, it would undermine Congressional concern in the conflict of interest area to tie the hands of the CO." 805 F.2d at 377; see also CACI, Inc.-Federal v. United States, 719 F.2d 1567, 1576 (holding that agency's determination under § 207 "is entitled to weight" so long as it is not based "on suspicion and innuendo" instead of "on hard facts").

This Court, in DSD Labs., Inc. V. United States, 46 Fed. Cl. 467 (2000), following the

above-discussed Federal Circuit precedent, sustained a contracting officer's decision to exclude a contractor based upon an alleged organizational conflict of interest ("OCI"). Although the plaintiff in that case argued that OCI restrictions did not apply to the procurement at issue, this Court held that "even if there were no flow down of OCI clauses," and thus no actual OCI violation, "the contracting officer still could act to avoid organizational conflicts of interest" pursuant to the Federal Circuit's opinion in NKF. See 46 Fed. Cl. at 473 (emphasis added) (discussing NKF, 805 F.2d at 375-378).[6]

In sum, an agency's decision to preclude an offeror from receiving a contract award in a particular procurement, pursuant to FAR 1.602-2, is entitled to the same high level of deference this Court affords to a contracting officer's best value decision in a negotiated procurement. In a challenge to an agency's award decision in a best value procurement, "technical ranking decisions made by the agency are 'minutiae of the procurement process . . . , which involve discretionary determinations of procurement officials that a court will not second guess.'" Erinys Iraq Ltd. v. United States, 78 Fed. Cl. 518, 525 (2007) (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996)). Indeed, with regard to such decisions "courts recognize [the] technical experience of [a] relevant agency and defer to [its] analysis unless

[6] See also Naddaf Int'l Trading Co., 90-2 CPD ¶ 316, 1990 WL 278571 (Comp. Gen. Oct. 19, 1990) ("Where there is an apparent conflict of interest or appearance of impropriety, an agency may exclude an offeror from a procurement in order to protect the integrity of the federal procurement system, even if no actual impropriety can be shown, provided that the agency's determination is based on fact and not mere innuendo or suspicion."); Computer Technology Assoc., Inc., 2001 CPD ¶ 187, 2001 WL 1513195, *3 (Comp. Gen. Nov. 7, 2001) ("[I]n meeting their responsibility to safeguard the interests of the government in its contractual relationships, [COs] are granted wide latitude to exercise business judgment, FAR § 1.602-2, and may impose a variety of restrictions, not explicitly provided for in the regulations, where the needs of the agency or the nature of the procurement dictates the use of those restrictions.").

without substantial basis in fact." 78 Fed. Cl. at 525 (citing Fed. Power Comm'n v. Fl. Power & Light Co., 404 U.S. 453, 463 (1972)). Thus, in a negotiated "best value" procurement, "'the protestor's burden of proving that the award was arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests.'" 78 Fed. Cl. at 525 (emphasis added) (quoting Galen Med. Assocs. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)).

An agency that is concerned with a potential violation of a criminal ethics statute should a contract be awarded to a particular offeror, may exclude that offeror from a procurement without demonstrating, beyond a reasonable doubt, that the contractor, in fact, will be criminally culpable. Indeed, precisely because the agency is concerned with a possible violation – or even merely the appearance of impropriety – an agency's decision to exclude an offeror, in such a case, is not an enforcement of the criminal ethics statute per se. Rather, such an exclusion constitutes a business decision, akin to a best value determination, and is implemented pursuant to the authority granted by OGE ethics regulations and FAR 1.602-2. Accordingly, a protest cannot be sustained where, as here (or in a future bid protest), CNAC merely quibbles with the agency's factual findings or disagrees with its business decision pursuant to FAR 1.602-2.[7]

B. CNAC Cannot Prevail Where, As Here, It Merely Disagrees With The Agency's Decision

As explained above, pursuant to FAR 1.602-2, a contracting officer possesses wide

[7] We note that the foregoing discussion also demonstrates that the Ethics Memorandum is not the relevant agency action in this case. Rather, the relevant agency action must be a decision pursuant to FAR 1.602-2; in this case, however, the agency has made no determination under FAR 1.602-2 that CNAC is ineligible to participate in the 2008 RFP, either with respect to Dr. Friedman, or otherwise.

discretion to exclude an offeror from a procurement to protect the business interests of the United States. Indeed, FAR 1.602-2 is unusually explicit in emphasizing the broad discretion afforded the contracting officer in fulfilling this duty: "In order to perform these responsibilities, contracting officers should be allowed wide latitude to exercise business judgment." 48 C.F.R. 1.602-2 (emphasis added). In that regard, we note that "'the greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious.'" Galen Med. Assocs. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting Burroughs Corp. v. United States, 617 F.2d 590, 597 (Ct. Cl. 1980)). Here, because the contracting officer possessed particularly broad discretion to act under FAR 1.602-2, plaintiff bears a heavy burden to demonstrate that the contracting officer acted irrationally.

In relying upon the Ethics Memorandum of the DAEO for HHS – who also serves as the HHS Associate General Counsel for Ethics – the contracting officer reasonably acted pursuant to her duty under FAR 1.602-2 to protect the contracting interests of the United States. See Exhibit 29 (A2293). The Ethics Memorandum CNAC attempts to challenge contains fifteen pages of analysis, including seven pages dedicated to a detailed background and factual statement regarding the ethics statute at issue, explanations of the NCS, and Dr. Friedman's role in that study. Thus, CNAC's suggestion that the Ethics Memorandum contains "only a limited factual discussion," Pl. Mot. for P.I. at 6, is erroneous.

Furthermore, the Ethics Memorandum indicates that the agency considered documentation related to the development of the NCS, pre-solicitation and pre-award correspondence from the fiscal year 2005 and 2007 procurements, acquisition plans, requests for proposals, comments on RFPs, materials from pre-proposal conferences, competitive range and

source selection determinations, information regarding the planned FY 2008 procurement, information from the NCS website, discussions with NIH contracting and program staff, as well as the documentation filed with this Court in CNAC's first bid protest. Exhibit 1 (A4). Thus, where, as here, "the relevant factors were considered and there was a rational basis for the decision, the agency's action will be upheld." DSD Labs., 46 Fed. Cl. at 471.

C. The Agency's Determinations And Findings In Its Ethics Memorandum Were Reasonable

As we demonstrate below, the agency reasonably determined that Dr. Friedman properly was excluded from performing as a principal investigator on a contract awarded under the 2007 RFP due to a possible, future violation of 18 U.S.C. 207(a)(1), if she would have so performed.

1. The Agency Reasonably Found That The NCS, With Respect To The 2007 RFP, Constituted a Particular Matter Involving Specific Parties

The agency reasonably concluded that, with respect to the 2007 RFP, the National Children's Study (NCS) is a "particular matter involving specific parties." As explained in the Ethics Memorandum:

> Among government matters, "particular matters" are those that involve consideration, determination, decision, or other action that is focused on the interests of specific persons, or a discrete and identifiable class of persons, and "particular matters involving specific parties" are the subset of particular matters that include applications, contracts, grants, and other proceedings that affect or determine the legal rights of the parties, or a related set of transactions between identified parties. 5 C.F.R. § 2640.103(a)(1), 5 C.F.R. § 2640.102(l)-(m), 5 C.F.R.§ 2635.402(b)(3), and 5 C.F.R. § 2637.201(c)(1).

Ethics Memorandum at 8. Furthermore, the Ethics Memorandum properly considered OGE Advisory Opinion 02 x 5 (July 31, 2002) (the "Yucca Mountain Opinion"), indicating that, for the 18 U.S.C. 207(a)(1) ban to apply, the "particular matter involving specific parties" must have

involved specific parties both at the time of the former employee's involvement and at the time of the employee's post-employment contact, and that the matter involved in the post employment time frame must be the same "particular matter involving specific parties" in which the former employee officially participated during Federal service. Ethics Memorandum at 9.

In the Yucca Mountain Opinion, OGE evaluated whether Federal employees who had participated in the conduct or management of feasibility and other preliminary studies and evaluations of the proposed Yucca Mountain nuclear waste disposal facility, conducted pursuant to contract by the Department of Energy, would be precluded by the post-employment restrictions from appearing before, or communicating with, government officials on behalf of nongovernmental parties interested in the subsequent NRC facility licensing proceedings. Id.

Here, the agency reasonably concluded that the NCS was similar to the program discussed in the Yucca Mountain Opinion because the NCS is also a program having "several, more or less distinct, phases." Ethics Memorandum at 9. Furthermore, the agency noted that the statute authorizing the study, the Children's Health Act of 2000, see Exhibit 2 (A18), called for only one study, as well as the fact that there was only one concept clearance for the entire NCS. See Exhibit 4 (A63). After reviewing the Research Plan and the relevant NCS RFPs, the agency reasonably found that by virtue of the collaborative nature of the NCS, the NCS is not "analogous to government programs under which numerous awards having little direct relation to each other are made."[8] Ethics Memorandum at 10 (noting that the NCS involves: (1)

[8] Given this finding, CNAC's observation that the 2005 RFP did not solicit proposals for the Montgomery County location is irrelevant. Rather, the fact that the Vanguard study centers may work in collaboration with additional study centers pursuant to future contracts counsels in favor of the agency finding that the NCS, as a whole, constitutes one particular matter involving specific parties.

collaboration by study centers across multiple procurements; (2) collaborative efforts of NIH officials; and (3) the collection of data in accordance with standardized protocols); see also Exhibit 11 (A666-73); Exhibit 6 (A242-43). Thus, the agency reasonably took into account OGE's guidance that "matters sharing a common nucleus of operative facts and related issues are not to be broken down into component parts." Id. (citing 5 C.F.R. 2637.201(c)(4); OGE Advisory Opinion 99 x 16 (September 10, 1999)).

In addition, the agency reasonably found that the 18 U.S.C. 207(a)(1) ban attached to Dr. Friedman, because she was personally and substantially involved in the particular matter (i.e., the NCS) during her Federal employment at NIH, and because her proposed post-employment contact as a principal investigator would relate to the same particular matter. Ethics Memorandum at 9. The agency reasonably reached that conclusion based upon Dr. Friedman's employment at NIH, where, from October 2005 to March 2006, she led a team of scientists to evaluate available tools designed to measure various aspects of neurodevelopment and social development of early-in-life subjects for the NCS, and to make recommendations based upon her team's analysis. Ethics Memorandum at 9; see also Exhibit 14; Exhibit 20. Given that, with issuance of an RFP for the 2005 procurement (not later than November 16, 2004), the NIH determined to conduct the study, in part, with the use of contractors, it was reasonable for the agency to conclude that Dr. Friedman's involvement with the NCS began after the start of the contracting phase. Ethics Memorandum at 9.

Furthermore, contrary to CNAC's arguments, the agency reasonably concluded that it could not permit Dr. Friedman as a principal investigator based upon an ethics regulation which provides that "[r]ulemaking, legislation, the formulation of general policy, standards or objectives, or other action of general application is not such a [particular matter involving specific parties]." Pl. Mot. for P.I. at 7 (citing 5 C.F.R. § 2637.201©). As explained by the agency in its Ethics Memorandum, the matters contemplated by that provision involve the formulation of policy, rules, or legislation focused on the interests of a broader group or identifiable class of entities, and is thus inapplicable to the 2007 RFP. Ethics Memorandum at 8; see also OGE Letter 93 x 32, 1993 WL 721252, *2 (Nov. 9, 1993) ("Formal action . . . is not required in order for something to be a 'particular matter' under 18 U.S.C. § 207. Indeed, internal deliberations within an agency may be a 'particular matter.'")

While the agency acknowledges CNAC's reference to OGE opinions indicating that "it is frequently the case that successive contracts are viewed as being different particular matters from each other," Pl. Mot. for P.I. at 8 (citing OGE Advisory Opinion 02 x 5 (July 31, 2002)), the agency noted in its Ethics Memorandum that

> when the Government pursues a "multi-year, multi-phase, multi-contract procurement program, it is not always easy to determine what parts of the process may constitute a particular matter or matters involving specific parties. . . ."

Ethics Memorandum at 9 (quoting OGE Advisory Opinion 05 x 6 (Sept. 19, 2005)). While CNA obviously disagrees with the agency's conclusion that the NCS is viewed appropriately as one particular matter involving specific parties, CNAC has not explained, nor can it explain, why the agency's view is irrational.

Even assuming that the 2007 RFP constituted a distinct matter (i.e., from the NCS as a whole), the agency reasonably concluded that Dr. Friedman should be precluded from the procurement. See Ethics Memorandum at 10-11. In so concluding, the agency reasonably relied upon OGE guidance which explains that a “matter becomes a particular matter involving specific parties ‘when the Government first receives an expression of interest from a prospective contractor.’” Id. (quoting OGE DAEOgram DO-06-29); see also OGE Informal Advisory Letter 06 x 8, 2006 WL 4512828, *1 (Aug. 23, 2006) (“Even in the context of 18 U.S.C. § 207(a) – which uses the narrower phrase, ‘particular matter involving specific parties’ – OGE has concluded that a matter may be covered prior to the receipt of any formal application or request from a private entity, as long as there have been agency discussions about the matter.”).

In this case, the agency found that it received expressions of interest from entities within the census region that includes the state of Maryland. See Exhibit 26 (A2264-65; A2271; A2274-75); Exhibit 10 (A525). Accordingly, the agency reasonably determined that because the 2007 RFP covered all remaining study locations, including Montgomery County, Maryland, the communications made in 2005 by eligible contracting entities properly should be considered early expressions of interest involving all future procurements, including the 2007 RFP. See OGE Informal Advisory Letter 05 x 6, 2005 WL 4169815, *7 (Sept. 19, 2005) (“Although follow-on contracts are generally viewed as separate matters, if there is some indication that one contract directly contemplated the other contract or if there are other circumstances indicating that the two contracts are really part of the same proceeding involving specific parties, then two contracts may be viewed as the same particular matter.”); OGE Informal Advisory Letter 99 x 16, 1999 WL 33305910, *3 n.3 (Sept. 10, 1999) (OGE disagreed with the “observation that . . .

expressions of interest must relate to a particular RFP, rather than an entire program, in order to establish parties to a matter.").

Moreover, the agency did not act irrationally or unreasonably in its consideration of cases and regulatory examples which, according to CNAC, provide (1) that "technical matters" should be separated from an analysis of "particular matters involving specific parties"; and (2) that before receipt of expressions of interest or proposals, there exists no particular matter involving specific parties. Although CNAC may disagree with the agency's conclusion, the agency explicitly considered, and rejected, the applicability of such cases and examples. See Ethics Memorandum at 12. In particular, the agency concluded that, because Dr. Friedman participated in the matter after the agency had already received expressions of interest, neither example was apposite.

Likewise, while CNAC takes issue with the agency's view of the "four phases" of the NCS, see Pl. Mot. for P.I. at 9, CNAC does not explain why the agency's characterization is unreasonable or irrational. Instead, CNAC simply points out that the technical description of the NCS in the agency's Ethics Memorandum differs from the general description of the NCS on the study's website, which provides bullet-points and summaries regarding various features of the study. See www.nationachildrensstudy.com. The agency, however, is permitted to rely upon the complete set of information that it analyzed for the purposes of rendering its opinion in the Ethics Memorandum, as described therein, and is not limited to considering the issue based upon website summaries geared towards an entirely different purpose and audience.

2. The Agency Reasonably Concluded That Dr. Friedman Participated Personally And Substantially In The Relevant Matter

As the agency correctly noted in its Ethics Memorandum, the ban at 18 U.S.C. § 207(a)(1) "applies only in relation to those particular matters involving specific parties in which the former employee participated 'personally and substantially' during federal employment." Ethics Memorandum at 12 (quoting 18 U.S.C. § 207(a)(1)(b)). Accordingly, the agency properly looked to regulatory guidance on that issue and explained:

> Former employees who participated in a matter through the exercise of discretion, the making of recommendations, or the provision of advice are deemed to have personally participated. Where that participation was of significance to the matter, the former employee is deemed to have participated substantially, and "[p]articipation may be substantial even though it is not determinative of the outcome of a particular matter." 5 C.F.R. § 2640.103(a)(2); see also 5 C.F.R. § 2637.201(d)(1) (reflecting that personal and substantial participation can occur through the making of recommendations or the rendering of advice).

Ethics Memorandum at 12-13.

Here, the agency carefully reviewed Dr. Friedman's involvement in the study, and reasonably concluded that Dr. Friedman's role as team leader for the neurodevelopmental team – in which she, amongst other activities, carefully considered, scrutinized, and debated the relative merits and utility of at least 60 different measurement tools for use throughout the entire NCS – constituted personal and substantial participation. See Exhibit 14; Exhibit 22. Conversely, there is no merit to CNAC's assertion, see Pl. Compl. at ¶ 49, that whether Dr. Friedman's participation in the study was personal or substantial should be determined based upon whether her name was included on an acknowledgment page on the NCS website. No evidence cited by CNAC renders the agency's findings unreasonable or irrational. See United States v. Clark, 333 F. Supp. 2d 789, 794-95 (E.D. Wis. 2004) (finding attorney's participation in a matter "personal"

and "substantial" where his "involvement was of significance to the matter, or sufficient to create a 'reasonable appearance' of such significance" (emphasis added)).

3. The Agency Reasonably Found That Dr. Friedman's Performance As A Principal Investigator On An NCS Contract Likely Would Involve Communications Prohibited By 18 U.S.C. § 207(a)(1)

The Ethics Memorandum acknowledges that, even when the 18 U.S.C. § 207 ban applies, its only effect is to prohibit the former employee from making, with the intent to influence, any appearance before or communication with Government officials on behalf of a third party in relation to the relevant, particular matter. See 18 U.S.C. § 207(a)(1). In that regard, the agency reasonably considered OGE guidance that "communications and appearances that trigger the statute as those 'made for the purpose of seeking a discretionary Government ruling, benefit, approval, or other action in connection with a matter which the former employee knows involves an appreciable element of dispute concerning the particular Government action to be taken.'" Ethics Memorandum at 13 (quoting OGE Advisory Opinion 04 x 11 (July 29, 2004), at 3-4).

In contrast to the examples cited by CNAC, see Pl. Mot. for P.I. at 16, the agency reasonably relied upon the NCS Director's statements that "[NCS] program officials meet with Study Center PIs from time to time to discuss matters that are controversial, sensitive, and/or that have financial implications for the Study Centers" to conclude that 18 U.S.C. § 207(a)(1) would apply to Dr. Friedman. Ethics Memorandum at 13.

4. The Agency Reasonably Concluded That The Scientific or Technological Information Exceptions Are Inapplicable

In CNAC's Motion for a Preliminary Injunction, CNAC alleged that "[t]he NIH Ethics Opinion inexplicably continues to ignore the exceptions for the communication of technical and scientific information in the applicable regulations." See Pl. Mot. for P.I. at 15 That is simply

not true; in fact, the agency expressly considered such regulations:

> An exception to the permanent post-employment ban allows former employees to make communications to an agency "solely" for the purpose of furnishing scientific or technical information. 18 U.S.C. § 207(j)(5). Although this exception was not raised by CNA, we evaluated potential options when our initial opinion was given. For a scientific or technical communication to qualify under the exception, it must have been made (1) "under procedures" acceptable to the agency to which the communication is directed, or (2) the head of such agency must have made, in consultation with the Director of OGE, a certification published in the Federal Register that the former employee has outstanding qualifications in a particular discipline, is acting with respect to a particular matter which requires such qualifications, and that the national interest would be served by the participation of the former employee. OGE has opined that if an agency has not established such procedures, "to qualify under the exception, the second statutory mechanism would have to be followed." OGE Op. 96 X 21 (November 5, 1996). HHS has no such procedures, and the Secretary of the Department of Health and Human Services has not undertaken the requisite steps to publish a certification regarding Dr. Friedman and her participation in the NCS.

Ethics Memorandum at 14. While CNAC may disagree with the agency's interpretation and application of various regulations, CNAC has not met its burden to demonstrate that anything about the agency's conclusion was unreasonable or irrational, particularly where, as here, the basis of CNAC's argument consists only of an erroneous assertion that the agency did not consider the regulations.

III. <u>This Court Has No Power To Award The Injunctive Or Declaratory Relief CNAC Seeks</u>

In CNAC's complaint, CNAC asks this Court for the following relief: (1) a preliminary injunction until this Court reviews and rules upon the merits of the NIH ethics decision; (2) a declaratory judgment that Dr. Friedman "is not barred from working as a Principal Investigator for CNAC on <u>any</u> contracts awarded to CNAC arising out of the [NCS]"; and (3) a "permanent injunction directing NIH to award the Montgomery County Contract to CNAC." Pl. Compl. at

22 ("Prayer for Relief").[9] The preliminary injunction is now moot, either because CNAC's complaint in this case will be dismissed for lack of jurisdiction, or the Court will decide the merits of CNAC's case. With respect to the remaining two forms of CNAC's requested relief, this Court can order neither.

First, it is well settled that this Court does not have the authority to select a contractor or order the award of a contract to a protestor. Innovative Resources v. United States, 63 Fed. Cl. 287, 290 n.5 (2004); see also CW Government Travel, Inc. v. United States, 46 Fed. Cl. 554, 559 (2000) (citing Parcel 49C Ltd. Partnership v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994); Scanwell Lab., Inc. v. Shaffer, 424 F.2d 859, 869 (D.C. Cir. 1970); CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1575 (Fed. Cir. 1983); ManTech Telecommunications and Information Sys. Corp. v. United States, 49 Fed. Cl. 57, 79 (2001) ("there are serious questions as to whether this court is ever authorized to award directly a contract."); Arrowhead Metals, Ltd. v. United States, 8 Cl. Ct. 703, 711 (1985); Contract Custom Drapery Service, Inc. v. United States, 6 Cl. Ct. 811, 820 (1984), aff'd without opinion, 785 F.2d 321 (Fed. Cir. 1985).

Second, the declaratory relief CNAC requests likewise would be improper because all future "contracts . . . arising out of the [NCS,]" see Pl. Compl. at 22, are not before this Court. At best, there is a controversy only about the substance of the Ethics Memorandum, and the contracting officer's exclusion of CNAC from consideration under the 2007 RFP. As explained above, our view is that such matters are now moot, and that there is no other agency action either properly challenged here or that is otherwise ripe for decision. If, however, the Court were to

[9] We note, however, that CNAC's complaint contains only two counts: one for preliminary injunctive relief, and another for an injunction directing an award of a contract to CNAC. See Pl. Compl. at 13, 20.

issue some form of declaratory relief, it could do no more than invalidate the agency's decision with respect to the 2007 RFP, because any other relief would be coercive in nature and, in any event, has not been requested by CNAC. See PGBA v. United States, 389 F.3d 1219, 1228 (Fed. Cir. 2004) (holding that PGBA could not "avoid the equitable calculus associated with injunctive relief" where PGBA's request for declaratory relief was "coercive and [would have] the same practical effect as an injunction").

In sum, even if CNAC's claims are within this Court's jurisdiction and otherwise properly are before this Court, and even if CNAC is entitled to judgment upon the administrative record, this Court cannot grant any of the relief CNAC requests in its complaint.

## CONCLUSION

For all of the above reasons, we respectfully request this Court to dismiss CNAC's complaint pursuant to RCFC 12(b)(1) or, in the alternative, to enter judgment upon the administrative record, pursuant to RCFC 52.1, in favor of the United States.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

s/ Matthew H. Solomson
MATTHEW H. SOLOMSON
Trial Attorney, Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street, N.W.
Washington, DC 20530
Tele: (202) 305-3274
Fax: (202) 514-8624

Of Counsel:

Daniel Barry
Deputy Associate General Counsel
Procurement, Fiscal and Information Law
Office of the General Counsel
Department of Health and Human Services
330 Independence Avenue, S.W.
Washington, DC 20201

Gretchen H. Weaver
Senior NIH Ethics Counsel
Office of the General Counsel, Ethics Div.
Department of Health and Human Services

Dated: April 17, 2008

Attorneys for Defendant

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE CNA CORPORATION, | ) | |
| | ) | No. 08-249C |
| Plaintiff, | ) | |
| | ) | (Judge Horn) |
| v. | ) | |
| | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S APPENDIX AND EXHIBIT LIST

| Exhibit # | Exhibit Name | Appendix Page # |
|---|---|---|
| Exhibit 1 | March 18, 2008 Ethics Memorandum from Mr. Swindell to Ms. E. Osinksi, Contracting Officer | 1 |
| Exhibit 2 | NCS Funding and Legislation Home Page | 17 |
| Exhibit 3 | March 18, 2004 Concept Clearance | 20 |
| Exhibit 4 | January 3, 2007 Memorandum Re: Waiver of Concept Clearance for NCS Study Centers | 62 |
| Exhibit 5 | Growing Up Healthy: An Overview of the National Children's Study | 105 |
| Exhibit 6 | National Children's Study Research Plan | 181 |
| Exhibit 7 | www.nationalchildrensstudy.gov web page | 470 |
| Exhibit 8 | National Children's Study E-Update, January 2008 | 472 |
| Exhibit 9 | November 29, 2005 Presentation of NCS Director | 482 |
| Exhibit 10 | December 1, 2004 Briefing for Pre-proposal Conference | 512 |
| Exhibit 11 | 2007 RFP | 586 |
| Exhibit 12 | National Children's Study E-Update, November 2004 | 714 |
| Exhibit 13 | National Children's Study E-Update, July 2004 | 720 |
| Exhibit 14 | Declaration of Dr. Peter C. Scheidt, M.D., M.P.H., Director, NCS | 724 |

| | | |
|---|---|---|
| Exhibit 15 | Proposed NCS 2007 Research Plan, 72 Fed. Reg. 41339 (July 27, 2007) | 727 |
| Exhibit 16 | Notice of Proposed Collection, 72 Fed. Reg. 65049 (Nov. 9, 2007) | 730 |
| Exhibit 17 | Agenda, Minutes, & Presentation, Federal Advisory Committee Meeting, May 31, 2006 | 735 |
| Exhibit 18 | May 8, 2006 CNAC Press Release | 783 |
| Exhibit 19 | CNAC description of REL Appalachia Staff and Organization | 785 |
| Exhibit 20 | Minutes of NCS Neurodevelopmental Team Meetings (various dates from Oct. 26, 2005 - Feb. 15, 2006) | 790 |
| Exhibit 21 | Neurodevelopmental team e-mail exchanges plus attachments | 876 |
| Exhibit 22 | January 12, 2006 Presentation of Neurodevelopmental Team to NCS Steering Committee | 2087 |
| Exhibit 23 | 2004 RFP | 2105 |
| Exhibit 24 | March 19, 2006 e-mail from Dr. Friedman to Dr. Scheidt | 2254 |
| Exhibit 25 | National Children's Study E-Update, September 2005 | 2259 |
| Exhibit 26 | Expressions of Interest | 2263 |
| Exhibit 27 | January 3, 2005 e-mail from Contacting Officer Virginia DeSeau to Drs. Salafia and Adair | 2286 |
| Exhibit 28 | National Children's Study E-Update, October 2007 | 2289 |
| Exhibit 29 | March 19, 2008 Letter from Contracting Officer to CNAC | 2292 |
| Exhibit 30 | Notification of Award | 2295 |