# EXHIBIT 1

DEPARTMENT OF HEALTH & HUMAN SERVICES

Office of the Secretary

Office of the General Counsel
Washington, D.C. 20201

March 18, 2008

MEMORANDUM

TO: Elizabeth J. Osinski
Contracting Officer
NIDDK Office of Acquisitions,
NICHD Branch
National Institutes of Health

FROM: Edgar M. Swindell
Associate General Counsel for Ethics
Designated Agency Ethics Official

SUBJECT: Eligibility of Sarah Friedman, Ph.D., to Serve as a Principal Investigator for a Study Center Selected to Collect Data for the National Children's Study

In response to the order of Judge Marian Blank Horn in *The CNA Corporation v. United States*, No. 07-858C (Fed. Cl. Jan. 3, 2008), we are documenting the legal analysis that informed our advice to you in connection with your determination that Sarah Friedman, Ph.D., was ineligible to serve as a Principal Investigator (PI) for a Study Center selected under the 2007 procurement to collect data for the National Children's Study (NCS).

As you know, former federal employees are subject to the criminal post-employment statute, 18 U.S.C. § 207. With the exception of a provision not relevant to this case,[1] former employees who are not "senior employees"[2] for purposes of the statute are subject only to the so-called

[1] Under 18 U.S.C. § 207(b), former employees who participated in ongoing trade or treaty negotiations on behalf of the United States within the year preceding their departure cannot, for one year, represent, aid, or advise anyone based on information exempt from disclosure to which the employees had access.

[2] "Senior employees" are subject to paragraphs (a)(1), (a)(2), (b), and additional restrictions known as the one-year "cooling-off period" and the one-year "foreign entity representation and advice prohibition," 18 U.S.C. §§ 207(c) and (f), respectively. "Senior employees" include Presidential appointees paid at Levels II through V of the Executive Schedule, uniformed service officers at pay grades O-7 or above, and members of the Senior Executive Service and employees in other pay systems with an annual rate of basic pay (excluding locality-based adjustments) set at an amount equal to or greater than 86.5% of the rate of basic pay for Level II of the Executive Schedule. For 2008, Level II is $172,200, which yields a senior status threshold of $148,953. In 2006, when Dr. Friedman left government employment,

"permanent ban" and the "two-year bar," 18 U.S.C. §§ 207(a)(1) and (a)(2), respectively.[3] At issue in the 2007 procurement was the permanent ban. Under this provision, former employees are prohibited from appearing before or communicating with government officials on behalf of any other person or organization (except the United States)[4] with the intent to influence in relation to any specific party matter in which the employee personally and substantially participated at any time during federal employment.

---

Level II was $165,200 and the senior status figure was $142,898. Dr. Friedman's salary was calculated according to the GS 15 pay schedule. The highest base pay that year for a Grade 15, Step 10, was $118,957. Accordingly, no employee paid under the General Schedule was a "senior employee."

[3] The remaining parts of 18 U.S.C. § 207 were inapplicable to this case. Paragraph (d) imposes a two-year "cooling-off period" for the Vice President, Cabinet officers paid at Level I, and certain high level employees of the Executive Office of the President. These "very senior employees" are precluded from making post-employment representational contact to employees of their former agency, as well as to any Presidential appointee in the entire Executive Branch and any employee paid at Levels I through V of the Executive Schedule. Paragraph (e) prescribes the post-employment restrictions for Members of Congress and Legislative Branch employees. Paragraphs (g), (h), and (i) address, respectively, special rules for detailees, the designation of separate components for purposes of the one-year "cooling-off period," and definitions. Paragraphs (j) and (k) deal with exceptions and a waiver procedure that are not applicable in this case, *see* discussion *infra* at pages 13-16, and paragraph (l) applies to detailees assigned to an agency from private sector organizations.

[4] In addition to the parenthetical exception in section 207(a)(1) that permits representational activities that are conducted on behalf of the United States, section 207(j)(1), discussed *infra* at footnote 19 on page 14, provides an explicit exception for acts done in carrying out official duties on behalf of the United States. However, neither the parenthetical exception in paragraph (a)(1) nor the exception in paragraph (j)(1) permit representational appearances or communications by former employees who work for government contractors or grantees. In discussing its proposed regulation, *see* discussion *infra* footnote 11 at page 8, to implement both the parenthetical and section 207(j)(1), the Office of Government Ethics (OGE) notes that such an expansive reading of the statute has been consistently rejected. 68 Fed. Reg. 7861 (February 18, 2003). According to OGE, a former employee does not act on behalf of the United States by virtue of performing work funded by the Government or engaging in the appearance or communication on behalf of a third party in response to a contact initiated by the Government, or because the Government will derive some benefit from the activity, or because the former employee or the person or organization on whose behalf he or she is acting may share the same objective as the Government. *Id.*; *see also* OGE Memorandum to Designated Agency Ethics Officials, General Counsels, and Inspectors General (February 17, 2000), available under "DAEOgrams" on the OGE web site, http://frwebgate.access.gpo.gov/cgi-bin/leaving.cgi?from=leavingFR.html&log=linklog&to=http://www.usoge.gov.

In September 2007, after NICHD ethics officials consulted with the Senior Ethics Counsel on my staff assigned to advise the National Institutes of Health (NIH), you determined that the permanent ban prohibited Dr. Friedman from serving as a Study Center PI. As a result, although the proposal submitted by The CNA Corporation (CNA) to operate as Study Center for Baltimore County and Montgomery County, MD, was included in the competitive range, CNA did not receive an award. Thereafter, CNA filed the above-referenced bid protest action disputing the government's analysis regarding the application of the criminal statute in Dr. Friedman's case on three grounds: (1) that the NCS is not a specific party matter to which the restriction applies in Dr. Friedman's case; (2) that Dr. Friedman was not personally and substantially involved in the NCS matter; or (3) that, alternatively, Dr. Friedman is exempt from the application of the restriction because of the nature of her work on the NCS while she was a federal employee. On January 3, 2008, the Court of Federal Claims issued an order finding that the record submitted in the case lacked a clearly articulated basis for concluding that section 207 would bar Dr. Friedman's participation as the Study Center PI if CNA were selected. The court directed NIH to reconsider the ethics decision and to articulate the statutory and regulatory grounds for its determination.

<u>Background concerning the National Children's Study</u>

Based upon our review of documentation related to the development of the NCS—including pre-solicitation and pre-award correspondence and documentation contained in the contracting files related to the fiscal year 2005 and 2007 procurements; acquisition plans; requests for proposals (RFPs); comments on RFPs; materials from pre-proposal conferences; competitive range and source selection determinations; information that currently exists regarding the planned fiscal year 2008 procurement; other information publicly available on the NCS web site; and the Complaint for Declaratory, Preliminary and Permanent Injunctive Relief and Motion for Preliminary Injunction filed by CNA in the United States Court of Federal Claims—and multiple consultations with you and members of the program staff, the following describes our understanding of the NCS:[5]

The Children's Health Act of 2000, 42 U.S.C. § 201, authorized and directed, in part, a consortium of federal agencies, led by the National Institute of Child Health and Human Development (NICHD) in partnership with the Centers for Disease Control and Prevention (CDC), the Environmental Protection Agency (EPA), and the National Institute of Environmental Health Sciences (NIEHS), to plan and conduct a large longitudinal study of the effect of

---

[5] It may also be worth noting that our understanding of the NCS is further informed by the significant interactions that Senior NIH Ethics Counsel Gretchen H.Weaver, the principal author of this opinion, has had with program officials since the autumn of 2001 in connection with the analysis and consideration of potential conflict of interest issues for the members of the National Children's Study Advisory Committee.

environmental exposures on child health and development.[6] After considering the feasibility of conducting a longitudinal cohort study of environmental effects on mothers and children, concept clearance was granted for the NCS, as a whole, in March 2004. The NCS will involve a nationally representative sample of approximately 100,000 children from before birth, whenever possible, to age 21. For purposes of the NCS, the environment is defined broadly to include biological, chemical, physical, behavioral, social, cultural, geographical, and educational factors. The goal of the NCS is to provide information that will lead to improvements in the health and development of children.

The Interagency Coordinating Committee comprised of federal employees from the NICHD and the other lead agencies was established in 2000 to guide the planning and implementation of the NCS. The Program Office within the NICHD, the chartered federal advisory committee, 22 working groups comprised of over 200 scientists, and more than 2500 people interested in the design, conduct, and results of the NCS provided input during the planning phase.

Based upon the advice of experts in study design and sampling and the recommendations of the National Children's Study Advisory Committee, the Government decided that the NCS would be conducted using a national probability sample of all births in the United States. In 2004, the first stage of sampling was completed with the selection of 105 geographic locations (the Study Locations), corresponding to counties or, in sparsely populated areas, contiguous counties, in the United States from which the NCS participants would be drawn.

In fiscal year 2005, the contract for the NCS-Coordinating Center was awarded. The NCS-Coordinating Center is responsible for providing scientific support to the NCS Project Officer(s) in the development and implementation of the NCS, coordinating the day-to-day activities of the Study Centers (i.e. the entities that will collect the data in the Study Locations), the Central Laboratories, and the Central Repository, supporting the Information Management System for the NCS, handling the data processing and supporting the statistical analysis and reporting of NCS results. In addition, contracts for the collection of data in seven of the 105 Study Locations were awarded in fiscal year 2005.

In 2007, 22 contracts were awarded for the collection of data in 40 Study Locations. It is anticipated that contracts for the collection of data in the remaining Study Locations may be awarded following a fiscal year 2008 solicitation and, as needed, future solicitations. Notably, concept clearance was waived in relation to the fiscal year 2007 procurement as a result of the project concept clearance that was granted in March 2004. Contracting decisions are made subject to the availability of funds, the quality of proposals received, and other factors at the time

---

[6] By Act of Congress (Public Law 110-154), the NICHD was recently renamed the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development.

of each solicitation.[7] Subject to OMB approval, the first wave of data collection is scheduled to begin in 2008.[8]

Although the Study Center contracts are described as contracts for the collection of data, the study design, or Research Plan, and RFPs instruct that the Study Centers will work collaboratively with the Project Officer(s), the NCS-Coordinating Center, and other participating Study Centers to determine and finalize the protocol(s), schedules and methods they will employ. In order to take advantage of scientific advancements that will occur during the 20+ years of the study, and to ensure that the study can adapt to accommodate new hypotheses and measurement tools, the PIs for each of the Study Centers serve on the Steering Committee for the NCS, along with NICHD program officials, officials from the NCS-Coordinating Center, and the Interagency Coordinating Committee. All data collections will be conducted in accordance with standardized protocols. The schedule of data collections, measurements and tools to be employed during the pre-conception through 18 months of age phase of the NCS was substantially completed in 2007, subject to peer review and approval from the Office of Management and Budget under the Paperwork Reduction Act. In particular, decisions regarding the measures and tools that would be used to assess neuro and psychosocial development were made in 2006. In addition, the Study Centers will collaborate in relation to the data analysis and publication of NCS findings and conclusions.

As mentioned above, the study design for the NCS employs a multistage probability sample of births in the United States. This national probability design was determined to be the best design in light of the following goals:

(1) Collection of high quality, objective data to minimize measurement biases;
(2) Avoidance of selection biases and other biases that could lead to invalid references concerning exposure and outcome relations;
(3) Ability to capture the diversity of the population of the United States such that both the range and diversity of exposures and outcomes are represented; and
(4) Ability to generalize the results of the NCS to the population of the United States.

In keeping with principles of research validity, a statistically representative sample must be maintained to the greatest extent possible throughout data collection. Conclusions drawn from an unrepresentative sample could not be extrapolated and supported. As a result, in each successive procurement, the contracts awarded must provide for data collection from previously identified study locations such that the entire sample that will exist until the next procurement is, to the greatest extent possible, statistically representative of the population of the United States.

---

[7] For the fiscal years 2000-2008, respectively, the following funding (in approximate millions) has been available for the NCS: $1.0; $3.2; $6.1; $10.6; $10.6; $11.0; $12.1; $69.0; and $110.9.

[8] Due to logistic and cost considerations, data collection cannot begin simultaneously in all 105 locations.

Dr. Friedman's Role

As noted above, the NCS is a long-term longitudinal study of children from birth to adulthood to assess the affects of various environmental influences on child health and development. The goal of the NCS is to better understand the role of biological, chemical, physical, social and behavioral influences on children. Pursuant to the Research Plan, the impact of a wide range of environmental influences will be examined, including air pollutants; drinking water contaminants; dietary nutrients, supplements, and contaminants; infectious and allergic agents; and social and behavioral characteristics. Participating children will be followed to evaluate the impact of the various measures in a wide range of health and developmental outcomes. Pursuant to their contracts, each of the Study Centers will conduct the study according to the prescribed protocol(s). Each Study Center will collect information and data on the same schedules and using the same tools and measures. Data analysis will occur in relation to each developmental phase and longitudinally. Hence, the analysis of data in the context of later developmental phases will necessarily be dependent on data collected in early phases. In other words, the effect of an environmental influence early in life will be measured or evaluated at various points in the lives of the participating children, and must be evaluated in the context of all other influences.

Dr. Friedman is an expert in the field of early childhood development who was employed at the NICHD for more than 15 years.[9] Based upon her experience and expertise, she was selected in 2005 by the Project Officer(s) to lead the NCS protocol development team tasked with evaluating available tools designed to measure cognitive, neurobehavioral, educational, psychological, motor, sensory, and social development early in life for use in the NCS. The relative quality of her team's work product (i.e., the recommendations) that she presented to the Steering Committee— a group comprised of the already identified Study Center PIs and NICHD and other government officials— was dependent upon the careful and deliberate consideration of the literature and other information available to them, and the exercise of sound scientific analysis of the relevant issues. This was not merely a ministerial task.[10] Dr. Friedman and her team were tasked and trusted to evaluate the state of the science and to make recommendations based on their sound analysis. Their work and discussions generated over 100 e-mail exchanges discussing the relative merits of various tools and approaches. Based upon our consultations with program officials, it seems clear that the importance of scientific analysis during the development of protocols for a study of the magnitude of the NCS cannot be overstated. The decisions made regarding what to measure and how to do it can and will affect the ultimate validity and reliability of the data and analyses and whether, ultimately, the statutory mandate is satisfied.

---

[9] Dr. Friedman was promoted to the GS-15 level effective in January 1998.

[10] It is noted that should Dr. Friedman serve as a Study Center PI, she will become a member of the Steering Committee she advised as part of her government duties.

Minutes from the NCS Neurodevelopmental Protocol Team indicate there were 20 meetings in 76 business days, between October 26, 2005, and February 15, 2006. The minutes reflect that the six-member team, joined in December by four Study Center PIs following the fiscal year 2005 contract awards, carefully considered, scrutinized, and debated the relative merits and utility of at least 60 different measurement tools during this period, contacting inventors and authors wherever necessary, based on the following criteria:

(1) Soundness of psychometric properties including internal consistency, test-retest reliability, concurrent/construct and predictive validity;
(2) Logistical feasibility (time, burden) within a large-scale multi-site study involving testing in the home;
(3) Relative ease of administration and scoring;
(4) Sensitivity to both individual variations in normal samples and clinically-relevant groups;
(5) Lack of bias against low-income, minority, or cultural groups; and
(6) Existence of comparable measures in the same domains for data collection at later ages.

A number of recommendations emerged from the meetings. For example, the minutes for the November 15, 2005, meeting indicate that the team recommended that:

(1) The NNNS measure of neurobehavioral organization be administered at age one month;
(2) The Bayley III (full version) be administered at twelve and eighteen months of age to assess language, cognitive, and motor function;
(3) A short-form Bayley III not be administered; and
(4) At age six months, the Ruff focused attention, Rose visual recognition memory, and the Rose representational competence measures would be administered.

By the time Dr. Friedman presented the work of her team to the Steering Committee on January 12, 2006, she presented a recommended schedule for the use of eleven selected measurement scales and tools to collect data relevant to ten developmental outcomes to be employed at various points during the first eighteen months of life, and indicated that measures addressing three additional outcomes were still being discussed.

Program staff has indicated that barring significant difficulty or problem discovered during the initial accrual phase, the recommendations made by Dr. Friedman and her team will be continued in the subsequent accrual phases.

<u>Dr. Friedman Participated in a Particular Matter Involving Specific Parties</u>

As noted in CNA's court filings, the permanent ban applies only in relation to certain government matters. Specifically, it applies in relation to "particular matters involving specific

parties." Among government matters, "particular matters" are those that involve consideration, determination, decision, or other action that is focused on the interests of specific persons, or a discrete and identifiable class of persons, and "particular matters involving specific parties" are the subset of particular matters that include applications, contracts, grants, and other proceedings that affect or determine the legal rights of the parties, or a related set of transactions between identified parties. *See* 5 C.F.R. § 2640.103(a)(1), 5 C.F.R. § 2640.102(l)-(m), 5 C.F.R. § 2635.402(b)(3), and 5 C.F.R. § 2637.201(c)(1).[11] These "particular matters involving specific parties" are distinguished from the other subset of "particular matters" that involve the formulation of policy, rules, and legislation that is focused on the interests of a broader group or identifiable class of entities and in relation to which the post-employment restrictions in 18 U.S.C. §§ 207(a)(1) and (a)(2) do not apply.[12] *Id.*

Guidance from the Office of Government Ethics (OGE) reflects that in order for the permanent ban in 18 U.S.C. § 207(a)(1) to attach, the "particular matter involving specific parties" must have involved specific parties both at the time of the former employee's involvement and at the time of the employee's post-employment contact, and the matter involved in the post-employment time frame must be the same "particular matter involving specific parties" in which the former employee officially participated during federal service.[13] *See* OGE Advisory Opinion 02 x 5 (July 31, 2002) (the *Yucca Mountain* opinion).

---

[11] As a result of the 1989 amendment of 18 U.S.C. § 207, the regulations published at 5 C.F.R. Part 2637 are binding only as to employees terminating federal service prior to January 1, 1991. In the present case, these regulations are properly cited, per the official notation to Part 2637, only as guidance in relation to terms and provisions that were not substantively revised. In 2003, the Office of Government Ethics published, with the concurrence of the Department of Justice as required by section 201(c) of Executive Order 12674, a proposed rule to revise and update the regulations implementing section 207. 68 Fed. Reg. 7844 (February 18, 2003). Although the draft final rule remains under consideration with the Office of Management and Budget, the proposed rule expresses the intent to discontinue the publication of 5 C.F.R. Part 2637. *See* 68 Fed. Reg. at 7844.

[12] This subset of "particular matters" is denominated "particular matters of general applicability." *See* 5 C.F.R. § 2640.102(m) and 5 C.F.R. § 2637.201(c)(1).

[13] OGE is a separate agency of the Executive Branch charged with overseeing and providing advice and guidance in relation to the administration of the ethics program within each Department and agency of the Executive Branch. Since 1980, OGE has had shared responsibility for providing interpretive guidance regarding the application of 18 U.S.C. § 207 with the Department of Justice, Office of Legal Counsel, although neither has authority to determine whether a particular individual's conduct violated the statute. *See* OGE Advisory Opinion 82 x 13 (August 31, 1982), at footnote 1, and OGE Advisory Opinion 05 x 06 (September 19, 2005), at page 1.

In the *Yucca Mountain* case, OGE was asked to evaluate whether federal employees who had participated in the conduct or management of feasibility and other preliminary studies and evaluations of the proposed Yucca Mountain nuclear waste disposal facility conducted pursuant to contract by the Department of Energy would be precluded by the post-employment restrictions from appearing before or communicating with government officials on behalf of non-governmental parties interested in the subsequent NRC facility licensing proceedings. After examining the relationship between the early studies and the licensing proceedings, as well as the nature of the licensing proceedings themselves, OGE concluded that the licensing proceedings were "a continuation of the same particular matter that involved the earlier site characterization process, as well as other efforts that were in anticipation of a potential license application." *Id.* There was one "particular matter involving specific parties" for purposes of the post-employment restriction, and the matter became one once persons "expressed an interest in participating in the matter or where circumstances indicate that persons have an obvious and distinct stake in participating in the matter." *Id.* OGE recognizes, however, that when the government pursues "a multi-year, multi-phase, multi-contract procurement program, it is not always easy to determine what parts of the process may constitute a particular matter or matters involving specific parties and exactly when they do so." OGE Advisory Opinion 05 x 6 (September 19, 2005) (the *Analysis Development Demonstration* opinion).

Based on our understanding of the NCS, the NCS can be viewed as a program having several, more or less distinct, phases: (1) feasibility; (2) concept clearance; (3) study design/planning; and (4) implementation/contracting. Under this construct, as noted above, the concept clearance phase concluded upon approval in March 2004. The study design and planning phase, during which it was determined that the NCS would be accomplished through the collaborative effort of NICHD program and other government officials and contractors selected on the basis of technical merit and geographic location, concluded not later than November 16, 2004, when the RFP for the fiscal year 2005 procurement was issued, a date by which it seems clear that the ongoing implementation/contracting phase began.[14] Considering this date to be the start of the implementation phase of the NCS is also consistent with the NCS E-Update dated November 16, 2004, which describes the NCS as entering the implementation phase with the release of a Study Plan, the list of Study Locations, and the issuance of the fiscal year 2005 RFP. According to information contained in CNA's court filings, Dr. Friedman was employed within the National Institutes of Health (NIH) at the NICHD until March 2006, and was tasked, from October 2005 until February 16, 2006, to lead a team of scientists developing recommendations regarding the neurodevelopmental and social environment assessments in the NCS study for the period between birth and eighteen months of age. *See* CNA's Memorandum at p. 4. Documentation provided in connection with this review reflects that her work as the team leader of the workgroup continued through at least March 19, 2006. In any event, it is clear that Dr. Friedman's participation occurred after the implementation/contracting phase began.

---

[14] As noted herein, NICHD expects to issue an RFP in fiscal year 2008 soliciting proposals for Study Centers representing remaining Study Locations. Subject to OMB approval, the first wave of data collection is also scheduled to begin this year.

Interpretive guidance from OGE reflects the general rule that in government contracting matters, parties are first identified "when the Government first receives an expression of interest from a prospective contractor." OGE DAEOgram DO-06-029 (October 4, 2006). *See also* OGE Advisory Opinion 91 x 33 (August 29, 1991) (citing earlier opinion in which OGE stated, "the question of when a particular matter involves a specific party is not to be determined mechanically by dates of contract documents, but more realistically by the degree of interest expressed and contacts made with...parties as contractual requirements evolve."), and OGE Advisory Opinion 05 x 06 (and citations therein). When parties to a particular matter are identified, the matter, by definition becomes a particular matter involving specific parties. Proposals submitted in response to the fiscal year 2005 RFP were due on or before February 16, 2005. Based on our reading of the *Yucca Mountain* opinion, the NCS was, as of that date, considered a particular matter involving specific parties in which Dr. Friedman subsequently participated.[15]

As previously noted, the Children's Health Act of 2000 called for one study; there was one concept approval for the entire project. The Research Plan and RFPs all indicate that the Study Centers will work collaboratively with each other, as members of the NCS Steering Committee, and with NICHD program and other officials to refine the further design and planning necessary to conduct a nationwide longitudinal study of this magnitude and duration, and that all data collection will occur according to standardized protocols. These facts, coupled with the need to maintain a statistically representative sample at all times, reflect the inter-relatedness of all of the Study Center contracts. The NCS was not considered analogous to government programs under which numerous awards having little direct relation to each other are made.

The Office of Government Ethics has advised that matters sharing a common nucleus of operative facts and related issues are not to be broken down into component parts. *See* 5 C.F.R. § 2637.201(c)(4); OGE Advisory Opinion 99 x 16 (September 10, 1999). Moreover, even if we had considered the contracts awarded as a result of the fiscal year 2007 procurement, in relation to which CNA proposed Dr. Friedman as a PI, as separate matters, we believed that the permanent ban on representational communications or appearances would still apply, based on the facts described below.

As we have noted, OGE has advised that in government contracting matters, the matter becomes a particular matter involving specific parties "when the Government first receives an expression

---

[15] That CNA may not have been an identified party at the time of Dr. Friedman's participation in the NCS was not considered relevant. Noting that "[i]f the statute had intended to prohibit only a former employee's representations of a party which was involved at the time of his or her official participation in the matter, a simple change in the language could have made that clear," OGE has concluded that section 207(a) applies even where the party the former employee would appear or communicate on behalf of was not an identified or proposed party at the time of the employee's participation in the relevant matter. OGE Advisory Opinion 84 x 15 (November 19, 1984).

of interest from a prospective contractor." OGE DAEOgram DO-06-29. In the *Analysis Development and Demonstration* opinion, OGE explained that the Government may even receive expressions of interest from prospective bidders in advance of a published solicitation or request. *See* OGE Advisory Opinion 05 x 6, at pages 6-7. Further, it is well-settled that the permanent post-employment ban can apply where the employee's participation was during an arguably preliminary or informal stage of a contract. *Id.* (citing 2 Op. O.L.C. 313, 315 (1978)).

The RFP issued in fiscal year 2005 solicited proposals for eight Study Locations: Orange County, CA; Orange County, FL; Lincoln, Pipestone, and Yellow Medicine Counties, MN; Duplin County, NC; New York City (Queens), NY; Montgomery County, PA; Salt Lake County, UT; and Waukesha County, WI. As previously noted, the RFP was issued on November 16, 2004, and proposals were due on or before February 16, 2005. The RFP indicated that Study Centers covering other Study Locations would be identified through subsequent solicitations. The list of other Study Locations was, as noted above, also released on November 16, 2004. Among the papers provided in connection with our review of the 2007 determination regarding Dr. Friedman's eligibility to serve as a Study Center PI, are a number of communications received by program and contracting staff regarding the NCS. From these, we have identified thirteen inquiries received in calendar year 2005 (i.e., prior to or during the time of Dr. Friedman's service as team leader) from universities, medical facilities and practices, and county health administrations, each of which requested information on eligibility requirements and/or the steps necessary to become a Study Center. Three of these expressions of interest came from entities within the census region that includes the State of Maryland.[16] Because the RFP issued in fiscal year 2007 solicited proposals for Study Centers covering all remaining Study Locations, the communications made in 2005 by entities eligible to serve as Study Centers for the Maryland locations can be considered early expressions of interest regarding the publicized future procurement(s). Consequently, even if each contract awarded under the NCS were viewed as a separate matter from the NCS itself, the contracts awarded in 2007 would have become particular matters involving specific parties in 2005, prior to or during Dr. Friedman's service as the neuro and psychosocial development team leader. Given this, and the fact that each of the contractors is required by the study design to collect the same data using the same tools, including the tools evaluated and recommended for purposes of the NCS by Dr. Friedman and her team, we believe that Dr. Friedman participated in the Montgomery County, MD, contract that otherwise would have been awarded in 2007 because her work on the protocol(s) to be incorporated in that contract occurred after expressions of interest were made in 2005 by

[16] Information provided in 2005 by the contracting office to those seeking information indicates that in relation to future procurements, successful bidders would be located within the same census region as the Study Location(s) for which they would serve as Study Center. Hence, any of these three could apply to serve as a Study Center for any Study Location in the relevant census region, including Baltimore County or Montgomery County, MD, or otherwise be a partner organization involved in a successful proposal for these counties.

potential bidders who were eligible to serve in the Study Locations in the State of Maryland covered by the 2007 procurement.[17]

In its court filings, CNA asserted that language contained within a regulatory definition of "particular matter involving specific parties" and certain examples following the text provide an "exemption" from section 207(a)(1). CNA asserted that Dr. Friedman participated "'in a proposed program prior to the formulation of a contract.'" *See* Memorandum, p.10. The language quoted by CNA is followed by two examples to illustrate its meaning. According to OGE, the first example reflects that an employee who participates in feasibility or "other technical work *before* parties are identified" to a particular matter may not be subject to the permanent ban. OGE Advisory opinion 05 x 6, p. 5 (emphasis in original). The second reflects that an employee involved in a project before initial proposals or indications of interest are received does not participate in a "particular party matter involving specific parties." *Id.* at p. 6. Although we did not have occasion to address this argument specifically when our advice was rendered initially, as noted herein, the facts demonstrate that even if the NCS were viewed as a program composed of multiple contracts to be issued, Dr. Friedman participated at a time when parties had expressed interest in contract(s) that eventually would be awarded within the respective census regions in which they operated.

Dr. Friedman Participated Personally and Substantially

As noted above, the permanent post-employment ban applies in relation to certain particular matters involving specific parties. Specifically, it applies only in relation to those particular matters involving specific parties in which the former employee participated "personally and substantially" during federal employment. 18 U.S.C. § 207(a)(1)(c). An employee participates personally if she is directly involved or supervises the direct involvement of a subordinate. *See* 5 C.F.R. § 2640.103(a)(2), 5 C.F.R. § 2635.402(b)(4), and 5 C.F.R. § 2637.201(d)(1). Former employees who participated in a matter through the exercise of discretion, the making of recommendations, or the provision of advice are deemed to have personally participated. Where that participation was of significance to the matter, the former employee is deemed to have participated substantially, and "[p]articipation may be substantial even though it is not determinative of the outcome of a particular matter." 5 C.F.R. § 2640.103(a)(2); *see also* 5 C.F.R. § 2637.201(d)(1) (reflecting that personal and substantial participation can occur

[17] Our review of a draft fiscal year 2008 RFP indicates that it is substantially similar to the 2007 RFP in that it solicits proposals for Study Centers covering remaining Study Locations, and informs the contractors that they will collect the same data using the same tools as the others, including those that Dr. Friedman's team evaluated for purposes of the NCS. Accordingly, while it would be premature for us to opine definitively in light of OMB's current consideration of the draft OGE final rule implementing section 207, given the same facts and absent significant changes in OGE's interpretation, we would expect to reach the same conclusions regarding Dr. Friedman's participation in a particular matter involving specific parties in relation to the fiscal year 2008 procurement.

through the making of recommendations or the rendering of advice). Accordingly, we would have rejected the bare assertion presented in CNA's court filings that because Dr. Friedman participated by providing recommendation or advice she could not have participated personally and substantially. The fact that the Steering Committee adopted some, but not all, of her recommendations is similarly not determinative of the substantiality of her participation as, again, there is no requirement that the employee's involvement be determinative of outcome.

Based upon our understanding of the relationship to and effect data collected in the early years of the NCS will have on findings made in later years, and conversations with program officials regarding the significance of the protocol development efforts to the integrity, validity, and perceived quality of the NCS, our opinion was predicated on the conclusion that Dr. Friedman's participation as described herein was both personal and substantial.

<u>Dr. Friedman Would Have Been Required to Appear Before or Communicate with Government Officials with the Intent to Influence on behalf of CNA</u>

As a practical matter, even where the permanent post-employment restriction applies based on a former employee's personal and substantial participation in a particular matter involving specific parties, its only effect is to prohibit the former employee from making, with the intent to influence, any appearance before or communication with government officials on behalf of a third party in relation to the relevant particular matter. 18 U.S.C. § 207(a)(1). It is well-settled that routine requests and exchanges of factual information are not prohibited communications or appearances because they do not reflect the requisite intent to influence. *See* 5 C.F.R. § 2637.201(b)(5). OGE has described the communications and appearances that trigger the statute as those "made for the purpose of seeking a discretionary Government ruling, benefit, approval, or other action in connection with a matter which the former employee knows involves an appreciable element of dispute concerning the particular Government action to be taken." OGE Advisory Opinion 04 x 11 (July 29, 2004), at pages 3-4.

For purposes of this review, Dr. Peter Scheidt, Director of the NCS, was consulted regarding this statutory element. Based on his experiences to date involving the Study Center PIs as members of the Steering Committee, he indicated that he and other program officials meet with Study Center PIs from time to time to discuss matters that are controversial, sensitive, and/or that have financial implications for the Study Centers. He further indicated that he strongly believes that this will continue, and that program officials must be able to fully interact will all PIs in order to fully and effectively implement the NCS in accordance with the statutory mandate. Although a factual determination of a violation cannot be made prior to an appearance or communication by Dr. Friedman acting as the PI for CNA, Dr. Scheidt's description of interactions he has already had with Study Center PIs is entirely consistent with our understanding and what a reasonable person would expect in such a large and complex collaboration in which all participating Study Centers are required to participate in planning and design, as well as data collection and analysis over a period of more than 20 years.

Dr. FriedmanWould Be Required to Make Communications As a Study Center PI on behalf of CNA That Do Not Qualify under the Scientific or Technological Information Exception

An exception to the permanent post-employment ban allows former employees to make communications to an agency "solely" for the purpose of furnishing scientific or technical information.[18] 18 U.S.C. § 207(j)(5). Although this exception was not raised by CNA, we evaluated potential exceptions when our initial opinion was given. For a scientific or technical communication to qualify under the exception, it must have been made (1) "under procedures" acceptable to the agency to which the communication is directed, or (2) the head of such agency must have made, in consultation with the Director of OGE, a certification published in the *Federal Register* that the former employee has outstanding qualifications in a particular discipline, is acting with respect to a particular matter which requires such qualifications, and that the national interest would be served by the participation of the former employee. OGE has opined that if an agency has not established such procedures, "to qualify under the exception, the second statutory mechanism would have to be followed." OGE Op. 96 X 21 (November 5, 1996). HHS has no such procedures, and the Secretary of the Department of Health and Human Services has not undertaken the requisite steps to publish a certification regarding Dr. Friedman and her participation in the NCS.

Dr. Friedman is not Eligible for a Presidential Waiver.

In the absence of applicable exceptions, we considered whether the section 207(k) waiver provision would apply. In recognition of the special relationship between the government and government-owned, contractor-operated entities, the post-employment statute gives the President of the United States limited authority to waive post-employment restrictions for up to twenty-five

---

[18] We determined that the additional statutory exceptions, subparagraphs (j)(1)-(j)(4), (j)(6), and (j)(7), are inapplicable. Subparagraph (j)(1) establishes an exception for activities a former employee may undertake as part of official duties at a federal agency, on behalf of the District of Columbia, or as an elected official at the state or local level. Similarly, subparagraphs (j)(2), (j)(3), and (j)(7) create exceptions for activities undertaken by a former employee on behalf of state and local government institutions, including universities, hospitals and medical research institutions, international organizations, and political parties and campaigns, respectively. Subparagraph (j)(4) reflects that a former employee may make uncompensated statements based on his or her own special knowledge, and subparagraph (j)(6) creates an exception permitting a former employee to provide testimony under oath or penalty of perjury in certain circumstances. Subparagraphs (j)(2), (j)(4), and (j)(7), by their terms, only apply to alleviate the restrictions of sections 207(c), (d), and (e). Since the restriction at issue in the 2007 procurement was section 207(a)(1), these exceptions did not apply. Moreover, because CNA is a private entity and not a governmental body or an international organization, the exceptions provided as subsections (j)(1) and (j)(3) did not apply. Finally, because the activities to be undertaken by a Study Center PI do not involve the provision of testimony, the exception at subparagraph (j)(6) was inapplicable as well.

Executive Branch employees. 18 U.S.C. § 207(k). These waivers may be granted to civilian employees, other than those employed in the Executive Office of the President. In order to grant one, the President must certify in writing that the waiver serves the public interest and that the services of the subject employee are "critically needed for the benefit of the Federal Government." 18 U.S.C. § 207(k)(1). Significantly, these waivers can only be granted:

> (1) To employees who were employed by a Government-owned, contractor-operated entity immediately prior to federal service in connection with the employee's re-employment at that entity following federal service; or
>
> (2) In the case of a federal employee who was employed at the Lawrence Livermore National Laboratory, Los Alamos National Laboratory, or Sandia National Laboratory immediately prior to federal service, in connection with the employee's re-employment at any such national laboratory following federal service.

18 U.S.C. § 207(k)(1)(B). Because CNA is not a Government-owned, contractor-operated entity, a waiver could not be granted to Dr. Friedman under this provision.

## Conclusion

Based upon our review and consideration of numerous documents and other papers related to the NCS, multiple consultations with you and other program officials, and research and analysis of the legal issues surrounding the eligibility of Dr. Sarah Friedman to serve as a Study Center PI for the NCS in light of the criminal post-employment statute, 18 U.S.C. § 207, we rendered the opinion that a violation of the statute would occur if she were to assume that role and make the communications and appearances expected of that position. If you have any questions, please contact Gretchen H. Weaver, Senior NIH Ethics Counsel, on my staff at (301) 402-2577.

# EXHIBIT 2



about the Study

THE NATIONAL CHILDI



## Funding and Legislation

Congress authorized the planning and implementation of the National Children's Study with the Children's Health Act of 2000. The following table shows the Interagency and Congressional funding levels for the Study.

**Interagency and Congressional Funding for the National Children's Study**
**(Dollars in Millions)**

| Funding received during the planning phase of the Study | | | | | | | Funding received during the implementation phase of the Study | |
|---|---|---|---|---|---|---|---|---|
| **FY 2000** | **FY 2001** | **FY 2002** | **FY 2003** | **FY 2004** | **FY 2005** | **FY 2006** | **FY 2007** | **FY 2008** |
| 1.0 | 3.2 | 6.1 | 10.6 | 10.6 | 11.0 | 12.1 | 69.0 | 110.9 |

Contributing Agencies are NICHD/NIH/HHS, NIEHS/NIH/HHS, CDC/HHS, and EPA

## Children's Health Act of 2000

Section 1004 of the Children's Health Act focuses on the National Children's Study. An excerpt from the Act follows:

> *(a) PURPOSE.—It is the purpose of this section to authorize the National Institute of Child Health and Human Development* to conduct a national longitudinal study of environmental influences (including physical, chemical, biological, and psychosocial) on children's health and development.*
> *(b) IN GENERAL.—The Director of the National Institute of Child Health and Human Development* shall establish a consortium of representatives from appropriate Federal agencies (including the Centers for Disease Control and Prevention, the Environmental Protection Agency) to—*
> *(1) plan, develop, and implement a prospective cohort study, from birth to adulthood, to evaluate the effects of both chronic and intermittent exposures on child health and human development; and*
> *(2) investigate basic mechanisms of developmental disorders and environmental factors, both risk and protective, that influence health and developmental processes.*
> *(c) REQUIREMENT.—The study under subsection (b) shall—*
> *(1) incorporate behavioral, emotional, educational, and contextual consequences to enable a complete assessment of the physical, chemical, biological, and psychosocial environmental influences on children's well-being;*
> *(2) gather data on environmental influences and outcomes on diverse populations of children, which may include the consideration of prenatal exposures; and*
> *(3) consider health disparities among children, which may include the consideration of prenatal exposures.*

*Congress passed Public Law 110-154 on December 21, 2007, renaming the Institute as the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development.

For a full copy of the legislation, see Children's Health Act of 2000 (Public Law 106-310 Sec. 1004).

## Congressional History

This study is led by a consortium of federal agency partners including: the National Institutes of Health (NIH), the Centers for Disease Control and Prevention (CDC), the Department of Education (ED), and the U.S. Environmental Protection Agency (EPA).

The National Children's Study is designed to examine the effects of environmental influences on the health and development of more than 100,000 children across the United States, following them from before birth until age 21. The goal of the Study is to improve the health and well-being of children. Researchers will analyze how these elements interact with each other and what helpful and/or harmful effects they might have on children's health. By studying children through their different phases of growth and development, researchers will be better able to understand the role of these factors on health and disease. Findings from the Study will be made available as soon as possible as the research progresses. The Study can also allow scientists to find the differences that exist between groups of people, in terms of their health, health care access, disease occurrence, and other issues, so that these differences or disparities can be addressed.

Congress appropriated funds for Fiscal Years 2007 and 2008 to continue the first phase of implementation of the National Children's Study. With these funds, the seven Vanguard Centers will begin recruitment of families into the Study; in addition, contracts for 22 additional Study Centers were awarded at the end of Fiscal Year 2007 to conduct the Study in 40 additional locations or counties. An additional wave of Study Centers and Locations will be awarded in 2008. The President's Budget Request for Fiscal Year 2009 does not request further funding for the National Children's Study.

Page updated - 04/09/08

# EXHIBIT 3

**DEPARTMENT OF HEALTH & HUMAN SERVICES** National Institutes of Health

National Institute of Child Health
And Human Development
National Children's Study Program Office
6100 Building Room 5C01 MSC 7510
Bethesda, MD 20892-7510
Phone: 301 594-9147
Fax: 301 480-1222
E-mail: NCS@mail.nih.gov

# MEMORANDUM

To: Susan Streufert, Director, Office of Extramural Policy

Through: Chuck Grewe, Deputy Branch Chief, Contracts Management Branch 3/18/2004
Through: Virginia DeSeau, Contracting Officer 3/18/04

From: Ruth Brenner, MD, MPH

Date: March 18, 2004 Regarding Concept Clearance for NCS Vanguard Sites

I am writing this memorandum as follow-up to the memorandum and materials submitted on February 9, 2004 regarding concept clearance for the National Children's Study.

As per discussions with Contracting Officer, Virginia DeSeau, I understand that the materials submitted on 2/9/2004 are sufficient to serve as the concept clearance for the National Children's Study (as per Manual Issuance 6315-1 part A(4)). For your reference I have attached the memorandum and documentation that was submitted on 2/9/2004.

Concurrence Susan Streufert Non- Concurrence ______________

Rationale:

We must assure that the many concerns raised in the attached concept review are addressed. Presumably, this will occur in the peer review of submitted proposals.

DEPARTMENT OF HEALTH & HUMAN SERVICES

For FILE

National Institutes of Health

National Institute of Child Health
And Human Development
National Children's Study Program Office
6100 Building Room 5C01 MSC 7510
Bethesda, MD 20892-7510
Phone: 301 594-9147
Fax: 301 480-1222
E-mail: NCS@mail.nih.gov

# MEMORANDUM

To: Susan Streufert

From: Ruth Brenner, MD, MPH RB

Date: February 9, 2004 delivered 2/9 by RBr

I am writing this memorandum to inquire about the need to conduct further concept clearances for the National Children's Study for future contract solicitations for major components of the study that address the study as a whole. We anticipate awarding contracts for a coordinating center, field sites, central laboratories, and repositories. We have conducted a formal concept clearance for the coordinating center and the study has been discussed extensively, in other public forums and by expert panels. In order to efficiently use our resources, we are seeking advice as to whether further concept clearances are needed for the NCS. Again the NCS is a highly visible study and has been the subject of many evaluations. Perhaps most relevant from the perspective of "concept clearance" are the consultation held in January of 2000 and the recent concept clearance for the establishment of the clinical/data coordinating center for the study.

Briefly, the National Children's Study is a proposed longitudinal cohort study that aims to examine the effects of environmental influences on the health and development of approximately 100,000 children. The plan is to follow the children from before birth until the age of 21 years. The goal of the study is to learn information that will ultimately lead to improvement in the health and well being of children.

In April of 1997 President Clinton issued Executive Order 13045 directing federal agencies to make it a high priority to identify, assess and address children's environmental health and safety risks and created a Task Force on Environmental Health Risks and Safety Risks to Children. On January 12, 2000, the Planning Committee of the Developmental Disorders Workgroup, a workgroup that arose from the original Taskforce, convened an expert panel to discuss what is now known as the National Children's Study. As noted in the materials from this meeting, the panel was asked to "provide information regarding the value and feasibility of a large, longitudinal study of children and the environment." The panel included experts from within and outside the U.S. Government who have experience in the design and conduct of large, longitudinal cohort studies.

In reviewing the summary of the January 2000 meeting, I believe that questions that need to be answered in a concept clearance were addressed by this expert panel; i.e. the significance of the proposed research, the availability of technology to achieve the project, and the practical, scientific and/or clinical uses for the results of the study. A summary of the meeting proceedings is posted on the public website and is also attached to this memorandum. As noted in the attached summary, "There was general support and extremely positive encouragement for conducting a large cohort study." The designers of this study were "encouraged to think boldly" and it was noted that the study should be a "trail blazer in the areas of ethics, data collection, information technology, biological analytic techniques and other areas." Two presentations specifically addressed technological aspects of the study (exposure assessment techniques and biospecimen collection techniques) and the panel recommended that the study take advantage of the latest in information technology and that modern bio-analytic and environmental monitoring techniques be planned into the study. As detailed in the attached report, the panel made a number of other suggestions about the proposed study.

Although inclusion of women and minorities, was not specifically addressed at the January meeting, it was specifically addressed with respect to the NCS at a separate, but very related concept clearance that was conducted on November 3, 2004 for the establishment of a clinical coordinating/data coordinating center for the National Children's Study. The concept review summary of the special emphasis panel is also attached to this memorandum.

In summary, I believe that all of the questions that are to be answered by the concept clearance have been addressed by appropriate groups of experts. Attached are the following in way of documentation:

1) Agenda, including list of speakers and participants, and background materials for the January 2000 consultation
2) Summary of the January 2000 consultation
3) Concept Review Summary for the Clinical Coordination Center / Data Coordination Center for the National Children Study (NCS)

I appreciate your advice as to whether we have already met the requirement to review the concept of the National Children's Study or whether an additional concept clearance is required.

# Consultation to Ascertain Feasibility of Conducting a Longitudinal Cohort Study of Environmental Effects on Mothers and Children

**Wednesday, January 12, 2000**
**Hubert Humphrey Building**
**Stonehenge Conference Room, 6th Floor**
**200 Independence Avenue, S..W.**
**Washington, D.C.**

## AGENDA

| | | |
|---|---|---|
| 8:30 - 8:35 | Welcome and Opening Remarks | Richard Jackson, M.D.<br>CDC/NCEH |
| 8:35 - 8:40 | Introductions and Background | Mark Klebanoff, M.D.<br>NIH/NICHD |
| 8:40 - 8:50 | Opportunities and Challenges: Need for a New Cohort | Philip Landrigan, M.D.<br>Mount Sinai Medical Center<br>New York City, New York |
| 8:50 - 9:10 | Exposure Assessment Techniques | Maurice Berry, Ph.D.<br>EPA/NERL |
| 9:10 - 9:30 | Biospecimen Collection Techniques | Terry Phillips, Ph.D., D.Sc.<br>NIH/OD |

**Study Structures and Implications for Current Use**

| | | |
|---|---|---|
| 9:30 - 10:00<br>10:00 - 10:15 | National Collaborative Perinatal Project<br>Discussion | Karin Nelson, M.D.<br>NIH/NINDS |
| 10:15 - 10:30 | **BREAK** | |
| 10:30 - 11:00 | Danish National Birth Cohort | Jorn Olsen, M.D., Ph.D. |
| 11:00 - 11:15 | Discussion | Danish Epidemiology Science Center<br>Aarhus, Denmark |
| 11:15 - 11:45<br>11:45 - 12:00 | Bogalusa Heart Study<br>Discussion | Gerald Berenson, M.D.<br>Tulane University |

| | | |
|---|---|---|
| 12:00 - 12:30 | ALSPAC Study | Jean Golding, Ph.D. |
| 12:30 - 12:45 | Discussion | University of Bristol |



| | | |
|---|---|---|
| 12:45 - 1:45 | **LUNCH** | |
| 1:45 - 2:15 | Closed-panel HMO | Barbara Cohn, Ph.D.<br>The Public Health Institute<br>Berkeley, California<br>(Background)<br>and<br>Diana Petitti, M.D.<br>Kaiser Permanente<br>Southern California<br>(Issues to Consider) |
| 2:15 - 2:30 | Discussion | |
| 2:30 - 3:00 | Nurses Health Study (mail cohort) | Frank Speizer, M.D. |
| 3:00 - 3:15 | Discussion | Harvard University |
| 3:15 - 4:15 | Discussant Reactions/Recommendations for Most Promising Model | |
| 4:15 - 4:45 | Public Observer Comments | |
| 4:45 - 5:00 | Wrap-up and Appreciation of Presenters and Discussants | |

**Scheidt, Peter (NICHD)**

| | |
|---|---|
| From: | Hale, Cyndy [cmh5@cdc.gov] |
| Sent: | Friday, December 03, 1999 9:22 AM |
| To: | Alexander, Duane (NIH); Amler, Rob; Ashley Coffield (E-mail); Baldwin, Wendy (NIH); Boyle, Coleen; Don Mattison (E-mail); Erickson, Dave; Fraumeni, Joseph (NIH); Goldman, Lynn; Graham, Judy phd; Gunter, Elaine; Hammerstrom, Karen, J.D.; Hardin, Bryan; Hoover, Robert (NIH); Hugh McKinnon MD (E-mail); Jackson, Richard J. (NCEH); Kaufmann, Peter (NIH); Khoury, Muin; Linet, Martha (NIH); Longnecker, Matthew P (NIEHS/DIR/); Michael Weitzman MD (E-mail); Olden, Kenneth (NIEHS/OD); Rodriguez, Evelyn M. (FDA); Romero, Roberto (NICHD); Rubin, Carol; Scheidt, Peter (NIH); Schendel, Diana; Sinks, Tom; Sondik, Edward J. Dr.; Thomson, Elizabeth (NIH); Trovato, Ramona; Vu, Vanessa PhD; Wilcox, Allen J (NIEHS/EBMP); Wilcox, Lynne; William Farland (E-mail); Zenick, Hal PhD |
| Cc: | Carole Kimmel (E-mail); Hale, Cyndy; Klebanoff, Mark (NIH); Yeargin-Allsopp, Marshalyn |
| Subject: | DHHS/EPA Long Cohort Feasibility Consultation |

FNLLTRTOPAR.WPD Agenda1day.wpd FnlCHARGETO.WPD strawman.wpd hotelinfo.wpd

Thank you for agreeing to participate in the January 12, 2000, consultation on the feasibility of conducting a longtudinatl cohort study of environmental effects on mothers and children. I am attaching important information for you concerning this meeting. Attached documents include:

A memo to you advising you of the meeting.
<<FNLLTRTOPAR.WPD>> <<Agenda1day.wpd>>
Background information regarding presentations.
<<FnlCHARGETO.WPD>> <<strawman.wpd>>
Information for out-of-towners on hotel accomodations.
<<hotelinfo.wpd>>
Please be sure to make hotel accommodations now. The rooms are blocked until December 12. Be sure to ask for "Inhouse Reservations."

Should you have any questions concerning the attached material or any other questions about the consultation, please reply to this email or call me on 770-488-4637. We're looking forward to seeing you at the consultation!

Thanks,

Cynthia M. Hale, MPA
Program Analysis Officer
NCEH, CDC

Dear Participants,

Thank you for agreeing to participate in this one-day consultation on January 12, 2000, in the Stonehenge Conference Room, Hubert H. Humphrey Building, Washington, D.C., to determine the feasibility of conducting a large pregnancy and birth cohort in the United States, focusing on "children and the environment." We are looking forward to your reactions to the presentations and suggestions as to how we can best proceed in assessing the feasibility of such a study. As noted on the agenda (attached), we have allotted 15 minutes for discussion after each study structure presentation, and another hour and 45 minutes for discussion (3:15-5:00) after all presentations have been made. Your comments during these discussion periods will be noted and considered when Longitudinal Cohort Study Planning Group meets the following day to draw up recommendations. These recommendations will be forwarded through participating agencies to the President's Task Force on Children's Environmental Health Risks and Safety Risks.

Although you need not prepare any written materials prior to the consultation, you may want to review the two documents (also attached) that we are providing to the study structure presenters. The first piece outlines what the workshop purposes to accomplish, the study structures to be presented, a short description of the issues we would like them to discuss vis a vis their study, and issues we would like them to flesh out. We have also given them a presentation guide listing specific questions they may want to consider in selecting issues to discuss. We've noted that our primary interest is in the structure and operation of each respective cohort, rather than in the results the cohort has produced.

The second piece we provided to them is the "Straw Man," a framework of the topical areas in which we might be interested and the probable types of data we might collect in those areas. We have cautioned them that at this early stage of considering whether such a study would be feasible, the Straw Man is not intended to be definitive, only suggestive, to give them an idea of the type of information we may be seeking.

For those of you outside the metropolitan Washington, D.C., area, a block of suites has been reserved at the Capitol Hill Suites at 200 C Street, SE. The Suites are about 4 blocks "up the Hill" from the Hubert H. Humphrey Building at 200 Independence Avenue, SW. **Please contact In-house Reservations, Capitol Hill Suites, at 202-543-6000, Monday through Friday, 9 a.m. to 5:30 p.m., between November 19 and December 12, 1999, to reserve a suite at the special rate of $110. Be sure to specify that you will be attending the "HHS/EPA Feasibility Meeting."** Additional information on the Capitol Hill Suites is enclosed.

Thank you again for agreeing to participate in this vitally important meeting. Should you have any questions, please feel free to call or email us.

Sincerely,

Mark Klebanoff    Marshalyn Yeargin-Allsopp    Carole Kimmel

# CONSULTATION ON THE FEASIBILITY OF CONDUCTING A LONGITUDINAL COHORT STUDY OF ENVIRONMENTAL EFFECTS ON MOTHERS AND CHILDREN: CHARGE TO PRESENTERS

## BACKGROUND

Not for almost 40 years has a large, longitudinal pregnancy, birth, and childhood cohort study been conducted in the United States. We are now determining the feasibility of beginning another large longitudinal cohort study. Although the impetus for the study originated with concern for environmental effects on multiple aspects of children's growth and development, the specific information to be collected on both exposures and outcomes, has not yet been considered in detail. A Longitudinal Cohort Study Planning Group has been convened under the auspices of the Developmental Disorders Working Group of the President's Task Force on Children's Environmental Health Risks and Safety Risks. The Task Force is co-chaired by the Secretary, Department of Health and Human Services, and the Administrator, U.S. Environmental Protection Agency. The Planning Group is convening this consultation for the purpose of gathering information on other cohort studies that have been conducted, and to discuss various structures and approaches for the cohort study. Recommendations will be developed by the Planning Group and submitted to the Task Force concerning the feasibility of conducting such a study, as well as a structure and long-range plan. Generally, we anticipate that the study would enroll women early in pregnancy, before conception when possible. Exposure and outcome information would be collected several times during pregnancy and at birth. Biological specimens from the mothers and children would be collected. Children would be followed at least through their primary school years, and preferably into adolescence. Groundwork would also be laid to follow them into adulthood. Although subjects would probably be selected from multiple areas of the country, the cohort does not need to be designed as a probability sample of the U.S. population.

## PURPOSE OF THE CONSULTATION

This consultation is being convened to consider issues important in determining whether a longitudinal cohort study of the environmental effects on mothers and children is feasible. Experts on various types of cohort studies will present background on their respective approaches. Presentations will highlight issues that need to be considered in deciding to commence such a study in the United States today, including specific advantages and disadvantages of each type, and its overall feasibility. Discussants will comment on each approach immediately after its presentation, and participants will discuss all of the approaches at the end of the first day, after all presentations have been given.

The Longitudinal Cohort Study Planning Group will meet on the following day to complete discussions about the consultation and to draft the recommendations to the Task Force.

## STRUCTURES TO BE CONSIDERED

Based on existing cohort studies, we have identified six possible approach structures, listed below. Each structure will be presented by the expert identified. They are:

1) Multi-site, medical office-based, using direct, centralized subject interview, follow-up, and minimal data collection through existing administrative structures (Denmark cohort; Jorn Olsen)

2) Single-site, community-based study, prenatal enrollment using mailed questionnaires (English-speaking women) and in-home interviews (non-English-speaking women), with samples of clinic exams of children and environmental inspections of homes, in Bristol, U.K.(Avon Longitudinal Study of Pregnancy and Childhood; Jean Golding)

3) Multi-site, clinic-based, study of pregnancy and children with face-to-face clinic interviews, telephone or mail interviews (less reliance on home interviews) for mothers, and specific medical, neurological, and psychological follow-up exams and specimen collection for children through age 8 years (Collaborative Perinatal Project; Karin Nelson)

4) Community-based (Bogalusa, Louisiana) study incorporating anthropometric evaluations with post-high school follow-up through periodic surveys of children and young adults through 38 years of age (Bogalusa Heart Study; Gerald Berenson)

5) Closed-patient-panel, HMO-based study, similar to the Danish study and the Collaborative Perinatal Project (Child Health and Development Studies; Barbara Cohn, background, and Diana Petitti, issues to consider)

6) Nationwide nurse cohort study conducted through initial mailed questionnaires and mail collection of biological samples with selective verification of reported outcomes and follow-up through questionnaire mailed every 2 years (Nurses Health Study; Frank Speizer)

## ISSUES OF INTEREST

As an invited presenter, you are being asked to present an overview of your study, whether it would be appropriate for the cohort we envision (see the "Straw Man,"enclosed), the strengths and weaknesses of your study design, the likelihood it would result in continued study subject participation, implications for human subjects concerns, staffing and skill mix required by the design, and recommendations for other appropriate designs. These issues are listed as more detailed questions in the presentation guide enclosed.

Should you desire, feel free to comment on the relative feasibility of studying the various outcomes we have listed (or failed to list) in the "Straw Man" table. However, at this point, we are primarily interested in the structural issues of establishing a cohort. **Please advise us of your audiovisual presentation needs, if any.**

# PRESENTATION GUIDE

1) Overview: Please provide an overview of the study design you are presenting, focusing on the structural aspects. For example,

a)What advisory structure did (does) the study have? In other words, how were (are) decisions made to determine what to study and how to study it?
b) Develop a timeline for the planning phase. How long was the total planning phase (lag time between date study was proposed and date first subject was enrolled)? How much of that time was spent on fundraising, developing questionnaires, piloting, etc?
c) What specific pilots did you conduct during the planning phase? Please describe them and whether or not they were helpful.
d) What was the size of the cohort?
e) How were subjects recruited, how did you contact them and under what schedule? What fraction consented to participate? What fraction has/had been followed successfully over time?
f) What level of personnel effort and cost was required to set up and maintain the cohort?
g) How did you collect data?
h) How did you follow up (written or phone questionnaire, exam, interview, etc.)?
i) How did you maintain follow-up?
j) What are the general strengths and weaknesses of the study design you are presenting?
k) How could exposure measurements have enhanced the study?

2) Applicability to "Straw Man":

a) Would the study design you are presenting be appropriate for a cohort as envisioned by the "straw man"?
b) If so, how could the "straw man" be accomplished within the context of the structure you are presenting?

3) What are the strengths of your design for conducting the proposed study?

4) What are the weaknesses and limitations of your design vis a vis the proposed study?

5) How likely is this design to get subjects to participate, both initially and at follow-up?

6) Are there specific or unique issues of confidentiality or other human subjects concerns?

7) In broad terms (cost analysis not necessary), how many people and with what skills would it take to accomplish the "straw man" within your study design?

8) Are there appropriate designs for conducting this cohort that we have not considered?

9) How can exposure measurements enhance the study?

## STRAW MAN

### Potential Themes and Related Data Elements to be Collected at Specified Points

This framework of data elements to be collected at designated points in time during the study include exposure assessment and potential outcomes arranged by proposed "themes." The themes of outcomes are used only as examples, are not ranked in any way, and are neither inclusive nor mandatory. (Determining outcomes to be studied is not our purpose here.) However, knowing factors that might be used to determine the outcomes ultimately studied is important in assessing study designs that may be appropriate. Such factors that might determine outcomes to be studied include:

– importance to public health;
– incidence/prevalence;
– ability to collect data using the study design;
– ease of applying diagnostic criteria (techniques for field study, likelihood of mis-classification, etc.)

## STRAW MAN

### Time Period

| Theme | Preconception | Early, Mid, Late Pregnancy | Birth | Postnatal Infant | Toddler/ Preschool | School aged 7 - 10 years | Age 10 and Up |
|---|---|---|---|---|---|---|---|
| **Exposure Assessment** | Interview; blood/urine other (saliva, buccal swabs); genetic markers; exposure from food, water, air. | Interview; maternal blood/ urine, other (saliva, buccal swabs); exposure from food, water, air. | Cord blood; placenta; maternal blood; breast milk.. | Interview; breast milk; infant blood/ urine; buccal swab exposure from food, water, air. | Interview; blood/urine other; exposure from food, water, air. | Interview; blood/urine other; exam. | Interview. |
| **Growth** | Maternal and paternal size, current and past. | Ultrasound; Maternal and paternal size, if not already collected. | Birth weight; intrauterine growth retardation; preterm delivery; and gestational age. | Postnatal growth (height, weight, head circum-ference). | Postnatal growth; body proportions. | Postnatal growth; body proportions; Tanner scales. | Tanner scales. |
| **Death** | | Spontaneous abortion/fetal death. | Infant death. | Infant death. | Death. | Death. | Death. |

(Continued - 2)

**STRAW MAN**

**Time Period**

| **Theme** | **Preconception** | **Early, Mid, Late Pregnancy** | **Birth** | **Postnatal Infant** | **Toddler/ Preschool** | **School aged 7 - 10 years** | **Age 10** |
|---|---|---|---|---|---|---|---|
| **Birth Defects** | | Ultrasound or termination (e.g. anencephally) | Record review/exam. | Record review/exam. | Record review/exam. | Continue to follow. | Continue to follow. |
| **Cancer** (size of cohort) | | | | Record review, registry link. | Record review, registry link. | Record review, registry link. | Record review, registry link. |
| **Neuro-developmental** | | Maternal blood/ urine for biomarkers (immune status, inflamation, thyroid function, measures of stress); ultrasound for multiple gestation. | Exam (e.g., (Brazelton, hearing); records on screening, blood specimens. | Motor (e.g., cerebral palsy); behavior; maternal-infant bonding. | Previous plus IQ/ cognitive ability, language hearing, vision. | Previous plus learning disabilities assessment, ADHD. | Previous |
| **Respiratory/ Immune** | | | Immune system development. | Asthma, allergies, immune system development. | Previous. | Previous plus pulmonary (age 8 +) | Previous. |

(Continued - 3)

**STRAW MAN**

**Time Period**

| Theme | Preconception | Early, Mid, Late Pregnancy | Birth | Postnatal Infant | Toddler/ Preschool | School aged 7 - 10 years | Age 10 |
|---|---|---|---|---|---|---|---|
| **Reproductive** | | | | | | Tanner scales. | Previous plus menses. |
| **Endocrine** | | | | | | | Glucose tolerance test. |
| **Cardiovascular** | | | | Central pulse rate, blood pressure. | Central pulse rate (to age 4), blood pressure. | Blood pressure (age 5+). | Blood pressure, lipids, fibrinogen, genetic markers for thrombophilia. |
| **Infectious Diseases** | Antibody status, markers for chronic endometritis | Biomarkers (cytokines, other markers). | | Respiratory infections, otitis, immuni-zation. | Respiratory infections, otitis, immuni-zation. | Respiratory infections, otitis, immuni-zation. | |

Enclosures - 4

1. Agenda
2. Charge to Presenters
3. Straw Man
4. Hotel Information

Rob Amler, MD
Coleen Boyle, PhD
Dave Erickson, DDS, PhD
Elaine Gunter, PhD
Bryan Hardin, PhD
Dick Jackson, MD
Muin Khoury, MD, PhD
Carol Rubin, DVM, MPH
Diana Schendel, PhD
Tom Sinks, PhD
Ed Sondik, PhD
William Farland, PhD
Judy Graham, PhD
Karren Hammerstrom, JD
Hugh McKinnon, MD
Ramona Trovato
Vanessa Vu, PhD
Hal Zenick, PhD
Duane Alexander, MD
Wendy Baldwin, PhD
Joe Fraumeni, MD
Bob Hoover, MD
Peter Kaufmann, MD
Doreen Koretz, PhD
Martha Linet, MD
John Marler, MD
Ken Olden, PhD
Roberto Romero, MD
Peter Scheidt, MD, MPH
Elizabeth Thomson, MS, RN
Allen Wilcox, MD, Phd
Ashley Coffield
Lynn Goldman, MD, MPH
Donald Mattison, MD
Evelyn Rodriguez, MD
Michael Weitzman, MD

# A SAFE AND HEALTHY ENVIRONMENT FOR CHILDREN

## *A National Longitudinal Cohort Study of Environmental Impacts on Children and Families*

June 2000

The President's Task Force on Environmental Health Risks and Safety Risks to Children

**THE PRESIDENT'S TASK FORCE ON ENVIRONMENTAL HEALTH RISKS AND SAFETY RISKS TO CHILDREN**

President William Jefferson Clinton issued Executive Order 13045 on April 21, 1997, directing each Federal Agency to make it a high priority to identify, assess, and address children's environmental health and safety risks. In issuing this order, the President also created the Task Force on Environmental Health Risks and Safety Risks to Children, co-chaired by Donna E. Shalala, Secretary of the U.S. Department of Health and Human Services, and Carol M. Browner, Administrator of the U.S. Environmental Protection Agency. The Task Force was charged with recommending strategies for protecting children's environmental health and safety.

**MEMBERS**

Honorable Donna E. Shalala
Task Force Co-chair
Secretary
U.S. Department of Health and Human Services

Honorable Carol M. Browner
Task Force Co-chair
Administrator
U.S. Environmental Protection Agency

Honorable Alexis Herman
Secretary
U.S. Department of Labor

Honorable Janet Reno
Attorney General
U.S. Department of Justice

Honorable Andrew Cuomo
Secretary
U.S. Department of Housing and Urban Development

Honorable Bill Richardson
Secretary
U.S. Department of Energy

Honorable Richard Riley
Secretary
U.S. Department of Education

Honorable Dan Glickman
Secretary
U.S. Department of Agriculture

Honorable Rodney Slater
Secretary
U.S. Department of Transportation

Honorable Ann Brown
Chairman
U.S. Consumer Product Safety Commission

Honorable Jacob J. Lew, Director
Office of Management and Budget

Honorable George Frampton, Chair
Council on Environmental Quality

Honorable Martin N. Bailey
Chair
Council of Economic Advisors

Honorable Neal Lane, Director
Office of Science and Technology Policy

Honorable Gene Sperling
Assistant to the President for Economic Policy

Honorable Bruce Reed
Assistant to the President for Domestic Policy

**THE LONGITUDINAL COHORT PLANNING GROUP**

The Longitudinal Cohort Planning Group was organized under the auspices of the Developmental Disorders Workgroup of the President's Task Force on Environmental Health

Risks and Safety Risks to Children.

**MEMBERS**

Maurice Berry, Ph.D.
National Exposure Research Laboratory
U.S. Environmental Protection Agency

Adolfo Correa, M.D., Ph.D.
National Center for Environmental Health
Centers for Disease Control and Prevention

Cynthia Hale, M.P.A.
National Center for Environmental Health
Centers for Disease Control and Prevention

Samuel S. Kessel, M.D., M.P.H.
Office of the Secretary
Department of Health and Human Services

Carole A. Kimmel, Ph.D.
National Center for Environmental Assessment
U.S. Environmental Protection Agency

Mark Klebanoff, M.D., M.P.H.
National Institute of Child Health and Human Development
National Institutes of Health

Matthew Longnecker, M.D., Sc.D.
National Institute of Environmental Health Sciences
National Institutes of Health

Carol Magee, Ph.D., M.P.H.
Department of Veterans Affairs

Cynthia A. Mamalian
National Institute of Justice
Department of Justice

Pauline Mendola, Ph.D.
National Health
and Environmental Effects Research Laboratory
U.S. Environmental Protection Agency

Jerome A. Paulson, M.D.
National Center for Environmental Health
Centers for Disease Control and Prevantion
Office of the Secretary
Department of Health and Human Services

Dalton Paxman, Ph.D.
Office of the Secretary
Department of Health and Human Services

W. Garry Rudolph, M.D.
Bureau of Medicine and Surgery
United States Navy

Kenneth Schoendorf, M.D., M.P.H.
National Center for Health Statistics
Centers for Disease Control and Prevention

Sherry Selevan, Ph.D.
National Center for Environmental Assessment
U.S. Environmental Protection Agency

Thomas Sinks, Ph.D.
National Center for Environmental Health
Centers for Disease Control and Prevention
Sue Swenson, M.B.A., M.A.
Administration on Developmental Disabilities

Allen Wilcox, M.D., Ph.D.
National Institute of Environmental Health Sciences
National Institutes of Health

Marshalyn Yeargin-Allsopp, M.D.
National Center for Environmental Health

Centers for Disease Control and Prevention

## EXECUTIVE SUMMARY

Executive Order 13045 (April 21, 1997) directs Federal agencies to make it a high priority to identify, assess, and address children's environmental health and safety risks, and created **the Task Force on Environmental Health Risks and Safety Risks to Children.** Co-chaired by the Secretary, HHS, and Administrator, EPA, the Task Force was charged to recommend strategies to protecting children's environmental health and safety, and chose four priorities: (1) asthma; (2) unintentional injuries; (3) cancer; and (4) developmental disorders. The Developmental Disorders (DD) Workgroup recognized that a large, prospective cohort study of children could offer a comprehensive approach to understanding how the environment, family, and society interact with the genetic constitution of the developing fetus and child. Large longitudinal studies of U.S. children were conducted 40-50 years ago, but the feasibility of conducting a modern-day longitudinal cohort study of children was in question.

On **January 12, 2000**, the Planning Committee of the DD Workgroup convened an expert panel to present state-of-the-art exposure assessment techniques and alternative study structures and methods to about 90 invited participants from government, academia, and private sector. Presentations highlighted issues to be considered in deciding the feasibility of such a study. General conclusions of participants' discussion were:

- General support and extremely positive encouragement for conducting a large cohort study.
- Realization that children cannot be studied apart from their parents and their families and that studies should be sensitive to behavioral, social, and cultural aspects of the children and families.
- Need to develop specific hypotheses using a longitudinal cohort approach.
- Critical need for broad-based support within the communities proposed to be studied.
- Need to address from the beginning ethical issues regarding collection, storage, and eventual distribution of information, biologic specimens, genetic material, and environmental samples.
- Observation that the study should take advantage of the latest in information technology.
- Need for resolution of issues of internal versus external validity, particularly regarding follow-up.
- Need for diversity of the study population; need for a "representative" sample was not resolved.
- Modern bio-analytic and environmental monitoring techniques should be planned into the study.
- Need for interaction/collaboration among all the Federal agencies.
- Need for new money to conduct the study.
- Need for a strong, central, small directing group dedicated solely to designing/conducting the study.

**On January 13**, the Planning Committee developed the following recommendations to the Task Force:

(1) The Task Force should plan a national longitudinal cohort study of children's environmental health.

(2) New money for this study is imperative.

(3) Full-time personnel are required to organize/oversee movement into the pre-pilot study planning phase.

**TIMELINE FOR FUTURE ACTIONS: Pre-pilot Phase**

| | |
|---|---|
| April 2000 | Develop study hypotheses that can only address important public health issues through longitudinal cohort study. |
| April 2000 | Establish an interagency coordinating team to oversee/organize the pre-pilot planning. |
| May 2000 | Begin to determine options for study design through consultations and |

committees.

| | |
|---|---|
| Jan-April 2000 | Develop a proposed study design. |
| July-Sept 2001 | Funding of first pilot studies. |

## INTRODUCTION

Evaluating the link between environmental exposures and developmental disorders in children is a difficult research challenge. The range of developmental disorders is extremely wide, as is the range of exposures that might effect a child's intellectual, physical, emotional or social growth and development. Many exposures have different effects when they occur at different times, either before or after birth; for some exposures this critical window may be short. Short critical windows make the retrospective study of exposures that might cause developmental disorders in children very difficult. A prospective, longitudinal study of pre- and post- natal growth and development, in which information is collected at multiple points in time about pregnant women and subsequently about their children and families, is the optimum design with which to study the dynamic nature of growth and development. However, longitudinal cohort studies of pregnancy and childhood are difficult to carry out. The last such large cohort studies in the United States were begun in the 1950s and early 1960s, and the feasibility of conducting such a study in present times is uncertain.

To explore the feasibility of conducting a large, longitudinal cohort of pregnancy, childhood and adolescence, the Centers for Disease Control and Prevention, U.S. Environmental Protection Agency and National Institutes of Health, under the auspices of the President's Task Force on Environmental Health Risks and Safety Risks fo Children, conducted a consultation on January 12 and 13, 2000. Experts from within and outside the Government who have experience in the design and conduct of large, longitudinal cohort studies were invited to provide advice regarding the feasibility of conducting a longitudinal cohort study, as well as regarding issues that must be considered is such an undertaking. This report details the background of this consultation, as well as its results.

## A SAFE AND HEALTHY ENVIRONMENT FOR CHILDREN

A growing body of science indicates that a child's growth and development are enhanced by a healthy and safe environment. Conversely, children may suffer disproportionately from environmental health and safety risks. Some normal childhood behaviors may result in exposures to physical, chemical, biological, or psychosocial threats, contaminants, and safety hazards. Pound for pound, children eat and drink more food and liquids, and breathe more air than adults. Children grow rapidly, and their absorption, distribution, metabolism, and excretion of various substances change over time, affecting how well they tolerate environmental exposures. Children by their very nature - small in size and weight - are less able to withstand the energy forces associated with injury and are less well protected by adult/standard safety features.

A child's environment represents more than hazards related to a specific exposure. It characterizes the totality of conditions and milieu in which a child grows and develops. The consequences of an unsafe and unhealthy environment may have long latency periods that result in untoward outcomes later in time. Thus, the scope of securing a safe and healthy environment for children is broad and encompasses the tenets of protection, prevention, and promotion throughout the life cycle.

The President's Task Force on Environmental Health Risks and Safety Risks to Children is

guided by a directorate comprised of a senior staff planning committee and workgroups on (1) program implementation and (2) data needs and research. In addition, four workgroups were formed to address the following priority areas: (1) asthma, (2) unintentional injuries, (3) cancer, and (4) developmental disorders.

Collectively, these priority areas represent key sentinel conditions concerning childhood morbidity and mortality. They also represent important opportunities for disease prevention and health promotion to prevent or relieve lifelong injury, illness and disability. In addition, their successful resolution requires broad cooperation and support from quality health and human services, environmental and legal protection, quality education, nutritious and safe foods, and safe and clean transportation. A safe and healthy environment for children requires safe labor and industry practices, safe and appropriate housing, safe consumer products and energy, as well as sound complementary fiscal, economic, domestic, and science policy.

The President's Task Force on Environmental Health Risks and Safety Risks to Children has employed four principles in directing its efforts: (1) primary prevention - eliminating the threat of exposure to harmful events or hazardous substances; (2) secondary prevention - providing screening, treatment, and follow-up care before the condition deteriorates to irreversible morbidity or mortality; (3) surveillance and monitoring - providing data for evaluation, decision making and resource allocations; and (4) research - generating new knowledge for effective primary prevention and quality treatment.

## STRATEGIC SCIENCE

Evaluating the link in humans between environmental exposures and developmental disorders is a major research challenge given the range of outcomes that may arise from one exposure and the variety of factors that can result in a given outcome. The range of developmental disorders affecting children is wide and includes intrauterine growth retardation, infant mortality, birth defects, suboptimal postnatal growth and development, functional deficits (e.g., neurobehavioral, immune, reproductive, respiratory) and possibly the foundations for chronic diseases of adulthood. The factors that might be responsible for these outcomes are equally diverse. Prenatally, they range from genetic disorders to *in utero* exposures to infectious agents, poor maternal nutrition, tobacco, alcohol, drugs, and other chemicals. Even before conception, exposures of parents to radiation and chemotherapeutic agents have been linked with developmental disorders. In early childhood, exposures of concern run the gamut from lead and environmental tobacco smoke to lack of a nurturing and stimulating environment. The timing and pattern of these exposures impacts the types of effects that are seen, and the degree to which children are affected.

It is estimated that more than 150,000 babies in the U.S. (about 4 percent of all live births) are born with significant birth defects each year. Ranging from severe to mild, 2% to 17% of children in the U.S. have a developmental disorder, such as cerebral palsy, mental retardation, autism, or a hearing impairment. While the exact proportion attributable to environmental factors is unknown, exposure to environmental hazards often have lasting and profound consequences for children's growth and development that may not manifest themselves until adulthood. A child's nervous system, reproductive organs, and immune system grow and develop rapidly during the first months and years of life. As organ structures develop, vital

connections between cells are established. These delicate developmental processes in children may be easily and irreversibly disrupted by environmental substances, such as lead, mercury, and polychlorinated biphenyls (PCBs), producing lasting changes in intelligence, behavior, and reproductive capability.

The consequences of both prenatal and postnatal lead exposure demonstrate the importance of investigating both acute and life-long toxicity and harmful effects in several domains. Lead is a neurotoxic metal that affects areas of the brain associated with regulating behavior by altering the output of neurotransmitters and disrupting the development of nerve cells. Exposure of pregnant women to lead may result in transfer of the metal to a developing fetus, resulting in developmental problems, while exposure of children, even to low levels, can cause lowered intelligence, reading and learning disabilities, impaired hearing, reduced attention span, hyperactivity, and antisocial behavior. Many of these problems last a lifetime and impact the quality of life of the child and his or her family.

Consequently, the President's Task Force on Environmental Health Risks and Safety Risks to Children seeks to establish and coordinate efforts of a unique multi-agency strategy to implement a longitudinal cohort study of environmental impacts on children and families. This national effort will assess the effects of early and ongoing exposures to physical, chemical, biological and psycho-social environmental influences on children's well-being, identifying both risk and protective factors.

## SCOPE AND NATURE OF THE INVESTIGATION

In principle, the study design that can best define the effects of multiple environmental exposures, occurring at multiple points during development, on a wide array of possible outcomes is the prospective cohort study. A prospective cohort study can evaluate both chronic and intermittent exposures while avoiding many of the difficulties that alternative study designs have when attempting to reconstruct this information. However, few cohort studies of children have actually been carried out. The only U.S. studies to take a longitudinal approach to examining multiple facets of exposures and specific health outcomes in children were the Federally sponsored Collaborative Perinatal Project, Child Health and Development Studies, and Kauai Child Development Study, all of which were done about 40 years ago. In other countries, such studies are currently underway (e.g. the Avon Longitudinal Study of Pregnancy, Adolescence and Childhood; and the Danish National Birth Cohort Study) or are being planned (e.g. a study of Norwegian children). A similar cohort approach has been used to study chronic health conditions in adults, e.g., the Framingham study.

U.S. researchers have considered conducting a similar present-day study of children, but no planning for such an effort has been undertaken to date due to the expense and time required to plan and conduct a longitudinal study. However, given the recent developments in biomarkers of exposures and outcomes and the experience gained in cohort studies with a narrow scope, it is desirable to now consider conducting a large, prospective cohort study of children, their parents and their families. This would represent a more comprehensive approach to understanding how the environment, family and society interact with the genetic constitution of the developing fetus and child to foster optimal childhood growth and development, and how environmental exposures can adversely affect that growth and development.

Understanding the complexity of human growth and development requires special investigative approaches. Conducting a longitudinal cohort study of children and families is such a special vehicle and it is a unique and necessary approach to assess the effects of prenatal, postnatal, and early childhood exposures to physical, chemical, biological, and psycho-social environmental influences on children's well-being. Central to understanding children's growth and development are the biological, behavioral, social, emotional, educational, and contextual consequences for identifying both risk and protective factors.

The longitudinal study represents a major legacy effort inaugurated by the Task Force. This effort will create an extensive national scientific resource and an interactive and collaborative research infrastructure for basic and applied scientists that will accelerate the pace of gaining new knowledge to improve the health and well-being of children for successive generations. It will enable maximum advantage of new developments in measurement, instrumentation and specimen preservation in the discovery of new knowledge integrated with information garnered from the genome project. This new investment will complement the existing children's environmental health research centers supported by this nation. Funding this research will represent a major commitment to discovering basic mechanisms of developmental disorders and environmental factors that influence growth and developmental processes.

The expertise of several agencies has been combined to explore the possibilities for developing a longitudinal cohort study of children. The study will begin during pregnancy and is intended to follow the children into adulthood. Assessments and data collection will include adverse physical, functional, and psycho-social consequences of environmental exposures. During FY1999 and FY2000, experts were consulted to assess the feasibility and benefits from various designs of longitudinal studies to guide future development of planning a study, conducting pilot tests, and providing information, including cost projections and scope, on which to base design decisions.

## ASSESSING FEASIBILITY

On January 12, 2000, a group of experts with experience in conducting large cohort studies was convened in Washington, D.C. by the Planning Group. Two presentations were made as background to the discussions, one on exposure measurements by Dr. Maurice Berry (EPA/ORD/NERL), and one on biological specimen collection, analysis and storage by Dr. Terry Phillips (NIH/OD). Subsequently, experts on various types of cohort studies presented background on their respective approaches. These included a review of 1) the National Collaborative Perinatal Project by Dr. Karin Nelson (NIH/NINDS); 2) the Danish national cohort study by Dr. Jorn Olsen (Danish Epidemiology Science Center); 3) the Bogalusa Heart Study by Dr. Gerald Berenson (Tulane University); 4) the Avon Longitudinal Study of Pregnancy and Childhood by Dr. Jean Golding (University of Bristol); 5) HMO-based studies by Dr. Barbara Cohn (The Public Health Institute, Berkeley) and Dr. Diana Petitti (Kaiser Permanente, Southern California); and 6) the Nurses Health Study by Dr. Frank Speizer (Harvard University). Presentations highlighted issues that need to be considered in deciding to commence such a study, including specific advantages and disadvantages of each study type, and its overall feasibility. The experts were asked to provide information regarding the value and feasibility of a large, longitudinal study of children and the environment. Invited discussants

commented on each approach and general discussion of all of the approaches was held at the end of the day. The following points and suggestions were made:

- While the specific nature of the longitudinal cohort study will require time and careful consideration of nominal hypotheses, there was general support and extremely positive sentiment for the possibility of conducting a large cohort study.

- Since children cannot be separated from the families in which they live, a longitudinal study must be a study of children, parents and families, and not just a study of children. The study should both collect information on and be sensitive to the behavioral, social and cultural aspects of the children and their families.

- Before giving further consideration to the settings and structure for the study, hypotheses must be developed. There was agreement that a large, long-term longitudinal study must address questions that are of importance to public health and the health of children, and that would be difficult or impossible to address with a smaller, shorter-term and less expensive design. A benefit of a longitudinal design is the ability to evaluate biomarkers of exposures and environmental measurements during critical windows of development, which continue throughout the life course, and to link exposures at particular times in development with their effects.

  - ✓ There was considerable discussion, both from the experts and within the Planning Group, regarding how narrowly or broadly focused the hypothesis should be. However, it was recognized that a study intending to address the health, growth and development of children must collect a wide range of information, from direct assessments of the immediate environment to indirect factors that may relate to a child's ultimate growth and development. Wide-ranging data collection does not mean such a study is merely a "fishing expedition."

  - ✓ Rather than specifying a particular setting for the study, such as within an HMO, a University hospital clinic, a geographic region, etc., the consultants believed that it was preferable to specify the study design, the common protocol, etc., and let investigators representing different institutions and settings submit proposals describing how they would carry out the protocol.

  - ✓ One design feature to be considered is a "core protocol" that all participants would follow, with the opportunity to incorporate modular components or "special studies" based on the characteristics, interests and expertise of the individual sites.

- Building support for a large cohort study both within the technical communities and study participants will be critical. In particular, two similar cohort studies planned or underway in Europe were either severely delayed or required major modification due to failure to build support within the community of general practitioner physicians. The support for the study within the community of parents is as crucial as the support from the medical and research communities. Input from all of these communities (parent, medical and research) should be obtained early in the process.

  - ✓ Ethical issues regarding collection, storage and eventual distribution of information, biologic specimens, genetic material, and environmental samples are paramount and must be addressed from the beginning of the planning process.

  - ✓ The need to garner support for the study should not be allowed to determine the type of information collected. In particular, simply allowing interested parties to exchange their support for questions or topics to be included will result in a poorly designed and unfocused study.

- Consideration should be given to the external and internal validity of the study, particularly with respect to

longitudinal follow-up. Individuals who can be identified before conception, who present early for antenatal care, who can be followed successfully over time, or who have exposures of particular interest, are probably not representative of the general population. During the planning phase, the potentially conflicting issues of "representativeness" versus the requirements to carry out long-term follow up successfully and to address hypotheses of particular interest must be resolved. The consultants themselves could not agree whether the study population should be chosen to be representative of a given area or whether it should be selected to be diverse in its composition and in environmental exposures, but not necessarily representative. All agreed that regardless of this conflict, diversity of the study population was important.

- The study should take advantage of the latest in information technology, particularly the Internet. Modern information technology should be incorporated into the design and conduct of the study from the beginning of planning, rather than being added after the study has already been designed.

- Similarly, modern bio-analytic and environmental monitoring techniques should be incorporated into the study during the planning phase. Some of these techniques already exist, but many may need to be developed specifically for this study. Banking samples for future use as technology evolves was discussed; its successful implementation will require resolution of many issues, particularly in logistics and ethics.

- Provisions and policies for public use of the collected information-- the data on the study forms, the biological specimens, and the environmental samples -- should be incorporated during the design phase, rather than added later. In this context, "public" is defined as both the research community and the general public. However, concerns were raised about the misunderstandings that can occur when individuals unfamiliar with a complex study are allowed to try to analyze the collected data without appropriate guidance and assistance.

- Long-term maintenance and ownership of both the study data and particularly the biological and environmental specimens should be addressed during the planning of the study. Provision should be made to assure adequate funds and facilities to store the biological specimens after the designers and investigators of the study have retired. The plan should be sensitive to the wishes of the study subjects, even years after the data and specimens have been collected.

- Several organizational issues were raised:

✓ Opportunities for public-private (foundations, industry, etc) partnerships should be explored.

✓ Interactions among the Federal Agencies involved will be crucial to the success of this project. More than one presenter expressed concern that conflicts among Agencies for control of the study might doom the entire project.

✓ The presenters, discussants and Planning Group all believed that "new money" must be allocated for a large, longitudinal cohort study to proceed. If Agencies were required to fund this large and expensive cohort from existing allocations, the accompanying reduction in funds available for both Extramural and Intramural research is likely to erode the support of both the Federal and University research communities. Erosion of this critical support would be a serious threat to any planned study.

✓ A strong, central and probably small directing group, dedicated solely to the design and conduct of the study, will be necessary to avoid the pitfalls raised during the consultation.

- Since a large, longitudinal study of parents and children, beginning prenatally and continuing through childhood has not been done in the United States since the 1960s, the designers of the proposed study were encouraged to think boldly. This study should be a trail-blazer in the areas of ethics, data collection,

information technology, biological analytic techniques and other areas.

## RECOMMENDATIONS AND NEXT STEPS

The Longitudinal Cohort Study Planning Group met on January 13, 2000, to review the discussions at the consultation and to draft recommendations to the Task Force. The following general recommendations are made:

- **Based on the consultation and discussions in the Planning Group, the Task Force should move ahead with the planning of a national longitudinal cohort study on children's environmental health.**

- **To conduct a study of such magnitude and importance will require new money that does not reduce current research funds of the various agencies involved.** The Planning Group is in complete agreement with the expert consultants on this point. If current research funds are reduced in order to carry out this study, the general research community would be adversely affected and would not be willing to support the study and its goals.

- **Full-time personnel are required to organize and oversee the numerous activities that will be required to move into the pre-pilot planning phase of the process.** In order to set up the various activities necessary to keep the process moving and to prepare for launching a national cohort study within the next 5 years, an **Interagency Coordinating Team** of a small number (2-3) of full-time individuals must be assigned to this effort. This could be accomplished, for example, by detailing an individual from agencies involved in the activities (e.g., EPA, NIH, and CDC) to a central location in the Washington, DC, area for coordinating these activities. This group would be advised by the Interagency Planning Group, and would be responsible to the Executive Secretariat of the Task Force, as well as their own agencies.

  The team would be responsible for the day-to-day management of all aspects of the pre-pilot phase. This would include planning the various additional consultations and committees (described below); compiling an inventory of other already planned studies that are related to the longitudinal cohort study, including instruments/techniques that are already being developed; setting up meetings/conference calls of the larger Planning Group when needed; writing RFPs or other documents for soliciting proposals for funding of the pre-pilot efforts; communicating with the Task Force, and other appropriate entities on a regular basis; and PR functions such as answering inquiries about the study and producing materials that can be distributed to appropriate interested parties, e.g., government agencies that have not been a part of the planning process to date, academic institutions, parent groups. Maintaining the "spirit" of interagency collaboration at all levels was cited as being extremely important. It is hoped that this proposed structure for coordinating the planning process can be in place in the **next 3 months.**

Included with this concept of the study and recommendations to move forward with planning and the pre-pilot phase is a work plan and a timeline that clearly define the next steps necessary.

## WORKPLAN AND TIMELINE FOR THE PRE-PILOT PHASE

**April, 2000** *Develop hypotheses for the study that address important public health issues that can only or best be addressed in this study.* Many of the other

activities to be conducted in the planning and pre-pilot phase hinge on the statement of the hypotheses to be tested in the study. Work has already begun on this effort within the Planning Group.

**April, 2000** — ***Set up an interagency coordinating team to oversee and organize activities during the pre-pilot planning phase.*** Detail individuals from at least the major agencies involved in planning, e.g., EPA, NIH, and CDC, to a central location in the Washington, DC, area for coordinating these activities.

**Beginning May, 2000** — ***Determine options for study design and conduct through committee/consultation work. Activities would include:***

- organizing additional consultations on ethics and legal issues, social and cultural issues, community involvement/partnerships (public/private/philanthropic), communication, and information technology;
- setting up committees to discuss options for study design, follow-up mechanisms, exposure measurements, outcome measurements, biological specimen collection, analysis, and storage, ownership and maintenance of data and samples; and
- developing a structure that includes the appropriate advisory committees (e.g., ethics, scientific, and other advisory groups as appropriate).

**Jan-April 2001** — ***Develop a proposed study design.*** After a series of consultations, as described above, a proposed study design would be developed by the Planning Group and Coordinating Team based on information gained from the consultations and committee work.

**July-Sept 2001** — ***Funding of first pilot studies.*** The number and nature of these first pilot studies will be determined by the information gathered through the workshops/consultations, and other methods development that has been identified by the Planning Group.

## CONCLUSION

As scientific and technological advances are made, the environment will undoubtedly change. More chemicals and pesticides designed to add comfort and productivity will be introduced. New emissions will alter air quality. High tech innovations will likely add to the number of known and unknown hazards. The interaction between these environmental influences and the biological and psycho-social environment of the child is not known. However, the risk to our planet, particularly our children, likely will rise each year. Consequently, the need for new knowledge to promote well-being and to protect and prevent untoward outcomes similarly rises. Fundamental research, surveillance, and program evaluation on such critical topics as the relationship between the environment and the effect it has on children's health arises from many

scientific disciplines and is supported through several mechanisms. The special nature of children, with their dynamic developmental trajectory, requires a longitudinal approach to assure maximum scientific information on and understanding of adverse health and safety risks in children resulting from exposure to a broad range of environmental agents. Such an enterprise is not only feasible but essential.

The President's Task Force on Environmental Health Risks and Safety Risks to Children has been successful in coordinating multi-disciplinary efforts and the skills of multiple governmental agencies to achieve one common goal – making the future for our children brighter, healthier, and safer. The implementation and execution of a national longitudinal cohort study of children and their families will generate new knowledge critical for new and innovative interventions to bridge the gulfs between different scientific disciplines and assure a safe and healthy environment for children in the coming millennium.

Department of Health and Human Services
National Institutes of Health
National Institute of Child Health and Human Development
Special Emphasis Panel
(Privileged communication)

CONCEPT REVIEW SUMMARY

Concept Title: Clinical Coordination Center / Data Coordination Center for the National Children Study (NCS)

Meeting Date: November 3, 2003 SRA: Hameed Khan, Ph.D.

Project Officer:. Drs. Peter Scheidt & Sarah Keim Branch: National Children's Study

Summary and Recommendation:

RESUME: The Special Emphasis Panel was asked to assess the scientific, technical and program significance of a Concept whose goal is to develop Clinical Coordination Center and Data Coordination Center for the National Children Study (NCS). The reviewers thought that the Concept is sound and its requirements are appropriate. They thought that the development of centralized Clinical Coordination Center/Data Coordination Center will be critical to the success of the National Children's Study. The concept needs to be broadened to adequately consider the information collected outside the clinic. Other exposure related information and samples will have to be collected in homes and communities where children reside. Issues associated with subject confidentiality will need to be carefully considered. The subject must be accurately placed in space and time to effectively examine exposures. Furthermore, children of split families may reside in multiple locations concurrently adding additional complexity to data management. The reviewers provide highly useful comments which will help to develop this Concept into a strong RFP. They found this Concept acceptable and highly recommended it further development.

CRITIQUE 1:

1. **The significance from a scientific or technical standpoint of the goals of the proposed research project.**

The reviewers strongly endorse the concept of a Clinical Coordinating Center/Data Coordinating Center. It will be a huge undertaking; without it the data may never come together in a cohesive manner. The following questions and comments are provided to improve the concept.

(2)

(1) It is clear that this concept addresses a "clinical" setting. It is unclear how data will be collected from "...subsidiary fixed and even mobile sites...(or)...home/community collection of exposure or outcome information..." (see paragraph 1 under scope). The concept does not address these important venues other than paying lip service to them. (In fact is *Clinical* Coordinating Center the right name?

(2) A subject and sample tracking system will need to be established to make this successful. Automated recalls will be necessary to sample all subjects in the critical life stage. Many more samples (in addition to those collected in the clinic) will be collected, analyzed and potentially archived. All these will need to be tracked for best use and acquisition of the data.

(3) Does this CCC receive/handle/ship/archive samples? will it be staffed for sample management/archive/shipping?

(4) Who will assign subject and sample identifiers? At the very least there needs to be a common id structure. Who will maintain the sample id matrix that links the subject with biological and environmental samples collected?

(5) The "Scope" discusses "tailoring" protocols. How will internal data validity be maintained?

(6) QA and Training of clinical data and clinical personnel can be achieved. What about environmental information that may be collected by the subject? Who will have the QA responsibility for that?

(7) Concrete coding will need to be used. Who will maintain codes?

(8) To return information to subjects, the CCC/DCC will need to know identities (see below). Will sufficient information be returned to individuals so that they can evaluate personal information in context?

2. **The availability of the technology and other resources necessary to achieve the goals of the project.**

The technology necessary to accomplish data capture for the clinical components of the project is available and rapidly changing every day. The idea of the CCC/DCC providing hardware and software to each clinical site is very appealing. Control over data architecture, coding, field definition and variable names to list but a few issues will be essential. Uniform provision of equipment will enhance performance and speed with which data becomes available.

(3)

Integration of off-the-shelf programming is appealing. Problems arise when manufacturers change subroutines in program packages that are integrated in data processing programs. Suddenly, there may be field shifts, code issues and other unanticipated problems. Build the program that meets the project needs and KEEP IT STABLE. Do not place the 21+ year

project at the mercy of software designers who must add incessant "features" or who may abandon some critical subroutine on which the process relies.

Technology utilized in other non-clinical sites will be more challenging and depend on local conditions. This portion of data collection will provide a challenge.

3. **The extent to which these are identified, the practical, scientific, or clinical uses for the anticipated results of the proposed study.**

Questions and Concerns: Will there be one Institutional Review Board, or will each of the 35 centers go through their own process? Will subject identities reside at the CCC/DCC? (and how much of it is contingent on IRB?) Are clinical environments and data from subject charts still do-able given the new HIPPA regulations? Will spatial indicators be available of analysis by all? How with confidentiality be protected?

The concept does not address how information outside the clinical setting will be captured.

4. **Attention to ensure the adequacy of inclusion of women and minorities in clinical research.**

This study focuses on mothers and their children. (Note: Some information/biological samples may be required of fathers; they may pose a recruitment challenge.) Inclusion of minority populations in clinical evaluations may be achieved with some additional outreach. I have concerns about enrollment of low socio-economic-status individuals, many of who may be recent immigrants or minority members, in the environmental assessment component of the project. Evaluation of non-clinical sites, and need for unassisted or technologically advanced evaluation of environments may add complexity that disenfranchises some participants or their families. The technological/data needs assessed outside the clinic will need to be carefully considered and accommodated. Gender issues will be less problematic than adequate recruitment of minority populations in the field.

<u>CRITIQUE 2:</u>

**1. The significance from a scientific or technical standpoint of the goals of the proposed research project.**

(4)

The stated goals of the project are as follows:

1. A high degree of clinical coordination and data coordination
2. Satisfying the demand for research data
3. Coordinating the changes and demands placed on the study.
4. Multi-agency participation.
5. Effective planning and management.

The five goals outlined in the proposed concept are well-thought out and necessary for the successful implementation of the NCS. Conceptually a clinical coordination center (CCC) and a data coordination center (DCC) that work in concert will be the linchpin that holds this study together. Consideration has been placed on training, oversight, some reporting, and desire for the

data.

The concept however could consider additional objectives on several different fronts. First, real-time data analysis is a conceptual and practical necessity. Building in this type of capability will ensure that quick field intervention is possible and that data can be released in a timely manner. This leads directly to proposing a third and independent leg of coordination, the analytic coordination center (ACC). The ACC would be responsible for handling data review, analysis, editing, production, sample design, weighting, and confidentiality. The ACC can make objective recommendations without being tied to the whim or will of either the CCC or DCC.

A second and very important consideration is how and when to report results to study participants. The challenges of reporting results shortly after examinations and during/after the long-term follow-up, introduces the significant ethical prospective or retrospective challenges.

A third consideration is internal governmental capacity building for the NCS. While consideration is being made for academic and private industry partners, the federal government needs a core group of people across many domains to lead this effort. Coupled to this is the desire to build up a cadre of people over time who will eventually lead this study. Without such consideration the effort will have considerable problems over time.

Finally, due to the study sample size, the hypothesis being proposed, and the complexity of this effort coordination will be a significant undertaking. It is strongly recommended that the NCS start small and build on success, rather than fielding a very large effort at once.

(5)

**2. The availability of the technology and other resources necessary to achieve the goals of the project.**

The technology to support the goals of the project is in some cases readily available and in other cases may need to be developed. For example many commercial off the shelf (COTS) applications are in the field for collecting medical examination data; laboratory systems are available; and systems for developing CAPI/ACASI questionnaires on varying topics are available. The challenge for the CCC/DCC will be to manage the scope of the examination / laboratory / questionnaire content and then successfully integrate these components. The integration portion of this will require a flexible and stable architecture and will not be COTS. The architecture will require a strong design, development, and implementation team. Staging the process with a requirement / architectural design team, a development team, deployment / support team, and a verification/validation team may be necessary. The NCS is encouraged to consider such an approach.

Second an enterprise wide concept could be utilized for a study of this magnitude. It would incorporate standards for data, equipment, systems integration and other areas. Conceptually this would allow organizations to partner with the NCS and allow for the CCC/DCC to insure consistency with the enterprise solution being utilized.

Finally, perhaps the most difficult challenge with respect to technology and the CCC/DCC will be the re-engineering efforts that naturally will occur as the life of equipment, systems, and software change over time. This will be a regular consideration that may occur in cycles of 6-8 years and should be planned for.

3. The extent to which these are identified, the practical, scientific, or clinical uses for the anticipated results of the proposed study

I do not understand the applicability of the criterion to the CCC/DCC. The only concerns I have are regarding how confidential data will be handled, how disclosure review will be conducted, and report of findings.

**4. Attention to ensure the adequacy of inclusion of women and minorities in clinical research.**

(6)
The Concept suggests that the CCC/DCC will support the NCS in providing a representative set of research results that will be inclusive of women, minorities, and other critical population groups. This is an appropriate and necessary condition for the study. The instructions to reviewers for evaluating research on human subjects, IRB considerations, policy, roles and responsibilities, and the guidelines for the inclusion of women and minorities as subjects in clinical research is adequately covered.
From an analytic perspective if the study is representative than the study design will have adequate coverage of women since mothers will be part of the sample selection. However, what is not clear is how the CCC/DCC will conduct outreach to ensure inclusion, and potentially over-sampling, of minority populations. Such a strategy might be necessary and should be evaluated, perhaps by the ACC as proposed in question #1. The outreach effort will also need to consider different strategies, promotional materials, and community connections depending upon the minority population being served/sampled. Further, sensitivity to different communities will be necessary. As an example communities that have strong religious beliefs may require sensitivity to sexually transmitted disease testing / reporting and physical examinations.

CRITIQUE 3:
**1. Significance from a scientific or technical standpoint of the goals of the proposed research project.**
The scope of work outlined in the above referenced Concept is critical to a research endeavor of the magnitude of the NCS. The CCC/DCC role is necessary to assure the development of and adherence to the study protocols and data collections procedures, to the monitoring of clinical site performance and to provide high quality data analyses and reporting. The CCC/DCC is expected to provide the primary energy behind all quality assurance activities from protocol development, training, performance monitoring, and data cleaning that are required to produce high quality scientific data. These elements are, as the Concept suggests, essential support elements of the scientific efforts to be undertaken within the NCS. Further, their introduction into the NCS early in the specification of all aspects of the study protocol and implementation would be particularly advantageous to the program and is consistent with the well-accepted organizational plan of multi-center studies. One would expect and hope that the CCC/DCC to be configured and staffed to provide substantial leadership to the formulation and conduct of the study.

(7)
There are some aspects of the Concept that would benefit by clarification or modification. First, it is unclear whether what is proposed is two separate entities, a CCC and a DCC, or a single organization covering both sets of functions. While both models can be and have been successful, there are clear advantages in having these functions co-located in a single physical institution.

There are institutions capable of assembling a broad range of expertise needed to respond to a request for an integrated coordinating center, so a preference for this should be considered. Second, though this level of detail is likely to come in subsequent documents, it would be helpful to specify the types of scientific expertise most relevant or needed in the CCC/DCC. This is an extremely broad initiative scientifically and so some sense of these priorities would be useful.
A point of concern is in the relatively low profile assigned to the DCC in this Concept. According to the current document, the DCC uses hardware and software developed and implemented by someone else to fulfill the role of directing data collection and data scrubbing activities, entering data into a research database and performing analyses directed by the CCC and PMO. Thus, the DCC as described is devoid of any specific scientific expertise, and any authority or specific role in the design, development, or implementation of the protocol and the information systems upon which they must rely to fulfill their responsibilities. Thus, if the DCC is a separate entity from the CCC, it may lack the authority needed to fulfill its obligations.
The current document does not suggest any requirement for scientific expertise, including statistics or bioinformatics. Though clearly a critical component of the NCS, it is not clear where this expertise will reside. To house it separately from the DCC problematic in two ways. First it misses the opportunity to engage some highly qualified scientists in this key interface. Second, the Concept does not require that the DCC will be lead by or even closely associated with the statistical and scientific expertise that could and should provide substantial leadership in the routine data oriented activities. These tasks inevitably affect the study's scientific products and so require guidance and a close working relationship with the scientific staff responsible for the end product .
The current document suggests a division of the authority and responsibility for the data related study products. The more intellectually engaging tasks of protocol and systems design and implementation, and specification of analyses are assigned to separate groups (CCC and other unspecified groups), while making the DCC is responsible for their daily use.
A final suggestion is that the issue of data ownership and access and any associated timelines be made clear to the CCC/DCC and all other units from the outset. The configuration of the CCC/DCC will be strongly affected by the requirements to support local, central, and distributed analyses and the associated timelines for these. It would be advantageous to all to set the tone of the program in this phase, signaling an intent to develop a partnership among scientific peers.

(8)
The success of a long-term, complex study of this nature will be best ensured by the development of strong working relationship among the numerous parties involved.
A few more minor points should be mentioned. The role in the CCC in tailoring the protocol for specific situations and populations is a task better assigned to those involved in these modifications. The CCC is in a better position to review and approve proposed modifications to protocol for their impact on data analysis and interpretation. The responsibility of the CCC/DCC for support of local for clinical site function should be clarified (e.g., does the CCC/DCC have a substantive role in recruitment and retention? Will there be computing systems to support clinic visit scheduling?).

1. Availability of the technology and other resources necessary to achieve the goals of the project. There are several organizations, both academic, non-profit research, and commercial entities capable of providing the designated coordinating center roles defined in the Concept, as is

evidenced by several other successful studies of generally similar size and scope. The basic computing technologies needed to provide for data acquisition, consolidation, data management, and analysis have in general been in existence for some time. These state of the art technology tools will need to be brought to bear on this process with customized software solutions that will need to be centrally supported, maintained, and strategically updated. A highly-standardized, integrated system will serve this study well if it is robust, well-tailored to the protocol and to the clinical and analytic environments it must serve. To be durable, it needs to be designed to evolve to meet the changing study requirements and to acknowledge and even anticipate the dynamic nature of the computing environment in which the study participants and the clinical sites otherwise exist.

The current Concept suggests that IT system design and development activities are outside of the scope of work of the CCC/DCC and are perhaps already in progress. The strategy of technology development in advance of the protocol and separate from the primary users, both at the DCC and the Clinical sites is a concern. This is an approach that differs from most multi-center study experience. The advantage may be to gain access to a more highly specialized technology resource but the disadvantage is a much more complex organization where these coordination functions are physically and administratively divided.

(9)

2. The extent to which these are identified, the practical, scientific, or clinical uses for the anticipated results of the proposed study.

It is not clear how this criterion is to be applied to this concept. Assuming that it should be interpreted as the practical, scientific or clinical uses of the CCC/DCC contributions to the NCS, the CCC/DCC has a fundamental role in the facilitating the practical aspects of the NCS by supporting and coordinating the daily functions of the operational units. Scientifically, the CCC/DCC has a role in defining, monitoring and improving quality assurance aspects of the entire study, and in specifying the analyses and interpretation of study data. The role in the clinical functioning is a supportive one, in shaping the study protocol to make it feasible for clinical sites, in providing a constant and consistent source of guidance in adherence to protocol and in facilitating sharing of information across study units.

The practical concerns are in the management and protection of confidential data, the maintenance of consent particularly with regard to use of biological specimens, and the changes to the data management and data acquisition systems over time.

3. Attention to ensure the adequacy of inclusion of women and minorities in clinical research.

This criterion is not directly applicable to the CCC/DCC as this organization will not recruit study subjects.

<u>Overall recommendation:</u>

The establishment of a Clinical and Data Coordination Center is absolutely critical to the functioning of the National Children's Study as described in this document. The identification of this entity as early as possible in the planning stage is fully endorsed and will be valuable to the overall design and conduct of the study. The current scope of activities of the proposed CCC/DCC includes many of the aspects of traditional coordinating center roles and as such, is a well-accepted organizational plan. Further, it is likely that there will be several competitors who

can successfully perform these functions. The current concept document is weak in recognizing the statistical and bioinformatics expertise that should be required of the DCC and in clearly establishing the leadership role of these type of scientists for the DCC and for the program as a whole. The apparent intent to specify, develop and implement the information technologies through a mechanism separate from the DCC is also a concern.

(10)

CRITIQUE 4:

**1. The significance from a scientific or technical standpoint of the goals of the proposed research project.**

The goals of the Concept are admirable. More specific information is needed on specific hypotheses to better direct clinical centers in their applications. They will need to know what they are expected to assess, so they can evaluate whether or not they have the ability to complete the work.

The CCC/DCC investigators will need to know what will be assessed (especially related to exposures) so they will know what will be required to develop data collection forms and processes. The CCC/DCC is a "given". No study of this magnitude can be undertaken without one. It is imperative to include a CCC/DCC and include it early in the planning of the project.

Summary Discussion:

Garnet Anderson: The scientific merit of a CCC/DCC is critical. It should be introduced early. Two issues need to be clarified: (1) Are there two entities, a CCC and a DCC, or is there just one site with both components? Her preference, based on previous experiences, is to have one site with both entities. Dr. Peter Scheidt, NICHD project officer, clarified that the intent was for one site, but stated that they are open to proposals where the parts are separate. 2) The place of the CCC/DCC in the study is the second issue to be clarified. Dr. Anderson stated that the study is a broad scientific initiative, but that the CCC/DCC was portrayed as low profile and devoid of scientific expertise. There was also the issue of authority of the CCC/DCC. Specifically, the CCC/DCC should have some authority over study proceedings. In addition, there is no provision for statistics and bioinformatics. By failing to target statistical expertise, the concept statement misses the opportunity to engage high-profile scientists. Dr. Anderson sees the CCC/DCC as critical to the success of the study and feels it should not be portrayed in a low level support role. Dr. Anderson supports having protocol changes coming from others but with the CCC/DCC reviewing, approving and assuring that approved changes are implemented.

Lew Berman: Mr. Berman agrees with having the CCC/DCC as one incorporated entity. He felt it was not clear that any analytic coordinating center had been considered and he supports an independent analytic group that makes recommendations to the CCC/DCC. He asked who would be responsible to report results to participants and feels this point needs to be clarified.

(11)

He also suggested that the capacity for a change in leadership as time progresses be built into the proposal to prevent problems in funding and oversight later on. This is especially important with a study that will follow children from birth to older age.

Mary K. O'Rourke: Dr. O'Rourke feels the CCC/DCC is an essential part of the project due to the need for uniform data collection procedures. She has concerns about subject movement and

tracking, as well as tracking multiple residences. She asked who will be responsible for disseminating data. She feels training of site personnel works fine for clinical centers but may present problems for personnel at mobile sites. She also asked about the collection of biological specimens and if there would be centralized labeling and who would prepare these labels. Dr. O'Rourke felt central coding and central data processing are essential. Other concerns included questions about the process of sample collection, linkage of samples to individuals, preliminary evaluation of the data, and implementation of the protocol at other-than-clinical sites.
Discussion: Dr. Scheidt explained the CCC/DCC will be "brought on board" ahead of the clinical centers and, therefore, will be able to conduct pilot and feasibility studies. Mr. Berman supports a separate analytic site and suggests defining who will be responsible for analyses. Dr. Anderson's experience is with a very integrated model where the analytic group provides the leadership and direction for data management system development (including all activities related to data collection). Mr. Berman is also used to an integrated model, but feels this study will dwarf NHANES and the number of people involved may preclude the same model being used for the NCS. He cautioned against allowing a system where entities other than those experienced with analysis control the CCC/DCC. He felt the analytic group should play a definite leadership role with the CCC/DCC.
Dr. Anderson felt long-term tracking will be difficult and asked where the data will reside. She feels it is best if it resides with the CCC/DCC as they can then play a back-up role with tracking and other study activities when the clinical centers are not able to meet their responsibilities.
Mr. Berman stressed that the nature of what people consider confidential data may change as the study progresses so investigators need to make provisions for these changes. There may also be the issue of children eventually not wanting parents to know about sensitive data they may provide. Dr. O'Rourke is concerned with QA, data confidentiality and training of site personnel, especially when special populations are involved. Dr. Berman suggested creating a research data center where all data would be housed so that sensitive data with identifiers could be analyzed in a secure environment with appropriate measures to maintain that security. Assuring the confidentiality of all data may prevent the preparation and use of public data sets because it might be possible to identify particular participants. Provisions for security of this data will need to be included in any CCC/DCC application.

(12)
Dr. O'Rourke stated some data are linked to environmental data and linking of a large spatial database with community participants may allow individual participant confidentiality to be broken. Any CCC/DCC investigators need to deal with this issue in their proposal. The committee felt there needs to be instructions to investigators in the RFP to clarify the need to fully describe how confidentiality issues will handled.

**2. The availability of the technology and other resources necessary to achieve the goals of the project.**
The technology exists to handle this kind of study. It is feasible to collect data and, although it will be complex; it is logistically feasible to manage the massive amounts of data that will be obtained.
Summary Discussion:
Dr. Anderson felt the technology was available for this kind of study. There are several entities capable of meeting the needs for computing and telecommunications required in a study of this nature and size. Mr. Berman felt the technology is available but the challenge is managing and

integrating the data. He felt a project of this magnitude requires a flexible and stable architecture developed by a strong design team. He supports the enterprise concept in partnership with NCS. Dr. O'Rourke stressed that technology is ever changing and that there are huge problems with "off-the-shelf" software. She recommends internal software development with the CCC/DCC creating study variables and names and preparing centralized coding. She advises attending to the details of the software early so the core of data obtained can be used in the future. She strongly advises against "off-the-shelf" software because her experience shows you have no control over changes and no ability to regain outdated systems in the event of catastrophes. Mr. Berman agreed. Additional comments concerned determining who will maintain the hardware and software. Dr. O'Rourke cautioned against blending software from "off-the-shelf" and newly developed "in-house" systems. Her experience has been that the integration does not work, you have no control of the "off-the-shelf" parts and changes in those parts can displace your data. Mr. Berman strongly agreed with Dr. O'Rourke.
Mr. Berman suggested an enterprise architecture using the NASA model where different aspects or components of the study must match the core system.

(13)
Dr. Anderson relayed her experiences with WHI which has a consolidated, integrated enterprise system that requires close coordination between systems. The integration has been achieved with WHI, however, so it is a feasible alternative. Dr. O'Rourke cautioned that a centralized approach is good for clinical centers but asked about the data coming from "mobile sites" such as households. She feels strongly that any CCC/DCC investigators must fully describe their approach to confidentiality of data especially data collected at "mobile"/non-clinical sites.

**3. The extent to which these are identified, the practical, scientific, or clinical uses for the anticipated results of the proposed study.**
The CCC/DCO has as its primary function, collection of data in such a way that it can be analyzed appropriately and the results presented to the public in a manner that is scientifically correct and applicable to the scientific and clinical communities. This is an "awkward" criterion, however, and I did not really understand its applicability to the idea of a concept review.
Summary Discussion:
Neither Dr. Anderson nor Dr. Berman clearly understood this criterion either. Dr. O'Rourke has concerns about linking national databases with individual data especially data that are not obtained in a clinical setting. Other concerns were those of participant confidentiality and maintenance of consent (and up-dating of consents) related to the use of specimens, as well as who provides consent as study participants age and children become adults.
During discussion, the reviewers thought that management of confidentiality and understanding of the maintenance of consent were important aspects to be carefully and completely described by CCC/DCC investigators. The need for practicality for remote sites was also discussed as well as confidentiality related to reporting of findings.

**4. Attention to ensure the adequacy of inclusion of women and minorities in clinical research.**
Since the study sample is mothers and children, there is no issue about not including women. There is an issue about the inclusion of minorities and those who are not usually involved in studies. How or what efforts are going to be made to include minorities? A full description of

planned sources and activities would be considered minimal information in a CCC/DCC application.

(14)

Summary Discussion:

Dr. O'Rourke had concerns about the minimum literacy and language requirements necessary for participation. If questionnaires are administered by technicians, there will be few problems, but non-clinical sites could have significant problems. The technology for obtaining information at non-clinical sites could be problematic and must be user friendly for those who are not literate, those who have English as a second language and for those who are intimidated by technology. In addition, the process must be economically feasible. Mr. Berman stressed that it is not clear how minorities would be sampled and if there would be over-sampling of specific groups. In addition, outreach efforts were not included. He feels outreach is critical with minorities and endorsements from high profile/high status groups or agencies are very helpful. The CCC/DCC should be involved with recruitment of minorities including religious minorities.

There needs to be a mechanism for replacement of key people and equipment, up-dates of the data management system (hardware and software) and training and re-training of personnel.

# EXHIBIT 4

DEPARTMENT OF HEALTH & HUMAN SERVICES

National Institutes of Health

National Institute of Child Health
And Human Development
National Children's Study Program Office
6100 Building Room 5C01 MSC 7510
Bethesda, MD 20892-7510
Phone: 301 594-9147
Fax: 301 480-1222
E-mail: NCS@mail.nih.gov

# MEMORANDUM

To: Jackie Holden, Director, NICHD Contracts Management Branch
Office of Acquisitions, NIDDK

From: Duane Alexander, Director, NICHD

Date: January 3, 2007

Regarding: Waver of Concept Clearance for NCS Study Centers

I concur that the attached materials submitted on 2/9/04 and approved on 3/9/04 document the concept clearance for the National Children's Study. These documents serve as the concept clearance for the Study as a whole and for future contract solicitations for major components of the study including additional Study Centers.

Approved Duane Alexander
Duane Alexander

DEPARTMENT OF HEALTH & HUMAN SERVICES

National Institutes of Health

National Institute of Child Health
And Human Development
National Children's Study Program Office
6100 Building Room 5C01 MSC 7510
Bethesda, MD 20892-7510
Phone: 301 594-9147
Fax: 301 480-1222
E-mail: NCS@mail.nih.gov

# MEMORANDUM

To: Susan Streufert, Director, Office of Extramural Policy

Through: Chuck Grewe, Deputy Branch Chief, Contracts Management Branch 3/18/2004
Through: Virginia DeSeau, Contracting Officer 3/18/04

From: Ruth Brenner, MD, MPH

Date: March 18, 2004 Regarding Concept Clearance for NCS Vanguard Sites

I am writing this memorandum as follow-up to the memorandum and materials submitted on February 9, 2004 regarding concept clearance for the National Children's Study.

As per discussions with Contracting Officer, Virginia DeSeau, I understand that the materials submitted on 2/9/2004 are sufficient to serve as the concept clearance for the National Children's Study (as per Manual Issuance 6315-1 part A(4)). For your reference I have attached the memorandum and documentation that was submitted on 2/9/2004.

Concurrence Susan Streufert Non- Concurrence ____________

Rationale:

We must assure that the many concerns raised in the attached concept review are addressed. Presumably, this will occur in the peer review of submitted proposals.

DEPARTMENT OF HEALTH & HUMAN SERVICES

National Institutes of Health

National Institute of Child Health
And Human Development
National Children's Study Program Office
6100 Building Room 5C01 MSC 7510
Bethesda, MD 20892-7510
Phone: 301 594-9147
Fax: 301 480-1222
E-mail: NCS@mail.nih.gov

# MEMORANDUM

To: Susan Streufert

From: Ruth Brenner, MD, MPH

Date: February 9, 2004

I am writing this memorandum to inquire about the need to conduct further concept clearances for the National Children's Study for future contract solicitations for major components of the study that address the study as a whole. We anticipate awarding contracts for a coordinating center, field sites, central laboratories, and repositories. We have conducted a formal concept clearance for the coordinating center and the study has been discussed extensively, in other public forums and by expert panels. In order to efficiently use our resources, we are seeking advice as to whether further concept clearances are needed for the NCS. Again the NCS is a highly visible study and has been the subject of many evaluations. Perhaps most relevant from the perspective of "concept clearance" are the consultation held in January of 2000 and the recent concept clearance for the establishment of the clinical/data coordinating center for the study.

Briefly, the National Children's Study is a proposed longitudinal cohort study that aims to examine the effects of environmental influences on the health and development of approximately 100,000 children. The plan is to follow the children from before birth until the age of 21 years. The goal of the study is to learn information that will ultimately lead to improvement in the health and well being of children.

In April of 1997 President Clinton issued Executive Order 13045 directing federal agencies to make it a high priority to identify, assess and address children's environmental health and safety risks and created a Task Force on Environmental Health Risks and Safety Risks to Children. On January 12, 2000, the Planning Committee of the Developmental Disorders Workgroup, a workgroup that arose from the original Taskforce, convened an expert panel to discuss what is now known as the National Children's Study. As noted in the materials from this meeting, the panel was asked to "provide information regarding the value and feasibility of a large, longitudinal study of children and the environment." The panel included experts from within and outside the U.S. Government who have experience in the design and conduct of large, longitudinal cohort studies.

In reviewing the summary of the January 2000 meeting, I believe that questions that need to be answered in a concept clearance were addressed by this expert panel; i.e. the significance of the proposed research, the availability of technology to achieve the project, and the practical, scientific and/or clinical uses for the results of the study. A summary of the meeting proceedings is posted on the public website and is also attached to this memorandum. As noted in the attached summary, "There was general support and extremely positive encouragement for conducting a large cohort study." The designers of this study were "encouraged to think boldly" and it was noted that the study should be a "trail blazer in the areas of ethics, data collection, information technology, biological analytic techniques and other areas." Two presentations specifically addressed technological aspects of the study (exposure assessment techniques and biospecimen collection techniques) and the panel recommended that the study take advantage of the latest in information technology and that modern bio-analytic and environmental monitoring techniques be planned into the study. As detailed in the attached report, the panel made a number of other suggestions about the proposed study.

Although inclusion of women and minorities, was not specifically addressed at the January meeting, it was specifically addressed with respect to the NCS at a separate, but very related concept clearance that was conducted on November 3, 2004 for the establishment of a clinical coordinating/data coordinating center for the National Children's Study. The concept review summary of the special emphasis panel is also attached to this memorandum.

In summary, I believe that all of the questions that are to be answered by the concept clearance have been addressed by appropriate groups of experts. Attached are the following in way of documentation:

1) Agenda, including list of speakers and participants, and background materials for the January 2000 consultation
2) Summary of the January 2000 consultation
3) Concept Review Summary for the Clinical Coordination Center / Data Coordination Center for the National Children Study (NCS)

I appreciate your advice as to whether we have already met the requirement to review the concept of the National Children's Study or whether an additional concept clearance is required.

DEPARTMENT OF HEALTH & HUMAN SERVICES

National Institutes of Health

National Institute of Child Health
And Human Development
National Children's Study Program Office
6100 Building Room 5C01 MSC 7510
Bethesda, MD 20892-7510
Phone: 301 594-9147
Fax: 301 480-1222
E-mail: NCS@mail.nih.gov

# MEMORANDUM

To: Susan Streufert, Director, Office of Extramural Policy

Through: Chuck Grewe, Deputy Branch Chief, Contracts Management Branch 3/18/2004
Through: Virginia DeSeau, Contracting Officer 3/18/04

From: Ruth Brenner, MD, MPH

Date: March 18, 2004

Regarding Concept Clearance for NCS Vanguard Sites

I am writing this memorandum as follow-up to the memorandum and materials submitted on February 9, 2004 regarding concept clearance for the National Children's Study.

As per discussions with Contracting Officer, Virginia DeSeau, I understand that the materials submitted on 2/9/2004 are sufficient to serve as the concept clearance for the National Children's Study (as per Manual Issuance 6315-1 part A(4)). For your reference I have attached the memorandum and documentation that was submitted on 2/9/2004.

Concurrence Susan Streufert Non- Concurrence ____________

Rationale:

We must assure that the many concerns raised in the attached concept review are addressed. Presumably, this will occur in the peer review of submitted proposals.

in FILE

DEPARTMENT OF HEALTH & HUMAN SERVICES

National Institutes of Health

National Institute of Child Health
And Human Development
National Children's Study Program Office
6100 Building Room 5C01 MSC 7510
Bethesda, MD 20892-7510
Phone: 301 594-9147
Fax: 301 480-1222
E-mail: NCS@mail.nih.gov

# MEMORANDUM

To: Susan Streufert

From: Ruth Brenner, MD, MPH RB

Date: February 9, 2004 delivered 2/9 by RB

I am writing this memorandum to inquire about the need to conduct further concept clearances for the National Children's Study for future contract solicitations for major components of the study that address the study as a whole. We anticipate awarding contracts for a coordinating center, field sites, central laboratories, and repositories. We have conducted a formal concept clearance for the coordinating center and the study has been discussed extensively, in other public forums and by expert panels. In order to efficiently use our resources, we are seeking advice as to whether further concept clearances are needed for the NCS. Again the NCS is a highly visible study and has been the subject of many evaluations. Perhaps most relevant from the perspective of "concept clearance" are the consultation held in January of 2000 and the recent concept clearance for the establishment of the clinical/data coordinating center for the study.

Briefly, the National Children's Study is a proposed longitudinal cohort study that aims to examine the effects of environmental influences on the health and development of approximately 100,000 children. The plan is to follow the children from before birth until the age of 21 years. The goal of the study is to learn information that will ultimately lead to improvement in the health and well being of children.

In April of 1997 President Clinton issued Executive Order 13045 directing federal agencies to make it a high priority to identify, assess and address children's environmental health and safety risks and created a Task Force on Environmental Health Risks and Safety Risks to Children. On January 12, 2000, the Planning Committee of the Developmental Disorders Workgroup, a workgroup that arose from the original Taskforce, convened an expert panel to discuss what is now known as the National Children's Study. As noted in the materials from this meeting, the panel was asked to "provide information regarding the value and feasibility of a large, longitudinal study of children and the environment." The panel included experts from within and outside the U.S. Government who have experience in the design and conduct of large, longitudinal cohort studies.

In reviewing the summary of the January 2000 meeting, I believe that questions that need to be answered in a concept clearance were addressed by this expert panel; i.e. the significance of the proposed research, the availability of technology to achieve the project, and the practical, scientific and/or clinical uses for the results of the study. A summary of the meeting proceedings is posted on the public website and is also attached to this memorandum. As noted in the attached summary, "There was general support and extremely positive encouragement for conducting a large cohort study." The designers of this study were "encouraged to think boldly" and it was noted that the study should be a "trail blazer in the areas of ethics, data collection, information technology, biological analytic techniques and other areas." Two presentations specifically addressed technological aspects of the study (exposure assessment techniques and biospecimen collection techniques) and the panel recommended that the study take advantage of the latest in information technology and that modern bio-analytic and environmental monitoring techniques be planned into the study. As detailed in the attached report, the panel made a number of other suggestions about the proposed study.

Although inclusion of women and minorities, was not specifically addressed at the January meeting, it was specifically addressed with respect to the NCS at a separate, but very related concept clearance that was conducted on November 3, 2004 for the establishment of a clinical coordinating/data coordinating center for the National Children's Study. The concept review summary of the special emphasis panel is also attached to this memorandum.

In summary, I believe that all of the questions that are to be answered by the concept clearance have been addressed by appropriate groups of experts. Attached are the following in way of documentation:

1) Agenda, including list of speakers and participants, and background materials for the January 2000 consultation
2) Summary of the January 2000 consultation
3) Concept Review Summary for the Clinical Coordination Center / Data Coordination Center for the National Children Study (NCS)

I appreciate your advice as to whether we have already met the requirement to review the concept of the National Children's Study or whether an additional concept clearance is required.

# Consultation to Ascertain Feasibility of Conducting a Longitudinal Cohort Study of Environmental Effects on Mothers and Children

**Wednesday, January 12, 2000**
**Hubert Humphrey Building**
**Stonehenge Conference Room, 6th Floor**
**200 Independence Avenue, S.W.**
**Washington, D.C.**

## AGENDA

| | | |
|---|---|---|
| 8:30 - 8:35 | Welcome and Opening Remarks | Richard Jackson, M.D.<br>CDC/NCEH |
| 8:35 - 8:40 | Introductions and Background | Mark Klebanoff, M.D.<br>NIH/NICHD |
| 8:40 - 8:50 | Opportunities and Challenges: Need for a New Cohort | Philip Landrigan, M.D.<br>Mount Sinai Medical Center<br>New York City, New York |
| 8:50 - 9:10 | Exposure Assessment Techniques | Maurice Berry, Ph.D.<br>EPA/NERL |
| 9:10 - 9:30 | Biospecimen Collection Techniques | Terry Phillips, Ph.D., D.Sc.<br>NIH/OD |

**Study Structures and Implications for Current Use**

| | | |
|---|---|---|
| 9:30 - 10:00 | National Collaborative Perinatal Project | Karin Nelson, M.D. |
| 10:00 - 10:15 | Discussion | NIH/NINDS |
| 10:15 - 10:30 | **BREAK** | |
| 10:30 - 11:00 | Danish National Birth Cohort | Jorn Olsen, M.D., Ph.D. |
| 11:00 - 11:15 | Discussion | Danish Epidemiology Science Center<br>Aarhus, Denmark |
| 11:15 - 11:45 | Bogalusa Heart Study | Gerald Berenson, M.D. |
| 11:45 - 12:00 | Discussion | Tulane University |

| | | |
|---|---|---|
| 12:00 - 12:30 | ALSPAC Study | Jean Golding, Ph.D. |
| 12:30 - 12:45 | Discussion | University of Bristol |



| | | |
|---|---|---|
| 12:45 - 1:45 | **LUNCH** | |
| 1:45 - 2:15 | Closed-panel HMO | Barbara Cohn, Ph.D.<br>The Public Health Institute<br>Berkeley, California<br>(Background)<br>and<br>Diana Petitti, M.D.<br>Kaiser Permanente<br>Southern California<br>(Issues to Consider) |
| 2:15 - 2:30 | Discussion | |
| 2:30 - 3:00 | Nurses Health Study (mail cohort) | Frank Speizer, M.D. |
| 3:00 - 3:15 | Discussion | Harvard University |
| 3:15 - 4:15 | Discussant Reactions/Recommendations for Most Promising Model | |
| 4:15 - 4:45 | Public Observer Comments | |
| 4:45 - 5:00 | Wrapup and Appreciation of Presenters and Discussants | |

**Scheidt, Peter (NICHD)**

| | |
|---|---|
| **From:** | Hale, Cyndy [cmh5@cdc.gov] |
| **Sent:** | Friday, December 03, 1999 9:22 AM |
| **To:** | Alexander, Duane (NIH); Amler, Rob; Ashley Coffield (E-mail); Baldwin, Wendy (NIH); Boyle, Coleen; Don Mattison (E-mail); Erickson, Dave; Fraumeni, Joseph (NIH); Goldman, Lynn; Graham, Judy phd; Gunter, Elaine; Hammerstrom, Karen, J.D.; Hardin, Bryan; Hoover, Robert (NIH); Hugh McKinnon MD (E-mail); Jackson, Richard J. (NCEH); Kaufmann, Peter (NIH); Khoury, Muin; Linet, Martha (NIH); Longnecker, Matthew P (NIEHS/DIR); Michael Weitzman MD (E-mail); Olden, Kenneth (NIEHS/OD); Rodriguez, Evelyn M. (FDA); Romero, Roberto (NICHD); Rubin, Carol; Scheidt, Peter (NIH); Schendel, Diana; Sinks, Tom; Sondik, Edward J. Dr.; Thomson, Elizabeth (NIH); Trovato, Ramona; Vu, Vanessa PhD; Wilcox, Allen J. (NIEHS/EBMP); Wilcox, Lynne; William Farland (E-mail); Zenick, Hal PhD |
| **Cc:** | Carole Kimmel (E-mail); Hale, Cyndy; Klebanoff, Mark (NIH); Yeargin-Allsopp, Marshalyn |
| **Subject:** | DHHS/EPA Long Cohort Feasibility Consultation |

FNLLTRTOPAR.WPD Agenda1day.wpd FnlCHARGETO.WPD strawman.wpd hotelinfo.wpd

Thank you for agreeing to participate in the January 12, 2000, consultation on the feasibility of conducting a longitudinal cohort study of environmental effects on mothers and children. I am attaching important information for you concerning this meeting. Attached documents include:

A memo to you advising you of the meeting
<<FNLLTRTOPAR.WPD>> <<Agenda1day.wpd>>
Background information regarding the consultation
<<FnlCHARGETO.WPD>> <<strawman.wpd>>
Information for out-of-towners on hotel accommodations
<<hotelinfo.wpd>>
Please be sure to make hotel accommodations now. The rooms are blocked until December 12. Be sure to ask for "Inhouse Reservations."

Should you have any questions concerning the attached material or any other questions about the consultation, please reply to this email or call me on 770-488-4637. We're looking forward to seeing you at the consultation!

Thanks,

Cynthia M. Hale, MPA
Program Analysis Officer
NCEH, CDC

Dear Participants,

Thank you for agreeing to participate in this one-day consultation on January 12, 2000, in the Stonehenge Conference Room, Hubert H. Humphrey Building, Washington, D.C., to determine the feasibility of conducting a large pregnancy and birth cohort in the United States, focusing on "children and the environment." We are looking forward to your reactions to the presentations and suggestions as to how we can best proceed in assessing the feasibility of such a study. As noted on the agenda (attached), we have allotted 15 minutes for discussion after each study structure presentation, and another hour and 45 minutes for discussion (3:15-5:00) after all presentations have been made. Your comments during these discussion periods will be noted and considered when Longitudinal Cohort Study Planning Group meets the following day to draw up recommendations. These recommendations will be forwarded through participating agencies to the President's Task Force on Children's Environmental Health Risks and Safety Risks.

Although you need not prepare any written materials prior to the consultation, you may want to review the two documents (also attached) that we are providing to the study structure presenters. The first piece outlines what the workshop purposes to accomplish, the study structures to be presented, a short description of the issues we would like them to discuss vis à vis their study, and issues we would like them to flesh out. We have also given them a presentation guide listing specific questions they may want to consider in selecting issues to discuss. We've noted that our primary interest is in the structure and operation of each respective cohort, rather than in the results the cohort has produced.

The second piece we provided to them is the "Straw Man," a framework of the topical areas in which we might be interested and the probable types of data we might collect in those areas. We have cautioned them that at this early stage of considering whether such a study would be feasible, the Straw Man is not intended to be definitive, only suggestive, to give them an idea of the type of information we may be seeking.

For those of you outside the metropolitan Washington, D.C., area, a block of suites has been reserved at the Capitol Hill Suites at 200 C Street, SE. The Suites are about 4 blocks "up the Hill" from the Hubert H. Humphrey Building at 200 Independence Avenue, SW. **Please contact In-house Reservations, Capitol Hill Suites, at 202-543-6000, Monday through Friday, 9 a.m. to 5:30 p.m., between November 19 and December 12, 1999, to reserve a suite at the special rate of $110. Be sure to specify that you will be attending the "HHS/EPA Feasibility Meeting."** Additional information on the Capitol Hill Suites is enclosed.

Thank you again for agreeing to participate in this vitally important meeting. Should you have any questions, please feel free to call or email us.

Sincerely,

Mark Klebanoff Marshalyn Yeargin-Allsopp Carole Kimmel

# CONSULTATION ON THE FEASIBILITY OF CONDUCTING A LONGITUDINAL COHORT STUDY OF ENVIRONMENTAL EFFECTS ON MOTHERS AND CHILDREN: CHARGE TO PRESENTERS

## BACKGROUND

Not for almost 40 years has a large, longitudinal pregnancy, birth, and childhood cohort study been conducted in the United States. We are now determining the feasibility of beginning another large longitudinal cohort study. Although the impetus for the study originated with concern for environmental effects on multiple aspects of children's growth and development, the specific information to be collected on both exposures and outcomes, has not yet been considered in detail. A Longitudinal Cohort Study Planning Group has been convened under the auspices of the Developmental Disorders Working Group of the President's Task Force on Children's Environmental Health Risks and Safety Risks. The Task Force is co-chaired by the Secretary, Department of Health and Human Services, and the Administrator, U.S. Environmental Protection Agency. The Planning Group is convening this consultation for the purpose of gathering information on other cohort studies that have been conducted, and to discuss various structures and approaches for the cohort study. Recommendations will be developed by the Planning Group and submitted to the Task Force concerning the feasibility of conducting such a study, as well as a structure and long-range plan. Generally, we anticipate that the study would enroll women early in pregnancy, before conception when possible. Exposure and outcome information would be collected several times during pregnancy and at birth. Biological specimens from the mother and children would be collected. Children would be followed at least through their primary school years, and preferably into adolescence. Groundwork would also be laid to follow them into adulthood. Although subjects would probably be selected from multiple areas of the country, the cohort does not need to be designed as a probability sample of the U.S. population.

## PURPOSE OF THE CONSULTATION

This consultation is being convened to consider issues important in determining whether a longitudinal cohort study of the environmental effects on mothers and children is feasible. Experts on various types of cohort studies will present background on their respective approaches. Presentations will highlight issues that need to be considered in deciding to commence such a study in the United States today, including specific advantages and disadvantages of each type, and its overall feasibility. Discussants will comment on each approach immediately after its presentation, and participants will discuss all of the approaches at the end of the first day, after all presentations have been given.

The Longitudinal Cohort Study Planning Group will meet on the following day to complete discussions about the consultation and to draft the recommendations to the Task Force.

## STRUCTURES TO BE CONSIDERED

Based on existing cohort studies, we have identified six possible approach structures, listed below. Each structure will be presented by the expert identified. They are:

1) Multi-site, medical office-based, using direct, centralized subject interview, follow-up, and minimal data collection through existing administrative structures (Denmark cohort; Jorn Olsen)

2) Single-site, community-based study, prenatal enrollment using mailed questionnaires (English-speaking women) and in-home interviews (non-English-speaking women), with samples of clinic exams of children and environmental inspections of homes, in Bristol, U.K (Avon Longitudinal Study of Pregnancy and Childhood; Jean Golding)

3) Multi-site, clinic-based, study of pregnancy and children with face-to-face clinic interviews, telephone or mail interviews (less reliance on home interviews) for mothers, and specific medical, neurological, and psychological follow-up exams and specimen collection for children through age 8 years (Collaborative Perinatal Project; Karin Nelson)

4) Community-based (Bogalusa, Louisiana) study incorporating anthropometric evaluations with post-high school follow-up through periodic surveys of children and young adults through 38 years of age (Bogalusa Heart Study; Gerald Berenson)

5) Closed-patient-panel, HMO-based study, similar to the Danish study and the Collaborative Perinatal Project (Child Health and Development Studies; Barbara Cohn, background; and Diana Petitti, issues to consider)

6) Nationwide nurse cohort study conducted through initial mailed questionnaires and mail collection of biological samples with selective verification of reported outcomes and follow-up through questionnaire mailed every 2 years (Nurses Health Study; Frank Speizer)

## ISSUES OF INTEREST

As an invited presenter, you are being asked to present an overview of your study, whether it would be appropriate for the cohort we envision (see the "Straw Man," enclosed), the strengths and weaknesses of your study design, the likelihood it would result in continued study subject participation, implications for human subjects concerns, staffing and skill mix required by the design, and recommendations for other appropriate designs. These issues are listed as more detailed questions in the presentation guide enclosed.

Should you desire, feel free to comment on the relative feasibility of studying the various outcomes we have listed (or failed to list) in the "Straw Man" table. However, at this point, we are primarily interested in the structural issues of establishing a cohort. **Please advise us of your audiovisual presentation needs, if any.**