1997). The higher level of monitoring of the cocaine-exposed infants suggests a higher level of vigilance by these infants and/or an inability to fully self-regulate higher levels of arousal. The passive/withdrawn behavior and the lower level of object engagement by the exposed infants suggest that they may be compromising not only their engagement with people but also their engagement with objects. Infants of depressed mothers evidence a similar pattern of behavior (Tronick & Weinberg, 1997).

The observed covariate effects broaden our understanding of the operation of cocaine beyond its specific effects. Higher SES was associated with lower levels of mother neutral social monitoring as was some exposure rather than no cocaine exposure. Lower birth weight and cocaine exposure were each independently associated with lower levels of infant object engagement. Higher levels of maternal alcohol use and the absence of cocaine exposure were each independently associated with higher levels of infant autonomic stress indicators.

Multiple comparisons were conducted in this study. One quarter of the presence of cocaine exposure effects tested (see Table 5) and approximately one fifth of the level of cocaine exposure effects (see Table 6) achieved significance. Using an alpha level of .05, one twentieth of the effects tested would be expected to show significant results by chance alone. It is, of course, possible that that some of the significant results could be due to chance. Yet adoption of too stringent an alpha level might inadvertently lead to mistakenly accepting the null hypothesis that exposure group differences do not exist (Jacobson & Jacobson, 1996). Our confidence in the accuracy of our inferences is strengthened by the fact that the size of the effects is consistent with the findings from other studies of exposure effects on other areas of functioning and by the relative consistency of cocaine (rather than opiate) exposure findings in analyses.

No cocaine exposure effect account for more than 3% of the relevant variance (effect variance plus between subject variance related to the effect); that is, partial eta squared, $\eta_p^2$, never exceeded .03. Using Cohen's (1988) criteria for variance explained, these are small effect sizes . By contrast, the size of within-subject effects associated with the still-face protocol were in the small to medium range, accounting for a maximum of 7% of the relevant variance. .

In contrast to the cocaine-exposed dyads, no interactive difficulties were found for opiate-exposed infants, caretakers, and dyads. One possible explanation is that opiate exposure has a strong immediate impact during the neonatal period (i.e., a withdrawal syndrome) and that early neurobehavioral dysregulation evident in the one-month interactions of these infants is ameliorated by four months of age (see LaGasse, et al., 2003). It is noteworthy that in this sample, dyads exposed to opiates were less likely to be of minority status and the mothers were older than mothers without opiate exposure. The opiate and non-opiate exposure groups also did not differ on socioeconomic variables such as maternal education and marital status. This makes the current group of opiate-exposed infants different from other samples that show more risk for child and maternal interactive deficits (Hans, 1989).

The infants displayed more negative affect, object engagement, and self-regulatory behaviors and less social positive engagement in the Still-Face than in the previous face-to-face Play episode. The infants also evidenced the expected increase in negative affect and the prototypical rebound of positive social engagement from the Still-Face to the Reunion episode (Weinberg & Tronick, 1996). These effects reflect both the carry-over of the negative experience from the Still-Face into the Reunion and the release of positive affect with the resumption of play.

The exposed infants' reaction to the FFSF suggests that the basic social emotional competencies of these infants remain intact. Like other infants, these four-month-olds reacted to the mother's breaking of social connection with the expectancy that she should be engaged with them. An important implication of the integrity of their interactive and regulatory capacities is that these infants are able to learn and adapt to changes in the interaction. Additionally, despite their interactive problems, the exposed-infants' Still-Face reaction suggests that their mothers are able to provide some level of affective and social nourishment to their infants. These findings are a source for optimism for their later development and for the effects of intervention.

Of concern is that the exposed infants' interactions with the mother were more negative than what is typically observed in non-exposed dyads. Most striking at the interactive level is the finding, both before and after statistical controls, that cocaine-exposed dyads engaged in mismatching in which the infant was neutrally engaged but the mother was negatively engaged (Espinosa et al., 2001; Rodning et al., 1989; Swanson, 2000). In samples where there is no drug use, maternal negative engagement during social interaction with their infant is extremely rare (Weinberg, Tronick, Cohn, & Olson, 1999). It is our belief that this neutral-negative mismatch generates frustration and anger in the infant and distrust of the mother (Tronick & Weinberg, 1997), an affective reaction that may compromise future interactions and may be related to later outcomes such as the quality of infant attachment especially if it is a stable chronic pattern.

The findings that the infants in the exposure groups were more likely to be exposed to other substances (e.g., alcohol, tobacco) emphasize that cocaine is a marker for other toxic exposures. Consequently, the observed effects point toward a complex assemblage of factors that lead to interactive difficulties. Nonetheless the covariate control findings indicate that cocaine exposure has a specific effect on the social-interactive behavior of the infant, caretaker, and dyad

and that these effects may show a dose response relationship. In general, the extent of these difficulties is consonant with Lester's interpretation that the neurobehavioral effects of exposure are subtle (Lester et al., 1998; Lester et al., 2002). Further the findings indicate that while cocaine has specific effects independent of other factors that can be described we also believe that an understanding of the behavioral phenotypic effects of cocaine (and opiates) requires a complex systemic regulatory developmental model.

This project is the first large-scale study to evaluate the early social-emotional interactions of cocaine and opiate-exposed infants and their mothers. Significant strengths of the study are the large sample size of the cocaine group, the evaluation of covariates, and use of observational data. A limitation of the study is that the opiate-exposed group was substantially smaller than the cocaine-exposed group and that therefore there was more power to detect cocaine rather than opiate effects. Another limitation is that many dyads were excluded from the analyses because of incomplete FFSF data and/or incomplete data on the Maternal Interview of Substance Abuse (MISU). Proportions of cocaine-exposed and opiate-exposed infants who participated in the FFSF did not differ from the proportions of non-exposed infants indicating that exposure did not diminish infants' capacity to engage in this paradigm. However, caregivers who had both FFSF and interview data were of slightly higher socio-economic status (e.g., more likely to have private insurance, to have finished high school, and to be or have been married) and were less likely to have used cocaine or marijuana during pregnancy. Thus, as is the case for most studies, these findings are not generalizable to infants who are most at-risk because of cocaine exposure and socioeconomic status.

The findings from this and other studies suggest that phenotypic behavioral effects are the product of the interaction over time of the specific independent effects of different factors

(e.g., cocaine) and the interactive effects of a large assemblage of other factors (e.g., birthweight) (Lester et al., 1998; Sameroff & Fiese, 2000). One suggestion is to conceptualize behavioral normalcy or deviance as emerging from the on-going chronic actions and interactions of an ensemble of protective and risk factors. The successful regulation of these factors moves the child along one or another of a large array of normative developmental pathways whereas dysregulation impels the child along one or another deviant pathway. Further, some factors such as SES operate at a macro- and contextual level whereas other factors such as interactive matching and mismatching operate at a micro-temporal level. The operation of micro-temporal factors is such that even small effects at one point in time may accumulate and have large effects over time. Thus, in this study, even though the observed infant, mother and interactive effects were small their eventual accumulated effect on developmental outcome may be significant. Longitudinal follow-up is necessary to determine whether these deficits become more or less pronounced with development.

Table 1

*Neonatal Characteristics of Cocaine-Opiate Exposed and Comparison Groups*

| | Cocaine Exposed (n = 236) Mean ± SD or Number (Percent) | Not Cocaine (n = 459) Mean ± SD or Number (Percent) | P | Opiate Exposed (n = 49) Mean ± SD or Number (Percent) | Not Opiate (n = 646) Mean ± SD or Number (Percent) | P |
|---|---|---|---|---|---|---|
| Mean gestational age wks. | 37.3 ± 3.3 | 37.0 ± 3.6 | .248 | 37.5 ± 3.4 | 37.1 ± 3.5 | .455 |
| Gestational age < 38 wks. | 93 (39.4%) | 200 (43.6%) | .292 | 18 (36.7%) | 275 (42.6%) | .425 |
| Gestational age < 33 wks. | 21 (8.9%) | 59 (12.9%) | .122 | 5 (10.2%) | 75 (11.6%) | .766 |
| Birth weight (gm.) | 2567 ± 772 | 2700 ± 876 | .049 | 2719 ± 822 | 2650 ± 846 | .522 |
| Birth weight < 2500 gm. | 96 (40.7%) | 184 (40.1%) | .880 | 19 (38.8%) | 261 (40.4%) | .823 |
| Length at birth (cm.) | 46.5 ± 5.0 | 47.2 ± 5.2 | .096 | 47.2 ± 4.8 | 46.9 ± 5.2 | .751 |
| Head circumference (cm.) | 32.0 ± 3.0 | 32.3 ± 3.2 | .229 | 32.2 ± 2.9 | 32.2 ± 3.2 | .904 |
| Male | 128 (54.2) | 248 (54.0) | .959 | 27 (55.1) | 349 (54.0) | .884 |

Table 2

*Maternal Characteristics of Cocaine-Opiate Exposed and Comparison Groups*

| Maternal characteristics | Cocaine Exposed (n = 236) | | Not Cocaine (n = 459) | | | Opiate Exposed (n = 49) | | Not Opiate (n = 646) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | P | N | % | n | % | P |
| Race/Ethnicity | | | | | .857 | | | | | .035 |
| Black | 183 | (77.5) | 345 | (75.2) | | 31 | (63.3) | 497 | (76.9) | |
| White | 35 | (14.8) | 77 | (16.8) | | 15 | (30.6) | 97 | (15.0) | |
| Hispanic | 16 | (6.8) | 31 | (6.8) | | 3 | (6.1) | 44 | (6.8) | |
| Other | 2 | (0.8) | 6 | (1.3) | | 0 | (0.0) | 8 | (1.2) | |
| Age | | | | | .000 | | | | | .004 |
| 18-25 | 39 | (16.5) | 212 | (46.2) | | 10 | (20.4) | 241 | (37.3) | |
| 26-35 | 166 | (70.3) | 206 | (44.9) | | 28 | (57.1) | 344 | (53.3) | |
| 36-49 | 31 | (13.1) | 41 | (8.9) | | 11 | (22.4) | 61 | (9.4) | |
| Marital Status | | | | | .000 | | | | | .070 |
| Married | 27 | (11.4) | 123 | (26.9) | | 12 | (25.0) | 138 | (21.4) | |
| Never married | 192 | (81.4) | 322 | (70.3) | | 31 | (64.6) | 483 | (74.8) | |
| Divorced | 17 | (7.2) | 13 | (2.8) | | 5 | (10.4) | 25 | (3.9) | |
| Insurance | | | | | .000 | | | | | .827 |
| Medicaid | 212 | (89.8) | 341 | (74.3) | | 38 | (77.6) | 515 | (79.7) | |
| Self-pay | 13 | (5.5) | 16 | (3.5) | | 2 | (4.1) | 27 | (4.2) | |
| Private/HMO | 10 | (4.2) | 96 | (20.9) | | 9 | (8.4) | 97 | (15.0) | |
| Unknown | 1 | (0.4) | 6 | (1.3) | | 0 | (0.0) | 7 | (1.1) | |

Table 2 cont.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Education | | | | | .000 | | | | | .835 |
| < 12 years | 109 | (46.2) | 135 | (29.4) | | 19 | (38.8) | 225 | (34.8) | |
| 12 years | 89 | (37.7) | 203 | (44.2) | | 20 | (40.8) | 272 | (42.1) | |
| >= 13 years | 38 | (16.1) | 121 | (26.4) | | 10 | (20.4) | 149 | (23.1) | |
| CPS Involvement | | | | | .000 | | | | | .014 |
| No | 152 | (64.4) | 462 | (98.5) | | 37 | (75.5) | 567 | (87.8) | |
| Yes | 84 | (35.6) | 7 | (1.5) | | 12 | (24.5) | 79 | (12.2) | |

Table 3

*Drug Exposure Characteristics of Cocaine-Exposed and Opiate-Exposed Infants*

| Drug use characteristics | Cocaine Exposed (n = 236) | | Not Cocaine (n = 459) | | | Opiate Exposed (n = 49) | | Not Opiate (n = 646) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | n | % | P | n | % | n | % | P |
| Tobacco | | | | | .000 | | | | | .000 |
| High | 93 | (39.4) | 52 | (11.3) | | 23 | (46.9) | 122 | (18.9) | |
| Some | 112 | (47.5) | 95 | (20.7) | | 12 | (24.5) | 195 | (30.2) | |
| None | 31 | (13.1) | 312 | (68.0) | | 14 | (28.6) | 329 | (50.9) | |
| Alcohol | | | | | .000 | | | | | .544 |
| High | 70 | (29.7) | 18 | (3.9) | | 8 | (16.3) | 80 | (12.4) | |
| Some | 126 | (53.4) | 220 | (47.9) | | 21 | (42.9) | 325 | (50.3) | |
| None | 40 | (16.9) | 221 | (48.1) | | 20 | (40.8) | 241 | (37.3) | |
| Marijuana | | | | | .000 | | | | | .572 |
| High | 19 | (8.1) | 8 | (1.7) | | 3 | (6.1) | 24 | (3.7) | |
| Some | 91 | (38.6) | 44 | (9.6) | | 11 | (22.4) | 124 | (19.2) | |
| None | 126 | (53.4) | 407 | (88.7) | | 35 | (71.4) | 498 | (77.1) | |

Note. 17 infants who were exposed to both cocaine and opiates are listed in both exposure groups.

Table 4

*Infant and mother behavior and dyadic interaction regardless of exposure status.*

| | Play | Still-Face | Reunion | F | *P* | $\eta_p^2$ |
|---|---|---|---|---|---|---|
| Infant Engagement | | | | | | |
| Passive/Withdrawn | .000 ± .000 | .002 ± .001 | .002 ± .001 | 0.40 | .673 | .001 |
| Protest | .035 ± .005[a] | .154 ± .011[b] | .150 ± .011[b] | 28.42 | .000 | .039 |
| Object | .501 ± .011[a] | .573 ± .011[b] | .470 ± .011[a] | 12.82 | .000 | .018 |
| Social Monitor | .338 ± .009[a] | .249 ± .009[b] | .280 ± .009[c] | 18.13 | .000 | .026 |
| Social Positive | .108 ± .006[a] | .019 ± .002[b] | .075 ± .004[c] | 51.96 | .000 | .070 |
| Mother Engagement | | | | | | |
| Negative | .006 ± .001 | | .015 ± .001 | 28.01 | .000 | .039 |
| Social Monitor (No Vocalizing) | .106 ± .005 | | .141 ± .007 | 11.08 | .001 | .016 |
| Social Monitor (Positive Vocalizing) | .589 ± .008 | | .617 ± .008 | 2.83 | .093 | .004 |
| Social Positive | .278 ± .008 | | .203 ± .007 | 31.11 | .000 | .043 |
| Dyadic Matches | | | | | | |
| Negative Match | .001 ± .001 | | .004 ± .001 | 3.17 | .075 | .005 |
| Neutral Match | .094 ± .005 | | .103 ± .006 | 1.70 | .198 | .002 |
| Positive Match | .102 ± .005 | | .071 ± .004 | 19.51 | .000 | .027 |
| Total Matches | .197 ± .006 | | .177 ± .006 | 6.23 | .013 | .009 |

Table 4 cont.

| Dyadic Mismatched Phases | | | | | | |
|---|---|---|---|---|---|---|
| Infant Negative – Mother Neutral | .008 ± .002 | | .032 ± .004 | 10.55 | .001 | .015 |
| Infant Negative – Mother Positive | .026 ± .003 | | .114 ± .008 | 30.07 | .000 | .042 |
| Infant Neutral – Mother Negative | .004 ± .001 | | .011 ± .001 | 20.85 | .000 | .029 |
| Infant Neutral – Mother Positive | .725 ± .008 | | .620 ± .010 | 21.80 | .000 | .031 |
| Infant Positive – Mother Neutral | .003 ± .000 | | .002 ± .000 | 0.04 | .847 | .000 |
| Infant Positive – Mother Negative | .000 ± .000 | | .001 ± .000 | 0.83 | .364 | .001 |
| Total Mismatched Phases | .765 ± .007 | | .778 ± .007 | 3.80 | .052 | .005 |

Table 4 continued

| | | | | | | |
|---|---|---|---|---|---|---|
| Infant self-regulation | | | | | | |
| Mouthing | .063 ± .006[a] | .115 ± .008[b] | .068 ± .006[a] | 4.70 | .009 | .007 |
| Self-Clasp | .063 ± .005[a] | .121 ± .007[b] | .052 ± .005[a] | 17.55 | .000 | .025 |
| Distancing | .217 ± .026[a] | .480 ± .039[b] | .300 ± .028[a] | 11.60 | .000 | .016 |
| Autonomic Stress Indicators | .247 ± .057 | .259 ± .0620 | .314 ± .068 | 0.90 | .370 | .001 |
| Mother Dysregulatory Actions | | | | | | |
| Rough Touches | .210 ± .038 | | .196 ± .037 | 0.00 | 1.000 | .000 |

Note: Infant and mother engagement, matching, mismatching and infant oral self-comforting are measured as proportion of time in the protocol. Infant Distancing, Infant Autonomic Indicators, and Mother Rough Touch are measured as frequency per minute. F and P values indicate overall effects between episodes. Different superscripts indicate significantly different means between episodes; they are only relevant for codes measured during the Still-Face. $\eta_p^2$, partial eta squared, is a ratio of variance accounted for by an effect to the sum of effect and total variance. Using Cohen's (1988) criteria, .01 is a small and .06 a medium effect size.

Table 5
Comparisons of FFSF outcomes by cocaine exposure and by opiate exposure

| Measure | Prenatal Cocaine Exposure | | | | | | Prenatal Opiate Exposure | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No N = 459 | Yes N = 236 | Unadjusted | | Adjusted | | No N = 646 | Yes N = 49 | Unadjusted | | Adjusted | |
| | Mean ± SE | Mean ± SE | P | $\eta_p^2$ | P | $\eta_p^2$ | Mean ± SE | Mean ± SE | P | $\eta_p^2$ | P | $\eta_p^2$ |
| Infant Engagement | | | | | | | | | | | | |
| Passive Withdrawn | .000 ± .001 | .002 ± .001 | .179 | .003 | .669 | .000 | .002 ± .001 | .000 ± .002 | .432 | .001 | .585 | .000 |
| Protest | .112 ± .016 | .112 ± .018 | .983 | .000 | .472 | .001 | .113 ± .008 | .110 ± .028 | .913 | .000 | .825 | .000 |
| Object | .526 ± .019 | .507 ± .022 | .300 | .002 | **.017** | **.008** | .511 ± .010 | .522 ± .034 | .737 | .000 | .538 | .001 |
| Social Monitor | .282 ± .015 | .303 ± .017 | .158 | .003 | **.012** | **.009** | .292 ± .008 | .292 ± .027 | .982 | .000 | .878 | .000 |
| Social Positive | .066 ± .006 | .067 ± .007 | .814 | .000 | .763 | .000 | .068 ± .003 | .065 ± .012 | .837 | .000 | .689 | .000 |

Table 5 cont.

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mother Engagement | | | | | | | | | | | | |
| Negative | .009 ± .002 | .013 ± .002 | **.011** | **.009** | .134 | .003 | .011 ± .001 | .011 ± .003 | .825 | .000 | .749 | .000 |
| Social Monitor | .113 ± .011 | .108 ± .013 | .657 | .000 | .062 | .005 | .124 ± .006 | .096 ± .021 | .193 | .002 | .355 | .001 |
| Social Monitor (Positive Vocalize) | .620 ± .015 | .622 ± .017 | .893 | .000 | .434 | .001 | .601 ± .008 | .641 ± .027 | .146 | .003 | .224 | .002 |
| Social Positive | .226 ± .014 | .234 ± .016 | .604 | .000 | .390 | .001 | .243 ± .007 | .217 ± .025 | .209 | .002 | .304 | .002 |
| Dyadic Matching Phases | | | | | | | | | | | | |
| Negative Match | .002 ± .001 | .002 ± .001 | .590 | .000 | .886 | .000 | .003 ± .001 | .001 ± .002 | .506 | .001 | .484 | .001 |
| Neutral match | .092 ± .010 | .088 ± .012 | .705 | .000 | .245 | .002 | .099 ± .005 | .081 ± .018 | .328 | .001 | .560 | .000 |
| Positive Match | .084 ± .008 | .089 ± .010 | .609 | .000 | .688 | .000 | .087 ± .004 | .086 ± .015 | .927 | .000 | .825 | .000 |
| Total match | .178 ± .012 | .179 ± .013 | .926 | .000 | .129 | .003 | .189 ± .006 | .168 ± .021 | .333 | .001 | .425 | .001 |

Table 5 cont.

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dyadic Mismatching Phases | | | | | | | | | | | | |
| Infant Negative – Mother Neutral | .017 ± .005 | .017 ± .005 | .980 | .000 | .789 | .000 | .020 ± .003 | .013 ± .009 | .400 | .001 | .534 | .001 |
| Infant Negative – Mother Positive | .069± .010 | .067 ± .012 | .848 | .000 | .574 | .000 | .069 ± .005 | .066 ± .019 | .851 | .000 | .773 | .000 |
| Infant Neutral – Mother Negative | .007 ± .001 | .011 ± .001 | **.001** | **.016** | **.026** | **.007** | .008 ± .001 | .009 ± .002 | .670 | .000 | .723 | .000 |
| Infant Neutral – Mother Positive | .679 ± .016 | .689 ± .018 | .549 | .001 | .220 | .002 | .672 ± .008 | .696 ± .029 | .419 | .001 | .451 | .001 |
| Infant Positive – Mother Neutral | .002 ± .001 | .002 ± .001 | .860 | .000 | .567 | .000 | .003 ± .000 | .001 ± .001 | .406 | .001 | .372 | .001 |
| Infant Positive – Mother Negative | .000 ± .000 | .000 ± .000 | .091 | .004 | .082 | .004 | .000 ± .000 | .000 ± .000 | .396 | .001 | .289 | .002 |
| Total Mismatching | .773 ± .013 | .785 ± .015 | .362 | .001 | **.022** | **.008** | .773 ± .007 | .785 ± .023 | .602 | .000 | .661 | .000 |

Table 5 cont.

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Infant Self Regulation | | | | | | | | | | | | |
| Mouthing | .083 ± .010 | .081 ± .012 | .780 | .000 | .838 | .000 | .082 ± .005 | .082 ± .019 | .975 | .000 | .831 | .000 |
| Clasping Hands | .085 ± .009 | .077 ± .011 | .417 | .001 | .860 | .000 | .077 ± .005 | .084 ± .017 | .677 | .000 | .943 | .000 |
| Distancing | .293 ± .051 | .367 ± .059 | .156 | .003 | .180 | .003 | .347 ± .027 | .313 ± .093 | .730 | .000 | .827 | .000 |
| Autonomic Indicators | .254 ± .109 | .162 ± .126 | .408 | .001 | **.044** | **.006** | .267 ± .057 | .150 ± .198 | .568 | .000 | .578 | .000 |
| Mother Dysregulation | | | | | | | | | | | | |
| Rough Touch | .152 ± .065 | .116 ± .075 | .586 | .000 | .316 | .001 | .208 ± .034 | .060 ± .118 | .228 | .002 | .570 | .000 |

Notes. Infant and mother engagement, matching, mismatching and infant oral self-comforting are measured as proportion of time in the protocol. Infant Distancing, Infant Autonomic Indicators, and Mother Rough Touch are measured as frequency per minute. Proportions of engagement states do not sum to one. Very small proportions of unscorable portions of the sessions are not included in the infant and mother engagement states. Exposure by Episode interactions are described in the text. $\eta_p^2$, partial eta squared, is a ratio of variance accounted for by an effect to the sum of effect and total variance; using Cohen's (1988) criteria, .01 is a small and .06 a medium effect size.

Table 6

*FFSF outcomes by level of cocaine exposure*

| | Heavy n=46 | Some n=133 | Not Exposed n=424 | Unadjusted | | Adjusted | |
|---|---|---|---|---|---|---|---|
| | Mean ± SE | Mean ± SE | Mean ± SE | P | $\eta_p^2$ | P | $\eta_p^2$ |
| Infant Phases | | | | | | | |
| Passive Withdrawn | .010 ± .002[a] | .001 ± .001[b] | .001 ± .001[b] | **.000** | **.028** | **.003** | **.019** |
| Protest | .124 ± .029 | .102 ± .017 | .113 ± .010 | .776 | .001 | .926 | .000 |
| Object | .514 ± .035 | .511 ± .021 | .520 ± .011 | .918 | .000 | .072 | .009 |
| Social Monitor | .279 ± .028 | .292 ± .016 | .284 ± .009 | .872 | .000 | .100 | .008 |
| Social Positive | .060 ± .012 | .080 ± .007 | .066 ± .004 | .154 | .006 | .063 | .009 |

Table 6 cont.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Mother Phases** | | | | | | | |
| Negative | .015 ± .003 | .010 ± .002 | .009 ± .001 | .213 | .005 | .267 | .004 |
| Social Monitor (No Vocalizing) | .162 ± .021 | .111 ± .013 | .127 ± .007 | .121 | .007 | **.045** | **.010** |
| Social Monitor (Positive Vocalizing) | .532 ± .028[a] | .608 ± .016[b] | .602 ± .009[b] | **.046** | **.010** | .106 | .008 |
| Social Positive | .270 ± .026 | .257 ± .015 | .236 ± .009 | .289 | .004 | .143 | .007 |
| **Dyadic Matched Phase** | | | | | | | |
| Negative Match | .008 ± .002[a] | .001 ± .001[b] | .002 ± .001[b] | **.015** | **.014** | **.019** | **.013** |
| Neutral Match | .121 ± .019 | .093 ± .011 | .101 ± .006 | .455 | .003 | .074 | .009 |
| Positive Match | .077 ± .016 | .105 ± .009 | .083 ± .005 | .085 | .008 | **.045** | **.011** |
| Total Matches | .206 ± .022 | .200 ± .013 | .187 ± .007 | .516 | .002 | .951 | .000 |

Table 6 (cont.)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dyadic Mismatched Phase | | | | | | | |
| Infant Negative – Mother Neutral | .038 ± .009[a] | .013 ± .005[b] | .020 ± .003[ab] | **.049** | **.010** | .117 | .007 |
| Infant Negative – Mother Positive | .069 ± .019 | .063 ± .011 | .070 ± .006 | .885 | .000 | .972 | .000 |
| Infant Neutral – Mother Negative | .007 ± .002 | .009 ± .001 | .006 ± .001 | .216 | .005 | .491 | .002 |
| Infant Neutral – Mother Positive | .638 ± .030 | .681 ± .017 | .669 ± .010 | .468 | .003 | .505 | .002 |
| Infant Positive – Mother Neutral | .002 ± .001 | .003 ± .001 | .002 ± .000 | .779 | .001 | .513 | .002 |
| Infant Positive – Mother Negative | .000 ± .000 | .000 ± .000 | .001 ± .000 | .269 | .004 | .534 | .002 |
| Total Mismatched Phases | .755 ± .024 | .769 ± .014 | .769 ± .008 | .855 | .001 | .650 | .001 |

Table 6 cont.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Infant Self Regulation | | | | | | | |
| Mouthing | .074 ± .019 | .082 ± .011 | .083 ± .006 | .905 | .000 | .768 | .001 |
| Clasping Hands | .073 ± .017 | .073 ± .010 | .081 ± .006 | .775 | .001 | .959 | .000 |
| Distancing | .573 ± .098[a] | .389 ± .058[ab] | .300 ± .032[b] | **.020** | **.013** | .079 | .009 |
| Autonomic Indicators | .141 ± .202 | .201 ± .119 | .311 ± .066 | .572 | .002 | .067 | .009 |
| Mother Disregulation | | | | | | | |
| Rough Touch | .289 ± .129 | .186 ± .076 | .228 ± .043 | .776 | .001 | .616 | .002 |

<u>Note</u>: Infant and mother engagement, matching, mismatching and infant mouthing are measured as proportion of time in the protocol. Infant Distancing, Infant Autonomic Indicators, and Mother Rough Touch are measured as frequency per minute. Different superscripts indicate that the overall unadjusted P was below .05 and that there were significantly different unadjusted means between the superscripted level of use groups (see text). $\eta_p^2$, partial eta squared, is a ratio of variance accounted for by an effect to the sum of effect and total variance; using Cohen's (1988) criteria, .01 is a small and .06 a medium effect size..

References

Adamson L. & Frick J. (2003). The Still-Face: A history of a shared experimental paradigm. *Infancy*, 4(4):451-473.

Bada, H., Bauer CR, Shankaran S, Lester B, Wright LL, Das A, Poole K, Smeriglio VL, Finnegan LP, & PL., M. (2002). Central and autonomic system signs with in utero drug exposure. Archives of Disease in Childhood Fetal and Neonatal Edition, 87(2), F106-112.

Ballard, K. L., Khoury, J. C., Wedig, K., Wang, L., Eilers-Walsman, B. L., & Lipp, R. (1991). New Ballard Score, expanded to include extremely premature infants. Journal of Pediatrics, 119(3), 417-423.

Bauer, C., Shankaran, S., Bada, H. S., Lester, B., Wright, L., Krause-Steinrauf, H., Smeriglio, V., Finnegan, L., Maza, P., & Verter, J. (2002). The Maternal Lifestyle Study: Drug exposure during pregnancy and short-term maternal outcomes. American Journal of Obstetrics and Gynecology, 186(3), 487-495.

Beck, A. T., Ward, C. H., Mendelson, M., Mock, J., & Erbaugh, J. (1961). An inventory for measuring depression. *Archives of General Psychiatry, 4*, 561-571.

Beckwith, L., Rodning, C., Norris, D., Phillipsen, L., Khandabi, P., & Howard, J. (1994). Spontaneous play in two-year-olds born to substance-abusing mothers. Infant Mental Health Journal, 15(2), 189-201.

Beeghly, M., & Tronick, E. Z. (1994). Effects of prenatal exposure to cocaine in early infancy: Toxic effects on the process of mutual regulation. Infant Mental Health Journal, 15(2), 158-175.

Beeghly, M., Frank, D., Rose-Jacobs, R., Cabral, H., & Tronick, E. (2003) Level of prenatal cocaine exposure and infant-caregiver attachment behavior. Neurotoxicology and Teratology, 25, 23-38.

Bendersky, M., & Lewis, M. (1998). Arousal modulation in cocaine-exposed infants. Developmental Psychology, 34(3), 555-564.

Bernstein, V. J., & Hans, S. L. (1994). Predicting the developmental outcome of two-year-old children born exposed to methadone: Impact of social-environmental risk factors. Journal of Clinical Child Psychology, 23(4), 349-359.

Brazelton, T. B., Koslowski, B., & Main, M. (1974). The origins of reciprocity: The early mother-infant interaction. New York: Wiley.

Brown, J. V., Bakeman, R., Coles, C. D., Sexson, W. R., & Demi, A. S. (1998). Maternal drug use during pregnancy: Are preterm and full-term infants affected differently? Developmental Psychology, 34(3), 540-554.

Cohen, J. (1988). Statistical power analysis for the social sciences (2nd Ed.). New Jersey: Lawrence Erlbaum.

Das Eiden, R., & Leonard, K. E. (1996). Paternal alcohol use and the mother-infant relationship. Development and Psychopathology, 8, 307-323.

Espinosa, M., Beckwith, L., Howard, J., Tyler, R., & Swanson, K. (2001). Maternal psychopathology and attachment in toddlers of heavy cocaine-using mothers. Infant Mental Health Journal, 22(3), 316-333.

Eyler, F. D., & Behnke, M. (1999). Early development of infants exposed to drugs prenatally. Clinics in Perinatology, 26(1), 107-150.

Field T, Vega-Lahr N, Scafidi F, Goldstein S. Effects of maternal unavailability on mother-infant interactions. *Infant Behavior and Development*. 1986;9:473-478.

Fogel, A. (1993). Developing through relationships: Communication, self, and culture in early infancy. London: Harvester-Wheatsheaf.

Frank, D. A., Augustyn, M., Knight, W. G., Pell, T., & Zuckerman, B. (2001). Growth, development, and behavior in early childhood following prenatal cocaine exposure: A systematic review. Journal of the American Medical Association, 285(12), 1613-1625.

Gusella JL, Muir D, Tronick E. Z.. (1988). The effect of manipulating maternal behavior during an interaction on three- and six-month-olds' affect and attention. *Child Development*,59:1111-1124.

Hans, S. L. (1989). Development and consequences of prenatal exposure to methadone. Annals of the New York Academy of Sciences, 562, 195-207.

Hans, S. L., Bernstein, V. J., & Henson, L. G. (1999). The role of psychopathology in the parenting of drug-dependent women. Development & Psychopathology, 11(4), 957-977.

Jacobson, J. L., & Jacobson, S. W. (1996). Methodological considerations in behavioral toxicology in infants and children. Developmental Psychology, 32(3), 390-403.

Kogan, N., & Carter, A. S. (1996). Mother-infant reengagement following the still-face: The role of maternal emotional availability in infant affect regulation. *Infant Behavior & Development., 19*(3), 359-370.

Kosofsky, B. E. (1998). Cocaine-induced alterations in neuro-development. Seminars in Speech and Language, 19, 109-121.

LaGasse, L., Lester, B., & Seifer, R. (1999). Interpreting research on prenatal substance exposure in the context of multiple confounding factors. Clinics in Perinatology, 26(1), 39-54.

LaGasse, L., Messinger, D., Lester, B. M., Seifer, R., Bauer, C. R., Shankaran, S., Bada, H., Wright, L., Smeriglio, V., Poole, K., & Liu, E. (2003). Prenatal drug exposure and maternal and infant feeding behavior. Archives of Disease in Childhood.

Lemelin, J.-P., Tarabulsy, G. M., & Provost, M. A. (2002). Relations between measures of irritability and contingency detection at 6 months. Infancy. Vol 3(4) 543-554.

Lester, B. M., ElSohly, M., Wright, L., Smeriglio, V., Verter, J., Bauer, C., Shankaran, S., Bada, H. S., Walls, C., Huestis, M. A., Finnegan, L. P., & Maza, P. M. (2001). The Maternal Lifestyles Study (MLS): Drug use by meconium toxicology and maternal self-report. Pediatrics, 107, 309-317.

Lester, B. M., LaGasse, L. L., & Seifer, R. (1998). Cocaine exposure and children: The meaning of subtle effects. Science, 282, 633-634.

Lester, B. M., & Tronick, E. Z. (1994). The effects of prenatal cocaine exposure and child outcome. Infant Mental Health Journal, 15(2), 107-120.

Lester, B. M., Tronick, E. Z., LaGasse, L., Seifer, R., Bauer, C., Shankaran, S., Bada, H. S., Wright, L., Smeriglio, V., Lu, J., Finnegan, L. P., & Maza, P. M. (2002). The Maternal Lifestyle Study (MLS): Effects of Substance Exposure During Pregnancy on Neurodevelopmental Outcome in One-Month Old Infants. Pediatrics, 110(6), 1182-1192.

Malanga III, C. J., & Kosofsky, B. E. (1999). Mechanisms of drugs of abuse on the developing fetal brain. Clinics in Perinatology, 26(1), 17-38.

Mayes, L. C. (1994). Neurobiology of prenatal cocaine exposure effect on developing monamine systems. Infant Mental Health Journal, 15, 121-130.

Mayes LC, & Carter AS. (1990) Emerging social regulatory capacities as seen in the still-face situation. *Child Development*, 61:754-763.

Mayes, L. C., Feldman, R., Granger, R. H., Haynes, O. M., Bornstein, M. H., & Schottenfeld, R. (1997). The effects of polydrug use with and without cocaine on mother-infant interaction at 3 and 6 months. Infant Behavior and Development, 20(4), 489-502.

Mirochnick, M., & Meyer, J. (1991). Circulating catecholamine concentrations in cocaine-exposed neonates: A pilot study. Pediatrics, 88, 481-485.

Needlman, R., & Zuckerman, B. (1993). Cerebrospinal fluid monoamine precursors and metabolites in human neonates following in utero cocaine exposure: A preliminary study. Pediatrics, 92, 55-60.

O'Connor, M. J., Sigman, M. D., & Kasari, C. (1992). Attachment behavior of infants exposed prenatally to alcohol: Mediating effects of infant affect and mother-infant interaction. Development and Psychopathology, 4(2), 243-256.

Oller, D. K., Yale, M. E., & Delgado, R. E. (1997). Development of coordination across modalities of communication: Coding and analysis tools. Paper presented at the Biennial Meeting of the Society for Research in Child Development, Washington, D.C.

Rodning, C., Beckwith, L., & Howard, J. (1989). Characteristics of attachment organization and play organization in prenatally drug-exposed toddlers. Development and Psychopathology, 1(4), 277-289.

Sameroff, A. J., & Fiese, B. H. (2000). Models of development and developmental risk. In C. H. Zeanah, Jr. (Ed.), Handbook of infant mental health (2nd ed.) (pp. pp. 3-19). New York, NY: Guilford Press.

Stack DM, Muir DW. (1990). Tactile stimulation as a component of social interchange: New interpretations for the still-face effect. *British Journal of Developmental Psychology*, 8, 131-145.

Stack DM, Muir DW. (1992). Adult tactile stimulation during face-to-face interactions modulates five-month-olds' affect and attention. *Child Development*, 63, 1509-1525.

Swanson, K. B., Leila; Howard, Judy. (2000). Intrusive caregiving and quality of attachment in prenatally drug-exposed toddlers and their primary caregivers. Attachment & Human Development, 2(2), 130-148.

Toda S, Fogel A. Infant response to the still-face situation at 3 and 6 months. *Developmental Psychology*. 1993;29 (3):532-538.

Tronick E. Z. Emotions and emotional communication in infants (1989). *American Psychologist*, 44(2), 112-119.

Tronick, E.Z., Als, H., Wise, S., & Brazelton, T.B. (1978). The infant's response to entrapment between contradictory messages in face-to-face interaction. *Journal of the American Academy of Child & Adolescent Psychiatry*, 17, 1-13.

Tronick, E., Als, H., & Brazelton, T. B. (1980). Monadic phases: A structural descriptive analysis of infant-mother face to face interaction. Merrill Palmer Quarterly, 26(1), 3-24.

Tronick, E.Z., Frank, D.H., Cabral, H., Mirochnick, M., & Zuckerman, B. (1996). Late dose-response effects of prenatal cocaine exposure on newborn neurobehavioral performance. Pediatrics, 98(1), 76-83.

Tronick E. Z. & Beeghly M, (1999). Prenatal cocaine exposure, child development, and the compromising effects of cumulative risk. *Clinics in Perinatology*, ;26:151-171.

Tronick E. Z. & Weinberg M. K. (1997). Depressed mothers and infants: Failure to form dyadic states of consciousness. In Murray L, Cooper PJ, eds. *Postpartum depression and child development*. New York: Guilford Press, pp. 54-81.

Ukeje, I., Bendersky, M., & Lewis, M. (2001). Mother-infant interaction as 12 months in prenatally cocaine-exposed children. American Journal of Drug & Alcohol Abuse, 27(2), 203-224.

Vohr, B., Wright, L., Dusick, A., Perritt, R., Poole, W., Tyson, J., Steichen, J., Bauer, C., Wilson-Costello, D., Mayes, L., & Neonatal_Research_Network. (2004). Center differences and outcomes of extremely low birth weight infants. *Pediatrics, 113*(4), 781-789.

Volpe, J. J. (1992). Effect of cocaine use on the fetus. The New England Journal of Medicine, 327(6), 399-404.

Weinberg MK, Olson KL, Beeghly M, Tronick EZ. (in press). Effects of maternal depression and panic disorder on mother-infant interactive behavior in the Face-to-Face Still-Face paradigm. *Infant Mental Health Journal.*

Weinberg, M. K., & Tronick, E. Z. (1994). Beyond the face: An empirical study of infant affective configurations of facial, vocal, gestural, and regulatory behaviors. *Child Development, 65*(5), 1503-1515.

Weinberg, K. M., & Tronick, E. Z. (1996). Infant affective reactions to the resumption of maternal interaction after the Still-Face. *Child Development, 67*(3), 905-914.

Weinberg, K. M., & Tronick, E. Z. (1998). Infant and Caregiver Engagement Phases system. Boston, MA: Harvard Medical School.

Weinberg, M. K., Tronick, E. Z., Cohn, J. F., & Olson, K. L. (1999). Gender differences in emotional expressivity and self-regulation during early infancy. Developmental Psychology, 35(1), 175-188.

**Weaver, Gretchen (NIH/OD) [E]**

**From:** Friedman, Sarah (NIH/NICHD) [E]
**Sent:** Thursday, February 16, 2006 3:45 PM
**To:** List NEURO_MEASGRP-L
**Subject:** appropriate respondent for the child care questionnaire
**Attachments:** SECCYD. Manual chapter 8.pdf; SECCYD.manual chapter 10.1.pdf

"Sarah Friedman will distribute rules used in SECC for identifying the appropriate respondent for the child care questionnaire".

See attached manuals of operation from the NICHD SECCYD. Chapter 8 starting on page 24 explains the decision rules that were used at 6 months to identify the primary child care arrangement. Chapter 10.1 has additional information about contacting directors and caregivers in the beginning pages and then on page 32 there is additional detail about which caregivers to interview.

Please note that the rules pertain to plans to visit in child care settings and to get information from the child care provider that is spending most time with the child. However, I think that these rules can be translated to the NCS situation, where, at this time, we don't have plans to visit in the child care settings. Once I see the rules from ECLS-B, I will be happy to make recommendations for others to review.

Sarah.

**Sarah L. Friedman, Ph.D.**
**Project Scientist and Scientific Coordinator,**
**NICHD Study of Early Child Care and Youth Development**
**OEP, Office of the Director,**
**National Institute of Child Health and Human Development**

**Phone: (301) 435-6946**
**Fax: (301) 480-2400**
**E-mail: friedmas@exchange.nih.gov**

# Chapter 10.1

## ADMINISTRATION OF CHILD CARE VISITS

## TABLE OF CONTENTS


I. PURPOSE OF THIS CHAPTER . . . . . . . . . . . . . . . 1

II. RECRUITMENT PROCEDURES . . . . . . . . . . . . . . . . 2

A. Child-Care Recruitment: General Approach . . . . 3

B. Center Recruitment . . . . . . . . . . . . . . . 7

1. Contacting the Director . . . . . . . . . . 7

2. Scheduling the Visit . . . . . . . . . . . . 10

a. Procedures . . . . . . . . . . . . . . . 10

b. Overview of Scheduling Constraints . . 12

3. When it is not possible to do the child-care assessment. . . . . . . . . . . . . . . . 13

4. Confirmation phone call to director . . . . 14

5. Obtaining Consent . . . . . . . . . . . . . 14

6. Center Payment . . . . . . . . . . . . . . . 14

C. Home Recruitment . . . . . . . . . . . . . . . . 15

1. Contacting the Provider . . . . . . . . . . 15

2. Scheduling the Visit . . . . . . . . . . . . 18

a. Procedures . . . . . . . . . . . . . . . 18

b. Overview of Scheduling Constraints . . 20

3. When it is not possible to do the child-care assessment. . . . . . . . . . . . . . . . 20

4. Confirmation phone call to provider . . . . 21

5. Obtaining Consent . . . . . . . . . . . . . . 21

6. Provider Payment . . . . . . . . . . . . . . . 21

D. Problem Solving . . . . . . . . . . . . . . . . . 22

1. Trouble making contact with caregiver/director. . . . . . . . . . . . . 22

2. During contact with the caregiver/director, the provider says "no" or is ambivalent about participation. . . . . . . . . . . . . . . . 24

a. Discussing the Study and its importance. . . . . . . . . . . . . . . . . . . . . . 24

b. Provider/Director is concerned the visit would be too disruptive to normal routines. . . . . . . . . . . . . . . . 25

c. The caregiver/director is concerned about the privacy of the staff and other children and parents. . . . . . . . . 26

d. Caregiver/Director wants to think about it first or discuss it further with the staff before giving consent or scheduling a visit. . . . . . . . . . . 26

e. The caregiver/director seems concerned that you may report your findings to licensing officials. . . . . . . . . 27

3. The provider takes steps that create an atypical day. . . . . . . . . . . . . . . . 27

III. ASSESSMENT PROCEDURES . . . . . . . . . . . . . . . . 28

A. General Procedures . . . . . . . . . . . . . . 28

1. Number of visits . . . . . . . . . . . . . . 28
2. Timing of visits . . . . . . . . . . . . . . 29
3. Confirming the visit . . . . . . . . . . . . 30
4. Number of observers . . . . . . . . . . . . 31
5. What to bring . . . . . . . . . . . . . . . 31
6. Arriving at the center/home and getting started . . . . . . . . . . . . . . . . . . 32
7. Whom to observe, interview, and ask to complete questionnaires . . . . . . . . . . . 32
8. Assigning Child Care ID's. . . . . . . . . . 34
9. Using the Child Care ID Worksheet . . . . . 40
10. When to use center vs. home instruments . . 44
11. Procedures at each visit . . . . . . . . . . 44
12. Minimum data collection required . . . . . . 47
13. Feedback . . . . . . . . . . . . . . . . . . 48
14. Flexibility . . . . . . . . . . . . . . . . 49
15. Multiple Study children in same arrangement 49
16. Taking leave . . . . . . . . . . . . . . . . 50

B. General Interview Procedures for Caregivers . . . 50

C. Interview Administration . . . . . . . . . . . . 54

1. Director Questionnaire . . . . . . . . . . . 54
2. Child Caregiver Interview . . . . . . . . . 56

D. Questionnaire Procedures . . . . . . . . . . . . 59

E. Observation Procedures . . . . . . . . . . . . . 61

1. Conducting the ORCE at a center . . . . . . 63
a. Before you start . . . . . . . . . . . 63
b. Entering the room . . . . . . . . . . 64
c. Behavioral Scales . . . . . . . . . . . 65
d. Qualitative Scales . . . . . . . . . . 67
e. Post-observation interview . . . . . . 69
f. Global ratings . . . . . . . . . . . . 69
2. Conducting the ORCE at a home . . . . . . . 69
3. Observer's Interaction with caregivers . . . 70
4. Guidelines for specific scales . . . . . . 72
a. General suggestions . . . . . . . . . 72
b. Behavioral scales . . . . . . . . . . 75
c. Qualitative ratings . . . . . . . . . . 94
CAREGIVER RATINGS . . . . . . . . . . . 96
CHILD RATINGS . . . . . . . . . . . . . 117
d. Post observations interview with caregiver(s) . . . . . . . . . . . . . 124
GLOBAL SCALES . . . . . . . . . . . . . 124
F. Profile Observation Procedures . . . . . . . . . 127
1. Overview of the instruments . . . . . . . . 129
2. Reduction of items . . . . . . . . . . . . . 130
3. Conducting the profile . . . . . . . . . . . 132
4. Entry into setting . . . . . . . . . . . . . 134
5. Clarification of items . . . . . . . . . . . 136
a. Assessment profile for early childhood 136
b. Assessment profile for family day care 149

G. HOME Observation Procedures . . . . . . . . . . . 158

IV. TROUBLE SHOOTING . . . . . . . . . . . . . . . . . . 158

VI. APPENDICES . . . . . . . . . . . . . . . . . . . . . 166

A. Recruitment Letter for Child-care providers . . 166

B. Confirmation Letter to Home Care Provider . . . . 167

C. Confirmation Letter to Center Director . . . . . 168

D. Description of Study . . . . . . . . . . . . . . 169

E. Visits to Child Care Settings . . . . . . . . . . 170

F. Consent Form . . . . . . . . . . . . . . . . . . 171

G. Materials Required for Child Care Assessments . . 174

H. Observation Schedule Face Sheet . . . . . . . . . 175

I. Child Care ID Worksheet . . . . . . . . . . . . . 176

J. Worksheet for Assigning Final Child Care IDs . . 178

K. Training and Reliability for Live Ratings . . . . 179

1. Preparation of Training Tapes for the Behavioral and Qualitative Ratings . . . . . 180

2. Training Procedures for the Qualitative and Behavioral Ratings . . . . . . . . . . . . . 182

a. Qualitative Ratings . . . . . . . . . . . 182

b. Behavioral Ratings . . . . . . . . . . . 186

3. Training Procedures for the Child Care HOME 188

4. Training Procedures for the Profile . . . . 188

5. Some Words About Getting Used to Being an Observer . . . . . . . . . . . . . . . . . . 189

6. Becoming reliable with the ORCE, Profile, and Child Care HOME . . . . . . . . . . . . . . 191

a. Memorization of the Coding Manual . . . 191

b. Establishing Reliability between Two Trainers . . . . . . . . . . . . . . . 191

c. After the training: Inter-observer and criterion reliability . . . . . . . . 192

d. Preventing Drift and Assuring Inter-site Reliability . . . . . . . . . . . . . . 194

e. Training New Coders . . . . . . . . . . . 195

# Chapter 10.1

# ADMINISTRATION OF CHILD CARE VISITS

## I. PURPOSE OF THIS CHAPTER

This chapter provides guidelines for the child-care assessment visits to assure that these visits are conducted in a standard way across all ten sites participating in the NICHD Study of Early Child Care. In addition, it will serve as the archival description of the methods used in the child care data collection. Amendments or suggested revisions should be addressed to Deborah Phillips (primarily responsible for operations manual, Profile, and interviews); Kathleen McCartney or Alison Clarke-Stewart (primarily responsible for behavioral observations and questionnaires); or Deborah Vandell (primarily responsible for qualitative observations). Alison Clarke-Stewart is also primarily responsible for the Mother Questionnaire about Child Care. Bettye Caldwell is responsible for the Child Care HOME measure.

It is vital to the success of the Study that the interview and observational data be collected in as identical a fashion as possible across sites. In this chapter, you will find suggestions about how to interpret both interview and observation items, as well as how to administer the interview and collect the observational data. These procedures must be followed by all research assistants to ensure the comparability of the data across sites.

We have attempted to consider as many questions and contingencies as possible. However, situations that we have not anticipated will arise during the course of data collection. When you are presented with a situation that is not covered in the manual, capture it as accurately as possible (e.g., write the caregiver's exact question about an interview item), then contact Kaye Fendt at the Data Center. She will confer with the relevant individuals and give you a coding decision, an interpretational decision, or whatever is needed. Each of these new decisions will be recorded in an appendix to this manual that will be distributed to all sites (with immediate BITNET messages for on-going updates).

## II. RECRUITMENT PROCEDURES

The overall recruitment strategy for child-care providers is based on a set of common guidelines and procedures. However, within these, flexibility and multiple approaches will undoubtedly be necessary. These procedures are described, in detail, in Chapter 8, Administration of the Five-Month Phone Interview.

This chapter picks up the process at the point that the provider/director is contacted. In general, the common guidelines are, <u>first</u>, to ask the mother for permission for us to contact the child-care provider directly, and, <u>second</u>, to ask the mother to contact/persuade the caregiver if our attempt to get the mother's permission to make the first call fails or if our

first attempt to obtain the caregiver's consent to visit is unsuccessful. It is also recommended that whenever an interviewer first finds out that a child is in or is entering a child-care arrangement (e.g., in the 3-month phone call), she begin to prepare the mother for the child-care visit.

**A. Child-Care Recruitment: General Approach**

You must first determine whether the target child has a primary provider and, if so, the identify of this provider. This information is contained in the 5-month telephone interview data on Form 5A. If there is no primary provider, there is no child care visit. If there is a primary provider, invoke the scheduling procedures for centers and homes (including care in the child's own home or another home, by a relative or non-relative), described below. This should be done as soon as possible after the 5-month interview is completed.

You will then use one of two approaches to contacting the provider. The preferred approach is to contact the primary child care provider (homes) or director (centers) directly. The alternative approach is to have the mother contact the provider/director prior to your contact.

In your scheduling call, you will explain the visit, answer any questions, obtain an initial verbal consent, and schedule 2 visits. (Center directors will also be given a telephone interview at this call - see center recruitment, below.) This window is as follows:

- 2 weeks prior to or after the child's 6-month birthday, for the first visit
- Second child care visit must be within 2 weeks of the first visit, but preferrably within 1 week
- First child care visit must be within 3 weeks of the home visit, but preferrably within 2 weeks

DO NOT SCHEDULE ANY VISITS BEFORE THE TARGET CHILD HAS BEEN ENROLLED FOR AT LEAST TWO WEEKS.

Thank the provider/director for being part of the study and mail out the CONFIRMATION letter, the description of the study and visits, and if required at your site, the consent form. Center directors will also be sent the Director Questionnaire (see Center Recruitment, below).

If you cannot reach the provider/director by phone, send the RECRUITMENT letter and STUDY DESCRIPTION. Then follow-up with another call or ask the mother to have the provider call you.

The day before the first scheduled appointment, call the provider/director to confirm the visit.

If the provider/director refuses a visit, information about the arrangement will be obtained through a telephone interview with the director (centers) or mother (homes and cases where center directors refuse this interview).

CENTER-BASED CARE CONTACTING THE DIRECTOR

STEP 1 Child care coordinator (or person responsible for scheduling child care visits) contacts the center director OR mother contacts the center director.

STEP 1B IT MOTHER CONTACTS DIRECTOR, coordinator recontacts mother for update, then contacts director.

STEP 2 Coordinator schedules 2 visits and asks the director to inform all classroom staff who provide care for target child about the study and the timing of the visits OR follows director's advice to contact the staff directly.

STEP 3 Conduct the Director Telephone Interview

STEP 4 Sent (a) letter confirming the visits, (b) study description, and (c) director questionnaire. If required at your site, also send the consent form.

STEP 5 Call director the day before the actual observation to reconfirm the visit. Remind him/her to complete the director questionnaire.

IF THE DIRECTOR REFUSES THE VISIT, ask his/her permission to conduct the "Director (or Mother) Telephone Interview for Centers we Cannot Visit". If he/she refuses, use the Interview with the mother.

HOME-BASED CARE (including in-home care by relatives) CONTACTING THE PROVIDER

STEP 1 Child care coordinator (or person responsible for scheduling child care visits) contacts the provider OR mother contacts the provider.

STEP 1B IF MOTHER CONTACTS PROVIDER, coordinator recontacts mother for update, then contacts provider.

STEP 2 Coordinator schedules 2 visits with provider

STEP 3 Send (a) letter confirming the visits and (b) study description. If required at your site, also send the consent form.

STEP 4 Call provider the day before the actual observation to reconfirm the visit.

IF THE PROVIDER REFUSES THE VISIT, conduct the "Mother Telephone Interview about Child Care for Home Arrangements we Cannot Visit."

The following two sections - CENTER RECRUITMENT and HOME RECRUITMENT - elaborate these procedures for these differing types of arrangements. In some cases, it will not be clear whether an arrangement is a center or home. Consider it a home if the setting is used as a residence, even if it resembles a center in room arrangements, numbers of children, etc. This will often be considered a "Group Family Day Care Home" by licensing officials.

**B. Center Recruitment**

**1. Contacting the Director**

Contact the center director by phone as soon as possible after getting information about the child's care arrangement from the mother or after the mother's contact with the director. If your site prefers to send the literature to the director and then make the phone call, that is allowable. First be aware of the 4-week window for the child-care assessment (2 weeks prior to and after the child's 6-month birthday), as discussed below. In the phone call, briefly explain the study, summarize what is involved on the directors and providers' part, answer any questions, and obtain an initial verbal consent. Also explain to the director that all of the staff who provide care for the target child need to be informed about the study and to sign the consent form. Offer two approaches: the director may contact the staff or you may contact them directly. Do what the director suggests. If you cannot reach the director by phone, send the RECRUITMENT LETTER AND STUDY DESCRIPTION and follow up with another call or ask the mother to have the director call us.

If the director says "no" at this point, try to find out why. You may be able to assuage his/her concerns. Ask if you might send the materials (RECRUITMENT LETTER AND STUDY DESCRIPTION) and call him/her back. If the director is adamant, we cannot force ourselves upon him/her. If the director is adamant, ask if you can just ask a few questions over the phone either now or later (preferrably now). Explain that it will take about 15 minutes (see below: 3. When it is not possible to do the Child Care Assessment)

In addition, in cases of refusal, if the child has a secondary arrangement in which he/she is enrolled for at least 10 hours a week, call the mother back and ask if we can repeat the recruitment process for this provider.

Talking Points for Child-care Recruitment

Following is a list of "talking points" for Child-care Recruitment.

1. Explain the overall purpose of the study using the consent form as a guide. For example: children are growing up under very different circumstances today; child care has become a very important part of most children's lives; we need to understand how this affects children's development; etc. Note national significance, importance to children and families, etc.
2. Describe the visit from the provider's perspective:
   a. Two days of visits;
   b. Three hours each;
   c. Prefer mornings, if target child is typically awake then;
   d. We will start by talking briefly with director, and then go immediately to the target child's classroom.
   e. Most of our time will be spent observing the target child. THIS DOES NOT REQUIRE ANY CHANGES IN YOUR TYPICAL ACTIVITIES. In fact, we don't want anything unusual to happen;

f. We will also be observing the target child's classroom.

g. And, we will interview up to 2 of the child's providers (about 30 minutes)

3. All procedures will be maximally convenient for the provider (we can be flexible).

4. All data are confidential (nothing is reported to any licensing agency our purpose is research, not evaluation). The only thing we would need to report is child abuse.

5. We will be paying $40 for his/her/their participation. (In cases of multiple providers, find out how they would like this to work, e.g., divide among providers, program gift, etc.).

6. Complete TELEPHONE INTERVIEW, with the director.

7. Again, stress the importance that he/she talk to his/her staff who take care of the target child. You may need to volunteer to visit in advance.

### 2. Scheduling the Visit

#### a. Procedures

If the director says "yes", schedule a visit, using the following questions:

(1). When you are speaking to the director of a center, ask if she knows that child's schedule well enough to be able to schedule the visit; if not, ask if you should speak to the child's caregiver to get the best times. Also ask the director the questions on the DIRECTOR TELEPHONE

INTERVIEW. Then, ask the appropriate individual, "*In your opinion, considering your schedule and the baby's, what would be the best time for us to schedule a visit? We need to see the baby when he/she is most likely to be awake and not likely to be interrupted by someone coming to visit (for example, the mother coming to feed him/her). We will need to make two visits of about 3 hours each*".

The baby is most likely to be aware and available in the morning, so if you have a choice, please schedule the visit so that it occurs predominantly during the morning hours. Of course, some children will not be in child care at all during the morning.

(2). What day of the week is best for you?

Do not observe children until they have been in an arrangement for at least 2 weeks. Aim for as close to the child's 6-month birthday as possible, give or take 2 weeks. It is extremely important that the child-care visit be scheduled within this 4-week window if at all possible. However, you may keep trying to complete the 6-month visits up until the child's 7-month birthday. Only if you have not been able to complete all observations (home and child care) by the child's 7-month birthday should you consider the data missing. The first child-care visit must also be scheduled within 3 weeks of the home visit.

(3). Select times and dates for the two visits, and include this information in the CONFIRMATION letter to the director.

Thank the director for being a part of the study and tell him/her that:

(1) You will call back the day before the observation appointment to confirm the appointment;

(2) He/she will receive, before your visit, a letter confirming the visits and a description of the Study and the visits. Tell the center director that he/she can post this description for parents to see, if he/she wishes;

(3) If your site reuqires that a consent form be sent in advance, tell him/her that this also will be included with the letter.

(4) He/she will also receive, with the letter, a brief questionnaire (DIRECTOR QUESTIONNAIRE) that you would like him/her to fill out before the visit.

(5) Make sure that the director will communicate the information about the visit to the staff in the child's room. Offer to talk directly to the staff before the visit if she thinks this would be wise. Remind her that these staff will need to sign the consent form, along with the director, in order for you to collect any data.

You will then send:

(1) the confirmation letter;

(2) the description of the Study and visits;

(3) the Director's Questionnaire; and

(4) a consent form (if required at your site).

NOTE: If the Director has already given permission for another target child to be observed in the past, and if she is already familiar with the study and has completed the DIRECTOR'S QUESTIONNAIRE within the past 6 weeks, you need not send her the Director's questionnaire again.

**b. Overview of Scheduling Constraints**

(1). Target child must be enrolled for at least two weeks prior to any observation. [This is enrollment in the center; not with respect to individual staff.]

(2). First child-care visit should be within two weeks of the target child's 6-month birthday.

(3). Second child-care visit must be within one week of the first visit, but aim for one week.

(4). First child-care visit must be within two weeks of the home visit, but aim for two weeks.

**3. When it is not possible to do the child-care assessment.**

You need to conduct a separate telephone interview to obtain crucial information about the target child's child-care arrangement. This interview will ideally occur with the center director, but may occur with the mother, if the director refuses.

The "Director (or Mother) Telephone Interview for Centers We Cannot Visit" is used if either the mother does not want us to observe in the center or the center policy does not allow us to observe. It is used instead of the regular Director Telephone Interview, the regular Director Questionnaire, and the Child Care Observation. If the director refuses to be interviewed, uses the "Director (or Mother) Telephone Interview for Centers We Cannot Visit" with the mother.

A validity check will be performed on these interviews, by having a subset of study sites conduct the interviews with directors/mothers on whom we also collect live data.

**4. Confirmation phone call to director**

The day before the scheduled appointment, call the director and confirm that the date for the observation is still okay. Make sure that the center director will have completed the Director's Questionnaire before your visit. Answer any questions he/she has about the questionnaire or the visit. Make sure that the director has informed the staff in the child's room of your visit and that she or someone else in authority will be there to sign the consent form when you come. If she will not be there, make sure that it will be OK for someone else on the staff to sign for her. Ask her to have the classroom caregiver call you directly if she has any questions about your visit, and then be available to take the call.

**5. Obtaining Consent**

Consent will be obtained from the director and from individual caregivers as well, after you arrive at the site and before you begin your observations. If your site requires that a consent form be sent in advance, bring extra copies with you and obtain consent following those procedures.

**6. Center Payment**

Each participating center will be paid $40 at the end of the second visit. (Some sites may wish to assure that all questionnaires are completed prior to payment.) For centers you will need to ask the director how he/she wishes to handle the payment. Some sites may wish, for example, to ask the director how he/she wishes to handle the payment. Others may want to involve the caregivers as well. Some may wish to divide the $40 equally among all participants; others may wish to purchase a gift for the center. Please be as flexible as you can. If a parent asks why the child-care payment is larger than the family payment remind him/her that the child-care assessment involves 2 days rather than 1 day.

**C. Home Recruitment**

**1. Contacting the Provider**

Contact the primary child-care provider by phone as soon as possible after getting information about the child's care arrangement from the mother or after the mother's contact with the provider. If your site prefers to send the literature to the

child-care provider and then make the phone call, that is allowable. First be aware of the 4-week window for the child-care assessment (2 weeks prior to and after the child's 6-month birthday), as discussed below. In the phone call, briefly explain the study, summarize what is involved on the providers' part, answer any questions, and obtain an initial verbal consent. If you cannot reach the provider by phone, send the RECRUITMENT LETTER AND STUDY DESCRIPTION and follow up with another call or ask the mother to have the provider call us.

If the provider says "no" at this point, try to find out why. You may be able to assuage his/her concerns. Ask if you might send the materials (RECRUITMENT LETTER AND STUDY DESCRIPTION) and call him/her back. If the provider is adamant, we cannot force ourselves upon him/her. We will then have to use the mother as our sole informant about the child's care arrangement (see below).

In addition, in cases of refusal, if the child has a secondary arrangement in which he/she is enrolled for at least 10 hours a week, call the mother back and ask if we can repeat the recruitment process for this provider.

Talking Points for Child-care Recruitment

Following is a list of "talking points" for Child-care Recruitment.

1. Explain the overall purpose of the study using the consent form as a guide. For example: children are growing up under

very different circumstances today; child care has become a very important part of most children's lives; we need to understand how this affects children's development; etc. Note national significance, importance to children and families, etc.

2. Describe the visit from the provider's perspective:
   a. Two days of visits;
   b. Three hours each;
   c. Prefer mornings, if target child is typically awake then;
   d. Most of the time will be spent observing the target child. THIS DOES NOT REQUIRE ANY CHANGES IN YOUR TYPICAL ACTIVITIES. In fact, we don't want anything unusual to happen;
   e. We will also be observing the target child's classroom. We will also be observing the rooms when the target child receives care.
   f. And, we will conduct an interview with you (about 30 minutes)
3. All procedures will be maximally convenient for the provider (we can be flexible).
4. All data are confidential (nothing is reported to any licensing agency our purpose is research, not evaluation). The only thing we would need to report is child abuse.
5. We will be paying $40 for his/her/their participation. (In cases of multiple providers, find out how they would like

this to work, e.g., divide among providers, program gift, etc.).

**2. Scheduling the Visit**

**a. Procedures**

If the provider says "yes", schedule a visit, using the following questions:

(1). "*In your opinion, considering your schedule and the baby's, what would be the best* <u>*time*</u> *for us to schedule a visit? We need to see the baby when he/she is most likely to be awake and not likely to be interrupted by someone coming to visit (for example, the mother coming to feed him/her). We will need to make two visits of about 3 hours each*".

The baby is most likely to be aware and available in the morning, so if you have a choice, please schedule the visit so that it occurs predominantly during the morning hours. Of course, some children will not be in child care at all during the morning.

(2). What day of the week is best for you?

Do not observe children until they have been in an arrangement for at least 2 weeks. Aim for as close to the child's 6-month birthday as possible, <u>give or take 2 weeks</u>. It is extremely important that the child-care visit be scheduled within this 4-week window if at all possible. However, you may keep trying to complete the 6-month visits up until the child's 7-month birthday. Only if you have not been able to complete all observations (home and child care)

by the child's 7-month birthday should you consider the data missing. The first child-care visit must also be scheduled within 3 weeks of the home visit.

(3). Select times and dates for the two visits, and include this information in the CONFIRMATION letter to the provider.

Thank the provider for being a part of the study and tell him/her that:

(1) You will call back the day before the observation appointment to confirm the appointment;

(2) He/she will receive, before your visit, a letter confirming the visits and a description of the Study and the visits. Tell the provider that he/she can post this description for parents to see, if he/she wishes;

(3) If your site requires that a consent form be sent in advance, tell him/her that this will also be included with the letter.

You will then send:

(1) the confirmation letter;

(2) the description of the Study and visits;

(3) a consent form (if required at your site).

**b. Overview of Scheduling Constraints**

(1). Target child must be enrolled for at least two weeks prior to any observation.

(2). First child-care visit should be within two weeks of the target child's 6-month birthday.

(3). Second child-care visit must be within two weeks of the first visit, but aim for one week.

(4). First child-care visit must be within three weeks of the home visit, but aim for two weeks.

**3. When it is not possible to do the child-care assessment.**

You need to conduct a separate telephone interview to obtain crucial information about the target child's child-care arrangement. If the mother will not allow us to visit the provider in a home-care arrangement or if the home caregiver refuses to be visited, the "Mother Telephone Interview about Child Care for Home Arrangements we Cannot Visit" is done after the 6-month home visit (in lieu of the on-site child-care assessment visit).

A validity check will be performed on these interviews, by having a subset of study sites conduct the interviews with mothers on whom we also collect live data.

**4. Confirmation phone call to provider**

The day before the scheduled appointment, call the provider and confirm that the date for the observation is still okay. Answer any questions he/she has about the visit. Make sure that she will be there to sign the consent form when you come. If she will not be there, make sure that it will be OK for someone else to sign for her.

**5. Obtaining Consent**

Consent will be obtained from the provider and from any additional helpers/providers who are observed, after you arrive at the site and before you begin your observations. If your site requires that a consent form be sent in advance, bring extra copies with you and obtain consent following those procedures.

**6. Provider Payment**

Each participating provider will be paid $40 at the end of the second visit. (Some sites may wish to assure that all questionnaires are completed prior to payment.) For family day-care homes with more than one provider who has been involved, you will need to ask the owner how he/she wishes to handle the payment. Some sites may wish, for example, to ask the owner how he/she wishes to handle the payment. Others may want to involve the caregivers as well. Some may wish to divide the $40 equally among all participants; others may wish to purchase a gift for the home. Please be as flexible as you can. If a parent asks

why the child-care payment is larger than the family payment remind him/her that the child-care assessment involves 2 days rather than 1 day.

**D. Problem Solving**

**1. Trouble making contact with caregiver/director.**

The caregiver or the director of the center is not available when the project staff person calls. A person other than the caregiver (home daycare) or director (center daycare) answers the phone or a machine answers the phone:

"*Hello. This is (your name) from the Study of Early Child Care. (Name of child) is in (name of provider's) care. (Name of child) and his/her mother are part of a study on early child experiences and development. (Name of mother) has agreed to participate in the study and has contacted caregiver/provider (or you) about the possibility of observing (name of child) while he/she is in (name of caregiver/director/your) care. Could (he/she) (you) please call me back today or tomorrow at the following number:* "

If speaking to a person add:

"*I am sure he/she is very busy so I hope it's okay for me to call (her/him) back if I don't hear from (her/him). Is there a good time when I might reach (her/him) today or tomorrow? Thank you. Bye.*"

Make the second phone call at the time suggested, or some time during the following day. If the caregiver/provider is

still not available, leave another message asking that he/she get back to you within the day.

If the phone call is not returned after the second try (second day) and no reason is given for the caregiver/provider's unavailability, then follow up with a third call the following day (third day) to leave a third message.

If by the morning of the fourth day (at the latest), the caregiver/provider has not returned your call, and the mother has made the original contact, call the mother, asking her to approach the caregiver/provider again with the following message (we are not asking the mother to read this to the caregiver/provider, but to try to include the following points when speaking again with the caregiver/provider):

"*The Study of Early Child Care that (name of child) and I are involved in would like to speak with you to discuss their study and your possible participation. They are having difficulty reaching you. I know you are very busy but they feel your input is very important to the study. Would you mind speaking with her/him within the next couple of days about the study and the possibility of a visit. Is there a good time for them to reach you to discuss the study and a possible visit?*"

Alternatively, you could at this point send the RECRUITMENT letter and a note suggesting that the director call you at her convenience.

If the caregiver is still unresponsive, the project staff person could suggest that the mother ask the caregiver/provider

if he/she would like to be introduced to the project visitor before he/she agrees to participate.

**2. During contact with the caregiver/director, the provider says "no" or is ambivalent about participation.**

Try to find out why. If the provider is adamant about refusing to discuss participation, we have a missing child-care observation. If the caregiver is willing to discuss refusal or is ambivalent about participation, use the following troubleshooting suggestions to encourage participation:

**a. Discussing the Study and its importance.**

Summarize what is on the Study Description, emphasizing its importance to children, its national significance, and the critical importance of caregiver provider participation in the study. If he/she has received the description, ask if he/she had a chance to read the description and if there are any questions about the study or his/her participation? If appropriate, mention the study's importance for children, its national significance, and how critical the input of caregiver/providers is to the study. Mention that the caregiver/provider/center will receive $40 at the end of the second visit in appreciation for their time and input.

**b. Provider/Director is concerned the visit would be too disruptive to normal routines.**

Explain that:

(1). The date and time of the visits are arranged for the convenience of the caregiver/director;

(2). Our project staff person will be as non-intrusive as possible;

(3). Our primary purpose is to observe the child in normal circumstances. We do not want any special arrangements made for the visit (changes in schedule, etc.);

(4). We understand your primary responsibilities are to the children;

(5). Although we do need to speak with you about your views and past experience, this brief interview can be at your convenience and you can request that we leave at any time, if you feel circumstances warrant it.

**c. The caregiver/director is concerned about the privacy of the staff and other children and parents.**

Explain that:

(1). All observations and staff comments are kept confidential and are shared only with project staff (with the exception of child abuse);

(2). Any information from the observations or interviews will not be shared with the parent (of course, overall study results will be made available to any interested caregiver/provider.);

(3). No information will be gathered on other children in their care;

(4). Any caregiver who is observed at a center is asked for consent prior to the observation.

**d. Caregiver/Director wants to think about it first or discuss it further with the staff before giving consent or scheduling a visit.**

Ask for a specific time to call back to discuss their participation. If the caregiver/director seems ambivalent, use suggestion #1 before concluding the phone call. If necessary, mention that we do have a time constraint in that we need to see the child as close as possible to his/her 6th month (or 15- 24- 36-month) birthday. If all else fails, go

back to the mother again and see if she can persuade the caregiver.

**e. The caregiver/director seems concerned that you may report your findings to licensing officials.**

This is particularly pertinent to family daycare providers, some of whom are unlicensed and operating illegally. If you sense this is the source of a provider's hesitation, be explicit about the fact that you will not report any data or anything else that you hear or observe to licensing officials. All data are confidential. (The only reporting requirement with which you must comply concerns suspected child abuse or neglect.)

**3. The provider takes steps that create an atypical day.**

Providers may try to schedule your visits when other children are asleep, when some children are absent, or after a "problem child" has gone home. This may be a real problem in smaller, informal arrangements. If you get a sense that this is happening when you schedule or confirm the visits on the phone, you should reiterate the importance of seeing a typical day and address his/her concerns about being "tested" or about the disruptiveness of the visit.

More often, you will sense that the visit is atypical when you arrive to conduct your observation. There is little you can do at this point, unless you are willing to reschedule the visit

(with no guarantee that the rescheduled visit will be more typical). In cases where the children are asleep at non-nap times and you sense that this has been done to accommodate your visit, try to wait until they wake up. There is a place on the ORCE form to indicate whether you felt you have captured a typical day. Indicate "no" in these cases.

## III. ASSESSMENT PROCEDURES

### A. General Procedures

This section covers general considerations for the child-care visits, including the determination of when the visit should take place, the "order" in which the data are collected, the determination of which caregiver(s) to observe in the case of multiple caregivers, and procedures in the case of a single arrangement being used by more than one Study child.

#### 1. Number of visits

Two visits will be made to the child-care facility at each assessment point. Observation and interview procedures will be divided into two visits to reduce observer bias (the observations will be made at the first visit, prior to collecting the interview information about the caregiver's education, etc.), to increase the reliability of the observation (two observations are better than one), to increase flexibility (if the child falls asleep or the caregiver has an emergency during the first visit, for example), and to make each visit a reasonable length.

**2. Timing of visits**

The first child-care visit in each pair of visits should occur within a 2-week window of the scheduled observation time (6, 15, 24, 36 months). The second visit should occur within 1 week after the first. However, if you need to reschedule the second visit due to the target child's illness, for example, and this puts you past the 1-week window from the first visit, just reschedule the second visit as close to the first as possible, but with no more than a 2-week gap and not past the child's 7-month birthday. In addition, no arrangement should be visited until the child has been enrolled for at least 2 weeks.

All data collection should occur within two visits at each time point, unless there are circumstances that prevent the collection of the minimum required data in two visits and a third visit is necessary. Be careful not to overstay your welcome. Do not pressure caregivers to complete their interviews or to let you stay longer when it is obvious that your presence is not wanted.

The scheduling of the visits should be worked out with the child-care provider when the appointment is made. You want times when the child is as alert as possible, and if all times are equal, a morning visit. You may arrive before the child if your site is one in which researchers are interested in observing drop-off.

**3. Confirming the visit**

Even though you called the provider to confirm on the day before the visit, it is a good idea to make another quick call to the director/provider on the day of the visit, to be sure that the child is not sick. Of course, if you are arriving early to observe drop-off, you will not have time to make this call. If you arrive and the child is sick, reschedule the visit, trying, insofar as possible, to stay in the 2-week window. DO NOT COLLECT ANY DATA if the target child is not there. As described below, the child-caregiver observations must be spread across 2 days; thus, if you collect data (e.g., caregiver interviews) on a day when the child is sick, this would put you in the position of visiting on 3 days, which should be avoided.

**4. Number of observers**

Only one research assistant (RA) will visit each child-care facility, unless a second individual must accompany the RA for safety reasons. The observer will not be the person who interviewed the mother. Child-care and home visits must be independent both within and across assessment dates. In other words, the 1- or 6-month home visitor cannot do the child-care visit for the same target child. We strongly recommend that the same RA conduct all visits for a given child-care arrangement.

**5. What to bring**

You should bring with you to the child-care visit the following:

a. Two additional copies of the consent form -- one to leave and one to bring back signed;

b. A copy of the parents' signed consent form in case the provider wants to see this;

c. Multiple copies of all data forms. Remember to take: (1) extra copies of the questionnaires to the second visit in case caregivers have lost the ones you gave them at the first visit; and (2) another set of consent forms in case there are new caregivers;

d. The Director's Telephone Interview (filled out);

e. Clipboard, stopwatch, "observe-record" tape (this will be produced centrally) or timer; tape recorder, if interview is being taped for reliability;

f. Stamped return envelope for caregiver to use in sending back any questionnaires not completed by the second visit; and

g. Child care ID Worksheet.

**6. Arriving at the center/home and getting started**

In a center, find your way to the Director's office. Chat with him/her about your visit. Get the Director's Questionnaire, which he/she should have completed. If he/she has not, suggest that perhaps she could fill it out before you leave. Ask him/her to describe all of the caregivers who are likely to be observed interacting with the target child and record this information on the Child Care ID Worksheet. Be sure to ask about his/her relationship to the child and whether he/she is specifically assigned to the child. Ask her to take you or show you to the room where you will be observing the target child.

**7. Whom to observe, interview, and ask to complete questionnaires**

In many cases, the child will have only one caregiver. However, in some large family day care homes (group homes) and in centers, the child may be cared for by more than one caregiver. In these cases, you need to determine whom to observe.

Observations will be done noting which caregivers and other adults were in the room and which caregivers and adults interacted with the child during each observation interval. <u>All</u> the caregivers with whom the child interacts, including non-staff

adults, will be observed during the Behavioral Scales observations. Since the focus is on the child's total caregiving experience, <u>which</u> caregiver interacted during a period will be noted, so we can link up the behavior of individual caregivers with their individual interview data.

The Qualitative Scales will be completed for up to 3 caregivers with whom the child interacts for at least 20 minutes (or for whom the researcher has seen an adequate sampling of behavior to make the judgments necessary for the Qualitative Scales).

Up to a maximum of two of these same caregivers will be interviewed. All caregivers who are interviewed should be asked to fill out questionnaires as well. The two caregivers who are interviewed should be the following:

First, the caregiver who interacted with target child <u>most</u> during the two sets of observations conducted on Day 1. It is important to identify the caregiver who <u>interacted</u> the most with the target child, who may or may not be the caregiver who was in the infant room the most. In centers that assign specific caregivers to specific children, you might expect that it will be this caregiver, but again, it may not necessarily be this caregiver.

Second, the "lead" teacher in the class, if he/she interacted with the target child at all during the observation.

Third, if there is no "lead" teacher, the caregiver who interacted with the child <u>second most</u> during the observations (if

observed for at least 20 minutes and Qualitative Scales were completed)

**8. Assigning Child Care ID's.**

Each child-care provider and center director is assigned an identification number. The 5-month interviewer will have assigned an ID to each arrangement (the Director ID for centers [Center ID], the Primary Child Care Provider ID for group family day care homes, and the Child Care Provider ID for all other arrangements [Arrangement ID] -- see below and also in the 5-month procedures). In the unusual case that a family or group home is co-owned (by a married couple, for example) there is not a clear primary provider. In this case, randomly assign one of the provider IDs as the arrangement ID. However, it is the responsibility of the Child-Care RA to assign any additional IDs. During the visit, these additional IDs will be temporary (see below) and then finalized by the site coordinator after all visits to a given arrangement are completed. This will occur for visits to center-based and large family day care (often called "group homes") arrangements, in which multiple caregivers are observed, interviewed, and asked to complete questionnaires. Recall that, although a maximum of two caregivers are interviewed and asked to complete questionnaires, more than two caregivers may be observed, given the child-focus of this observation.

The "on-site" temporary ID's will be assigned using an ID worksheet (see next section and Appendix), and the finalized by the site coordinator (or counterpart) after the last visit to

each arrangement (see below). BRING THE ID WORKSHEET TO THE CHILD CARE VISIT.

The final identification number consists of 7 digits and is tied to both the research site and the relationship (REL) code. The first digit of each Provider and Director ID is the Site Code. The second digit is the Relationship Code. This code identifies the person being observed or responding to the interview or questionnaire, and refers to the relationship of the respondent to the study child. Specifically REL should be coded as follows:

0 - Mother (in cases where the mother is a child-care provider and also takes care of the target -- her own -- child).

1 - Father (the father is the child-care provider)

2 - Grandparent (the grandparent is the child-care provider)

3 - Other Relative (another relative, including sibling, is the child-care provider)

4 - Primary Child-Care Provider (a provider with supervisory responsibility for the target child's classroom; sometimes called a head or lead teacher. Use this code, as well, for the owners of large family day-care homes, sometimes called group homes, in which more than one caregiver is employed. All of these other providers are assigned a REL code of 5.)

5 - Support Child-Care Provider (a provider who also takes care of the target child but who is not the teacher-

in-charge for the target child's classroom, sometimes called an assistant teacher or aide.)

6 - Child-Care Provider (no hierarchical designation; use in instances where all classroom teachers are of equal status, e.g., all "teachers" or all "assistant teachers"; this is also to be used in all instances where there is only one provider, e.g., in a small family day care home or in-home arrangement, given that this provider is not the mother or another relative.

7 - Director (only in centers)

As you can see, if the child-care provider is related to the child, use the codes for actual relatives (0 through 3). If the child-care provider is not related to the child, use codes 4, 5, 6, or 7. If the child has more than one provider who fits a single relationship code (e.g., two assistant teachers), they both get assigned the same REL code. What makes the ID unique is the last four digits, as described below.

The third digit, the Assignment Code, indicates whether the provider is specifically assigned to the Target Child:

1 = The provider is specifically assigned to the target child;

2 = The provider is not specifically assigned to the target child;

3 = Only one provider (use in arrangement, such as father care or family day care home with no other

available providers). Don't take the director's word on this information -- ask the provider.

The remaining digits in the Child-Care Provider ID (4 through 7) are the unique code for each provider, starting with 0001 and ending with 9999. Thus, the first assistant teacher who is observed/interviewed at the University of Virginia site who is not specifically assigned to the target child, would be assigned ID 6520001. The second assistant teacher, who is not specifically assigned to the target child, if applicable, would be assigned 6520002. This unique ID will be assigned after the second child care visit by the site coordinator in consultation with the child care data collector. Make sure that this final ID is written on ALL FORMS in the designated spaces.

The Director ID will serve as the Child Care ID number for center-based arrangements and the caregiver ID number will serve as the Child Care ID number for all other arrangements. In the case of large family day-care homes with more than one provider, the ID of the lead child-care provider will serve as the Child Care ID. In cases where the same provider and/or center is visited at least twice because 2 study children use the same arrangement, use the same ID for both observations. This is our only way of knowing that it is the same center/provider. The Site Coordinator will keep a <u>confidential</u> list that matches names and ID's (see Appendix: Final Care Provider ID's.)

If the center remains the same over 2 assessment points, but the director changes, assign a new ID and note, on the Final Child Care ID Form, that these "two" centers (presummably with the same name) are the same place. The data center will then deal with this situation.

SUMMARY

ASSIGNING CHILD CARE IDS

The identification number consists of 7 numbers and is tied to both the research site and the relationship (REL) code.

SITE CODE (First Digit)

REL CODE (Second Digit)

0 - Mother

1 - Father

2 - Grandparent

3 - Other relative

4 - Primary child-care provider

5 - Support child-care provider

6 - Child-care provider

7 - Director (only in centers)

ASSIGNMENT CODE (Third Digit)

1 - Specifically assigned to target child

2 - Not specifically assigned to target child

3 - Only one caregiver

UNIQUE CAREGIVER ID (4-7th Digits)

0001 - 9999

### 9. Using the Child Care ID Worksheet

Assigned child care provider IDs and keeping them straight across observations will pose a major challenge in child care centers, where the target child is likely to have multiple caretakers. The Worksheet (see appendix) is designed to facilitate this process and assure our ability to cross-walk from the observational data to the questionnaire and interview data.

AFTER FINAL ID'S ARE ASSIGNED AND WRITTEN ON THE WORKSHEET, IT IS SENT TO THE DATA CENTER WITH THE CHILD CARE DATA.

As suggested in the previous section, it is CRUCIAL that the RAs assign caregiver ID numbers when they visit the center, given the high turnover rates among staff. Immediately prior to starting the observation, find out who is likely to be in the classroom (ask the lead teacher or director) and interacting with the target child. Assign each of these individuals a temporary ID number using the ID worksheet (see appendix) (see below). Of course, you may be told that only one caregiver will be seen, only to find that a second caregiver enters the classroom and interacts with the infant. Assign this individual a temporary ID for "caregiver 2" and when your observation is completed, check on this caregiver's relationship to the infant and fill this information in on the worksheet.

For each observation cycle, match your temporary ID to the actual caregivers that you observe. For example, if you observed 4 different caregivers during cycle one (1=A, 2=B, 3=C, and 4=D), then you observed 3 of them during cycle two (say A, B, & D) PLUS one new caregiver, you would record the following for cycle two:

1=A, 2=B, 3=E, 4=D. This will allow us to match caregiver 1 to caregiver 1, caregiver 2 to caregiver 3, and caregiver 4 to caregiver 4 across these 2 cycles. We will also know that caregiver 3 in cycle one is not the same person as caregiver 3 in cycle two. Use the space for "Description" to record permanent cues to help you keep the caregivers straight, e.g. hair, size, etc. Clothes are not good cues since they will likely change from visit 1 to visit 2.

After observing for the behavioral ratings, you will record data for the qualitative ratings for no more than 3 caregivers. This is described in the section on the qualitative rating procedures. For the purposes of the worksheet, indicate, for each caregiver (1 through 4) whether you consider him/her in the qualitative ratings, and which caregivers (1, 2, 3 or 4) number you worked with.

| | Temp. ID | Final ID | Descrip | REL | ASSIGN | QUALS? |
|---|---|---|---|---|---|---|
| e.g. | Caregiver 1 | A | | | Cg1 | |
| | Caregiver 2 | B | | | | |
| | Caregiver 3 | C | | | Cg3 | |
| | Caregiver 4 | D | | | Cg4 | |

The data sheet for the qualitative ratings indicates 4 caregivers, to make it easier to match from the behavioral scales to the qualitatives. NOTE that you will only rate 3 of the 4. It may be caregivers 1, 2 and 3 (persons A, B, and C) or 1, 3 and 4 (persons A, C, and D), or any other combination.