The NICHD Study of Early Child Care

___Addendum to Six-Month Home Interview and Child Care Manual

September 12, 1991

______This addendum is based on all of the questions that have come in, thus far, on the 6-month home interview and child care assessments. There will be subsequent addenda, as needed, which compile the responses to later questions.

(Note on 5 Month Phone Call)

**5A&B**

If more than one set of Forms A & B are completed because a subject changed child care providers between the initial 5 Month Phone Call and the Six Month Child Care visits, please send in only the set of forms containing the current information for the Six Month Child Care visits.

**6F**

On Form 6F, page 12, the top grid for change code should have numbers 1 2 3 4 & 6 as selections. There is no 5 change code. Fill in the change code box labelled 5 if you are using change code "new husband/partner." The response will be coded as 6 on the database.

**6L**

Assigning Subject Numbers

1. <u>Subject Numbers for Caregivers/Programs Not Visited</u>

(Repeat "It is essential that you assign......all IDs. page 10)

This affects the <u>My Child Care Questionnaire</u>, which is given to the mothers at the home visit (Form 6L). This form requires a caregiver ID -- include the IDs for the arrangements that we cannot visit. If multiple caregivers, pick one (get name). If caregiver changes after Home Visit, readminister Form 6L over phone. Don't administer if child care is < 10 hours, (i.e. is not to be used with child care that is not observable.

This form should be held until the caregiver ID has been assigned. For center based care the caregiver ID should be the director ID; for all other arrangements the caregiver ID is used. Also please remember that the spaces printed on this form for the caregiver ID is one space short - if you write in the last digit we will bubble in the digit for the scanner to read.

The relevant citations in the manual regarding when to complete My Child Care (Form 6L) are located in Chapter 9.2, page #35.

(1) Home Visitors should use the 5 month phone interview forms to identify the non-maternal caregiving situation that will be visited.

(2) The form is not completed if the father is the caregiver.

(3) If we use My Child Care, we enter (1) the caregiver's first name and/or center's initials on the blank at the end of the directions, and (2) the caregiver or center ID Number. We get the caregiver's name and center initial from the 5 month phone call worksheet.

(4) There are also directions about this form in the INFORMATION FROM PREVIOUS CONTACTS (page 3 of the 6 Month Home Interview) that the home visitors use to get ready for the visit. It states that if the child is in care fewer than 10 hours or is in care with the father, do not administer this questionnaire.

(5) On some occasions, the home visitors may not have the 5 month phone interview prior to doing the home visits. In these situations, ask the mother about her child care arrangements. We need to find out about caregivers for the HOME, so work it in there.

The intent of questions 19 & 20, page 4, is to find out when the mother and baby were last reunited and when they will be separated again relative to the time of the observation.

Therefore, Q. 19 - day & time last worked/school - should be the time the mother LEFT WORK OR SCHOOL; Q. 20 - day & time going to work/school - should be the time the mother will next leave home to go to work/school.

Questions 13, 16, 17, 18 can be answered with multiple responses.

## Setting Priorities on Which Child Care Arrangement to Visit

In general, for children with multiple "observable" arrangements, you should elminate from consideration those that would put you beyond the window before you make your selection. Here's an example of this:

The Target Child's birthday is 8-8-91. The home visit was done on 8-6-91. This child will be starting a new child care arrangement (a family day care provider) on 8-19-91. By the time she has been enrolled for 2 weeks, she will be beyond the window for observing child care. This child is also cared for by her father 3 days a week, for approximately 30 total hours a week. This meets our criteria for an observable child care arrangement. You should observe the father, rather than wait to observe the more formal arrangement which will put you beyond the window.

## Number of Visits

You should do everything in your power to keep to 2 child care visits per arrangement. Do not return a third day, for example, to complete your fourth ORCE cycle unless this is absolutely unavoidable.

Contradictions Between 5-Month Call and Call to Schedule the Child Care Visit at 6 Months

Sometimes mothers will give you information about their child care arrangement during the 5-month call that is later contradicted by the caregiver when you call him/her to set up an observation. In general, it is good practice to try to reach the mother and to clarify the contradictory information. So, for example, if you call the caregiver and learn that s/he stopped caring for the target child "2 weeks ago", you will need to talk with the mother about her current arrangements. In fact, you should complete a new 5-month phone call if you learn that her situation has changed and send this form to the data center with a note to disregard the prior 5-month data.

Certainly, if a caregiver has not seen the Target Child for more than two weeks, you should not collect any data on this arrangement.

Similarly, if you talk to the caregiver and learn that the Target Child is not awake for at least 3 hours on a typical day, then you should confirm this information with the mother and, if it is true, then you would not collect any data on this arrangement. In this case, the arrangement does not meet our criteria for observable child care. Find out if there is secondary arrangement that meets the criteria for observing.

You should never ask a caregiver to wake up a child!

**7A**

Director Telephone Interview

(a) Question 6, page 4: Please get the total number of children enrolled in the room. There may be some cases where, because of part-time children, the maximum children in the room at one time is less than the total number of children enrolled in the room, e.g., 9 children enrolled, but only 7 in the room at one time due to part-time children. But, please code "9" in this case. This may seem a little unfair, but it will provide the most consistent data across settings given situations where, for example, one of the PT children is dropped off a little early and another is picked up a little late and so they end up in the classroom together.

(b) Question 7, page 4: Code the ages of all children enrolled in the room (see Question 6, page 4, above).

**7B&C**

The form (7B) for interviewing center directors (or mothers) who will not permit an on-site center visit contains a space for filling in the center/director ID. However, the form for interviewing mothers about their home-based arrangements that you cannot visit (Form 7C) does not. IT IS ESSENTIAL THAT YOU ASSIGN IDS TO ALL CHILD CARE ARRANGEMENTS, WHETHER VISITED OR NOT. Please write in a caregiver ID number using the instructions for assigning all IDs.

**7D** Director Questionnaire

(a) Question A3, page 2: If a center is in a federal building and set up for federal employees' children, code it as "6: Corporate/business/hospital". This is, in effect, an employer-sponsored program. It does not matter whether the employer (in this example, the federal government) has any say in how the center is run.

(b) Question B1, page 3: If you have more than 99 children, write in the correct answer next to the bubbles.

(c) Question B3, page 4: This refers to the maximum number of children there on any given day, NOT the center's licensed capacity. If a center has 40 children enrolled, but has a licensed capacity for 50 children, code "40".

(d) Questions C1, 2, and 3, page 5: An administrative director is a director whose responsibilities are entirely administrative. S/he does not have routine responsibility for caregiving. Sometimes, an administrative director may have to fill-in if a caregiver becomes ill, but as long as this is the exception rather than the rule, then s/he is still an administrative director.

(e) Question C8, page 6: If teachers are laid off due to low enrollment, please code this as "voluntary". We want to keep the category of fired due to poor performance as "pure" as possible.

**7E & 7F** Child Caregiver Interview -- Center Version

(a) It has been pointed out that on the Caregiver interviews - center and home versions - forms 7F Q.B2 & 7J Q.I2 describing race or ethnic group refer to CARD 1. There are 7 categories for race on the forms and only 5 categories for race on CARD 1. CARD 1 will not be modified until after the one month data has been collected. IN the mean time, use a temporary measure to add the two additional categories "biracial" & "don't know" to the selections available for the six month data collection only.

(b) Question B5, page 5: Answer this question in years, If the children are under 1 year of age, code as "0".

(c) Question B6, page 6: Please code the type of care that is used for most of the year in cases where the caregiver makes it clear that, during the summer, the child attends camp, but then goes to a family day care home during the school year. If nothing is said about "most of the year", then just code whatever the caregiver says. In other words, don't confuse the caregiver.

(d) Question C10, page 8: This should be answered in years. If the caregiver has worked in the center for less than a year, code as 0.

(e) Question E1, page 10: A high school diploma plus one college course is coded as "14". A high school diploma plus 4 college courses is also coded as "14".

(c) Question E3, page 10: Any certificates that are issued by the state and that are used to qualify a person as a caregiver of young children should be coded as "state certification in ECE". For example, the Massachusetts Office for Children issues Office for Children certificates which specify whether a caregiver meets the state criteria as a "teacher" or a "lead teacher". These count as "state certification in ECE".

If you have a provider who has a high school diploma plus some college courses (even 1 course), you should code "14".

(f) Question E8, page 11: Training that is required by the state or by an employer for purposes of advancing from a teacher to a lead teacher (as in Massachusetts) should be coded as "yes", training that is required...

(g) Question E9

For horizontal numbers 1 2 3 4

1 2 3 4 , the top row is tens.

the bottom row is ones.

(h) For the Typical Day questions A6-A11 which are located on the Caregiver Interview and on the ORCE, ask the questions once, but mark the information on both forms or the data will be noted as missing.

(i) Question A8, Caregiver Interview - how disruptive - the "only slightly" choice should be selected if they respond "not at all".

(j) Question C5 - How many months out of the year do you work at the center? If less than 1 year worked, code the months the caregiver is planning to work.

ORCE: General Procedures

1. Incomplete Observation Cycles

Any ORCE cycles of data collection which are not completed should be sent to the DCC with whatever data was collected on them. The complete cycles should not be renumbered leaving the incomplete cycle out.

2. Interrupted Cycles, Same Providers

If one of your ORCE cycles is interrupted by a nap, or whatever, but the cast of characters (caregivers and children) and the setting remains the same when the child wakes up, you can resume the cycle where you left off. If, however, any of these factors has changed, then you must start a new cycle.

3. Child Notices Observer

You only need to "look at the sky" once. Otherwise, you'll never get your coding done.

4. Available Children

Please write in the number of children aged 25 to 35 months. We do not have a category for these children on the form. Also, the 18-24 month category should read 19-24 months.

5. <u>Ages of Other Children</u>

You are told that other children are those under age 13 years. Anyone over age 13 is considered an adult and their interactions should be coded as such. (see below, question A9 on form 7J)

6. <u>Available Children and Adults When Outside of the Child Care Setting</u>

The 6-month child care manual says to code as available adults, those who are "in the same room as the child or, particularly in home settings, within earshot" and to code as available children, those who are "in the same room as the child" (even if they are not paying attention to the child). These descriptions were not written with parks, playgrounds, banks, detc. in mind. They apply to daycare centers and homes (houses, apartments, even the backyard of the house) -- not to wide open spaces or places of business. When the child is out of his/her regular care setting (ie.g., the home or center), some more "functional" definition of "available" must be used. Children in the park, playing on the swings, running through the grass, minding their own business, while the child (6 months old) is in a stroler next to the caregiver, should not be counted as

available. Adults standing in a check-out line at the store or bank or library should not be counted. There must be come likelihood that these people would interact with the child; they must be part of some functional "group" of which the child is also part (as would be the case if they were in the child's class at a center or in the child's home). The reason to make this distinction is (a) to make the coding for parks, etc. more comparable to the coding for centers and homes, and (b) to use the coding as the basis for calculating meaningful adult-child ratios. If the park or playgound is, in fact, a regular child care setting -- that is, the caregiver takes the child there everyday and they see and interact with the same people there everyday -- then the "functional group" would consist of those adults and children that they see and interact with everyday.

7. <u>Post-Observation Interview</u>

Do not change answers the caregiver gives you. S/he may contradict herself by, for example, saying "yes" to question 1 and then saying "yes" to several items on question 2. Do not change her answers to make them consistent.

For the Typical Day questions which are located on the Caregiver Interview and on the ORCE, ask the questions once, but mark the information on both forms or the data will come out missing. We will note that the information is repeated for future forms development.

Clarification of Items on the ORCE: Behavirals

1. Cognitive Stimulation

(a) How to code reading to the child

Only some types of reading are coded as cognitive stimulation. There is a difference between reading a bedtime story and reading a lesson.

Reading is cognitive stimulation when it provides information about the world, teaching about colors, letters, shapes, numbers (the three R's), when the adult is showing a picture to the child and reading what is underneath it, when the adult is making an effort to teacher the child. The books being read could be comic books for Johnson & Johnson readers -- or anything else. Reading is cognitive stimulation if the adult showed the child pictures (so the child was learning to connect the words with the images) or if the "stories" were about the 3 R's, science, etc.

Reading that is not cognitive stimulation would include reading to keep the child quiet or to put the child to sleep when there is no obvious "teaching" going on. The adult, for example, would let the child look at pictures, but would not be reading. Or, the child is not learning anything from the content of the reading.

(b) And Facilitates

A facilitate can turn into a cognitive stimulation and visa versa.

2. Other Activity with Adult

(a) Coding Being Physically Close and Watching

Involvement with the child has been expanded to include being physically close (defined as within arms reach) and watching the child. As is generally true of this code, this new form of involvement must last 5 continuous seconds to be coded as other activity with adult. And, as is generally true, interaction is defined as the caregiver being involved with the TARGET child.

If the caregiver is "vegging out", do not code "Other activity with adult". The caregiver has to be involved (eye-to-eye contact, physical contact, verbal interaction, or within arms reach and watching the child).

If the caregiver is within arms reach of the target child and glances over to the target child for less than 5 seconds, do not code this as "Other activity with adult" (It did not last 5 seconds or more).

If the caregiver is 3-4 feet from the target child in a room with other children watching the target child play, do

not code this as "Other activity with adult". Note that the caregiver, in this case, is not really involved with the target child. She is also not within arms reach of the target child.

3. Other Talk

(a) Must be directed to target child

Only talk that is directed to the target child is coded as "other talk". Do not code everything that the caregiver says as "other talk". If the caregiver is talking (or singing) to other adults or children, including a sibling, this is NOT coded as "other talk".

So, if the target child is on the caregiver's lap, and the caregiver is talking specifically to a child across the room, using that child's name, etc., this is NOT CODED as "other talk". If the caregiver is singing along to a record or tape, this would be coded as "other talk" only if it is directed to the target child -- the adult would have to be looking at the child, possibly holding or rocking the child, not vacuuming or doing dishes or watching out the window.

(b) When to also code "other activity with adult"

If "other talk" lasts 5 seconds or more, then you should also code "other activity with adult". If "other talk"

lasts less than 5 seconds, do not also code "other activity with adult".

4. Child "Solitary or Unoccupied"

(a) When caregiver is uninvolved

Code "solitary" or "unoccupied" if the child is in close proximity to the caregiver but the caregiver is paying no attention to the child. Which one of these you code depends on what the child is doing or failing to do (see self-feeding example, below).

(b) Self-Feeding

If the child is holding a bottle and obviously drinking from it, code this as "Solitary". However, if the child is holding the bottle and vegging out (the amount of formula doesn't go down, no sucking is occuring), then code this as "Unoccupied".

5. Positive Physical contact

(a) Holding/Sitting in Caregiver's lap

Include situations in which the caregiver is holding the child on his/her lap, as well as situation in which

the child is sitting on the caregiver's lap. These really amount to the same thing at 6 months.

(b) Contingent and Noncontingent Kissing

Code kissing as positive physical contact whenever it occurs in the interval that it occurs.

6. Restricts

(a) Intentionality

______________Code restrict only when the behavior is clearly intended to restrict. If a caregiver says "no" or "don't" purely playfully, then do not code as restrictive. The caregiver has to "mean it".

7. Questions

(a) Tag questions

A tag question ("You're really enjoying playing in the water, aren't you?) is a question. However, if you are in doubt -- and it can be hard to differentiate a tag question from a statement if the caregiver pauses -- then code it as "other talk".

Clarification of Items on the ORCE: Qualitatives

1. Sustained Attention

Sets of Toys

Sustained attention includes a child playing with a single toy or to a child who is playing with thematically

related toys. For example, a child who is playing with a brush and a doll (pretending to brush the doll's hair) or a cup and saucer may be coded as displaying sustained attention. A child who is playing with unrelated toys, even if they are all clustered in front of the child, switching from one toy to another, is not displaying sustained attention.

**7J and 7I?**

Family Day Care Homes with Two Caregivers

Some family day care providers will have "helpers". These are often family members who do not work full-time in the home, and many will not consider themselves to be caregivers. For our purposes, what is important is whether they provide care to the target child 10 or more hours per week, on a typical week. In this case, they are caregivers to us. They need an ID number. The primary caregiver should get a REL code of 4 (since this really is a hierarchical arrangement -- it is clear who is in charge and who is primarily responsible), and the "helper" should get a REL code of 5.

These "helpers" who meet our 10 hour a week criteria should also get the questionnaires and interviews if at all possible. And, their IDs should be indicated on the ORCE when they are observed.

Sometimes these "helpers" may be young. One site had a 16 year old helper in a family day care home. Again, as long as the 16-year old is there 10 hours or more per week, s/he gets an ID number and is treated as a regular caregiver.

Caregivers Under 18 Years of Age

It is very important that you include these caregivers in the child care assessments. Sometimes, the child's only caregiver will be under 18 years of age. Other times, the child will have multiple caregivers, one of whom is under 18 years of age.

This poses a question for the consent forms. You should clarify procedures with your human subjects committee. In some cases, it may be necessary to obtain the consent of the caregiver's parent. Perhaps this consent can be obtained over the telephone. Perhaps it is required only if the under age caregiver is not being supervised by an older caregiver. You will need to get answers to these questions for your site. But, we repeat, we need data on these caregivers -- they are a particularly interesting group.

Interviews

1. General Questions about Procedures

When you are observing the mother of a target child who provides family day care in her own home to her own (target) child plus other children, use the FAMILY DAY CARE INTERVIEW (LONG OR SHORT FORM), but you need to inquire about her care for the Target Child (own child) in the context of caring for other children. So, for example, for Section A, you need to inquire about how long she has been caring for the Target Child along with other children; How many hours she takes care of the Target Child along with other children, etc. Similarly, for the Future Plans section on page 33 (long form), you will need to find out if the caregiver/mother is likely to stop providing care for her own child in the context of providing care for other children.

In general, in this situation, it would be helpful if, at the outset of the interview, you explained to the mother that you are interested in her role as a child care provider. So, many of the questions ask about her caring for (Target Child), but we are really interested in the times that she is caring for the Target Child as a family day care provider.

2. Family Day Care Interview -- Long Form (Form 7J)

- Getting Data on Helpers

-- Please complete this form for all helpers who provider care for at leat 10 hours per week.

- The scale for question J5, page 26, is 11-20 rather than 10-20.

Question A9, page 4: please write in caregivers who are aged 14-17, and indicate whether they are the caregiver's own child, sibling, or other child.

Questions A10 and A11: "Spouse" and "sister" refer to the caregiver's spouse and sister.

- Question B4, page 5, use the target child's rate if rates vary for different children.

- Questions B4 and B5, page 5: If a provider charges a set amount, regardless of whether a child comes part- or full-time, then code the same rate for both questions, e.g., if s/he charges $35 per day regardless of hours, then both questions are answered with 5 X $35 = $175. If a provider charges $4.00 per hour, then full-time is 40 X $4.00 = $160 and part-time is 20 X $4.00 = $80. If the number of PT hours varies for different children, just get the hourly rate and multiply by 40 for the FT, weekly rate and by

20 for the PT, weekly rate.

Also, please note that the "$" and "." are incorrecntly located for items B3-5. Write over these and enter dollar amounts up to 3 columns.

Check point at C1 - If the caregiver cares for siblings of the target child and other children in addition to the target child, complete all of the questions in Section D & questions 1-8 in Section G. To alert the DCC of this special selection, please circle 1 & 4 at check point C1 and make a note that both are needed.

- Question D3, page 7: Some caregivers may not consider their own relatives, e.g., nieces and nephews, as children in their care, even if they are in care on a regular basis. Please rely on your own observations of the children who are there to answer this question. You should also confirm your observations with the caregiver, i.e. "I can't help but notice Jason and Jenny. Who are they? Do they come here regularly?".

Other caregivers may consider live-in grandchildren as their "own children". But, for our purposes, these are "other children".

If there is a live-in, daughter-in-law, she does not get coded as "grown children living at home". These include only children of the caregiver.

- Question D25, page 11: Please include grown children of the provider (his/her own children), but not spouses or children of these children, or children of the provider's relatives.

- Question D28, page 11: This question refers to all children who live at home with the provider, regardless of their age.

- Questions G12 and G13, page 21 In cases of grandmother care when the grandmother has grown children, these questions may feel awkward, but they allow you to code all possible responses and we need these data. For G12, you would probably code 00. For G13, you would probably code 6 or 7 (interpret "arrangement" liberally). If no children live with the provider, go ahead and code G13 for the provider's children wherever they live.

It has been pointed out that on the Caregiver interviews - center and home versions - forms 7F Q.B2 & 7J Q.I2 describing race or ethnic group refer to CARD 1. There are 7 categories for race on the forms and only 5 categories for race on CARD 1. CARD 1 will not be modified until after the one month data has been collected. IN the mean time, use a temporary measure to add the two additional categories "biracial" & "don't know" to the selections available for the six month data collection only.

- Question I4: do not double-code this item. Find out which response applies most often.

- Questions J2 - J5, page 26: Questions J2 and J3 refer to paid child care. Questions J4 and J5 refer to both paid and unpaid child care. These are our only questions about child care experience, and many unpaid providers have responsibilities that are identical to those of paid providers.

- Questions J8, 9, and 10, page 27: Include nanny agencies as long as they provide the kinds of support that are asked about.

- Question L2, page 31: Please code "N" for Not a reason for items that do not apply to the provider, for example the item "to see my grandchild/niece/nephew grow up" should be coded N for unrelated providers.

- Question L3, page 31: Please code "1 - Not at all important" for items that do not apply, such as "to give the child a home away from home" in cases of in-home care.

- Question M1, page 33: You may run into caregivers who are ending a child care career. In these cases, ask the caregiver if she considered child care to be a long-term career.

**7K**

Forms 7K thru 7P - child care provider packet - should not be separated when you send them to us. Since the caregiver ID on F07K is the unique identified for the rest of the forms in this packet, all of the forms need to be kept together. The transmittal sheet need only indicate the number of 7K packets being sent. Please do not staple these forms together.

Data Collection on Father Care

Do not give the fathers the Child Care Provider Packet. Only give the father the "This Baby" form to complete.

(KM: What do you want to do about "About Raising Children"?)

**7M and 7N**

Q1. <u>Mother and Father Jointly Drop-Off or Pick-Up the Baby</u>

If parents alternate, ask the caregiver to respond based on the most typical/common situation. If the two parents always come by together or really alternate equally, then ask the caregiver to complete this form for the mother, since this will be most comparable with the other target children (sorry dads).

**7R** The Profile for Family Day Care

(a) When to Use this Form

Use this form for all home-based arrangements, including father care in the child's own home. Several items are excluded for arrangements in which only the Target Child is in care. These items should also be excluded in situations in which the Target Child is in care with only his/her siblings.

(b) Unobserved Items

If you do not observe what you need to observe to complete an item (no diapering, no cooking, etc.), then you are instructed to ask the caregiver about the item and code this item in the proper column ("R") on your data form.

(c) Items that do not Pose Hazards to the Target Child

There will be items, for example, turning in the handles of pots on the stove (Safety and Health, Item 3), that do not apply to a 6 month old. They do not pose a safety hazard to the target child. In these cases, you need to ask yourself the following question, remembering that the Profile is a measure of the caregiving environment in general, not just the environment for the target child: Considering all of the children who are cared for in this setting, is this a safety or health hazard? If there is a child who can walk, then the pot handles do pose a

safety hazard. When in doubt, code an item as unsafe or unhealthy if you see a violation of an item. Next week, an older child may be enrolled in the arrangement.

(d) Date on the Cover Sheet

Put the date of the first visit on the cover sheet.

(e) Questions on Specific Items

(1) Safety & Health, Item 6: If a crib is shared and there is no overlap between children's attendance, you may code "yes" if the two children have separate sheets and they are changed religiously, and if some labeling system is established (name on crib or on sheets) to indicate which sheets are on the crib.

(2) Safety & Health, Item 13: Closed doors do not count for stairs. Even if you never observe them to be open, it is very risky to assume that they never will be inadvertently left open.

(3) Safety & Health, Item 18: You may exclude this item if only the Target Child is in care.

(4) Safety & Health, Item 20: If there is no outdoor play equipment, code as "yes". In general, we code "yes" if equipment is not present.

(5) Safety & Health, Item 27: Code "no" if a caregiver's CPR or First Aid certificate has expired.

(6) Individualizing, Item 1: Code "no" for a child having his/her own room/closet.

**7S** Profile for Centers

(a) Questions on Specific Items

(1) Physical Environment, Item 1: If there is a separate nap area in a room divided by a partial wall, this does count as a separate nap area, as long as non-napping children are not allowed in ever.

(2) Safety & Health, Item 3: If a crib is shared and there is no overlap between children's attendance, you may code "yes" if the two children have separate sheets and they are changed religiously, and if some labeling system is established (name on crib or on sheets) to indicate which sheets are on the crib.

(3) Safety & Health, Item 7: It is never considered safe to diaper 2 children at once, even if the diapering surface is large enough for two. It is not considered healthy if, after diapering one child, the caregiver disinfects only the portion of the surface that she used for this child.

(4) Safety & Health, Item 8: If a caregiver has received these guidelines, knows they are available in the director's office, but does not know where they are in her own room, you may code this "yes".

(5) Learning Environment, Item 7: Monthly rotation of toys is NOT enough.

(6) Individualizing, Item 3: If a crib is shared and there is no overlap between children's attendance, you may code "yes" if the two children have separate sheets and they are changed religiously, and if some labeling system is established (name on crib or on sheets) to indicate which sheets are on the crib.

(7) Individualizing, Item 4: If a center rotates groups of children among caregivers on a weekly basis, even if, for a given week a caregivers DO have primary responsibility for a child, code "no". This item is designed to assess consistency of care, and this arrangement certainly does not assure consistency.

(8) Individualizing, Item 9: All components of the description need to be there for a yes. It is okay, however, if the caregiver indicates that s/he would modify the procedure based on parents' personalities, as long as they key ingredients are present.

(9) Adult Needs, Item 3: Once a month is "regular", but it cannot be any less frequent than this.

(10) Adult Needs, Item 4: "Dual use" implies a high probability of scheduling conflicts. So, for example, in a church-housed center, if staff meetings are held during the week in a room that is also used by the church on week-ends, then this is not dual use for our purposes. If a center classroom is used for parent meetings and conference that occur only after-hours, then this is not dual use. In contrast, sometimes you will be told that a classroom is used for staff planning when the children are on the playground or taking naps. This is dual use, because there is a high probability that on any given day, one child will be too sick to go outside, or one child simply will not go down for a nap and so has to remain in the classroom.

(Note on 7 Month Phone Call)

**9A**

On Form 9A - 7 month time use - the reference to Recording Sheet Number was inadvertently left on the form - it is not needed for this version of the form. Also, the S can indicate Sat or Sun and the workday item differentiates the non-workday. The actual date can be used to identify Sat or Sun if need be.

## Weaver, Gretchen (NIH/OD) [E]

**From:** Friedman, Sarah (NIH/NICHD) [E]
**Sent:** Wednesday, February 15, 2006 12:47 PM
**To:** List NEURO_MEASGRP-L
**Subject:** Bayley III Gross motor items with bullets. Easier to follow.
**Attachments:** NCS.Bayley III Gross Motor items.doc

**Sarah L. Friedman, Ph.D.**
**Project Scientist and Scientific Coordinator,**
**NICHD Study of Early Child Care and Youth Development**
**OEP, Office of the Director,**
**National Institute of Child Health and Human Development**

**Phone: (301) 435-6946**
**Fax: (301) 480-2400**
**E-mail: friedmas@exchange.nih.gov**

**Weaver, Gretchen (NIH/OD) [E]**

**From:** Friedman, Sarah (NIH/NICHD) [E]
**Sent:** Wednesday, February 15, 2006 12:33 PM
**To:** List NEURO_MEASGRP-L
**Subject:** List of Bayley III gross motor items

Bayley III Gross Motor items:

Thrusts legs in play
Thrusts arms in play
Controls head while upright
Turns head to sides
Turns head to sides
Makes crawling movements
Controls head in dorsal suspension
Controls head in ventral suspension
Controls head while upright
Holds head in midline
Holds head upright while carried
Controls head while prone
Rights head
Rolls from side to back
Elevates trunk while prone
Sits with support-briefly
Controls head while prone
Elevates Trunk while prone
Sits with support 30 sec
Rossl from back to sides
Elevates trunk while prone. Extends arms Sits without support 5 sec Pulls up to sit Grasps foot with hands Rolls from back to stomach Sits without support 30 sec Sits without support and holds object Rotates trunk while seated Makes stepping movements Crawls on stomach Crawl position Moves from sitting to hands and knees Supports weight Crawl movement Raises self to standing position Bounces while standing Walks with support Walks sideways with support Sits down with control Stands alone Stands up alone Walk alone Walk alone with coordination Throws ball Squats without support Stand up mature Walks up stairs: Both feet on each step with support Walks backward 2 steps Walks downstairs. Both feet on each step with support Runs with coordination Balances on right foot: With support Balances on left foot with support Walks sideways without support Jumps from bottoms step Kicks ball Walks forward on path Walks up stairs both feet on each step Alone Walsk down stairs both feet·on each step. Alone Jumps forward 4 inches Balances on right foot 2 seconds alone Balances on left foot 2 seconds alone Walks on tiptoe 4 steps Walks backward close to path Walks upstairs alternating feet Alone Imitates postures Stops from a full run Walks downstairs alternating feet alone.
Hops 5 feet
Balances on right foot 8 sec alone
Balances on left foot 8 sec alone
Walks heel to toe
Jump forward series 24 inches.

Sarah L. Friedman, Ph.D.
Project Scientist and Scientific Coordinator, NICHD Study of Early Child Care and Youth Development OEP, Office of the Director, National Institute of Child Health and Human Development

Phone: (301) 435-6946
Fax: (301) 480-2400
E-mail: friedmas@exchange.nih.gov

-----Original Message-----
From: Lewis Leavitt [mailto:lewis.leavitt@GMAIL.COM]
Sent: Wednesday, February 15, 2006 11:40 AM
To: List NEURO_MEASGRP-L
Subject: Re: Today's agenda: Motor and sensory development.

quick tour of motor assessment:

for young children there isn't a norm-referenced scale which is generally accepted as the "gold standard"

in addition to the bayley motor form
there is :

for newborns : prechtl's generalized movement scale ---requires substantial training advantage--looks at subtle differences

birth to 18 mos: the alberta infant motor scales--advantage almost all observation takes 20 min

test of gross motor development (tgmd-2)--age range 2-10y --advantage : functional assessment i.e. skills used in play and life takes 20 min

beery-buktenica developmental test of visual integration--age range 2-18y
advantage: more fine motr/hand -eye coordination assessment time ~30 min

bruininks-oseretsky test of motor proficiency age 4-14y
advantage: quite extensive fine and gross motor buuuut takes 60 min for full test.

balance: most students of motor development use a force plate to assess balance measurements are obtainable on preschool children buuuut (like the still face procedure) we would be using a research tool founded on data from small studies without much in the way of norm-referenced data.

**Weaver, Gretchen (NIH/OD) [E]**

---

**From:** Friedman, Sarah (NIH/NICHD) [E]
**Sent:** Tuesday, February 14, 2006 7:41 PM
**To:** List NEURO_MEASGRP-L
**Subject:** Re: Woodcock-Johnson Literacy Subtests

Hi Gary, Thanks so much for sending this information. Since passage comprehension would give us a test of literacy that is more independent of verbal IQ than LWI, we may want to reverse our decision and go with it. This would be my choice, but I will go along if others want to stick to yesterday's decision to go with LWI. Both measures would capture literacy over and above verbal IQ and would be useful. Sarah.

Sarah L. Friedman, Ph.D.
Project Scientist/ Scientific Coordinator
NICHD Study of Early Child Youth Development
National Institute of Child Health and Human Development

6100 Executive Boulevard, Room 2C01
Rockville MD 20852

Phone: (301) 435-6946
Fax: (301) 480-2400
e-mail: friedmas@exchange.nih.gov

---

**From:** Gary Resnick [mailto:RESNICG1@WESTAT.COM]
**Sent:** Tuesday, February 14, 2006 2:10 PM
**To:** List NEURO_MEASGRP-L
**Subject:** Woodcock-Johnson Literacy Subtests

Attached is a summary of the Woodcock-Johnson Letter-Word Identification and Passage Comprehension subtests from the Achievement Test Battery. As you can see, both subtests have good reliability, both test-retest and internal consistency, and after 5 years of age, the two tests are fairly well-correlated (the coefficients ranging from .64 to .79). The Technical Manual only reports on one study that looked at how these tests correlated with measures of cognitive ability (IQ), and the study involved preschool to early school-age children (1-6 years), so it may not represent the correlations for later ages. However, this study probably serves as a rough lower bound since we know that correlations between IQ and language ability tend to increase in the early childhood years and then stabilize. It is interesting that the Letter-Word Identification subtest is moderately correlated with cognitive ability (coefficients ranging from .39 to .48), with the strongest correlations between L-W ID and the verbal measures, but only in the moderate range (which matches what we know of the relationship between language measures and general IQ on the brief intelligence tests but also suggests a lower bound since these are very young children). However, the Passage Comprehension is not well-correlated with cognitive ability, even for the verbal measures.

In summary, both are highly correlated with each other (Passage Comprehension and Letter-Word Identification), yet only Letter-Word Identification is correlated with general cognitive ability. Each of the tests require 5-10 minutes, so if we were to do both it would take 10-20 minutes (depending on how far respondents go in each test). Of course, the question is which

test to recommend if we only had sufficient time for one. It seems that Passage Comprehension is picking up on domains not already covered by our measure of general cognitive ability. However, the Letter-Word Identification is only moderately correlated with general cognitive ability as we had expected, so we know more about how it functions relative to the Passage Comprehension.

Gary

**Weaver, Gretchen (NIH/OD) [E]**

**From:** Friedman, Sarah (NIH/NICHD) [E]
**Sent:** Monday, February 13, 2006 5:43 PM
**To:** List NEURO_MEASGRP-L
**Subject:** Re: WASI vs. K-BIT

Dear all,

Today we spent quite a lot of time discussing the merits of WASI vs, K-BIT2. Carol Andreassen reviewed the information about the two measures and concluded that the K-BIT2 takes less time to administer (about 10 minutes less) and that it is less demanding from the perspective of training data collectors. I assume that we are recommending the collection of information about maternal IQ because we believe that it can serve as a proxy for the shared intelligence of mother and child. In other words, we believe that maternal IQ data will serve as a possible control or mediator variable in analyses predicting from environmental exposures to children's developmental outcomes. Consequently, I believe that we will be fine with the K-BIT2, even though my original preference was for the more differentiated WASI. If you were not at the meeting and would like to share your knowledge about the advantage of one of the two measures, please let me know. Sarah.

---

**From:** Alison Clarke-Stewart [mailto:acstewar@UCI.EDU]
**Sent:** Monday, February 13, 2006 4:39 PM
**To:** List NEURO_MEASGRP-L
**Subject:** WASI vs. K-BIT

Here are a couple of references relevant to our discussion of whether the K-BIT is as good as the WASI... The first has a correlation coefficient between the two tests exceeding my .85 standard (never mind that it's based on crazy people). The second is a good citation for a review/comparison of the two tests (sorry I couldn't manage to copy the relevant sections p. 12-13) giving a general coefficient of .80 when K-BIT is validated with the WAIS/WISC..(although that's across child and adult tests). psycINFO had 486 references to Kaufman Brief Intelligence...so it's widely used...

Concurrent validity of the Wechsler Abbreviated Scale of ***Intelligence*** and the ***Kaufman Brief Intelligence*** Test among psychiatric inpatients

Author Hays, J Ray; Reas, Deborah L; Shaw, J Bryant

Affiliation U Texas, Medical School, Houston, TX, US [Hays, Reas, Shaw]

Source Psychological Reports. Vol 90(2), Apr 2002, pp. 355-359

I

Abstract This study examined the convergent and discriminant validity of the Wechsler Abbreviated Scale of ***Intelligence*** (***WASI***) and the ***Kaufman Brief Intelligence*** Test (K-BIT) for 85 psychiatric inpatients (mean age 34 yrs). The correlation between the ***WASI*** Full Scale and K-BIT Composite IQ scores was significant ($r=.89$, $p < .001$). Multitrait-multimethod analysis of the subtest scores showed that the K-BIT had higher internal consistency for its two subtests but, therefore, less differentiation of cognitive functioning than the ***brief*** Wechsler scale, as would be expected due to the larger number and diversity of the latter subtests. Correlations among the Wechsler scale subtests were lower than among those for the K-BIT, so the former may tap different cognitive functions and yield more clinically useful information than the latter. This ***brief*** Wechsler scale appears to be a valid screening measure of verbal, performance, and general intellectual ability for use with an inpatient psychiatric population when considerations of the setting or patient preclude administration of a longer measure of intellectual ability. (PsycINFO Database Record (c) 2005 APA, all rights reserved)

Time for the changing of the guard: A farewell to short forms of ***intelligence*** tests

Author ***Kaufman*** , James C; ***Kaufman*** , Alan S

Affiliation Educational Testing Service, Princeton, NJ, US [***Kaufman***]

Source Journal of Psychoeducational Assessment. Vol 19(3), Sep 2001, pp. 245-267

I

Abstract The development of short forms of ***intelligence*** tests, especially of Wechsler's scales, has been pastime of researchers and clinicians for decades. These short forms have usually been of the 2- or 4-subtest variety, but other variants such as Satz-Mogel split-half short form have also been common. The literature is replete with proposed short forms and with controversies over their proper use, the statistical problems associated with validity coefficients when the short-form data are obtained from a complete administration of the test battery, and the logic of choosing subtests that are long to administer and score in view of the goal to reduce time. This article argues that the time has come to abandon short forms of ***intelligence*** tests in favor of ***brief*** tests such as the ***Kaufman Brief Intelligence*** Test (K-BIT), the Wechsler Abbreviated Scale of ***Intelligence*** (***WASI***), and the Wide Range ***Intelligence*** Test (WRIT), which are reliable, valid, well normed, and easy both to give and score. (PsycINFO Database Record (c) 2005 APA, all rights reserved)

## Weaver, Gretchen (NIH/OD) [E]

**From:** Friedman, Sarah (NIH/NICHD) [E]
**Sent:** Monday, February 13, 2006 1:08 PM
**To:** List NEURO_MEASGRP-L
**Subject:** Tentative agenda for today's meeting

Tentative agenda for today's meeting:

--Selecting a measure of mother attachment to child. (Alison).
--Any left over business regarding the assessment of child care.
--Maternal IQ measure (WASI vs. K-BIT). (Gary and Carol. Follow up on Fred Morrison's recommendation)
--Maternal literacy. (Fred Morrison's recommendation)
--Autism. A Report to the group about our meeting with the experts. (Regina)
--Visual acuity? (Sarah. D.Teller's test)
--Developmental Disabilities (report of Sarah's conversation with Peter Vietze)
--Motor development (Group discussion).

**Sarah L. Friedman, Ph.D.**
**Project Scientist and Scientific Coordinator,**
**NICHD Study of Early Child Care and Youth Development**
**OEP, Office of the Director,**
**National Institute of Child Health and Human Development**

**Phone: (301) 435-6946**
**Fax: (301) 480-2400**
**E-mail: friedmas@exchange.nih.gov**

*Journal of Autism and Developmental Disorders, Vol. 31, No. 2, 2001*

# The Modified Checklist for Autism in Toddlers: An Initial Study Investigating the Early Detection of Autism and Pervasive Developmental Disorders

**Diana L. Robins,[1,2] Deborah Fein,[1] Marianne L. Barton,[1] and James A. Green[1]**

Autism, a severe disorder of development, is difficult to detect in very young children. However, children who receive early intervention have improved long-term prognoses. The Modified Checklist for Autism in Toddlers (M-CHAT), consisting of 23 yes/no items, was used to screen 1,293 children. Of the 58 children given a diagnostic/developmental evaluation, 39 were diagnosed with a disorder on the autism spectrum. Six items pertaining to social relatedness and communication were found to have the best discriminability between children diagnosed with and without autism/PDD. Cutoff scores were created for the best items and the total checklist. Results indicate that the M-CHAT is a promising instrument for the early detection of autism.

**KEY WORDS:** Autism; modified checklist; toddlers.

## INTRODUCTION

Autism and related disabilities are severe disorders of development, affecting between 5 and 30 children in 10,000 (Mays & Gillon, 1993; Rapin, 1997; Siegel, Pliner, Eschler, & Elliot, 1988; Stone, Hoffman, Lewis, & Ousley, 1994). These disorders are disruptive and sometimes devastating to social relationships, communication, and imaginative play (Wing, 1988), and cause a restricted range of activities and interests (Rapin, 1997; Siegel *et al.*, 1988).

Given currently available diagnostic instruments, autism and other pervasive developmental disorders (PDD) are difficult to detect in very young children. This may be due to several factors: presentation of symptoms varies from case to case, social and language deficits and delays may not be identified until the child is given the opportunity for peer interaction in preschool, low incidence leads to a low index of suspicion, and motor milestones are usually unaffected. Furthermore, there is no standard and easily administered screening instrument for young children.

For all these reasons, pediatric evaluations rarely identify autism/PDD before the age of 3 (Gillberg, 1990). However, evidence indicates that there is a large gap between the age of the child at the parents' first concern, the age of the first evaluation, and the age of a definitive diagnosis (Siegel *et al.*, 1988). Parents are typically first concerned between the ages of 15 and 22 months (earlier for children who have comorbid mental retardation), but the child is often not seen by a specialist until 20–27 months (De Giacomo & Fombonne, 1998). In addition, there is often further delay between the first visit to a specialist and a definitive diagnosis (Siegel *et al.*, 1988). However, evidence shows that this delay in diagnosis causes additional distress to parents, as well as wasting valuable intervention time, indicating that professionals in the field of autism need instruments to aid in the detection of autism/PDD in very young children.

[1] University of Connecticut, Storrs, Connecticut.

[2] Address all correspondence to Diana Robins, Department of Psychology, University of Connecticut, 406 Babbidge Road, U-1020, Storrs, Connecticut 06269-1020.



0162-3257/01/0400-0131$19.50/0 © 2001 Plenum Publishing Corporation

Current evidence indicates that early intervention and therefore identification is essential. Early educational intervention optimizes long-term prognosis (Lord, 1995; Prizant & Wetherby, 1988; Mays & Gillon, 1993). More specifically, children with autism/PDD who develop language and symbolic play before the age of 5 have better prognoses (Mays & Gillon, 1993). Early intervention may enable children to reach important milestones; research has shown that children who receive early intervention are more likely to develop communication skills and fewer out-of-control behaviors (Siegel *et al.*, 1988). Interventions with children with autism/PDD may show diminishing returns as the children get older (Mars, Dowrick, & Mauk, 1996). Clearly, time is of the essence in the early detection of autistic features. The necessity of early screening and diagnosis, as well as the current state of the field, has been comprehensively reviewed by Filipek *et al.* (1999).

Researchers have variously suggested that the primary deficit in autism is accounted for by deficits in language (Tager-Flusburg, 1993), arousal modulation and sensory responsiveness (Dawson & Lewy, 1989; Kinsbourne, 1987), theory of mind (Baron-Cohen, Leslie, & Frith, 1985), motor functions (Teitlebaum, Teitlebaum, Nye, Fryman, & Maurer, 1998), social/emotional development (Fein, Pennington, Markowitz, Braverman, & Waterhouse, 1986; Hobson, 1998; Waterhouse, Fein, & Modhal, 1996), and other functions. The checklist designed for this study, the Modified Checklist for Autism in Toddlers (M-CHAT), includes items for these functions or their precursors, for example, sensory abnormalities (undersensitive to noise), motor abnormalities (unusual finger movements, climbing), social interchange (eye contact, smiling in response to parent's smile), early joint attention/theory of mind (bringing objects to show parents, pointing to indicate interest, following adult's point), early language and communication (pointing to request, understanding "no," indicating own wishes). Analysis of which items most frequently indicate autistic features at this early point in development may lend support to the centrality or primacy of specific impairments in the development of autism/PDD.

One difficulty in studying the "primary" deficit is that the presentation of autism/PDD changes depending on the child's age. Children younger than the age of 3 rarely display perseveration, preoccupations, or resistance to change (Dahlgren & Gillberg, 1989; Rapin, 1996; Tanguay, Robertson, & Derrick, 1998); these children may not have the cognitive ability necessary to play repetitively (Lord, 1995). However, preschool children with autism/PDD often show unusual sensory responses, including the repeated interest in certain stimuli (e.g., a spinning top, the clanging of a dropped spoon). In middle childhood and adolescence, the fascination with repetitive sensory and motor toys drops off, and is often replaced with an obsessive fascination with extremely narrow topics or activities, and the child may learn a great deal in one restricted area, without the ability to broaden the topic (Volkmar & Lord, 1998).

Lord (1995) found that at age 2, failures in showing things to others and responding to name alone correctly predicted autism at age 3 with 83% accuracy. Charman *et al.* (1998) contrasted signs of autism in infancy with signs found between 3 and 4 years of age in order to determine whether the features of autism characteristic of preschool children were apparent at 20 months. They particularly focused on behaviors reflecting empathy, pretend play, joint attention, and imitation. They found that evidence of gaze shifting, awareness of distress in others, imitation, and sharing of positive experiences (affect sharing is a part of joint attention) was greatly reduced among autistic children compared to children with PDD and other nonautistic developmental delays.

### Characteristics of a Screening Device

Pediatric screening is often the only evaluation children receive until they begin preschool or even kindergarten. Therefore, pediatricians must be sensitive to developmental concerns. A screening device that alerts physicians to possible cases of autism/PDD and related disorders at 18 months would therefore be invaluable.

Given the pressures of the typical pediatrician's office, such an instrument must be objective, easy to administer, and brief. Furthermore, physicians cannot always reliably identify a developmental delay based on a child's behavior in one session in the doctor's office (Rapin, 1996); particularly for very young children, a potentially serious communication and social delay may be confused with shyness in a typically developing youngster and behavior in the doctor's office may not represent the child's typical behavior. This makes parent report essential to any screening instrument.

The M-CHAT, created for the current study, has been designed to meet these requirements for a screening device (see the Appendix).

### Existing Measures

There are several tools available to evaluate autistic symptoms, but none has yet been found to be appropriate to detect signs of autism/PDD in unselected populations of very young children. These instruments include the Autism Behavior Checklist (Krug, Arick,

& Almond, 1980), the E-2 form of the Diagnostic Checklist for Behavior-Disturbed Children (Rimland, 1964), the Behavior Rating Instrument for Autistic and Atypical Children (Ruttenberg, Dratman, Fraknoi, & Wenar, 1966), the Behaviour Observation Scale for Autism (Freeman, Ritvo, Guthrie, Schroth, & Ball, 1978), the Childhood Autism Rating Scale (Schopler, Reichler, DeVellis, & Daly, 1980), the Autism Diagnostic Interview-Revised (Lord, Rutter, & LeCouteur, 1994), the Autism Diagnostic Observation Schedule-Generic (Lord, Rutter, & DiLavore, 1997), the Screening Test for Autism in Two-Year-Olds (Stone & Ousley, 1997) and the Infant Behavioural Summarized Evaluation (Adrien *et al.*, 1992). Each has its advantages. Most of these are appropriate for older children, particularly those for whom developmental concerns have already been identified.

All of the existing instruments have one or more of the following problems *as a screening device*: their administration is too long and cumbersome; they are designed for school-age children and may not be valid for younger children; some do not take into account parent report, but rather rely on a sample of behavior observed in the office; some rely on abnormalities in behavior that rarely appear before the age of 3 (e.g., idiosyncrasies of speech, resistance to change); many of the measures available have not been standardized; they need to be administered by a specialist in developmental disabilities or autism; and they require setting up structured interactions, which is not possible in the pediatrician's office. Most important, they are used with children already identified as having autistic features or other developmental concerns, rather than being administered to all children. Therefore, none of the previously mentioned instruments is appropriate for screening a large number of very young children. What is needed is a brief screen that is easy to administer and score and that will alert physicians to the need for further evaluation in children with the early signs of autism/PDD.

Researchers have begun to develop other screening and early diagnosis instruments; some of these have not yet appeared in the literature but their current status is described in the comprehensive review of Filipek *et al.* (1999).

### The Current Instrument

The M-CHAT is a simple screen that can be given to all children during pediatric visits. It does not rely on the physician's observation of the child, but on parents' report of current skills and behaviors. The format is extremely simple (parents fill out the checklist in the waiting room) and does not require the physician's administration. The M-CHAT can also be given to parents of children who have already been referred for early intervention services. The Connecticut early intervention (EI) system does not screen specifically for autism/PDD, and children usually receive minimal services before a diagnosis is made; this diagnosis must be made by a psychologist or physician outside the EI system.

The M-CHAT is an extension of The Checklist for Autism in Toddlers (CHAT; Baron-Cohen, Allen, & Gillberg, 1992). The format and the first nine items are directly taken from the CHAT, with the authors' permission.

The CHAT was developed and validated in Great Britain. The CHAT is used to help identify the early signs of autism at 18 months by assessing the child's attainment of developmental milestones. Items include report of such behaviors as taking an interest in other children, pointing, and pretend play. The CHAT consists of nine items asked of the parents by the physician, and five items for which the home health visitor observes the child in the home. The American health care system has no analogous role to British home health visitors; in addition, Rapin (1996) reported that developmental delays could be missed in a one-session behavior observation. Therefore, the modified checklist consists only of parent report of current behavior.

A follow-up study by Baron-Cohen *et al.* (1996) pinpointed three items on the CHAT as key items indicating early signs of autism: protodeclarative pointing (pointing at an object of interest), gaze monitoring, and pretend play. Baron-Cohen *et al.* (1996) screened 16,000 children with the CHAT and 12 of those children met the criteria for the autism risk group. Of the 12 children considered to be at risk for autism, 10 received a diagnosis of autism, and 2 received a diagnosis of developmental delay. All diagnoses were confirmed at 3.5 years, showing the stability of the earlier diagnoses. It should be noted that Baron-Cohen *et al.* (1996) were looking for children who met strict criteria for Autistic Disorder, rather than the broader population of children with autistic features who need intervention services and who are the target of the current screening.

A long-term follow-up study (Baird *et al.*, 2000) used intensive methods to identify the total number of children with autism or PDD in the previously screened population at age 7. They found 50 cases of autism and 44 cases of PDD. They classified children from the 18-month screening as having high risk for autism (failing all five key items on the CHAT involving protodeclarative pointing, gaze monitoring, and pretend play

in two successive screenings) or medium risk for autism (failing the two protodeclarative pointing items in two successive screenings). Of the 50 cases of autism, 10 were identified at 18 months using the high-risk cutoff and 19 were identified using the medium-risk cutoff. Of the total 94 cases on the PDD spectrum, 11 were identified using the high-risk cutoff, and 33 were identified using the medium risk cutoff. These identification rates resulted in sensitivity rates of 11.7% (high risk–PDD spectrum), 20% (high risk–autism), 35.1% (medium risk–PDD spectrum), and 38% (medium risk–autism). Specificity was high for all of these conditions (above 97.5%).

No research has yet been done with the CHAT in the United States. In a review of autism assessment tools, Vostanis, Smith, Chung, and Corbett (1994) called the CHAT "the most promising work in this area [assessment of autism], although it requires further evaluation." The current work is designed to evaluate the nine parent-response items from the CHAT, in addition to 21 new items. These 21 items (see Method) were designed to (a) broaden the checklist symptoms to identify a greater range of children with PDDs and (b) to compensate for the elimination of the home health visitor's observations, Part B of the original CHAT. The revised checklist has been named the Modified Checklist for Autism in Toddlers (M-CHAT). The M-CHAT is expected to have improved sensitivity compared to the CHAT for several reasons: (a) the age of screening is 24 months instead of 18 in order to catch children who regress between 18 and 24 months, (b) the M-CHAT has a lower threshold for follow-up, and (c) the use of a structured telephone interview as an intermediate screening step keeps the specificity relatively high without compromising sensitivity.

The current study determines (a) how predictive each item is for autism/PDD, and (b) how many items are failed by children who have autism/PDD. This analysis leads to a final recommendation of how many items failed should lead to an evaluation. In addition, (c) discriminant function analysis determines whether the total checklist score or any subset of items are sufficient to predict autism/PDD with reasonable accuracy, and (d) how the total score compares with the original CHAT (Baron-Cohen *et al.*, 1992, 1996).

## METHOD

### Participants

Participants consisted of children screened during well-baby checkups with their pediatrician or family practice doctor at 18 or 24 months (570 male, 531 female; 21 unknown (parents did not identify the child's sex and the name was nongendered) and children screened through early intervention service providers at any age between 18 and 30 months (123 male, 46 female, 2 unknown; mean age 26 months) (Table I). None of the children referred from early intervention sites had been diagnosed previously with a DSM-IV disorder (American Psychiatric Association [APA], 1994). They were receiving minimal services (e.g., 1 hour of speech therapy every week). Analyses were conducted on the entire sample, although some analyses eliminated a small number of participants as a result of missing data.

Physicians were invited to participate in the study through several mass mailings sent throughout Connecticut. In addition, a few physicians from outside Connecticut agreed to participate after hearing about the project directly from one of the investigators. Currently, 98 physicians' offices are involved in ongoing data collection, and additional sites are continually being enrolled.

Connecticut's statewide early intervention program, Birth-to-Three has invited their offices throughout the state to participate in the study.

Children were excluded if they had a combination of (a) total lack of expressive language or any functional communication system and (b) motor deficits so severe as to preclude obtaining meaningful responses on developmental/cognitive testing. Based on these criteria, one nonspeaking child with severe cerebral palsy was excluded from the study.

### Instruments

The M-CHAT (see the Appendix) incorporates the nine parent-report items from Baron-Cohen *et al.*'s (1992) CHAT. For additional items, the investigators

**Table I.** Demographic Information

| | 18-month screen (nonselected pop.) ($n$ = 1,122) | Early intervention screen (high-risk sample) ($n$ = 171) |
|---|---|---|
| Male | 570 | 123 |
| Female | 531 | 46 |
| Sex unknown | 21 | 2 |
| Age range (in months) | 18–25 | 18–30 |
| No. of Spanish checklists | 8 | 0 |

generated a list of symptoms thought to be present in very young children with autism. Items were created based on hypotheses in the literature, clinical instruments used to evaluate older children, and their own clinical experience. Some items were generated based on findings from home videos of children later found to have autism (Adrien *et al.*, 1991, 1992; Baranek, 1999; Osterling & Dawson, 1994). The investigators did not change the original wording of the first nine items (taken from the CHAT), but for the remaining items, responses were balanced so that some responses indicating development within normal limits are answered by "yes" and others by "no."

Initially, the M-CHAT consisted of 30 items. Following preliminary analyses of the first 600 participants, 8 items were discarded because they were not as discriminating as other items or because many parents misunderstood them. Items were retained which (a) were sensitive and specific as determined by the discriminant function analysis, (b) were directly related to key symptoms of autism, or (c) formed a set of "buffer" items to which virtually all parents would be able to respond positively (e.g. "Does your child walk?"). Most of the items representing atypical sensory responsiveness were eliminated (e.g., Does your child rock back and forth?, Does your child seem undersensitive to noise?). One new item was added: Several investigators (Bacon, Fein, Morris, Waterhouse, & Allen, 1998; Sigman, Arbelle, & Dissanayake, 1995) have found that social referencing deficits (i.e., failure to look at caregiver's face in frightening or new situations) are extremely characteristic of both high- and low-functioning children with autism; therefore, a new item on social referencing has been added.

Initially, participants received a follow-up call after failing 5 of the 30 items on the checklist. If a child failed 3–5 items, one of the senior clinicians (D.F. or M.B.) examined the checklist in order to flag for telephone follow-up any child where the failed items were of concern. Parents were also called regardless of their checklist score if the child's pediatrician or early intervention provider indicated concern. After the first 600 participants were recruited, preliminary analyses led to revisions of both the checklist itself and the cutoff criteria. A subset of eight items was determined to be critical based on preliminary analyses of the first 600 participants. The cutoff criteria was set to two of the critical items or any three items.

Once a child failed the M-CHAT, the family was called, and responses were confirmed over the phone. If the child's score was still above the cutoff, the family was invited to participate in a free developmental evaluation. No families declined to participate. One family with a low checklist score agreed to participate but then stopped returning phone calls.

The developmental evaluation included the following measures: the Vineland Adaptive Behavior Scales (Sparrow, Balla, & Cicchetti, 1984), the Bayley Scales of Infant Development, Second Edition (Bayley, 1993), the Communication and Symbolic Behavior Scale (CSBS; Wetherby & Prizant, 1993), the Childhood Autism Rating Scale (CARS; Schopler *et al.*, 1980), and a semistructured interview based on DSM-IV criteria for Autistic Disorder (APA, 1994), a full history of the child was also taken during an interview with the parents.

The Vineland Adaptive Behavior Scales is a widely used parent interview scale that assesses communication, socialization, self-help, and motor competence. The Bayley Scales of Infant Development is a test administered to the child that assesses mental and psychomotor development. The CSBS consists of four parts. First, the evaluator offers a child eight "communicative temptations:" toys for which the child must ask for help in order to play with them (e.g., a bottle of bubbles closed tightly). Next, the evaluator engages the child in symbolic play using two different sets of toys. Third, the evaluator assesses verbal comprehension (e.g., "Where's your nose?"), and last, engages the child in combinatorial play (e.g., stacking blocks, nesting cups). For this study, the CSBS was not scored; rather, it was used qualitatively, to evoke communicative attempts and play from the child. The CARS, a frequently used measure of autistic behavior and diagnosis, consists of 15 subscales for rating aspects of autistic behavior; children are rated on each subscale based on the clinician's observation of how the child responds to structured and unstructured activities. Lord (1995) suggested a cutoff of 32 for very young children (the standard cutoff is 30); however, based on clinical judgment, five participants were diagnosed with autism/PDD with CARS scores below 32. The follow-up study will investigate whether Lord's finding is confirmed, when these five participants are seen again between the ages of 3.5 and 4 years.

### Procedure

Physicians who agreed to participate gave a consent form and an M-CHAT to the parents of every child who came into the office for an 18 or 24 month checkup. Initially children were screened at 18 months. However, following preliminary analyses of the first 600 participants, the age of screening was raised to 24 months for several reasons: Pediatricians were more

willing to screen at 24 months, children are not usually referred to an early intervention center before age 2, and most important, children who show regressions are most likely to do so between the ages of 15 and 24 months, indicating that children screened at 24 months are not likely to regress after the checklist is completed.

Early intervention providers screened children using the M-CHAT as they were referred for early intervention services. Therefore, these children were considered to be at risk for a developmental disorder, but none had received any specific diagnoses and none had received more than several weeks of minimal intervention services.

Parents' participation was voluntary. They were told that they had no obligation to participate, and that their participation could be withdrawn at any time during the study. Parents were assured that the data would be coded using subject numbers and that no results would be published with any identifying information. Checklists were sent back to the investigators for scoring in stamped and addressed envelopes provided by the investigators. Pediatricians and early intervention providers were also given the opportunity of flagging the checklists of any children about whom they were particularly concerned for telephone follow-up by the investigators.

The use of the M-CHAT with an unselected pediatric population constitutes a Level I screen. Although the M-CHAT was primarily designed to act as a Level I screen, the sample of children already referred for early intervention (considered a high-risk sample) constitutes a Level II screen. This was done concurrently with the unselected population in order to obtain a large sample of children diagnosed with autism/PDD. In addition, the high-risk sample consisted of children receiving minimal intervention (usually 1 hour each week), and none had yet received diagnoses on the autism spectrum.

Any child who failed two or more of the eight items determined to be the critical (the best discriminators from a discriminant function analysis performed during preliminary analyses of the first 600 participants) or any three items was considered at risk. The physician or early intervention provider's office was contacted, and permission was requested to invite the family in for a complete developmental evaluation. Fifty-eight evaluations were completed. The evaluation was performed either in the Psychological Services Clinic at the University of Connecticut ($n$ = 34), in the child's home ($n$ = 14), or in the early intervention office ($n$ = 10). The amount of time that elapsed between screening and assessment ranged from less than 1 month to 7 months, with a mean of 2.12 months between the time of screening and the time of evaluation. Only 7 children waited longer than 3 months for an evaluation. Delays occurred with these participants for a variety of reasons: The checklist was not returned to the investigators immediately, the investigators had difficulty reaching the families by phone for follow-up, and at times there were scheduling conflicts necessitating a delay before evaluation.

Evaluations were performed by a team of investigators, consisting of one licensed clinical psychologist, one graduate student clinician participating in the evaluation, and one student videotaping the session. One person on the team collected history and parent measures, while the second person on the team collected the child measures. Since all children presented with some degree of risk, having failed the M-CHAT, it was felt that truly blind assessment was not possible.

Following the evaluation, children were diagnosed as (a) on the autism spectrum ($n$ = 39), or (b) having developmental delays, usually either language delay or mental retardation, but not a disorder on the PDD spectrum ($n$ = 19). No children were found to be developing typically. Appropriate recommendations were provided for the parents.

## RESULTS

### Reliability

Reliability was determined using Cronbach's alpha for the 22-item checklist as well as for the subset of 6 items found to be the best discriminators of children diagnosed with autism spectrum disorders (see Discriminant Function Analysis). Internal reliability was found to be adequate for both the entire checklist and for the critical items ($\alpha$ = .85 and $\alpha$ = .83, respectively). When the social referencing item was included, reliability remained high ($\alpha$ = .85), even though the sample was much smaller, since only 480 participants completed the social referencing item.

### Descriptive Statistics

Children were divided into four groups: (a) children who did not require any follow up ($n$ = 1,161), (b) children who required telephone follow up, but did not require an evaluation ($n$ = 74), (c) children who were evaluated and found to have language or global delays, but not autism or PDD ($n$ = 19), and (d) children who were evaluated and diagnosed with autism or PDD ($n$ = 39). No children who were evaluated were found to have entirely typical development.

Table II shows the percentage of items failed by each group. Of the children evaluated and found to have language or global delays, 4 were from the unselected pediatrician screen and 15 were from early intervention. Of the children who received a diagnosis of autism/PDD, 3 were from the unselected pediatrician screen and 36 were from early intervention. In all tables, the No Follow-up sample sizes vary slightly because of missing data.

**Table II.** Percentage of Children in Each Group Who Failed Each Item

| Item | No follow-up (*n* = 1,144) | Ok on phone follow-up (*n* = 74) | Evaluated nonautistic (*n* = 19) | Evaluated autistic/PDD (*n* = 39) |
|---|---|---|---|---|
| 1 | 0.7 | 5.4 | 10.5 | 2.6 |
| 2 | 0.1 | 6.8 | 31.6 | 59.0 |
| 3 | 0.2 | 0 | 15.8 | 5.1 |
| 4 | 0.3 | 2.7 | 15.8 | 25.6 |
| 5 | 0.9 | 20.3 | 31.6 | 51.3 |
| 6 | 1.0 | 14.9 | 42.1 | 71.8 |
| 7 | 0.4 | 17.6 | 31.6 | 82.1 |
| 8 | 1.7 | 10.8 | 21.1 | 41.0 |
| 9 | 0.2 | 4.1 | 31.6 | 53.8 |
| 10 | 1.3 | 8.1 | 15.8 | 35.9 |
| 11 | 17.9 | 40.5 | 57.9 | 41.0 |
| 12 | 0 | 5.4 | 5.3 | 20.5 |
| 13 | 2.1 | 18.9 | 42.1 | 59.0 |
| 14 | 0.3 | 5.4 | 15.8 | 64.1 |
| 15 | 0.1 | 16.2 | 42.1 | 74.4 |
| 16 | 0.3 | 2.7 | 0 | 0 |
| 17 | 1.0 | 9.5 | 31.6 | 51.3 |
| 18 | 4.4 | 27.0 | 26.3 | 38.5 |
| 19 | 7.1 | 35.1 | 57.9 | 76.9 |
| 20 | 2.0 | 18.9 | 21.1 | 53.8 |
| 21 | 0.3 | 17.6 | 15.8 | 51.3 |
| 22 | 8.2 | 37.8 | 57.9 | 61.5 |
| 23[a] | 2.0 | 12.2 | 15.8 | 17.9 |

[a] Item 23 had a smaller sample, because it was added later. Sample for Item 23 are No Follow-up (*n* = 402), Phone (*n* = 54), Evaluated Nonautistic (*n* = 8), Evaluated Autistic (*n* = 16).

Once the children were categorized, several different scores were compared: (a) total score based on all 23 items (M-CHAT 23), (b) the score based on the CHAT's original nine items (CHAT 9), and (c) a statistically derived score from a discriminant function analysis consisting of the 6 most discriminating items (DFA 6; as, for example, in Siegel *et al.*, 1988; see below). See Table III for a comparison of groups on these summary scores.

Children who were not followed up failed an average of 0.5 items of the 23 items on the checklist, children who passed a telephone screen failed 3.4 items, children who were evaluated and found to be nonautistic failed 6.4 items, and children with autism/PDD failed an average of 10.3 items.

### *Analysis of Variance*

One-way analysis of variance indicated that there was a significant difference between groups based on all three summary scores. Tukey's post-hoc tests indicated that all differences between groups were significant on every measure (Table III).

### *Item Analysis*

Chi-square analyses indicated that all items were significantly different between the children diagnosed as autistic compared to all other participants, except Items 1 ("Does your child enjoy being swung, bounced on your knee, etc.?") and 16 ("Does your child walk?").

### *Discriminant Function Analysis*

A discriminant function analysis (DFA) was performed using the 22 original M-CHAT items (excluding the social referencing item) in order to determine the ability to classify children as either autistic/PDD or nonautistic. Due to the small sample in this initial study, it was not possible to include the false positive children

**Table III.** Comparison of Groups on Summary Scores[a]

| | No follow-up done | Phone screen | Evaluated nonautistic | Evaluated autistic | ANOVA | | |
|---|---|---|---|---|---|---|---|
| | | | | | *F* | *df* | *p* |
| M-CHAT 23 | 0.53 (0.71) | 3.38 (2.33) | 6.37 (2.79) | 10.32 (4.11) | 1121.85 | 3, 1268 | <.001 |
| DFA 6 | 0.03 (0.18) | 0.74 (0.99) | 2.00 (1.31) | 4.13 (1.53) | 1220.20 | 3, 1269 | <.001 |
| CHAT 9 | 0.05 (0.24) | 0.82 (1.17) | 2.32 (1.57) | 3.92 (1.95) | 802.58 | 3, 1267 | <.001 |

[a] Post-hoc Tukey's tests indicated that all differences were highly significant ($p < .001$). Mean differences ranged from 2.85–9.86 for M-CHAT 23, 0.71–4.10 for DFA 6, and 0.77–3.87 for CHAT 9.

who were evaluated and found to be nonautistic as a separate group ($n$ = 19). The DFA was therefore conducted dividing the total sample into two groups: the children who were not autistic ($n$ = 1,196; 58 children who had missing responses were excluded from the DFA) and the children diagnosed as autistic/PDD ($n$ = 38, 1 child who had missing responses was excluded from the DFA).

Table IV lists the standardized canonical discriminant function coefficients for each item, along with the percentage of autistic and nonautistic children who failed each item. The items with the highest weights (in descending order) are 7, 14, 2, 9, 15, and 13. These are the items designated as DFA 6 in the following discussion of optimal scoring.

The discriminant function analysis correctly classified 33 out of 38 children with autism/PDD, and only misclassified 8 of the 1,196 nonautistic children (false positives), indicating that the M-CHAT is successful at indicating children who require further follow-up. Of the nonautistic children misclassified as autistic, 5 were children who received evaluations and received diagnoses other than autism/PDD, and 3 were children who received phone follow-up. The 5 children with autism/PDD who were misclassified as nonautistic were children whose parents initially underreported symptoms, and the child's early intervention provider or pediatrician flagged the checklist for further investigation ($n$ = 3), or children with checklist scores not very far above the cutoff ($n$ = 2).

A larger sample will allow the investigators to determine a second algorithm that would differentiate the children who were found on evaluation to be nonautistic but developmentally impaired from the children who were diagnosed with autism/PDD. Furthermore, most of the children diagnosed as having autism/PDD came from early intervention referrals and only 3 from unselected pediatric referrals (as would be expected from the sample to date of approximately 1,000 children and an estimated base rate of 1 in 300 of an unselected sample). Therefore, it was not possible to determine whether the items that characterize autism/PDD in an unselected sample are different from the items that characterize autism/PDD in a sample identified as having a language delay or nonspecific developmental issue of concern. Since the content of the items found by the DFA are entirely consistent with prior literature, this is unlikely but will be a focus of analysis in future studies.

**Table IV.** Standardized Canonical Discriminant Function Coefficients and Percentage Failing Each Item

| Item | Function 1 | Failed item | |
|---|---|---|---|
| | | % of nonautistic ($n$ = 1,229) | % of autistic ($n$ = 38) |
| 7 | .480 | 1.9 | 82.1 |
| 14 | .341 | 0.9 | 64.1 |
| 2 | .279 | 1.0 | 59.0 |
| 9 | .225 | 0.9 | 53.8 |
| 15 | .167 | 1.7 | 74.4 |
| 13 | .118 | 3.7 | 59.0 |
| 12 | .088 | 0.4 | 20.5 |
| 3 | −.087 | 0.4 | 5.1 |
| 5 | −.078 | 2.5 | 51.3 |
| 10 | .074 | 1.9 | 35.9 |
| 1 | −.071 | 1.1 | 2.6 |
| 19 | .069 | 9.5 | 76.9 |
| 18 | .056 | 6.1 | 38.5 |
| 6 | −.056 | 2.4 | 71.8 |
| 8 | .055 | 2.6 | 41.0 |
| 20 | .044 | 3.3 | 53.8 |
| 21 | .042 | 1.5 | 51.3 |
| 17 | .039 | 1.9 | 51.3 |
| 4 | .026 | 0.7 | 25.6 |
| 22 | −.009 | 10.8 | 61.5 |
| 16 | .005 | 0.5 | 0 |
| 11 | .003 | 19.9 | 41.0 |
| 23 | —[a] | 2.8 | 17.9 |

[a] Item 23 was excluded from DFA because not all participants received the item; for nonautistic subjects $n$ = 464, for autistic subjects $n$ = 16.

## Sensitivity, Specificity, and Predictive Power

Calculation of absolute sensitivity and specificity cannot be determined until follow-up of the entire initial sample, which has begun, is complete. However, the discriminant function analysis gives values for sensitivity and specificity consisting of the statistical significance of the DFA classification based on current diagnoses. These values are reported here, in addition to positive predictive power, which can be determined at this time. Based on the DFA classification, the M-CHAT has a sensitivity of .87, specificity of .99, positive predictive power of .80, and negative predictive power of .99.

However, another way to discuss the psychometric properties of the test is by examining sensitivity, specificity, and predictive power for both the M-CHAT 23 and the 6 best items as indicated by the DFA. The M-CHAT 23 score and the 6-item score were determined to have cutoff scores that maximized sensitivity without a large false positive rate.

Given a conservative cutoff score of any three items out of the entire checklist, 67 false positives are referred

for phone follow-up and/or evaluation, and 38 out of 39 children with autism/PDD are flagged (Table V). This yields sensitivity of .97, specificity of .95, positive predictive power (PPP) of .36, and negative predictive power (NPP) of .99. However, if the phone call is considered part of the screening process (since the children who pass the phone interview are not offered an evaluation), a cutoff of three on either the original screen or phone interview yields 18 false positives, causing the sensitivity to remain at .97, specificity to rise to .99, PPP to rise to .68, and NPP to remain at .99.

When looking at the 6-item score (Table VI), a cutoff of two leads to 21 false positives (if the children called are considered false positives) and 10 false positives (if the children called are considered part of the screen). The former case would lead to sensitivity of .95, specificity of .98, PPP .64, and NPP of .99. The latter would yield sensitivity of .95, specificity of .99, PPP of .79, and NPP of .99.

Calculation of sensitivity for this initial study presumes that all children with autism/PDD would fail at least two critical or three total items on the checklist and would therefore be caught by phone interview or evaluation, or that their checklist would be flagged by the pediatrician or early intervention provider as having concerns related to autism, as happened in several cases. Children not netted by the screen or flagged by their health provider would therefore not be ascertained in the initial study, and therefore true sensitivity may be lower, but ascertaining misses is a major focus of the ongoing project.

**Table V.** Number of Items Failed Out of M-CHAT 23 Items

| Item | No follow-up done ($n$ = 1,140) | OK on phone interview ($n$ = 74) | Evaluated nonautistic ($n$ = 19) | Evaluated autistic ($n$ = 39) |
|---|---|---|---|---|
| 0 | 669 | 4 | | |
| 1 | 354 | 6 | | |
| 2 | 108 | 15 | 1 | 1 |
| 3 | 6 | 24 | 2 | 2 |
| 4 | 3 | 11 | 3 | |
| 5 | | 4 | 2 | 2 |
| 6 | | 6 | 2 | 3 |
| 7 | | | 1 | 4 |
| 8 | | 2 | 5 | 2 |
| 9 | | | 1 | 1 |
| 10 | | | 1 | 1 |
| 11 | | | | 5 |
| 12 | | 1 | | 4 |
| 13 | | | 1 | 6 |
| 14 | | 1 | | 2 |
| 15 | | | | 2 |
| 16 | | | | 2 |
| 17 | | | | 1 |
| 18 | | | | 1 |

**Table VI.** Number of Items Failed Out of Six Best Discriminating Items (DFA 6)

| | No follow-up done ($n$ = 1,141) | Phone screen ($n$ = 74) | Evaluated nonautistic ($n$ = 19) | Evaluated autistic ($n$ = 39) |
|---|---|---|---|---|
| 0 | 1,104 | 41 | 1 | |
| 1 | 37 | 22 | 8 | 2 |
| 2 | | 7 | 5 | 7 |
| 3 | | 1 | 2 | 6 |
| 4 | | 3 | 2 | 8 |
| 5 | | | 1 | 9 |
| 6 | | | | 7 |

## Comparison of M-CHAT to Original CHAT

A discriminant function analysis was run using the original nine items from the CHAT. Of 1,233 nonautistic participants, 27 were misclassified as having autism/PDD (5 children who were not followed, 14 who received phone follow-up, and 8 who were evaluated and found to be nonautistic). Four children were misclassified as nonautistic when the clinical diagnosis was autism/PDD. A cutoff score of two items failed (Table VII) would lead to sensitivity of .87, specificity of .98, PPP of .63 and NPP of .99.

## Clinical Data

Analysis of variance showed that the children who received diagnoses on the autism spectrum ($n$ = 39)

**Table VII.** Number of Items Failed Out of the Original CHAT Items (CHAT 9)

| Item | No follow-up done ($n$ = 1,140) | Phone screen ($n$ = 74) | Evaluated nonautistic ($n$ = 19) | Evaluated autistic ($n$ = 39) |
|---|---|---|---|---|
| 0 | 1,080 | 41 | 2 | 1 |
| 1 | 57 | 15 | 5 | 4 |
| 2 | 3 | 13 | 4 | 6 |
| 3 | | 2 | 3 | 5 |
| 4 | | 1 | 3 | 6 |
| 5 | | 2 | 2 | 8 |
| 6 | | | | 5 |
| 7 | | | | 4 |
| 8 | | | | |
| 9 | | | | |

**Table VIII.** Clinical Data for Children Evaluated

| Scale[a] | Evaluated autistic $M$ age = 27.6 months ($n$ = 39) | Evaluated nonautistic $M$ age = 26.7 months ($n$ = 19) | $F$ | $df$ | $p$ |
|---|---|---|---|---|---|
| Bayley MDI[b] | | | | | |
| *M* | 53.46 | 70.53 | 12.08 | 1, 54 | .002 |
| *SD* | 12.99 | 23.88 | | | |
| VABS-Comm. | | | | | |
| *M* | 64.46 | 75.79 | 19.96 | 1, 54 | .001 |
| *SD* | 5.93 | 13.11 | | | |
| VABS-DL | | | | | |
| *M* | 68.03 | 75.37 | 7.63 | 1, 54 | .009 |
| *SD* | 6.22 | 13.74 | | | |
| VABS-Soc. | | | | | |
| *M* | 67.24 | 78.26 | 16.53 | 1, 54 | .001 |
| *SD* | 8.09 | 12.07 | | | |
| VABS-Motor | | | | | |
| *M* | 82.05 | 84.58 | 0.56 | 1, 54 | .457 |
| *SD* | 10.27 | 14.72 | | | |
| CARS | | | | | |
| *M* | 35.43 | 22.84 | 91.20 | 1, 50 | .001 |
| *SD* | 4.61 | 4.11 | | | |

[a] Bayley MDI = Bayley Scales of Infant Development, Mental Development Index; VABS-Comm. = Vineland Adaptive Behavior Scales, Communication Domain, Standard score; VABS-DL. = Vineland Adaptive Behavior Scales, Daily Living Domain, Standard score; VABS-Soc. = Vineland Adaptive Behavior Scales, Socialization Domain, Standard score; VABS-Motor = Vineland Adaptive Behavior Scales, Motor Domain, Standard score; CARS = Childhood Autism Rating Scale.
[b] When the Bayley MDI was found to be "below 50," a score of 49 was assigned.

were significantly more impaired on all measures used in the developmental evaluation except for the Vineland Adaptive Behavior Scales Motor Domain (Table VIII) than the children who were evaluated and found not to have diagnoses on the autism spectrum ($n$ = 19).

## DISCUSSION

The purpose of the current study was to validate the M-CHAT, a 23-item parent-report checklist, examining children's developmental milestones. The M-CHAT was found to be reliable, as was the subset of six most discriminating items. The children who were diagnosed with autism/PDD failed more items than all other children, and were significantly different on each item except enjoying being swung/bounced and walking. Analysis of variance and post-hoc Tukey's tests confirmed that all groups were significantly different from one another on all summary variables (i.e., M-CHAT 23, DFA 6, and CHAT 9), supporting the use of the M-CHAT as a screen for the early signs of autism.

The M-CHAT was able to accurately detect children at risk for autism/PDD. A discriminant function analysis correctly classified 33 of 38 autistic/PDD children and 1,188 of 1,196 children who did not have autism/PDD. The group of children who were misclassified as having probable autism/PDD when they did not consisted of 5 children who had received follow-up evaluations and non-PDD diagnoses and 3 children who had received phone follow-up but did not require evaluations, suggesting that the parents of the latter children had overreported symptoms. The children with autism/PDD who were misclassified as not having autism/PDD consisted of 3 children whose parents underreported symptoms but were flagged by early intervention providers or pediatricians for follow-up, and 2 children with relatively low checklist scores.

The nonautistic group included both normally developing children and those children who were evaluated and found to have other global delays that were not on the autism spectrum (e.g., language delays or mental retardation). The sample size was not sufficient to attempt to discriminate the children with these global delays from the children on the autism spectrum, but future research will address this question.

The DFA yielded canonical discriminant function coefficients for each item. Based on these weights, a

set of optimal items was created. This set of items was composed of those items having the highest canonical discriminant function coefficients, DFA 6. This statistically derived subset of items was used to determine optimal cutoff scores on the checklist. An optimal cutoff score is defined as a score that will identify almost all children with autism/PDD, with the identification of minimal false positives. It is expected that some children who do not receive diagnoses on the autism spectrum will be identified by the checklist as needing further evaluation; it is necessary to have these false positives in order to maximize sensitivity to autism/PDD. Cutoff scores based on DFA 6 were as successful as cutoff scores using all 23 items, indicating that a smaller subset of items can successfully identify those children requiring additional assessment. In order to miss as few children as possible, a cutoff of two critical items (DFA 6) or any three total items is suggested as sufficient to warrant follow-up. These cutoffs lead to sensitivity of .87–.97, specificity of .95–.99, positive predictive power of .36–.80, and negative predictive power of .99 depending on which score is used and whether the children who received telephone follow-up are considered to be false positives or part of the sample screened but not evaluated. Based on the discriminant function analyses, the M-CHAT is slightly better than the CHAT at detecting autism/PDD without compromising the false positive rate.

It is useful to examine the individual items that serve to discriminate the children with autism/PDD from the other children in the sample. The content of the DFA 6 items may shed light on those signs of autism/PDD that are apparent in very young children. Furthermore, the symptoms that indicate the earliest signs of autism/PDD may support one or more of the current theories of the underlying disorder in autism/PDD. The six items that had the largest canonical discriminant function coefficients pertained to *joint attention* (protodeclarative pointing, following a point, and bringing objects to show parent), *social relatedness* (interest in other children and imitation), and *communication* (responding to name). These items as a group discriminated the children on the autism spectrum from the other children in the sample, indicating that failure of these behaviors to develop may be among the earliest signs of autism or PDD. It is also interesting to note that the most potent predictors of autism/PDD in these very young children are generally negative symptoms—failure of normal behavioral systems to mature—rather than positive signs (such as finger twiddling), which may appear later. It should be pointed out that several items not in the DFA 6 (such as protoimperative point; see Table IV for the percentage of children failing these items) are good discriminators; they apparently did not add unique variance to the discrimination after the best six items were accounted for.

The M-CHAT continues to be studied. A large-scale validation study is under way in parts of Connecticut, Massachusetts, Rhode Island, and northeastern New York. It is expected that several thousand children will be screened, yielding a large enough group to examine separately children referred for evaluation but found not to have autism/PDD. This study will be used to validate the M-CHAT, and confirm the subset of items best used to discriminate those children who warrant further evaluation from children developing typically. Follow-up of the initial sample at age 3–4 is also under way; this will allow better estimates of true sensitivity. It is predicted that the 23-item M-CHAT will have better sensitivity than the 9-item section of the CHAT because the age of screening is 24 months instead of 18 in order to catch children who regress between 18 and 24 months, the M-CHAT has a lower threshold for follow-up, and the use of the telephone interview as an intermediate step keeps the specificity relatively high without compromising sensitivity.

An effective checklist may greatly improve the ability of pediatricians and family practitioners to detect autistic features in very young children. As effective as a screening checklist can be, the authors caution physicians against screening solely based on parent report. Some parents are poor observers or judges of their child's behavior, particularly if they have limited exposure to other young children, and others may have difficulty answering written questions; therefore, a physician who has concerns about a child's development should refer the child for a diagnostic evaluation even without a checklist score above the cutoff.

It should also be remembered that the M-CHAT is solely for the purpose of initial screening and is not a diagnostic instrument. Children who fail the screening need comprehensive evaluations to establish developmental profiles and diagnoses and to make appropriate recommendations for intervention services.

Administering such a checklist as standard practice in 18–24 month checkups will improve the early detection of autism/PDD and facilitate an early start on effective therapies. The early discovery of autism/PDD with the M-CHAT may increase the success rate of these therapies. This may lead to an increase both in the number of children who can be integrated into regular education programs and in the experience of educational success and long-term adjustment for these children.

Psychologists have begun to document children with a history of autism/PDD who have excellent outcomes (Lovaas, 1987). Although this outcome cannot be expected for all children with autism/PDD who receive aggressive early intervention, the converse may be true: All dramatically improved children with autism/PDD may have received aggressive early intervention.

Furthermore, for those children who cannot be said to be recovered, their outcomes will nevertheless be more positive with early services. The alleviation of child and family suffering that will accompany a positive outcome is immeasurable. In terms of public policy, the financial and personal resources that public schools will save on children with autism/PDD who are recovered or substantially improved are immense. The minimal cost of using the checklist, as well as the temporary adverse effects on parents with false positives, is greatly outweighed by the benefit of early detection of autism and subsequent early intervention.[3]

One limitation of this study is that the unselected pediatric population is analyzed with the high-risk early intervention population. At this time, sample sizes are not sufficient to analyze the two samples independently. A larger sample is being collected; this will allow for separate analyses of the two populations. A second limitation is that true sensitivity and specificity cannot be determined. However, a follow-up study is under way, and longitudinal data will allow the researchers to determine sensitivity and specificity of the M-CHAT.

## APPENDIX

### M-CHAT

Please fill out the following about how your child **usually** is. Please try to answer every question. If the behavior is rare (e.g., you've seen it once or twice), please answer as if the child does not do it.

1. Does your child enjoy being swung, bounced on your knee, etc? Yes No
2. Does your child take an interest in other children? Yes No
3. Does your child like climbing on things, such as up stairs? Yes No
4. Does your child enjoy playing peek-a-boo/hide-and-seek? Yes No
5. Does your child ever pretend, for example, to talk on the phone or take care of dolls, or pretend other things? Yes No
6. Does your child ever use his/her index finger to point, to ask for something? Yes No
7. Does your child ever use his/her index finger to point, to indicate interest in something? Yes No
8. Can your child play properly with small toys (e.g., cars or bricks) without just mouthing, fiddling, or dropping them? Yes No
9. Does your child ever bring objects over to you (parent) to show you something? Yes No
10. Does your child look you in the eye for more than a second or two? Yes No
11. Does your child ever seem oversensitive to noise? (e.g., plugging ears) Yes No
12. Does your child smile in response to your face or your smile? Yes No
13. Does your child imitate you? (e.g., you make a face-will your child imitate it?) Yes No
14. Does your child respond to his/her name when you call? Yes No
15. If you point at a toy across the room, does your child look at it? Yes No
16. Does your child walk? Yes No
17. Does your child look at things you are looking at? Yes No
18. Does your child make unusual finger movements near his/her face? Yes No
19. Does your child try to attract your attention to his/her own activity? Yes No
20. Have you ever wondered if your child is deaf? Yes No
21. Does your child understand what people say? Yes No
22. Does your child sometimes stare at nothing or wander with no purpose? Yes No
23. Does your child look at your face to check your reaction when faced with something unfamiliar? Yes No

[3] Please contact the corresponding author for more information on receiving copies of the English or Spanish M-CHAT.

## ACKNOWLEDGMENTS

We thank Dr. Simon Baron-Cohen for making the CHAT available for this study. This research was supported by the U.S. Department of Education Student-Initiated Research Grant, the University of Connecticut's Research Foundation Faculty Grant, the National Alliance of Autism Research, and a National Institute of Mental Health Predoctoral Fellowship.

We thank all the physicians, early intervention providers, children, and their families, without whom this project would not have been possible. We also

thank Miriam Liss, Garland Jones, and all the undergraduate research assistants whose work was invaluable on this project: Tina Baldwin, Jenny Byrne, Kim Braga, Kelly Donnelly, Heather Ferris, Myriah Hinchey, Anna Janowicz, Jessie LeBlanc, Gali Lev, Sarah Ludwig, Mike Moravecek, Tara Pocock, Ann Marie Schaeffer, and Casey Sharpe.

## REFERENCES


Adrien, J., Barthelemy, C., Perrot, A., Roux, S., Lenoir, P., Hameury, L., & Sauvage, D. (1992). Validity and reliability of the Infant Behavioral Summarized Evaluation (IBSE). *Journal of Autism and Developmental Disorders, 22,* 375–394.

Adrien, J., Perrot, A., Hameury, L., Martineau, J., Roux, S., & Sauvage, D. (1991). Family home movies: Identification of early autistic signs in infants later diagnosed as autistics. *Brain Dysfunction, 4,* 355–362.

American Psychiatric Association. (1994). *Diagnostic and statistical manual of mental disorders* (4th ed.). Washington, DC: Author.

Bacon, A., Fein, D., Morris, R., Waterhouse, L., & Allen, D. (1998). The responses of autistic children to the distress of others. *Journal of Autism and Developmental Disorders, 28,* 129–142.

Baird, G., Charman, T., Baron-Cohen, S., Cox, A., Swettenham, J., Wheelwright, S., & Drew, A. (2000). A screening instrument for autism at 18 months of age: A six year follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry, 39,* 694–702.

Baranek, G. T. (1999). Autism during infancy: A retrospective video analysis of sensory-motor and social behaviors at 9–12 months of age. *Journal of Autism and Developmental Disorders, 29,* 213–224.

Baron-Cohen, S., Allen, J., & Gillberg, C. (1992). Can autism be detected at 18 months? The needle, the haystack, and the CHAT. *British Journal of Psychiatry, 161,* 839–843.

Baron-Cohen, S., Cox, A., Baird, G., Swettenham, J., Nightengale, N., Morgan, K., Drew, A., & Charman, T. (1996). Psychological markers in the detection of autism in infancy in a large population. *British Journal of Psychiatry, 168,* 158–163.

Baron-Cohen, S., Leslie, A., & Frith, U. (1985). Does the autistic child have a "theory of mind?" *Cognition, 21,* 37–46.

Bayley, N. (1993). *The Bayley Scales of Infant Development* (2nd ed.). San Antonio, TX: Harcourt Brace.

Charman, T., Swettenham, J., Baron-Cohen, S., Cox, A., Baird, G., & Drew, A. (1998). An experimental investigation of social-cognitive abilities in infants with autism: clinical implications. *Infant Mental Health Journal, 19,* 260–275.

Dahlgren, S., & Gillberg, C. (1989). Symptoms in the first two years of life: A preliminary population study on infantile autism. *European Archives of Psychiatry and Neurological Sciences, 238,* 169–174.

Dawson, G., & Lewy, A. (1989). Arousal, attention, and socioemotional impairments of individuals with autism. In G. Dawson (Ed.), *Autism: Nature, diagnosis, and treatment* (pp. 49–74). New York: Guilford.

De Giacomo, A., & Fombonne, E. (1998). Parental recognition of developmental abnormalities in autism. *European Child and Adolescent Psychiatry, 7,* 131–136.

Fein, D., Pennington, B., Markowitz, P., Braverman, M. & Waterhouse, L. (1986). Toward a neuropsychological model of infantile autism: Are the social deficits primary? *Journal of the American Academy of Child and Adolescent Psychiatry, 25,* 198–212.

Filipek, P. A., Accardo, P. J., Baranek, G. T., Cook, E. H., Dawson, G., Gordon, B., Gravel, J. S., Johnson, C. P., Kallen, R. J., Levy, S. E., Minshew, N. J., Prizant, B. M., Rapin, I., Rogers, S. J., Stone, W. L., Teplin, S., Tuchman, R. F., & Volkmar, F. R. (1999). The screening and diagnosis of autistic spectrum disorders. *Journal of Autism and developmental Disorders, 29,* 439–484.

Freeman, B., Ritvo, E., Guthrie, D., Schroth, P., & Ball, J. (1978). The Behaviour Observation Scale for Autism: Initial methodology, data analysis, and preliminary findings on 89 children. *Journal of the American Academy of Child Psychiatry, 17,* 576–588.

Gillberg, C. (1990). What is autism? *International Review of Psychiatry, 2,* 61–66.

Hobson, R. (1998). Hello and goodbye: A study of social engagement in autism. *Journal of Autism and Developmental Disorders, 28,* 117–127.

Kinsbourne, M. (1987). Cerebral brainstem relations in infantile autism. In E. Schopler & G. Mesibov (Eds.), *Neurobiological issues in autism. Current issues in autism* (pp. 107–125). New York: Plenum Press.

Krug, D., Arick, J., & Almond P. (1980). Behavior checklist for identifying severely handicapped individuals with high levels of autistic behavior. *Journal of Child Psychology and Psychiatry, 21,* 221–229.

Lord, C. (1995). Follow-up of two-year-olds referred for possible autism. *Journal of Child Psychology and Psychiatry, 36,* 1365–1382.

Lord, C., Rutter, M., & DiLavore, P. (1997). *Autism Diagnostic Observation Schedule-Generic (ADOS-G).* : Psychological Corp.

Lord, C., Rutter, M., & Le Couteur, A. (1994). *Autism Diagnostic Interview–Revised*: A revised version of a diagnostic interview for caregivers of individuals with possible pervasive developmental disorders. *Journal of Autism and Developmental Disorders, 24,* 659–685.

Lovaas, I. (1987). Behavioral treatment and normal educational and intellectual functioning in young autistic children. *Journal of Consulting and Clinical Psychology, 55,* 3–9.

Mars, A. E., Dowrick, P. W., & Mauk, J. E. (1996, November). *Early indicators of autism investigated in prediagnostic home videos.* Paper presented at Association for Advanced Behavior Therapy 30th Annual convention, New York.

Mays, R. M., & Gillon, J. E. (1993). Autism in young children: an update. *Journal of Pediatric Health Care, 7,* 17–23.

Osterling, J., & Dawson, G. (1994). Early recognition of children with autism: A study of first birthday home videotapes. *Journal of Autism and Developmental Disorders, 24,* 247–257.

Prizant, B., & Wetherby, A. (1988). Providing services to children with autism (ages 0 to 2 years) and their families. *Focus on Autistic Behavior, 4* (2), 1–16. (Reprinted from *Topics in Language Disorders, 9* (1), 1–23).

Rapin, I. (1996). Neurological examination. In I. Rapin (Ed.), Preschool children with inadequate communication: Developmental language disabilities, autism, Low IQ. *Clinics in Developmental Medicine, 139,* 98–122.

Rapin, I. (1997). Autism. *Current Concepts, 337,* 97–104.

Rimland, B. (1964). *Infantile autism: The syndrome and its implications for a neural theory of behavior.* New York: Appleton-Century-Crofts.

Ruttenberg, B., Dratman, M., Fraknoi, J., & Wenar, C. (1966). An instrument for evaluating autistic children. *Journal of the American Academy of Child Psychiatry, 5,* 453–478.

Schopler, E., Reichler, R., De Vellis, R. F., & Daly, K. (1980). The Childhood Autism Rating Scale (CARS) for diagnostic screening and classification of autism. New York: Irvington.

Siegel, B., Pliner, C., Eschler, J., & Elliott, G. (1988). How children with autism are diagnosed: Difficulties in identification of children with multiple developmental delays. *Journal of Developmental and Behavioral Pediatrics, 9*(4), 199–204.

Sigman, M., Arbelle, S., & Dissanayake, C. (1995). Current research

findings on childhood autism. *Canadian Journal of Psychiatry, 40,* 289–294.

Sparrow, S., Balla, D., & Cicchetti, D. (1984). *The Vineland Adaptive Behavior Scales.* Circle Pines, MN: American Guidance Services.

Stone, W., Hoffman, E., Lewis, S., & Ousley, O. (1994). Early recognition of autism: Parental reports vs clinical observation. *Archives of Pediatric and Adolescent Medicine, 148,* 174–179.

Stone, W. L., & Ousley, O. (1997). *Screening test for autism in 2-year-olds.* Unpublished manuscript, University of Nashville, TN.

Tager-Flusburg, H. (1993). What language reveals about the understanding of other minds in children with autism. In S. Baron-Cohen, H. Tager-Flusburg, & D. J. Cohen (Eds.), *Understanding other minds* (pp. 138–157). New York: Oxford University Press.

Tanguay, P. E., Robertson, J., & Derrick, A. (1998). A dimensional classification of autism spectrum disorder by social communication domains. *Journal of the American Academy of Child and Adolescent Psychiatry, 37,* 271–277.

Teitlebaum, P., Teitlebaum, O., Nye, J., Fryman, J., & Maurer, R. (1998). Movement analysis in infancy may be useful for early diagnosis of autism. *Proceedings of the National Academy of Sciences, U.S., 95,* 13982–13987.

Volkmar, F., & Lord, C. (1998). Diagnosis and definition of autism and other pervasive developmental disorders. in F. Volkmar (Ed.), *Autism and pervasive developmental disorders.* Cambridge, UK: Cambridge University Press.

Vostanis, P., Smith, B., Chung, M., & Corbett, J. (1994). Early detection of childhood autism: A review of screening instruments and rating scales. *Child: Care, Health, and Development, 20,* 165–177.

Waterhouse, L., Fein, D., & Modhal, C. (1996). Neurofunctional mechanisms in autism. *Psychological Review, 103,* 457–489.

Wetherby, A., & Prizant, B. (1993). *The communication and symbolic behavior scale.* CITY: Riverside.

Wing, L. (1988). The continuum of autistic characteristics. In E. Schopler & G. Mesibov (Eds.), *Diagnosis and assessment in autism.* New York: Plenum Press.

**Weaver, Gretchen (NIH/OD) [E]**

| | |
|---|---|
| **From:** | Friedman, Sarah (NIH/NICHD) [E] |
| **Sent:** | Friday, February 10, 2006 10:29 AM |
| **To:** | List NEURO_MEASGRP-L |
| **Subject:** | Autsims screening and diagnosis instruments |
| **Attachments:** | Diagnostic instruments ADI-R and ADOS.htm; ADOS Exam.htm; m-chat.pdf; M-Chat.Robins.Fein.Barton.Green..pdf; ESAT_instrument (2).doc; FYI Version 21 0.pdf |

I thought you may want to have these instruments handy for our conference call today and for later. Sarah.

**Sarah L. Friedman, Ph.D.**
**OEP, Office of the Director,**
**National Institute of Child Health and Human Development**

**Phone: (301) 435-6946**
**Fax: (301) 480-2400**
**E-mail: friedmas@exchange.nih.gov**

**Weaver, Gretchen (NIH/OD) [E]**

**From:** Friedman, Sarah (NIH/NICHD) [E]
**Sent:** Thursday, February 09, 2006 5:27 PM
**To:** List NEURO_MEASGRP-L
**Subject:** Sugwara et al. paper with information about a scale for maternal attachment to child

**Attachments:** Sugwara et al. includes maternal attachment to child data.pdf

Sugwara et al. includes matern...

Hello,

Please find attached the article by Masumi Sugwara and her colleagues in which there is information about a maternal attachment to baby scale. This presents one more option for assessing mothers' feelings about their babies. If you want me to get more information from Masumi Sugwara, I will be glad to do that.

Sarah.

**Autism Research at the University of Michigan**
Diagnostic instruments: Description of the ADI-R and ADOS

# Description of the ADI-R and ADOS

The Autism Diagnostic Interview-Revised ( ADI-R: Lord, Rutter & Le Couteur, 1994) and the Autism Diagnostic Observation Schedule (ADOS: WPS Edition; Lord, Rutter, DiLavore & Risi, 1999) are complementary diagnostic instruments originally created for research, but now adapted for clinical purposes.

They are intended to be used by experienced clinicians; training in their use is highly recommended. For these reasons, and because of their length, they are most appropriate as part of a comprehensive evaluation within specialty clinics. A strength of both instruments is that they operationalize current DSM-IV and ICD-10 criteria and quantify separately the three domains that define autism spectrum disorders: social reciprocity, communication and restricted, repetitive behaviors and interests. This can be very helpful in increasing parents' understanding of their children's disabilities and setting goals.

The clinical version of the ADI-R takes about 90 minutes to administer and yields current scores and history. The ADOS is a standardized observation of social behavior in naturalistic and communicative contexts, with different modules and tasks for children of different ages and language levels. It yields scores that fall within a range from autism to autism spectrum disorder, and so may be particularly helpful with difficult to diagnose cases. It takes about 30-45 minutes to administer. Inter-rater and test-retest reliability as well as internal validity have been demonstrated for both instruments and they, and their previous versions, have been widely used in research and in academic centers for about 15 years.

Related links:

Social Communication Questionnaire (SCQ), previously known as the Autism Screening Questionnaire (ASQ)

Instrument References

---

**UMACC Home Page** | **Diagnostic Instruments** | **ADOS** | **Contact**

Revised: Oct 19, 2001
Feedback: um.autism@umich.edu
URL: http://www.umich.edu/~umacc/diagnostic_instruments/description.htm
All contents copyright 2000-2001 The University of Michigan. All rights reserved.

AGRE Access: | Application for AGRE | About Data and | AGRE Program Information | AGRE Pedigrees | Referen

search

Cure Autism Now

->return to Index of Protocols

## About the ADOS-G

The Autism Diagnostic Observation Schedule -Generic (ADOS-G) is a semi-structured assessment of communication, social interaction and play or imaginative use of materials for individuals suspected of having autism or other pervasive developmental disorders (PDD). It is a combination of two earlier instruments: the Autism Diagnostic Observation Schedule (ADOS: Lord et al., 1989), a schedule intended for adults and children with language skills at a minimum of the three-year-old level, and the Pre-Linguistic Autism Diagnostic Observation Scale (PL-ADOS: DiLavore, Lord & Rutter, 1995), a schedule intended for children with limited or no language, as well as additional items developed for verbally fluent, high-functioning adolescents and adults. The ADOS-G consists of four modules, each of which is appropriate for children and adults of differing developmental and language levels, ranging from no expressive or receptive language to verbally fluent adults. These modules are described in separate sections following this introduction. They are labeled with numerals 1 to 4, with each activity numbered within its module.

The ADOS-G consists of standard activities that allow the examiner to observe the occurrence or non-occurrence of behaviors that have been identified as important to the diagnosis of autism and other pervasive developmental disorders across developmental levels and chronological ages. The examiner selects the module that is most appropriate for a particular child or adult on the basis of his/her expressive language level and chronological age. Structured activities and materials, and less structured interactions, provide standard contexts in which social, communicative and other behaviors relevant to pervasive developmental disorders are observed. Within each module, the participant's response to each activity is recorded. Overall ratings are made at the end of the schedule. These ratings can then be used to formulate a diagnosis through the use of a diagnostic algorithm for each module. In effect, the ADOS-G provides a 30 to 45 minute observation period during which the examiner presents the individual being assessed with numerous opportunities to exhibit behaviors of interest in the diagnosis of autism/PDD through standard 'presses' for communication and social interaction. 'Presses' consist of planned social occasions in which it has been determined in advance that a behavior of a particular type is likely to appear (Murray, 1938).

The modules provide social-communicative sequences that combine a series of unstructured and structured situations. Each situation provides

a different combination of presses for particular social behaviors. Module 1, based on the PL-ADOS, is intended for individuals who do not consistently use phrase speech (defined as non-echoed. three-word utterances that sometimes involve a verb and that are the child's spontaneous, meaningful word combinations). Materials for Module 1 have been selected for young children, but materials from other modules may be substituted if desired. Module 2 is a combination of the ADOS and PL-ADOS and is intended for individuals with some phrase speech who are not verbally fluent. Module 3 is based on the ADOS and is intended for children for whom playing with toys is age- appropriate, (usually under 12 - 16 years of age) who are verbally fluent. Verbal fluency is broadly defined as having the expressive language of a typical four year-old child: producing 4. range of sentence types and grammatical forms, using language to provide information about events out of context and producing some logical connections within sentences ( e.g., "but" or "though"). There may be some continued grammatical errors. Module 4 includes the socioemotional questions of the ADOS as well as additional tasks and some interview items about daily living. It is intended for verbally fluent adolescents and adults. The difference between Modules 3 and 4 lies primarily in whether information about social-communication is more appropriately acquired during play or a conversational interview. The modules overlap in activities, but together contain a range of tasks from observing how a young child requests that the examiner continue blowing up a balloon in Module 1 to a conversation about social relationships at school or work in Module 4. Modules 1 and 2 will often be conducted while moving among different places around a room, reflecting the interests and activity levels of young children or children with very limited language; Modules 3 and 4 take place sitting at a table and involve more conversation and language without a physical context. Though the superficial appearance of the different modules is quite varied, the general principles involving the deliberate variation of the examiner's behavior using a hierarchy of structured and unstructured social behaviors are the same.

Because the focus of the ADOS-G is on observation of social behavior and communication, the goal of the activities is to provide interesting, standard contexts in which interactions occur. Standardization lies in the hierarchy of behavior employed by the examiner and the kinds of behaviors taken into account in each activity during the overall ratings. The activities serve to structure the interaction; they are not ends in themselves. The object is not to test specific cognitive abilities or other skills in the activities, but to have tasks that are sufficiently intriguing that the child or adult being assessed will want to participate. What the examiners do not do (such as deliberately waiting to see if the participant will initiate an interaction or try to maintain it) is often as important as what they do.

In general, each module should stand on its own in providing a range of tasks and social presses. However, an examiner may need to shift from one module to another if the language level of the individual is different than expected or, if for another reason, the tasks seem generally inappropriate. If in doubt, it is better to err in choosing a module that requires fewer language skills than an individual possesses than to risk confounding language difficulties with the social demands of the instrument. As is discussed later within the four modules, the order of

tasks, pacing and materials can be varied, depending on the needs of the individual being assessed.

Many of the ratings made at the end of each schedule are similar across modules, with some identical items and some that are relevant only for a subset of modules. Separate algorithms for the different modules have been generated and are presented at the end of each section. Adequate inter-rater reliability for items has been established. However, this work has been carried out in small samples; thus, replication from independent samples will be very important.

In the following pages, the manual is organized around the four modules. Within each module, there is a general introduction, a description of tasks, a list of the materials needed and guidelines for overall ratings. Separate coding sheets contain the ratings and provide a recording form for notes made during each activity. These sheets include a summary of the purpose of each activity and the focus of observations targeted during each task. Notes should be taken during administration of each schedule. All modules, even if videotaped, should be rated immediately after they are administered. Earlier research with the PL-ADOS and ADOS showed that ratings of items made after live administration of the scales were equal or greater in reliability (and never less) than ratings from videotapes because the ratings involve social nuances of behavior that are not always observable or interpretable on a screen (such as distinguishing appropriate eye contact from looking over one's shoulder). Within a clinic or research group, examiners should obtain inter-rater reliability with each other before using the instruments for research. Our recommendation has been for 80 percent agreement on individual items and mean kappas greater than .60 (when sample sizes and distributions permit) for raters for three consecutive joint scorings.

The examiner needs to be sufficiently familiar with the ratings and the activities that she can focus her attention on observation of the individual being assessed, rather than on administration of the tasks. This requires practice in administering the activities, scoring, and observation. Notes need to be sufficiently detailed to be interpretable but not so lengthy that they interfere with administration.

The ADOS-G offers clinicians and researchers the opportunity to observe social behavior and communication in standardized, well-documented contexts. These contexts are defined in terms of the degree to which the examiner's behavior structures the individual participant's response and social initiative. For purposes of diagnosis, use of this instrument should be accompanied by information from other sources, particularly a detailed history from parents whenever possible (see Lord, Rutter & Le Couteur, 1994). Its goal is to provide standardized contexts in which to observe the social-communicative behaviors of individuals across the life span in order to aid in the diagnosis of autism and other pervasive developmental disorders. For this reason, it may not be a good measure of response to treatment or developmental gains especially in the later modules. On the other hand, some items have been deliberately included across several modules, even though they have diagnostic utility only in one (e.g., response to

joint attention). It may be that developmental or treatment gains will be measurable using these items. An alternative strategy to measure absolute gains is to re-administer the same modules over time, as well as administering the developmentally appropriate module.

For purposes of brevity, the examiner is referred to as "she" and the participant as "he."

---



contact AGRE webmaster

Autism Genetic Resource Exchange
Cure Autism Now
5455 Wilshire Blvd., Suite 2250,
Los Angeles, CA 90036-4234
1-323-931-6577
fax:1-323-549-0547

emailmailto:info@agre.org

hosting by Accu-Find Internet Services
made possible by a donation from Network Appliance, Inc.

# Premenstrual Mood Changes and Maternal Mental Health in Pregnancy and the Postpartum Period

▼

M. Sugawara

*National Institute of Mental Health, NCNP*

▼

M. A. Toda

*Hokkaido University of Education*

▼

S. Shima

*Tokyo Keizai University*

▼

T. Mukai

*Fukushima University*

▼

K. Sakakura

*Saiseikai Chuo Hospital*

▼

T. Kitamura

*National Institute of Mental Health, NCNP*

We thank Drs. S. Hayashi, Department of Obstetrics and Gynaecology, Dr. T. Shikano, Department of Neuropsychiatry, and other members of Kawasaki Municipal Hospital, Kawasaki, Japan. Thanks are also extended to Professor T. Takuma, Tokyo Kokusai University.

This study was partly supported by a grant from the Akaeda Foundation (1994), a grant from the Toyota Foundation (86-II-081), a grant for Nervous and Mental Disorders from the Ministry of Mental Health and Welfare, (3A-6), and a grant-in-aid for Scientific Research from the Ministry of Health and Welfare (Assessment of the Mother and Child Health Care System, Japan).

We would also like to acknowledge J. Rohan, B. A., for his editing advice on an earlier draft of this paper.

Correspondence should be addressed to Masumi Sugawara, Section of Family Study, Department of Sociocultural Environmental Research, National Institute of Mental Health, NCNP, 1-7-3, Kohnodai, Ichikawa, Chiba, 272 Japan, TEL: 81-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, ext. 1283, FAX: 81-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.

JOURNAL OF CLINICAL PSYCHOLOGY, Vol. 53(3), 225-232 (1997)

© 1997 John Wiley & Sons, Inc.

CCC 0021-9762/97/030225-08

To investigate the relationship between premenstrual mood changes and maternal mental health in the perinatal period, a prospective questionnaire survey of 1,329 women was carried out. Women with a premenstrual mood changes (irritability) before pregnancy showed significantly higher Zung's Self-rating Depression Scale (SDS) scores than those without it, throughout pregnancy and the postpartum period (6 time points: early, middle, and late pregnancy, 5 days, 1 month, and 6 months after childbirth). In addition, women with premenstrual irritability had greater anxiety about pregnancy and delivery, were more reluctant to accept mother roles, and felt their babies (fetuses or neonates) were more vulnerable. These findings suggest that premenstrual mood change is correlated with unstable mental health throughout the perinatal period. © 1997 John Wiley & Sons, Inc.

Ramcharan, Love, Fick, & Goldfien (1992) reported that about 4.5% of women in a community suffer regularly from severe negative mood changes in the few days prior to menstruation. Despite the possibility of endocrinological disturbance being related to the premenstrual mood changes (Schagen van Leeuwen, et al., 1993), this condition has been included as a psychiatric disorder in a formal nosological classification (American Psychiatric Association, 1994; Spitzer, Severino, Williams, & Parry, 1989). Women with premenstrual mood change are more likely to have a high lifetime prevalence of affective disorders (Coppen, 1965; Wetzel, Reich, McClure, & Wald, 1975; DeJong, Rubinow, Roy-Byrne, Hoban, Grover, & Post, 1985; Endicott & Halbreich, 1988; Graze, Nee, & Endicott, 1990). Recently, Endicott, Nee, Cohen, & Halbreich (1993) reported that of the five symptom clusters they extracted from a factor analysis of 20 premenstrual change items, those women reporting physical discomfort and dysphoric mood scores tended to be more likely to have experienced Research Diagnostic Criteria (RDC; Spitzer, Endicott, & Robins, 1978) major and minor depressive disorders. These findings have drawn the attention of clinical psychologists and psychiatrists to the management of premenstrual negative mood change.

Another period when most women feel strained is the pregnancy and puerperium. In pregnancy and the postpartum period, many women undergo great stress due to physiological, endocrinological, and psychosocial changes (acceptance of mother role, unemployment, etc.). Evidence has accumulated to suggest that the rate of onset of affective disorders is high during pregnancy, as well as in the puerperium (Kitamura, Shima, Sugawara, & Toda, 1993; Kitamura, Sugawara, Sugawara, Toda, & Shima, 1996; Kumar & Robson, 1984). Despite the importance of these two periods, a specific relationship between premenstrual mood change and perinatal affective disorders has rarely been sought. In a retrospective study (Pearlstein, Frank, Rivera–Tovar, Thoft, & Jacob, 1990), 29% of 51 women who were diagnosed as suffering from DSM-III-R (American Psychiatric Association, 1987) proposed late luteal phase dysphoric disorder (LLPDD) had also experienced postpartum depression. Therefore, more studies on the possible link of these two conditions which are specific to female gender may be warranted in order to understand better the aetiology of and possibly treatment for these mood changes.

Some researchers have studied the relationship between premenstrual mood change and rearing patterns and female role-taking (Shainess, 1961; Spencer–Gardner, Dennerstein, & Burrows, 1983). However, there has been no research about the effects of premenstrual mood changes on the perinatal development of maternal consciousness.

To approach these issues, we compiled a longitudinal assessment of maternal depression at six points in pregnancy and the post-partum period, for women who were also asked if they had experienced any premenstrual mood changes before pregnancy. This study had two purposes: to compare the severity of depression longitudinally in a premenstrual mood changing group and a non-changing group; and to compare maternal consciousness, feelings for one's baby, and the psychological attitude towards pregnancy or delivery in the same two groups.

## METHOD

### *Subjects and Procedure*

A total of 1,329 women who were in attendance at an antenatal clinic in the obstetrics department of a general hospital in Kawasaki, an industrial city in central Japan, participated in a questionnaire survey, after pregnancy had been confirmed by the presence of a foetal heart-beat on ultrasonography. Women who were at more than 12 weeks gestation were excluded, but no other exclusion criteria were applied. From these 1,329 women, 1,322 (99.5%) usable questionnaires on premenstrual complaints were returned. Their age was between 17 and 42, with a mean ($\pm SD$) of 27.9 ($\pm$4.6) years.

Questionnaires were distributed six times during the pregnancy and after delivery—in early pregnancy (when the subjects were recruited), middle pregnancy (approximately 22 weeks gestation), late pregnancy (approximately 34 weeks gestation) and 5 days, 1 month, and 6 months after delivery. Until one month after delivery, questionnaires were administered in the hospital. For the six months after delivery, questionnaires were sent and received back through the mail.

### *Premenstrual Mood Change*

The questionnaire given in early pregnancy included a single item referring to premenstrual mood change: "Do you feel irritable and unpleasant in the premenstrual period?" This item was rated on a 4-point scale: never (0), sometimes (1), often (2), and almost all of the time (3).

### *Depression*

On six occasions, Zung's (1965) Self-rating Depression Scale (SDS) was used to measure the severity of depression. The total number of SDS items is 20, which are rated on a 4-point scale from never (0), to sometimes (1), often (2), and almost all of the time (3). The maximum total score is 60; higher scores indicate greater depression. The validity of the Japanese version of the SDS was studied by Kitamura, Shima, Sugawara, & Toda (1994), using a subpopulation of 120 women extracted from the present subjects.

### *Maternal Consciousness and Feelings Towards the Baby*

The questionnaire given in middle pregnancy and 5 days after delivery included items concerning both anxiety about the pregnancy or delivery and acceptance of the mother or mother-to-be role (Table 1). The Feelings towards the Baby (fetus or neonate) Scale (Hanazawa, 1978) was also administered in mid-pregnancy and five days after delivery. This scale consists of 14 adjectives that were associated with "my own baby" (Table 2). These were rated on a 7 point scale from disagree completely (0) to agree completely (7).

**Table 1.** *Comparison of Maternal Consciousness (t-test of mean scores)*

| Items | Irritable ($n$ = 956) | Non-Irritable ($n$ = 366) |
|---|---|---|
| Middle of pregnancy (20–24 weeks) | | |
| Anxiety about Pregnancy | 5.07 (1.48) | 4.65 (1.68)** |
| Anxiety about Delivery | 4.71 (1.52) | 4.16 (1.75)** |
| Reluctance to Become a Mother | 2.10 (1.37) | 1.92 (1.36)* |
| Envy of Non-Pregnant Person | 3.44 (1.72) | 3.05 (1.63)** |
| 5 days After Delivery | | |
| Satisfaction with Delivery | 6.05 (1.00) | 6.13 (.83)*ns* |
| Tiredness | 4.59 (1.53) | 4.32 (1.58)** |
| Happy to be a Mother | 6.27 (.78) | 6.28 (.77)*ns* |
| A Feeling of Reality- "My Baby" | 2.57 (1.71) | 2.30 (1.59)* |

**$p < .01$; *$p < .05$.

## RESULTS

The subjects were divided into those who reported experiencing premenstrual irritability at least sometimes, ("irritable group" $n = 956$, 72.3%) and those who had never experienced such irritability ("non-irritable group" $n = 366$, 27.7%). The breakdown of the irritable group was as follows: almost all of the time = 4.8% ($n = 64$), often = 16.9% ($n = 224$), and sometimes = 50.5% ($n = 668$). There were no significant differences in age, occupation, income, number of previous pregnancies, or parity between the two groups. Although the "non-irritable group" had a higher average level of education than the "irritable group" (non-irritable group = 4.38 (.79), irritable group = 4.22 (.73), $t = 3.41, p < .01$), no significant interaction was observed through variance analysis of all the independent variables.

**Table 2.** *Factor Analysis of Feelings for Baby Scale*

| Items/Factor Loadings | Middle of Pregnancy (20–24 weeks, $n$ = 1,150) | 5 Days After Delivery ($n$ = 1,113) |
|---|---|---|
| Factor I: "Angel Baby Image" | | |
| Fresh | .75 | .71 |
| Pretty | .78 | .70 |
| Pure | .75 | .64 |
| Innocent | .74 | .65 |
| Want to touch | .67 | .63 |
| Cuddly | .65 | .54 |
| Sweet | .61 | .55 |
| Touching | .52 | .61 |
| Factor II: "Vulnerable Baby Image" | | |
| Fragile | .61 | .73 |
| Sickly | .66 | .58 |
| Flabby | .49 | .61 |
| Scary | .54 | .64 |
| Factor III: "Detachment from Baby" | | |
| Obstructive | .74 | .67 |
| Burdensome | .74 | .56 |
| % Variance Explained | 60.2% | 56.9% |