find that there are a large number of items that you have not observed (say more than 30 or 40) or that you do not have a sense of the items that you will place in the top 2 and bottom 2 piles. In that case, at the end of the visit, tell the mother that you need more observation time to complete the description. Ask if you can stay longer or if it would be possible to come back at another time. Tell her that you had not expected this, but it does happen some times, that you are sorry, that you will pay her for the second visit, and that you appreciate her cooperation. If the mother refuses to have you come back, complete the sort if you can, but give it the lowest confidence rating.

**F. Exiting**

1. The Observation Report Form.

The visitor will complete the Observation report form at the end of the visit. The Visitor should always ask the mother if this 2-3 hour period was typical for the child and record the mother's answer. The visitor also will record who was present for the observation and any unusual events that occurred. At this time the visitor will give the mother page 3 of the 24-Month Post Home Visit Interview-Part 2 (Form 24P) to complete. Questions 8 & 9 on the Post Home Visit Interview with Mother-Part 1 (Form 15Q) are not asked by the visitor. These two questions have been added to the end of Form 24P for the mother to compete.

2. Debriefing

It is important at the end of the visit to "debrief" the mother. Ask the mother if she has any comments or questions about the visit she would like to share with us. The Visitor needs to be sensitive to any negative affect in the mother and needs to give the mother a chance to share her feelings. If the mother asks questions about the research hypotheses, try paraphrasing the information for the families in the consent form and two-week phone call. This is necessary to give the mother a sense that she is an important part of the research process, to give her the chance to tell us if the visit captured out-of-ordinary circumstances, and to express any adverse feelings she may have had about the visit.

3. Leaving the MacArthur Language Inventory, and Questionnaire Packet

The standard protocol calls for Home visitors to leave the MacArthur Language Inventory and the questionnaire packet at the home visit for the mothers to complete and bring to the lab visit. Should mothers not be able to read, the questionnaires are to be administered at the lab visit.

However, there are a number of ways in which this protocol may need to be revised: the home visit takes place AFTER the lab visit, the mother forgets to complete the questionnaires before the lab visit, the mother needs assistance with the questionnaires and this was not done at the lab visit for

whatever reasons. In these circumstances (and any others we have not envisioned), please use the guidelines below.

Guidelines:

1. Always hand out questionnaire packet at the first visit, (Home or lab). In most cases, this will be the home visit. Enclose a stamped, lab addressed mailing envelope with the packet.

2. Pick up the completed questionnaire packet at the next visit.

3. The lab team is always responsible for follow-up, to be sure that they have the completed data and that they send it to the DCC.

4. At the second visit, usually the lab, but possibly the home visit, the questionnaire packets are collected. If the mother does not have her packet, she may be given a second one. However, all mothers will be paid for their visit, whether or not they return their questionnaires.

5. If there is some concern that the mother may not be able to complete the questionnaire on her own time and return them via mail, sites may choose to have the mother complete the questionnaires at the lab visit. This assumes that both the mother and lab team have the additional time required.

Below is a detailed list of instructions for implementing these guidelines.

1. When the lab visit precedes the home visit: Guidelines for the lab team

a. Give the mother a manila envelop with the macArthur and common protocol questionnaires. Attach postage to the envelop and address it to the lab, so that it can be mailed back, if the mother wishes or if the packet is not picked up at the home visit, for whatever reason.

(1) Tell the mother that we would like her to complete these materials in the next few days, and that we will pick up the packet when our home team visits her in her home.

(2) Alert the home team to pick up this packet at the home visit. When the packet is returned, the lab team can consider this subject's materials completed.

(3) If the packet is not retrieved at the home visit, it is the lab team's responsibility to call the mother a reasonable number of times (at least two), within a reasonable period (3 to 5 days after the visit) to retrieve the completed material.

b. If past practice has shown difficulties with the mother returning materials by mail, and if the lab team is able to spend the additional time with the mother and child to compete the questionnaires (40 minutes total: MacArthur: 20 minutes, Questionnaire packet, 20 minutes), the mother may be invited to complete them during the lab visit, after the completion of the height and weight measurements.

Some mothers may not be able to spend the additional time; other mothers may welcome the free child care and comfortable space that we offer her to get her questionnaires done "on the

spot". Having the mother complete the questionnaires at the lab visit is desirable (when possible), because then we are assured that the questionnaires are received. Mothers may not be able to complete them by the time we visit the home. Administering these materials at the lab visit, we can avoid additional postage and time-consuming follow-up calls.

(1) In these circumstances, if the lab team determines that they do not have the additional time, or if the mother cannot stay to complete both the MacArthur and the questionnaire packet, then perhaps there is time to complete just the MacArthur Language Inventory (20 minutes). If so, do so, and give the mother the questionnaire packet to be picked up at the home visit.

c. If the mother needs help in completing the questionnaires, (i.e., she cannot read), the lab team should prepare to administer the MacArthur and questionnaires at the lab visit. Additional time will need to be scheduled, and the mother should expect to stay at the lab visit for at least three hours to complete the Common Protocol.

(1) If there is any problem administering the questionnaires, they can be administered over the phone, on a separate lab visit, or if necessary, after the 24 month home visit.

e. In any case, pay the mother for the lab visit.

2. When the lab visit precedes the home visit: Guidelines for the home team:

a. If the lab visit takes place before the home visit, the home team should be on alert. They will need to find out from the scheduler or from the lab team whether they are to retrieve or administer questionnaires at the home visit. If so:

(1) At the confirmation call, the caller should ask the mother to please have the questionnaires completed and ready for pickup at the home visit. If the mother has not completed them yet, the caller should ask the mother to see if she could try to find time to do so before the home visit.

(2) At the home visit, the home visitor should retrieve the completed questionnaires. If they are not completed, the visitor should ask the mother to complete them in the next few days and return them via mail in the lab-addressed stamped envelop provided. The home visitor should offer the mother another lab-addressed, stamped set of materials, in case the mother has misplaced them.

(3) If the mother is a nonreading mother, and for some reason the questionnaires were not administered in the lab, then the home visitor should prepare to administer these items in the home after the observation. Mothers should be told on the confirmation call that we will need to schedule approximately 3 hours for the home visit. If this cannot be done, then the lab team needs to be informed that they need to call the mothers to

schedule a time to administer the questionnaires over the phone or at the mother's home.

(4) After the home visit, the home visitor should convey the questionnaire packet to the lab team or inform the lab team of their status.

(5) It is the lab team's responsibility to contact the mother for the questionnaires. They should call about at least twice, between 2 and 5 days after the home visit is completed.

3. When the home visit precedes the lab visit, but the mother does not bring the completed questionnaires with her to the lab: Instruction for the lab team.

a. If the mother has completed the questionnaires, but has simply forgotten to bring them, the interviewer should ask the mother to please return them via mail. The envelop she has does not have postage, so the interviewers should give the mother a stamped lab-addressed envelop with which to return the materials. However, the interviewers may also explain that, just in case she has any trouble locating the completed questionnaires, the interviewers has paced a new set of materials in the envelop. The mothers should remove these and put in her completed questionnaires and drop the packet in the mail.

(1) By enclosing an additional set of materials, we can speed their receipt, in case the mother has misplaced her original set.

(2) The lab team should call the mothers at least twice over the next 2 to 5 days to encourage the mothers to put the materials in the mail.

b. If the mother has not completed the questionnaires, the interviewer should give the mother a new set with a stamped lab-addressed envelop with which to return the materials. Follow the same guidelines as in XX above.

4. When there is a home visit, but no lab visit: Instruction for the lab team.

It is the lab team's responsibility to retrieve the MacArthur interview and questionnaire packet. In calling to contact the mother to schedule or reschedule the lab visit, the team member should encourage the mother to return the questionnaire packet within the next week, even if she cannot make the lab visit. This information is very important to us, and we value her input. Sites can offer to send the mother a $15 check on receipt of the completed materials.

5. When there is a lab visit, but no home visit: Instruction for the lab team

It is the lab team's responsibility to retrieve the MacArthur interview and questionnaire packet. The team member should call the mother and encourage her to return the questionnaires packet with in the next week, even if she cannot make the home visit. The packet we gave her is already stamped

and self addressed, and all the mother needs do is fill out the questionnaires and drop it in the mail. This information is very important to us, and we value her input. Sites can offer to send the mother a $15 check on receipt of the completed materials.

6. When all else fails, lab team members can feel free to complete the questionnaires over the phone with the mother, if this is acceptable to the mother, of course. Sites can pay the mother for her time on the telephone, just as if we were getting this information in the mail from her. When questionnaires are completed over the telephone, this needs to be indicated on the questionnaire log.

4. Paying the Mother

Thank the mother for all her time and help. Explain how important this study is, and how we value her time and help. Pay her $30.00, or make arrangements to pay her.

5. Preparing for the Next Contacts

If the mother has not yet had her 24-month lab visit, the most important order of business here is to confirm the time and date of that visit and go over with the mother information about how to get to the lab and, if appropriate, where to park. Written directions as to how to get to the lab or how to arrange for transportation may be necessary at some sites. Remind the mother that someone will call to confirm the time and date of the lab visit on the day or two before the visit. If the mother tells you that the scheduled lab time is no longer convenient,

either reschedule her on the spot or tell her that someone from the lab will call to reschedule.

Mothers may want to know what will happen at the lab. You may tell her that we will be observing her child playing first. We will also have some special activities for CHILD, and we will be watching to see what the child does. We will want to ask her some things about the child and her family and have her complete some brief questionnaires (sites add site-specific descriptions). If the mother has already had her lab visit, say something like:

"The next time we visit you in the home will be when CHILD is 36 months old. At that time, we'll be talking with you again. We will also want to watch CHILD doing some things that may be fun for her to do with you. There will also be a lab visit at 36 months of age. We will contact you a few weeks before CHILD is 36-months old to talk with you about the details of these visits. If at 36-months CHILD is in (still in) some form of regular child care, we would also like to visit her while she is there. When we call you to arrange our visit at 36-months, we'll also want to contact the caregiver. We will (will again) pay the caregivers for their time and help."

"Someone will call when CHILD is 27-months to talk with you about whether CHILD has been sick or whether you have changed your child care arrangements".

Leave the mother a business card or some small information card with your name on it that she can file or "put on the refrigerator." If the lab visit is scheduled, be sure to have the

date and time of the lab visit on the card. If the lab visit is to be rescheduled, have the original date on the card, crossed out. Say, "We'll be in touch with you, but if anything changes for you or if you want to contact us, please call. Our number, and my name, is on this card."

### G. Departure

Leave the mother with a good feeling about your visit. As you leave, give the mother positive feedback along the lines of "You've really been helpful to us," "I've enjoyed meeting you, I'll look forward to visiting you again," "You really have a beautiful child."

## V. POST-VISIT ACTIVITIES

### A. Doing the Q-Sort

After the visit is completed, the visitor should proceed to a quiet place directly and complete the Q-Sort. The Q-Sort MUST be done immediately after the visit. It must never be put off till later in the day or the next day. Your notes will be important here.

After the observation period is over, the observer should carefully read over their entire set of notes. Then take the Q-set deck and review the content. With notes taken during the observation serving as a guide, the observer initially divides the Q-set into 3 piles of items: 1) Those items that are NOT LIKE, or are UNCHARACTERISTIC of the observed child; 2) Those

items that are LIKE or are CHARACTERISTIC of the observed child, and 3) Those items that are BOTH LIKE AND UNLIKE the child. These three piles are then further divided. Regarding the third stack, sometimes items seem to characterize the child at one point in the visit, but not at others or these items were never observed. All information received solely through the mother's report should initially go into this third stack. Note here that you may have observed a behavior and then asked mother if behavior was typical. These items do not need to go in middle pile because you observed them. Place them there only if that is where they truly belong, not because you asked mother. For some items you will have observed the behavior and received clarifying information from the mother as well. You must use your judgement concerning the saliency of the item based both on observation and maternal report. For a fair number of the items, you will have to rely completely on maternal report. These reports should be treated as data, but not as meaningful as directly observed behavior. Occasionally when the visit has been especially unproductive in terms of observed behavior you will need to sort some of these maternal report items into more extreme categories. Detailed information on completing the sort is provided in Section 8 on Training.

**B. Documentation of the Visit**

To document the visit, the Visitor will need to complete some forms after leaving the home. These will be done after the Q-Sort is completed.

1. Observation Report Form

On this form the visitor will record any comments about the home visit. This will include who was present during the visit, any interruptions or unusual circumstances that occurred. This form is filed in the subjects' personal files at the site.

2. Log Book

We also recommend that each site keep an informal log book on each visit. Here you could include information about who the Visitors met during the visit, general comments about the proceedings, and note some non-protocol information about the visit such as things the Visitor may have discussed with the mother, the name of the family dog, etc. This information may be useful in maintaining rapport during future contacts. Be careful not to include information that may bias future Visitors; only information that may help them respond as sensitive, friendly visitors to the family.

**C. Posting the Data**

See Chapter 3, "Data Management and Paper Forms Handling" for information on posting the data forms to the Data Coordinating Center.

**D. Maintaining Rapport**

Each site will send some type of thank-you note to the families after both the home and lab visits are completed. Each site can decide the form of the note with which they feel most comfortable. All sites will send the children yearly birthday cards. Each site can also decide whether they want to send holiday cards.

## VI. ENCOUNTERING UNUSUAL CIRCUMSTANCES

Listed below are some situations that may be encountered on the 24-month visit and our suggested solutions. We realize that each site is different and we invite your comments and suggestions.

1. The Visitor arrives and the mother is not home. Do we call and reschedule her?

Before leaving the area, the Visitor should attempt to call the mother from a nearby phone booth to make sure that she really is not home (e.g., her doorbell may not be working). If the mother is not home, the Visitor or the scheduler should attempt to contact the mother as soon as possible. Every attempt should be made to reschedule the visit within the allotted time frame.

2. The mother refuses to participate once the visitor arrives at the home. Do we pay her?

If at all possible, the Visitor should try to determine exactly why the mother refuses to participate before she leaves the home. By keeping accurate records of refusals and drop-outs, we may have some insight into the biases that may creep into our

sample. If the refusal is related to specific circumstances of the day or week, then arrangements to re-contact her and reschedule the visit should be made. As for paying her, we do not have to, considering that the money is for participating in the study. We should thank the mother for her earlier participation and leave. The P.I. or Study Coordinator will want to decide how to follow up on this situation.

3. The Visitor arrives at the home and the mother says that she or the child is not feeling well and she wants to reschedule.

The Visitor should try to determine why the mother did not phone the lab to cancel her appointment. Is this a sudden illness that may have prevented the mother from contacting us? The Visitor should offer to reschedule if the mother or child was truly ill and the mother was too busy or too distracted to call us. If possible, she should be rescheduled on the spot. However, it may be that neither the mother nor her child is ill; the mother just does not want to be in the study anymore. The Visitor should verbally check this out with the mother. If the mother does not want to be rescheduled, the Visitor should thank the mother and politely leave. Tell your SC or PI of the circumstances when you return to the lab/office. The mother will be called and rescheduled if possible.

4. The mother is very hostile, uncooperative, high, etc. What do we do? Will we see her again?

If the mother is merely uncooperative or somewhat hostile, the visitors may want to switch gears and allow the mother to do more open-ended talking for a while. If this does not help, the visitor should reassure the mother that her participation is strictly voluntary and that if she finds the questions or procedures in any way a problem, she can withdraw at any time with no penalty.

If the mother is overtly high or psychotic, the Visitor should leave the house as soon as possible, as tactfully as possible. Data from the 24-Month Home Visit will be missing in this case, but the mother will be contacted again at the next scheduled data collection.

5. What if we/she has to leave before finishing the observation?

A return visit will need to be scheduled if you are not confident that you have observed for a sufficient period of time to be able to complete the sort and feel it represents the child-mother interaction.

6. What if the visitor(s) see indicators of child abuse or potential abuse?

This information should be reported to the PI immediately. If required by state laws, this information will need to be reported to the appropriate authorities. If the family still wants to be in the study, they should still be included. This information must also be reported to the Data Coordinating Center.

7. If a child dies unexpectedly before the twenty four month visit, is it appropriate to send a card?

It is appropriate to send a note of sympathy. Each site can decide how they want to handle this situation. The Temple site would recommend sending a card which includes the phrase, "If there is any way that we can be of help to you, please let us know."

8. If the mother and her child are not living together in the same household at the time of the twenty four-month visit, what do we do?

If the legal guardian or the person who has been taking care of the child has agreed to participate at the 23-month phone call, schedule the visit and do the observation with that person if he/she has cared for the child for at least 2 months or has had a consistent relationship with the child for at least 6 months (seen the child on a weekly basis) using the appropriate alternate caregiver forms. Do not drop the original family at this point--the mother and child may be reunited later.

## VII. SAFETY GUIDELINES

Occasionally, home visitors will have to go to an area with which they are unfamiliar. In some cases, they may have to make the decision not to collect the home data at 24 months because the family's home is unsafe to visit for some reason. It is, therefore, essential that visitors be able to evaluate the safety of an area and learn how to increase their safety when traveling

in unknown areas. We have compiled two lists to help visitors with these tasks. These indicators are only imprecise guide-lines. The presence of these indicators does not necessarily mean that the area is unsafe, nor does the absence of these indicators necessarily mean that the area is safe. These are meant only as indicators to consider. Sometimes visitors will have to go on their 'gut reaction'. Remember -- the safety of home visitors is paramount! Never enter or stay in a situation in which you feel threatened.

**A. Things to consider in evaluating the safety of an area.**

There are three significant characteristics of dangerous areas: isolation, evidence of drug use or criminal activity, and a general air of abandonment. Remember that the presence of these characteristics do not always indicate danger, but they are signs that should be attended to. Some indicators of dangerous areas include:

Isolation

Poorly lit areas

People walking around with no apparent destination

Closed down industrial or business establishments

Nobody to go to if there is a problem (i.e., areas with boarded up homes, closed businesses or industrial firms)

Evidence of drug use or criminal activity

Lots of graffiti

Adults and teenagers loitering on street corners during the day

Prostitutes standing around on corners

Crack vials and syringes on the street

House with lots of people going in and out

Abandoned or boarded up buildings

Unkempt homes: Broken windows, homes in need of extensive repair

Area with many boarded up homes

Many old or abandoned cars

More trash than normal

The appearance of any one of the above characteristics does not mean that an area is unsafe. However, if you notice several of these characteristics, and you have a gut feeling that you should not be in that area, it probably means that the area is unsafe.

**B. How to Increase Your Safety**

1. Dress casually, in flat shoes, with no jewelry. (A casual watch is fine.)

2. Do not go into a possibly unsafe area alone.

3. Have exact directions to the home. Tell the mother that you are unfamiliar with the area and ask her exactly where to park the car.

4. Arrive early to a neighborhood to check things out. If you give yourself plenty of time then you will be better able to make an evaluation of the area.

5. Carry minimal equipment in a canvas tote.

6. Don't carry a purse.

7. Don't leave anything in your car. If your car has a trunk, try not to keep the equipment in there. If you are seen going into the trunk, someone may suspect that you have other things in the trunk.

8. Look like you know where you are and what you are doing. If you look intimidated, you are more likely to be the target of crime.

9. Make sure that someone knows the time of your visit and the time that you are expected to return.

10. Keep in contact with the local police precinct. They can answer many questions you may have about an unfamiliar area.

11. Try to schedule the home visit during daylight hours.

**C. Dealing with Unusual Circumstances From a Safety Perspective**

1) If the visitor arrives in front of the house and decides it is too dangerous to get out of the car, or the house looks "too questionable to enter", the visitor should get to the nearest safe phone booth and call the mother to tell her that she is not coming. In cases where the visitor knows that she is going to a

borderline neighborhood, she should arrive early to check out the situation. This way she will also minimally inconvenience the mother because she will call her about the time she should have been arriving rather than leaving the mother waiting. In this case, it may be better not to tell the mother the truth about our fears of her house and neighborhood because this may be inaccurate and unkind. Visitors could tell her that something happened and they couldn't get to her house. Although we did not reschedule when the situation was too dangerous at one month, we will attempt to handle these circumstances differently at 24 months, since this is a longitudinal study. We now have considerable data and time invested in this family. Reschedule the visit and enlist help from security or police personnel to enable you to make the visit on the next try.

If you know from previous visits that the home is in a dangerous neighborhood, you should check out the area at least 48 hours before the scheduled home visit as was done before the 1 month visit. If you see that the neighborhood does not at this time meet the criteria for "safe," make arrangements to have the help of security or police personnel to get from your car to the home and back. If you cannot obtain help to make the visit safely, then cancel the appointment and send the mother a check for $30.

If the visitor enters the house and decides that the situation looks unsafe: If the situation looks extremely unsafe (see safety regulations) as the visitor enters, the visitor

should leave and arrange to visit the mother at another time. For the next visit, the visitor will need to arrange security or police protection.

If the visitor enters a situation which appears okay at first but later becomes dangerous, she should leave as soon as she can and as tactfully as possible without compromising her personal safety. As she leaves, she can briefly explain that this looks like a bad time.

If the visitor decides not to see a family on the basis of safety, she should report this to the Study Coordinator and Principal Investigator. In addition, the visitor should document why and how she arrived at the decision to terminate the home visit so that a written justification, based on each site's guidelines, can be sent to the Data Coordinating Center. (See the Safety Exclusion Form, in Appendix D of Chapter 6.1.) Some suggestions on developing site-specific safety guidelines are contained in Appendix G of Chapter 6.1.

## VIII. OVERVIEW OF TRAINING

The 24-month training for the home visit will be different from the previous training efforts. For this training, Brian Vaughn, who is a consultant to the Steering Committee for the 24 month Attachment Q-set, will visit each site for a period of 3 days. During those 3 days, he will make home visits with the RAs who will be responsible for completing the 24 month home visits. Training will entail observation of his approach to collecting

observational data relevant to the Attachment Q-set and his procedures for sorting the items from the Q-set, after the observation period. He will also observe and adjust as necessary the approach to the observation task and the sorting procedure by the RAs. Training will proceed in four phases (a detailed training plan has been sent to each site):

A. Phase 1: To become acquainted with the Q-set items and the reasons these particular items have been included in the Attachment Q-set, it will be important for the RAs to read several chapters and articles by Mary Ainsworth and associates and by Brian Vaughn and Everett Waters. It would also be useful to a potential observer to have read Bowlby's Attachment volume. At a minimum, the following articles/chapters should have been read and understood during July of 1992. This material will be sent to you in June 1992.

1. Ainsworth, Blehar, Waters, & Wall (1978). Patterns of Attachment. (chapter 7, "Relationships between infant behavior in the strange situation and at home"), Hillsdale, NJ: Erlbaum. (Chapter 1 will also help to orient readers unfamiliar with Ainsworth's perspective; Chapter 8 gives corresponding data relating maternal behavior at home to infant behavior in the strange situation).

2. E. Waters, & K. Deane (1985). Defining and assessing individual differences in attachment relationships: Q-methodology and the organization of behavior in infancy and early childhood. In I. Bretherton & E. Waters (Eds.), Growing points in attachment

theory and research. (Monographs of the Society for Research in Child Development, 50, [Serial No. 209, pp. 41-65]). (This chapter describes the rationale for a Q-set measure and Q-methods in general. Although the item-set you will use is different from the one originally described in this publication, the thematic content of the items is the same in both Q-sets. It is very important that you read and understand this chapter. If there are any questions about it, the will be discussed during training. A second chapter in the same volume of the SRCD Monographs by Vaughn, Deane, & Waters provides additional information about the Q-set and the thematic contents covered by the Q-items. In addition, the first substantive chapter by Bretherton provides an excellent overview of attachment theory and research circa 1985. For RAs without a solid and extended background in attachment research and concepts, this is a good starting point.)

3. B. Vaughn & E. Waters (1990). Attachment behavior at home and in the laboratory: Q-sort observations and strange situation classifications of one-year-olds. Child Development, 61, 1965-1973. (This article provides some evidence that the home observations and Q-sort security scores derived from them are related in predictable ways with the behavior of 12-month -olds seen in the strange situation. Again, the item-set used is not the same one that you will be using for this study, but the points made should be equivalent). There are also a number of other published articles that are relevant and may be of interest

to the RAs and others interested in the training exercise. One of the more provocative is by Waters, Kondo-Ikemura, Posada & Richters (1991). It is a chapter in Volume 24 of the Minnesota Symposium on Child Psychology (M. Gunnar & L.A. Sroufe, Eds.). The title is "Learning to love: Milestones and mechanisms in attachment, identity, and identification."

A number of recent papers have appeared in Child Development in which the Attachment Q-set has been used as an index of attachment for children between 18 and 40 months of age. Several more such papers are in press in the leading developmental psychology journals. All are relevant to the tasks being given the RAs for this collaborative study.

B. Phase 2: After reading and digesting this material, you will be sent a videotaped tutorial on the Q-Set by Brian Vaughn and 2 practice videotapes showing an observation. You will do a practice Q-Sort from watching the videotape and then will see how an expert did the Q-Sort and why. The tutorial and the practice videotapes will arrive August 1, 1992. Then, you should make at least two and not more than five practice home observation on your own prior to Brian's arrival for training. Several observations will be preferable since many questions regarding the Q-set and the Q-sorting procedures will not occur to you unless you have attempted to complete a sort on your own.

All reading and the preliminary home visits should be completed about 7 to 10 days prior to Brian's scheduled visit to your site. The training visits are scheduled between September

1, 1992 and November 20, 1992. It is better not to do the visits more than a month prior to Brian's training visit, since your questions will not be fresh in mind. Thus, sites should time their activities depending on their scheduled training.

Each site should invest in a copy of Q-STAT, which is a computer program developed and marketed by Everett Waters at SUNY-Stony Brook (Stony Brook, NY 11794). This program is inexpensive (about $75) and provides excellent utilities for entry of Q-sorted data. The program is especially helpful for training purposes as it can identify items or sets of items sorted differently by two observers. The program also provides a convenient way to calculate criterion scores and includes a copy of the current criterion Q-sort for Attachment Security. It is well worth the money and can save time and headaches often encountered when attempting to decode and score Q-sort data.

B. Phase 2: When Brian arrives at each site, it is expected that at least three home visits will have been scheduled, along with three backup cases in the event that a scheduled visit is canceled or doesn't work out for some other reason (schedule more if several observers must be trained). For the purposes of training, it is best that the three home visits be scheduled on separate days. However, it may be necessary to complete two home visits on day 2 of the training. This will be dictated by the availability of appropriate pilot cases and by local plane schedules for getting in and out of your site. Ideally, the schedule will be as follows:1. Day 1: In the morning, Brian will

meet RAs and others being trained. After a brief overview of the Q-set and Q-methodology, questions and problems that have come up in practice, pre-training cases will be identified and resolved (to the extent such questions/problems are resolvable). Questions about the sort itself will be discussed. (All questions asked of Brian and the answers given during training at each site will be tape recorded, transcribed, and compiled as an appendix to this manual.) And, finally, a consensus sort of the "ideal 24-month old" will be completed and discussed.

Day 1: In the afternoon, Brian and the RA trainee(s) will make the first home visit. It is expected that the subject will have been fully informed as to the number of adults coming on the visit, that the purpose of the visit is to learn how this instrument is used, etc. By and large, the trainees will stay close to the child, making brief notes of the moment-to-moment behavior of the child, especially as her/his behavior is relevant to Q-set content domains. You should have a copy of the item set with you (but not as separate "cards") so that you can refer to it over the course of the home visit. You will be especially careful to inquire from the mother about attachment content that is not observed in the first 90-100 minutes of the visit.

Taking notes during the home visit is a very idiosyncratic process. For some observers, it is important to have a continuous running record of the child's behavior. For others, very sketchy and minimal notes are more than adequate. As a rule of thumb, it is usually helpful to have a minimum of a page of

handwritten notes for each 30 to 45 minutes of observation. In a two to three hour period, you should expect to take 4-6 pages of notes at the very minimum. Persons with tiny cursive habits will have proportionately fewer pages of notes. Remember, these notes are to help you recall the behavior of the child when it comes time to sort the Q-items. The more, and more relevant, detail you have, the better the notes will help you. The notes will be especially important if you are forced to postpone completing the Q-sort for several hours after the home visit. (In general, you will want to sort the Q-items as quickly as possible after the home visit. In this case, extensive notes may not be as critical. However, even when the sorting is completed immediately after the visit, good notes can make your task much less onerous.)

After the visit, the RA trainees and Brian Vaughn will review the notes taken by RAs and then complete the Q-sort. There are many different procedures that can be followed in completing a Q-sort. Over several years and with hundreds of children the following procedure has proven quite useful.

First, the 90 items of the Q-set are divided into three roughly equal stacks or piles. In the first stack are items that are UNCHARACTERISTIC of the child, or are OPPOSITE what the child was like during the home visit. In the second stack are placed items that are MOST CHARACTERISTIC of the child. These are the items from the set that are most closely like the child as you saw her/him today. In the third stack are placed items that are

BOTH LIKE AND NOT LIKE the child. Some items seem to characterize the child at one point in the visit, but not at other points. These items would be placed in this third stack. Other items were not observed one way or the other. If you have no information upon which to base a judgment for a given item, this item should be placed in this third stack. Some of this content might have been discussed by the mother, upon probing questions made by the observer, but if relevant behavior is not directly observed during the visit, then the item should be placed (initially at least) in this stack.

Now, you have three stacks or piles of item statements (those items Characteristic of the child, those items neither characteristic nor uncharacteristic, and those items Uncharacteristic of the child). Each of these stacks will be further subdivided into 3 stacks, for a total of 9 categories.

Starting with the item seen as MOST CHARACTERISTIC, divide these into three separate stacks. In the first stack, place those items that are really the MOST CHARACTERISTIC of the child. In the second stack place those items that do not quite make it into the MOST CHARACTERISTIC pile. Place the remaining items in the third stack. Now adjust the numbers of items in each stack to the predetermined distribution for your study. For this study, we have elected to use a quasi-normal distribution of items (4, 6, 10, 15, 20, 15, 10, 6, 4), make sure that the numbers of items in each category conform to the chosen distribution. If there are items remaining in your stack after

making the appropriate adjustments, place them in the stack containing "Neither characteristic nor Uncharacteristic" items.

By convention, the 4 items "Most Characteristic" of a case are assigned to Category 9, the 6 items considered next Most Characteristic items are assigned to Category 8, and so on. You will now have completed the Q-sort for categories 7, 8, and 9. You should have 10 items in Category 7, 6 items in category 8, and 4 items in category 9.

Now, take the stack of items seen as "UNCHARACTERISTIC" of this child. Go through the same exercise as described above. That is, subdivide the stack into three piles and rearrange items in each stack until you have obtained the prescribed quasi-normal distribution. If there are items left over, place them in the remaining large stack of "Neither Characteristic nor Uncharacteristic" items.

By convention, items in the "MOST UNCHARACTERISTIC" stack are assigned to Category 1, the next Most Uncharacteristic items are assigned to Category 2, and so on. You should have 4 items in category 1, 6 items in category 2, and 10 items in category 3. When this part of the sort is completed, you will have items/cards placed in six stacks (Categories 1, 2, 3, 7, 8, 9).

Now return to the final stack of items. These are to be divided into three piles, as with the Characteristic and Uncharacteristic items. The most neutral or non-descriptive (not UNdescriptive) items go into the middle category with items falling on either side being SOMEWHAT undescriptive or

descriptive of the subject. Arrange items into the final stacks according to the quasi-normal distribution prescribed. These items will be assigned category scores of 4, 5, and 6. There should be 15 items in category 4, 20 items in category 5, and 15 items in category 6.

When you have completed the sort this far, arrange the items in order of categories (from 1 to 9). Look over the items in each category and feel free to change your mind about the placement of specific items, if you realize that certain of the item meanings is more or less characteristic of the subject than implied by its initial category placement. If you are satisfied that the item placements provide the best description of the child at this visit, enter the category scores onto the Q-sort score sheet. Or, when you are practicing, use Q-STAT to enter the data, if you have access to a computer when the sort is completed.

After the sort is completed by consensus among the RA trainees and Brian Vaughn, further questions and problems that have come up will be identified, discussed and resolved (or put off for the next day).

2. Day 2: The second home visit should be scheduled for the morning of the second training day. The visit will proceed as for training day 1. Again, the RA trainee should plan on spending the bulk of time close to and observing the child for at least the first 90-100 minutes of the observation period. In the

last 20-30 minutes, the RA trainee will complete the interview aspect of the observation with the mother.

After the visit, notes taken during the visit will be reviewed and critiqued. The sort will be completed as on day 1.

In the afternoon, the two cases observed will be compared and contrasted. The two sorts of the children will be compared and a discussion of the cases will focus on the differences seen between the children. To the extent that differences may be a function of differences in the setting, time of day, and other attachment irrelevant aspects, these will be identified and their implications discussed.

As an emergency contingency, when the home visit on day one was not completed as scheduled, or when plane connections make it impossible for a third visit to be completed and discussed on training day 3, a second home visit will be scheduled for the afternoon of training day 2. In this case, the discussion of all cases will take place the following morning.

3. Day 3: It is expected that the third home visit will take place in the morning, with the RA trainee taking full responsibility for conducting the visit. Brian Vaughn will simply serve the role of evaluator, not a second observer for this visit. Again, the RA trainee will spend the bulk of time near the child, with about 20-30 minutes at the close of the observation spent taking information about content domains under observed (or not observed at all) from the mother.

After the observation visit, the RA trainee and Brian Vaughn will review the RA trainee's notes and then complete the Q-sort independently, according to the prescribed distribution. The sort will be discussed and critiqued by the RA trainees and by the evaluator. Rater agreement between the RA trainee and Brian Vaughn will be assessed in terms of the Q-correlation between the two independently formulated Q-sorts and in terms of the number of items sorted more than 2 categories apart. For purposes of determining rater agreement, Q-correlations between .55 and .65 are acceptable. In addition, it is anticipated that no more than 9 items would be sorted more than 2 categories apart by the observer-pair.

C. Phase 3: Rater reliability and rater agreement over time. Although all RA trainees will have achieved an acceptable Q-correlation at the time of initial training, this does not necessarily insure valid and reliable observations throughout the period of the project. Two weeks after Brian's training visit to a particular site, that site will be sent 5 videotaped observations for certifying observers. Observers will independently view the 2-hour videotapes of children in their home environment doing one videotape per day. After viewing the videotape, they will complete a Q-Sort based on the videotape. These Q-Sorts will be recorded on the Q-Set form and sent to the Data center. The observers will "pass" if their median agreement with an "expert" is 60% with no test tape lower than 40%. There

also may be a criterion for the accuracy of placement of individual items.

At two other points, after the third and seventh months of collection (weeks of April 12th and August 16th, 1993), the observer will be sent 3 videotaped observations to check for drift.

Previous experience with the Q-set suggests that reliability and validity of the Q-sorts is enhanced when observers complete the sorts immediately after the home visits, rather than hours or days later. Validity will also be enhanced to the extent that the home visits are as "standard" as possible across all subjects. Close attention should be paid to those conditions identified above that would lead the observer to reschedule the home visit. The mother should also be asked directly about the "typicalness" of her child's behavior during the home visit. If she reports marked atypicality, the Q-sort data must be considered suspect.

A subset of cases observed simultaneously by two or more Q-sorters will also be used to establish and maintain rater agreement/reliability. At least 6 observations should be done jointly by each pair of observers. These observations should be spread throughout the data collection period. Q-correlations of at least .60 will be considered acceptable. If the Q-correlations move below .60 for observer-pairs, then additional joint visits would be in order. At the conclusions of these visits and after completing the sorts on the subjects, the

observers should compare and share notes and discuss the child's behavior and the child's interaction with the mother. Focused discussion and sharing of notes can increase the degree of rater agreement over time and can help calibrate raters to each other.

# 24-MONTH HOME VISIT ADDENDUM

## TROUBLE SHOOTING

## I. PURPOSE OF THIS DOCUMENT

Due to the diversity of both families and Research Assistants participating in the 24-Month Home Visit (Q-Sort) across ten sites, there will be areas in which "trouble shooting" is required. The following section contains information about areas in which potential problems may arise with appropriate responses given for these situations. Thanks to Brian Vaughn and German Posada for working with us on answering many of your queries. Many of the answers provided are transcribed from an audiotaped response they have given. This is a working document. We will be updating it throughout the 24-month data collection period. I encourage you to send me (or call with) your questions as they arise. Also, speak with your PI and Site Coordinator as problems occur and let me know any decisions made at your site that might be helpful to include in future revisions of this document.

## II. PROBLEMS DURING THE VISIT

### A. Mother and child sit together and play the entire 2 hours

What should be done if the mother and child sit together and play (do not separate) during the visit? This makes it difficult to sort many of the items, as was the case in the Austintest tape. Should the RA ask the mother to do something that requires her to go to another room?

Brian's Response: If the mother and child have 45 minutes in play and it looks like they will not stop, have RA's ask if this is what mother and child would do under ordinary circumstances (like if RA was not there). If mother says "yes, this is what we always do" then I would try to reschedule at some time when they have more variety in their time together. If mother is adamant about never doing anything but sitting and playing with child, then accept that you will get no better observations and sort from what you see.

This is not optimal since you see no separations, no child playing alone, etc. In this case (when rescheduling is not possible), lots of questions will need to be asked. You should try to get the mother to play more chase or hide and seek games. Asking the mother to go do something else seems undesirable if it seems clear that the mother is only staying with the child "so you will see some interaction".

One way you might avoid this problem is in the scheduling. If mothers are asked what kinds of activities they might do when

the observers come, they can be assured that observers are not there only to watch mother-child play and that mothers should feel free (obligated) to do whatever chores, child maintenance, and play that they might otherwise do. If mothers volunteer that they play for 2 hours when they get home, try to schedule another time.

**B. Other family members are present**

It is extremely important during the scheduling phone call, as well as the visit confirmation call, to emphasize to the mother that this visit requires that only mother and target child are present (younger sibling/s are okay). Read carefully the information concerning "others present" in section C. Pre-Visit Preparation (pages 12-15, chapter 22).

## III. A SECOND VISIT

**A. When is a second visit necessary?**

Many of you have asked this question. We have provided a good bit of information concerning this in the most recent version (1-14-93, Chapter 22) of the 24-Month Home Visit Manual. Read carefully section D. Rescheduling, on pages 16-18 and the end of section E, particularly pages 26-27. In order to deter-

mine when a second visit is necessary, good clinical judgment must be used. A second visit may be required due to the following circumstances:

1) At the end of the 2-3 hour period you do not feel confident that you have enough information to do the Q-Sort. One or more of these things may have occurred.

A) many interruptions

B) the child went to sleep

C) there were others present

D) it was an unusual or difficult visit in some way

E) child watched television/video for most of the visit

2) The mother indicates that the child's behavior was very atypical.

A) child was becoming ill

B) child very distressed

3) During the Post Home Visit Interview, the mother may tell you that something very difficult has happened to her today. You feel that her behavior during the visit was highly atypical, therefore the child's interactions with her were likely to be affected as well.

4) There are a large number of items that you have not observed (more than 30 or 40). Or, you do not have a sense of the items that you will place in the top 2 and bottom 2 piles.

Again, read carefully the information about rescheduling (pages 16-18) and what you need to say to the mother if it is necessary to reschedule or to lengthen the visit (page 27).

## IV. Q-SET ITEM CLARIFICATION

Many of you have asked questions concerning the interpretation of various q-set items. In this section we will answer many of those questions. It is impossible to consider every situation in which a particular item might be in question. Remember, good clinical judgment must be used. Most important, you should consider the saliency of the behavior expressed in each item WITHIN THE CONTEXT OF THE ENTIRE VISIT. We are looking for those behaviors (items) that are most salient for the child over the course of the visit. These items are to be sorted as most characteristic (7, 8, or 9) or, they are to be sorted as uncharacteristic 1, 2, or 3) if the behavior described as "low" is very salient for the child within the context of the entire visit.

### A. General Issues and General Questions

**1) Items sorted to the middle (4, 5, or 6)**

Items can be sorted to the middle for various reasons. **First**, an item may be sorted to the middle if the behavior is both like and not like the child. Some items seem to characterize the child at one point in the visit, but not at other points. **Secondly**, you should place an item in the middle stack if you have no information upon which to base a judgment for that particular item. Some of this content might be discussed by the mother, upon probing questions made by the observer, but if relevant behavior is not directly observed during the visit, then the item should be placed (initially at least) in the middle stack. **Thirdly**, an item should be placed in the middle if the child's behavior is best described by a "middle" description given on the item card. A separately defined middle description is given only for the following items: #s 12, 13, 21, 22, 25, 27, 28, 34, 35, 49, 51, 60, 61, 69, 77, & 90.

Items can be sorted to the middle for **any** of these three reasons. For those items with a "middle" description given, IT IS NOT NECESSARY FOR THE CHILD'S BEHAVIOR TO MATCH THE MIDDLE DESCRIPTION TO SORT THE ITEM TO THIS PILE. The item can be placed in the middle pile due to reasons one and two as well. For example, let's look at item # 12

"Child quickly gets used to people or things that initially made him shy or frightened him.

(**Middle if never shy or afraid)"

During the course of your visit you might note that the child quickly becomes used to you even though he had initially hidden behind his mother when you came to the door. You later note that he seems to remain afraid of the plumber who comes to repair the leaky faucet. Therefore, you sort this item to the middle because you have observed one case of this being characteristic for the child and one case of it being uncharacteristic, even though it doesn't match the "middle" definition given.

German Posada's comments:

I've read some of the comments sent to Martha by Brian Vaughn as to why some items wind up in the middle piles. I also agree with Brian. He and I had gone over every single item in the Q-sort and we commented about each of them and what we said, basically, was that some items, for one reason or another, in this 2-year-old project, wind up towards the middle. I guess when Brian went to each of the sites he must have mentioned something related to this. As a result, some observers may have felt that certain items should automatically end up in middle piles. Which is not what Brian meant and is not what the Q-sort should do.

In other words, if we think of the Q-sort items as descriptors of child behavior that we're going to use to characterize a child, before we characterize the child, before we observe the child, before we start doing the Q-sort, all the

items should begin being placed in the middle. We use the visit and the information obtained in the visit as the basis for moving items away from the middle.

For most of the items, or for a lot of them, we're going to find information about them. And then, we're going to start moving them toward the characteristic side or uncharacteristic side. Some items we won't obtain information for, so they wind up in the middle. Some of the items we will obtain information for, but that information basically tells us to put the item in the middle. I don't really move an item from the middle more than one pile (only in very extreme cases, when I don't have enough items for pile seven, or going down to pile three, I'll move an item to one of those piles) because of mother's information, very rarely. I don't think that I did it more than once or twice in these instances. So generally, mother's information just helps me to move items from five to six or from five to four, for example. The reason is that sometimes mothers tell you something and then you observe quite a different thing.

So in any case, this is just a different way of saying what Martha and Chris have explained as to when an item goes in the middle.

**2) Visitor's Interactions with the Mother**

Tell mother at the beginning of the visit that our goal is to be like flies on the wall. We want to observe the child and be minimally interactive during the first part of the visit.

### 3) Visitor's Interactions with the Child

Use the child behavior as a cue for how much interaction you will have with him. If the child is shy when you arrive, do not approach him immediately. Follow his lead. You must consider the child's initial reaction to you as well as his general nature in determining how quickly you will approach him as well as how quickly you will try to elicit particular items on Q-set items (e.g. #15, 48, 72, 78). Brian suggests that you use a natural opportunity to pick-up the child during the course of the visit. The child may come to you for comfort or assistance. More likely, you will have to find a situation when the mother calls to the child from another room, then you can scoop him up and carry him in. Also, asking the child for "high five" as you leave seems to elicit various reactions.

Some children may be so totally caught up with interact- ing with you that can't see many behaviors relating to mother/child interactions. Brian suggests that after 20 minutes of this you leave the room and go into the other room with the mother and begin asking her some of the questions.

### 4) Saliency or frequency?

You count both, but basically, there are a series of things in these items, behaviors that are very low frequency and they could be very salient. And they just need to occur once or twice and they could go as high as nine without any problem, if it is very salient. That's one of the characteristics of the Q-sort

method. That not just frequency counts. Unless the item is made for that purpose.

5) **Timing of the observation.**

**Do we begin timing two and a half hours from the minute we enter the home? Will it differ depending on whether there are people present who we need to get rid of before beginning the observation?** Even when you're not ready to start doing the observations, there are some items that need to be checked at the very moment you get there. So you should pay attention to some things that happen immediately after you walk in.

6) **General Questions**

**1) To what degree can the placement of an observed item be moved by the maternal report when doing the sort? If the observation of an item contradicts the mother's report, where should this item be placed?**

Answer: You should give more weight to what you actually observe during the visit.

**2) How do we handle the situation when the child is watching too much TV during the visit?** I think that we've addressed this question, too, but in any case, let me say that the deal thing would be that he not watch a lot of TV during the

visit, because it doesn't allow him to interact with anybody. And as a matter of fact, I recall we had an experience here at Stony Brook. Once we basically had to redo a visit because a child spent an hour in front of the TV and he would barely talk to anybody. So I guess the ideal thing is just to try to get him off the TV, or get the mother to get him off the TV. But it depends on each case. Sometimes it's not possible to do that.

3) **How much do we direct activities in the course of two hours?** I think that this question was addressed in the rationale by Martha and Chris. I guess you would try not to be that influential in that we just want to see interactions and what goes on in each of these family homes, as they occur naturally. So we try not to influence. On the other hand, if we need to interact, we interact. **When do we need to influence what's going on?** It occurs to me that maybe this question has to do with the fact that some people going into the visits may feel a little bit uncomfortable about what to do in the visit. For me, the best thing is just to go to the visit, just act like a regular person, without really interfering too much. If people talk to you, you answer back. We have to introduce some activities like the snack and the book. So those are ways of influencing things when observers are going to ask questions. I think that these things have to do more with the observers getting used to the visits and just feeling at ease during them.

4) **Regarding the mom's report, are there some answers that you give more weight to?** Well, no, it depends on how specific and how clear an answer is. But again, since the mother's answers are not going to give us the most or the least characteristic items, it's really not that crucial.

5) **Why do you ask the mother about items that are going to wind up towards the middle anyway?** You have to make some distinctions about the items in the middle. You have to find items for six, five and four. So that's why. But true, I mean, this is not going to change your placement much. But we do need to make those distinctions by asking the questions. And sometimes the mother's answers clarify behaviors that are not totally clear during the visit. So I think that questioning the mother can be used in different ways and is necessary.

6) **How do you sort data that is not exhibited vs. data that is uncharacteristic?** I don't know if this is a matter of one versus the other. Sometimes not being exhibited doesn't mean that in goes in the uncharacteristic piles. In other words, I think that there are two parts to this question. My interpretation of the question is that sometimes we don't have information about some items. That doesn't mean that it's uncharacteristic. Chris and Martha have addressed this; that it should go in the middle. Now, not being exhibited may sometimes mean that it goes into the uncharacteristic side. For instance,

the item about being fond of adults (#66). This is an example. The low end sometimes is determined in part by lack of evidence as to the child's being fond of adults; in other words, the child doesn't seem to care whether you leave, doesn't seem to be very affectionate, or this type of behavior. When he doesn't exhibit it in spite of your having interacted with the child or having been there for two hours, then it gives you an indication that probably, he doesn't do it. But again, being not exhibited cannot be confused in every single instance with not having information about an item. Those things are different.

7) **What is the norm for "neat and tidy" for two-year-olds?** One important thing about the Q-sort is that it tries to eliminate the roles of "norms" that observers bring into their descriptions, by asking them to compare the behavior of one child by himself. In other words, the behavior of one person. You're not comparing one person with another one. I know what you're trying to ask but what I'm trying to say here is you just have to look for information that says the child is clean and tidy or attempts to be, makes an effort to be clean and tidy.

8) **How do you determine if he is strongly attached to new items?** The first thing is that I wouldn't call it "attached". But I think the person here is talking about #40. How do you determine whether the child really gets into the activity; with the book in this case or with any new object? See whether he

really engages with the new object or whether he just takes a look and throws it out and keeps on doing some other things he was doing before, or goes onto other familiar activities.

9) **How can you tell if a child is bored?** Well, I guess, as Martha and Chris have said, people have to use, on occasion, some kind of judgment on some of these items. And sometimes the child is not very enthused, he doesn't engage very much in his activities, or he just wanders around. That's what it means, being bored. I know that is very difficult to see, but I guess that's what being bored means.

10) **Observed vs. asked items**

**Question: What percentage of items can we ask the mother about, rather than observe, so that the Q-sort data is still considered reliable? Similarly, at what point do we decide that a second visit is warranted?**

Answer: This issue is covered in the 24-month home manu- al. Brian also indicated that he generally asks about 20 to 30 questions during the course of the visit, but many of these are clarification probes regarding behaviors he has already observed. As stated in the manual, if you must ask about 30 to 40 of the items (because you haven't observed them), then the visit should be redone.

**11) How to best ask the mother questions**

You will ask the mother questions for two reasons: 1) to probe for clarification about behaviors you have observed during the visit and 2) to ask about items that you have not observed during the visit.

When probing, use the content of the visit and go from there. For example, item 16: child prefers toys that are modeled after living things (e.g. dolls, stuffed animals). The observer might say to the mom (after observing the behavior) "I noticed that Ashlyn enjoys her Barbie dolls and stuffed dog a lot, does she seem to prefer these to her blocks and legos?"

When asking questions you are wanting the mother to focus on current (contemporary) behaviors. Try not to read the items verbatim. Don't ask leading questions.

**12) Do observers count as visitors, people other than mother, new adults?** Yes, we are the visitors. We are the people other than mother. We are the new adults for those two hours. Yes, the only way of doing those items in which new adults or visitors are included is just by basing our observations on the child's behavior regarding us.

**II. Questions about specific items:**

**Question: Item # 1: Does the mother have to ask the child to share? Posada looks at give and take in play and counts that as sharing.**

Answer: Item # 1 says "child readily shares with mother or lets her hold things if she asks to". The mother does not have to ask the child to share, it says or. Observed give and take also counts as you have noted in the Posada scoring. Place in the middle if the mother never asks and the child never shares.

**Question: Item #2: What does "returns to mother after playing" mean, does it mean returns to mother after being in a separate room.**

Answer: The child doesn't have to have been in a separate room, it can be just returning and checking in with mom from an activity across the room.

**Question: Item # 3: If we have mom's report that child accepts comfort from others we tend to see this as a six. Posada tends to ignore mom's report and consistently scores low because child goes only to mom. It seems to us we would never see a child**

**go to a stranger (the visitor) for comfort but that is not enough reason to score low.**

Answer: You should always use observed behavior as a stronger indicator of where to place the item over responses from the mother to questions about the item. It is possible for a child to come to the visitor for comfort. In fact, if you are near the child when the child hurts him/herself you can say something like "Oh, did you hurt yourself? Let me see." to see if the child will come to you. Generally, this question is one that you should ask the mother about even if you have observed it. But if you observe the child going directly to the mother when upset or injured and showing no inclination to come to you, you should place the item toward the low end even if the mother reports that the child will go to others.

**Question: Item # 5: This item has been confusing to people in terms of knowing how to rate television and children's attention to toys when he is in proximity to people.**

Answer: Brian has suggested apparently that the easiest way to see this is if all the adults leave and room and then see whether the child continues to play with toys or watch TV (prefers things) or whether he follows the adults. But even when the child and adults are in the same room, you can look at the way the child distributes her/his attention. Does she focus on her

toys and show no interest in the adults or does she look at/talk to/listen to the people around her? Even if he/she is playing with toys are his/her interactions with people in the service of his/her play with things or do the social interactions seem to be the most important?

**Question: Item # 7: Posada seems to ignore the definition for low on this item. He scores high if he observes them smiling.**

Answer: We can't figure out this criticism. Posada seems very clear in his use of this item. Note on Megan, he places the item low (3 or 4) because he says that even though the child smiles with everyone, the mother can get her to smile more easily. Please go over Posada's justification of the placement of this item for the first 5 test tapes; his rationale seems quite clear and consistent.

**#8) When child cries, he cries hard. Low end, weeps, sobs, doesn't cry hard or hard crying never lasts very long.** I think that "cries hard" refers to the fact that there are children who, when crying, are loud in doing it. The only sort of confusion, I think, arises from the fact that the low end says hard crying never lasts very long. This clearly refers to the duration of hard crying. Crying hard means that the child cries loud. I don't know how to explain it in a different way. Probably, some of the observers, and that's good, are trying to be very literal about

the item. They want to exactly discriminate when the cry becomes hard crying and when it becomes soft crying. It just means simply, for me, that some children really scream and are loud about their crying, and some others just sob, weep, their crying doesn't last very long.

**Question: Item # 10: Brian says ask mom. Posada puts in the middle always because he says we never see.**

Answer: What do you see as the contradiction here? Please note the reasons for placing items in the middle (both in the manual and earlier in this troubleshooting section). You place items in the middle if you don't see it and can only ask about it. Posada places the item in the middle because he says we never see it. Brian is correct, you should still ask the mother even though we never see it and then you can decide whether to put it at a 4, 5, or 6. They are both correct, and there is essentially no disagreement here.

**Item#11 and Item #44. Having to do with child often hugging or cuddling against mother without her asking or inviting him to do so; and child enjoys having mother hug, hold and cuddle him. These items seem very similar because it seems the child will often initiate a hug by asking for a hug. What should we look for to distinguish the scoring of these two items? Also, in #44, does asking for a hug always have to be a verbal request?** Asking for

a hug doesn't have to be a verbal request. It could be just lifting his arms and just going for a hug, to be picked up. Now, the items are very similar. And I think that #11 focuses more, in this case, on frequency. Whether the child just frequently goes and hugs and cuddles against the mother. #44 has to do more with the child asking for and enjoying these behaviors. So I agree, they're very similar. Yet, they're not exactly the same.

**Question: Item # 12: Define quickly. Item # 12: Child quickly gets used to people or things that initially made him shy or frightened him. (**Middle if never shy or afraid).**

Answer: Quickly means 5 to 10 minutes. This also counts for child's reaction to seeing you (visitor).

**#12)** See rationale given by Martha and Chris. NOTE: Each of these by themselves are not that important; what I'm trying to say is that the placement of an item also depends on other items. In other words, how salient the item is in this pool of items. So a child could be quick to warm up to strangers but it's not that salient because there are some other things that call your attention, that are more visible in this particular child.

**Question: In Items # 14, and 40 does "new" refer to something truly new to the child or can it be a different activity?**

Answer: "New" means totally new, not just something different. Use the book vignette to sort these items. Rarely will a new toy show up during the course of the visit. But if it does (as in the Jacob tape), certainly use this information.

**Item #15. If the child talks to new people, shows toys, etc., would you move lower if the mother didn't ask him to?** This item looks at behavior in the context of the mother's asking the child to do something. So I consider that, basically, what I'm looking for. If the mother doesn't ask but the child shows or talks to new people, even in the presence of the mother, that's some kind of indication. So I don't see any problems. But it is much more clear if the child does it when the mother asks. In some instances, the mother does that, so it's much clearer.

**#16) Child prefers toys that are modeled after living things; dolls, stuffed animals. Low, prefers balls, blocks, pots and pans. Her question has to do with the fact that ah, what should we do if a child, say a little girl, has only dolls and stuffed animals?** Well, if that's the case, I think that one has to look at how the child plays with these toys. If there is no opportunity to see whether she has balls, blocks, pots and pans, then we don't really have any information about this thing. Yet the fact that she plays and has these other toys, if she indeed plays with them, would give you a bit of information. But then in that case, I guess, if you're not sure, you don't place the item very high,

and certainly not toward the low end, because you don't know. And you may get some information from the mother that would help you a little bit in this case. But again, if you don't have the information you cannot just place the item in a very extreme pile.

**Item#18. According to Brian, this item implies that the mother is already directing the activity. Posada scores according to whether the child follows suggestions, whether they are already directing the activity or not.** I don't think that what Brian has said and what I do is much different. It doesn't really have to redirect activity, as long as the child follows mother's sugges- tions, it applies to the item. It doesn't have to be exclusively redirecting activity.

**Item#21. Needs clarification on "keeping track". Posada tends to score higher than Brian's instructions would indicate. Brian says we are not really in the home long enough to see this clear- ly. The item reads: Child keeps track of mother's location when he plays around the house, calls to her now and then, notices her go from room to room, notices if she changes activities.** Well, that's what keeping track means. I mean, the most obvious way is when the child calls the mother to know where she is. It doesn't have to be an open question such as "mom, where are you?" As a matter of fact, two year olds won't do that. But in any case, and

I think that I did this in some of my rationales, things like when the mother moved away from the place she was, the child took a quick look. That's keeping track of mother's location. Sometimes in real visits you can observe the child paying attention to noises. For example, I remember this visit in which I was playing with this three year old and we heard noise in the kitchen. The child immediately, sort of for a second, stopped and was registering that noise. That's what we mean by keeping track. The child is attentive to where the mother is. And if she changes activities, then he either by looking at her or checking her or by hearing and paying attention to noises, real- izes where the mother is.

**Item #24. When mother speaks firmly or raises her voice at him, child becomes upset, sorry or ashamed about displeasing her. Do not score high if child is simply upset by the raised voice or is afraid of getting punished. How do we distinguish whether the child is simply upset by the raised voice or is ashamed about displeasing her?** I guess the way to make this distinction is by the child's subsequent behavior after the mother has raised her voice and spoken firmly to the child. Some children tend to sort of make up or just, you'll see them upset because of what the mother just said to them. And some of them will try even to approach the mother. Some others apparently don't care and ah, the raised voice doesn't seem to affect them at all, to upset them. So when this happens this goes in the low end. The other

part of the question is what happens with the clarification in the item when it says "do not score high if child is simply upset by the raised voice or afraid of getting punished." What the item is trying to do with this clarification is just to avoid mixing together those children who are really upset about dis- pleasing mom and those who are really upset because they may get punished. And these children that get upset, more because of the possible consequences of their behavior, won't do the same type of things after the mother has spoken firmly to them, as the children who are really upset. Like they would just go back without any problems or without checking on mother or without trying to make up for what they had just done. This is a diffi- cult item, I admit. I don't see it happening very frequently. And it's an item in which you have to use some kind of, if you will, clinical judgment. You have to use your judgment to see if the child was ashamed, or wasn't, and more important, whether the child was upset because he had displeased his mother or because he was afraid of getting punished. But again, I think that what determines whether the child was upset and why he was upset is subsequent behavior.

**Item#25. This item says "child is easy for mother to lose track of when he's playing out of her sight. Low, talks and calls when out of sight, easy to find, easy to keep track of what he's playing with."** I think the item is clear, yet, I think that this refers to the fact that some children, when playing out of sight,

are very silent and very quiet and they sort of disappear. The only way the mother could know where they are or what they're doing is when they have to go and check and really look for the child and see what he's doing. The low end refers basically to children who, when playing, they laugh, they talk, they make noises. So those children are easy to keep track of. That's what the item means.

**One of the questions is whether "talks and calls when out of sight" refers to child or to mother.** It refers to child. "Easy to find" simply means that the child makes noises and is easy to track down, to know what he's doing. **Then the question: If a mom says she can keep track of the child because she can hear him talking to himself or to toys, can recognize the noises of the items he's playing with, is that scored low?** What I would have to say here is that if the mother says that, that's a different thing. The observer has to see this thing. If the observer sees this type of behavior, then yes, they have to score it low. It's not if the mother says. But if that happens, then yes, the child should be described with the low end, which is "easy to keep track of". **And then: "What about the mother whose child is out of sight and completely quiet?"** Well, probably this child is not that easy to track down or to know what he's playing with or what he's doing. And if you want to do that, then the mother has to really go and see and check what he's doing. So probably, I would say, then, the child is easy for the mother to lose track of when the child is playing out of her sight.

**Item #26.** We've dealt with this, but the question is somewhat different. **Child cries when mother leaves him at home with babysitter, father or grandparent. What if the child cries when left with babysitter but not the father? Does this pertain only to the child's reaction to the person he is left with regularly?** Okay, some items go in the middle because you don't have information, because you're not sure. And sometimes because the child does things from both ends. I mean, in this case, if the child doesn't cry with the babysitter and cries with the father when left with the father, or vice versa, then it'll go toward the middle. I mean, he doesn't cry with some and he does cry with some others.

**Item #27. Child laughs when mother teases him. What do we count as teasing?** Oh, boy. Well, I don't know how to define teasing but I know that it refers to things like when the mother is playing with the child and she says, or when he's interacting with her and she says, "you silly goose" or she hides from him or she takes things away from him in a playful way. And ah, the child, some children get angry, some children don't laugh and they get irritated. Some children laugh and go with it. So, that's what it means. I hope this is clear.

**Question: Item # 28 Child enjoys relaxing in mother's lap. Can this also be leaning against mom when on sofa, etc.**

Answer: Yes, Brain says that any leaning, reclining against mom in a relaxing way can be counted. It doesn't just have to be in her lap. Use the book vignette for a good indication of this item.

**Item #32. When mother says "no" or punishes the child, he stops misbehaving, at least at that time; doesn't have to be told twice. If the mother never punishes the child or restricts his activities, does this item go in the middle?** Yep. Either mother never says "no" or never punishes the child in front of the observers, then you don't have information about the item and it goes in the middle.

**Item#33. Brian says this refers to picking up for comfort or distress. Posada scores based on any picking up.** The item says: Child sometimes signals to be put down but then fusses to be picked right back up. Generally these things happen when the child is in some discomfort. But it doesn't necessarily have to be when the child is in distress. Yet, it happens sometimes when the child is, and it counts when the child is distressed. But my interpretation of the item is that it doesn't necessarily have to be when the child is distressed.

**Item#34. Does this mean leaving the child at home when mother goes out or mother's leaving the room? The item says: When child is upset about mother's leaving him, he sits right where he is**

**and cries, doesn't go after her; low, actively goes after her if he's upset or crying.** If I'm not wrong, there is an item also for when the mother leaves home, item #26. Also, item #75, which refers to child's getting upset when mother leaves the room. So item #34 is different from these two and refers to whether the child sits where he is or whether he follows the mother, when the child is upset about mother's leaving him. You should look at this either when the mother leaves the room or when the mother leaves home. What happens is that during the visit, the mother very rarely leaves the house so the only basis we have to judge this thing is whether the child is upset by mother leaving him; he runs after mother or he doesn't. So, I think that it counts for both occasions. That's the way I interpret the item.

**Item #35. Does Posada see this as "prefers to play on his own" being important. Brian focused on "leaves mother easily when he wants to play". Item #35 says: Child is independent with mother, prefers to play on his own, leaves mother easily when he wants to play; low, prefers playing with or near mother.** I think that those two things are just expressions, or hints, about the child's being independent or not. Some children just prefer to be on their own, others, when they want to play, just leave the mother. Probably, you should count both of them. That's the way I look at that.

**Item #36. Needs clarification on "keeping track". Brian says that this item tends to stay in the middle because in two hours you probably won't see this pattern clearly. Posada based it on the two hours of the visit and sorted it high on Austin.** Well, I think that Brian explained this already. This is about secure base behavior. The child clearly shows a pattern of using mother as a base from which to explore. If the child shows it, you score it, either way. I mean, if the child is always close to the mother or always very far away from her, it's showing something. But if you can't see it at all and if you can't make up your mind, you can't judge it.

**Question: Item # 37 Child is very active. Always moving around. Prefers active games to quiet ones. What is considered very active?**

Answer: You must consider two things. First, how active is the child compared to other two year olds? But of most importance, how salient is the child's high activity level or low activity level in the context of the entire visit and all of the other items. CHILDREN DISPLAYING SIMILAR ACTIVITY LEVELS MAY BE SORTED DIFFERENTLY BECAUSE ACTIVITY MAY BE MORE SALIENT FOR ONE CHILD IN RELATION TO ALL THE OTHER ITEMS THAN FOR ANOTHER CHILD.

**Item#40. Since the book is the only new object there will be, can it be rated high if the child is really into it but doesn't use**

**it in different ways or take it apart?** The item says: Child examines new objects or toys in great detail. Well I think that the answer lies in the question itself. If the child is really interested, probably, he or she will examine the book, will want to get into it, flip through the pages, look at it. So that will count as yes, the child examines new objects.

**Item #41. When mother says to follow her, child does so. Don't count refusals or delays that are playful or part of a game unless they clearly become disobedient. What if the mother calls to the child, "come here", from another room. Is this relevant to the scoring of this item?** My first reaction to the item is like, when the mother is moving to a different place and she's with the child, sometimes she tells the child to follow her. And that's what the item is referring to. When she's in a different room, I think that that could be captured in other items, like following mother's suggestions or being obedient. But my first reaction to this item was like, when the mother is leaving the place they're at and she says to the child "come with me", not when she's calling him from another room, but I'm not sure we should disregard this information altogether. But certainly, the main thing is when the mother reaches out and asks him to follow her.

**Item#43. Needs clarification on keeping track. If child keeps track but does not stay closer than task of keeping track of mother requires, wouldn't this go in the middle? On Jacob, Posada**

**gives a seven and gives evidence of his keeping track as the rationale. The item says: Child stays closer to mother or returns to her more often than the simple task of keeping track of her requires; low, doesn't keep close track of mother's loca- tion or activities.** Regarding the question, I would agree that that situation would go in the middle. Well, probably, I had to push it up and because of that, I thought that it would go up. But I tend to agree with the interpretation they give.

**Item#44. Child asks for and enjoys having mother hold, hug or cuddle him. Needs more clarification. Brian says enjoying is more important than asking for. Posada tends to rate this lower because he doesn't see clear evidence of the child's asking.** Well, in principle, I agree with what Brian is saying. I think that this item is looking at enjoyment the child has. One way of expressing it is by asking. But yes, I think that it focuses in the child liking the mother holding him or hugging him or cud- dling him. That's fine. I'm hope I'm not focusing on asking because that's not really the intent of the item. I mean, asking is just one way of showing interest.

**Item#45. Brian indicated that the child should be singing or dancing along with music. Posada places this item high for Jacob, who was singing a little bit on his own. The item says: Child enjoys dancing or singing along with music. Low, neither likes**

**nor dislikes music.** Well, it's both. If there is music playing and the child dances and moves his feet and sort of likes it, it's evidence. Now, if the child sings, it counts as evi- dence also. That's the way to look at it.

**Item#46. A question about bumps and stumbles. Posada tends to rate lower than Brian. Brian says we should consider the coordination of the two year old and that this item would not likely go very low.** Well, you're comparing child behavior to child be- havior. If the child bumps and drops, or stumbles and falls, this counts as high. If he doesn't, it doesn't. I don't know if I really tend to rate it lower than Brian. You should go by what you see in the visit.

**Item#48. Posada puts this in the middle if the visitor doesn't ask to see the toy. Brian says if the child shows a toy, it doesn't matter whether the visitor asked or not. The item says: Child readily lets new adults hold or share things he has, if they ask to.** I think, as I said before, in reference to a dif- ferent item, if the visitors, this is in the context of the child's being asked by the visitor to share things. That's the way I look at that item. As Brian says, if the visitors don't ask, yet the child is sharing with them, most likely I get the assumption that if the visitors asked for anything the child is holding, it's likely that the child would share it with them.

It's evidence that the child would do it. So I would count this type of evidence for this item.

**Item#51. If child doesn't climb all over visitors but does come close, will it be in the middle? The categories are very confusing. The item says: Child enjoys climbing all over visitors when he plays with them; low, doesn't seek close contact with visitors when he plays with them.** Well, I think that the item, very specifically, refers to the child's establishing some kind of physical contact with the visitors. Some children will jump all over you, will lean against you, will just touch your arms, your legs. Others, they play with you, they're very interactive, but you see them keeping a distance. So this is what the item refers to. Some children just don't have any problem establish- ing physical contact with visitors. Some others do. And you get a sense, I guess, for children who sort of have a preference for not very close contact. That's what it's referring to.

**Item#55. Posada seems to dismiss or not give much weight to copying verbal responses as evidence of child's copying mother's behavior. Brian definitely counted verbal imitating, which is the most likely behavior we'll see.** Yeah, that's probably true. I don't know if I have paid close attention to the verbal behavior. I don't know if I weight it as much. And probably it shouldn't be so. If the child is trying to imitate mother's verbal behavior, it counts as the child's trying to copy mother's

behavior from watching her, from listening to her. So, it should count, definitely.

**#57) Child is fearless. Low, child is cautious or fearful. The question is: Should we include child's being fearless with the family dog?** I wouldn't really give this a lot of weight. But in any case, I think that's just one little piece of evidence that you would have. Hopefully, you would get some more information about other things. But if the family dog has been with the child since he was born, I mean, it's just like, yeah, you count it, but hopefully, you will get more confirming evidence about this item.

**Item#59. Posada says the item doesn't count, or would go in the middle, if the child is with the mother all the time. One of our observers rated Austin high on this because he clearly initiated new activity on his own, without asking mother or seeking her suggestion. Does it have to be only when mom is out of sight? The item says: When child finishes with an activity or toy, he generally finds something else to do without returning to mother between activities; low, when child is finishes with an activity or toy, he returns to mother for play, affection or help finding more to do.** Well, the idea of the item is just that the child is somewhat apart from the mother and when he finishes with certain activities, he goes back and sort of establishes contact with the

mother, or for purposes of asking her what else to do, whatever. So, if the child is close to the mother, then it's very difficult to give it high placement because he hasn't returned to the mother. The mother is there. So you cannot really place it very high. So I would say to place this item high, clearly and without many doubts, yeah, probably the clearest way of seeing it is when the child is apart from the mother. If he is with the mother, then he doesn't need to go back to the mother for affection, etc.

**Item #61. Plays roughly with mother; bumps, scratches or bites her in active play. Doesn't necessarily mean to hurt mom. Does this include hitting because the child is frustrated or angry while playing?** No, I think that in the context of play, there are children that are rough with mothers. And they just, this doesn't have to be because the child is angry. There is an item for when the child easily becomes angry with mother. In that case, the hitting will be within the context of being angry. But if it happens, I guess, I mean, in a way it will influence the location of the item a little bit. If it occurs within the context of play. So I guess the answer would be a tempered yes.

**Item #61. We just discussed this item. In any case, I think the question is different. It says: Do we assume the child's play is never very active if we don't observe these within the visit, or should we probe the mother further to find out if the child plays**

**actively on other occasions?** Well, if you don't see active play in the visit, then you cannot really place this item other than in the middle piles, based on the information that you gather from the mother, if you happen to ask about this item. So you wouldn't be able to place this in any of the extremes, if you don't see active play and the child doing this type of thing.

**#62 With a two- to three-hour visit, can we make an accurate prediction about child's mood?** What the item is referring to is the child's mood during the visit. So just answer for the session.

**Item#64. The item says: Child enjoys climbing all over mother when they play; low, doesn't especially want a lot of close contact when they play. The question is: is this to be judged only in play? What if the child clearly avoids close contact with the mother and there is little or no play. Posada puts this closer to the middle because of no play.** Well, I think that I'm considering this action in the context of play. Because there are different types of situations, I guess. Once situation in which mother/child interactions occur is when they're eating at the table, or in the context of cleaning tasks or cleaning the child. So in any case, yes, I would have put it within the context of play. That's what it means.

**#66 How fond does the child have to be to get a rating on #66?** Again, this is an item that I think is difficult to see. Yet, you just look for expressions of fondness in the child towards adults and basically towards the observers. So I don't think that we can look for degrees. Just look for expressions of this thing.

**Item #76. When given a choice child would rather play with toys or adults. Does watching TV constitute a toy?** We already dealt with this. In as much as possible, try to keep TV away from the child.

**Item #77. When mother asks child to do something, he readily understands what she wants; may or may not obey. How do we determine that the child understands the child's request? In part, this seems to depend on whether the child does or does not obey.** Yes, the way you realize whether the child understands or not is by what he does after the mother tells him to do something. And I think that by that behavior that you could determine whether he does or doesn't understand. He doesn't necessarily have to obey. Sometimes you see disobedient behavior and clearly the child has understood what the mother has told him. But yes, you have to look at what the child does afterwards, after the mother tells him.

**Item #78. Child enjoys being hugged or held by people other than his parents and/or grandparents. Why are grandparents included here? Is this question trying to get a child's reactions to hugs beyond immediate family members? If so, many of our children live with aunts, uncles, etc. Should they also be excluded here?** Well, the question, I think, refers to whether a child enjoys this type of behavior, being hugged or held by pecple with whom he's not very familiar. That's all, that's all it means. Generally, these people are not going to be there during the visits. Because the visits are being set up in a way that, for most of them, it's only the mother, the child and the observers and the camera person, if there is a camera person. So, in this case, these other people are going to be the visitors, if the occasion happens to occur for them to be hugged by the visitors. So that's that for that question.

**Item#81. Are we concerned with the child's method for getting what he wants, or are we trying to determine the purpose of the child's crying, whether he's crying for manipulation or out of genuine discomfort? This item says: Child cries as a way of getting mother to do what he wants; low, mainly cries because of genuine discomfort.** Well, in a way, what the item refers to is that some children use crying as a way of getting what they want. I think that in one of the tapes, I don't exactly recall which one, but there is, I remember the occasion very clearly. There is

a child in the kitchen and he or she wants to reach this kitchen utensil and it's too high. And he/she sort of, the mother is there, and I think that Brian is there, I don't know who else was there, and the child starts like, instead of asking, starts "uh, uh" and starts fussing and sort of crying. Just to get the mother to give him/her the utensil. Genuine discomfort is when the child is distressed or is going through the painful experience, she's fallen down, she's scratched herself or she's done something else to herself. I hope that this answers that. I don't know if we're trying to determine the purpose of the child's crying, but in a way, we are, I think.

**#82) How many activities count as just a few? If the child plays mainly with three items, is that "just a few"?** This applies to item #82. Even though the item seems very clear, this question comes up frequently. The question gives a "for in- stance" of three items and asks if this is just a few. I don't really know because it depends on what he does with the three items. I mean, some children may play with one or two items throughout the visit, but they use them creatively, they just do various things with the object. So it's not really one activity. But if the child is just focused on one, two, three things throughout the visit, probably, depending on how other descriptives of child's behavior are placed, it's going to wind up being placed with just a few toys or activities. But again, it depends on other behaviors of the child and it depends on how he uses the object.

In other words, he doesn't have to play with ten ob- jects, it refers more to activities.

**Item #86. Child tries to get mother to imitate him or quickly notices and enjoys it when mom imitates him on her own. Can this imitation be verbal behavior or both?** I guess it could be both.

**Item #90) If mother moves very far away, child follows along and continues his play in the area she's moved to, doesn't have to be called or carried along, doesn't stop play or get upset. Middle if the child isn't allowed or doesn't have room to be very far away.** The low end for this type of item would be when the mother moves far from the child within the house and the child doesn't follow her. The child remains where he or she was playing. And in some occasions, the mother would have to call the child or go and pick him up and move him where she is going in the house. So basically, the low end means the child doesn't really follow on his own. Also I guess if the child winds up being called or picked up and taken to where the mother is, then that means that the child didn't follow the mother, didn't move along with the mother to the place where she was going.

**Item#90. The item says: If mother moves very far, child follows along and continues his play in the area she has moved to. Is the issue here whether the child does or doesn't follow, or whether**