IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| THE CNA CORPORATION<br><br>Plaintiff,<br><br>v.<br><br><br>THE UNITED STATES,<br><br>Defendant, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br>No. 08-249C<br>(Judge Horn) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S BRIEF IN SUPPORT OF DECLARATORY AND INJUNCTIVE RELIEF

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

DEBORAH A. BYNUM
Assistant Director

MATTHEW H. SOLOMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice

*Of Counsel*
Daniel Barry
Deputy Associate General Counsel
Procurement, Fiscal and Information Law
Office of the General Counsel
Department of Health and Human Services

Gretchen H. Weaver
Senior NIH Ethics Counsel
Office of the General Counsel, Ethics Div.
Department of Health and Human Services

April 21, 2008

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………..iii

I. CNAC Fails To Identify Any "Violation Of Statute Or Regulation In Connection With A Procurement Or A Proposed Procurement" And Is Not An "Interested Party"……………………………………………………………..………….2

II. CNAC Fails To Acknowledge The Contracting Officer's Broad Discretion Under FAR 1.602-2 To Enforce 18 U.S.C. § 207 And, In Any Event, Cannot Demonstrate That The Agency's Ethics Memorandum Is Unreasonable Or Irrational ………………………………………………………………….…6

III. CNAC Is Not Entitled To, And This Court Cannot Order, A Directed Contract Award……………………………………………………………..…………12

CONCLUSION……………………………………………………………………..14

# TABLE OF AUTHORITIES

## CASES

Alfa Laval Separation, Inc. v. United States,
47 Fed. Cl. 305 (2000) ....................13

Bannum, Inc. v. United States,
56 Fed. Cl. 453 (2003) ....................6

Bean Dredging Corp. v. United States,
19 Cl. Ct. 561 (1990) ....................13

Blue Cross and Blue Shield of Maryland Inc. v. United States,
718 F. Supp. 80 (D.D.C. 1989) ....................12

Blue & Gold Fleet, L.P. v. United States,
492 F.3d 1308 (Fed. Cir. 2007)....................6

DSD Labs., Inc. v. United States,
46 Fed. Cl. 467 (2000) ....................6, 7

Dachman v. United States,
73 Fed. Cl. 508 (2006) ....................4

Data Gen. Corp. v. Johnson,
78 F.3d 1556 (Fed. Cir. 1996)....................4

Data Monitor Systems, Inc. v. United States,
74 Fed. Cl. 66 (2006) ....................3

Essex Electro Engineers, Inc. v. United States,
3 Cl. Ct. 277, 288 (1983) ....................13

Infrastructure Defense Technologies, LLC. v. United States,
-- Fed. Cl. -- 2008 WL 1047660 (April 7, 2008) ....................4

Mack Trucks, Inc. v. United States,
6 Cl. Ct. 68, 72 (1984) ....................13

Myers Investigative & Security Svcs., Inc. v. United States,
275 F.3d 1366 (Fed. Cir. 2002)....................4

NKF Engineering, Inc. v. United States,
805 F.2d 372 (Fed. Cir. 1986)....................7, 12

NSK Ltd. v. United States,
510 F.3d 1375 (Fed. Cir. 2007)……………………………………………………5

PCI/RCI v. United States,
36 Fed. Cl. 761 (1996) ....................................................................................13

Ramcor Servs. Group, Inc. v. United States,
185 F.3d 1286 (Fed. Cir. 1999)..........................................................................3

Texas v. United States,
523 U.S. 296 (1998)..........................................................................................6

TRW Environmental Safety Systems, Inc. v. United States,
18 Cl. Ct. 33 (1989) ..........................................................................................13

United States v. Medico Industries, Inc.,
784 F.2d 840 (7th Cir.1986) ..............................................................................7

STATUTES

5 C.F.R. § 2635.205(g) ..................................................................................11

5 C.F.R. § 2637.101(c)(8)................................................................................12

5 C.F.R.§ 2637.201 ..........................................................................9, 11, 12

18 U.S.C. § 207...........................................................................................1, 10

28 U.S.C. § 1491(b)(1) ....................................................................................2, 3

FAR 1.602-2……………………………………………………………..1, 7, 12

**OTHER AUTHORITIES**

Comptroller General Letter to The Honorable John D. Dingell, B- 202893,
1987 WL 103044 (Sept. 18, 1987)......................................................................7

OGE Informal Advisory Letter 99 x 12,
1999 WL 33305905 (April 29, 1999) ...............................................................12

OGE Informal Advisory Letter 99 x 23,
1999 WL 33305918 (Dec. 6, 1999) ....................................................................8

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE CNA CORPORATION, | ) | |
| | ) | No. 08-249C |
| Plaintiff, | ) | |
| | ) | (Judge Horn) |
| v. | ) | |
| | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S BRIEF**
**IN SUPPORT OF DECLARATORY AND INJUNCTIVE RELIEF**

On April 17, 2008, defendant, the United States, filed a motion to dismiss and, in the alternative, for judgment upon the administrative record. Plaintiff, The CNA Corp. ("CNAC"), also on April 17, 2008, filed its brief in support of declaratory and injunctive relief, in which it presses for only a single form of such relief: an order "directing NIH to award the Montgomery County Contract to CNAC, or . . . [to] preclude NIH from awarding the Montgomery County Contract to any offeror other than CNAC." CNAC's April 17, 2008 Brief ("Pl. Br.") at 38.

First, although CNAC has the burden to demonstrate that the Court has jurisdiction over this case, the precise relief CNAC seeks all but proves that it is not an interested party and that its complaint is not within this Court's jurisdiction. Second, except in limited circumstances not applicable here, the relief CNAC seeks is beyond the power of this Court.

Finally, with respect to the agency's March 2008 affirmation of its ethics decision, CNAC entirely failed to address the scope of discretion conferred upon the agency to enforce 18 U.S.C. § 207 administratively pursuant to FAR 1.602-2. While CNAC may disagree with the agency's ethics memorandum and the contracting officer's affirmance of the agency's decision

to exclude CNAC from the 2007 procurement, CNAC has not, and cannot, demonstrate that any agency decision was irrational.

I. CNAC Fails To Identify Any "Violation Of Statute Or Regulation In Connection With A Procurement Or A Proposed Procurement" And Is Not An "Interested Party"

CNAC generally concurs with our view that CNAC "must argue that it is objecting to an 'alleged violation of statute or regulation in connection with a procurement or a proposed procurement.'" See Def. Mot. at 14-15; Pl. Br. at 11 (discussing 28 U.S.C. § 1491(b)(1)). Indeed, we correctly observed in our motion that CNAC does not challenge a solicitation, a proposed award of, or the award of, a contract. Id. Plaintiff, however, incorrectly asserts that the "jurisdictional issue[] [is] . . . whether this case is 'in connection with' a procurement or proposed procurement." Id. (emphasis added). The inaccurate paraphrasing serves CNAC's interests, to be sure, but it is wrong. The issue is not whether "this case" is somehow connected to a procurement; rather, the issue is whether CNAC has "alleged [a] violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b)(1) (emphasis added).

CNAC fails to allege any violation of any statute or regulation, let alone one "in connection with a procurement." Id. Accordingly, CNAC's complaint must be dismissed for lack of jurisdiction.

In a last-ditch attempt to manufacture some ripe controversy within this Court's jurisdiction, CNAC contends that the agency, "[h]aving failed to make award of the Montgomery County Contract under [the 2007 RFP]," and now having "re-solicited the same requirement under the 2008 RFP[,]" somehow "satisfies the . . . jurisdictional prerequisite of 1491(b)(1), that the action involve [a] violation of a statute or regulation in connection with 'a procurement or a proposed procurement.'" Pl. Br. at 11 (quoting 28 U.S.C. § 1491(b)(1)). CNAC does not

explain that argument in any detail, declining to identify what statute or regulation the agency violated by including the Montgomery County, Maryland study location in the 2008 RFP.

Nor can CNAC's invocation of Ramcor Servs. Group, Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999), save CNAC's complaint from dismissal. In Ramcor, the Court of Appeals for the Federal Circuit indeed held that the statutory phrase "in connection with" is broad in scope, but that phrase does not excuse CNAC's failure to identify even a single violated statute or regulation. Thus, for example, in Data Monitor Systems, Inc. v. United States, 74 Fed. Cl. 66 (2006), the plaintiff's argument virtually was identical to CNAC's here. This Court rejected such a nebulous theory of jurisdiction, and explained that:

> [p]laintiff does not . . . point to any specific statute or regulation that was violated by the Air Force's decision to resolicit the contract; rather, plaintiff contends that the entire statutory scheme that governs procurements . . . is violated if the agency exercises its powers arbitrarily. Such a sweeping grant of jurisdiction, however, is not what section 1491(b)(1) intends. Rather, the violation claimed **must be rooted in a specific statute or regulation and plaintiff alleges no such violation here.**

74 Fed. Cl. at 72-73 (emphasis added) ("Nor can the decision to resolicit, standing alone, possibly be construed as arbitrary."). In urging, "on the merits," that the NIH ethics evaluation should be set aside as being arbitrary, capricious, and without a rational or reasonable basis, see Pl. Br. at 17, CNAC repeats the same error as the plaintiff in Data Monitor. Whatever jurisdiction might exist to challenge a memorandum of legal advice to a contracting officer in district court, under Administrative Procedure Act standards, no such jurisdiction exists here.

At best, CNAC merely attempts to relitigate the denial of the invasive injunctive relief it sought in its first bid protest with respect to the 2007 RFP. But that solicitation is no longer pending, and, in any event, CNAC's claims with respect to that solicitation are either moot or are

plainly barred by uncontroversial principles of res judicata. See Dachman v. United States, 73 Fed. Cl. 508, 522 (2006) (noting that a final judgment on the merits bars further claims by parties based on the same cause of action).

CNAC's arguments with respect to standing – and the statutory requirement that CNAC be an "interested party" – fare no better. "To establish standing, interest in the specific procurement and capability to compete, cannot be inferred." Infrastructure Defense Technologies, LLC v. United States, -- Fed. Cl. --, 2008 WL 1047660, *12-13 (April 7, 2008) (discussing Myers Investigative & Security Svcs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002), and concluding that "[t]o have standing, a protestor must also establish it . . . could have performed the . . . services solicited"). CNAC appears largely to agree with our view of the standing requirements in a bid protest case, see Pl. Br. at 12-13,[1] but asserts that it is an "interested party" because "this Court has already determined that CNAC would have been awarded the Montgomery County Contract . . . ."

We readily conceded during CNAC's first bid protest that it had standing with respect to the 2007 procurement. The problem for CNAC in this bid protest is that CNAC has not submitted a proposal for the 2008 procurement; indeed, several of CNAC's factual allegations suggest that it cannot compete. For instance, CNAC argues that NIH's actions "have irreparably harmed CNAC's ability to compete for award under the 2008 RFP." Pl. Br. at 2. And, although CNAC originally "teamed with seven research institutions in the Baltimore-Washington area" in

[1] See also Pl. Mot. for P.I. at 5 (quoting Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996), and conceding that "[t]o establish prejudice, a protestor must show 'that there was a 'substantial chance' it would have received the contract award but for the alleged error'").

response to the 2007 RFP, id. at 4, CNAC now admits that it has lost team members, "making it very difficult for CNAC to prepare for or respond to the 2008 RFP." Id. at 10.[2]

Nor, in this case, is there any final agency action ripe for this Court's review. In that regard, CNAC agrees that it must challenge an agency action that is not "merely tentative" and that such "action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Id. at 15 (quoting NSK Ltd. v. United States, 510 F.3d 1375, 1385 (Fed. Cir. 2007)). CNAC asserts that the March 18, 2008 Ethics Memorandum – in concert with the March 19, 2008 contracting officer's letter – has "legal consequences." CNAC fails to explain how that is so, and, moreover, falsely alleges that the former "definitively states that Dr. Friedman is permanently barred from acting as PI for an NCS Study Center." Pl. Br. at 16. That is simply not the case. See Ethics Memorandum at 1 ("[W]e are documenting the legal analysis that informed our advice to you in connection with your determination that Sara Friedman, Ph.D., was ineligible . . . under the 2007 procurement."); id. at 12 n.17 (explaining that "it would be premature for us to opine definitively" upon "Dr. Friedman's participation . . . in relation to the fiscal year 2008 procurement").

Finally, we note that the Ethics Memorandum does not, and cannot, constitute agency action. Instead, a correct inquiry should focus on a contracting officer's decision to exclude

---

[2] Although we address in more detail below CNAC's request for a directed contract award, we suspect that CNAC likely is compelled to request such relief because it simply cannot compete for, let alone win, a contract award otherwise. See, e.g., Pl. Br. at 33 ("[E]ven if given the opportunity to re-compete for the Montgomery County Contract, CNAC will be unable to compete for that contract on a level playing field . . . ."); id. at 34 ("CNAC has been placed in the difficult position of having to identify and replace lost talent, on an extremely tight schedule.").

CNAC pursuant to FAR 1.602-2, had such a decision been issued with respect to the 2008 RFP. Because the contracting officer issued no such decision, however, and because CNAC's claim "'is premised upon'" any number of "'contingent future events that may occur as anticipated, or . . . not occur at all[,]'" CNAC's case is not ripe for judicial review. Bannum, Inc. v. United States, 56 Fed. Cl. 453, 462 (2003) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)).

CNAC notably does not contend that pursuing the agency's offer to consider additional facts or legal argument would be futile. Indeed, as we explained in our motion to dismiss, such an argument would require that CNAC conclusively demonstrate bad faith on the part of the agency. Def. Mot. at 22-23. Moreover, CNAC's reliance upon Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007), is misplaced. In Blue & Gold, the Federal Circuit was very explicit in its formulation of the case's primary holding: "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action . . . ." 492 F.3d at 1313 (emphasis added). Here, CNAC challenges no term of a pending solicitation, let alone a patent error in the solicitation.

## II. CNAC Fails To Acknowledge The Contracting Officer's Broad Discretion Under FAR 1.602-2 To Enforce 18 U.S.C. § 207 And, In Any Event, Cannot Demonstrate That The Agency's Ethics Memorandum Is Unreasonable Or Irrational

We agree generally with CNAC regarding the standard of review that should apply to the agency's Ethics Memorandum, assuming for the sake of argument, that it can be challenged in this Court. See Pl. Br. at 18. We note, however, that "[u]nder an arbitrary and capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable,

and supported by the facts." DSD Labs., Inc. v. United States, 46 Fed. Cl. 467, 471 (2000). In other words, "[s]o long as the relevant factors were considered and there was a rational basis for the decision, the agency's action will be upheld." Id.

In this case, CNAC takes issue with the agency's conclusions, but cannot demonstrate that they are irrational or unsupported by the facts. To the contrary, as we discussed in our motion, the agency's decision was eminently reasonable, particularly in light of: (1) the enormous discretion Congress has conferred upon agencies to enforce, administratively, Government ethics statutes; and (2) the Federal Circuit's decision in NKF Engineering, Inc. v. United States, 805 F.2d 372 (Fed. Cir. 1986). See also DSD Labs., 46 Fed. Cl. at 473 (discussing NKF and FAR 1.602-2). We need not repeat, however, all of the arguments made in our opening motion regarding those authorities; instead, we address below, in detail, only a few key points.

First, in CNAC's review of the Office of Government Ethics (OGE) Yucca Mountain opinion, see Pl. Br. at 21, CNAC acknowledges that, according to OGE, it is only "frequently" – but not always – "the case that successive contracts are viewed as being different particular matters." OGE Advisory Opinion 02 x 5 (July 31, 2002). Thus, CNAC must concede that successive contracts properly may be viewed as part of the same "particular matter" depending upon the circumstances. See also Comptroller General Letter to The Honorable John D. Dingell, B- 202893, 1987 WL 103044, *3 (Sept. 18, 1987) ("Construing the phrase 'particular matter involving specific parties' as covering a 'nucleus of operative facts,' the courts have declined to give this statutory language a narrow interpretation. United States v. Medico Industries, Inc., 784 F.2d 840, 843 (7th Cir.1986).").

In any event, CNAC misapprehends the agency's position in the Ethics Memorandum regarding the nature of the "particular matter" at issue. The Ethics Memorandum views either the NCS, as a whole, or the 2007 procurement, itself, as constituting a "particular matter involving specific parties." Ethics Memorandum at 9-12. The significance of the 2005 procurement is not that it, together with the 2007 procurement, constitutes a "particular matter involving specific parties." Rather, the point is that, as of the time of the 2005 procurement process, the agency already was aware of, and had identified specific parties to, future NCS procurements, including the 2007 RFP. Id. at 11 ("[E]ven if each contract awarded under the NCS were viewed as a separate matter from the NCS itself, the contracts awarded in 2007 would have become particular matters involving specific parties in 2005, prior to or during Dr. Friedman's service as the neuro and psychosocial development team leader."); see also OGE Informal Advisory Letter 99 x 23, 1999 WL 33305918, *2 (Dec. 6, 1999) ("With respect to contracts, a contract does not have to have been entered into, or even the request for proposals formulated, for a particular matter involving specific parties to exist.")

Second, CNAC's reliance, see Pl. Br. at 22-23, on the timing of NCS appropriations is misplaced. Indeed, CNAC provides no analysis for, and cites no authority in support of, the proposition that a matter must be funded for it to constitute a "particular matter involving specific parties." In truth, and as this Court pointed out, every Government procurement is subject to, or contingent upon the availability of funds, until an award is made. See April 9, 2008 Hearing Tr. at 6:24-25.

Third, CNAC misconstrues the agency's point concerning expressions of interest. See Pl. Br. at 25. CNAC contends that, under the agency's interpretation, "Dr. Friedman would not

be prohibited from working on the NCS if she simply had taken post-government employment with an employer in a state outside of the 'respective census regions' where there had been no 'early interest' expressed in 2005 . . . ." Id. The first problem with that statement is that the agency never opined that Dr. Friedman could not work in any capacity on the NCS, but only that she could not serve as a principal investigator for a study center. The other problem is that the Ethics Memorandum would not, in fact, make any distinctions regarding where Dr. Friedman worked. The key point here is that the agency received, in 2005, multiple expressions of interest in future study center contracts generally, some of which, notably – but not dispositively – were from contractors eligible to bid on the Montgomery County study center contract. Accordingly, at the time of Dr. Friedman's work on the protocol, the 2007 procurement already had become a particular matter involving specific parties.

Fourth, CNAC errs in relying upon "Example 2" in 5 C.F.R.§ 2637.201(c)(2). CNAC asserts, based upon that regulatory example, that "technical design can appropriately be considered a distinct matter from the ultimate matter involving specific parties." Pl. Br. at 26. That example, however, supports the agency's position here. The example discusses a case in which "[a] Government employee, who has worked for years on the design of a new satellite communications system, joins C Company." 5 C.F.R.§ 2637.201(c)(2). In such a case, the employee is permitted "to act as C Company's representative in connection with its anticipated proposals for the contract" to construct the new satellite system. Id. There is no indication in the example, however, that the Government contemplated any RFP when the employee was working on the design of the satellite system. Moreover, the example concludes that the satellite contract could become a particular matter involving specific parties once "indications of interest

therein by contracts were . . . received." Id. In Dr. Friedman's case, that occurred while she was employed at NIH and both before and during her work on the NCS.

Finally, plaintiff incorrectly asserts, see Pl. Br. at 28-30, that the agency ignored "exceptions" related to the communication of scientific and technical information. In fact, the Ethics Memorandum expressly indicates that only certain communications are problematic (e.g., those made with the intent to influence for the purpose of seeking a discretionary Government ruling, benefit, or approval or other action where there is an appreciable element of dispute). Ethics Memorandum at 13. Based upon consultations with senior program officials, the agency reasonably determined that the nature of certain of the communications and appearances that the study center principal investigators are, and will be, required to undertake, over the course of the 20+ year NCS, goes beyond merely providing scientific and technical information. Id. at 13-14.

Matters of budget, controversies regarding human subjects research – particularly where, as here, the research involves children – in addition to discussions regarding ethical issues that often arise in human subjects research, and attendant scientific and research decisions do not merely involve the conveyance of scientific and technical information and data. Discussions of these and other such issues related to planning and management are reasonably viewed as having an appreciable potential for dispute. In any event, the agency specifically addressed the inapplicability of the statutory scientific and technical information exception in Dr. Friedman's case. Id. at 14.

In arguing that the appearances and communications Dr. Friedman would make, if she were to serve as a principal investigator, would not implicate the statute, CNAC relies upon an example as an illustration of the application of 18 U.S.C. § 207(c), a post-employment restriction

that does not apply in Dr. Friedman's case, and a similar, but not identical, example set out as an example to the definition of "communication" for purposes of the statute in the proposed regulations. See Pl. Br. at 29-30. In so doing, CNAC fails to address the express limitations stated in the examples. In particular, these examples stand for the proposition that a former employee may communicate scientific and technical information in connection with a funding or award decision "so long as he does not argue for approval or funding of the application," in the case of one of the cited examples, and "provided that he does so [only] under circumstances indicating no intent to influence the Government," in the case of the other cited example. See 5 C.F.R. § 2635.205(g) and 68 Fed. Reg. at 7873 (Example 4 to proposed 5 C.F.R. § 2641.201(d)).

Moreover, each of the communications mentioned in the aforementioned examples, and cited by CNAC, are pre-decisional. That a former employee who is otherwise subject to the permanent post-employment restriction would not violate a particular statute merely by signing an assurance that he would be personally responsible for the research if an award is granted, or by responding to scientific questions about a proposal, does not mean that the former employee can therefore appear or communicate with the government about everything or anything. That is, even by the express terms of the examples, a former Government employee can violate the statute by communicating scientific or technical information in a context where there is an intent to influence Government action. Based upon the collaborative nature of the of the NCS – as evidenced, in part, by the role of the study center principal investigators as members of the NCS Steering Committee – the agency's decision to involve the principal investigators in future planning activities and data analysis and publication, and the experience of the NCS Director to date, the agency reasonably concluded that study center principal investigators will continue to

be involved, during the 20+ years of the NCS, in communications with agency officials regarding issues where there is likely to be a divergence of views and where the decisions of the Government will have financial and managerial implications for the study centers.

Ultimately, CNAC's challenge to the agency's Ethics Memorandum must fail because "OGE regulations assign agencies the primary responsibility for providing advice to former employees regarding post-employment restrictions. In particular, since an agency ethics official will undoubtedly be more familiar with agency programs and operations, OGE 'generally defers to the cognizant agency ethics official . . . .'" OGE Informal Advisory Letter 99 x 12, 1999 WL 33305905, *3 (April 29, 1999) (citing 5 C.F.R. §§ 2637.101(c)(8) and 2637.201(e), and quoting OGE Informal Advisory Letter 93 x 17). This Court should do the same where, as here, the Federal Circuit has held that a contracting officer's sensitivity to Government ethics statutes "is by no means irrational," see NKF, 805 F.2d at 377, and a heightened level of deference applies. See Def. Mot. at 28-29 (discussing contracting officer's "wide latitude" under FAR 1.602-2).

III. CNAC Is Not Entitled To, And This Court Cannot Order, A Directed Contract Award

Before turning to the cases CNAC cites in support of its request for this Court to direct NIH to award a contract to CNAC, we note that the fatal flaw in CNAC's position is that it has not submitted a proposal. Thus, even if this Court could direct a contract award to CNAC – without due regard for potential competing offerors – CNAC's failure to submit a proposal means that there currently is no basis upon which a contract could be awarded to it.

First, to the extent any harm suffered by CNAC is attributable to its failure to obtain the permanent injunction it sought during its first bid protest, CNAC cannot rely upon that harm now to justify the injunction it seeks. Yet, that is precisely what CNAC appears to do.

In any event, all of the cases cited by CNAC are readily distinguishable or inapposite. See Blue Cross and Blue Shield of Maryland Inc. v. United States, 718 F. Supp. 80, 89 (D.D.C. 1989) (in post-award bid protest, court remanded the case to the agency for reevaluation "rather than award the contract to [the protestor]"); Alfa Laval Separation, Inc. v. United States, 47 Fed. Cl. 305, 315 (2000) (explaining, in post-award bid protest, where there were only two offerors, "[t]he Federal Circuit's prejudice finding requires the granting of an injunction foreclosing further Navy purchases from intervenor under the subject contract"); PCI/RCI v. United States, 36 Fed. Cl. 761, 776 (1996) (noting that "the other offerors were not entitled to the award because plaintiff submitted the lowest responsive bid"); Bean Dredging Corp. v. United States, 19 Cl. Ct. 561 (1990) (plaintiffs were "the lowest responsive and responsible bidders" and challenged "the defendant's authority to cancel the [IFB]"); TRW Environmental Safety Systems, Inc. v. United States, 18 Cl. Ct. 33 (1989) (plaintiff was unsuccessful bidder and intervenor's contract tainted by conflict of interest); Mack Trucks, Inc. v. United States, 6 Cl. Ct. 68, 72 (1984) ("Plaintiff's was the lowest responsive bid and no other deficiencies have been suggested. Award of the contract to another, therefore would be inconsistent with [law and regulation]."); Essex Electro Engineers, Inc. v. United States, 3 Cl. Ct. 277, 288 (1983) (plaintiff was "the lowest responsive bidder").

Thus, in each of the foregoing cases, the successful plaintiff at least had submitted a bid or proposal. In contrast, CNAC has not done so here. Furthermore, in this case, even if CNAC were to submit a proposal in response to the 2008 RFP, the Court cannot circumvent the competitive process and prevent other offerors from submitting proposals for the Montgomery County, Maryland study center when such offerors are not presently before this Court, and have

committed no wrongdoing such that they effectively should be barred from the procurement themselves.

Finally, CNAC cannot rely upon the fact that it would have received an award under the 2007 RFP – but for the agency's ethics decision – to justify a directed award now. As explained above, the 2007 RFP is moot, CNAC did not receive the full injunctive relief it sought in its first bid protest, and cannot now use its standing in the 2007 procurement to argue for an award – without facing competition – in the 2008 procurement.

CONCLUSION

For the foregoing reasons, we respectfully request that this Court grant our motion to dismiss and, in the alternative, for judgment upon the administrative record.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

s/ Matthew H. Solomson
MATTHEW H. SOLOMSON
Trial Attorney, Commercial Litigation Branch
Civil Division, U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530
Tele: (202) 305-3274
Fax: (202) 514-8624

Attorneys for Defendant

Of Counsel:

Daniel Barry
Deputy Associate General Counsel
Procurement, Fiscal and Information Law
Office of the General Counsel
Department of Health and Human Services
330 Independence Avenue, S.W.
Washington, DC 20201

Gretchen H. Weaver
Senior NIH Ethics Counsel
Office of the General Counsel, Ethics Div.
Department of Health and Human Services

Dated: April 17, 2008

Certificate of Filing

I hereby certify that on this 21th day of April, 2008, a copy of "DEFENDANT'S RESPONSE TO PLAINTIFF'S BRIEF IN SUPPORT OF DECLARATORY AND INJUNCTIVE RELIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Matthew H. Solomson
MATTHEW H. SOLOMSON