# In the United States Court of Federal Claims

**No. 08-249C**
**Filed: April 30, 2008**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| **THE CNA CORPORATION,** | * | **Pre-Award Bid Protest; Post-Employment Restrictions, 18 U.S.C. § 207; Standing; Ripeness.** |
| **Plaintiff,** | * | |
| **v.** | * | |
| **UNITED STATES,** | * | |
| **Defendant.** | * | |
| * * * * * * * * * * * * * * | * | |

**Alex D. Tomaszczuk**, Pillsbury Winthrop Shaw Pittman LLP, McLean, Virgina, for the plaintiff. Of counsel, **Daniel S. Herzfeld**, Pillsbury Winthrop Shaw Pittman LLP, McLean, Virginia and **Caroline L. Plant**, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, California.

**Matthew H. Solomson**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were **Jeffrey S. Bucholtz**, Acting Assistant Attorney General, **Jeanne E. Davidson**, Director and **Deborah A. Bynum**, Assistant Director, Commercial Litigation Branch. Of counsel, **Daniel Barry** and **Gretchen H. Weaver**, Office of the General Counsel, Department of Health and Human Services, Washington, D.C.

## O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

Plaintiff CNA Corporation (hereafter, CNAC) filed the current pre-award bid protest, based on the United States Department of Health and Human Services (HHS) Request for Proposals No. NIH-NICHD-NCS-08-21E (2008 RFP), for the Montgomery County, Maryland Study Center location of the National Children's Study (NCS). The National Children's Study is a long-term study to assess the effect of environmental exposures on children's health and development from before birth to age 21. See Children's Health Act of 2000, Pub. L. No. 106-310, § 1004, 114 Stat. 1101, 1130-31 (2000). In 2005, the contract for the NCS Coordinating Center was awarded, along

with contracts for seven of the 105 projected study locations. In 2007, awards were made for 22 contracts. The 2008 solicitation projects awards of up to 58 more contracts. CNAC bid for one of the contracts for Montgomery County, Maryland in the 2007 solicitation and has indicated its interest to bid on the 2008 solicitation. HHS issued an ethics decision that CNAC's proposed Principal Investigator for the Montgomery County, Maryland Study Contract, Dr. Sarah L. Friedman, was barred from acting as a Principal Investigator on the 2007 contract (an earlier, very similar contract solicitation to the one at issue in the case currently before the court) due to the post-employment restrictions of 18 U.S.C. § 207 (2000) and her former government employment. The HHS ethics opinion also indicated that Dr. Friedman most likely would be barred from any future NCS contract as well.

The earlier, post-award protest (No. 07-858C), which will be referred to as CNAC I, was filed by CNAC when HHS refused to award an NCS study contract to CNAC pursuant to a 2007 solicitation. The HHS refusal was based on CNAC's proposal of Dr. Friedman as its Principal Investigator. After reviewing the record submitted, including an ethics opinion in the record regarding post-employment restrictions for Dr. Friedman in the earlier, 2007 bid protest, the court concluded that:

> [D]efendant acknowledged and the court concludes that, in rendering the adverse ethics decision on Dr. Sarah Friedman's proposed participation as plaintiff's Principal Investigator for the contract at issue, which is at the heart of this case, the agency did not provide the specific statutory basis for its decision; the agency did not consider the impact of the pertinent regulations and other pertinent matters before making its ethics decision; the agency did not provide a reasonable basis for its adverse ethics decision; the administrative record, compiled and submitted by the agency, is inadequate to have supported a full and complete ethics review of Dr. Friedman; and the agency did not afford plaintiff a meaningful opportunity to respond to its adverse ethics ruling. The court concludes that the agency's adverse ethics decision on Dr. Friedman's proposed participation in the contract at issue is arbitrary and without apparent rational basis.
>
> * * *
>
> [T]he weight of the admissions by defendant as to the inadequacy of the decision making process, the filed administrative record complied by the defendant and the absence in the filed record of sufficient indication or documentation to support proper administrative review, directs the court to a finding that the agency, NIH, acted arbitrarily and capriciously when it found Dr. Friedman ineligible to participate as the Principal Investigator in a contract award to the plaintiff. The agency conducted an inadequate review of the important ethics issues presented and failed to properly document even the minimal review steps it undertook.

CNA Corp. v. United States (CNAC I), No. 07-858C, Order at 1, 2-3 (Fed. Cl. Jan. 3, 2008).

In CNAC I, the court vacated the agency's initial, adverse ethics decision on Dr. Friedman, and directed the agency to conduct a reconsideration of its decision:

> Dr. Friedman, and plaintiff, deserve a properly conducted ethics review by the agency. The impact of the decision to bar Dr. Friedman from participation as plaintiff's Principal Investigator is especially compelling given statements made by government officials, and acknowledged by defendant's counsel and agency personnel in the hearings before the court, that plaintiff CNA Corporation had been recommended for an award for the Montgomery County [Maryland] study contract, pending only the issue of the eligibility of Dr. Friedman as plaintiff's Principal Investigator, given her previous employment at NIH.

CNAC I, No. 07-858C, Order at 3 (Fed. Cl. Jan. 3, 2008).

In response to the court's January 3, 2008 Order, the HHS contracting officer for the 2007 RFP, Elizabeth Osinski, in a March 19, 2008 letter to CNAC, reaffirmed her decision to exclude Dr. Friedman and, therefore, CNAC, from consideration for a 2007 study award. She added the following words with respect to the 2008 RFP for the National Children's Study:

> With respect to the forthcoming solicitation Reference-Number-NIH-NICHD–NCS-08-21 (2008 RFP), I advise you that the 2008 RFP does not materially differ from the 2007 RFP with respect to Dr. Friedman's eligibility under 18 U.S.C. § 207(a)(1) to serve as principal investigator. Accordingly, I would anticipate the same determination with respect to Dr. Friedman under the 2008 RFP as under the 2007 RFP.

The same day, March 19, 2008, that contracting officer Osinski issued her letter to CNAC on Dr. Friedman's post-employment restrictions, the 2008 RFP was issued, soliciting proposals for NCS Study Centers, including the one for Montgomery County, Maryland in which CNAC is interested.[1] Study proposals in response to the 2008 RFP are due at the agency May 2, 2008.

Ms. Osinski enclosed with her letter to CNAC a 15-page memorandum, dated March 18, 2008, from Edgar M. Swindell, the HHS Designated Agency Ethics Official, which concluded that, if Dr. Friedman made the "communications and appearances" to the agency expected of the Principal Investigator position, she would be in violation

[1] No study award for Montgomery County, Maryland was made pursuant to the 2007 RFP.

of 18 U.S.C. § 207. Mr. Swindell indicated that "given the same facts and absent significant changes in OGE's [Office of Government Ethics] interpretation, we would expect to reach the same conclusions regarding Dr. Friedman's participation in a particular matter involving specific parties in relation to the fiscal year 2008 procurement."

In the current bid protest regarding the 2008 contract solicitation, CNAC seeks to set aside the decision of the HHS contracting officer to exclude CNAC from the NCS procurement, based on the HHS ethics evaluation adverse to Dr. Friedman, and a permanent injunction prohibiting NIH from awarding the Montgomery County, Maryland study contract to any offeror other than CNAC, or a directed award of the Montgomery County Study Center to plaintiff. Defendant defends the merits of the HHS ethics decision and the exclusion of CNAC with Dr. Friedman as the Principal Investigator from the NCS as reasonable. Defendant also argues that CNAC has no standing to bring the protest and that the bid protest is not ripe for review by this court.

Dr. Friedman was employed for more than 15 years at the National Institute of Child Health and Human Development (NICHD), one of the National Institutes of Health (NIH) within HHS. Dr. Friedman left federal employment in March 2006, and joined CNAC on April 3, 2006.

In October 2005, an NICHD meeting was held to "kick off the neurodevelopment work" for the National Children's Study, with then government employee Dr. Friedman selected as the leader of one of the teams, the Neurodevelopmental Team. Contracting for portions of the National Children's Study had begun with a 2004 RFP, for certain Fiscal Year 2005 Study Centers.

At a December 12, 2005 Neurodevelopmental Team meeting, four Study Center Principal Investigators from 2005 NCS study contract awards joined the Neurodevelopmental Team led by Dr. Friedman. From October 2005 through February 2006, Dr. Friedman and her protocol team developed recommendations regarding the infant neurodevelopmental protocol and, on January 12, 2006, presented their recommendations to the NCS Steering Committee. The NCS Steering Committee was composed of NICHD officials and Study Center Principal Investigators. As noted above, Dr. Friedman left the agency shortly thereafter in March 2006.

The Director of the National Children's Study, Dr. Peter C. Scheidt, addressed his view of Dr. Friedman's federal government role in the NCS in a sworn declaration, submitted in support of the government's position in this protest action. Dr. Scheidt concurred in Dr. Friedman's role as described in the HHS Designated Agency Ethics Official's March 18, 2008 memorandum, and stated a requirement for interactions between NCS Program Officials, such as Dr. Scheidt with Study Center Principal Investigators, the role proposed for Dr. Friedman, on matters "relating to budget,

planning, design, management, and other matters of a controversial or sensitive nature . . . ."

CNAC acknowledges that Dr. Friedman, while working for NICHD, was the team leader of the group assisting in making recommendations for the infant neurodevelopmental protocol and social environmental measures for the National Children's Study:

> Her team met approximately 20 times between October 26, 2005 and February 15, 2006 to assist in developing the neurodevelopmental protocol. This team provided its recommendations via a 34-page power point presentation to the National Children's Study Director and to the Study's Steering Committee; the team had no authority to implement its recommendations and the Study Director and the Study's Steering Committee had no obligation to accept the recommendation. Some of the team's recommendations were accepted as part of the Study; some were not.

The March 18, 2008 memorandum of the HHS Designated Agency Ethics Official acknowledges that Dr. Friedman and her team were one of many such entities providing inputs to the National Children's Study: "The Program Office within the NICHD, the chartered federal advisory committee, 22 working groups comprised of over 200 scientists, and more than 2500 people interested in the design, conduct, and results of the NCS provided input during the planning phase." The government also admitted that the final protocols for the nationwide study are not yet firmly established. The government defends the post-employment exclusion of Dr. Friedman as Principal Investigator for CNAC from the National Children's Study because of her participation while an NICHD employee. Defendant also argues that CNAC does not have standing to bring a protest against the 2008 RFP for the NCS, and that this matter is not ripe for judicial review.

The plaintiff filed its complaint in this court on April 8, 2008. Because of the urgency, following a hearing the court issued a bench ruling shortly thereafter on April 25, 2008. This opinion incorporates the ruling in the court's earlier bench decision of April 25, 2008.

## DISCUSSION

### Standing

Defendant argues that CNAC has no standing to bring this protest. The court disagrees. The Tucker Act provides for bid protests based on any alleged violation of statute "in connection with a procurement or proposed procurement." 28 U.S.C. §

1491(b)(1). This is broad language. See RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope."). Defendant appears to argue that CNAC has identified no violation of statute or regulation, which, if true in this case, would insulate from judicial review even the most outrageous exclusions of prospective contractors, so long as based on the contracting officer's views of the post-employment legislation. For its part, plaintiff has properly submitted for judicial review its virtually certain exclusion from the current National Children's Study procurement, based on the agency's reading of 18 U.S.C. § 207. See also 48 C.F.R. § 3-104-2(b)(3) (the Federal Acquisition Regulation (FAR), in its section on Procurement Integrity, cites post-employment restrictions on prohibited conduct, and 18 U.S.C. § 207, 5 C.F.R. § 2637 and 5 C.F.R. § 2641).

To be an interested party, a plaintiff must be an "actual or prospective bidder[ ] or offeror[ ] whose direct economic interest would be affected by the award of the contract or by failure to award the contract . . . ." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.) (quoting Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001), cert. denied, 534 U.S. 1113 (2002)), reh'g and reh'g en banc denied (2003); see also Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); Infrastructure Def. Techs., LLC v. United States, Nos. 07-582C, et al., 2008 WL 1047660, at *9 (Fed. Cl. Mar. 14, 2008). CNAC was an actual offeror for the 2007 procurement, and it was represented to this court by defendant that, save for the ethics problem, CNAC would have been awarded a study contract for Montgomery County, Maryland. Even though CNAC has not yet submitted a proposal for the 2008 RFP, it is a prospective bidder. Plaintiff has indicated to the court that it plans to submit an offer for the 2008 contract, but has been advised by the contracting officer that it has the same, exclusionary, ethics problem on the 2008 procurement, which is not materially different from the 2007 procurement. The contracting officer and the agency designated ethics official in his March 18, 2008 ethics opinion, have both stated that the agency would anticipate or expect to reach the same adverse conclusions regarding Dr. Friedman's participation with CNAC for the 2008 procurement.

A CNAC Vice President, Stephen Broyhill, stated in an April 23, 2008 sworn declaration that, even though several members of the proposed 2007 NCS team are seeking other employment options, CNAC intends to submit a proposal pursuant to the 2008 RFP. See Rex Serv. Corp. v. United States, 448 F.3d at 1308 ("MCI [Telecommunications Corporation v. United States, 878 F.2d 362 (Fed. Cir. 1989)] held that 'in order to be eligible to protest, one who has not actually submitted an offer must be *expecting* to submit an offer prior to the closing date of the solicitation.' 878 F.2d at 365 (emphasis in original)."). Although defendant is skeptical, Mr. Broyhill indicates that, if necessary, team replacements are being identified, and CNAC expects to submit a strong proposal, including Dr. Friedman if she is eligible to be proposed as the Principal Investigator, for the 2008 RFP, as it did for the 2007 RFP.

Plaintiff also must demonstrate that it has been prejudiced. To demonstrate prejudice plaintiff must show there was a substantial chance it would have received the

contract award, but did not. Rex Serv. Corp. v. United States, 448 F.3d at 1308; Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States 175 F.3d 1365, 1367 (Fed. Cir. 1999); Infrastructure Def. Techs., LLC v. United States, 2008 WL 1047660, at *13. In the case before the court, the test is met by the government's acknowledgment that, save for Dr. Friedman's post-employment restrictions, CNAC would have received a study award under the 2007 RFP. With Dr. Friedman as the proposed Principal Investigator for 2008, CNAC has a substantial chance for a study award on the merits. CNAC, as a prospective bidder, with a substantial chance for award of a 2008 NCS study, is an interested party and has standing to bring this protest.

**Ripeness**

Defendant also argues that this protest is not ripe for judicial review, since plaintiff has not yet submitted a proposal pursuant to the 2008 RFP and Dr. Friedman has not yet been officially disqualified on the 2008 procurement. According to the defendant, there has been no final agency action for the court to review. The court disagrees.

Regarding ripeness, the United States Supreme Court has stated:

> The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy "ripe" for judicial resolution. Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967) (footnote omitted).

The agency's ethics decision is a final decision. It was rendered for the 2007 NCS procurement, but the defendant has advised that there are no material differences between the 2007 and 2008 NCS procurements. The contracting officer, as well as the designated ethics official, have indicated in writing that they "anticipate" and "expect" reaching the same conclusions regarding Dr. Friedman's participation on the 2008 procurement. Despite the use of hedge words by the agency officials such as "expect" and "anticipate," the agency's decision is a death blow to Dr. Friedman's role in a CNAC's proposal for the 2008 NCS procurement. It is not "merely tentative or interlocutory," and legal consequences flow from it. NSK Ltd. v. United States, 510 F.3d 1375, 1384-85 (Fed. Cir. 2007), reh'g and reh'g en banc denied (2008). In reality, Dr. Friedman has no chance to reverse the decision already issued twice.

The contracting officer and designated ethics official have indicated that, inasmuch as there are no material differences between the 2007 and 2008 procurements, the same ethics determination and same disqualification is "anticipated or expected." The agency disqualified plaintiff from the 2007 procurement, initially, based on little indicia. After the court's decision on the 2007 contract, the agency produced the March 18, 2008, 15-page HHS legal opinion, again disqualifying Dr. Friedman as a Principal Investigator, which was adopted by the contracting officer. The same disqualification result, for the third time, cannot be doubted regarding the 2008 procurement, which is virtually identical to the 2007 procurement. In the court's view, with Dr. Friedman as the proposed Principal Investigator the 2008 contract, disqualification of her role in a CNAC proposal is not only anticipated or expected, but is a foregone conclusion. Plaintiff has filed a timely protest before proposals are due, seeking an adjudication as to whether submitting its intended proposal would serve any useful purpose.

The court concludes that submitting a proposal at this stage, before the disqualification issue is addressed by the court, would be futile and serve no purpose. See Heck and Assocs., Inc. v. United States, 134 F.3d 1468, 1472 (Fed. Cir. 1998) ("[T]he futility exception simply serves 'to protect property owners from being required to submit *multiple* applications when the manner in which the first application *was rejected* makes it clear that no project will be approved.'" (quoting S. Pac. Transp. Co. v. City of Los Angeles, 922 F.2d 498, 504 (9th Cir. 1990) (emphasis added in original)); see also Beekwilder v. United States, 55 Fed. Cl. 54, 61 (2002). Futility often may be argued and seldom found by courts. Under the particular facts and circumstances of this case, however, requiring CNAC to submit a proposal before review of the contracting officer's all but certain disqualification of Dr. Friedman for the third time would serve no purpose. The hardship to CNAC of refusing to adjudicate the issue prior to submission of a proposal is to guarantee plaintiff certain rejection of their offer. The court finds that this matter is ripe for review and adjudication by the court.

**Particular Matters involving Specific Parties**

At issue is the permanent prohibition of section 207(a)(1):

> (1) **Permanent restrictions on representation on particular matters**.– Any person who is an officer or employee (including any special Government employee) of the executive branch of the United States (including any independent agency of the United States), or of the District of Columbia, and who, after the termination of his or her service or employment with the United States or the District of Columbia, knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of any department, agency, court, or court-martial of the United States or the District of Columbia, on behalf of any other person (except the United States or the District of Columbia) in connection with a particular matter–

(A) in which the United States or the District of Columbia is a party or has a direct and substantial interest,

(B) in which the person participated personally and substantially as such officer or employee, and

(C) which involved a specific party or specific parties at the time of such participation, shall be punished as provided in section 216[2] of this title.

18 U.S.C. § 207(a)(1).

The issue of "particular matters involving specific parties" is not always easy to fathom, and is made even more challenging by large, multi-year, multi-contract programs such as the National Children's Study. The HHS ethics opinion recognized this, in quoting an earlier OGE advisory opinion: "[W]hen the government pursues 'a multi-year, multi-phase, multi-contract procurement program, it is not always easy to determine what parts of the process may constitute a particular matter or matters involving specific parties and exactly when they do so.'" Analysis Development Demonstration, OGE Advisory Opinion 05 x 6 (Sept. 19, 2005).

The HHS ethics opinion identified as a "particular matter" the first NCS RFP. The RFP for the initial, NCS 2005 contracts was issued on November 16, 2004, and responsive proposals were received on February 16, 2005. The HHS opinion defined "specific parties" through the expressions of interest from prospective contractors on the 2004 solicitation. Thus, certainly by February 16, 2005, according to HHS, prospective contractors – specific parties – were identified to a particular matter, with the first NCS RFP/contracts or first expressions of interest in the 2005 solicitation. Dr. Friedman's first involvement with the NCS came later that same year, on October 26, 2006, the date of her first Neurodevelopmental Protocol Meeting.

The HHS analysis on "particular matters involving specific parties" may be appropriate for a traditional contract, but on a 20-plus year study such as the NCS, the result, if the "particular matters involving specific parties" were the only dispositive element of the test, would be a host of experts such as Dr. Friedman disqualified from offering their expertise at NCS Study Centers, literally for a generation. The HHS opinion also argued that, rather than looking at NCS as a monolithic entity, even if each NCS RFP/contract was considered to be a separate matter, contracts awarded in 2007 or to be awarded in 2008, still became particular matters involving specific parties in 2005, because that is when the contracting began and interest from prospective contractors, or specific parties, began. The open-ended terms of 18

[2] Section 216, titled Penalties and injunctions, provides for criminal punishment, including imprisonment and fine, civil fine, and enjoining a person from violating 18 U.S.C. § 207. 18 U.S.C. § 216 (2000).

U.S.C. § 207(a)(1), and the OGE guidance to date, may permit this broad definition of particular matters and specific parties, though Congress, and particularly a research organization such as NIH, arguably might not have intended or like the consequences of such a loss of expertise of former government employees at Study Centers, in this case, over the next 20-plus years. These elements, "particular matters involving specific parties", do not stand alone, and are not dispositive under the facts and circumstances presented.

**Participated "Personally and Substantially"**

For imposition of the post-employment restrictions, not only must there be "particular matters involving specific parties," discussed above, but also the former employee must have participated "personally and substantially" during federal employment in the matter, in this case the NCS. See 18 U.S.C. § 207(a)(1)(B). The application of the "particular matter" and "specific parties" standards of 18 U.S.C. §§ 207(a)(1) and (a)(1)(C) are used to determine the subject matter or parameters of the government work at issue and when the clock starts running. These two generic measurements are at issue regarding any participant or offeror in a projected government contract or project. The ethics decision with respect to a particular individual, however, cannot be reached without careful and individualized attention to the standard in 18 U.S.C. § 207(a)(1)(B) to determine whether the individual participant participated "personally and substantially" in the particular matter after the clock began to run. Application of these last two criteria is very personal and fact specific, in this case to Dr. Friedman.

OGE regulations provide that participating "personally" means participating directly, which Dr. Friedman did. See 5 C.F.R. 2637.201(d)(1). Participating "substantially" in a program of this size and scope is another matter. OGE regulations provide that substantially

> means that the employee's involvement must be of significance to the matter, or form a basis for a reasonable appearance of such significance. It requires more than official responsibility, knowledge, perfunctory involvement, or involvement on a administrative or peripheral issue. A finding of substantiality should be based not only on the effort devoted to a matter, but on the importance of the effort. While a series of peripheral involvements may be insubstantial, the single act of approving or participating in a critical step may be substantial.

5 C.F.R. § 2637.201(d)(1).

In a sworn declaration submitted to the court, the Director of the National Children's Study (NCS), Peter C. Scheidt, M.D., M.P.H., stated that he had reviewed, and concurred in, the factual portions of the March 18, 2008 HHS legal memorandum

which was adopted by HHS contracting officer Elizabeth Osinski. The HHS opinion notes that this 20-plus year study involves the National Institute of Child Health and Human Development (NICHD), the Centers for Disease Control and Prevention (CDC), the Environmental Protection Agency (EPA), and the National Institute of Environmental Health Sciences (NIEHS). An Interagency Coordinating Committee, 22 working groups comprised of over 200 scientists, and more than 2500 personnel provided inputs during the NCS planning phase alone. Dr. Friedman was one of these many participants. The study will involve approximately 100,000 children, from before birth through age 21. Data will be gathered from 105 Study Centers across the country. According to the HHS ethics opinion, data will be collected in accordance with standardized protocols, and the Study Centers will work with Project Officers and the NCS Coordinating Center "to determine and finalize the protocol(s), schedules and methods they will employ." The neurodevelopmental protocol on which Dr. Friedman's team submitted recommendations was only one of 21 protocols for the NCS. Moreover, as of this date, the study protocols have not yet been finalized and the agency represents they may evolve further.

Against this backdrop, the HHS ethics decision surveyed the minutes of Dr. Friedman's NCS Neurodevelopmental Protocol Team and counted 20 meetings over 76 business days, between October 26, 2005 and February 15, 2006. The first meeting was held on October 26, 2005. Dr. Friedman presented the recommendations of her team to the NCS Steering Committee on January 12, 2006 and Dr. Friedman left the agency shortly thereafter in March 2006. The last team meeting was held on February 15, 2006. The team started with six members, then added four Study Center Principal Investigators in December 2005. Dr. Friedman did not work alone on the single protocol, and her team's work was not dispositive. Some of the team's recommendations were accepted, some were not. As represented by the defendant, all of the protocols will receive further continued scrutiny and are subject to change before ultimate finalization. Thus, even those recommendations accepted by the Steering Committee were "drafts," and not final products. Nor does the record reflect any involvement on the part of Dr. Friedman outside the technical work on a single protocol. There is no indication of her involvement in an individual study or in any part of the contracting function. For that matter, Dr. Friedman left federal employment before either the 2007 or 2008 RFPs, in which plaintiff expressed interest, were issued. Moreover, the four months that Dr. Friedman worked on the protocol were not full-time, but part-time.

The court has considered the massive size, generational scope, number of participants, number of Study Centers, number of protocols and methods contained in this evolving, comprehensive National Children's Study, weighed against the part-time nature of the work of Dr. Friedman, the limited scope on which her team made recommendations for consideration by others, and that these were recommendations on a single protocol, which were part of on-going review by others before protocol finalization. The court finds, therefore, that Dr. Friedman's part-time work does not rise to the level of substantial participation in the NCS, in comparison, for example,

to another who might have been working full-time on the NCS, for a longer period of, and/or with decisional authority or responsibility. Essentially, in the language of 5 C.F.R 2637.201(d)(1), the facts and circumstances do not "form a basis for a reasonable appearance" of significance. More than "official responsibility" and more than scientific knowledge are required. See 5 C.F.R. 2637.201(d)(1). Under the statutory and OGE definitions, Dr. Friedman, though a team leader, did not even possess "official responsibility." The phrase is defined as "the direct administrative or operating authority, whether intermediate or final, and either exercisable alone or with others, and either personally or through subordinates, to approve, disapprove, or otherwise direct Government action." 18 U.S.C. § 202 (2000); 5 C.F.R. § 2637.202(b). Dr. Friedman did not have authority to approve, disapprove or direct government action. "Substantially" requires "more than official responsibility," 5 C.F.R. § 2637.201(d)(1). Dr. Friedman did not have official responsibility or any involvement in more than one out of 21 protocol development segments. Moreover, her role was limited to presenting recommendations on that one segment, with final decisions on the shape of even that one segment to be made at a later date after she left the agency.

Thus, it is not reasonable to conclude that the permanent restrictions of the section 207(a)(1) are activated under these facts and circumstances. Had the scope of the project been smaller and Dr. Friedman's involvement larger or different, the court's conclusion may have been otherwise, but the sheer massiveness and scope of the project, as well as Dr. Friedman's limited role, drive the court's fact-specific conclusion. The consequences of interpreting the statute and OGE regulations to conclude that Dr. Friedman and others in similarly limited roles should be permanently barred from offering their expertise on government projects is not the result intended by the statute or the regulations. This is not your standard "revolving door" in which a former government employee benefits from a program he or she has structured to benefit him or herself. Nor can the court see how Dr. Friedman's involvement in a contract awarded to plaintiff be viewed as appearing to be "detrimental to public confidence in the Government," the standard articulated in the "purpose and policy" section of the Ethics in Government Act enabling regulations. See 5 C.F.R. § 2637.101(c)(5). The same regulatory introduction goes on to state:

> Departments and agencies should avoid enforcement actions that . . . frustrate the Government's ability to employ the skilled persons who are needed to make the programs of the Federal Government succeed. Special attention should be given to the need to preserve the free flow of expertise, especially in scientific, technological and other technical areas, from private activities to the government.

5 C.F.R. § 2637.101(c)(6).

The court, therefore, concludes that Dr. Sarah Friedman's participation in the NCS Study while a government employee was not "substantial", based on the specific facts of the case presented to the court.

**Communication to and Appearance before the Government**

Regardless of the above conclusions regarding "particular matters involving specific parties," and "personal and substantial" participation, the focus of section 207(a)(1) is on representational activity, that is, communications to, or appearances before the federal government by a former employee with the intent to influence. See 18 U.S.C. § 207(a)(1). Communications with the government by former government employees with no "intent to influence" are not prohibited. See 5 C.F.R. § 2637.201(b)(5). OGE regulations also provide that there is no prohibition on a former government employee imparting purely factual information. See 5 C.F.R. § 2637.201(b)(5). The record suggest that the primary purpose of the NCS Study Centers is to collect and report factual data. Therefore, Dr. Friedman, and CNAC, should be able to collect and report study data, the stated purpose of the NCS contracts, without running afoul of permanent, post-employment prohibitions, should CNAC be awarded a study contract, even under the defendant's interpretation of those rules.

The Director of the NCS, Dr. Scheidt, however, indicated in his declaration that NCS government Program Officials, including himself, need to be able to fully interact with Principal Investigators over the more than 20 years of the study, on "matters relating to budget, planning, design, management, and other matters of a controversial or sensitive nature[.]"

Because the court found earlier that Dr. Friedman did not participate "substantially" in the NCS Project while she was a government employee, there would be no prohibition on her communications with the federal government on any topic, even on those Dr. Scheidt called "controversial" topics. But, even under the government's interpretation, Dr. Friedman should be free to enter into discussions on most, if not all, those controversial matters, including budget and management issues. These are issues on which Dr. Friedman had no previous role in the NCS Study, and which will not likely give CNAC or Dr. Friedman a competitive advantage, as opposed to the other contractors in the NCS, should CNAC be awarded a contract.

An example in the OGE regulations suggests that if such a different conversation should present itself, there are available solutions.

> A Government employee, who participated in writing the specifications of a contract awarded to Q Company for the design of certain education testing programs, joins Q Company and does work under the contract. She is asked to accompany a company vice-president to a meeting to state the results of a series of trial tests, and does so. No violation occurs when she provides

> the information to her former agency. During the meeting a dispute arises as to some terms of the contract, and she is called upon to support Q company's position. She may not do so. If she had reason to believe that the contractual dispute would be a subject of the meeting, she should not have attended.

5 C.F.R. § 2637.201(b)(5). In the above example, the former government employee was not prohibited from contact with the government, but directed to avoid taking an advocacy position for her company on a dispute on the terms of the contract on which she participated in writing the specifications.[3] In our case, at the point the Study Centers begin collecting data, the protocols, the scope of work, including the neurodevelopmental protocol Dr. Friedman's team worked on, will be set in order to ensure collection of uniformly comparable data. That will have occurred long after Dr. Friedman left NIH and without her input. Dr. Friedman's situation is far different from the above example. The scope of work or anything about the contract awards will not so easily be impacted by any one individual as in the example. If awarded a contract, CNAC would become one of the many scores of contractors on the NCS Study and could hardly have a major impact to its own benefit, even with input from Dr. Friedman, among many others.

**Contracting Officer's Discretion**

Defendant raises agency discretion in this matter, but that discretion is not unfettered, and with broad powers comes responsibility to act in a reasonable manner. As the court stated in CNAC I, in finding the record did not reflect that the earlier ethics decision was given the agency attention it warranted:

> Agency ethics reviews and decisions are mandated, and the final determinations are critical to both the agency and the individuals impacted by those decisions. Dr. Friedman, and plaintiff, deserve a properly conducted ethics review by the agency. The impact of the decision to bar Dr. Friedman from participation as plaintiff's Principal Investigator is especially compelling given statements made by government officials, and acknowledged by defendant's counsel and agency personnel in the hearings before the court, that plaintiff CNA Corporation had been recommended for an award for the Montgomery County study contract, pending only the issue of the eligibility of Dr. Friedman as plaintiff's Principal Investigator, given her previous employment at NIH.

CNA I, No. 07-858C, Order at 3 (Fed. Cl. Jan. 3, 2008).

---

[3] In the case currently before the court, although Dr. Friedman was involved in making recommendations for one out of 21 protocols, those recommendations were not all accepted, and according to the defendant, still are in a state of flux. It is a stretch to say that she wrote the contract specifications.

Defendant cites to NKF Engineering, Inc. v. United States, 805 F.2d 372 (Fed. Cir. 1986), in support of the contracting officer's discretion. However, such cases are fact specific. The Federal Circuit in NKF did not abandon, but rather reiterated that the agency must not act in an arbitrary and capricious manner, but in a reasonable manner, when rejecting a bid. Id. at 376. The Federal Circuit in NKF supported a contracting officer's decision to exclude a bidder in an appearance of a conflict of interest situation, and a strong appearance at that:

> Mr. Park [a former government employee] had been actively involved in the procurement process on RFP 4175 and, before the contract was awarded, took a job with one of the bidders. Then . . . NKF submitted the winning bid that included a price revision of 33 percent where no other offeror decreased its bid by more than 19 percent. Whether or not inside information was actually passed from Mr. Park to NKF, the appearance of impropriety was certainly enough for the CO [contracting officer] to make a rational decision to disqualify NKF.

NKF Eng'g, Inc. v. United States, 805 F.2d at 376. NKF involved source selection information, and a classic switching of sides which the ethics rules are designed to address. See 5 C.F.R. § 2637.101(c)(1). In contrast, in the present case, there is no evidence of Dr. Friedman's involvement in writing the 2005, 2007 or 2008 RFPs, or any other RFPs, no evidence of the abuse of source selection sensitive information, no evidence of impropriety, and not even the appearance of impropriety, much less the strong appearance of impropriety found in NKF. Dr. Friedman's team provided scientific/technical recommendations for others to review and choose portions from for inclusion in the final protocols. She now seeks to be part of a team to provide factual, scientific/technical information as part of one of the NCS Study Centers.

The OGE regulations are not insensitive to the movement of skilled professionals in government, to and from positions in the private sector:

> The provisions of 18 U.S.C. 207 do not, however, bar any former Government employee, regardless of rank, from employment with any private or public employer after Government service. Nor do they effectively bar employment even on a particular matter in which the former Government employee had major official involvement except in certain circumstances involving persons engaged in professional advocacy. Former Government employees may be fully active in high-level supervisory positions whether or not the work is funded by the United States and includes matters in which the employee was involved while employed by the Government. The statutory provisions are not intended to discourage the movement of skilled professionals in Government, to and from positions in industry, research institutions, law and accounting firms, universities and other major sources of expertise. Such a flow of skills can promote efficiency and communication between the Government and private activities, and it is essential to the

success of many Government programs. Instead, only certain acts which are detrimental to public confidence in the Government are prohibited.

5 C.F.R § 2637.101(c)(5).

The agency views NCS as a monolith, stretching 20 years and beyond into the future. Given the massiveness and the time line of this effort, it is unreasonable to be insensitive to the temporary, part-time, relatively small involvement of those who are not even involved, to any degree in the procurement end of the business, but who essentially provided, as part of a team, a small, draft, set of the scientific proposals for others to consider, reject, adopt, and modify over time. It also is unreasonable and not in keeping with the regulatory guidance to be insensitive to the nature of the NCS, which is the technical collection and reporting of factual, scientific data, as opposed to, for example, advocating and attempting to influence for marketing and business development purposes.

## CONCLUSION

For the foregoing reasons, the HHS contracting officer‘s decision to exclude plaintiff, based on the HHS ethics opinion, is determined to be arbitrary and unreasonable, and is hereby vacated. Defendant’s motions to dismiss and for judgment upon the administrative record are denied. Plaintiff may submit a proposal for the 2008 National Children’s Study RFP with Dr. Friedman as the Principal Investigator, and HHS shall not exclude her on the basis of the post-employment restrictions of 18 U.S.C. § 207(a)(1).

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**